**FILED - GR**
December 10, 2021 11:31 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW   SCANNED BY: KB / 12/13

(Rev. 11/2012)

**PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

1:21-cv-1047
**Ray Kent**
**U.S. Magistrate Judge**

| United States District Court | District |
|---|---|
| Name (under which you were convicted): Joshua Michael Salyers | Docket or Case No.: ~~16-004697-FC~~ |
| Place of Confinement: Oaks Correctional facility | Prisoner No.: 422144 |
| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody) |
| Joshua Michael Salyers    v. | Warden Burgess |
| The Attorney General of the State of: Dana Nessel | |

**PETITION**

1.  (a)  Name and location of court that entered the judgment of conviction you are challenging: Muskegon County Court 14th Judicial Circuit 990 Terrace St. Muskegon, MI 49442

    (b)  Criminal docket or case number: 16-004697-FC

2.  Date of judgment of conviction: September 22, ~~2018~~ 2017

3.  Identify all counts and crimes for which you were convicted and sentenced in this case: 1) MCL 750.316 - First Degree Premeditated Murder

4.  Length of sentence for each count or crime for which you were convicted in this case: 1) MCL 750.316 - Life without Parole

5.  (a)  What was your plea?
    - Not guilty ☒
    - Guilty ☐
    - Nolo contendere (no contest) ☐

(b) If you entered a guilty plea to one count or charge, and a not guilty plea to another count or charge, give details:

N/A

6. If you went to trial, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?  Yes ☒  No ☐

8. Did you file a direct appeal to the Michigan Court of Appeals from the judgment of conviction?  Yes ☒  No ☐

9. If you did appeal, answer the following:

   (a) Date you filed: May 29, 2018

   (b) Docket or case number: 341162

   (c) Result: Affirmed

   (d) Date of result: July 9, 2019

   (e) Grounds raised: The defendant-appellant was denied his right to a fair trial when he was handcuffed in the Courtroom in full view of the entire Jury and the trial court denied his motion for a mistrial.
   (Continued on extra sheets)

   **Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

   (g) Did you seek further review of the decision on appeal by the Michigan Supreme Court?  Yes ☒  No ☐

   If yes, answer the following:

   (1) Date you filed: August 15, 2019

   (2) Docket or case number: 160076

   (3) Result: Denied; "We are not persuaded that the questions

   (4) Date of result: March 3, 2020

pg. 2   Question 9(e)  (Continued)

II) Trial Counsel was ineffective for failing to object to the
Admission of a facebook post purportedly authored
by the defendant-appellant where the post was not
properly authenticated.

III) The trial court erred when it denied the defendant-
appellant's request that the jury be instructed on the
lesser included offense of Involuntary Manslaughter.

## Standard 4 Appeal

I) Defendant-Appellant was denied Constitutional Rights under
the 5th, 6th, and 14th Amendments due to ineffective assistance
of counsel throughout the pre-trial process and throughout the
four day trial

II) Defendant-Appellant was denied due process when trial court
erred by allowing inculpatory hearsay evidence and the exclusion
of exculpatory hearsay evidence by using an uneven application of
the Hearsay Rule.

III) Trial Court erred when it removed initial trial counsel off
Defendant-Appellant's case without his request, consent, or
Knowledge, violating the Constitutional Right to counsel of the
6th Amendment and infecting the entire trial mechanism
because the violation occurred before trial began.

Federal statutes        2(B)

IV) Defendant - Appellant was deprived of Due Process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony, evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in cross exam and closing arguments, and destroying evidence.

Federal Habeas          2(C)

(5) Grounds raised: I) Was the defendant- appellant denied his Right to a fair trial when he was handcuffed in the courtroom in full view of the entire jury and the trial court denied his motion for a mistrial? (Continued on extra sheet)

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(h) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐  No ☒

   If yes, answer the following:

   (1) Date you filed: _____

   (2) Docket or case number: _____

   (3) Result: _____

   (4) Date of result: _____

   (5) Grounds raised: _____

   _____

   _____

   _____

10. Did you file a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules with respect to the judgment of conviction and sentence? Yes ☐  No ☒

11. If your answer to 10 was "yes," give the following information:

   (a) (1) Date you filed: _____

      (2) Name of court: _____

      (3) Docket or case number: _____

      (4) Grounds raised: _____

      _____

      _____

      _____

      (5) Did you receive a hearing where evidence was given on your motion? Yes ☐  No ☐

      (6) Result: _____

      (6) Date of result: _____

   **Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

pg. 3    Question 9 (g)(5)

II) Did the trial court ERR when it denied the defendant-Appellant's Request that the jury be instructed on the lesser included offense of involuntary manslaughter?

III) Defendant-Appellant was denied Constitutional Rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four day trial.

IV) Trial Court ERRed when it Removed initial trial counsel off Defendant-Appellant's case without his Request, consent or knowledge, violating the Constitutional Right to counsel of the 6th Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

V) Defendant-Appellant was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony, evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in Cross-exam and closing arguments, and destroying evidence.

New Issue I) Did Petitioner suffer prejudice under Brady

Federal habeas     3 (B)

New Issue II)   Ineffective assistance of Appellate Counsel –
failure to investigate potential witnesses, failure to provide
defendant-appellant all Relevant documents to file a
successful standard 4 brief, failure to withdraw as
Requested, failure to Review the appeal with appellant
before submitting it, failure to properly communicate to
work this appeal, failure to investigate further than the
lower court transcripts.

(b)  If you sought further review of the decision in the Michigan Court of Appeals, please answer the following:

    (1)  Date you filed: _____

    (2)  Docket or case number: _____

    (3)  Result: _____

    (4)  Date of result: _____

    (5)  Grounds raised: _____

    _____

    _____

    _____

*N/A* (handwritten across items)

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(c)  If you sought further review of the decision in the Michigan Supreme Court, please answer the following:

    (1)  Date you filed: _____

    (2)  Docket or case number: _____

    (3)  Result: _____

    (4)  Date of result: _____

    (5)  Grounds raised: _____

    _____

    _____

    _____

*N/A* (handwritten across items)

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

12.  Other than a direct appeal or a m tion for relief from judgment, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?  Yes ☒  No ☐

13.  If your answer to 12 was "yes," give the following information: **[Attach additional sheets of paper, if necessary, to answer the following for each petition, application, or motion you filed.]**

    (a)  (1)  Date you filed: _12/13/18_

          (2)  Name of court: _U.S. District Court_

          (2)  Docket or case number: _Salyers v Medena  1/11/19   case# 1:18-CV-1371_

          (3)  Nature of the proceeding: _§1983  for Malicious Prosecution (to preserve evidence state was destroying.)_

(4) Grounds raised:  Malicious Prosecution : Wrongful Conviction.

_____

_____

_____

(5) Did you receive a hearing where evidence was given on your motion?  Yes ☐  No ☒

(6) Result:  Denied (due to status of the criminal case only)

(7) Date of result:  1/11/19

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(b) Did you appeal to the highest court having jurisdiction the result of action taken on any petition, application or motion?
Yes ☐  No ☒

If yes, please provide the following:

(1) Date you filed: _____

(2) Name of court: _____

(3) Result: _____

(4) Date of result and case number: _____

(5) Grounds raised: _____

_____

_____

_____

**Please submit, if available, a copy of any brief filed on your behalf and a copy of the decision by the court.**

(c) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

14. For this petition, state every ground on which you claim  that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

CAUTION:  To proceed in the federal court, you must ordinarily first exhaust your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** _See Attached Document_ pg 6 (B) — 6 (N)

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim.): _See Attached Document ; Letters_

(b) **Direct Appeal of Ground One**:

   (1)  If you appealed from the judgment of conviction, did you raise this issue?  Yes ☒  No ☐

   (2)  If you did not raise this issue in your direct appeal, explain why: _____

(c) **Post-Conviction Proceedings**:

   (1)  Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?  Yes ☒  No ☐

   (2)  If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: _____

Name and location of the court where the motion was filed: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

Date of result: _____

   (3)  Did you receive a hearing on your motion?  Yes ☐  No ☒

   (4)  Did you appeal from the denial of your motion?  Yes ☐  No ☒

   (5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  Yes ☐  No ☐

Ground One:

Issue (A)    Trial Court erred when it removed initial trial counsel off Defendant - Appellant's case without his request, consent or knowledge, violating the Constitutional Right to counsel of the 6th Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

Supporting Facts    On Sept. 20, 2016, I had been binded over for trial. Oct. 14, 2016, I was court-appointed Chad Catalino. On Nov. 29, 2016, I was ready for Court to be provided discovery materials. Officer's came to my door and told me I would not be attending Court today. On Dec. 16, 2016, I, again, was ready for Court. I was instead taken to a room to meet with my lawyer, Fred J. Lesica, who I thought and was expecting to be Chad Catalino. People v Johnson, 215 Mich App. 658. United States v Gonzalez-Lopez, 548 U.S. 140.

I had asked Fred J. Lesica where my lawyer is. He told me that the Trial Court, the Judge, removed Mr. Catalino and had forced him, an Estate attorney, to take my case. Included with this issue are numerous letters I had written to the Trial Judge, Timothy G. Hicks, and a letter to Benjiman Lee Medema, the prosecuting attorney, about this.

This is a situation where the trial court acted without a request by the defendant to remove his counsel and without defendant's consent to do so. The trial court's action was an arbitrary infringement on the right to the assistance of counsel and an interference with the attorney-client relationship.

This issue is, furthermore, serious because between the time that counsel was appointed, initially, and the time that the trial court improperly interfered, Barbara Ann Dailey was cremated before an independent review could be performed by a defense expert forensic pathologist.

Issue (B)

Trial Court further erred when, on Feb. 15, 2017, instead of holding a hearing to remove Fred J. Lesica, as the unwanted and Ineffective counsel, trial court gives the defendant legal advice. As Judge, Timothy G. Hicks, entered the courtroom and took a seat, he told me that he has received my several letters, that I need to trust my lawyer, as he's been doing this 20 plus years and knows what he's doing. He further tells me that he no longer wishes to receive anymore letters from me and that 95% of cases such as mine are handled via plea bargaining. Then, Court began regarding a motion I had no idea was filed for a forensic evaluation. The letters speak for themselves. A replacement of Counsel Hearing should have been held.

The Court has failed to provide me with all of my transcripts on the matter as well as others. See the attached letters to the Judge, the court clerk, and ineffective appellate counsel Melissa Krauskopf. For reference see State v Weddington, 179 A.3d 1028 (2018); Lopez v Stah. 420 M.d.18(2011), United States v Harrison, —— F.3d —— (CA8, 9-10-2020, WL 5414858).

Issue (C)

Judicial participation in legal advise undermines the fundamental fairness of the proceedings. 230 P.3d 726; United States v Tezling, 387 A2d 1101, 1105 (DC App. 1978); United States v Harrison, —— F.3d —— (CA8, 9-10-2020, WL 5414858)

Federal Habeas 6 (C)

Issue (D)  The Trial Court ERRED when it denied the defendant-appellant's Request that the jury be instructed on the lesser included offense of Involuntary manslaughter.

Supporting facts:

Ineffective counsel Fred J. Lesica argued with the Deputy medical examiner HIS version of what he claims to have happened because he refused to work close with me and investigate into anything Regarding my case and what I've told him had happened.

While counsel was, deliberately, destroying, or Redirecting, my case he did, however, get the Medical Examiner to admit that his theory is possible. So ~~clearly, under Retinson~~ ~~Retinson, 489 U.S. 278~~

So, clearly, under United States v Anderson, 201 F.3d 1145 the instruction for Involuntary Manslaughter must have been given: 'The failure to instruct on involuntary manslaughter was error if there was evidence in the record to support the theory that the killing was accidental:

"Even when the evidence is conflicting, if any construction of the evidence and testimony would Rationally support a ~~juries~~ jury's conclusion that the killing was unintentional or accidental, an involuntary manslaughter instruction must be given. When the defendant maintains that the killing was unintentional (In my case Fred Lesica says this was unintentional/accidental), the instruction is necessary even when there is also testimony by others that the defendant stated his intention to kill the deceased." Thomas v United States, 136 U.S. App. D.C. 222, 419 F.2d 1205-1206 (DC Cir. 1969)

Even in People v Jones, 419 Mich. 577  had Reversed the conviction due to the trial court's failure "to instruct on involuntary manslaughter as Requested by defense." Michigan Supreme Court,

Counsel, Fred Lesica, argued that this was a prolonged struggle where both of us were up and down and that that was the cause of the cuts and blunt force injuries. That I was only trying to get the knife away from her. Deputy M.E. agrees that if that scenario was to have happened than it is possible. Therefore, Involuntary Manslaughter must have been instructed as Requested.

Further Trial Court erred in its ruling on the motion to instruct on Involuntary Manslaughter because Trial Court was <u>NOT</u> the fact finder, the Jury was. The trial court denied the request, finding that a rational view of the evidence did not support Mr. Salyers's version of events.... (see page 18-19 of the Michigan Court of Appeals Appeal Brief of Appellant COA# 341162 and the trial transcript 9/22/2017 pg. 5 Line 11 - pg. 14 Line 25. Review People v Thomas Peterson COA# 344705 (9-10-20) Michigan Court of Appeals

Issue (3)  The Defendant-Appellant was denied his right to a fair trial when he was handcuffed in the Courtroom in full view of the entire Jury And the trial Court Denied his motion for a mistrial.

Supporting facts: Read pg 14 Argument One of Appeal brief of <u>Appellant</u> COA# 341162

It should also be noted that I was already fitted with an ankle device under my pants that'd shoot, "150,000 volts straight

Federal Habeas   6 (3)

up into your balls if you act out in any way or do not comply with our orders."

Also, the Court of Appeals provided its opinion based on its own unevidenced facts. Read pg 2 of its opinion on 7/9/2019 COA #341162 (I've underlined & starred them).

The shackling or handcuffing was not for public safety or to maintain order; 1) I was already strapped to a device that would "Ruin your manhood" from "150,000 volts of electricity" if I did anything to cause a problem and 2) Deputy Gilbert insisted on cuffing me even after I told him No that he can't cuff me infront of the Jury and I'm already wearing the device HE put on my Right ankle and had the Remote control to fry me. 3) No Record to support being handcuffed.

See People v Payne, 285 Mich App. 181
   In Re Pers. Restraint of Davis, 152 Wn. 2d 647
 * People v Dunn, 446 Mich 409 (contains no Record of evidence to support restraint).
 * Odell v Hudspeth, 189 F. 2d 300, 302 (1951) *


Issue(F) Trial court ERRED when it failed to suppress statements made during the interrogation.


On 9/5/2017 a hearing was held to suppress the statement given to the detectives. Offer of leniency to speak to whomever is over my case to provide a lighter sentence for my story if they feel I'm not likely to Re-offend. Deceit & improper influence when Detective Lukee tells me that this looks to have been an ATTEMPT to commit Suicide, as he already knew before the interrogation began that she died and they were investigating a "Homicide."

Federal Witness   6(F)

Read preliminary examination pg. 13 (9/20/16). Due to their deceit it led to a promise made: "Promise me that you won't take her children from her if I tell you what she had done?" They agreed. And they failed to notify me that I was a suspect for or being questioned for "Murder" or her death. They had led me to believe that she was still alive and "in good hands" yet they knew she passed away at the hospital at 8:01pm, 46 minutes after I called for medical attention. The interrogation did not begin until after 8:30pm, close to nine.

Had the trial court reviewed the video evidence, it'd have known that the statements were unconstitutionally received and that the statements must have been suppressed. The reason they were not suppressed I believe was due to there was "NO evidence collected or tested as the 'suspect confessed and had been lodged..." They needed this statement.

The interrogation gave the state an opportunity to concoct a theory based on 1) a misunderstanding and 2) based on a false theory and misrepresentation of particularly exculpatory evidence the state twisted and then destroyed. Further, had trial court read the Detective Luken's report it'd had seen that the promise was the reason a statement had been given when Detectives decided to be manipulative and unethical and asked a question that had nothing to do with what I was explaining, yet made it seem as if it was.

Review People v Jones, 416 Mich 354 Supreme Court of Michigan.

Federal Habeas 6(G)

"In determining whether a confession is voluntary, the test is whether the confession was extracted by any.... or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence."

This test has been applied by several recent Federal and State courts, which have found that confessions induced by promises of leniency are inadmissible. "A confession is no more reliable simply because the defendant begins the negotiating..." (Kavanagh, J.)  See also Rogers v Richmond, 365 U.S. 534, 540-541, 81 S.Ct. 735, 5 L Ed 2d 760 (1961).

Review Colorado v Spring, 479 U.S. 564. "the failure to notify the accused of the accusations against him is a violation of the 6th Amendment guaranteed him through the Constitution of the United States, to be notified of the accusations so that the accused may give an effective waiver of Constitutional Rights."

"An effective waiver must be voluntary, knowing and intelligent and the burden of proof is on the prosecution by a preponderance of the evidence." People v Daoud, 462 Mich 621, 634 (2000), People v Cheatham, 453 Mich 1, 27 (1996)

In State v Vincenty, 202 A.3d 1273 (N.J. 2019). The Court observed that the common law has granted individuals the "right against self-incrimination since colonial times" State v A.G.D., 835 A.2d 291 (N.J. 2003). "It is one of the most important protections of the Criminal Law" State v Presha, 748 A.2d 1108 (N.J. 2000). "But individuals may waive the Right. Presha. "However, law enforcement officers must

Federal Habeas  6 (H)

inform suspects of the right before getting a waiver." Miranda v Arizona, 384 U.S. 436 (1966). "A waiver must be knowing, intelligent, and voluntary." State v Reed, 627 A.2d 630 (N.J. 1993). "The State has the burden of proving beyond a reasonable doubt that the waiver was knowing, intelligent, and voluntary." Prshs. "If suspects are not informed of the charges pending against them, they necessarily lack critically important information to enable them to knowingly, intelligently, and voluntarily waive the right against self-incrimination." A.G.D.

"In such circumstances, the State cannot meet its burden of proof." A.G.D. "The police may inform the suspect of the charges before or after the Miranda warnings, but they must do so before obtaining any waiver." A.G.D. Read also People v Mathews 324 Mich App 416 (2018) (inadequate Miranda Recitation).

Regarding leniency being offered, it falls under People v Jones 416 Mich 354 and Rogers v Richmond 365 U.S. 534, 540-541

Regarding Deceit and Improper influence. Detective Luker Stated at preliminary examination that Barbara Daily died prior to the interrogation and that he knew this before the interrogation began. He stated later in future proceedings, I.e. Suppression hearing and trial, that he would not have notified me of the charges until this and toward the end of the interrogation or after and then again laughed it off stating he usually leaves it to the prosecution to inform suspects of the charges. So for Detective Luker to lie and say that this looks to have been an **Attempt** to commit suicide was improper influence and deceit that led to me asking

him to PROMISE ME that if I tell them what SHE had done, they would not take her children from her. They agreed so I began trying to explain what she had done and what I was trying to do to prevent her from further cutting herself, when out of no where one of them asked what I thought was said "How many more cuts, or additional cuts, did SHE make after the initial cuts?" I held up 2 fingers. I did not know they asked how many more cuts did You make after the initial cuts until the day of trial when I heard it on the Audio/video presented. I made no cuts to her neck, she made them. I thought we were talking about her.

Again, had this been reviewed at the Suppression hearing before trial court rendered its opinion of it being voluntarily made and there were no police misconduct, its Ruling of this voodad Suppression would have most likely been granted, instead it was DENIED!

Also, again, No Evidence was collected or tested. "I was advised that the lab would not be collecting the items or testing them as the suspect had confessed and been lodged." per Reporting Narrative Officer Phillip Dill.

The United States Supreme Court's decisions under the 14th Amendment have made clear, "Convictions following the admission into evidence of confessions which are involuntary, that is, the product of coercion, either physical or psychological,

Federal Habeas  6 (J)

cannot stand."

The Reason that involuntary confessions are not admissible was set forth by the Court in Rogen v Richmond, 365 U.S. 534, 540-541; 81 S.Ct. 735; 5 L. Ed. 2d 760 (1961)

"Our decisions under [the 14th] Amendment have made clear that convictions following ~~the~~ the admission into evidence of confessions which are involuntary cannot stand. This is so because the methods used to extract them offend an underlying principle in the enforcement of our criminal Law: that ours is an accusatorial and not an inquisitorial system-- a system in which the state must establish guilt by evidence independently and freely secured and may not, by coercion, prove its charge against an accused out of his own mouth."

What evidence they do have derives from the interrogation:1) A knife that tests positive for human blood. (A knife that was not used. It physically could not make the incised wounds described by the States Medical Expert. The blood on the knife is just trace evidence of the bloody butcher knife that rested on top of the 2 knives in the photograph. Where is the knife I described to the detectives? "long like a bread knife, shaped like a big steak knife."

2) My phone logs that include my facebook and facebook messaging as well as the phone text messages and call logs. (Evidence state manipulated and deleted after it gaebled what it wanted, destroying, they thought, the

exculpatory evidence and the proof they manipulated it. (It's why State Requested the untimely Motion in Limine just before it was Defenses turn to present its case.) (The Court Orders: <u>Motions in limine must be heard at least 7 days before Trial.</u>)

<u>Motion in Limine</u>

"to exclude potential evidence that I can see the defendant or defense attorney trying to introduce in this case. And that would be contents of the defendants phones and conversations from that phone, any statements defendant made to somebody in that phone conversation or any statements made to the defendant are very classic example of hearsay that I know of no exception that would allow the introduction of that evidence."

— (However, State used exactly what it denied me to use as everything on Facebook derived from my phone. Including the succidal post written State used erroneously to prove its Knowingly false theory of premeditation Murder. (Prosecutions opposing briefs are clear proof they know of information that shows they are wrong and I was telling the truth).

Therefore, without this "Confession" evidence, and all the evidence derived from this interrogation (fruit from the poisonous tree) there would most likely not been a case against me or, if there was a case, most likely there'd have been a much different outcome. Trial Court

Federal Habeas    6 (L)

erred by denying the motion to suppress especially before it Reviewed the Recording and the detectives Report stating there were promises and such.

Also, please, note that Judge Hicks (trial court) had cut off Fred J. Lesica during his argument on page 41 line 3-7. And during Selection of the jury on Trial Tran. 9/19/17 pg 35 line 17 Trial Court erred in it questioning STATEMENT.  No evidence has yet been presented to determine whether or not anything is a FACT! He's giving jurors his personal thoughts of the case on what is Fact and not.

Fact - "Something that actually exists; an aspect of Reality. Facts include ... States of mind ... intentions... and the HOLDING of OPINIONS. An evil deed; a crime.  It is any act or condition of things assumed as happening or existing." Textbook of the Law of Evidence 7 (1935)

This case has no facts other than we see in Court to determine what is Fact (truth) and not fact through trial proceedings yet the Judge has already begun saying there are facts already! He's not the body to determine what is fact, the jury is and he's telling them "were the Facts gruesome like this? Like what?

Where was the Fact-Finding process to determine this "fact" he has gave inference to the jury as fact (truth) already?

See fact-finding and fact-in-evidence.

Again, on pg 36, another juror excused for this "fact"

Federal Habeas  6(m)

that has yet to be determined to be fact (Truth).

Why are the Jurors already assuming Barbara had been brutally Murdered like this one's cousin's case and this one's Sister-in-law?

On pg 40 he suggests, on line 25 - pg 41 line 1, that Barbara was <u>killed</u> by somebody.

Federal Habeas    6 (N)

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available) : _____

_____

Date of result: _____

(d) **Other Remedies**:  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have
used to exhaust your state remedies on Ground One: _____

_____ Michigan Supreme Court _____

_____

(e) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

**GROUND TWO**: ___ See pg 7 (b) — ~~P(mmmm)~~ 7(NNNNNN) ___

_____

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim): _____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground Two**:

(1)  If you appealed from the judgment of conviction, did you raise this issue?  Yes ☒ No ☐

(2)  If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

Ground Two:

Defendant - Appellant was denied Constitutional Rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four day trial.

Supporting Facts:

On 9/5/2017, Counsel failed to subject the state's case to deny Suppression to meaningful adversarial testing:

On 9/4/2016, Per Report, I was found in the home weeping and crying, kneeling over Dailey. I was very emotional and unable to follow questioning well. I was asked to go with an officer to the police station and, supposedly, went voluntarily.

When at the police station I was held there nearly an hour before Detectives Luker and Stratton spoke with me, then asked if I'd speak with them in their office. When brought into the "office", I was under questioning by Detectives. They offered to speak to whomever was going to be over my case about being lighter on sentencing if I tell them "my story." When they read me my rights, they did not inform me of the pending charges or complaint against me before obtaining any waiver against self-incrimination. After a while, and not getting what they wanted, they tell me that this "looks to have been an Attempt to Commit Suicide." So I, then, ask them to promise me that they will not take her children from her if I tell them what she had done. They agreed. After getting put in the back of the transport vehicle I was, then, notified that Barbara Dailey had passed away. Per Andersons report, I cried uncontrollably.

Federal Habeas

On 9/20/2016, Detective Lukee admitted to knowing that Dailey had died _before_ the interrogation began, and that he was aware that he was investigating a "homicide." (Preliminary Exam)

Trial Counsel, Fred J. Lesica, failed to present Anderson and Smith as defense witnesses regarding my state of mind before and after the interrogation and failed to present the recorded video evidence of the patrol vehicle of Anderson's and of the recorded Interrogation where <u>offer of leniency</u>, <u>failure to obtain a valid waiver of Rights against self-incrimination and the Right of an attorney</u>, <u>improper influence & deceit</u>, and a <u>promise made</u>. (Suppression hearing)

Per Report, No evidence had been collected or tested as the suspect confessed and had been lodged on the charge of "Open Murder." There is actually <u>Not</u> a true confession.

Note:

Review of my Supplement 4 brief to Court of Appeals on the bottom of page 8 and top of page 9, you'll see that the Court of Appeals failed to read the issue; Page 4 of Case #341162 7/9/2019. I was not asking to suppress statements made to Anderson and Smith. I wanted them as witnesses along with the videos of the interrogation and the cruiser played at the hearing. Had they been called as witnesses and the videos been played the suppression would have had to been Granted.

When I was told that this looked <u>to have been an Attempt to Commit Suicide</u>, I asked them to <u>promise not to take her girls from her if I tell them what she had done</u>. They agreed.

While I was trying to explain, and make sense of it all in my own head, Det. Luken asked me "How many more cuts did you make after the initial cuts?" I held up 2 fingers; I thought he had asked me how many more cuts did SHE make after the initial cuts? I didn't make any cuts to her neck and was explaining what SHE had done. Why else would I need them to promise not to take her children from her? (Interrogation)

↓ (McMann v Richardson, 397 U.S. 759, 771; 90 S.Ct 1441) ↓

Instead of doing his job, properly, Lesica told me to just tell the court that I "do not remember". So, according to the legal advice given to me by the Judge in Ground One of this Habeas, I did what I was told; "Trust your lawyer. He's a good lawyer and knows what he's doing." (Motion Suppression Hearing). 2/15/17

─────────────────────────────

12/16/16  Fred J. Lesica, upon meeting me the first day, asked me what in God's name would possess you to nearly decapitate the head of your girlfriend? When I told him I didn't do it, that she did it to herself, he told me it didn't matter because the State will get their conviction regardless. He told me that he cannot afford a defense expert and that the Court will not appoint one to me. He said it was pointless to try anyways because while trial court removed my counsel, Barbara Dailey was being cremated so there is no body to examine. I told him that he is telling me that the state is claiming my post is about murder because Barbara Dailey was cut exactly 4 times, but that is false and I can prove both but it is MY word against the States, how do you expect me to be believed unless

Federal Habeas   -7-(d)

we have an expert to prove that that 1) the post is actually
about me thinking of Suicide and 2) that the Autopsy Report
is manipulated as it only bulletins 4 of 6 incisions; leaves
off the record the 2 cigar burns on her chest, the past incision
scars on her upper inner thighs, the incision scars on the armpits
under both arms, the new scar on the right side neck and the stab/
pricking scars on the bottom of her right foot; it fails to document
the depths of the incisions; and it doesn't describe Barbara Ann
Dailey's physical discription. Included in the Autopsy Report is information
regarding a Tania Lynn Sweets. Who is she? What does she look like?
How'd she die? Most importantly what color hair does she have? What's
her weight, eye color, and height?    Barbara had dishwater
blonde hair that I dyed purple on 9/2/16. We had weighed ourselves
just that day as we always do when we go walking; she weighed 110.72
pounds; I'm 5'6"; she was a little over an inch shorter. Barbara's eyes
were Blue.    The report says Brown hair, 134 lbs., 66 inches tall, and
hazel eyes. That is NOT Barbara Ann Dailey. ~~Had Fred~~

    Had counsel got me defense expert to do his/her forensic
pathology duties it would have provided the correct information
detailing all the scars on Dailey's body proving she is a cutter,
proving these wounds are not significantly deep in of themselves, that
there were 6 incisions and that the contusion/blunt force trauma
she had was not due to being beat and was not a factor that caused
death.    In other words, appointed expert could very well have
contradicted the State's Deputy Medical Examiner's testimony and Report.
The report was not even put into evidence to impeach state's witness
as the claims are that all the incisons caused damage to the muscles, yet

the report actually proves otherwise. The state's claims was that Dailey was cut exactly four times, again, the report proves otherwise.

Counsel's failure is ERROR and it cannot be sound trial strategy because the State's Medical Expert is the chief witness that Led to a conviction through false testimony. Such error greatly prejudiced me from presenting MY defense.

Also on 12/16/16 I showed him the ERROR of the time on the police report of the surveillance footage. It leaves out of the report the time we first met up at 5pm or so because on that video, and comparing it to the time I called her at 5:01pm in front of the house with the cameras, you would know the EXACT time difference so that it could be seen I could not have done what I was accused of. I already knew that when I got a message from Stephanie Ann the time was 7:03:04 pm. Why I remembered that I don't know. I asked Lesica for my call, facebook, text log. He told me there wasn't one. He LIED! So lets look at the ~~error~~ ERRED time and its implications:

CH7 - 7:06:14     Both walking North in Alley.

CH1 - 7:07:12     Both walking along South side of 1432 Jirach to the front of the house.

CH1 - 7:07:26     Both of them walk onto porch and go inside.

Her phone Outgoing call to: "My Husband" 405-747-0680 (me) at 7:11pm

CH 7 - 7:14:48   He is walking South in the Alley.

my call to 9-1-1 at 7:15:51 pm

CH4 - 7:12:22   He's walking West on Northside of Grand, then turns

7 (f)

Federal Habeas

North on eastside of Jieoch.

CH7 - 7:17:48   He's walking north on eastside Jieoch
CH2 - 7:17:53   "                                          "
CH1 - 7:17:58   "                                          "
CH1 - 7:18:16   He goes onto the porch and inside.
CH1 - 7:20:15   He goes outside and stands at edge of stairs
CH1 - 7:20:37   He goes inside
CH1 - 7:20:49   He goes outside into the yard and by the sidewalk
CH1 - 7:21:20   He goes to the steps and sits down on them
CH1 - 7:22:31   He goes inside
CH1 - 7:25:29   First officer is heading west on Irwin and turns South on Jieoch
CH1 - 7:25:52   First officer enters house.

As this will show, as presented by the State, is that Barbara Dailey and I go into the house together and, after 3 minutes, a call is made from her phone to mine while I'm still there with her. Then, after being in the house with her 6 minutes and 10 seconds, I'm seen in the Alley alone leaving. Then, before Returning to the house I called 9-1-1. The call lasts about 3 minutes before my phone died. Which means that everything else the camera shows makes me look as if I don't care about Barbara's well-being. What it says is that I knew before I left that Barbara was hurt and in need of medical attention as it shows I called 9-1-1 after leaving but <u>before</u> Returning. Why? Did I Kill her? Then call my phone from hers? Leave and call 9-1-1 as I was coming back for what Reason?

Federal Habeas          7(g)

As presented, of course, I'd be found guilty.

Now, the 7:03:04 message from Stephanie was Received while in the backyard petting the dog and walking to the front.

It'd take only about 5 seconds to walk from the backyard gate to where it shows us at 7:07:12. Subtracting 7:03:04 from 7:07:12 is 4 minutes & 8 seconds plus the 5 seconds makes <u>4 minutes and 13 seconds.</u> So 7:07:12 would be 7:03:13. Now take the 4 minutes and 8 seconds and subtract it from all the Surveillance times except CH4's 7:12:22. This is the most correct time without the footage from 5pm that State suppressed:

CH7 — 7:02:06    Both walking North in Alley
CH1 — 7:03:13    Both walking along south side of 1432 Jiroch to the front of the house
CH1 — 7:03:18    Both go onto porch and inside
CH7 — 7:10:40    He is walking South in Alley
Barbara Dailey Calls me at 7:11 (after being there with her for 6 min 10 seconds)
CH4 — 7:12:22    He is "running" west on N side Grand then turns N on E side Jiroch
CH7 — 7:13:40    He is "running" N on Jiroch
CH2 — 7:13:45    He is "running" N on Jiroch (Pro Med Ambulance passes by)
CH1 — 7:13:50    He is "running" N on Jiroch (Sees woman across the street about to leave)
CH1 — 7:14:08    He goes onto porch and inside (leaving door open)
CH1 — 7:16:07    He goes outside and stands at edge of stairs (waves left for the Pro-Med Ambulance)
CH1 — 7:16:29    He goes inside
CH1 — 7:16:41    He goes outside into the yard and by the sidewalk (again, looking left for Pro-Med Ambulance)

I
911 call at
7:15:51

Federal Habeas        7 (h)

CH1 — 7:17:12  He goes to the steps and sits down on them (911 asked me to calm down.)

CH1 — 7:18:23  He goes inside (To do as 911 had advised for me to do. I kept her alive)

CH1 — 7:21:21  First officer is heading west on Irwin then turns south on Jireoch

CH — 7:21:44  First officer enters the house.

Clearly, the differences in the times make a significant different story than the one the State speculated to at during Trial. Thereby misleading the Jury.

Fred Lesica told me that he'd make the prosecutor aware of this issue as well as the Autopsy Report ERRORS and see what he wants to do about it. Counsel's failure to make sure of the corrections before Trial began fell short of due diligence, competence and effective assistance. This error prejudiced me as the more correct time proves I could <u>not</u> have time to beat her, throw her around, choke her after cutting her, not 4 times but, 6 times all while she's "fighting for her life" as both State and <u>defense counsel</u> claims. Then stand there a minute before calling 9-1-1 as some Jailhouse liar claims I told him. Counsel failed to object to this footage's use until properly corrected by comparing the call at 5:01 and the time of the footage when I called her to tell her I was there <u>across</u> the street. (Daniel DeYoung claims I was never on that side of the street. He LIED).

Also, on 12/16/16, the Lesica told me that the Butcher Knife that was found in the sink, bloody, was destroyed and in its place a small steak knife that tested positive for human blood was preserved as evidence. When I asked him to have

the evidence all tested for blood spatter on my shirt, and
my necklace, and have the steak knife printed to prove
that there are prints on the knife but none of them would
be of Barbara's or mine. he told me the court would not
provide the funds to do that and he couldn't afford it either.

Counsel's failure to test the collected evidence is error
and prejudice can be had as the state claims it's the knife
used and because it had been "wiped off" what would testing that
knife prove? It'd prove that there are prints and that that steak
knife could NOT have physically caused that 12 cm incised wound
as the State claims. (Read Criminal law Dishback P 16.21)

"...... A large sharp object could make one clean cut 4
inches long and an inch deep...." (12cm is 4 ¾ inches long).

On 12/16/16, I asked Lesica for the rest of my discovery
so I could work my own case because I don't trust him and
I don't want him as an attorney. He told me he only has what
I have plus the videos, photographs of the scene and Autopsy. I
asked him to provide me with a transcript of the interrogation,
the police transport's camera and the full account of the
surveillance footage from 4:50 pm until she was taken to the
hospital, as well as all the photos he has, medical treatment notes
of the E.M.Ts and Hospital personnel and I want her medical
records, both physical and psychological. He said there are
no medical records in the discovery but he'd get me everything
else. I told him to get off my case and get me Chad Catalino

back; My initial trial counsel. I didn't hear from him again until 2/15/17 for a psychological evaluation motion to determine criminal Responsibility. I never asked for that to be filed. You can see that just from the transcripts when the judge asked him if he needed to talk to me because of the surprise on my face, I guess. Jesica lied to me and told me that it would be used to help get the suppression granted and that it will NOT affect the 180 speedy trial. So because of TRIAL COURT giving me that LEGAL ADVICE to "trust your lawyer ... knows what he's doing..." I told him fine so long as it doesn't affect my speedy trial. I never got anything more in my discovery than I already had: Police Report and Autopsy Report and Preliminary Exam transcripts.

Jesica did not take no calls from me or keep me updated about anything he was doing. I didn't see him again until 5/31/17 after he underwent the surgery he was saying about on 12/16/16 when he was popping pain killers and saying he may also have cancer and doesn't think he'll live through to the end of my case. Again, I was not taken to court that day either. I gave him cases to file the suppression motion and he said he'd get it done. He lied.

On July 14th 2017, he came to see me. He smelled of alcohol and he had more pain killers on him. even offered me one. He gave me a copy of the motion, and it's not with the cases I provided him. People v Jones, 416 Mich 354; Roger v Richmond, 365 U.S. 534, 540-541; 81 S.Ct. 735; 5 L Ed 2d 760 (1961).

I told him to redo it. Instead, he decided to add more issues: Motion to Dismiss and Motion to charge reduction. He still failed to file it the way I asked him to. (8/22/17).

9/5/2017 is already discussed at the beginning of Ground two. He also failed to challenge post-Miranda statements see People v Mathews 324 Mich App 416 (2018)

### First day of Trial 9/19/17: Jury Selection

Before entering the courtroom Fred J. Lesica came to speak with me leaving my case defense notes & questions in the chair he was sitting in reading them. When I told him to go get my notes and questions to go over them he could not "find" them. For 30 minutes he "lost" them then "finds" them where he left them in the same chair. We didn't get to discuss anything about my defense.

During Jury Selection I had told Lesica not to allow some of those on the jury to remain. He allowed them to stay. The ones I asked him to keep, he got kicked off the jury. Also during Jury Selection, I had pointed out the fact that the prosecutor deliberately lifted a photo of Barbara's cut neck and bruised face so that the jury could see it. Fred Lesica was told to have that entire jury selection pool to be cleared and a new one put in. He refused to do that and told me to use it on my appeal. The jury were biased or prejudicial and at the end of day One proves it. A JUROR

Requested to be Removed.

Lesica failed to object to playing the involuntary "confession" and not having an official transcript of it so that it can be clearly read that leniency was offered, promises made, deceit & improper influence and that the waiver against self-incrimination is <u>NOT</u> valid as they failed to notify the suspect of the accusation <u>before</u> obtaining the waiver. It wasn't until the next day I had been told I was being charged with Murder. Trial Tran. 9/19/17 pg 4

Trial Tran. 9/19/17 pg-8
    Lesica has no idea what he is arguing. My defense is that she cut herself and as the judge said from his presiding over motions I was only trying to prevent her from killing herself with the knife.
    Lesica says "that is partially correct, yes."
His argument is Redundant and contradicting of <u>MY</u> defense.

    Trial:
    Lesica failed to impeach and point out false information that had been presented or elicited from the following witnesses:

Trial Tran 9/19/17 pg 141
    1) Sarah Girardinelli is <u>NOT</u> the stepmother of Barbara's oldest daughter.
    2) Sarah and Barbara are <u>NOT</u> friends (Texts and facebook messages would have shown this).
    3) It was Becky Arends' suggestion Barbara move in because

Federal Habees      7 (m)

Barbara's oldest daughter is Becky's granddaughter. Sarah was asking me in facebook messages to leave Barbara and help her get Barbara kicked out. (Lesica has failed to obtain these documents from either the prosecutor or facebook or from my phone).

4) I'm not from California

5) Barbara was carried out covered in white sheets with an oxygen mask over her face. The word Body suggests NO life remained.

6) Sarah says that Barbara wasn't covered and that it's not correct that she was unable to observe potential injuries.

* 7) Lesica again has NO idea what his arguing with Sarah. (a) Sarah and I were never together and (b) there are no son/stepson.

8) I had asked Lesica to get Sarah to explain the issues as to why she and everybody else wanted Barbara to be out of the house. Sarah lied earlier because I was <u>NOT</u> living there at the time of the incident. This is relevant because these issues that they had said were between Barbara and I were in fact issues they, in the home, had with Barbara, not me. I was the only one that was helping Barbara which is why I was forced to leave or even Barbara and her youngest 2 daughters had no place to live.     9/19/17 pg. 158

9) Lesica refused to ask who the people were that I told to stay away from my girl (Barbara). That was relevant to show that those I ordered to stay away were pill poppin drug dealing low lifers that kept getting her involved in deals and using. I didn't control her. I handled her drug problem.

10) Those in the home forced Barbara to quit the job I helped her

Federal Habeas          7 (N)

get because they were using her as a house slave and for her
E.B.T (Food stamps) & W.I.C.

Lesica provably shown that he did NOT come to
court prepared. He asked no questions I'd asked of him to
ask and refused to present anything to prove she lied about
the various things said.

Trial Tran 9/19/17  pg 160  Daniel DeYoung

1) Daniel DeYoung lied about seeing Barbara and I walking up Jiroch North
~~and back to his car~~ and into the house.  pg.165 & pg.166
2) He could not have been outside the house 15 minutes before going in
and then seeing me in the alley walking south alone, 20 to 25
minutes later.
3) I never looked up at him and have a look in my eyes as a
deer caught in headlights. pg 168
4) pg. 172  Again he lies and says he seen Barb and I walking
down the street and going into the house.
5) Clearly, DeYoung had lied because he says he doesn't see me
come out on my own yet he was on his porch until police
and emergency arrived. pg. 175
6) The witnesses testimony does not fairly & accurately represent
what the video shows and yet it was still admitted
and Lesica refused to object to its use for (a) the reasons
above and (b) the time stamps are ALL incorrect.
7) Lesica's failure to use the police report to impeach DeYoung and

Federal Habeas    7(o)

to show that DeYoung's testimony has been tailored to the exact needs of the prosecutor's false theory is ineffective, and it prejudices the defendant, Me.

8) Review of the video will show me in the home only 6 minutes before DeYoung would see me in the alley alone. (He claims 15 to 20 minutes. pg 182. Lesica doesn't point this out to keep the jury from being misled.

9) Then 20 to 25 minutes after, I run back into the home he says police arrive.

10) On page 184 Lesica fails to impeach him as he <u>JUST</u> watched the video and said that what he saw on that video accurately and fairly represents what he saw that day yet on line 15:16 and 17,18,:19 he answers <u>NO.</u>

11) DeYoung says I was Never on the West side of Jireoch that's a lie because at 5pm I walked right in front of his house and he was <u>not</u> out there. Lesica failed to present that portion of the video to obtain the actually <u>Correct</u> time for the proper presentation of this case.

12) Again he watched the video and still says he doesn't see me come out of the house until police arrive yet he was outside for 3 to 4 hours beforehand.

13) pg.186 DeYoung says he wasn't close enough to determine how I was dressed or how my clothes were (note he was asked to get closer to see the Big Screen at trial) yet he was able to see the look on my face as I was jogging back. Again, Lesica failed to pursue this issue of his untruthfulness.

14) Lesica failed to object to Madama capitalizing on false testimony

being deliberately elicited by the prosecutor. pg 187 lines 15-21 & pg 188 lines 4-8.

15) Lesica fails to point out that if DeYoung doesn't see both Baababaka and z multiple times that day or us Both in the Alley then he could NOT have been outside as he claims to have been which goes to show he was coerced on what to say. pg.188 lines 14-25.

Again, Lesica refused to provide effective assistance of Counsel by allowing DeYoungs lies to go unimpeached by using the very evidence before the jury and the video segment from 5pm to 7pm. Lesica was not prepared to Represent the TRUTH.

Trial Tran 9/19/17 pg 190 Officer Phillip Dill
1) It was NOT the index finger. It was the Second finger of the Right hand. 1.5cm = .59 inches about 9/16 inch. pg.198
2) Exhibit was admitted on false testimony.
3) Dill is in ERROR about me getting up and going outside as he claims to have told me to do. (Officers Smith's Report is proof of that. Joshua was in the house crying and weeping over Barbara Doiby). (Bringedahl is the one that told me to step outside) (After the home was cleared).

🎯

Lesica failed to correct Dill's testimony of the wound of the finger. He made an issue regarding the time difference

Federal Habeas    7(Q)

but fails to request a hearing/motion to establish the CORRECT time as I have told him to do from the very beginning. This is relevant because the two different times each tell a completely different story that would leave the jurors free from the state's false theory while it makes its decision of guilty or not guilty.

At the end of Day One  Lesica and I spoke in the back for a bit. I asked him why he wasn't following my case defense and why hasn't he did the motion to establish the Correct time. He told me that it is the job of the prosecutor's to establish the correct time, not his, and as for my case defense he says it doesn't make sense to him so it's easier to just go with what comes up. I asked for the next days witness list he said he doesn't have one. I asked for the list of my witnesses. He said he'll get it to me before we get to the defense then. He lied to me. He called no witnesses, interviewed nobody and did not get me a defense expret.

Day Two of Trial:
   Trial Tran 9/20/17   pg 5   Officer Casey Beingsdahl (F.T.O)
1) I didn't meet Beingsdahl on the porch. He asked me to step out so he could "assess the subject" then asked Smith to take a statement from me. Smith led me out to the porch where I threw up.

Federal Habeas   7(R)

2) Bringedahl says "I observed a cell phone in the hand of the victim." pg. 8

3) Bringedahl states he observed "This black knife right here. I specifically remember seeing that and noting that there wasn't any blood on it. And without any further information at that point I just left it alone." pg. 10

4) He was asked, "are there any other statements from Mr. Salyers on that facebook page?" His Response, "The initial post...... And then a sub post....." you know how I feel about her Doug Carlson". He deliberately leaves out all the other comments/statements that regard that the post is about me THINKING of cutting my wrists properly. Those statements were to Doug Carlson, Stephanie Ann, and her mom, Connie. (Stephanie's mom). pg. 12

5) On pg. 8 He says that he's just kinda trained to stop the bleeding and make an assessment. (I had already stopped the bleeding as best as could be prior to being asked to step out). He says he didn't want to move her to keep the wound from opening (note: So there was nothing more that he could do to help her. The next thing is to preserve evidence before further disrupting the scene). On pg. 15 He says that he's no more responsible than any other officer to preserving the scene, that he didn't take photos while she (Barbara) was face down how he'd found her because his main concern "at that point was her welfare" and collection or preservation of evidence takes a secondary position to the victim's welfare. pg. 16

6) He denies helping to roll her over however his preliminary testimony states otherwise.

7) He claims the phone was in her right hand pg. 18 (the same hand that shows a cut on the SECOND finger (inside: Medial distal) She could

<u>not</u> have had the phone in her Right hand and sustain a cut to the inside portion of that finger. Lesica failed to point that out or make it an issue as with the rest above. If there is nothing to have been done further for her welfare preserving evidence before removing it is next ~~already~~ priority; for this exact reason. For her to have the phone in her right hand would suggest 1) she couldn't have cut herself or 2) it was placed there by me after (ie., staging the scene).

8) When he seized the phone he claims it was lit up and he looked at the screen and that it displayed an outgoing call to "My Husband" at 7:11pm.  Note: "My Husband" 405-747-0680 is Me: Joshua Salyers.  pg. 19

    Lesica failed to do as I order him to do. That was to prove that he had to manipulate that phone in order to determine the outgoing call, to whom, and to get the time. Thereby, violating search & seizure. That phone had to be unlocked by pressing 2 separate buttons because it locks after a couple minutes or less. The light shuts off after seconds.  If the call was made at 7:11 (which is false; it was 7:10:46) then it'd have been locked by the time he got to it nearly 12 minutes later.


9) Bringsdahl doesn't recall wearing gloves or not and it being properly collected into a bag.
    Lesica failed to push this to prove that the phone was <u>NOT</u> in her right hand as if it was it'd have been covered in her blood from the cut of her second right finger and he'd have had blood on his hand/fingers and the seat of his patrol

Federal Habeas   7(T)

Vehicle. Thereby, undermining his truthfulness.

10) pg. 26 Bringedahl claims that he rendered aid yet realize he did nothing in fear of opening the wound. Lesica failed to impeach him on this subject. On pg 26 per lines 20 - pg 27 line 1 he claims that it'd have been detrimental to her and her condition to take a photo. He did NOTHING to help her because as I noted I had already slowed the bleeding as best as could be had for the time being so <s>why</s> how could $it be a danger to her to properly preserve evidence?

11) Exhibits #1 & #2 were erroneously admitted through an officer that did NOT fairly and accurately represent what he observed. Lesica failed to object to these authentications as competent counsel would have. (Dr. Bader Cassin once testified in People v Dimambro, 318 Mich App. 204 "So by the time [the] autopsy had occurred, there were those conflicting findings. And I say conflicting only because injuries and surgical change all give the same amount of change..."

   In other words spoken by Dr. Cassin "Surgical intervention can severely complicate the findings of injury examinations".

Had Lesica called upon Dr Bader Cassin as requested as the Defense Expert he could have undermined the results of this improper authentication.

   Lesica failed, again, to properly cross-examine the witness and impeach him as well as provide him the questions I had specifically had for this officer.

   Federal Habeas     7 (u)

I will, again, point out that the authentication of exhibits 1 & 2 is a violation and Lesica failed to point this out thereby rending his assistance ineffective. pg 31 & 32 Trial Tran 9/20/2017

Per Bringedahl's report there were no injuries apart from the neck incision yet here at trial he's authenticating that all the injuries he is seeing were as he had seen them only with lot of blood.

Trial Tran 9/20/17 pg 38 Officer Tyler Sean Smith (Kentwood P.D) (Formerly Muskegon P.D. last day was 9/4/16).
* Per Report: I arrived and went Officer Dill had already entered the home. I went inside after him and observed a white female in her 20's lying face down with blood covering her face and the floor. Officers Bringedahl and Edens arrived and cleared the home with Officer Dill.

A male subject identified himself as Joshua Salyers. Joshua was in the home crying and weeping over the victim... Joshua was shirtless when I made contact with him and had blood on his Right hand.

Joshua was very emotional and could not follow my questioning well.
Area Check: I was advised that Joshua may have ditched a weapon in the alley as no weapon was found in the home.

Trial Tran 9/20/17 pg. 40
Lesica failed to object to the leading question Regarding identification on lines 16 & 17.

Smith states for the prosecution. "I found him in the house. He

Federal Habeas        7 (V)

was in the living room area when z walked in." And that he, "spoke to him outside of the house. Officer Dill was clearing the house and z wanted to get him out in case there was someone inside."

Smith, again, repeats on pg 41 line 10-11 Mr. Sakyers was in the living room of the house ...."

On pgs. 44-45 Lesica fails to object to the constant use of the word "Homicide" as Dailey was not deceased at the times of his contact with me or this other individual.


On pg. 45 Lesica fails to perjure and make it a point that the prosecutor refused to correct the false testimony that was elicited on direct exam. Line 19 ; 25 and again on pg. 46 line 8. The Prosecutor knew this elicited on Direct exam to be FALSE.

Everyone, including Smith, report Barbara Ann Dailey was found in the home face down in the DINING Room. There are absolutely NO Records in the State's files about the living room. Except for a letter written to Governor Rick Snyder, that was taken from my Attorney/Client folder in my cell, there is No Mention ever about the Living Room. Lesica fails to point this out and present this copy of the letter he had from me as evidence to the needed Correction of this witness to corroborate another state witness's false and, again, coerced testimony.


On pgs. 47-49 Lesica shows that he isn't properly prepared and exuding due diligence to get his point to the jury. Officers's Reports are testimonial and had he presented the Report to Smith he'd been able

Federal Habeas    7(w)

to present it through "evidence" as the court said, "I need to hear it from evidence, I think"

Trial Tem 9/20/17 pg 50 Officer Logan Anderson

Lesica rendered ineffectiveness of counsel for failing to present the video of the transport vehicle of Anderson's. 1) It would have revealed that I did NOT want to be at the police department as I said that I wanted to be with Barbara ("my girl") at the hospital. I was told that I could not go there so I tell him to take me to "Dad's" (where I lived) so I could tell him what she had told me to tell him and what really happened. Anderson asked for the address and said he'd take me there. He lied. 2) It would show that I was NOT told why I was being lodged and that they were aware that Barbara was deceased just as Anderson's Report that Lesica refused to admit into evidence to impeach/perjure this witness.

Per Report: "... at the end of the interview, I was instructed to transport and lodge Joshua at MCJ on the charge of Open Murder .... Before leaving for the jail, Joshua was notified that Barbara had passed. Joshua cried uncontrollably for a few minutes."

Also, the Report would contradict testimony given during the direct examination and but for ineffective assistance of counsel it'd have been brought to the attention of the jurors and the Court.

Federal Habeas  7(x)

that Anderson's Recollection is in fact just more correction to fit the needs of the prosecution's knowing & intentional incorrect theory just as other officers and state witnesses.

For instance: Everyone that's testified about grudges or disputes claim that I said there were none between Barbara and everyone else or with me and everyone else. Yet, Anderson's report says otherwise. The problems were not between Barbara and I as everyone is claiming but with everybody against Barbara and I being together. Also, that Barbara and I are together just as Sarah Grandinette testified to. This is important because the Supposed motive is that I couldn't handle her leaving me and so I took her life when, in fact, the State and everybody knows that is absolutely false. There is clear evidence of this that both State and Lesica failed to submit, admit, present and make known to the Court & Jurors. Including Barbara's Journal, our texts, calls, & facebook messages. These were closely relevant as the Jurors asked Breingedahl about any texts and such.

The following contradictions: pg 52 line 2. "Officer had just went upstairs to go upstairs to clear the rest of the home. I was downstairs in the ——." Note he was in the dining room next to Smith and me while officers searched the home, then Breingedahl asked me to step outside so he could "assess the subject."
line 1 pg 53 "Assaulted his —— the female inside...."
Note: He knows I told him "my fiance" or "my wife". Just as he knew he was in the dining room as noted above.

Federal Habeas  7(4)

Pg. 55    Q: So he volunteered all this information to you willingly?

A: That's Correct.

Q: Without being asked?

A: Correct

Lesica could have admitted the tape/video Recording to prove otherwise but his ineffectiveness did not allow for this to be seen.

Anderson contradicts himself on pgs. 55 & 56.

Lesica doesn't touch that issue. Again, ineffective.

pg 55 lines 11, 12, 13, 14, 15  then on pg. 56 lines 2, 3, 4 (Trial Tran 9/20/17)

On Page 58  line 8:9 Lesica shows he has no clue what he is asking. He isn't prepared because there isn't a phone on a kitchen table. We were in the Dining Room, not the Kitchen.

On Page 59 Lesica asks on line 13:14 "—Did you even cuff him going downtown?" The answer was "No." Lesica was asked to question Anderson to the point of proving that they believed me to being the suspect and to explain why if I'm the suspect was I not cuffed and Read my Rights in such a horrendous case (situation). Lesica failed to do this.

* On page 60 Anderson lies on stand to cover their failure of obtaining a proper waiver of self-incrimination Rights. Lines 6-9. Per his Report Lesica should have impeached him but Refused to do so

Federal Habeas    7(z)

** Per Report (Lynn Anderson) " ... At the end of the interview, I was instructed to transport and lodge Joshua at MCJ on the charge of Open Murder.... Before leaving for the jail, Joshua was notified that Barbara had passed. Joshua ~~had~~ cried uncontrollably for a few minutes."

On page 61 Medema (prosecutor) elicited false testimony, knowingly, Lines 6:7 and, more importantly, 15:16.

Lesica was told to object to it but refused and then failed to impeach him on it later on Re-cross. The Recorded 9-1-1 call is proof that I was asked to render aid!

On page 64 lines 3-8 again Anderson lied to cover substantial rights violation committed by Detectives and Lesica failed to impeach him with his very own police report. (See above **)

On page 63 The questions regarding blood on <u>my</u> phone is a strong issue that Lesica was ordered to pursue because if <u>I</u> cut her throat, my hands would be covered in blood so when z call 9-1-1 blood would be on the phone. The fact there isn't blood on my phone yet my hands are bloody suggests the cuts had to be made by Dailey. I get the knife away from her, call 9-1-1, and, per ~~their~~ HER (dispatch) Request, Rendered aid after placing the phone on speaker and on the Dinner table in the <u>Dining Room</u> where Barbara Dailey was.

The placements and conditions of the phones claimed to be in Dailey's Right hand, when it wasn't, by Bringedahl and the fact of there is no blood on either phone tells the story almost on its own. Both officers are lying to paint a picture that isn't true and to cover-up

their misconducts. The issue I have is Lesica was told about this and he refused to pursue this to its conclusion.

As you will see further into this with State's witnesses Detective Luker and Deputy Medical Examiner Dr. Amanda O. Fisher-Hubbard, Lesica created his own absurd concoctions for a defense showing that he deliberately ignores what I tell him happened.

&ast; Trial Transcript 9/20/17 <u>Detective Kory Luker</u>    pg. 65

On pg 71 lines 8-17 Luker states he shared information with me about what they were learning. Lesica fails to address this later as I requested. For the reasons of proving the interrogation <u>must</u> have been suppressed due to deceit and failure to obtain a valid waiver.

On pg. 73 lines 1-7 Luker states that I used the knife ...." we made the first cut together ...." That is False and Lesica, again, fails to point this out later after the video was played.

Further on lines 15-18 Lesica failed to use the video to impeach him (Luker) as I told them I <u>thought</u> about wiping it off to keep them from knowing she committed suicide or tried to. I didn't want her losing her girls over this. Had the evidence been tested they'd have gotten fingerprints but none of them being either Barbara's nor mine.

On pg 74 Lesica agrees to fast-forward through portions of the video without my consent. The video does have blank spots; However, it was also spliced together removing some portions of

what was said by the detectives. The video was once on a full clip yet now it's been split into 3 segments. Lesica made no issue about this when he was called up to the bench from 11:12:57 — 11:14:25. That is ineffective and it prejudices me because had the jurors seen and heard the leniency, failure to notify, deceit, and heard the promise made they'd have likely understood that it was <u>not</u> a confession afterall. And it'd have shown just how corrupt the system in Muskegon is.

On pg. 77 Luker was asked "You weren't in the interview room or here yet, correct?" He answers "Not Yet." Lines 13:14. (Read Lukers Report pg 40)

That is absolutely <u>False</u> because Luker & Stratton walked me to "Their Office" after speaking with me in the break room for a few minutes. Lesica failed to point this out later which would further show that Detective Luker is a part of editing out the parts that would render the video inadmissible.

On pages 78, 79, 80, 82 Lesica still allows the videos to be skipped through even with my request it be played through. I wanted it all played so that I can have it on record of the time jumps. (example pg 79. Line 6:7 then look on line 20:21 11:41:40 — 11:42:07 & then when I demand to him to go back or I'd head-butt him it goes only back to 11:42:35 — 11:51:30 (pg 80 line 6) line 6 of pg 79 starts at 11:35:58; there is nearly 7 minutes missing.

This goes to show the state is trying to cover up its' errors and it shows that Lesica did not come prepared or, if he did, that he did not have his client's best interest in mind by helping the state cover up its misconducts. (Ineffective)

Trial Tran 7/20/17

On page 83 line 18 Luker begins talking about how he uses deceit to make me feel one way or another towards him. He says that such doings are deliberate on Lines 23-25. And further corroborates his deceit & misconducts (improper influence) on pg 84 Line 1-3.  And, again, on pg 84 Lines 10-21.  Lesica fails to take note of this or use what questions I gave him in regards to such issue and ellicit the false "truths" Luker was telling me.  Remember at preliminary hearing Luker was asked if he knew Dailey to bring deceased before or after the interview began.  He said he knew he was investigating a "homicide" before the interview began, yet some of these, per line 16-17 pg.84, "I think you said to bring them back, steer the towards the truth"s was him telling me "This looks to be an attempt to commit suicide".  line 10 of pg 84 says "...You & try to offer something that's in the RIGHT DIRECTION OF THE TRUTH to help them..."

Lesica's failure to expose and use this to discredit Detective Luker's integrity, professionalism, veracity and honesty is ineffective and brought prejudice to his client. His failure to segue this at the Supp Suppression Hearing on 9/5/17 was clearly ineffective and had led to the admission of this video evidence with its constitutional violations.

On Pg 92  Cross Examination of Det. Luker.
Lesica asks if the knife was forensically tested (line 24-25) pg 93 (line 2-5) He answers that the State Police checked to see if it had human blood on it but nothing further was done.

Lesica failed to pursue this issue because he would not use what I prepared for him regarding this issue. Had Lesica done

Federal Habeas   7(DD)

so it would have established 1) The investigation stopped upon this supposed Confession. 2) It'd have established that the knife they claim to have been the knife used is, in fact, physically incapable of causing at least one of the incisions (12 cm) (4.72 inches) and so could not be the knife. (See Criminal Law Deskbook P16. 21).

~~On pages 94 : 95 Lesica stated again on the issue of not informing one of the complaint I'm being interrogated over~~

On pages 94-98 Lesica brings up the issue regarding the validity of the waiver due to the failure to notify as I, again, had to threaten him to do so that he could then request a mistrial for the use of an inadmissible interview, yet he failed to bring up the information of offering leniency, telling me this looks to be an ATTEMPT to Commit Suicide and due only to that piece of information a promise was asked of them to not take her girls if I tell them what she had done and was agreed to. All four of these issues are clear violations of the Constitutional Rights and Lesica's failure to pursue this issue ultimately led to the conviction as NO EVIDENCE had been Collected or tested to determine Homicide compared to Suicide or vice versa.

Lesica had a chance to cross-examine again and passed it up where I told him to get the information I stated above and to ask Luker "Would testing the knife not prove that 1) Perhaps the knife was Not wiped off? and 2) that the knife ya'll claim to be the knife is, in fact, a fabrication as it would prove it could not have caused the 12 cm incised wound?

Federal Habeas          7(EE)

Lesica could have even asked Luker who's truth are you concerned with finding... You just testified that you knew Dailey to be deceased BEFORE the interview began, yet you fail to tell Salyers so that you could obtain a valid waiver, you then offer leniency to get him to tell his story; when you don't like what he has to say, you then tell him what it looks to have been, and was, until she died 46 minutes later: An Attempt to Commit Suicide, Right? Then, and only then, Salyers asks you to promise him you wouldn't take her girls from her if he tells you what she had done... So I ask you to answer me all that and then tell me why there was no investigation into this case except for the "Truth" you wanted it to be?"


Trial Transcripts 9/20/17   Deputy Marci Jo Neel   pg. 101
Per Report: Salyers is here on ~~Murder~~ a charge of murder. While I was working in booking tonight (9/5/16) Salyers and another inmate, Eric Emory, got into an argument while in their individual cell. During the course of the argument Salyers yelled to Emory "I'll slit your throat and watch you lay there. I'm here for murder." As the argument continued, Salyers told Emory something to the effect of: "I killed her and now I have to live with it and it's tearing me up inside." Salyers asked me several times this evening to speak to a "jail house psychiatrist" to talk out some things.

First and foremost, Lesica failed to provide Eric Emory as a witness. Emory had written a letter to Lesica in regards to what was said and regarding the inappropriate interview detectives were

Federal Habeas    7(FF)

conducting trying to get him to back up Neel's Report in exchange for leniency or even dismissal of his case.

Trial Tran 9/20/17 pg 105  line 22

Lesica clearly isn't familiar with the issue because the doors opening has no bearing on the matter. He's "fishing" instead of complying with my questioning I asked him to use.

pg 106  line 6   The question was suppose to be, "Why was Me. Salyers placed in a suicidal gown?" The reason for this is because the State claims that my facebook post was about "murder". However, due to the post on facebook, I was placed on Suicide Observation because it clearly states that I was thinking of cutting my wrists, properly, being 4 cuts.

You can, clearly, see that Lesica is not doing anything but causing a mess of what he's trying to conduct in <u>his</u> questioning from line 6 pg 106 through to pg 107 line 21.

On page 112  you can see Lesica botched the opportunity of showing on initial Cross-exam that Neel is not above violating peoples Rights and writing false Reports just because of it sounding like something was said. Lesica was told by me to question her about this on cross but failed to do so.

On page 116  Lesica asks if it is possible despite her testimony if it could have been a case of "They said I did this or did that." She says, "No", yet Lesica fails to follow up with the part where, in her report, she says "...told Emory something to the effect of:...."

According to Model Rules of Professional Responsibility DR 6101(A)(2)

"A Lawyer shall not handle a legal matter without preparation adequate in the circumstances."

Lesica's actions result in ineffective assistance for failure to demonstrate adequate competence and adequate diligence to assure a fair trial. He has taken every witness, of the states, testimony at face failure and failed to present evidence in the defense of the state witnesses untruthful testimonies. Eric Emory was who I supposedly threaten to kill and confessed to yet State doesn't call this man and neither does Lesica even After Emory requested to be a witness on my behalf.

People v Strodder, 394 Mich 193   Docket 54882 Michigan Supreme Court could have been the governing case of this issue and the several before and to come.

The United States Supreme Court holds the right to effective assistance of counsel to be so basic that every reasonable presumption would be indulged against waiver of this right. In addition, the harmless-error standard is inapplicable when dealing with so basic a right. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice resulting from its denial.

Lesica did not interview ANY witnesses or call ANY possible witnesses. Lesica did not even attempt to learn of anything significant until we were in the midst of trial when, of course, it was, in fact, too late. That is failure of due diligence.

Lesica's failure to investigate all apparently substantial defenses available to the defendant and assert them in a proper and timely manner is proof of his incompetence.

Federal Habeas    7 (HH)

Trial Transcript 9/20/17  pg 117  <u>Joshua Guerin</u>  (Jailhouse Liar)

Lesica <u>Never</u> informed me of this guy being a state witness against me. Regardless of what the jail record shows I could have proven that I have <u>Never</u> spoken to this guy and <u>Never</u> been in the same unit as him. Lesica's failure to inform me of this witness denied me the ability to get <u>Jennifer Swanger</u>, Kierrelle Burns, Josiah ~~Fase~~ Fousse, Jeffrey Willis as witnesses that on June 25, 2017 an Article was written by MLive "alleged throat-slasher writes officials" and three days later I was removed and placed in "Suicide observation" for 3 weeks and a few days from A-pod to M-pod. Also, during that time, I could have proven that the reason I had been moved was due to the fact of State wanting to discover what it was I was writing to officials and in my book. Now? You seen Officer Tyler Smiths testimony and now you just need to pay attention to this Jailhouse Liars testimony then read the letter written to Governor Rich Snyder which is provided. I warned the judge and prosecutor not to trip the snare I set up for them and sure enough they did anyways.

Pg 118 Lines 16 - 22.  Lesica failed to get a copy of this guys criminal record so that I could also review it and participate in my defense against this guy. (Confrontation Violation under the 6th Amendment).

Had Lesica received my misconduct reports it'd have been seen that during the 3rd and 7th of July I was on sanctions meaning that even had I been in the same pod as him, which I wasn't, he

Federal Habeas    7(II)

could not have seen me pop the hatches as he talks about on pgs. 122 lines 10 - pg 123 line 3. The only way Guerin would know about me "popping hatches" would be due to the prosecution gleaning that from the report and providing that info to Guerin as to giving more "Truth" to his lie.

Based on the copy of the Letter I provided Lesica, it was clear as to where Guerin had gotten the specific information provided in his testimony in Lines 16 of pg. 125 through lines 13 of pg. 126. Read any and all reports & listen to any and all recordings. Nowhere is there any mention of the <u>living room</u>. Lesica failed to capitalize on this as well as on the following:

pg. 127 Line 1 "Have you talked with anybody else, obviously except Detective Luker, about the case?"   "No."   "Have you learned any details about the case from anybody else?"   "No sir."

Lesica failed to question Guerin as to what his Lawyer and he talked about regarding <u>MY</u> case and what was said between Det. Luker and him  and what was discussed between the prosecutor and him in that nearly 15 minute break we had before he took the stand. Yet, Guerin claims he's talked to nobody about the case and that he only got the information from talking to me. Again, had Lesica called witnesses on my behalf it'd clearly show that 1) I have never spoken to ANYBODY about my case except Jennifer Swanger, Detectives, and my lawyer and, of course, through letters the media : State/Government Officials. Oh, Sorry, and Dr. Stephanie Howell who in her report even states that I claim to only try prevent Barb from further harming herself as I told the Detectives.

Federal Habeas    7(JJ)

On page 131 line 20 Lesica asks: "Isn't it true the testimony that you gave here today was gleaned from newspaper articles?" "No, Sir."

Here, Lesica shows that he doesn't know what it is he's talking about. I gave him a copy of the letter to Governor Rick Snyder and told him this is the only place that mentions the Living Room and that the only way that ofc. Smith & Guerin could both speak about the "Living Room" was if they were coerced by the one who prepares their witness for testifying: The prosecutor!

Lesica was not properly perpared to represent any sort of defense/cross-examination against this Jailhouse Liar. They present this guy but not Eric Emory. Why? Supposedly, Emory was threatened to have his throat slit and supposedly he was confessed to, according to Deputy Nkoli's Report, yet he wasn't a State witness. I get witnesses presented are at the prosecutor's discretion but doesn't it sound and seem rather odd not to have included Emory but instead use this Guerin guy. I suppose it's all good and well to use lies in order to exchange those lies for freedom or leniency of that testifying persons charges/sentences. S.M.H.

Federal Habeas    7(KK)

Trial Transcript 9/21/17  <u>Deputy Medical Examiner Dr Amanda O. Fisher - Hubbard</u> pg. 3

First and Foremost, Lesica failed to call, interview, and provide an expert for the defense and allowed Barbara to be cremated before a independent examination could be had. This is crucial because the medical examination by the state expert left out other scars from previous self-inflictions and abuse. State expert contradicts her report and had written her report, manipulatively, to meet the needs of the case and she had failed to investigate into any other causes/manner of death. She also contradicts Proven Medical Literature/Science in her determination of manner of death.

People v Ackley    No. 149479    497 Mich. 381; 870 N.W.2d 858;
2015 Mich. LEXIS 1450    Reversed, Vacated, Remanded.


pg. 6 lines 14-17 establishes that the Dr Amanda O. Fisher-Hubbard has only been a deputy Medical Examiner since July 2016; maybe 2 months before she had the opportunity to examine Barbara Ann Daiky.

Lesica failed to point this out about her inexperience in the "feild."

pg. 10 line 11 fingernail clippings collected as evidence.

Lesica failed to question her in regards to the findings of the nail clippings since both State and he says Barbara was "fighting for her life."

pg 11 line 3 "She had multiple bruises on the back of her right arm, on her left hand, on her knees."

Lesica fails to question the Dep. M.E in regards to <u>MY</u> defense. Concocting his own made up theory.


Federal Habeas    7 (LL)

pg. 11. Line 25: "And you able to quantify how many wounds, incised wounds there are?"   "There were at least four incised wounds." "And how were you able to determine that?"   "By just examination."

Lesica took the testimony as true and failed to use the Medical Autopsy Report to impeach this, knowingly elicited, false testimony.  (View pages 5 & 6 of the Autopsy Report for this above and the following) Four incised wounds are BULLETINED but she hides 2 ADDITIONAL incisions within the 3rd bulletin instead of giving them their respective bulletins as she did the rest.


On pg 15 she was asked if she had the opportunity to examine individuals who have inflicted wounds on themselves.  "Yes." On pg 16 she's asked if she is given information before she examines a body? "I'm usually given  scene photos and an investigative report."

Lesica failed to use this information to ask HER on cross that if the investigative report provided by the State had any influence of how she performed HER investigation and the lack of an investigation into a different conclusion.  This is significant because the post "One Cut... Two Cuts... Three Cuts... four.... what I have in my mind will ease this pain for real" is factually about me thinking of properly cutting my wrists. However, State claims it is in regards of premeditated murder, knowing that to be False, yet now even the medical autopsy report bulletins exactly 4 incised wounds to corroborate the "investigative report" contents  and excludes the cut scars on her upper inner thighs, armpits, Right neck and the burn scars of her chest that are symmetrical from one another, thus showing that Daiky wasn't a "cutter" or "suicidal" and giving merit to the post being premeditative rather than what it, in fact, is about: My thoughts of self-infliction.

Federal Hobbies       7(MM)

On page 16 line 14 "Is there anything significant about somebody's injuries when you can confirm that they've inflicted those injuries upon themselves?"   line 19 "An incised wound, self-inflicted incised wounds, one of the characteristics of them is hesitation marks.... And hesitation marks are generally linear, parallel, and very shallow incisions."   Line 25 "For instance, what types of incisions would those be, location? On a wrist or where do you normally see those type of —"   "Typically seen on a wrist or an extremity." ✳

On page 17 line 14 "Did you, in any of these numerous incised wounds to her throat did you notice any hesitation marks?" ✳

"Nothing that I would consider consistent with hesitation marks." ✳
Line 18 "You also described when somebody inflicts these injuries on themselves that they're often shallow, correct?"   "Yes."
"Is that what you observed with Ms. Dailey?"   "No."   ✳
"In fact these were pretty significantly deep, correct?   "Yes." ✳
Line 25 "What did — what parts of the body did these incised wounds affect?"   pg 18 Line 2 "These affected the neck muscles. And then one of the incised wounds also included an incision of the trachea or the windpipe as well as the right jugular vein which is the main artery vein that drains the blood from the head." ✳

Line 13 "Based on all your observations and your training and experience, is it likely that Ms. Dailey inflicted these wounds upon herself?" "No."   "What leads you to that conclusion?" The lack of hesitation marks, the wound that she had on her finger as well as the additional blunt force injuries that she had." ✳✳

Lesica failed to use the Medical Autopsy Report to, again, impeach
Federal Habeas     7(NN)

this testimony. He also failed to investigate into and be prepared in regards to the truth of this being a Suicide and me trying to only prevent it.

First, Bulletin One - 3cm incised wound, the left aspect of this wound shows it's got a 2cm superficial continuation. Superficial means <u>Shallow.</u>  3cm = 1.12 inches. Of 1.12 inches, .75 inches of it is <u>SHALLOW</u>. <u>No</u> damage to the Neck Muscles!

Bulletin Two — 8cm incised wound. 8cm = 3.14 inches  Again, no damage to the neck muscles; SHALLOW!

Bulletin Three — 12 cm incised wound. The right aspect of this shows it's got a 5cm <u>superficial</u> continuation and the left aspect .60 cm <u>superficial</u> continuation. 12cm is 4.72 inches 5cm is 1.98 inches and .60 cm is .24 inches. This wound of itself was Superficial, or shallow and caused no damage to the neck muscles. Of 4.72 inches, 2.58 inches of it is a Superficial continuation.

Then, it says there are 2 ADDITIONAL <u>superficial</u> incised wounds that are 2.5 cm each. One over the trachea, the other over the Right jugular vein. (She does not say which in her Report; external or internal. However, Medical literature states severing of the internal jugular will cause death in about 2-3 minutes. Barbara Daiky lived 4½ minutes proving it was the EXTERNAL jugular which drains the blood from the FACES features, eyes, nose, face, etc. Not the head/Brain.). 2.5 cm is .98 inches. These two superficial incisions were within the 12 cm superficial wound causing the wound to become slightly deeper and causing muscular damage and in the process severing the <u>EXTERNAL</u> jugular which sets on or flush

Federal Habeas      7(00)

with, the musculature of the neck and causing a SMALL incision of the FRONT portion of the trachea.

——— This, above, is why an independent review and a defense expert was needed, yet, Lesics failed to provide that for me to discredit the state's expert. Also, the following discredits the testimony of Dr. Amanda O. Fisher-Hubbard:

In an Article Dr. David B. Auyong had stated "average time to insert the needle into the internal jugular vein was 14 Seconds.... it's Relatively Deep."

4A Lawyers' Medical Cyclopedia §31.16 [F] Repair
"Superficial wounds require only a single layer closure of the skin. Deeper lacerations require buried sutures.."

3A - 236 - 23 Courtroom Medicine Series: Death §23.50 [4]
"Incisions result from the use of a sharp edge, such as a knife blade... Incisions may be accidental; in such cases, they are seldom serious. More often, the examiner must differentiate between incised wounds that are self-inflicted with suicidal intent and similar injuries resulting from an aggravated assault. Major distinguishing features include:

• The position of the incisions. Incisions at the wrists almost always suggests suicide, while those at the NECK may suggest either homicide or Suicide. Examination of the wound may prove that it was anatomically impossible to self-inflict, however.

• The number of the wounds has little bearing, since suicidal incisions are frequently multiple. Suicidal incisions SOMETIMES show evidence of Fattering Determination Marks (Hesitation Marks), however.

Federal Habeas    7 (PP)

Forensic Evaluation can usually determine the direction of the incision, especially if the wound is deep. Such determinations may be invaluable in determining if a wound was self-inflicted.

[6] Contusions and lacerations rarely cause death, unless an underlying vital organ is ruptured by the blow. Hemorrhage from incisions is usually not severe, but if an underlying vessel is involved in the incision, hemorrhage sufficient to cause death can occur.

In Suicides, this generally involves incisions over the arteries of the wrists or of the major blood vessels in the neck."

~~The hemorrhage loss, the~~

In a Georgia case, the Medical Examiner states a "fatal wound would render victim unconscious within 10 to 15 seconds, and victim bled to death a few minutes later..." Perez v State, 281 Ga. 175   case# SO6A0774

Per Dr Amanda D. Fisher-Hubbard's Report of Dailey pg 9 & 10 of 12: Lungs: "The right and left lungs are 240 and 210 grams, respectively. There is normal septation. The lungs are inflated. There is mild anthracosis. On the cut surface, the parenchyma is mildly congested. There are no areas of consolidation, masses, or abscesses. The trachea and mainstem bronchi appear normal without foreign bodies, masses, or mucus. Hilar lymph nodes are not enlarged. The pulmonary arteries are free of Thrombi."

In Jones v State, 212 So. 3d 321, "when the windpipe is cut you'll begin to aspirate blood, which would cause more pain as the lungs would no longer be a place for aeration or oxygenation; this is called "dyspnea, painful breathing." There'd be significant amount

of the blood in the lungs."

Courtroom Medicine Series

4 Medical Malpractice Guide: Muscle

"Sternocleidomastoid protects vital structures in the neck Including the carotid artery; internal jugular vein."

Had Lesica provided effective assistance of counsel and provided me with my constitutional Right to the appointment of an expert, the inconsistencies of Dr. Amanda O. Fisher-Hubbard's autopsy Report and her testimony would have 1) been brought to light before the jury and 2) it'd have challenged the validity of the state's knowingly false theory and the credibility of the state's only Medical expert.

Dr. Fisher-Hubbard said that her conclusion on the incised wounds of the neck is based on "lack of hesitation marks (pg 18 line 18) and the number of incisions (pg 26 lines 9 + 20 and pg 27 line 4 of 9/21/17 Trial Transcript). However, as seen in 3A-236-23 Courtroom Medicine Series: Death § 23.50 [4] Incisions, we know that 1) Suicidal incisions only Sometimes show evidence of faltering determination, a.k.a "Hesitation Marks" and 2) The number of wounds has little bearing since suicidal incisions are frequently multiple.

On page 18 line 2 she claims, under oath, that all these wounds affected the neck muscles. Her Report documents otherwise. Also, in her Report, she documents that there were only incised wounds to the sternocleidomastoid, and other muscles, not that the sternocleidomastoid muscle was severed. Therefore, proves that the internal jugular vein was not the vein severed but was, in fact, the External Jugular. The fact that Barbara lived 46 minutes is also proof of this. The severing

Federal Habeas        7(RR)

of the internal jugular would cause death in a matter of 1 to 3 minutes.

Dr. Fisher-Hubbard also claims that suicidal incisions are usually found on the wrists or other extremities. However, 3A-236-23 Coretram Medicine Series: Death § 23.50 [4] : [6] state that such incisions are found on wrists and/or the _neck_ in suicides.

She, also, states that the incised wounds of the neck were all significantly deep. But, again, her report states otherwise. Further proof of this false testimony is seen by observing that there were no buried sutures which are required for deep lacerations/incised wounds; there were only a single layer of surface ~~stit~~ stitches/sutures, thereby, suggesting that the wounds were _not_ deep but, instead, shallow.

On page 19 line 8 of Trial Transcript 9/21/17, Lesica failed to take notice and follow up with Dr. Fisher-Hubbard's testimony that "Typically when we see wounds on the hands or the fingers we think of defensive type wounds, so someone trying to defend themselves."

The angle of the incision, and the length and location, is not consistent with the theory of Barbara trying to defend herself. This could have been pursued to further challenge the state's theory and the De's credibility. Furthermore, Lesica could and should have questioned this because as previous testimony suggests such wound would have been highly unlikely since it was stated by F.T.O Bringedahl's false testimony that he found Barbara's Alcatel cellphone _in_ Barbara's Right hand. So, how then could such a wound on the medial distal finger occur? That single, small and superficial (shallow) incision occurred when I removed the butcher knife from her hand by the handle.

Federal Habeas   7(SS)

Again, Lesica's failure to take note and pursue this issue was error and prejudiced. On pg. 19 "There was a fracture or a break of the hyoid bone (Right aspect pre esad) which is a small bone in the upper portion of the neck. It's a U-shaped bone. It's very delicate." On pg 20 lines 13-18: "And what do petechial hemorrhages tell you about what happened?" "Petechial can be seen when there is stoppage of the blood draining from the head. We will occasionally see them in hangings or when there is pressure that is placed around the neck." line 23 "It's generally there's pressure applied to the neck, yes."

First, the fracture occurred when she landed onto her Right arm, neck, face, right scalp on the stairs. Secondly, it only takes 3 to 4 pounds of pressure to stop the flow of blood to, and from, the head/face and 11 lbs to restrict the airway. Lesica showed me this information at trial yet he failed to use it. I admitted to using my shirt and applying light pressure to the area of bleeding to stop ~~the~~ her from bleeding out as _advised_ by 9-1-1 dispatch.

Is not such pressure sufficient to cause petechial hemorrhaging aka "Punch Drunk"? Is not hitting the corner/edge of the stairs with the Right neck from a fall enough pressure to cause a fracture of such a delicate bone? That is what happened, yet Lesica does not pursue this. Instead, he made up stupid scenarios as he went and ignored <u>the truth</u> $\equiv$ built <u>my defense</u> on.

On page 22 line 20, the Dr. states the 3 centimeter cut didn't cut the "jugular vein" but the 12 centimeter cut did. Lesica failed to use her written report to impeach her. It was,

Federal Habeas          7 (TT)

in fact, one of the two ADDITIONAL incised superficial wounds she documented, hidden, in the 3rd bulletin (12 cm).

~~On page 22 line 25, the Dr. states, "They were incised wounds. I don't know the implement that was used."~~

Also, Lesica failed to pursue the above mentioned here on page 25 line 10: "... The third cut you indicated was approximately 12 cm ..." "Yes" "Did that wound cut the trachea or the aorta that's up in your neck there?" "It did. Beneath that wound there was an incised wound to the trachea and the Right jugular vein"

She just said that the 12cm cut is the wound that cut the jugular vein (pg 22 line 20 and pg 25 line 12) but in the same sentence she now says it was the incised wound beneath that wound that cut the jugular and the trachea.

Lesica failed to pursue the more important piece of information regarding this 12 cm wound and the TWO ADDITIONAL superficial incised wounds beneath that 12 cm wound: On page 24 line 8, "So a superficial wound is a shallow, shallow wound?" "Yes, Yes."

The 12 cm incised wound showed that 5cm of it was Superficial on the Right and .60 cm on the left. 5cm = 1.96 inches & .60cm = .24 inches. 12cm = 4.72 inches. Therefore, 2.20 inches of the 4.72 inch cut is more shallow than it began, Contradicting her earlier testimony that all the incisions were significantly deep and that the 12cm is the incision that cut the jugular vein and trachea.

Lesica's failure to pursue this and bring out the fact that all these incisions are 1) all shallow incised wounds of themselves and 2) that she is constantly contradicting her written report and 3) that 5 of the 6 incisions are of different lengths, not consistent

with a homicidal situation as compared with a suicidal one. 3cm (1³/₁₆") ⅔ of it is superficial (shallow, 2cm); 8cm (3⅛") ~~and~~ neither caused underlying structural damage, i.e. muscle jugular, trachea, thereby proving they're shallow.   12cm (4⅝") ½, nearly, being superficial (shallow, 5cm) on the right side which is over the jugular vein. Superficial wounds are limited to the upper portions of skin or fascia per 1 Attorneys textbook of Medicine (3ʳᵈ ed) §3.04 (d), therefore caused no damage to underlying structures.  The <u>two additional</u> <u>superficial</u> incised wounds within/beneath the 12cm incision caused incisions of the Sternocleidomastoid and 3 other muscles which severed the <u>Right</u> jugular (<u>external</u>, not internal) and cause a small incision to the anterior, or front, portion of the trachea, both incisions were .98 inches (1inch or 2.5 cm) each.   7cm (2¾) again caused no damage to any underlying structures. So as I pointed out once already she, Dr. Fisher-Hubbard, provided knowingly false testimony that 1) prosecutor knew and failed to correct and 2) Lesica allowed to go unchallenged  when she testified that all incisions affected the neck muscles.

Back on page 23 line 4 of trial transcript 9/21/17, Lesica twisted what I told him to ask: "Can you make a blunt wound with a ~~butt~~ butcher knife as far as cutting?"
I asked him to get her to speak about the capability of the incised 12 cm wound be done by the Butcher Knife rather than the fabricated steak knife the state claims to be the knife used just because it tested positive for Human blood.
The Reasoning for this is because Barbara used a 8"-10" Butcher Knife. , not the steak knife. It's blade would have

to had been longer than the 12 cm to cause a "significantly deep" wound as state's state medical expert claim.

## Criminal Law Deskbook P 16.21

Certain presumptions must be made, that to rapidly make a wound that is an inch deep, you need a fairly sizeable instrument. It has to have, the cutting edge has to be a certain size. If it isn't, you'll see stops and starts when you look at the wound. A large sharp object could make one clean cut four inches long and an inch deep, and you as a layperson, at least, make that observation.

Dailey's incision is 12 cm, nearly 4 3/4 inches long.

Lesica's failure to bring this to the jury's attention and the failure to have the steak knife forensically tested, since <u>NO</u> <u>evidence</u> was tested, is error and prejudiced defendant because it'd show that the state fabricated evidence as well as it'd show that the forensic pathologist, Dr. Fisher-Hubbard did no investigation as to the weapon nor did she investigate into anything other than what the state wanted this case to be: a "homicide."

## 2 Forensic Sciences 25.06

"The only instances where the distribution of coup and contrecoup injuries caused by a fall resembles that of a blow is when the fall occurs over a projecting object." I.e., Bannister, stairs, floor, table, rails, poles, etc. "or from a considerable height."

(A) Blunt force injuries are inflicted by a force sufficient to cause bruises, contusions, or fractures. Such injuries are seen in motor vehicle accidents, <u>falls</u>, <u>suicides involving falls</u> and

Federal Habeas          7 (WW)

homicides involving fights.

(B)  The type and level of forensic death investigation conducted is heavily dictated by the cause of death. In addition, the type of forensic evidence collected is also dictated by the type of case.

Critical information that needs to be collected is the objects or surfaces that caused the blunt force trauma. The forensic investigator should attempt to recover objects such as bats, pipes, and other objects used to inflict the injuries. (In my case, the stairs, floor and bannister). If the blunt force ~~injury~~ trauma is caused by a fall, the height, type of surface and the cause of the fall should be ascertained. ~~See manner of~~ See the specific manner of death for more detailed on the type of investigation to be conducted.

<u>3 Forensic Sciences 32F. 02</u>  (Investigation of Suicide)

Scientific knowledge of suicide is well established, inasmuch as suicide is a major public health problem. Suicide ranks as the 8th leading cause of death in the United States. (2nd leading cause of death for people ages 10-34 since 2008)(per recent newsletter). The accuracy of suicide statistics, especially the accurate determination of suicide versus other modes of death, has significant public health implications and is of great emotional concern and significance to the deceased's family and community. ..... Substance abuse are also sometimes a factor, with substance abuse being more prevalent among young suicide victims. Some of the common precipitating causes for suicide are Seperation, unemployment, legal trouble, and other major stresses.

<u>2 Forensic Sciences 25.11</u>  (Toxicology)

Federal Habeas   7(XX)

From the stand-point of intensive, complete surveys being conducted in all cases of sudden, unexpected, violent, unexplained, and suspicious deaths in Medico-legal investigative offices in the United States, toxicologic principles have not been invoked for too long a time. Unfortunately, many law enforcement officers, coroner, and even certifying physicians still make determinations regarding the cause and manner of death in many cases without the benefit of toxicologic studies. This is a great tragedy and undoubtedly results in serious injustices in many civil and <u>criminal matters.</u>

Lesica, as you see on pages of transcripts came up with some illogical scenarios before on page 26, asks a part of what I asked him to do from the beginning then he adds the falling part at the end and about who was initially holding the knife. I never held onto the knife during the struggle.

page 26 line 21: "How about this scenario? <u>When say the defendant was holding onto the knife</u> and the victim attempted to jerk the knife out of the hands of somebody who was trying to maybe prevent this and <u>his hand</u> slipped off there, got cut in the force of this going back into her neck, you know by her own force as the parties were falling.....?"

"If it was a single wound I could say yes it was possible. But there were at least four incised wounds."

Clearly, Lesica had no clue as to what he's trying to have explained and, again, he implicates his client. He twisted what was supposed to be asked which was: Could the 12 cm and the

two __ADDITIONAL__ superficial incised wounds you hid within the 3rd bulletin have been caused by during when Dailey was making the 8cm cut. MR. Salyers Reached up and grabbed her hand with his left hand, pulled her Right hand with the knife toward him to take the knife away from her, she jerked her hand away causing the knife to go back across her neck, and due to the severity of that wound causing nerves damage, her hand twitched a few times, causing the two incisions that cut the trachea and severed the __External__ jugular vein?

   * Lesica was not helping me. He was causing a lot of harm by his unpreparedness and lack of knowledge in the things he was asking about, trying to make sense of it by instead adding his own twists and ignorance into the mix.

   When that theory of his didn't work he suggests another of his made up theories on pg 27-28 claiming it to being a "fight for life between the victim and the alleged defendant and there were more than one fall..." Again, he is Referring to the incised wounds.
   1) She didn't get cuts from a fall, then another, then another, and another, another, and another. Lesica's false theory is based on nothing in evidence and is not at all __my__ defense.
   2) The Doctor M.E. says, "Yes, multiple falls" that it's possible to cause such cuts but again that is just more proof that she herself doesn't know what she is talking about because when a person falls, their arm's range of motion is severely limited making much more __LESS__ likely for her to cut her neck.

   · Federal Habeas   7(22)

And 3) Lesica, again, implicates the "alleged defendant" by referring this as "a fight for life."

On page 29 Trial Transcripts 9/21/17  line 9: "A small contusion of her brain is caused by hitting the ground probably. Right? Is that a fair —" her: "Some impact." him: "Some impact" Her: Either an impact of an object to the head or the head hitting something." line 19: him "It can occur two ways. Somebody can be hit with say a club or somebody can hit the floor really hard." her: "Correct."

1) A contusion of the inferior left temporal lobe that is only 0.5cm x 0.5cm x 0.3cm (about 1/8" x 1/8" x 1/16" inches) is not sufficient to cause death. The Left Temporal Lobe is the centre for language, speech. 2) Lesica did not bother to ask the Medical Examiner if there had been any investigation into what Barbara Darby's head had come into contact with to cause the bruising, fracture, abrasion, and contusion of the neck, face, head, brain. (Refer back to pg 7(ww) of this and pg 7(xx) a Forensic Sciences 25.06) Lesica failed to show that there was no investigation of this being anything other than what the State wanted this to be written up as even though I told the police I was only trying to prevent a suicide and that she hit her head on the bannister and fell onto the stairs on her right side. Lesica's failures to get anything tested prejudiced me and was error as well as not proving the only line of investigation was that of what police & Prosecutor wanted regardless of the facts.

Federal Habeas     7 (AAA)

On pg. 30 line 12 (9/21/17) "Could she have got the cut on her finger by fighting over this knife?"  "Yes"

Lesica again implicates his client by suggesting she was trying to defend herself from the knife. I told the police in the interview that her finger <u>MAY</u> have gotten cut when z slid the knife out of her hand by the tip of the handle.... yet, Lesica started this theory that she was fighting for her life. 1) implicating me as the violent aggressor and 2) doing the prosecutor's job for him.

Also on pg. 30, There is no such thing as a post mortem psychological evaluation for an injury to the finger. Clearly, Lesica had no idea what he was talking about.

A post-mortem psychological evaluation is the testing of the brain to determine the levels of chemicals in certain areas of the brain in order to see if the person was depressed, enraged, scared, petrified, etc. during the time of the incident onto death. Not sure if something like that even exists so, again, Lesica clearly should have had an independent expert for the defense instead of playing Medical Expert himself.


Again, on pg. 30. "Are you familiar with a finding that she had a certain level of THC Marijuana in her blood level?"
  "Yes"
Prosecutor object to Relevance.
Lesica: "We're talking of a possible fight here over a knife and if she was enraged by this marijuana or some way affected by it."
After so the jury were dismissed fails to question the

7 (BBB)

Federal Habeas

Doctor on what actually mattered.

Refer back to page 7(XX) 3 Forensic Sciences 32F.02 (Investigation of Suicide) " Substances abuse are also sometimes a factor, with substance abuse being more prevalent among young suicide victims. ... Separation, unemployment, legal trouble, and other major stresses."

※ All of which pertain to this case.※

Also, 2 Forensic Sciences 25.11 ( Toxicology)

"Unfortunately, ~~even~~ many coroners and certifying ~~people~~ physicians still make determinations regarding the cause and manner of death in many cases without the benefit of toxicologic studies. This is a great tragedy and undoubtedly results in serious injustices in many civil and <u>Criminal Cases</u>."

1) Dr. Amanda O. Fisher Hubbard is obviously out of her element regarding the effects of THC of 1.9 ~~or~~ ng THC per milliliter of heart blood.   1 nanogram is sufficient to effect a man that is 180 lbs and uses often, per studies and ● expert toxicologists.

2) <u>We're</u> <u>NOT</u> talking about a possible Fight... <u>Jessica</u> is! I asked him to bring up the THC to find out if substance abuse has been known to motivate an individual to go through with committing suicide. Faltering Determinations a.k.a. "hesitation marks" are due to someone who lacks the DETERMINATION to go through with something. However, someone motivated by a controlling substance very well may have a greater determination to go through with their "mission" to succeed in what they're doing.

3) For Dr. Hubbard to say it has NO EFFECT on anything is error and malpractice.

Federal Habeas   7(CCC)

On pg. 33  Lesicz asked "So the summary of your opinion is that death was caused by i.e. just to simplify it, cutting and or blunt trauma, I guess. Would that be accurate?" Dr: "Yes."

Lesicz failed later to object to the Judges denial of involuntary manslaught instructions when he denied them saying it is important that the Doctor said the cause of death was due to both and/or blunt force trauma. * As you see above that is NOT what the Doctor said on page 30. She said Cutting and or blunt trauma. Which, however, is still false as that small contusion of the temporal lobe (left, inferior) is not sufficient to cause death.

On Pg. 35  Lesicz failed to object to the prosecutor twisting what was said. Read pg. 35 line 19-21 and pg. 28 line 2-8. One Refers to the multiple cuts resulting from separate falls whereas the prosecutor changes what was said to Refer to blunt force injuries.

Pg. 36  goes to show that Lesicz (Defense Counsel) implicated his client. "As Mr. Lesicz put it, consistent with somebody fighting for their life."  Lesicz's ERROR caused prejudice, clearly.

Pg. 39  Lesicz fails to re-cross examine the Dr. and impeach her with her Report in Regards to her statement to questions and Answers on pg 36 lines 9 - 16  and he failed to again make it acknowledged to the Court & Jury that there were NOT exactly four cuts as the state and her report suggests, so that the evidence falls in line with my post about thinking of cutting my wrists 4 times, but that there were 6 incisions, 2 more that she hid under the 3rd bulletin so that her report corroborates

Federal Habeas   7(DDD)

the prosecutors knowingly false theory.

Also, Lesica fails to point out that the report 1) withholds previous self-inflicted scars on her upper thighs, right neck, armpits and bottom right foot as well as the cigar burns on her chest from physical abuse. Lesica failed to question the Dr. about who this Tonie Lynn Sweats is whose info is in Barbara's Autopsy Report and failed to make it clear that Barbara Ann Dailey did not weigh 134 lbs, have brown hair, 5 foot 6 inches, and have hazel eyes. So who is the body she examined and included in Dailey's Autopsy Report.

In part, Ferd J. Lesica tried to be the expert. That was not reasonable trial strategy. He failed to interview the Dr. before trial and did not reasonably prepare to cross-examine the trial testimony by relying on the report to ask targeted questions to elicit the exculpatory evidence. Instead of using the report to impeach the witness and to show the inadequacies, he made up outrageous scenarios that undermined the defendants claims that this was a suicide.  Any attorney acting reasonably would have elicited the favorable exculpatory evidence from the report and used the report to impeach the witness by presenting to the jury her failure to document previous self-inflictions, bulletizing the proper number of cuts, the depths of the cuts, and the basic info (weight, height, hair, eyes). Any attorney acting reasonably would have gotten a defense expert, an independent review of the body and report and looked into this case as a suicide and investigated it that way as well. This case is solely a credibility contest, therefore, counsel should have gotten a defense expert to test the credibility along with MEDICAL LITERATURE.

Federal Habeas        7 (EEE)

Trial Transcript 9/21/2017 pg 40  Doug Caelson

On pg 41 lines 12-22.  Lesica failed to question Doug in regards to all of this further. It's irrelevant to the issue on trial but it'd have shown his credibility is worthless.
1) my employment record would show I had work, 2) He had not given me work it was I that gave HIM work doing car brakes, gas filter changes, tune-ups, etc.

On page 42 line 10 "Ok, what was the name of the facebook account?" Caelson: "Joshua Salyers"

Lesica failed to later correct this false testimony. I have Several accounts. The one in Question is Josh Salyers (chosensmalesinger 1987@gmail.com).

On Pg. 43 lines 5-11. Lesica failed to use contents of the facebook post to impeach Caelsons testimony. Also, Lesica failed to establish why exactly Caelson believed this to be in Regards to me thinking about Suicide.  * This is important because that would have proven that State and/or County officials were hiding/destroying/suppressing exculpatory evidence. * (See pages 2/23, 4/22 and 5/22 facebook posts/comments).

You'll see all of a sudden all of Stephanes and mine and the rest of Caelson's comments had been deleted. (facebook.com/josh.Salyers.5)

On Pg. 45 Lesica's only question is : "The one cut, two cut, three cut, four, he was talking about himself, right?"
Caelson: "I assumed that at first."

Lesica as I've mentioned above failed to ruin his credibility with evidence he failed to get and failed to impeach him with that was

Federal Habeas       7(FFF)

in Lesica's possession, and 2) failed to establish as to why Carlson believed that post was about myself and NOT murder.

* Why did Lesica fail to present ALL of Carlson/Salyers comments and the rest to include ALL of Connie Short Clerys/Salyers and failed to present ANY of Stephanie Ann/Salyers comments? *

On pg. 47 goes to show proof that Lesica did NOT work close with me regarding anything about this case. Lines 22 — pg 48 lines 10.

Per Lesica, I was under the impression that he had Eric Emory, Kierrelle Burns, ⊘ Stephanie Ann, Connie Short Clerys, Jennifer Swanger, Dr. Stephanie Howell, psyc., and at least one death investigator/forensic Pathologist defense expert and one toxicologist expert for the defense witnesses.

Had Lesica provided these witnesses I would NOT have had to taken the stand and play this "credibility contest against the Medical Examiner, Deputy Neal, Dete Kway Lakin, city police officers and this jailhouse liar Joshua Gunkin.

Those 5, 10 minutes he Requested were spent asking me what I wanted him to ask the Court to consider giving instructions on when this case is turned to the jury.

I told him ask for the same offer to be instructed that he said State offered: Negligent Homicide along with Involuntary manslaughter.

As you'll see up next, Lesica did absolutely NOTHING to help me, and only furthered implicated this to be something more than preventing, or trying to prevent a Suicide.

Federal Habeas 7 (GGG)

Trial Transcript 9/21/2017 pg 51     Voir Dire of Joshua Salyers

Fred J. Lesica, court-appointed ESTATE attorney, at no time before today (9/21/2017) had discussed with me anything in regards to being put on stand to testify on my own behalf. 1) I had only seen Lesica on 12/16/16, 2/15/17, 5/31/17, 8/3/17, 9/5/17 and during trial. At no time was trial strategy discussed except that all my witnesses had been contacted and would be there to testify as well as 2 defense experts regarding suicide incidents and forensic Pathology/forensic toxicology. It was my full understanding that because of all the people testifying on behalf of the defense, I would NOT have to get on stand to tell what happened because it would have all been explained, clearly, for the jury and court through direct examination of all witnesses.

2) Lesica refused to work close with me or discuss anything regarding what was going to take place at trial. It was only at the time that the prosecution rested its case that he told me that there would be no witnesses to testify on my behalf. He told me only that if I was smart I would NOT take the stand because I cannot discuss anything up there that wasn't already put into evidence nor will he be asking me many of the questions I'd written him, again, because it required the show of evidence that he does not have or wishes to get submitted into evidence.

pg. 52     transcripts of 9/21/2017

Court: "…. I'm guessing that you and Mr. Lesica have probably talked about this repeatedly over the case haven't you?"

Federal Habeas      7 (HHHH)

Me: "Which part?"
Court: "About whether or not you're going to testify."
Me: "It's actually just today we talked about it."

Back on 2/15/17   Judge Hicks refused to provide me a hearing to fire and replace Fred J. Lesica. Instead, the judge gave me legal advice to trust Lesica and to no longer write him anymore letters.

Lesica led me to believe that I would NOT have to testify to tell what happened. Althroughout the state's case Lesica refused to use cross-examination to perjure/impeach witnesses and expose the truth with State's own evidence. Then, when state rests its case against me, he tells me that there will NOT be any witnesses for the defense. Lesica RAILROADED my case. With everything presented by the state, everything being fabricated, mischaracterized, misstated, destroyed, false testimony elicited, reports manipulated, witnesses coerced, witnesses intimidated, and evidence that got suppressed,  I had no choice but to get up on stand and hope that I could get the truth out. Lesica, now Medema, allowed me that chance and had only put words in my mouth and then accuse me of being the one lying and implicates me.

Suppressed evidence due to ineffective assistance is proven in the motion in Limine and the evidence of facebook posts and the phone logs of texts, calls, and facebook messaging. Evidence that proves the State destroyed, manipulated, portions of texts and messaging and comments of conversations regarding

Federal Habeas   7 (I I I)

my, "One cut... two cuts... three cuts.... four... what I have in my mind will ease this pain for real", post proving that 1) the post is, in fact, about my thoughts of properly cutting my wrists; properly done is 4 cuts; and 2) proving that it was, in fact, I that was ending our relationship, not her trying to leave me.

pg. 56 Trial Transcripts 9/21/2017

Motion in Limine.

Medema (states) argument is as follows:

"Your honor, at this time I have a Motion in Limine to exclude potential evidence that I can see the defendant or defense attorney trying to introduce in this case. And that would be contents of the defendant's phone and conversations from that phone, any statements defendant made to somebody in that phone conversation, or any statements made to the defendant are a very classic example of hearsay that I know of no exception that would allow the introduction of that evidence."

Here follows Lesica's ineffectiveness:

1) The post he admitted into evidence, he, bring the prosecutor, was contents of my phone. "And that would be contents of the defendant's phone and conversations from that phone, any statements made defendant made to... or any statements to defendant... classic example of hearsay...."

Lesica failed to point out that my post was made using my phone and that Medema only used parts of it that worked for his knowingly false theory.

Federal Habeas    7 (JJJ)

2) Lesica came unprepared to argue this evidence into being submitted. pg. 57 lines 4-13.

"I wanted all of the Facebook comments provided for the Jury and the Court to see. Evidence Lesica showed me, however, he presented to the Judge the phone text log not my facebook. Lesica had "no idea" what he was trying to argue for. That can be further seen on pgs. 58 & 59. We are not trying to submit Instagram. Further proof,

Madams: "That's why I was standing your honor. We're talking about two different documents here....."

Altheroughout this Motion, as you will read, Lesica had "no idea" as to what he was trying to admit into evidence and still failed to provide the right document. However, he did make a mistake in his and Madams's game and proved <u>Brady</u> violation, pg. 62 line 22, "Which is, the prosecutor cut it off at about halfway through page two." Conversation between Stephanie Ann and Connie (Stephanie's Mom)

3) Had Lesica called Stephanie Ann and her Mom, Connie, to court they'd have been able to testify just as Doug Carlson died regarding what very little of the contents of that suicidal-thought-post which would, therefore, allowed all of the contexts and characterization of the post to been seen. That the post was <u>NOT</u> about Mueckes, it was about me thinking about cutting my wrists.

This shows his argument on pg. 64 to be false.

line 12: The Court: "But the context is provided by your own client?"

lin 14: Lesica: "That's true."

That is <u>NOT</u> true. Stephanie, Connie, and Dougs continued

Federal Habeas                7 (KKK)

Conversation with me proves all that.

4) Lesica had a chance to point out that it was the conversations with Stephanie Ann, Connie Short Clarys and further discussion with Doug Caalsen I wanted submitted into evidence. Not Sherranda Gilz or Brenda Dailey as the Judge states on pg. 65.

Look on the two facebook posts contained in this federal Habeas. You'll see One printed on 9/6/16 and fails to show the complete contents including Stephanie Ann, Connie, and Doug's conversation with me. On the Second printed, by another garbage appointed attorney, on 5/8/2018 where it shows state deleted all of Stephanie Ann and most of mine and Connie's conversation. <u>Destruction of Evidence and Brady Violation evidence!</u>

Trial Transcripts 9/21/2017    <u>Joshua Salyers</u>   pg. 66

Barbara Ann Dailey committed Suicide. As I had stated on pages 68-72, while we were together, She had attempted, or at the least had contemplated, cutting her neck twice before 9/4/2016. She even had a scar on the side of her Right neck, from before we met, when she cut herself to see the amount of pain it'd be.

Lesica's failure to build the background as to why Barbara had become a pill junky, pot-smoker, and a cutter was ineffective because the State misled the jury and Court to believe that Barbara had a lot of life, love, happiness. That

Federal Habeas    7(LLL)

there were no problems in her life that would lead her to want to end her life. The state knows that to be false. According to Barbara Ann Dailey, she was sexually assaulted like her sister, Karol, had been by their Mom's boyfriend at their Mom's permission. She began cutting on her inner-thighs not long after. Barbara's Grandfather was molesting her and, to keep her quiet, he burned her with his cigar on both sides of the chest, symmetrical from one another. Told her it was a taste of what'd happen if she ever told. He passed not long after and she's only told two people about it she said. Legal guardianship went to, Wendy Brown, her mom's "bestfriend" who is a big drug-addict, shoplifter, suicidal, cutter. Wendy married Barbara's cousin, Adam Berge, who raped Barbara around the same time she and Phillip Arends started to become sexually involved. She claims she was raped by Phillips brother as well. Not long after, she ended up pregnant with Angel, her eldest. The relationship was toxic, she said, because he would see other girls and would put his hands on her out of anger. She then got with Christopher Hughes who treated her like gold until after she gave birth to Saverah Hughes. Then, he too supposedly became violent, drug addicted, and began cheating on her with someone named Lara. October 2014, she ended up getting reported for smashing his car window out and being violent toward him at her Dad's on Smith street. Chris and her got thrown out due to the constant fights, arguments, drugging, drinking, leaving the kids with her Dad to go party, and refusing to find and keep a job.  They moved to Hart, Mi / Stoney Creek. ~~Before~~ February of 2016, Barbara gave birth to

Federal Habeas                    7(mmm)

Gemma Hughes and Chris left her "high and dry" for Lara. Barbara moved to Muskegon, on Jireoh St, with her oldest daughter's family because she had nowhere else to go. That was about ~~April 16th~~ April 10th - 12th, Easter Weekend of 2016.

While there ~~for~~ she was kept from getting a job because they were using her to feed everyone off her E.B.T and W.I.C state assistance. She was forced to stay home to cook, clean, do everyone's laundry and be there for her girls. Barbara had been mistreated, neglected, abused, and hurt all her life. It is no wonder she was suicidal, depressed, had anxiety, was put on Meds, bi-polar, etc.

I had moved to Fruitport late February of 2016. I met Barbara off of Kass Stache's facebook page on April 27th or so. She wanted to work as an adult entertainer on the internet. Adult Industry Camming. We met and I refused to hire her onto my streamatemodel.com studio and instead began helping her get her life on track.

Eventually, we moved in together, mid-May, at 1432 Jireoh St. in Muskegon, MI. Barbara had issues with everybody at that house and with Chris Hughes. She would not allow Chris to see his daughters. It got to the point I had to mediate between them even after Chris threatened ~~her~~ to kill her and I both by putting a bullet in our foreheads and taking his daughters. Barbara would get mad at me because I'd make her let Chris see his daughters and because I'd take time to talk to him and get to know him. Chris wasn't the person she made him out to be. Most of it, anyways.

Federal Habeas        7(NNN)

I bought Barbara a car, Dodge Neon, as an incentive to stop using and selling pills and to get a job. I told her if she'd get a job I'd teach her to drive, pay to get her license, and get the car plated and insured. She did. That is when all of the main problems began with everyone trying to break Barbara and I apart because they had lost their control over her, and I had to go. Barbara was forced to quit her job because nobody would watch her girls anymore and I couldn't work 3rd shift and her work 1st/2nd and me stay up and watch them all the time.

After she lost/quit her job she fell back into a depression. She told me she might try getting back with Chris so the girls don't grow up in a "broken home" like we did. She gave me back the car I bought her and told me to go home to Jackson. I understood because I was still married (separated) and wasn't over her either. I left. This is in July after I had to wake up Savrah and Gemma to get her to put my knife down away from her neck. She called me about an hour after I left and begged me to come back, that she is sorry and changed her mind. I gave her the weekend to figure out what she wanted. I ended up in Jackson County Jail Sunday night/monday morning. An outstanding warrant from 2007, I think. Traffic violation? So I went back to 1432 Jiroch St. to Barbaras that Tuesday. I had gotten Barbaras and I intreviews at Michigan Adventure when I got back. We went and got the jobs if we wanted them, but Barbaras said NO because she couldn't be out in the sun too long or she'd faint and become sick.

Federal Habeas     7(000)

Again, everybody began trying to break us apart. On Savash's 2nd Birthday we were going to get party stuff and Angel asked me if she could go. I told her not unless she asked her Dad, Phillip Arends, first since he was awake. He worked 3rds, so, when he's up, I don't step on his plans with his daughter. Barbara got made at me over that and accused me of treating Angel different than the younger two and told me to pack my stuff and leave. I told her to pack it if she wanted me gone and put it in the car. She packed it but then told me to take the plate off the car so I couldn't leave. She called 9-1-1 to get the plate and they told her they couldn't since it was in both our name. They took her to Jail. I called all her "family & friends" to see if they would help me get her out since it was Savash's 2nd Birthday. Everyone told me leave her there, that if I was smart I'd pack my stuff, call chris to come get his daughters, and leave Barbara before she burns the bridges with me and breaks my heart. Her aunt Karen said Barbara refuses to seek help and stay on her meds and that she has been messed up for a very long time. Eventually, Aunt Brenda agreed to help me but in the morning.

We got her out and Aunt Brenda asked I bring her out to her house to have Barbara work off what she owed and so she could try talking sense into her. I helped Aunt Brenda's husband build steps from the house down the hill to the lake due to her "Dropfoot Syndrome."

Later in the days after getting back from her Aunt Brenda's house she (Barbara) again placed my other knife (Buck Hunting Knife) to her

Federal Habeas     7(PPP)

neck. I'd gone upstairs to get her because my friends arrived to hangout at the fire. When I'd gotten up there, I had to wake Saveah and Angel up to get Barbara to put the knife down.

Then, later in the week, Mid-August, Barbara and I was out front watching the meteor shower when one of her old drug dealers did a drive-by shooting. I plowed her to the ground and covered her body with my own. 6 shots ~~for the~~ 7.62 rounds later, he sped off.

Becky, the homeowner, took Barbara to go get her food assistance cashed out for the house on August 15th 2016 and told Barbara if I made it harder on her (Becky) to get me out of the house (court ordered 30 day notice) then when I go she ~~also~~ will also be kicked out with her youngest 2 daughters while Becky took full custody of Angel from her. So, I left the next day. Was gonna go back to Jackson, but Barbara begged me to move in with her friend, David Shivlie, in North Shores, Mi. He gave me 3 weeks to find somewhere to go or find a job. I had a job opportunity at Shape in Grand Haven but because people at 1432 Jirah sabotaged our car I had no way to work when I was suppose to start. I made plans to go back to Jackson and work but Barbara again did not want me leaving. She asked me to meet her at her dads on ~~September~~ 1, 2016 to see if he would let her, her daughters and I move in until we could get to Jackson together. He told her, "No, because of her and Chris drugging, partying, leaving the girls with him to do all that and constantly fighting." He told her that I could move in but not her and his granddaughters. We left with her really

hurt and upset. I told her that if she couldn't move in I was just going to Jackson. She talked me into staying until Angel starts school which was after Labor Day weekend (vacation).

I moved in the next day ~~August 2~~ September 2, 2016 after David Shivik got home from work. Barbara called Chris to have him take Saveah and Gramma on Friday when he could get them. Then she came and spent the weekend with me at her Dad's. She had me dye her hair purple and her Dad's girlfriend's Blonde. She bought an ounce of weed from her girlfriend (ex) (drug dealer).

On Saturday night, I told Barbara that I plan on getting tested to see if I can be a donor for a family friend who was on dialysis. She took it kind of hard and told me that <u>if I choose</u> to do that then I should <u>consider</u> moving on. I walked her home and returned back to her Dad's. I chose the Relationship with her and tried talking to her about it so she wouldn't go to bed upset.

The next morning I spoke with several people about thinking about ending <u>my</u> life by properly cutting my wrists (‖ ‖). Instead, Stephanie Ann and her Mom, Connie, talked me into leaving Barbara. When I told Barbara she hung up on me and when I did as she asked and left her alone she got mad because I blocked her on facebook. She messaged me ~~after~~ <u>on my phone</u> telling me to "burn in hell" because I blocked her. All she wanted to do was argue. Eventually, she calmed down and asked me to meet up with her to go walk. "I'm going for a walk, I'll see you if I see you. I'm sorry and I love you." I was cooking and didn't answer the text, so she called. I called her back 3 times before she answered because she was getting Ready. I told her I was going to Wood St. Market for a couple

Federal Habeas                    7(RRR)

single cigarettes and asked if she wanted to go with me. She agreed so I walked to the front of Kevin Sanders' house (House with Cameras) at about 5:01 pm when I called her to tell her I was there. She told me that nobody was home and to come on over. We left for the walk a minute or two later to Wood Street Market.

\* There is proof of this. Also <u>Brady</u> violation and prosecutor's brief is falsified in its facts. \* \* Ineffectiveness of Counsel for not exposing this and all of this above mentioned history. Showing Brabees had everyone against her and I, causing her problems. \*

After we sat for a bit and smoked a cigarette out of the sun since the sun and heat was getting to her, we made it back to the house on Jiroch St. went in for a few minutes then left, again, this time to go get the Weed from her Dad's so we could go to her friend David Cobbs who we met with at Wood Street Market. We got to the end of Jiroch st on Southern, behind Hackley Hospital when she got light-headed again from the heat and sun. We sat in the shade along the street under the trees. We tried readding one another on facebook but couldn't because I had to wait 48 hours to add her since I blocked her. We had gotten back together. When we got up to leave she got light headed so she wanted to go home out of the heat for a bit. The plan was to take her home, then I go to get the weed, then meet back at her place.

We took the back alley to behind her house to be out of the sun. The back door was locked so we went to the front. As she was coming off the back porch, Stephanie Ann messaged me at 7:03:04 pm (this is extremely important info)(More <u>Brady</u> violation, \* obstruction of Justice and prosecutorial/police misconduct. I.A.C.) \*

We go inside the house, according to flawed video footage that was presented to the Jury while knowing it to be flawed, at

<u>7:07: 26</u>!?

After we'd gotten onto the porch she asked me to stay for a few and if anyone came home to go out the back door. Things were getting intimate between us when we heard a door close outside. I had got up with her on my lap and sat her in the chair and went out the back door, nearly tripping over Sadie, the pitbull. I had went up the small terr and over the left-corner fence, walked down the back alley and when I looked down the drive I had seen the lady across the street carrying stuff from her vehicle into the house and also the next-door girl going in from her car. When I got to the corner of Leahy and Gerard Ave Barbara called me to tell me nobody was there. I told her I know, it was either the lady across the street or "pretty girl," as I seen the lady when I look down the deiveway. I told her I was going to just go get the weed and eat then I'll be back to get her to go to Davidz Cobb's. She said, "okay, tell Dad I'm sorry for everything. That I forgive him and love him." She was upset and crying. I said "okay, what's wrong?" She told me "I Love you and I'm sorry." I told her "I love you, too. Barb, what's wrong?" She hung up. *Police say the call was only 25 seconds*

I put the phone in my right pocket and jogged back to check and see what was wrong with her because everything was fine when I had left.

When I'd gotten to the house I went in and left the door open. Barbara was standing near the stairs that lead upstairs holding a large Kitchen block butcher knife to her neck in her right hand and the Alcatel cellphone in her left. I told her to put the knife down, that everything will be fine. She said that she is "tired of all the bullshit," that she loves me and she's sorry.

Federal Habeas    7 (TTT)

She made a cut (small cut) that was bleeding pretty bad. I had stopped the cut from continuing by shoving her with both hands to her chest. I shoved her to force her to drop the knife and catch her fall. Her left hand hit the bannister, slinging the phone to the south wall, and she hit the left side of her head on the bannister. She fell to the stairs, landing onto her right side.

When she got up, she told me, "Josh, please don't, just let me do this." I seen she still had the knife in her right hand. I told her I couldn't let her do this because of her girls, that if she does this I'll be joining her soon. She told me, this is why I gave Chris the girls. Promise me you'll make sure they are taken care of." She made another cut. I'd reached up with my left hand and tried grabbing her wrist but instead got her hand. I pulled her hand and arm toward me when she jerked her hand out of my left hand and the knife went across her neck. Her hand twitched like two times as she was going lax. I had stepped to my left, her right, grabbing her wrist with my right hand pulling her arm and hand away from her body, stepping behind/beside her and shoved her OVER my left leg.

She landed face first, then, when her body landed, her head came up and landed onto her left side on the floor. Switching hands on her wrist, I grabbed the tip of the handle and slide the knife out of her hand which I ~~thoud~~ thought cut a couple fingers. It caused a single small cut to the ~~second~~ medial-distal portion of her second right finger. *(Impossible to have if a cellphone was in the hand ~~as~~ Bringedahl lied on stand about.)*

I placed the bloody butcher knife in the sink on top of the two knives that were in the sink and immediately called 9-11 then stepped outside onto the porch to look and see if pro-med was driving back up the street. 9-1-1 answers and I tried

Protecting her from losing her childrens by not telling ~~them~~ her (dispatch) what really happened. I said I saw a black male running from the area, with a very vague description, so that Nobody would get falsely arrested. When I was outside, 9-1-1 told me to calm down so I sat down on the steps and talked to her. She asked me to go in and tell her everytime Barbara took a breath. Then advised me to use something soft, a towel or shirt, to place to the wound with light pressure. When I turned her head to gain better access to the wound, I'd seen her blood bubbling and frothing which told me that she'd cut her trachea. So to keep her from dyspnea, or painful breathing, I had placed my finger of my right hand over the incision of the trachea to keep Barbara from aspirating bloods into her lungs and drowning on it. Had I not done this Barbara would have had a significant amount of blood in her lungs. However, she had none. I then placed ~~my~~ shirt over the rest of the wound and applied light pressure as advised by 9-1-1 dispatch lady.

4.4 pounds of pressure is all that is needed to keep the blood from leaving the facial part of the head through the EXTERNAL jugular vein, causing ~~pet~~ petechial ~~hemmor~~ hemorrhaging, or "punch drunk." I stopped the bleeding as best as I could without stopping it completely so she could still get oxygen into her.

When this portion of it occurred, Barbara grabbed my right lower leg and scared the hell out of me. Listen to the 9-1-1 call. The emotion is not faked nor the reaction to her grabbing my leg near my sock/boot area, slinging blood UP my leg.

I kept Barbara alive for medical to arrive. She lived until passing away 46 minutes later at the hospital.

I should have been allowed to fully explain all of this

Federal Witness        7(VVV)

but Fred J. Lesica and the Judge had told me I could not explain or talk about anything that is not in evidence. Lesica had Railroaded my testimony for failing to ask me questions that I could have had put things into evidence such as the self-inflicted scars on Barbara from past cuttings, the abuse she's told me about, the problems with everybody against Barbara and I, where I was when I called Barbara (so that the Correct time could be determined), what knife Barbara had used, what was her height, weight, eye color and hair color, how'd I think she fractured the hyoid and got the bruising to her face, how many cuts did she have to her neck, the lengths & depths, when I was in Basic Training what was I taught regarding cutting a person's neck and why, when was it we argued and she told me to "burn in hell" (Text log).   There is more but all this would have gotten the Autopsy Report put into evidence, the photos that state had suppressed to hide the previous self-inflictions and cigar burn scars, the rest of the video surveillance footage that proves the Right time and that Charles Justain lied in his brief opposing motions and Daniel DeYoung lied about me never being on the west side of Jiroch St, among other lies he did. It'd have gotten my text log admitted that was suppressed, during trial, to prevent me from proving Medema was deliberately misleading everyone and that police/state had deleted several things out of it. And it'd have allowed me to explain the proper way to cut a neck that'd kill someone in under 3 minutes, not 46!

What I have written here is what I've given to Lesica and, clearly, you can see that he did NOT represent my defense, or claims of what happened. Had Lesica asked the M.E. (Deputy) Dr. Amanda O. Fisher-Hubbard this, the results of this case would have most likely had a different outcome. Or perhaps had Lesica provided me with a Defense expert to verify my claims of what happened... the TRUTH! ... then, again, the Defense Expert could have

Federal Habeas          7 (www)

unexamined the States expert and her manipulated **report** and without having to put me on the stand had the Defense expert explain **MY** case, defense, claims. This case was a matter of who the jury was going to believe, Me or the police & State's Medical examiner. And based on the knowingly false evidence presented by the state to corroborate its false theory, I had **absolutely** no chance of being believed.

Lesics was ineffective for failing to object to Medema putting words in my mouth then accusing me of not telling the truth. (Trial Transcript @ 9/21/17 pg 87 lines 10 – pg 90 line 17 (6/28/2010) Wend v People, 235 P. 3d 1089  "A prosecutor acts improperly when using any form of the word "lie" in reference to a witness's or defendant's veracity." New Trial

This was **NOT** the first or last time he calls me a liar. pg 94 line 24: I cannot tell him what happened about the "4th" bulletined cut. I couldn't give him my assumption without the rest of the cuts also being in evidence. The 2 that occurred before the "4th" cut but after the 1st, 2nd, and 3rd cuts. My assumption is it occurred when I grabbed her waist with my right hand <u>while</u> she was starting to fall forward, as I side stepped to beside/behind her. It caused no significant harm; even State expert said so. perhaps pg 93 line 18 is the "4th" cut?

pg 105 line 8 – pg 106 line 6: State putting words in my mouth then calls me a liar by saying that's not what I told him earlier on pg 94 line 10; This is error on Lesics for not objecting because Medema used his own lies to capitalize on making me out to be a liar during his closing arguments (See Trial Transcript 9/22/2017 pg. 16 lines 12 – 25, pg. 17 line 18, pg. 19 lines 1 – 6, pg. 19 line 10, pg. 19 lines 13 – 16, pg. 24 lines 9 – 10, pg 25 line

Federal Habeas    7(XXX)

1-15, pg. 26 line 7. Page 29 line 1-10, pg 31 line 17-19. Pg 44 line 13-21. Pg 45 line 12-13 & line 22-23. Pg 48 line 11-13 pg. 49 Line 5!

Trial Transcripts 9-21-17  Deputy Kaleb Gilbert  pg 117-122

Deputy Kaleb Gilbert was called by the state to provide testimony as to my where abouts so that state can "prove" that Joshua Guerin and I were in A Pod together, and to give credibility to Guerins coerced statements.

When Ferd Lesica had the opportunity to cross examine Deputy Gilbert, he failed to do that Rendering ineffective assistance of counsel. This is ineffective because had he consulted with Jennifer Swanger (mental Health Social worker with Health West), Lesica would have been able to show absolute proof that I was never in A Pod with Joshua Guerin Regardless of the "Inmate Log". Swanger came to see me on July 21st 2017 and at that time the "Inmate Log" told her I was in A-Pod. When she went to pull me out to talk, Deputies told her I was moved to M-POD and it wasn't logged properly.

This is proof that the Inmate Log was later "Doctored" to show me being in A-Pod so Guerins coerced testimony rings true.

Lesica should have investigated into this and prepared for this by getting in touch with Swanger and several

other inmates.

I was moved on June 28, 2017, a Wednesday, from A-Pod to M-Pod after I had written to MLive. They printed an article on <u>June 25, 2017</u>.

"Alleged Throat-Slasher writes Officials"

I then wrote a 2 page letter to Governor Rick Snyder. Sent a copy to my Mom and addressed the other to Snyder and placed it in my attorney-client privileged folder. 3 days later I was pulled out and placed in M-Pod and put on "observation" off books. I was <u>NOT</u> given my property until Jennifer Swenger seen me on July 21, 2017. When she saw me she told me she was never notified that I was placed on "observation" and because I had been denied showering for 3 weeks plus, she said "Whew, you smell really bad." I told her all that had happened before this day while she was on vacation. She told me the "log" says I'm still in A-Pod and that this happens often because the Deputies are forgetful or lazy.

When I got my property back the letter addressed to Snyder was missing, along with the book I was writing. Now all of a sudden Guerin is put as a witness and states on stand exactly what is contained in that letter and in my book I was writing. That letter was intentionally misleading & written to prove corruption & prosecutorial misconduct.

Fred Lesica failed to ask Deputy Gilbert if, ever, he has encountered an ERROR in the system "log" when he's went to get an inmate for court, or otherwise, or whether

Federal Habeas   7(ZZZ)

if he's heard of there being any errors by other Deputies who went to one pod to get someone that was to be found in another Pod.

Lesica provided ineffective assistance of counsel for failing to elicit testimony from Gilbert of possible error in documenting my whereabouts until a later date and for failing to prepare properly for trial as he did not interview Mrs. Jennifer Swanger to provide the truth of where I was and where did the "Inmate Log" claim me to have been when she came to speak to me. This would have proven the system was changed AFTER July 21st 2017, not July 14th, 2017 as Gilbert testified the "Inmate Log" states.

Trial Transcript 9-21-2017 Sgt James Gust pg 123-129

Lesica was ineffective because he failed to use the time off of my phone of 5:01:27pm when I was standing in front of the house, on the Westside of Jiroch St, that has the camera surveillance system to obtain the exact time that I entered the home at "7:18:16" and called 9-1-1 at 7:15:51.

Sgt James Gust failed to compare the only two Relevant times to, correctly, establish the right time. Lesica was informed of this while Gust was testifying and knew of this error regarding the time difference

Federal Habeas 7 (AAAA)

Since the day he met me on 12/16/2016. Yet, Lesica had failed to do the investigation for himself to determine the exact time and to prove the physical impossibility of a murder being committed as the prosecutor has falsely suggested.

On pg. 128 ˡⁱⁿᵉ ¹⁵ Sgt Guest says "No, I've looked at, I think there's three or four channels, I'd have to ~~took~~ take a look at my report, and I watched all of them."

Here, Lesica should have provided Guest with his report because it shows that there are 5 channels, not 3 or 4. However, Guest only documented in his report CH1, CH2, CH4, CH7. Where is CH5? Also, his report documents that he had downloaded the surveillance system's files from 14:00 hrs to 20:59 hrs (2pm - 7:59 pm) Yet, he failed to document from the time Barbara Ann Dailey and I first met up and went for our walk. He only documented in his report from 7:06:14 to 7:25:52.

On pg 128 line 24 - pg 129 line 2, Guest says, "I didn't ~~can~~ use— I didn't compare those channels to the cruiser videos or dispatch call. I did this one here. <u>If I recall when I looked at all the channels they had the same time.</u>"

Please refer to the diagram I've drawn of the area and times the surveillance shows the documented times and channels of Guest's report:

Federal Habeas 7 (BBBB)

<u>Per Diagram A</u>

You will see that at 7:06:14 (CH7), ~~Barb~~ Barbara
and I are walking North together ~~at~~ in the alley
heading to the house (1432 Jiroch St). At 7:07:12 (CH1)
Barbara and I are walking along the Southside of 1432
to the front of the house. Then at 7:07:26 (CH1),
Barbara and I go into the house. Then at 7:11pm,
per Barbara's phone, according to Officer Bringedahl, there is
a call to "My Husband" (405-747-0680) (me), that lasts about
25-30 Seconds.

After being in the house about 6 minutes and
10 seconds, you will see me in the alley alone at 7:14:48
(CH7) walking South. How'd I come up with 6 minutes and
10 seconds?

From point A to point B, it took us 1 minute 12 seconds
to walk that. From 7:07:26 until 7:14:48 is 7 minutes
and 22 seconds. Subtract the 1 minute and 12 seconds from
7 minutes and 22 seconds and you get 6 minutes and 10
seconds, the amount of time her and I were together
inside before I left.

Now, per <u>MY</u> phone records, I called 9-1-1 at 7:15:51.
According to Diagram A, the call would have had to been
made either near or between Leahy St. and the alley, <u>OR</u>
it was made after 7:12:22 (CH4) when I came around the
corner onto Jiroch St and before 7:17:48 (CH7) as I'm
"walking" ~~back~~ back to 1432 Jiroch St.

What Diagram A (what was presented by State)

Federal Habeas 7(CCCC)

is that Barbara and I go into the house together. While we are in there something bad is happening and that a little over 2minutes after a call is made to my phone (405-747-0680)("my Husband") from her phone at 7:11, you see me walking alone in the alley. Then, Regardless of the call being made at point C or D, there was a 9-1-1 call made BEFORE I had Returned back to the house.

Now could I have had the Knowledge that Barbara Ann Dailey was in need of Medical attention before I had Returned unless I was in the house those 6 minutes and 10 seconds doing what the State presented and accused me of doing?

As it was presented to the Jury, it proves "Guilt" beyond Reasonable doubt. However, for the Courts to ~~affirm~~ affirm such a conviction is ERROR.
"One of the fundamental principles of our legal system is that the government's interest in criminal prosecutions is NOT simply to win a conviction, but Rather to see that justice is done." Berger v United States, 295 U.S. 78, 88 (1935)
"As long ago as Mooney v Holohan, 294 US. 103, 112, 79 L. Ed. 791, 794, 55 S.Ct. 98 ALR 406(1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'Rudimentary demands of justice." This was Reaffirmed in Pyle v Kansas, 317 U.S. 213, 87 L Ed. 214, 63 S.Ct. 177(1942).

Federal Habeas   7 (DDDD)

In Napue v Illinois, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), we said, "[t]he same result obtains when State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id., at 269, 79 S. Ct. at 1177."

A new trial is required if "the false testimony could... in any reasonable likelihood have affected the judgement of the jury." Napue, supra, at 271, 79 S. Ct. at 1178. Giglio v United States, 405 U.S. 150, 153-154 (1972).

Testimony that gives a false impression is false evidence. People v Atkins, 397 Mich 163, 173 (1976).

The burden of disclosure is on the prosecutor, not on the witness or the defense attorney. People v Trombley, 67 Mich App. 88, 240 NW2d 279 (1976)

In People v Anderson, 44 Mich App 222 (1972) the Court of Appeals held: "We are constrained to rule that even though the testimony... may have been obtained by the prosecutor innocently and given by (the witness/evidence) in good faith it was not true, and in fact was used to improperly to discredit defendant and obtain his conviction." People v Anderson, Supra, at 229

"We cannot speculate in light of this substantial error whether or not the jury gave consideration to the erroneous testimony in reaching its verdict. A new trial is required." See People v Anderson, Supra, at 44 Mich App pp 228-229; 205 NW2d pp 84-85." People v Cassell, 63 Mich App 226 (1975) at 229.

Fred J. Lesica provided ineffective assistance of counsel when he failed to ascertain that defendant was given a fair

Federal Habeas 7 (ΣΣΣΣ)

trial through the presentation of evidence that is true. Lesica knew that the surveillance footage would be used at trial to help the prosecution paint the picture in the minds of the jury that defendant is Guilty of Murder in the 1st degree/2nd degree. However, Lesica failed to ensure that 1) the footage would be shown from the time ~~that last~~ Barbara Ann Dailey and defendant first met up at 5:01:27, 2) that the ERROR in the time sequence would be _correctly_ established before trial as he knew about this ERROR since 12/16/2016, and 3) Lesica failed to investigate into this matter and further establish the _Correct_ time by impeaching Sgt. Gust on his testimony regarding the time he now claims to be correct and that all times were the same.

Sgt. Gust added 2 new "controls" in order to establish the "correct" time: The police cruiser video/audio and the cellphone of Sgt. Strauss, neither of which were there when this incident occurred. Sgt. Gust is in charge of the technology aspect of this case. ~~Photo Lesica~~

Had Lesica played the portion of the surveillance footage of when defendant was standing in front of CH1, CH4, CH7 when making the call to Barbara Ann Dailey ("My Wife") at 5:01:27 the _absolute_ _correct_ time would have been established.

Lesica's ERROR will be shown in Diagram B and the prejudice to the defendant is had because if not for counsel's mistakes, the outcome of the trial would have been different. Strickland supra, at 694

Federal Habeas   7 (FFFF)

It'd have been different because defendant would have been able to show but for the prosecution altering its presentation to compact with ~~flawed~~ knowingly flawed evidence of the surveillance system and causing the pertinent exculpatory evidence, which would have created a reasonable doubt, at the least, for the accused, to disappear from the record.

Sgt Gust downloaded all files from 2pm to 7:59pm, but none but that of 7:06:14 - 7:25:52 was disclosed.

See Diagram B

At point "A" you'll see Barbara and I walking North in the alley. At point "B" I receive a Facebook Message at 7:03:04 from Stephanie Ann (see phone log) while we were heading to the front door since she said the back door was locked.

7:03:04 from 7:07:12 (CH1) Equals 4 minutes and 8 seconds then it took about 8 seconds to be seen by CH1 which would make it 4 minutes 16 seconds minus 7:07:12 which now comes to 4 minutes and 4 seconds off between MY phone time and CH1 footage.

So since Lesica did not get the footage of when the call to "My Wife" was made at 5:01:27 and subtract it from CH1, CH4, and CH7 the 4 minutes 4 seconds difference is the best time that is nearest to correct.

Subtracting 4 minutes 4 seconds from all surveillance times except CH4 you can now see the clear error and how the prosecution's use of incorrect footage and its speculation had mislead the jury and Court.

Federal dubbies 7(GGGG)

Here is the following in nearest correct evidence.
At 7:02:10 Barboza and defendant are walking North in Alley. At 7:03:08 Barboza and defendant are walking along South side of 1432 Jiroch St to the front. At 7:03:22 they both go onto porch and go inside the house.

Watching the footage you'll see, possibly, the "lady across the street" pull into her drive. Then, at 7:10:44 you'll see defendant walking alone South in alley. At about the corner of Leahy St and Grand Ave defendant receives a call from Barboza at 7:11 ("My wife"). The call ends with defendant near to Forest Ave (25-30 seconds). Next you see defendant on "like a jog", at "7:12:22", West on Grand Ave, then turns North on East side of Jiroch St. At 7:13:44 defendant is on "like a jog" heading North on East side Jiroch St. Pro-Med Ambulance passes him as it's going to Hackley Hospital. At 7:13:49 defendant still on "like a jog" heading North on East side Jiroch St sees the "lady across the street" getting into her vehicle, on the phone, about to leave. At 7:13:53 defendant still heading North on Eastside Jiroch St. At 7:14:12 defendant goes onto porch and inside 1432 Jiroch St. He leaves the front door open. Defendant is in the home approximately 1 minute and 38 seconds when there is a call to 9-1-1 at 7:15:51 from defendant's phone.
At 7:16:11 defendant goes outside and stands at

(* 7:12:22 is also off by at least 1 minute)
Federal Habeas    7 (NNNNNN)

edge of stairs. ** At 7:16:33 defendant goes inside. At 7:16:45 defendant goes outside into the yard and by sidewalk.** At 7:17:16 defendant goes to the steps and sits down on them (9-1-1 told me to calm down). At 7:18:27 defendant goes inside (to render aid as advised by 9-1-1 dispatch). At 7:21:25 first officer heading west on Irwin Ave and then south onto Jiroch St. At 7:21:48 first officer enters the house.

Defendant could not have the time to knock ~~to Barbara~~ Ann Dailey around, beat her, cut her neck not 4 times but 6 times, stage the call, stage the scene, and choke her as the prosecutor speculates further in closing "to keep her from being able to tell the truth of what happened" all in a matter of 1 minute and 38 seconds.

Defense attorney, Fred J. Lesica, rendered ineffective assistance of counsel that meets the requirements of Strickland v Washington, 466 U.S. 668; 104 S.Ct. 2052; 80 L.Ed. 2d 674 (1984)

"There is no doubt that the evidence in this case was sufficient to support a verdict of Guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and again under

(** Notice on footage defendant looks south for Pro Med as it may come up Jiroch St.)

Federal Habeas   7 (I I I I)

the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt and innocence with all of its ramifications" United States v Barham, 595 F2d 231, 242 (CA 5, 1979).

In the instant case, had Fred Lesire provided effective assistance of counsel to show the mischaracterization of Defendant's post, the errors in the Autopsy Report, the false testimony of several state witnesses, the error in the surveillance footage time and properly corrected it, and had he effectively shown that statements made to Detectives were in violation to the Constitutional standards for it to have been properly suppressed and shown that there was no evidence collected or tested due to the recorded statements, and had he provided the defendant with his right to defense experts and defense witnesses the case would have absolutely been different as the evidence was in fact, not overwhelming to offered a conviction without the prosecution's many misconducts and errors.

See also Beasley v United States, 491 F2d 687, 696 (CA 6, 1974) "Counsel must take reasonable steps to challenge the weight and credibility of the evidence against the defendant, including witness testimony. This standard is violated when counsel, through ineffectiveness or incompetence, deprives a criminal defendant of a

Federal Habeas 7 (JJJJ)

substantial defense, or when counsel fails to investigate and properly assert all apparently substantial defenses."

✳    <u>Trial Transcript 9/21/17 Detective Korey Luker</u> pg. 130

During Cross-Examination Lesica failed to expose the fact that the apology letter is not in regards of a "murder" but that it was regarding that we both decided that death was what we've both chosen for our hurts and pains. ~~asked~~ In other words, I had apologized that we've decided suicide was our option to end our pain and that I failed to keep her from trying to kill herself.

During "Cross", Lesica failed to question the detective about the photo of my ~~no~~ hands. During "direct", Luker stated that there were no injuries of my hands. Had I punched her over and over as the prosecutor states in his closing, would there not be injuries on my hands? Or how about this, if I am "choking" her, which is "what put the blood on his hands", would there not be ~~a~~ offensive wounds such as scratches, nail diggings, etc to my hands and/or arms and face?

During "Cross", Lesica failed to ask Luker about how gravity affects things such as blood. If you

Federal Habeas    7(KKKK)

take a look at the photo (exhibit 31) you will notice that the "blood drops" on the back of my calf are not actually blood drops. When blood falls onto a vertical (up & down) surface, it will follow the path of the least resistance. Since gravity affects all things, the "blood drops" would ~~Rain~~ Rain downwards!

These "blood drops" show that they were slung upwards onto my leg and then gravity began pulling them downwards. This is important because according to Officer Beingedahl Barbara had her alcatel cellphone in her Right hand. How then could she have a cut on the inside portion of her 2nd finger of her Right hand if there is a phone in that hand. And if you look at the back of my sock and boot area, you would see the "smear" or "smudge" from her grabbing the back of my Right leg when I went to render aid as advised by 9-1-1. There does NOT have to be "Handprints" when the wound to her finger is minor and only on the 2nd finger (middle finger) of her Right hand.

Trial Transcript 9/21/2017 pg 139-141

The "History" of the handcuffing before all 12 Jurors:

Court asks my counsel if "Salyers isn't wearing any chains around his legs is he?"

Lesica says "No" and fails to mention I have a ankle tazer that'll send 150,000 volts into me.

Federal Hobbies  7 (L L L L)

As you will also read through pages 139-140, there is no justification for handcuffing me cited in this "History" the Court made. Just that it should NOT have happened.

The next morning counsel moves for a Mistrial to be declared.

Trial Transcript 9/22/2017 Request of Mistrial & Jury Instruction of Involuntary Manslaughter pg.3-14.

On page 3, the Judge states that he thinks what happened was a combination of several missteps including probably a couple of his own. There is no record as to what the "missteps" of the deputies nor his are and surely there is not any record of the handcuffing me, while wearing the ankle tazer, was due to "maintaining order and for public safety....." as Court of Appeals erroneously wrote in its opinion. Public Safety was NOT an issue seeing how I've been nothing but cooperative and I was fitted with a 150,000 volt ankle tazer. (Read pg 2 of COA # 341162 opinion 7/9/19 unpublished.)

Lesica failed, again, to inform the trial court of the fact I have been fitted with the ankle tazer device the entire trial for the reason of "maintaining order and public safety" and that handcuffing me, after I'd just given my testimony that day, could very well had a negative impact and further show that I cannot be trusted and that because the court allowed me

Federal dbbsas   7 (mmmm)

to be handcuffed in front of them, when on all other days I had not been so restrained before them, the trial court must also be worried about me being a threat and cannot be any longer trusted.

Lesica, also, failed to counter that I did not "urge" the deputies to handcuff me. Lesica heard them tell me to "cuff up" and me tell them, "No, you cannot cuff me in front of the jury." The Deputy told me "Cuff up or tazer gets activated." This is the reason Lesica asked for the record to reflect the error and the next morning he requested a mistrial. Yet, he, as I said, failed to put all that had occured on record. This failure cannot be deemed effective assistance of counsel nor can it be deemed as "Sound trial strategy" because had the court knew the actual incident that took place, it is likely a mistrial was most likely.

Also, the judge cannot know whether or not the handcuffing had no negative impact on the Jurors mind Regarding my cerdibility as a witness and as an upstanding individual that is presumed to be innocent, until proven guilty, and whether or not I can be trusted. Especially when Restraints are known to show that they are used to Restrain a person, and animals, that are deemed to be dangerous and/or untrusted, and it made it all the more an error that Restraints were applied with no Record or evidence of needing them as there was no cause for them considering I'm already fitted with an ankle tazer.

A mistrial should have been declared.


Federal Habeas   7(NNNN)

Regarding "Involuntary Manslaughter" Instruction: pg 7-14

Lesica failed to challenge the prosecutions opposing brief on a few "facts" the state knew to be false.

1) Defendant did __NOT__ come out of the house to meet officers. I was found in the home weeping and crying over Barbara Ann Dailey. Kneeling over her rendering aid as advised by 9-1-1.

2) "Defendant indicated that he and the victim went for a walk together. He purchased a cigarette for her at Wood Street Market and they ~~walked~~ then walked to Hackley Hospital where they sat under a tree and had a conversation. They got into an argument and she told him to "burn in hell." Other evidence presented indicates the defendant's story of what occurred was a prevarication. He never went for a walk with the victim. Defendant's facebook posting indicates a prior plan to administer four cuts."

   Defendant __DID__ go to Wood Street Market with Barbara Ann Dailey. Had Lesica presented __All__ video footage from around 5pm until 7:25:52, according to surveillance footage time, and interview David Cobb it'd prove we took a walk to get cigarettes, then ended up back at 1432 Jiroch for about 2-3 minutes, THEN, we went to go to her Dad's but sat at Hackley Hospital's shade tree along the street and then we went, again, together back to 1432 Jiroch St. There was no argument at the tree where Barbara told me to "Burn in Hell." She told me to "burn in hell" for blocking her on facebook at 4:19:37pm. That was hours __Before__ we

Federal Habeas      7 (0000)

end up at the tree. Only about a little more than a half-hour before we met up to go for the walk to Wood Street Market at about 5:01:27 when we met up at 1432 Jiroch.

Watch the surveillance footage. It's no wonder the state failed, purposely, to ~~disclose~~ ~~withhold~~ these facts and suppress this exculpatory evidence. See surveillance footage from 5pm to 7:25:52 and text log pg16 #255  ; when I met up with her at 1432 Jiroch pg 20 #328 (5:01:27)

3) Defendant's hand did __NOT__ apply too much pressure to her hand. Nor was both our hands on the knife.

It was the pressure __she__ caused when __she__ jerked her hand out of my left hand and it ~~went~~ across her neck. My hand was __NOT__ on the knife, nor her hand, when any cuts were made.

Also, if defendant supposedly cut her throat, how then could she tell me make sure her girls were taken care of and to say "Josh, please don't"?  She told me Josh, please don't, just let me do this."

Opposing counsel's brief is written in ERROR and is exaggerated and Lesico failed to challenge these issues. The post regarding four cuts was, __In Fact__, about defendant's __thoughts__ of cutting __his__ wrists properly. Lesico failed to prove this and failed to show that Barbara had __SIX__ cuts, not 4! "....indicating a prior plan to administer __four__ cuts." Review Autopsy Report pg 5-6 (.3cm , .8cm , .12cm , 2 additional incised wounds 2.5cm each, and 7cm). That is 6 incisions, not 4. Only the M.E. bullet-ized 4 of six to compart with state's false theory.

Federal Habeas          7 (PPPP)

Lesica further allowed opposing counsel capitalize on the cuts (four) issue when on pg 3 of its brief says

"According to the Forensic Evidence.... four slicing/cut wounds to the neck and was also the victim of a choke hold."

There again, were 6 cuts in the report, all shallow and/or very shallow in and of themselves. Also, the Report nor the M.E. ever states that Barbara was a victim of a choke hold. Nor did defendant ever push the knife into her neck or cut her two more times after she was dying and told me to "take her children."

Lesica's error to challenge this falsified opposing brief was error and but for this error may have gotten the Involuntary Manslaughter instruction granted and showed the trial Court that the prosecution is playing "dirty" with the facts of Truth by twisting them to their will.

More to Lesica's error, he states on pg 7 of Trial Transcript 9/22/17 that, "I believe the testimony of my client clearly established those facts when he described that from the witness stand."

My testimony would NOT turn on the instruction for Involuntary Manslaughter. It'd have turned on less than that if any charge. However, Lesica's several ridiculous theories HE brought forth for the M.E.'s opinion of those theories does turn on the instruction of Involuntary Manslaughter. Lesica refused to work close with me about anything. My

Federal Habeas    7 (QQQQ)

testimony is clear proof of that and had the Medical Examiner been presented with **MY** defense, the outcome of this case would most definitely had been different.

Jessica fails to counter Medema's third argument on pg.8:
"that all I was doing was trying to stop somebody from killing themself. That in and of itself is not a careless or Reckless act and does not warrant the involuntary manslaughter jury instruction."

The fact that I am not a professional specifically trained and qualified in stopping someone from committing Suicide, or "killing themself," does bring on the fact of this matter that my action to interfere was indeed careless and Reckless <u>not only for her</u> but <u>for myself as well</u> because she could have just as easily caused me harm just as she did herself. So that such act of a non-professional trying to stop her from killing herself <u>was</u> ~~too~~ "careless and Reckless."

Pg.15-31  Closing Argument #1 by State (Trial Transcript 9/22/17)

Medema stated "for my closing arguments to you, I started out making lists of what the defendant has said, when, and how all those things contradict themselves. <sup>13th</sup> ... it would be an utter waste of your time for me to go through each and every single thing the defendant said that contradicted itself.... He outright <u>lied</u> to you as well. And you guys saw it yesterday. "Oh, I

Federal Habeas    7 (RRRR)

never said that."   And I asked him were you here literally 10 seconds ago when that's what you told me? So I could go through all those inconsistencies, but it's not necessary... I know that using your reason and common sense you don't believe him. ~~Th as~~ During our initial conversation... I asked you if somebody lies first... then tells a different version, is that something ~~th~~ that you can take into ~~consideration~~ account when determining their credibility... And that's exactly what happened."

Lesica failed to object or to otherwise place it on record for appellate review that Medema consistently impressed on the jurors that I was a "_LIAR_" especially when in regards to things Medema was, in fact, lying about:

"Oh, I never said that." "And I asked him were you not here literally 10 seconds ago when that's what you told me?"

Review Trial Transcript 9-21-2017 pg. 90  line 2
" You were here 10 seconds ago for this conversation with You and I, Right? When I asked you what she said and you said "I'm sorry for everything, I love you" and you said that concerned you about her committing suicide so you ran back."

Line 16 "I'd like you to tell the _truth_ about what happened."

Now read pg 87-90 (lines 21-1) [pg 87 - pg 90], I never said I was concerned that she was going to commit suicide or that she threatened suicide. Those were words Medema put in my Mouth as  saying. Even line 5 I affirmed that she never actually said (pg. 88)

Federal Abbies  7(SSSS)

anything about suicide, just "I love you and I'm sorry."

It is ineffective assistance to allow such attack on the defendant go unchecked and corrected.

"A prosecutor acts improperly when using any form of the word "lie" in reference to a witness's or defendant's veracity" People v Smith, 498 Mich 466 (7/30/15) also see Wead v people, 235 P.3d 1089  (6/28/10)

"the word lie is such a strong expression that it necessarily reflects the personal opinion of the speaker.... it has the dangerous potential of swaying the jury.... it is also "prohibited" because it is an "inflammatory term, likely to evoke strong and negative emotional reactions against the witness" or, my case, the defendant.

It was prosecutorial impropriety to suggest to the jury that I "lied" to them when it was, in fact, he that stated that I said something that I never said.

This is Reversible error because it is structural, affecting the very framework within which the trial proceeds. "To ascertain the TRUTH is brought forth...." Such structural error directly impinges upon a defendant's right to a fair trial and cannot be permitted in any circumstances.

"A prosecutor, while free to strike hard blows, is not at liberty to strike foul ones" Domingo-Gomez, 125 P.3d at 1048 (Quoting Berger v United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed 1314 (1935)).

Federal Habeas      7 (TTTT)

It was Lesica's error to ^not correct further lies of the prosecution's when on pg 18 line 5-8 of Trial Transcript 9/22/17.

"He saw exactly what, fortunately, we have on that surveillance video. And what he testified to is corroborated by the surveillance video." Prosecution was Referring to the witness Daniel DeYoung who's testimony is _not_ exactly corroborated.

1) I was on the opposite side of Jiroch when I called Barbara to tell her I was there. 2) Barbara and I never walked North on Jiroch in front of his house back to her house.

3) I never stopped and looked at him with a look of "Deer in headlights". Never looked at him period. 4) I was not alone with Barbara in the house for 15 to 20 minutes before leaving and then Returning.


Prosecution misstate facts and vouches for testimony that is in fact, _NOT_ corroborated by the evidence in the surveillance video.


Further on Pg 19, Lesica allowed the prosecution to state an opinion (personal) about my emotional state being faked and based on a "lie". Further, Medema calls me a liar about whether I knew if Barbara had any other injuries when asked by 9-1-1 dispatch.

She had no bruises showing nor can I see through her shirt's bra, nor do I have X-Ray vision to see a fracture to the hyoid bone or the contusion. So how can I know of any other injuries at that time?

Federal dibbers  7(UUUU)

Also, on pg 19 line 16, I never said she said it sounded like her trachea was injured. Nor did I say that "I had stuck my fingers IN her trachea."

I saw her blood bubbling and frothing so like THAT told me her trachea had been injured. So before I used my shirt to place it over the neck wound I placed my finger OVER the incision of the trachea to keep her from aspirating, or breathing, blood, thereby, keeping her from drowning on her blood and allowing her to breathe.

Also, on pg 19, line 23-24, Medema claims, falsely, that I called Barbara "The Subject."
Ofc Bringedahl told me to step aside so HE "could assess the subject." I have Never nor would call Barbara "The Subject", dead or alive.

On pg 20 line 18-19  Medema claims that Bringedahl testified that I was "walking out in the hallway."
The hallway is between the kitchen & Dining Room. Bringedahl did NOT testify to this. Again, as above, Medema is lying, misstating facts, misleading the Jury and Lasica refuses to object or otherwise correct these errors.

On pg 21 line 24-25 Medema provides "expert opinion" "There's no way you can get a pulse based on those injuries with all of that blood." This had gone unchecked or corrected.

Federal Habeas      7(VVVV)

1) He is not an expert and 2) the amount of blood does __NOT__ determine whether there's a pulse or not. __Blood pressure is.__

On pg. 23 Medema again gives personal opinion on line 7-8 "He fakes that emotion of concern." Again, Lesica fails to object or to otherwise have it corrected.

Lesica failed to object to Medema's statements regarding another of his expert witnesses. pg 23 line 25 - pg 24 line 2 "He admitted not everything I said there about her ~~being~~ bi-polar or him not being malicious is true." "So don't take those statements as true." That is prosecutorial error. Who is he to tell the jury what to believe and who to believe?

On pg. 24, Medema, again, misstates what was said to make me out to bring a "liar." Line 9-11 "~~there~~ MR. Salyers, under oath, said "I never said I wiped it down." Unexplainable.

Read trial transcript 9/21/2017 ~~from~~ pg 95 line 24 - pg 96 line 15.

Again Lesica failed to object to this or otherwise have it corrected.

Medema on pg 25 line ~~12~~12-13 makes a racial comment stating I said this. I've never testified to such.

"I believe MR. Salyers testified it was something he said about being __white__ to that other inmate." Again clear prosecutorial misconduct that had gone unchecked, objected to.

Federal Habeas 7 (wwww)

And z said "no, no, no z said trauma. And then he even denied saying that 10 seconds later and said, "z never said anything about my leg." He was grasping for at straws trying to come up with an even brand new story to explain the overwhelming evidence that he hissed and it makes no sense."

Review my testimony on Trial Transcript 9/21/17 pg 77 Line 1 – pg 79 line 2. Then compare it with Medema's prossecutorial misconduct putting words in my mouth again on pg 105 line 8 pg. 92 line 13 – pg 94 line 20. Pay attention to pg 94 Line 10 – 13. Medema put words in my mouth and z corrected him on it there. Then, on pg 105 line 8 – pg 106 Line 6. Yet, now on closing pg 29 of Trial Transcript 9/22/2017 at lines 3-7 Medema makes me out to being a liar.

Lesica, again, fails to object or otherwise correct it.

On pg 31 Trial transcript 9/22/2017 line 17-18, Medema states "I told you when we started that you can't believe the defendant."

Lesica, again, failed to object or otherwise correct this. Prossecution cannot speak for witnesses or defendants veracity of testimony.

✳ Lesica's Closing Argument ✳
Trial Transcript 9/22/2017 pg 32-42

Federal Hobbes   7(4444)

On page 35 Lesica painted a violent picture of his client (ME). line 23 — pg 36 Line 3.

"When you go to jail you want to establish that you're a tough guy 'cause you won't survive in the jail for one year, two years, three years unless you're at the top and people <u>fear you</u>. You can't be a wimp so you start out right away acting tough. And a statement my client made is disputed."

This was in Reference to the Deputy Neal's Report about the threat of slitting ERIC Emory's throat and watch him bay there.

1) Eric wrote Lesica a letter asking to come to Court to tell what was said, that Deputy Neal lied and detectives tried getting him to lie.

2) Lesica made me look like a very bad person that wants people to fear me. I'm a very good and social person. I love people, interacting with people. I'm not mean to people, and don't try to make people fear me.

3) The statement was <u>NOT</u> disputed because he failed to call <u>ERIC Emory</u> to testify to what I said to him.

On pg 36 Lesica shows again he doesn't even know what he's arguing about: Line 20-25. There was no string of video statement presented as evidence from my facebook. The State only presented what it wanted of <u>a</u> facebook post and

Federal Habeas    7(ZZZZ)

<u>Brady'd</u> (withheld) the rest of that string of comments to keep the truth from being known my post was about me <u>THINKING</u> of cutting my wrists four times. But, yes, Doug Carlson testified his impression was that my post was about killing myself. Obviously all the <u>Brady'd</u> comments and subcomments was clear proof of my thoughts for him (Carlson) and Sherersnek and Stephanie Ann and her mom Connie to all tell me that I should not harm myself ever over a female, etc.

Read my text log / facebook messaging log from my phone, as well as the facebook posts and my notes showing <u>state deleted comments and subcomments</u>!

Lesica's absolute worse error during his closing argument that ~~through~~ thoroughly, prejudiced me and can <u>NOT</u> be deemed trial strategy:

"How do you kill yourself? You kill yourself by cutting your wrists. One, two, three, four. Not, you know, kill yourself by cutting your throat four times. That's, you know that's not possible..."

1) He knew there were SIX cuts yet he corroborated states theory.

2) People do and have killed, and attempted to kill, themselves by cutting their own throats, necks.

* 3) If it is <u>NOT possible</u> for her to have done this to herself, then who is he saying, implying, suggesting had done it? <u>There was only her and I there!</u>

Federal Habeas     7 (A A A A A)

Suicides and attempted suicides in the exact way as in my case:  12 of 895,740 cases

1) Reinking v Philadelphia Am. Life Ins. Co., 910 F.2d 1210,
Reinking stabbed <u>herself</u> 11 times in the arm and wrist, <u>6 times in her neck</u>, 7 times in her chest (nicking her heart twice), and 8 times in her abdomen, then thrusted the knife into her thigh, virtually, severing a finger when the blade closed. She injured almost every vital organ in her body as well as numerous severings of arteries, tendons, and ligaments and nerves. <u>She said</u> despite the extreme brutality of her injuries, she felt <u>NO</u> <u>pain as she inflicted them.</u>

2) Fether v Frederick County, 2015 U.S. Dist. LEXIS 14302
3) Dodd v Workman, 2011 U.S. Dist. LEXIS 85604
4) Rosario v Brown, 2011 US. Dist. LEXIS 531145
5) Acerbo v State of New York, 32 Misc. 3d 1230(A)
6) Shoemaker v Central Business Men's Ass'n, 218 Mo. App. 374
7) Jacoby v Baldwin County, 2013 U.S. Dist. LEXIS 72212
8) Mulberky v Tice, 2017 U.S. Dist. LEXIS 142815
9) Wilson v Prince George's County, 2017 U.S. Dist. LEXIS **50155**
10) Easley v Kiremsee, ~~235 F.2d~~ 235 F.Supp. 2d 945
11) Wilson v Cosio, 2014 U.S. Dist. LEXIS 184637
12) People v Flores, 2012 Cal. App. Unpub. LEXIS 1602

Jessica had a duty to protect my constitutional Rights and defend my case with earnest, integrity, to present
Federal Habeas  7 (BBBBB)

MY defense to the jury and to come to trial prepared to defend me based on the TRUTH, not his ~~ridiculous~~ ridiculously concocted theories that, indeed, did NOT make any sense.

I've given only 12 of 895,740 of suicides/attempted suicides that were reported in the court system. That's still only a few considered on how I looked those ones up. Lesica did NOT investigate into ANYTHING regarding this case and relied on state's witnesses only. He refused to use evidence, reports, video to impeach nearly all witness testimony of the state witnesses. Lesica failed to get an independent examination of the Autopsy, the report, etc. He refused to interview and obtain a defense expert for the several medical contradictions, the THC effect on Barbara, the surveillance footage flawed time, the neurology aspect of the contusion to the interior left temporal lobe, and to bring the fact that the steak knife could NOT have caused the wounds in which the Deputy M.E. testified to.

Lesica failed to withdraw and ask for new counsel, he would not provide me with ANY of my Discovery, he failed to work close with me, he failed to get anything tested independently, he failed to interview the several witnesses I requested and he failed to bring forth the one witness that had video evidence & Journal entries that Barbara Ann Dailey had been planning to kill herself in this way before the weekend of 9/4/2016.

Lesica did NOTHING to help me or to afford me a

Federal Habbeas   7(CCCCC)

fair trial. He filed a psychological evaluation motion without first consulting me and when I asked him to have me polygraphed he told me, no.

Nothing Fred J. Lesica had done was sound trial strategy nor did it afford meaningful adversarial testing of anything the state presented that was, knowingly and deliberately, false, mischaracterized, misstated, fabricated, manipulated, and coerced.

Further, during his closing argument Lesica failed to point out all the things Medema said I was lying about were, in fact, Medema's lies as those were what he claims I had said when evidence shows that I did NOT say those things.

On Trial Transcript 9/22/17 pg 42-49
Medema's Rebuttal Closing Argument

Line 22: Medema improper vouching for what Lesica stated without investigating into such facts.
   "There's one thing that I do agree with Mr. Lesica on. He said to you, 'You don't kill yourself by cutting your throat. That's not possible. I agree. And Ms. Dailey wasn't trying to do that either."
See   Wilson v. Mazzuca, 570 F.3d 490 (2d Cir. 2009)

Because of Lesica's failure to investigate and to present the ONLY possible defense, MY defense, the Truth, Medema
         Federal Habeas   7 (DDDDD)

was able to capitalize on that error and it had gone unobjected to or otherwise corrected.

On pg 43 Medema again makes the suggestion that I am lying on line 7-8: "He said Mr. Solyers was the only person there. There was another person there who can't tell us the truth."

Lesica failed to object to this.

On lines 11-14: Medema improperly vouches for Detectives. "Det. Luker and Det. Stretton are two of the nicest people that I know and theyer in there saying listen, just tell us the truth."

Lesica failed to object to the improper vouching and the inference of me lying.

Line 15 "They gave him so many chances to tell the truth." Who's Truth? The things they want to be the "truth" or My Truth. My Truth would have caused her to lose custody of her girls.

Lines 16-17: "We want to know from you what happened."
Lines 21-23: "They offered some suggestions, as Det. Luker said, to get closer to the truth."

Lesica, again, failed to object as it's insinuating that Det. Luker's conduct was proper and that I was still a liar as they didn't like what I was telling them.

On pg 44, lines 12-21, I never pointed out the knife and said, "No, No, No .... Right there on that knife that that We

Federal Habeas      7 (EEEEE)

used, he identified it for you, Right there is that speck of blood that I didn't wipe down...."

Lesica failed to have the Record corrected because I did NOT identify that knife as the one used. I said, "it isn't" not "it is." I pointed out the knife and in the photo and even said that I assume they mean that knife because there is a taint of blood on it.

Lesica asked the Deputy M.E. about the Butcher knife that belonged to that same steak and bread knife in the photo because I've told him, Stephanie Howell and Jennifer Swanger long before teial began the knife she (Boeboes) had used. I had even described it to Det. Lukee as being long like a bread knife and shaped like a big steak knife at the interrogation because I could not think of what that knife was called at the time.

But, further, Lesica had a duty to object to Medema's misstatement of facts and misstating testimony. I never said "Right there on that knife we used." 1) Neither of those knives were used and 2) WE didn't cut her neck, She did.

line 18-21: "When she wasn't moving I slid the knife out from her hand that she had by the handle and, that, no struggle, by the handle causes this injury?" (regarding 1.5 cm (9/16") incision on finger).

Lesica failed to object for Medema playing expert about something he doesn't know about.  I such at drawing, please forgive me.

I geab this handle on the end with index finger and thumb. then slide the knife out ---->

The "injury" Medema refers to is the 1.5 superficial incised wound to the Federal Habeas     7(FFFFF)

Medial - distal portion of her second finger of her Right hand.
Medial - distal: Turn your Right hand so your palm is facing
You.



Very Shallow
(superficial)
1.5cm
incision
(9/16")

Medial
Distal

4    3    ②    1

Second finger
Right hand

Palm

Thumb

Jessica made "a big deal" that the state didn't introduce the
Knife because it was a butcher knife from the kitchen block set
and it was NOT at all in evidence or in the photograph. Yet,

Federal Habeas    7(GGGGG)

Lesica refused to do or say anything to get this knife into evidence.

pg. 45  lines 8-13, "Mr. Lesica says, 'well, yeah, he made some statements in the jail but those are disputed.' Disputed by whom? Mr. Salyers? SHOCKING. Disputed what?..... So how are they disputed by a liar?"

Again, Lesica failed to object to calling me a liar. Also, had Lesica called Eric Emory, the guy I supposedly threatened and "confessed" to, the statements would have been disputed by the guy the STATE/DETECTIVES were trying to bribe to lie and support Neel's false report. It's no wonder state refused to call him as a witness against me. But Lesica's failure to call this witness/interview this witness, even after Eric wrote him a letter, was ERROR and it prejudiced me by making me look like a "liar" and violent.

line 22-23: Lesica's failure to call Jennifer Swanger, Kirrelle Burns, Josiah Fousse, Deputy Greeves, as witnesses to prove I was, infact, in M-pod from 6-28-17 to trial and that the inmate log does not always show accurately where a person is moved to until it later gets realized and changed was error and prejudiced me because Medema's closing argument again calls me a liar because the "record" says I was moved 7/14/17, not 6/28/17.

line 25: "He heard a MURDERER confess to him. I don't care if he's in jail. He had the decency to say I need to tell

Federal Habeas        7(HHHHH)

Someone.

Lesica failed to object to the inflammatory Remark calling me a "Murderer." Also failed to object to improper vouching of Medema's "jailhouse liar".

pg 48 line 11-12: "Even after seeing all the evidence, he got on that stand and he lied to you and he still cannot account for four cuts."

Again, Lesica failed to object to the use of "lied to you." Medema says I can't account for four cuts... he didn't want to hear my assumption. Medema can't account for the correct # of 6 cuts.

line 23-24: "And that expert who knows what she's talking about said "absolutely.""

Lesica failed to object to improper vouching of State's expert witness.

Again, Lesica fails to object to knowingly false statement and then calling me a "liar" based on his (Medema's) false statement. prosecutorial impropriety: lines 2-9

"Now the defendant testified that he called 9-1-1, stepped briefly out onto the porch and looked to see if Pres-Med was coming and immediately went back inside. But, again, we know he lied. We know from the surveillance video that's not what happened. We see him call 9-1-1, go out on that porch, go out into that yard and actually go sit on the steps while Barbara Dailey laid inside bleeding out, gasping for air."

Federal Habeas    7/(IIIII)

According to Sgt Gust the 9-1-1 call would have been made at 7:20:43 or 7:20:45. (Trial Tran 9/21/17 pg 124 line 17)

Review the following:

7:18:16   He goes onto porch and inside

7:20:15   He goes outside and stands at edge of stairs

<u>7:20:37   He goes inside</u>   (I NOW <u>INSIDE</u>!)

7:20:43 or 7:20:45   9-1-1 call was made ("we see him call 9-1-1") (House)

<u>7:20:49</u>   He goes outside into yard and by sidewalk ( I'm now <u>outside</u>)

Clearly, Medema <s>mist</s> misstated facts and, in doing so, he appealed to the jury to believe I <u>lied</u> about calling 9-1-1 then going outside. And look at the call log of my phone (9-1-1 call was made at 7:15:51, not 7:16:05).

Lesica knew of this error and failed to object.

Estate Attorney, that trial court appointed, Fred J. Lesica provided clear ineffective assistance of counsel. In providing such he prejudiced his client because if not for his many errors, failure to investigate, failure to interview/call witnesses, failure to present MY defense, failure to obtain defense experts, failure to provide a meaningful adversarial testing and failure to work close with his client and failure to withdraw when I've told him to and get new counsel appointed, failure to impeach the known false testimony per the Reports and other evidence, and his improper statements of his closing (giving expert testimony about how one kills themselves) and his failure to object to prosecutorial misconducts, it is likely that the outcome would have been different!

Federal Habeas   7(JJJJJ)

Lesica's closing argument was absolutely unhelpful, unreliable, and was extremely prejudicial. Lesica was ineffective by all standards required of his profession and by the requirements of both State and Federal Constitutions.

During Jury Selection Lesica allowed Juror Pablo Ruiz to be excused without an objection. I wanted Mr. Ruiz more than any other juror that was put up there. (Trial Transcript 9/19/17 pg 71 line 20) Lesica knew this because I told him as much. Pablo better understood the system, and how they operate, ~~better~~ than the rest of them and I feel he'd have perhaps been the best bet I had to get a "Not Guilty" verdict.

Pg 85 Lesica excused Katie Combs calling her Annie though Annie Gravel was already gone. Katie Combs was ex police and I wanted her to remain both because she was ex police and now Department of Health and Human Services. She'd best know the proper procedures of evidence collecting, search and seizure violations. etc as an ex cop.

Page 93  Lesica was told to get rid of Mary Calkins on preemptory for the fact of the abuse and such and ~~ties~~ ties with law enforcement. He instead excuses Ms. Mitchell.

For cause I told him to get rid of Collier. I did not want someone that is up all night ! day trying to pay close attention to the contradictions, that were a great many, of the

Federal Habeas       7 (KKKKK)

States case.

On page 103 Lesica failed still to get rid of Matthew Collica with the peremptory.

Also the newly added Christy Holland and Ashley Ward I'd told him to try to remove after Collica.

Everyone I wanted to Remain on as jurors he Removed except Mary Calkins and Kept everyone I wanted removed. This is suppose to be a juey of MY peers. People that share commonalities with me.

Further, Lesica Refused to Request venue change due to all the publicity of this case and the statement Det. Lukke made of having a confession of slitting Dailey's throat 3 times! That is false as well. 1) there were only 2 fingers held up, and 2) if the Recording would have been Reviewed at the hearing you would see it is a false confession as I did not hear what exactly was asked. And I can prove it!

On page 107 Lesica objects to the proposed malice instruction Line 4-6 ; 22 - pg 108 line 4. Then, without taking the opportunity to Review and research over the proffered day or two, Lesica tells the court to just go ahead and then give the parcention.

This is NOT competant trial strategy, assistance, due diligence and adequate trial preparation. MY defense was the absolute

Federal Habeas        7(L L L L L)

TRUTH and Lesica did EVERYTHING opposite of presenting MY defense. There was ~~absolutely~~ absolutely NO MALICE! in trying to prevent a suicide. The bruisings wear collateral damage that I knew nothing of until the Autopsy Report. To prevent her from further harming herself. No assault by me occurred, the bruisings are only from impacts on stairs and the floor. along with the hyoid fracture. Contusion of temporal lobe & hand bruising, from the bannistere. The cuts wear all her except the 1.5 cm on the finger due to removing the butcher knife from her.

Lesica forced me to try convincing the Jurors because he concocted absolute pathetic false scenarios, presented no evidence and no witnesses nor defense experts.

## Opening Statements   9/19/2017

I asked Lesica to hold off on his opening statement so that I could assist him on that yet he gives it anyways and could not have given anything worse as an opening statement.

\* Lesica failed to call Barbara's friend/dealer Raven as a witness even after she contacted him with video Recording of Barbaras threatening suicide and Barbara's journal enteries talking about her cutting herself and her plans on 9/4/2016 to commit suicide.

see Hargrove-Thomas v Yukins, 236 F. Supp. 2d 750; Bryant v Scott, 28 F.3d 1411, 1415 (5th Cir 1994).; People v Dixon, 263 Mich. App. 393, 398, NW2d 308 (2004)

Federal Habeas        7(mmmmm)

I. A. C

Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) failure to consult and
   obtain defense expert. (In my case Dr. L. J. Dragovik) (see letter)

Harris v. Cotton, 365 F.3d 552 (7th Cir. 2004) Toxicology

Miller v. Webb, 385 F.3d 666 (6th Cir. 2005) Biased Jury

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) failing to object to prosecutions
   improper and prejudicial closing argument.

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) failure to object to any aspect of
   prosecution's egregiously improper closing argument.

Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005) failure to investigate

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005) Failure to obtain forensic exam that'd
   contradict state's argument.

Adams v. Bertrand, 453 F.3d 428 (7th Cir. 2006) failure to find & present "pivotal witness",
   Raven Stacchild (my case), because counsel committed to a predetermined strategy without
   reasonable investigation.

Richards v Quarterman, 566 F.3d 553 (5th Cir. 2009) several errors

Wilson v Mazzuca, 570 F.3d 490 (2d Cir. 2009) opened door to damaging evidence, failed
   to pay attention, acted recklessly

Showers v Beard, 635 F.3d 625 (3rd Cir. 2011) failed to enlist expert witness to rebut
   state's expert on key issues instead relying on ill-informed cross-examination of
   state's expert.

Strickland v Washington, 466 U.S. 668 (1984) New trial must be granted when
   evidence is not introduced because of the incompetence of counsel if....
   Result would have been different. (Barbara's Journal entries, Autopsy Report, other expert).

Federal Habeas                    7(NNNNN)

On 9-19-2017 pg 8 of Trial Transcripts it is proof that counsel was Not prepared nor knew what the defendant's defense was.

line 6 - 21

The Court: "Mr. Lesica, from presiding over motions here recently it seems at least a part of your client's defense is that he was trying to prevent Ms. Dailey from killing herself with this knife. Fair enough?"

Mr. Lesica: "That is partially correct, yes."

The Court: "All Right. I mean, is there anything else you can tell me about your defense that allows me to evaluate the motion? You don't have to. Sometimes in terms of the Court making its ruling it helps sometimes to know what the defense is likely to do."

Mr. Lesica: "Well, I think, your honor, it's, I think he's not claiming that his hands were not on the knife, that, I think, it's pretty well know based on you... know what he said in his confession that you know it's not a matter of her just standing there by herself and cutting her throat."

The Court: "But his intent?"

Mr. Lesica: "Right..."

Lesica never wanted to talk to the defendant about what the defense was to be. Clearly, Lesica's above statements do contradict what defendant testified to. Defendant never had the knife in his hands while any cuts to the neck were made. It was Barbara Ann Dailey who administered these cuts to her own neck. The "blunt force injuries" were caused by defendant's actions of shoving her causing two seperate falls one including impact on the bannister then landing on the stairs and the other landing face first to the floor after shoved over defendant's left leg. The incision of the finger caused by the removal of the knife.

(c)  **Post-Conviction Proceedings**:

  (1)  Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?  Yes ☒  No ☐

  (2)  If your answer to Question (d)(1) is "Yes," state:

  Date motion was filed: _____

  Name and location of the court where the motion was filed: _____

  _____

  Docket or case number: _____

  Result (attach a copy of the court's opinion and order, if available): _____

  _____

  Date of result: _____

  (3)  Did you receive a hearing on your motion?  Yes ☐  No ☐

  (4)  Did you appeal from the denial of your motion?  Yes ☐  No ☐

  (5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  Yes ☐  No ☐

  If yes, answer the following:

  Date you filed: _____

  Name and location of court: _____

  Docket or case number: _____

  Result (attach a copy of the court's opinion and order, if available) : _____

  _____

  Date of result: _____

(d)  **Other Remedies**:  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _Michigan Supreme Court_

_____

_____

(e) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

- 8 -

**GROUND THREE:** _See attached documents_     9(B) - 9(XXXXX)

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim): _____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?  Yes ☒  No ☐

    (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?  Yes ☒  No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: _____

Name and location of the court where the motion was filed: _____

_____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

    (3) Did you receive a hearing on your motion?  Yes ☐  No ☐

    (4) Did you appeal from the denial of your motion?  Yes ☐  No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  Yes ☐  No ☐

Ground Three:

Defendant-Appellant was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony/evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in cross-exam and closing arguments, and destroying evidence.

Supporting Facts:

Preliminary Examination  9/20/16  Transcripts

On page 5 line 13, Medema elicited false testimony. Barbara was reported to be Responsive.

On line 19-23, Bringedahl again provide false testimony. Four officers, Dill, Smith, Bringedahl, and Edens, were all in the home while I was kneeling over Barbara weeping and crying, rendering aid. After they searched the home, Bringedahl asked me to step aside so "I can access the subject." He then instructed Smith to take me outside and get a statement from me.

On page 6, line 11-13, Bringedahl again provides false testimony. Barbara was NOT located in the hallway. She physically cannot fit in the hallway laying North & South. She was in the Dining Room near the Bannister Stairs and the Dining Room table.

On page 10, line 3. Det. Kory Lukee lied. He was called in, according to several reports, for the "assault" of Barbara Ann Dailey.

Federal Habeas    9 (B)

On line 24, Luker, again, lied. I NEVER <u>said</u> I had cut her neck 2 more times. Nor do I believe I told him that I applied pressure to her hand and that is what cut her neck open.

On page 11, line 9 - 13, Luker again provides false testimony. I was not told to "burn in hell" when we were talking at Hackley Hospital. See text log. She got mad <u>HOURS</u> before we met up ~~and~~ because I blocked her on Facebook. She told me "blocked me... Okay then you can burn in hell..."

On line 22, again false testimony. When I grabbed her hand and was <u>Pulling</u> it toward me she jerked her hand out of mine and it, the pressure/force of her jerking the ~~hand~~ with the knife hitting her neck, caused a cut.

On page 12, line 4-10, false testimony, again. Barbara said Josh, please don't, just let me do this. She told me this is why ~~she~~ gave Chris the girls and to promise that I'll make sure they are taken care of. I told her if she were to do this <u>I'd be joining her</u>, <u>Not</u> that I was going to kill her.

On page 12, line 18-19, false testimony and proof of destruction on the knife. The butcher knife was <u>NOT</u> Recovered. The knife they "recovered" was a <u>steak</u> knife. Per report I described the knife to being long like a bread knife and shaped like a big steak knife. Closely, <u>not</u> a <u>steak knife</u>.

The testimony provided by Bringedahl and Luker is false in the above mentioned. Testimony had been tailored to provide the minimum requirements to bind over for "open Murder."

Federal Habeas      9(c)

On 9/5/2016 there was a report written claiming that I had threatened inmate, Eric Emory, to "slit his throat and watch him lay there" and then pressured to "confess" that I'm in jail for murder because "I killed her" and "now I have to live with it and it is tearing me up inside."

Prosecutor Medema sent Detectives to interview Eric Emory about it. They tried getting Eric Emory to lie for them after he told them that the report was falsely written.

Eric Emory was never put on the witness list because the prosecution ~~had~~ rather would allow the false testimony to go uncontested with the truth of what was actually said:

Emory asked what They said I did. I told him "They said I'm here for slitting my girls throat and watched her lay there. They said I killed her. Now I have to live with that and it's tearing me up inside. All I tried to do was keep her from committing suicide. They are charging me with murder."

The threat to him was to "beat his ass if he didn't stop being loud" calling himself "Jesus" and yelling "Stranger danger" everytime someone new came in the door.


On ~~Sept 23~~ Sept. 23, 2016, Detectives were told to shake my cell down by prosecutor Medema. They stole the poem I wrote regarding the SUICIDE out of my attorney/client privilege folder. They labeled it a "multi-page letter in regards to the Homicide in question."

State violated search & seizure and attorney/client privilege

Federal Habeas          9 (D)

material by taking stuff out of privilege folder.

Because of the attempt to bribe Eric Emory to testify against me because they "have nothing against me and need his testimony" and because of taking my poem about the Suicide, I knew that they were fishing and would continue to do so, so I set the State up.


On June 25, 2017, after a letter I wrote MLive, MLive wrote an article, "Alleged Throat-Slasher writes Officials." I knew that was going to cause another "Shakedown" so I wrote a letter to Governor Rick Snyder, again, only I didn't send it because it contained false information in form of a "confession". I made a copy and sent it to my Mom. Sealed the Governor's, addressed it, leaving out the zip code, and placed it in my attorney/client information folder on the night of 6/25/17, morning of 6/26/17.

On June 28, 2017, a Wednesday, I was placed on "Suicide" observation and put in M-Pod from A-pod. I was left there with no running water, shower, none of my property including my legal stuff and the book I was waiting.

On July 14th my lawyer Fred J. Lesica came to see me and said that they thought I was in "A-pod" and that he was waiting there on the ~~A-pod~~ A-pod's visit room for 15 minutes before they found me in M-pod. He brought me the motion he was filing.

On July 21st, 2017, Jennifer Swanger came back from her vacation and came to see me. She also thought I was

Federal Habees          9(ε)

still in "A-pod" just to find me, not only in M-Pod, but also in Suicide gown. She was NEVER notified, as per policy, that I was under "Suicide" observation. I told her everything about what happened that day with Barbara. I also kept her informed of everything I was doing and what I was wanting Regarding my case. I told her about the set-up I was doing and she agreed that was smart because Chances are the prosecutor wants to see what I'm writing to officials and in my book which makes sense to why I'm in "Suicide watch in the wrong pod/place and she was never notified and the fact all my property has been gone through.

   I was taken off "Suicide" watch and given back all my stuff except the letter to Governor Snyder and my several chapters I'd written for my book.

   This trap was set off and proven at trial by the testimony of a "Jailhouse liar" I never met until that day, and officer Sean Tyler Smith.


   On July 28, 2017, prosecution filed a brief in opposition to Defendant's motion to suppress statement. The prosecution misstate facts in its brief. I did NOT state that she was attacked by a Black male. I just stated I saw a black male Running from the area. Also, I never stated I was at Barbara's father's house on 1645 Smith Street and Ran from there to her house on 1432 Jiroch Street. (That'd be a 5 minute journey)

Federal Habeas          9(F)

State claim that she had "Bled Out." (Barbara was still very much alive and breathing until 46 minutes later at the Hackley Hospital when she passed at 8:01pm)

State accuse me of "acting emotional" and said she lived at the house with 2 children. (I was very emotional, crying and weeping as per Report of Officer Smith and unable to follow questioning well. And Barbara has <u>3</u> children living there with her, not 2.)

State claims I said Barbara had no issues or grudges with anyone but, clearly, that is false based on conversations on Facebook posts and messaging, text logs, and the interrogation itself. Also, review Barbara's Journal entries.

Further, Barbara's father was in bed before Midnight and Barbara had <u>NOT</u> ended the relationship. (Text log between Barbara and I show this.)(Even statements to Ofc. Anderson for about two issues).

State claim that Daniel DeYoung says I had been in the home only 10 to 20 seconds before coming back outside and I was "acting normal." (Kevin Sandra's video surveillance proves this also is false information because I was in the home 1 minute 35 to 40 seconds before coming out and stood at edge of stairs a few seconds looking for pro-med and talking to 9-1-1. 9-1-1 call shows I was <u>not</u> "acting normal.") (This portion gives State erred/false credibility in its theory that this is premeditated murder.)

Sarah Grandinette may have said what State claims but based on Sarah's and I conversations prior to all this, goes to show there was <u>no</u> animosity between Barbara and <u>I</u>.

Federal Habeas     9(G)

It goes to show that the animosity was between Barbara and Saresh, Becky, and Doug. The state were privey to all this information and failed to provide this to the Defense.

State claims I stated some "Black Guys" threatened to kill mr. Wesny. (The threat was to Barbara because she stole money and Drugs from an old dealer of hers. That is in her journal, which State failed to provide the defense.)

State claims I said that BOTH our hands were on the knife and the original cut was done on accident by both of us. Wrong. (She made the cut, I shoved her to make her drop the knife) (She made 2nd cut, I grabbed her hand, she jerked her hand away causing another cut then 2 more due to nerve Reflex)   State only Recite 3 incisions of the 6 she made. (The sixth was when she was beginning to fall forward and I grabbed her wrist.) (3cm, 8cm, 12cm, 2.5cm, 2.5cm, 7cm)

State claimed the interview was video/audio recorded and a copy will be available to the Court, yet it was never played before the court during the Suppression Hearing.

State claims that the videotape captures the moments before Barbara's death. (False information meant to mislead).

Under State's opposition's Law : Re argument it states, "In this case, Defendant was read his <u>Miranda</u> Rights and understood those Rights and, therefore, this is not at issue." (It was at issue.) (I was not notified of the accusation for which I was being Mirandized before they obtained any waiver. (N.G.D. 835 A.2d 291 (2003))

Further, State claims there was no coercion by

Federal Habeas                      9(H)

by the police.

1) They tell me that Barbara is in good hands at Hackley. Suggesting that she was still alive when they knew, per preliminary examination transcripts 9/20/2016 pg. 13, that she was deceased at 8:01pm. (Deceit)

2) They fail to notify me of the charge against me before obtaining any waiver. (failure to notify) (Colorado v Spring) (Stoh v A.G.D. 835 A.2d 291) (State v Vincenty, 202 A.3d 1273)

3) Offers me leniency by talking to whomever will be over my case about a lighter sentence for my story. (People v Jones, 416 Mich 354. Rogers v Richmond, 365 U.S. 534, 540-541; 81 S.Ct. 735, 5 L. Ed. 2d 760 (1961).)

4) They tell me this looks to have been an <u>ATTEMPT to commit Suicide.</u> (improper influence, deceit as, again, they already knew she died. The word '<u>Attempt</u>' suggests she's still alive, failing to have succeeded committing Suicide.)

5) Due to ERROR #4 I ask them to promise me they wouldn't take her girls from her if I tell them what <u>she</u> had done. They agreed. (People v Jones, 416 Mich 354. Rogers v Richmond, 365 U.S. 534, 540-541; 81 S.Ct. 735; 5 L Ed 2d 760 (1961).) (Promised Made)

(All the above is violation of Constitutional Rights under 5th, 6th and 14th Amendments of the United States.)

6) Just a mere mention of a 'Right to an attorney' does not satisfy the constitutional rights <u>Miranda</u> is meant to protect.

The State said, "Miranda protects defendants against governmental coercion leading them to surrender rights protected by the 5th Amendment. (Voluntariness to talk would have dissolved had I known 1) She had already passed, 2) They told me I was a suspect of Murder, and 3) had they not agreed to not taking her girls if I tell them

Federal Habeas                9 (I)

what she had done.

Prosecution claims "Defendant acknowledges that, absent evidence of coercive police activity, which is a "necessary Predicate to the finding that a confession is not voluntary," Connelly. 479 U.S. at 167, the Court's inquiry ends without addressing the factors delineated in People v C.prisno, 431 Mich 315, 334; 429 NW2d 781(1988).

'I did NOT acknowledge that there was not any police coercive activity. State knows there was coercive tactics imployed which is why they got a statement in which they asked me a question that I thought they were asking about her, not me, when I then held up two fingers. This is why both State and appointed counsel refused to present the video recording to the Court during the hearing and having me testify. The video would have spoken for itself but the Judge told me to "trust your lawyer, he knows what he's doing" and that's what happened.

The State says that, "He killed the victim because he was jealous and she had ended their Relationship."

State knows this to be absolutely False based on texts, facebook posts, facebook messenger and Sarah Grandinette. who acknowledged then, and at trial 9/19/2017, that Barbara and I are engaged. (Also Read the Journal Enteries of Barbara)

On 8/30/2017 State filed another Brief in Opposition to Defendant's motion to Dismiss or for Reduction in Charge. Under Statement of the facts, prosecution again provides false

Federal Habeas          9 (J)

facts and done so Knowingly or at least should have known.

1) Barbara was <u>NOT</u> severely beaten and defendant did <u>NOT</u> cut her throat.

2) Defendant did <u>NOT</u> meet officers when they arrived.

3) Officers had <u>NOT</u> found Barbara in the <u>hallway between the kitchen and Dining Room.</u> (scene photos prove this) (also if she was in the hallway, she could not have had her head against the South wall.)

4) We did <u>NOT</u> have <u>ANY</u> argument from the time we met up at about 5pm and she did not tell me to "burn in hell" at Hackley Hospital while sitting at the tree. (view text log when she got mad <u>I</u> ended the relationship and blocked her) We met up and got back together, <u>NO arguments.</u>

5) ~~D~~ Defendant did <u>NOT</u> apply pressure to her hand which was holding the knife. ( This also contradicts state's claim that <u>BOTH</u> our hands were on the knife).

On 9/5/2017 the Suppression Hearing was held. On page **16** line 1 — page 17 line 10, you can see Medema is acquiring information that will later be suppressed so I cannot defend myself of their lies, knowingly false theories.

On page 17, line 25, it was the State that made the claims that the "black guy" was Responsible. I Never claimed him to be the one to actually have done this. (I made this guy up to protect Barbara from losing her children for being found to be unfit for trying to commit suicide).

Further, on page **19** line 1-17, Medema is further

Federal Habeas.          9(K)

gaining information in regards to the ongoings of the incident that is suppose to be his job through independent investigation and collecting evidence. (Lesica had told me this was going to happen and to just tell them "I don't Remember" if they did start asking about what I said or done to further catch the state in creating false information. Listening to Lesica as I was advised by the Judge, who provided legal advice instead of giving me the Required hearing to Remove this incompetent attorney, caused the entire suppression hearing to fail. Not once did Lesica ask me the 4 questions I told him to ask me. 1) What was the nature of why I was being interrogated and read my Rights? 2) Was I offered leniency? If so, what was offered? 3) Did ~~officers~~ Detectives tell me this looked to have been an <u>Attempt to Commit Suicide</u>? And, if so, what was my Reaction to their knowingly deceitful statement? And 4) What was the Promise they agreed to for me to tell them what She had done?)

On page 21 Medema manufactures testimony on line 10-13. (Lesica didn't ask me that during direct examination which is why I went along with Medema waiting for the estate attorney to object to misstatement of facts or whatever).

On page 22 it is clear that Medema knows of the Promise made. Line 6-13. (Their promise is the only reason I began telling them about the <u>attempt</u> to commit Suicide, me trying to prevent her from further harming herself.) (See forensic evaluation Report page 10 lines 28-30).

Federal Habeas          9(L)

On page 30 line 20, Medema elicits from Det LuKere the same information as in preliminary examination pg 13 by defense counsel Adam Masserrrg. That he was called in regards of a Homicide. (Again, proof that LuKere knew before the interrogation that Barbara had passed away).

Yet, Medema fails to later correct LuKere when he changes his story to help state get the suppression denied. Page 36 line 4 - pg 37 line 19

Medema states on page 42 line 3-4: "what he has Not done is make any accusations that the police acted in any improper way." (Read pg 9 line 9-17) (watch the video)

But aside that, Medema, clearly, knows of the offers of leniency, the deceit, the promise made, and the failure to notify of the reason I'm being read my rights. All of these are clearly in violation of Constitutional Rights. Yet, Medema "suppresses" this information by failing to present these violations he KNOWS of to the Court so it will properly GRANT the suppression. That is Prosecutorial Misconduct to cover up violations of fundamental Constitutional Rights to capitalize on these known violations.

The beginning of a four day Trial
Day One   9/19/2017
Jury Selection

Federal Habeas         9(m)

During the time just before Medema had gone up to the podium to address the panel of potential jurors, he had deliberately went through some of his documents picking up the photo of Barbera Ann Dailey showing them the bruised face and cut neck on the sly. (Trial Tran 9/19/17 pg 54 Lines 1-5 is about where you see on camera footage in the courtroom he shows this photo. Further, you see me inform Lesica because I, myself, already saw it. Lesica did not object!).

Quis erit innocens, si clam vel palam accusare sufficiet?

Page 56 line 16 - pg 57 line 3. "I do <u>not</u> have to prove the case beyond a reasonable doubt."

Model Penal Code §1.12 - "Beyond a reasonable doubt" is <u>THE Standard</u> used by a jury to determine whether a criminal defendant is not guilty.   In determining whether guilt has been proved <u>beyond a reasonable doubt</u>, the jury must begin with the presumption that the defendant is innocent.   Also termed "Rational Doubt"

Quisquis praesumitur bonus, et semper in dubiis pro reo respondendum.

Medema was in violation of giving the jurors knowingly false facts, as he <u>does</u> have to prove the case of guilt <u>beyond a Reasonable Doubt</u>. Which he has <u>NOT</u> done.

On pg 58 line 2 he tells the jury "I'll never intentionally mislead you on something. I know Fred (Lesica); he won't either."

This is an issue because they both misled the jury, intentionally, to get this wrongful conviction.

Federal Habeas          9(N)

# Beginning of Trial  9/19/2017

One of the fundamental principles of our legal system is that the government's interest in criminal prosecutions is not simply to win a conviction, but rather to see that justice is done. *Berger v United States*, 295 U.S. 78, 88 (1935). As a result, the Due Process Clause of the U.S. Constitution requires that prosecutors act fairly, and prohibits them from certain conduct. *See e.g. Napue v Illinois*, 360 US. 264, 269, 272 (1959) (due process is violated when prosecutors knowingly or recklessly uses false testimony). As the United States Supreme Court has explained, "our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 US 83 (1963); *See also People v Lester*, 232 Mich App 262, 278 (1998) (defendant has a due process right to a criminal prosecution that comports with prevailing norms of fundamental fairness).

Due Process requires that criminal prosecutions comport with prevailing ~~notions~~ notions of fundamental fairness. *Napue v Illinois*, supra, 269; *People v Lester*, supra. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Napue, Supra* at 269-270 quoting *People v Savvides*, 1 NY2d 554, 557; 154 NYS2d 885, 887; 136 NE2d 853, 854-855.

* The United States Supreme Court has clearly established that the Fourteenth Amendment Due Process Clause requires that a criminal defendant receive a new trial when his convictions are obtained through the use of material false and perjured testimony, which the prosecutor knew or should have known was perjured. *See Mooney v Holohan*, 294 US 103 (1935); *Berger v United States*, 295 US at 85-86; *Pyle v Kansas*, 317

Federal Habeas              9(0)

US 213 (1942); Napue v Illinois, supra; Brady v Maryland, 373 US 83 at 86-88; Giglio v United States, 405 US 150, 153-154 (1972) United States v Agurs, 427 US 97, 103-105 (1976) United States v Bagley, 473 US 667, 679 & n 8 (1985).

The "same result obtains when the State, although not having solicited false evidence, allows it to go uncorrected when it appears." Napue v Illinois, supra at 269; Giglio v United States, supra at 153. It is inconsistent with due process when the prosecutor, although not soliciting false testimony from a state witness, allows it to stand uncorrected when it appears, even when the false testimony goes only to the credibility of the witness. People v Smith, 498 Mich 466, 475 (2015); People v Weiss, 425 Mich 448, 453-54 (1986), Mooney v Holohan, 294 U.S. 103

The prosecutor must correct false testimony through evidence on the record and not merely through a statement. People v Woods, 416 Mich 581, 602 (1982). Testimony which gives a false impression is false evidence. People v Atkins, 397 Mich 163, 173 (1976), overruled in part on other grounds in People v Woods, 416 Mich 581 (1982).

The burden of disclosure is on the prosecutor, not on the witness or the defense attorney. People v Trombley, 67 Mich App 88, 240 NW2d 279 (1976), lv den, 396 Mich 861 (1976). The prosecutor has a duty to correct false testimony not only going to the elements of the charged offense, but anything that affects the credibility of a witness. Napue v Illinois, supra at 269; Giglio v United States, supra at 153-155.

Knowledge

Knowledge of facts which are known to the prosecutor's investigative officer must be imputed to the prosecutor, so that even

if the prosecutor innocently relies on false testimony, there is error. People v Cassell, 63 Mich App 226 (1975). In People v Lester, 232 Mich App 262 (1998), the Court emphasized the prosecutor's duty to rebut false testimony, and remanded to determine whether the prosecutor knew that the witness lied. If so, the prosecutor's duty to correct the false testimony was not vitiated by defense counsel's knowledge that the testimony was false.

In Giglio v United States, supra, the Supreme Court reversed the defendant's conviction stating:

"As long ago as Mooney v Holohan, 294 US 103, 112, 79 L Ed 791, 794, 55 S Ct, 98 ALR 406 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in Pyle v Kansas, 317 US 213, 87 L Ed 214, 63 S Ct 177 (1942). In Napue v Illinois, 360 US 264, 3 L Ed 1217, 79 S Ct 1173 (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id., at 269, 79 S Ct. at 1177

\*   \*   \*

A new trial is required if "the false testimony could... in any reasonable likelihood have affected the judgement of the jury." Napue, supra, at 271, 79 S Ct at 1178." Giglio, 405 US at 153-154 (emphasis added).

Michigan Courts have also condemned the use of false testimony to convict a defendant. In People v Anderson, 44 Mich App 222 (1972)

the Court of Appeals held:

> "We are constrained to rule that even though the testimony...
> may have been obtained by the prosecutor innocently and
> given by (the witness) in good faith it was not true, and in
> fact was used improperly to discredit defendant and obtain
> his conviction." People v Anderson, supra, 229.

In People v Cassell, 63 Mich App 226 (1975), a witness lied about his involvement with a narcotics unit.... the prosecution's chief investigative officer, who was seated at the prosecutor's table at trial, had knowledge that the witness was lying. The prosecutor did not inform the trial judge or the jury that the witness was lying..."   Furthermore, in his closing argument, the prosecutor treated the testimony of the witness as if it were completely true and urged the jury to believe it.  In reversing the defendant's conviction, the Court of Appeals held that the officer's knowledge must be imputed to the prosecutor; however, the Court further found that reversal was compelled under Anderson, supra, even if the officer's knowledge was not imputed to the prosecutor. The Court was compelled to reverse as it could not speculate whether or not the jury gave consideration to the erroneous testimony in reaching its verdict:

> "On the strength of Anderson, therefore, we would feel
> compelled to reverse this defendant's conviction even were
> the prosecution totally unaware of the falsehood.
>                    *   *   *
> The jury had a right to know that the witness was
> lying on the witness stand. The fact that the witness

had not been called by the prosecution was likewise of no importance. The prosecution's duty to prevent lies from entering the evidence in the guise of truth stems not from any particular role in the adversary process; rather, it is derived from the prosecution's duty to represent the public interest, and to place the pursuit of TRUTH and justice above the pursuit of conviction.

We cannot speculate in light of this substantial error whether or not the jury gave consideration to the erroneous testimony in reaching its verdict. A new trial is required. See People v Anderson, supra, at 44 Mich App pp 228-229; 205 NW2d pp 84-85." People v Cassell, supra, 229.

See also People v Wiese, 425 Mich 448, 453-454 (1986); People v Woods, supra; People v Atkins, supra at 173-174; People v Barbara, 400 Mich 352, 363 (1977); People v Thornton, 80 Mich App 746 (1978).


A new trial is warranted if "there was any reasonable likelihood that the false testimony could have affected the judgement of the jury." United States v Agurs, 427 US at 103; Napue, 360 US at 271; Giglio, 405 US at 154. As the Fifth Circuit has explained, the "reasonable likelihood" standard is a low one:

"There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After

all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and again under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence, when it decides the question of guilt or innocence with all of its Ramifications." United States v Boeham, 595 F2d 231, 242 (CA 5, 1979).

People v McRunels, 237 Mich App 168, 171 (1999) Courts address Constitutional issues under a De Novo standard of Review.

In the instant Case, People of Michigan v Joshua Michael Salyers Case # 16-4697-FC, the State obtained its Conviction with Knowingly false testimony and Knowingly false evidence.

9/19/2017  Testimony of Sarah Grandinette.  Pg 139 - 159

She States that there were no problems except with the defendant. She states that her and Barbara Dailey were close friends and talked about everything including the Relationship of defendant and Dailey's. ☒ Facebook messages between the defendant and Grandinette would prove she was lying. Text log and Facebook message log and Barbara's Journal also contradict Sarah's testimony. The prosecution had knowledge of all this and refused to correct Sarah's testimony because it wished to mislead the court and jury that defendant was a problem and controlling and that Barbara was trying to end the Relationship even though Sarah told, on stand, that Barbara and defendant were in a "Toxic" Relationship

Federal Habeas                    9(T)

and in the Report that they were Engaged.

She testified that defendant and Dailey did not have to leave the home they lived in together, yet again, the Facebook messages prove otherwise and State had knowledge of it.

The relevancy of there being issues in the house with Barbara and everyone else is important to impeach her previous statements. Defendant wasn't the issue as State claims because defendant was <u>NOT</u> controlling nor would he "fight/argue" about things with Barbera Ann Dailey.

"A lie is a lie, no matter its subject." <u>Napue</u>; <u>Barham</u>; <u>Anderson</u>

<u>9/19/2017   Testimony of Daniel DeYoung   pg. 160</u>

• Lie #1   pg 165 line 20-21  "When z first seen them they were on this sidewalk right here walking across in front of this empty lot." (To be presumed walking to 1432 Jiroch based on pg 166 line 11 - 23).

• Lie #2   pg 167 line 4 - pg 168 line 16 (per video surveillance it proves all of what DeYoung said to be a lie).

At "7:06:14" they were both in Alley walking North. Not on the sidewalk in front of his house. At 7:07:27 they go into the house.

At "7:14:48" Salyers (defendant) in Alley walking South.

At "7:12:22" Salyers "on like a jog" back to 1432 Jiroch St

Only 7 minutes and some seconds pass before DeYoung would have again seen defendant (Salyers). (Pg 167 line 23 - pg 168 line 3).

(pg 168 line 8) He states he sees defendant there where he <u>FIRST</u> saw him. Defendant and Dailey were first in the Alley!

(pg 168 line 11-16). Defendant <u>Never</u> looked at him with any look because DeYoung was not on the porch of his home. Video footage will show

Federal Habeas                    9 (U)

that defendant doesn't stop and look as if ~~he had~~ like a deer caught in headlights.    Also with ~~this is~~ DeYoung's vision problem, he could NOT have seen defendants eyes to say they "were wide and wide open". He couldn't even see the big screen in the court room without getting closer to it.

\* This lie would give the false impression that something had occurred before the fact that defendant had been returned after leaving. The false footage times support this impression as the State presented knowing it had been wrong. \* Testimony which gives false impression is false evidence.  Atkins, 397 Mich 163, 173

<u>Wards</u>, 414 Mich 581

○  Lie # 3 (pg 169 line 22-25) From his porch he would not be able to see if anybody else could have gone into the house. Did he see ~~the~~ defendant leave? Did he see Barbara and Defendant leave? Can he see the easily accessible back door? Or the side door?

○  Lie # 4 (pg 171 line 15) "He actually has three cameras."

Sgt James Gust reports 5 cameras: CH1, CH2, CH4, CH5, ¦ CH7.

○  Again, Lie #5 though the same as Lie #1 (pg 172 line 20-23)

It gives that intended false impression that something occurred while defendant was alone with Dailey for about 5½ minutes to 6 minutes, left then came back and supposedly caught doing something. (More support on this later with Sgt. Gust's Testimony). See pg 177 line 3-20 (Pawns perjury)

●  Lie # 6 (pg 169 line 9-15 ¦ pg 175 line 19-22)

In one line of questioning DeYoung claims to get off his porch to observe defendant going inside the front door. On the other line he admits he stayed on the front porch. (It cannot be both ways).

●  Lie # 7 pg 179 line 24 - pg 180 line 1. He'd just ~~admitted~~ testified on pg 172 line 20-23 ¦ pg 165 line 20-21 to one thing and now another.

Federal Habeas                    9 (v)

- Lie #8 pg 181 line 1-2. DeYoung reverts back to his original lie as on Lie #1 and Lie #5

- Lie #9 follows Lie #'s 1, 5, 8. pg 181 line 16-21

- Lie #10 pg 182 line 14 - pg 183 line 13

  Line 12 of pg 183 again gives merit to the State's knowingly false theory supporting defendant had time to do this "crime", leave, then return. (Again more on this at Testimony of Sgt Gust).

- Lie #11   pg 183 line 16

  Police arrived at 7:21:40ish  9-1-1 was called 7:15:51 after only 1 minute and some seconds in the house with her. Give or take that'd be 7 minutes after defendant returned that police arrived, NOT 20-25 minutes. That'd still give that false impression.

- Lie #12  pg 184  line 15-16  line 17-19

- Lie #13  pg 185  line 10.

  This is very important as this lie allowed the State to do a Brady violation. Defendant was on the west side of Jirech and called Dailey at 5:01:27, IN FRONT OF THE CAMERAS. It's important because if you subtract the call time of 5:01:27 from the camera time you'll have the exact materially relevant TIME! (Again continued with Sgt. Gust)

- Lie #14  pg 186  line 9-14

  How then could he have seen the look on defendant's face as if it

  "like a deer caught in headlights"; "eyes were wide and wide open."

- Lie #15  pg 186  line 19-23

  Video footage proves this lie yet the State fails to correct any of the lies DeYoung told.

- Lie #16 (even after State reviewed the footage with DeYoung) pg 187 line 20-21

Federal Habeas                    9 (w)

"You see them walking down Jiroch and going in?"

"Correct."

The prosecutor JUST watched it and walked him through it. You do NOT see "them" on "Jiroch" you see "them" on the back Alley!

Yet, prosecution does NOT correct the false testimony and allows it to stand that way CAPITALIZING ON THIS TESTIMONY ON CLOSING ARGUMENTS! As well as pg 188 line 4-9 Lie #17 ✳

• Lie #18 pg 188 Line 14-25

It is absolutely clear this testimony is to tailored to comport with State's false theory. Watch the footage from 5:00:00 pm of the surveillance Qvideo. If he was outside for all these hours he'd have seen defendant talking on phone at 5:01:27 (5:05:? on camera time) in front of the CAMERAS on the WEST side of Jiroch. Then, Defendant & Daisy leave together to go to Wood Street Market. Then, return & go inside for 2 minutes, give or take. Then, Both leave to go to her Dad's where defendant was staying, where they only got to the tree on Southern Ave. Then, Both walking North in ALLEY. Then, Both walk to front of house & inside. Then, defendant leaves in Alley 5½-6 minutes later. Then, defendant, on a jog back to house & inside. Then, defendant, on phone with 9-1-1, come out so (after 1 minute and some seconds of his return). Then, go back inside (seconds). Then, back out into yard. Then, on steps. Then, still on phone with 9-1-1, back inside until police officer Smith and defendant steps out together AFTER the search & close was done.

If DeYoung was outside watching then how does he miss all this?

Federal Habeas          9(X)

9/19/2017      Testimony of Officer Phillip Dill    pg 190

On page 191 line 3: He states that he was the UNDERLINE_FIRST
on scene. Pay attention to where he states he finds me on
page 192 line 14: "When I reached the doorway I saw Joshua
kneeling over Barbara who was on the floor in a puddle of
blood."

On page 193 line 2: "I had Joshua step outside with
another officer and then myself and two other officers cleared
the house and made sure nobody else was in it and then we
advised medical alert it was clear to respond."

It should be noted, and can be verified by camera footage,
that defendant did not step outside with the other officer until
AFTER the home was cleared. Otherwise up to this point his
testimony is accurate aside of Barbara gasping for air until
defendant was outside (defendant covered the small incision, with his
finger, of the trachea so she could breathe. When told by Bringedahl
to step outside so that "I can assess the subject" he told me,
He did nothing!)

On page 196 line #7 the description given was NOT a
black male in all Black.    Listen to the 9-1-1 call. Prosecutor
failed to correct this.

On pg 198 line 1-4 officer gives speculation to a unknown
fact as nothing was tested. "No x-rays were done. Also, the autopsy
report contradicts his testimony that there was a small indention by
the hairline. That's suggesting a skull fracture and there was none.
Prosecution did not correct this nor did defense counsel object on
grounds of speculation or evidence with no proof.

On page 202 the prosecutor admitted into evidence
photos that Officer Phillip Dill did not take. "I believe those are Medical

Federal Habeas          9(8)

examiner pictures from the _actual_ autopsy." Which he was _NOT_ present for on 9/5/2016

On page 204 Officer Dill testifies to what he was _told_. That's Hearsay! Dill states that he was at the hospital while all the MSP crime lab was at the house doing their stuff. That he Returned and the _collected_ evidence was turned over to him. So, obviously, he was not there to observe where this STEAK knife came from.
(Defendant knows that knife was in the sink but where is the Bloody Butcher knife that was on _top_ of that knife?) (Defendant described the knife as "long like a bread knife and shaped like a big steak knife", pre interview).

On page 206, Dill slightly changes his testimony (lin 14-23) On page 209 Dill states that he observed the knife in the sink, yet earlier when all this was collected and "tested" by MSP crime lab techs he was at the hospital and Returned to retrieve the _Collected_ evidence! (line 12-13)

This does not go against anything officer Dill did or did not do, only the prosecutor. On page 217 line 19 - pg 218 line 14.
Before Trial began it was brought to State's attention that the video footage time was incorrect and if presented as is during trial it would be _highly_ prejudicial for the defendant as it will mislead the jury and court to assume/presume certain things. However, right here it was brought up into evidence by Officer Dill that the surveillance footage is Inaccurate and the PROSECUTOR had a duty to keep inaccurate, incorrect, false, misleading, evidence that gives false impressions, false presumptions from entering into evidence. The prosecutor capitalized on this footage as being accurate and correct even when it proves witnesses lied and that defendant is _INNOCENT_!! had it been properly corrected!

<u>End of Court Trial Day One  9/19/2017</u>

On page 220 the Judge asked if there was anything for the record. Both the prosecutor and pathetic defense counsel said, "NO!"

Medema (prosecutor) had a duty to Correct on RECORD evidence that he knew to be inaccurate. The duty and burden is on the prosecution not the defense; however, I told that slim ball appointed estate attorney to bring it up and he Refused to do that.

It is absolutely no wonder why the court tells both State and defense counsel, "gentlemen I don't know that I've ever accomplished — never advanced this far in a trial in a case like this in one day. And so you have my sincere thanks."

Defense counsel was helping the state convict defendant. Defense counsel believed his client guilty guilty according to his statement in the "investigation" conducted by the Attorney Grievance Commission.

Also, the court has refused to provide transcription of all the bench conferences for defendant to review and raise possible issues about.

Remember I said at the bottom of page 9(Z) of this about evidence that misleads the court and jury?

Page 225 a juror came forward to say he cannot be fair and impartial because his girlfriend "was in a <u>similiar position, wanted to get out, wanted to end things</u> and if I had not been asked to assist it may have gone a different way."

The prosecutor has/had evidence/proof that defendant 1) was Referring to thoughts of self-infliction in the Post on facebook and in facebook messenger/phone text log. 2) Proof that it was Defendant that was ending the relationship, not Barbara. Yet, during his opening statement he made false claims, gave false impressions that biased this Juror. How many others felt this way but didn't come forward due to state misconduct?

Federal Habeas                    9 (AA)

During Voir Dire of this Juror the prosecution further insinuates that defendant had threatened Barbara that he was going to do what the state claims defendant did. (pg 226 line 7)

Then, prosecution tries to argue keeping a juror on the case who has already stated/testified he cannot be fair and impartial to the defendant.

Already, we've begun to see the effects of the false theories the prosecution KNOWS to be false and the presentation of evidence that due to its incorrectness gives a substantially false impression.

If need be, defendant request oral argument on this issue to be clarify this. ^(better)

## DAY TWO  of Trial     9/20/2017
## Testimony of Officer Casey Bringedahl  pg. 4

On pg. 6 Bringedahl claims that defendant had come walking out of the house practically the same time as he got onto the porch, (line 10-13), and that he pointed and identified the "victim" who was laying down in a hallway, (line 13-15).

All three claims are false. The video footage proves that defendant did not go outside until After the home was "cleared." Barbara Ann Dailey was NOT found in the hallway the hallway is only 3½ ft. x 4½ ft. or about. She would not fit there. She was in the dining room near the stairs and south wall. Defendant never said a word to Officer Bringedahl and did not identify who Barbara was to him because he was still kneeling over her keeping her alive, crying & weeping.

On pg. 7 Bringedahl lies, again, about what he'd done immediately upon seeing Barbara. (line 21- pg 8 line 4). Bringedahl, Edens, and Dill cleared the home while Defendant

Continued Rendering aid. Then he (Bringedahl) asked defendant to step outside so he "can assess the subject" he said. He then told Officer Smith to take a statement from defendant.

* Note on pg 8 line 1-4 that he admits he did nothing because he did not want to move her until first responders got there. Note this because on page 16 he gives excuse to why he violated Search & Seizure and did not properly collect evidence. (line 1-5) and even on pg.11 line 12. he states he was waiting...(why not properly secure evidence?). On pg 17. line 14 he admits he provided no treatment

On pg 8 (line 15) Bringedahl lies about finding the alcatel cell phone in Barbara's hand.

When the back of her left hand hit the bannister, the phone was slung out of her hand and landed behind defendant near the South wall closest to the hallway to the kitchen. The phone could NOT have been in her RIGHT hand as he states on pg 18 line 9. 1) If it was why was it not covered in blood from the 1.5cm (9/16")cut of the second right inside-part of her finger? 2) If it was in her Right hand then how'd she get the cut to said finger to begin with?

Thus far everything about has been told to the prosecutor by defendant's appointed counsel, so the prosecutor knows this officer is lying yet he still allows it because it helps him with his false theory.

On pg.9 line 24 - pg 10 line 22 Officer Bringedahl speaks about the knife he claims he was looking for. On line 14-17 he makes claims that he Remembers specifically, "This black knife right here." Noting that there was no blood on it. And so without any further information

Federal Habeas                9 (CC)

at that point, he "just left it alone."

The issue here is he has <u>authenticated</u> the weapon they <u>claim</u> to be the knife used. The knife had undergone <u>NO</u> testing aside to find it tested positive for human blood. Had the knife been properly tested it would show 1) That the steak knife, <u>HE claims</u> was the knife used, would <u>NOT</u> have been capable of making a <u>12 cm incised wound</u> "significantly deep" 2) It'd show that it was never wiped off and 3) It'd possibly have shown that, if printed, it was last handled by someone other than Barbara Ann Dailey and definitely <u>not</u> handled by defendant. The knife <u>SHE</u> used was "long like a bread knife" and shaped "like a big steak knife"

1" I ⊨———————————⊨ and shaped "like a big steak knife"
├— 11 inch —┤

<u>Not a steak knife</u>
3/4 ⊤———
├ 4½" ┤

2" I ⊨————————————► AKA Butcher Knife.
├— 8-8½" —┤

<u>Criminal Law Deskbook P16.21</u>
"Certain presumptions must be made.... A <u>large</u> sharp object could make one clean cut 4 inches long and <u>1</u> inch deep...."

12 cm = 4.72 inches (4¾") This is over 4 inches.

Per Report: No weapon had been found in the home. They were advised that defendant may had ditched the weapon in the alley when he left.

All three knives above were in the sink. Defendant placed the bloody butcher knife atop of the other two knives which is why the knife or knives tested positive for human blood. Where is the butcher knife? What knife <u>handle</u> is it they were given 2 days later. State fabricated or manufactured this knife as evidence and presented only in photographic form to be

Federal Habeas          9(dd)

falsely authenticated by this officer, Casey Bringedahl.

On page 10 line 25 Bringedahl is allowed to give improper testimony as an "expert."

"Very Shallow, labored. <u>You know, it was definitely someone who was likely in the last stages of their life.</u>"

* (She lived 46 minutes from the time defendant called 9-1-1). She died at the hospital where <u>proper</u> medical intervention did <u>NOT</u> occur.

On page 11-13 (line "8 - 13) Casey Bringedahl was used by the prosecution to authenticate defendants facebook post which was erroneously admitted  1) Because the post is factually in regards of suicidal thoughts of defendant, <u>NOT</u> Murder. Prosecution <u>KNEW</u> this. 2) There were <u>many</u> sub posts about this post between defendant, Stephanie Ann, Connie, Sheeranda Gile, and Doug Caalson. Prosecution/investigative team deleted/destroyed these comments that prove the facts of this post. (The proof of this is seen also via text/facebook log as well as the other copy of the same post). 3) Bringedahl is not able to authenticate such post.

This post should have <u>not</u> been allowed to be used as evidence to begin <u>with</u> or, at the very least, not without the rest of the several sub posts to show the full extent of what it was about.

This is prosecutorial misconduct as the prosecution knew it was about suicidal thoughts, not murder, and because he or the investigative team deleted portions of it then began covering it up when he requested motion in limine just before defendant testified. Prosecution knows that Bringedahl could not have properly authenticated such evidence but went ahead with it anyways.

Federal Habeas     9 (εε)

On page 14 (line 12-14) Bringedahl gives false testimony. The prosecution allows it to still go uncorrected. Per video evidence defendant does not go outside until after Bringedahl tells him to step outside with Smith (officer) to get a statement and so he can "assess the subject" he told the defendant.

The same false testimony on line 25 - pg 15 line 2

On page 17 line 14  Bringedahl contradicts/gives proof he's been lying: "I didn't perform any treatment to her."
page 16 line 1-5, "My main concern at that point was her welfare, and obviously any collection or preservation of evidence takes a secondary position to the victim's welfare...."

What did he DO? He admitted he did no treatment which left him to _properly_ collect evidence and preserve its location.

On page 18 line 22  Bringedahl claims the phone was in her right hand and that it was lit up and so he looked at the screen. On line 24 - pg 19 line 3  he claims that it read an outgoing call to "my husband" at 7:11 pm.

This is search + seizure violation and the prosecuter was made aware of this and still allowed it into evidence.

In order for Bringedahl to view that the call was her last outgoing call at 7:11 pm to "My Husband" (405) 747-0680 (defendant) he would have to first press 2 seperate buttons on the phone to unlock it. Then, go to the call log and view details.  The Alcatel cellphone is one of those old, cheap, "governement" phones given to state assisted people. The phone's light does _NOT_ stay on and automatically locks within 5 minutes. Prosecution knows this as well, or should have known. Barbara calls "My Husband" (defendant) at 7:11. Police don't arrive until almost 7:22. It takes a minute or two for them to clear the home and ask defendant to step out so he can assess her.

That'll be about 7:23-7:24. That's 12 to 13 minutes after she calls "My Husband" at 7:11. The phone would have been locked? "sleeping." Also, Bringedahl claims it being in her Right hand. Now? Now, if Barbara has a cut to her second Right finger on the INSIDE of her finger, could she have had the phone in her Right hand?

1) Bringedahl can "Remember" the posts words, "location of the phone", the time & who she called last, but he can't "Remember" if he had blood on his hands from collecting the phone that'd have been covered in blood from the cut to her finger. It's why defense attorney asked if he wore gloves and put the phone in bag on not.

2) Prosecution knew who "My Husband" is in her phone just as he knew who "my wife" is in defendants phone. For Bringedahl to have told the jury who "My husband" is would have began causing doubts to his knowingly false theory that Barbara was trying to leave defendant.

On page 20 line 6-7 Defense attorney asked, "when you were first dispatched to Jirouch, were you dispatched on an assault with _Subject_ down type of call?" "Yes." See page 34 line 16-17 as well (9-20-17)

Prosecution used this as well as defendants recitation of what Bringedahl told him to inflame the jury during his closing argument: "...what did he call Barbara Daily yesterday? The Subject. Assessed the subject" (9/22/17 pg 19 line 21-24)

On page 22, Jury asked Bringedahl, line 1 "was the call incoming or outgoing and how long was the call?"

Bringedahl said he don't recall specifically. "I just glanced at it for a second. Phones are kind of a touchy subject under search and seizure and I didn't want to go through the phone without search warrant." However, on page 18 he admitted it was an "Outgoing call" to "MY HUSBAND"; pg 19 that the call was placed at 7:11. So, clearly, he just lied to the jury and

the prosecution knew he lied yet left it uncorrected.

On page 25 line 2   Medrano (prosecution) elicits "hearsay" asking him what was told to dispatch. This also goes to show that defendant was forced, although he was never arrested, mirandized, or otherwise notified that he was a suspect, to be taken to the police department. (line 12)"We need to make sure he doesn't go anywhere."

Also, what exactly wasn't making any sense? 1)He's not an expert/detective  and  2)He had no information to determine if a scene made any sense at the time. Prosecution also knows this but elicits this improper testimony to fdfurther mislead the jury.

Prosecution uses improper terminology pg 25 (line 17-19) knowing Beringdahl did no searching for anyone. "Wild goose chase", "chased this phantom person" or looked for this phantom person."

Prosecution began trying to make excuse for why Beringdahl failed to properly preserve evidence and knowingly elicited false testimony while doing so. Page 25 line 21 – pg 29 line 9
The false testimony: pg 26 line 5-11
"One, I want to make sure that it's safe for first responders or anybody else showing up at the scene." (true enough) "And two, I want to render aid to the victim." (He did no treatment, defendant did).
"And so that's exactly what you did?"
"Yes." (Lied)    Review pg 8 line 2-4; 10-11 (yet he did nothing to stop the bleeding because defendant already did before he was told by Beringdahl to step outside with Smith to get a statement), line 19-23,  pg 16 line 1-5 (Again. He did not render any kind of aid) ✱Pg 17 line 14 ✱! pg 21 line 2-5 (admits to just standing there!)

On pg 26 line 23 – pg 27 line 1, "would it have been detrimental to her and her condition..." (to properly preserve

Evidence). "Absolutely." ( A lie again he did NOTHING to help her. He admitted he did no treatment and just stood there waiting for medical).

Prosecution admitted photo exhibits 1 & 2 through Officer Beingedahl ERRONEOUSLY pg 29 - pg 33 line 19

Officer Bringdahl could NOT have observed the full extent of the Several SHALLOW injuries that are in evidence in these photos. (Dr. Bader Cassin once stated that ~~Medical~~ Surgical intervention can ~~seriously~~ significantly complicate the injury finding and make the interpretation of injury finding difficult, if not actually impossible, in some details") People v Dimambro 318 Mich App 204 (2016) Dimambro, 318 Mich App at 242?

So Bringedahl ~~could~~ CAN not be the one to authenticate these photo exhibits. That would have been the Dr. who treated Barbara Ann Dailey at the hospital who failed to provide the proper treatment ~~that~~ was able to authenticate these photos.

On page 37 Prosecution withheld the fact that Bringedahl's sister ~~was~~ is a prosecutor. That's a BRADY violation. Defendant had to learn it through another jailed inmate and relay it to his appointed attorney and force him to relay it to prosecution that defense did not get this information in discovery.

Testimony of Tyler Sean Smith (Officer) 9/20/2017 pg 38

* Per report, this officer states that Officer Dill entered the home first. He then entered behind him. Then Officers Bringedahl and Edens entered and began clearing the home with Dill. He states that defendant was found in the home

Federal Habeas          9 (II)

crying and weeping over Barbara Dailey. Joshua (defendant) was very emotional and could not follow my questioning well.

Officer states that he was advised that defendant (Joshua) was likely the only one who entered or exited the home and was also advised that defendant (Joshua) may have ditched a weapon in the alley as no weapon was found in the home.

<u>Trial Transcript 9/20/17 pg 39</u>

line 19: "And in fact, September 4th of 2016 was actually already planned to be your last day with the Muskegon Police Department, correct?"

line 22: "Correct."

On page 49 line 25: "That's the basically the end of your contact with the defendant (Joshua)? pg 50 line 1: "Yes."

Officer Smith had been coached on what needed said in order to corroborate the testimony of a jailhouse liar Joshua Currin. Ofc. Smith's last day was 9/4/16 and per Report defendant had been found in the home crying and weeping over Barbara Dailey who was face down in the Dining Room. There is Absolutely no mention of the <u>living Room</u> anywhere except in a letter written to Governor Rick Snyder on 6/26/17. Then this jailhouse liar Joshua Currin pops up saying I confessed to him about this happening in the <u>living Room</u>. This letter was stolen out of defendants attorney/client privileged folder on 6/28/17 when he was placed into a different pod on the 3rd floor and on "Suicide watch."

Federal Habeas          9(JJ)

Where else could Officer Smith had been getting this info of the living room where he claims to have found the defendant if not for the prosecution coercing him during the time he prepared him for his trial testimony?

Page 40 "I found him in the house. He was in the living room area when z walked in."

Page 41 "I entered the house and Mr. Salyers was in the living room of the house..."

The prosecution <u>Knows</u> these statements are false testimony yet he fails to correct Officer Smith. Why? The Defendant believes it's because this false testimony was coerced to corroborate the knowingly false testimony of the jailhouse liar, Joshua Guerin.

"... the knowing use of false by the prosecutor of false testimony Results in a denial of Due Process under the 14th Amendment and a new trial is required." United States v Lochmondy, 890 F. 2d 817, 822 (6th Cir. 1989).

"... a lie is a lie, no matter what its subject, and if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." Napue, Supra at 269-270 quoting People v Savvides, 1 NY2d 554, 557; 154 NYS 2d 885, 887; 136 NE2d 853, 854-855.   "our system of the administration of justice suffers when any accused is treated unfairly." Brady v Maryland 373 U.S. 83 (1963) See also Mooney v Holohan, 294 US 103 (1935); Berger v United States, 295 US at 85-86; Pyle v Kansas, 317 US 213 (1942); Brady v Maryland, 373 US at 86-88; Giglio v United States, 405 US 150, 153-154 (1972); Napue v Illinois, supra at 269, People v Smith, 498 Mich 466, 475 (2015); People v Wiese, 425 Mich 448, 453-54 (1986).

Federal Habeas                    9 (KK)

It is not the defenses responsibility to correct the false testimony such as Trial Transcript 9/20/17 pg 45

"And you observed the defendant here kind of over her?"

"Correct."

"He was kneeling over her..."

pg 46 "He was crying and kind of weeping over the body basically, Right?"

"Yes"

See People v Trombley, 67 Mich app 88, 240 NW2d 279(1976)

Further, Prosecution makes improper Remarks in his question on pg 43 Trial Transcript 9/20/17 line 3: "Did you participate in any kind of Search for that Phantom black man wearing black shirt and Red shoes?"

Prosecution also asks the officer about someone that did not even match the description I had given them. They talk about someone with Black and Red shorts with earphones in. They talk of irrelevant information to both confuse and inflame the jury's prejudice toward defendant along with the prosecutions Remark pinning defendant as Racist during his closing argument.

Prosecution elicits false testimony in regards of having to stop this individual so he could be asked if he committed a homicide? (Pg 44-45). It's false testimony because it was not considered a Homicide until after a person has passed away. Prosecution made the false impression that Barbara

Federal Habeas                    9(LL)

Dailey had passed away at the house and at defendant's hands when Barbara Dailey had, in fact, died at Hackley Hospital 46 minutes after defendant called 9-1-1.

"... False impression is false evidence." People v Atkins, 397 Mich 163, 173 (1976)

Trial Transcript 9/20/2017 <u>Officer Logan Anderson</u> pg. 50

Per his Report: " I arrived on scene with knowledge of a female was assaulted and lying on the floor bleeding. As I walked up to the front door, I observed a male (Joshua Salyers) crying on the front porch. I entered the residence to find officers had a W/F on the floor not moving. Medical staff rolled the body over to find a cut to the neck...."

Page 9(ss)  *  I asked Joshua if he would come with me to MUPD. Joshua was cooperative and stated he would do what was asked of him. Before leaving, Joshua asked for his cell phone, stating it was on the kitchen table. I retrieved the phone for him and asked that I hang on to it. Joshua stated the phone was "dead" and did not mind that I held his phone for him. Joshua was transported to MUPD in my cruiser per my request. Joshua was cooperative and did not ask if he had to go with me....

Joshua made several comments that CPD instructed him to apply pressure to the wound on Barbara. Joshua stated he tried to use his shirt to stop the bleeding....

Det Luker and Det Stratton interviewed Joshua about the

incident while being recorded. At the end of the interview, I was instructed to transport and lodge Joshua at MCJ on the charge of Open Murder... Before leaving for the jail, Joshua was notified that Barbara had passed. Joshua cried uncontrollably for a few minutes."

Trial Transcript 9/20/2017  pg 52

"The ~~officers~~ other officers had just went to go upstairs to clear the rest of the home. I was downstairs in the — right at the doorway kinda was holding rear security and also there was a male on scene that I was standing by with with Officer Smith."  (That male was Joshua Salyers).

This testimony is false. It contradicts his report. However, it coincides with exactly what the prosecution needs to be said as well as with what some other knowingly false testimonies said. (Watch video footage.) Defendant remained in the home rendering the only aid until the home was "cleared" and was asked to step out so (Bringedahl) could "assess the subject", he told defendant, and asked Ofc. Smith to take a statement from defendant. While on the porch, Pro Med & fire emt's arrived and went inside. Then, Ofc Anderson arrived and went inside.

Pg. 53  "...You said that he said that Barbara was what to him? Did he ever identify that?" Anderson answered "I'm sorry. I guess I don't follow."
Federal Habeas                    9(NN)

"Did Mr. Salyers ever say to you the relation that Barbara was to him?" Anderson answered "I don't recall"

After prosecution uses his report, Anderson says she was identified as "his life."

That is incorrect, false. Defendant identified her as his fiance. Told the officer that they were engaged. Defendant's PHONE/Facebook identifies Barbara as "My Life" and the Phone identifies Barbara as "MY WIFE".

Anderson wrote his report after he and detectives had gained access to defendant's phone during the interview where defendant told them what she (Barbara) was to be found under in the phone and facebook. Anderson wrote his report at 01:02:07 AM on 9/5/2016.

Pg. 54    Anderson testifies that defendant "talked a lot about he had been engaged to Barbara."

Again, this shows that Anderson is not being truthful with his testimony because, just above, he testified twice the he 1st) "doesn't follow" and then, 2nd) "I don't recall" when asked if Defendant ever told him what Barbara was to defendant. Now, he testifies that defendant states they are engaged.

Anderson testifies that he doesn't recall if he or somebody else retrieved defendant's phone from the dining room table, yet, in his report he wrote extensively about the retrieval of said phone and it being "Dead" and holding onto it. He says "I believe it was off."

Federal Habeas               9(00)

This false testimony gives the false impression that while defendant was on the line with 9-1-1 who were advising defendant on what to do to help keep Barbara alive, he instead just turned his phone off because the call with 9-1-1 was disconnected while giving advisement.

"False Testimony which gives false impression is false evidence." People v Atkins, 397 Mich 163, 173 (1976). "A lie is a lie, no matter what its subject." Napue v Illinois, 360 US at 269, "and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."

"Knowledge of facts which are known to the prosecution's investigative officer must be imputed to the prosecution, so that even if the prosecution innocently relies on false testimony, there is error." People v Cassell, 63 Mich App 226 (1975)

On page 60 Anderson states that "I was advised by the detectives that he (defendant) was to be lodged in the Muskegon County Jail" "At that point I believe we told him he was being lodged for an assault, possibly weapons charge. We did not know that Ms. Dailey had passed away."

Review Anderson's report. "Before leaving for the jail, Joshua was notified that Barbara had passed away. Joshua cried uncontrollably for a few minutes." "I was instructed to transport and lodge Joshua at MCJ on the charge of Open Murder."

Clearly, Officer Anderson, again, provided false testimony.

Federal Habeas                    9 (PP)

This testimony is, again, what prosecution had the duty and responsibility to correct. Prosecution, however, did not correct Ofc Anderson because if it was to be known that Detectives interrogated the defendant without a valid waiver of his Rights the interrogation could NOT be used against defendant at trial. Prosecution and Det. Luker capitalize on this false testimony later.

Defendant was supposedly Read his Rights and waived said Rights "due to the nature of the situation." Had defendant been properly informed of why he's being Read his Rights, say being charged or questioned about "Murder", defendant would not have waived his Rights nor talk to the police. Not to mention the offer of leniency, the deceit/improper influence that lead to a promise made. All of which the Prosecutor knew about and still insisted on allowing the false testimony to go uncorrected.

State v A.G.D., 835 A. 2d 291 (2003); State v Vincenty, 202 A.3d 1273 (2019)


On page 161 Anderson testifies that defendant said he had blood on his hands, Central Dispatch (CPD) had told him to use something ~~soft~~ to try to stop the bleeding as he was talking to them. Defendant said that he used his shirt to put on her neck.

Prosecution asks Anderson, "The only information you have to go on about him Rendering aid to her is his own statement?"

Anderson says, "Correct."

Federal Habeas                    9(QQ)

Again, this is a false impression, false testimony, and the prosecutor knew this even before he asked Anderson that question.  1) Prosecution heard the 9-1-1 call. 2) Dailey (Boehnes) was obviously still alive and according to Bringedahl the wound on the neck had ~~been~~ in a way that kept her from bleeding profusively. Bringedahl rendered <u>NO Aid</u>, only the defendant had up to the point that Pro-Med gotten there and rendered aid.

Prosecution <u>speculates</u> to Anderson "It would be equally as possible or plausible based on the blood on his hands that he had his hands on her neck doing Something far worse."  1) It wasn't a question which means it was improper for prosecution to speculate in such a manner. 2) Anderson answered "Right" as if he is an expert that agrees with the prosecution AFTER which prosecution implies defendant was lying about rendering aid  and his "own statement" is all they had to go on.

On page 62 in regards of retrieving defendant's phone Anderson provides false testimony which prosecution, again, fails to correct. Review Anderson's Report.
  "You said, 'well its not working. At that point only after he (defendant) was informed it wasn't working did he say – you actually asked him, could I hold it?"  "Correct."

Federal Hobeas           9(RR)

* Under 18 ... USC 3501 (b) (1999) "prior to a custodial interrogation a criminal suspect must be warned .... That also applies to placing a suspect under physical constraint. Defendant (Salyers) asked to be else-where but was taken into custody anyways without being cuffed and/or Mirandized.

On page 62 Jessica asked Anderson:

*

"Did he (defendant) ask you to be taken to Barb's dad when he was about to leave the house on Jiroch?"

Anderson says he don't recall.

On the cruiser video/audio you'll hear where defendant requested to be taken to the hospital. He was told that the hospital is going on lockdown and would not be permitting anyone. Defendant then asks to be taken to Barb's Dad's place where he was staying. Anderson said he'd take defendant there and asked for the address. Defendant gave it to him and asked to have Becky go to Barb's Dad's too so he could tell them what Barbara had told him to tell her Dad and to tell them both what had really happened.

Prosecution did not turn the cruiser video/audio over to defense or, if he had, defendant has never seen it along with 90% of the "Discovery" turned over.

~~Under 18 custodial interrogation and custodial constraint~~

On page 64 Anderson lied on stand and the Prosecution failed to correct the false testimony as didn't defense counsel.

"When you transported him to the jail they---"

"Yes. At that time we did not know. I think we made ~~calls~~ some ~~calls~~ phone calls later to find out that she was deceased."

It wasn't corrected because it helps to cover police misconduct and prosecutorial misconduct. Review Anderson's Report.

Testimony of Det. Kory Luker   Trial Transcript 9/20/17 pg 65
Luker's Report is attached

On page 67 Prosecution knows that first init initial contact was not when we were in the interview room for the interrogation. Yet, he fails to correct that because there was about 5 minutes of conversation in the break room.

On page 71 Detective Luker lied about why defendant changed from the lie and told him about what she had done: Commit Suicide, trying to commit suicide.
It wasn't that he'd gotten "a bit more information" it was the <u>fact</u> he had told defendant "<u>this looks to have been an attempt to commit suicide.</u>" Defendant, <u>only then,</u> had asked the Detectives to <u>promise</u> to not take her girls from her if defendant told them what she had done. 1) Luker <u>agreed to that promise.</u> 2) Luker knew that Barbara was already deceased ~~yet she~~ before the interrogation began yet claimed it was an <u>Attempt</u> to commit suicide. That is deceit and improper influence. 3) The waiver of Rights were invalided as defendant was not informed of the situation as to why he'd been <u>Mirandized.</u> 4) Offer of leniency was made for defendant's "story." Prosecution knows this from the Recorded Audio/video footage that was manipulated into 3 discs.
On pg 71 Prosecution knows Luker is giving false testimony because defendant did not say the pressure from his hand caused the cut. Listen to the video.

Federal Habeas                    9(TT)

On page 73 lines 1-6   more false testimony and prosecution knows this. Defendant never _said_ he used the knife on that "They" made the first cut.

Prosecution knows that the knife wasn't wiped off as he claims defendant said. Defendant actually said he _wanted_ to wipe it off more or less to protect her from losing her girls. However, it was never wiped off.

On page 83 Prosecution knows that the tactics Det. Luhra was using are police misconduct. Offering leniency. Not getting a valid waiver, not notifying of accusation, deceit, promises. Yet, instead pursues questioning and embraced it even though he knows it's wrong. He asks "OK, so some of this stuff is a very deliberate thing on your behalf."   "Yes."

On page 92 Prosecution presented the audio recorded interrogation while it was distorted/white-noise-ish yet later has it manipulated to "clean" it up and still refused to have it transcribed so defendant could properly present the many ERRORS on behalf of the Detectives on direct appeals and Federal Habeas Corpus Review. (Pg 92 line 11-13 Trial Transcript 9/20/2017).

On page 94 Defense counsel asked "I realize it's a technique that's involved in these kinds of interviews, but do you

Federal Habeas            9(UU)

try to plant words in his mind or thoughts in his mind as part of your interview, whether they're true or not?"

Det. Luker replies, "I don't think it's a matter of trying to plant words or make him say something that's not true or that he didn't want to say. It's giving him options that are <u>closer to the truth</u> that he can kind of baby steps, I guess, if you will, towards the truth."

Prosecution erred by allowing this false testimony to stand uncorrected. Prosecution and Det. Luker knows this is false and doesn't fully answer the question of "Thoughts in his mind" part.

Preliminary examination transcript. pg 13  9/20/2016
Q: "Detective, did this interview take place before or after Ms. Dailey was deceased?"
A: "I believe it was right after."
Q "Did it (the interview) take place before or after you learned that?"
A: "It was after."
Q: "So at the time you were conducting this interview you were aware that this was a homicide investigation?"
A: "Yes, Sir."


Prosecution and Luker both know that 1) Barbara died at 8:01 pm on 9/4/2016. 2) The interrogation began at about 9pm on 9/4/2016. 3) That Luker & Stratton (Detectives) knew Barbara was deceased before reading defendant <u>Miranda</u> warnings and failed to obtain a valid waiver of rights due to not notifying defendant

Federal Habeas                    9 (VV)

that he's a suspect for her death, Murder, assault, etc.
4) That detectives put it in defendant's mind that Barbara
Dailey had survived her attempt of suicide when Det. Luker
advised defendant that "this looks to have been an attempt
to commit suicide." 5) That only then did defendant ask
them to promise not to take her girls from her if he told
them what she had done. See People v Jones, 416 Mich 354

Obviously, defendant did NOT want to tell them what
she had done for fear they'd take her kids from her until
they led him to believe that she survived and was talking.
How else could they have known that she tried committing
suicide?

Prosecution knows Luker wasn't just giving "options that
kind of see closer to the truth." Who's truth? Their belief
in what they think is true or defendant who knows what
happened?


On Page 95 Luker admits that he never told/
informed defendant that Barbara passed away until after
the interview. See Colorado v Spring 479 U.S. 564.

"had a duty to inform Spring that he was a suspect, or to
readvise him of his Miranda rights, before questioning him about murder."
671 P. 2d 965, 966 (1983). "any waiver of rights in regards to
questions designed to elicit information about Walker's death was not
given knowingly and intelligently." Id., at 967

Here, detectives Luker and Stratton failed to inform

defendant (Salyers) that he's a suspect and that it was in regards to a death, the death of Barbara Ann Dailey. Instead, they led him to believe she was alive by telling him "this looks to have been an <u>Attempt to commit Suicide,</u> using deceit and improper influence.

"the absence of an advisement to Spring that he would be questioned about...homicide, and the lack of any basis to conclude that at the time of the execution of the waiver, he reasonably could have expected that the interrogation would extend to that subject, are determinative factors in ~~determining~~ undermining the validity of the waiver." Id., at 874.

See also   State v A.G.D., 835 A.2d 291 (N.J. 2003); United States v Burger, 728 F.2d 140, 141 (CA2 1984); Carter v Garrison, 656 F.2d 68, 70 (CA4 1981); United States v McCreary, 643 F.2d 323, 328 (CA5 1981).

On pg 97 Even after ~~Feed~~ Lesica showed the preliminary examination transcript to "Refreshen" Det. Luker's memory he still ~~start~~ tried lying to cover up the fact they (he) committed police misconduct by failing to obtain a valid waiver and using deceit and improper influence.

A: "What I said was I didn't know until after ~~the~~ interview."

The techniques used at the interrogation clearly violate the Constitutional Rights.

On Pg 100 the prosecutor asks, "Mr. Lesica wants to Characterize your interview techniques as planting things

Federal Habeas                    9 (XX)

in his mind. What is your goal in an interview?"

   A: "My goal is to find the truth."

* Why then did Det. Luker specifically tell defendant, Joshua Salyers, during the interview that this looks to have been an ATTEMPT to commit suicide when he had already had knowledge Barbara Ann Dailey had passed away before Salyers was Read _Miranda_?

   On the case supplement Report Luker documents that "At one point he sighed and said that if he tells us what he is about to say, then he wanted us to promise him we would not take her children. ( Pg. 43 of Case Supplement Report)

He fails to mention what deceit and improper influence he used to get Joshua Salyers to give the supposed confession, including agreeing to the promise.

<u>Testimony of Dr. Amanda O. Fisher Hubbard   9/21/17 pg. 3</u>

* Lie #1   pg. 11 line #25 - pg 12 #Line #4

    Q: And you able to quantify how many wounds, incised wounds there are?"

    A: "There were at least four incised wounds."

    Q: "And how were you able to determine that?"

    A: "By just examination."

    Per Barbara A. Dailey's Autopsy Report there were "at least" 6 incised wounds, <u>NOT</u> 4 as she (Deputy M.E.) claimed. Deputy Medical Examiner written the report bulletining only 4 of the 6 incisions to corroborate with the facebook post ("1cut, 2 cuts, 3 cuts...4......"). <u>Under bulletin 3</u>, she clearly describes 3 incisions: 1) 12 cm   2) 2.5 cm 3) 2.5 cm.

* Lie #2   pg. 16 line #25 - pg 17 line #3

    Q: "For instance, what type of incisions would those be, location?..."

    A: "Typically seen on a wrist or an extremity."

Ballentine's Law Dictionary - Extremity: The outermost; the hands and feet. 3A-236-23 Courtroom Medicine Series: Death § 23.50 [4]

* "The number of the wounds has little bearing, since suicidal incisions are frequently multiple".

* "The position of the incisions. Incisions at the wrist almost always suggest suicide, <u>while those at the neck</u> may suggest either homicide or <u>Suicide</u>."

Federal Habeas        9(ZZ)

Lie #3   pg.17  Line #23-24

   Q: "In fact these wear pretty significantly deep, correct?

   A: "Yes."

     Per Autopsy Report: • 3cm of which 2cm of it is Superficial.

                 • 8 cm

                 •12 cm of which 5.6cm is Superficial,

                   2.5cm Superficial & 2.5cm superficial

                 • 7 cm

  42 Am. J. Trial Advoc. 331

77+ "Superficial incised wounds may be the result of hesitation — as are SOMETIMES seen in suicide victims."

   3A Criminal Defense Techniques §67C.06

"Suicidal wounds are also seen in certain predilection areas, mainly the neck, chest and wrists. In the neck and wrists, the wounds are mainly incised (cutting wounds)...

   1 Attorney's Textbook of Medicine (3rd Edition) §3.04

"Superficial wounds are limited to the upper layers of skin and mostly cause bleeding. They are open but do not penetrate the deeper layers of skin or fascia.

    4A Lawyer's Medical Cyclopedia §31.16 [F] Repair

"Superficial wound require only a single layer closure of the skin. Deep lacerations require buried sutures."

   * Barbara Ann Dailey had no buried sutures.*


Lie #4   pg.17 Line #25 – page 18 Line #5

   Q: "What parts of the body did these incised wounds affect?"

   A: "These affected the neck muscles. And then one of the

incised wounds also included an incision of the trachea, or the windpipe, as well as the right jugular vein which is the main vein that drains the blood from the head."

Dr. Amanda O. Fisher-Hubbard claims these all affected the neck muscles which, if true, would be proof they were all significantly deep as she testified. However, per her written report, only after the 2 ADDITIONAL 2.5 cm superficial incised wounds she hid in the 3rd bulletin was there any mention of musculature damage. None of the other 4 incisions claim any damage to the muscles including the 8cm and 7cm incisions. Incisions she says were not the cause of death (3cm, 8cm, 7 cm). The wound that caused death was, according to her, the 12cm incision which is only partly true. Here is why:

12 cm = 4.72 inches. The right aspect of this incision was superficial of 5cm (1.96 inches), the left aspect was also superficial of .6 cm (.24 inches; ¼") The superficial incision over the right side does not penetrate the deeper layers of skin or fascia which means it had not touched the muscle at this point. However, the 2 additional <u>superficial</u> incisions <u>within</u> the 12 cm incision, one over the jugular; the other over the trachea, would cause damage to the musculature and the EXTERNAL Jugular Vein and the cause of the small incision to only the front portion of the trachea. Therefore, the Internal Jugular Vein was, in fact, NOT severed, it'd have been the EXTERNAL which drains the blood from the face/ scalp areas. The internal jugular drains the blood from the brain. Further proof of this is had the internal jugular vein been severed, Barbara Ann Dailey would have died within 2 to 3 minutes, <u>NOT</u> 46 minutes later at the hospital.

Lie #5   pg. 18 Line # 9-12

Q: "Were you able to determine the cause of death in this case?"
A: "Yes."
Q: "And what did you determine?"
A: "Multiple injuries including blunt and sharp force."

Per report (Autopsy) there was a contusion on the left inferior temporal lobe of the brain measuring 0.5cm x 0.5cm x 0.3cm. This small of a contusion is not sufficient enough to cause death

3A-236-23 Courtroom Medicine Series: Death § 23.50

[1] Contusions
        is not often the cause of death, although if major internal blood vessels or the brain are involved, it can have lethal consequences.

[6] Cause of death after wounding
    Contusions and lacerations rarely cause death, unless an underlying vital organ is ruptured by the blow. Hemorrhage from incisions is usually not severe, but if an underlying blood vessel is involved in the incision, hemorrhage sufficient to cause death can occur.
    In Suicides, this generally involves incisions over the arteries of the wrist or of the major blood vessels in the neck.
    See Trial Transcript 9/21/21 pg. 33 #Line# 23 – pg. 34 Line #1.
        Q: "So the summary of your opinion is that death was caused by i.e. just to simplify it, cutting and or blunt trauma, I guess. Would that be accurate?
        A: "Yes."

    Which is it blunt and sharp force or cutting and (sharp force) or Blunt trauma?

    Per report it is painfully clear that there was absolutely

no investigation conducted to determine whether this was, in fact, a suicide situation.

2 Forensic Sciences [1] Brief Autopsy procedure Guide for the Forensic Pathologist
  • General Rule is "if in doubt about the manner of death, treat as a homicide."

2 Forensic Sciences 25J.07 Mechanism of Death - BFT
  [a] Definition
      Blunt Force Trauma (BFT) injuries to the body are inflicted by a force sufficient to cause bruises, contusions, or fractures. BFT injuries are seen in accidents such as in MVA and falls, suicides involving falls from heights, and homicides that involves fights.

  [b] Investigation
      The type and level of forensic death investigation conducted is heavily dictated by the cause of death. In addition, the type of forensic evidence collected is also dictated by the type of case. Critical information that needs to be collected is the object or surfaces that caused the BFT. . . . If the BFT is caused by a fall, the height, type of surface and cause of the fall should be ascertained. See the specific manner of death for more detail on the type of investigation to be conducted.

  * Per Reporting Officer Narrative  pg.8  Phillip W. Dill
      "I was advised that the lab would not be collecting the items or testing them as the suspect had confessed and had been lodged."

  Forth Further, there are no reports that any type of

Federal Habeas        9(DDD)

investigation was conducted such as taking measurements of the stairs and bannister to compare with the bruising on Barbara Ann Dailey.

Per Police Report and the Report of the forensic evaluation it is said,   Docket #16-4697-FC     CFP# 1004376  pg. 10   5/18/17

"Rather, in his statements to police as well as during the current evaluation, Mr. Salyers asserted that he did not purposely harm the alleged victim and was only trying to prevent her from harming herself further."

Lie #6 (Kind of a half lie  because no forensic testing was done regarding the cause of blunt traumas nor on the knife state claims to be the weapon).

Trial Transcript 9/21/2017  pg. 18 Line # 13 - #20
Q: "Based on all your observations and your training and experience, is it likely that Ms. Dailey inflicted these wounds upon herself?"
A: "No."
Q: What leads you to that conclusion?"
A: "The lack of hesitation marks, the wound that she had on her finger as well as the additional blunt force injuries that she had."

Again, 3A-236-23 Courtroom Medicine Series: Death §23.50 [4]
Incisions:
1) The position of the incisions. Incisions at the wrist almost always suggest suicide, while those at the neck may suggest either homicide or Suicide. Examination of the wounds may prove it was, anatomically, impossible to be self-inflicted.
    * In this case, the anatomical impossibility isn't a factor because it very much is the case that they could be self-inflicted.

Again, 42 Am. J. Trial Advoc. 331
77↓ "Superficial incised wounds may be the result of
hesitation — as are Sometimes seen in suicide victims."

As for the "additional blunt force injuries that she had."
2 Forensic Sciences 25.06
Contusion,
the second degree of injury, is caused by a
structural alteration of the brain. This usually occurs on the
crests of the brain convolutions, and is characterized by
small punctate or streak-like hemorrhages and associated
focal destruction of tissue, with or without the edema (swelling).

<u>The Determination of Falls vs. Blows in Head Injuries</u>
In many instances, it is possible to conclude, on the basis of the
pattern, type and localization of cranio-cerebral injuries, if they
resulted from a fall or from blows. Usually, in blows, the scalp
shows hemorrhages in various areas with possible underlying skull
fractures. In some cases, the imprint of the assaulting weapon
may be "branded" on the skin by the force of the impact and can be
easily recognized. Linear or comminuted skull fractures may
underly such injuries. Such fractures, if located on top of the
head or both sides of the head, are most often produced by a
blow. Examination of the brain, most often, will highly enhance
the accuracy of such determination.
In trauma to the brain, contusions may be produced both
at the site of impact ("coup" lesions) and at the site opposite the
area of impact ("contrecoup" injuries).
In blows, the brain may show much larger contusions
underlying the area of impact (coup) than at the site opposite
the impact (contrecoup).
The opposite is true in cases of head injuries caused by

falls in which the contercoup injuries, usually located in Relatively inaccessible positions (i.e., inferior left temporal lobe), are larger than the coup contusions. The only instances where the distribution of coup and contercoup injuries caused by a fall Resembles that of a blow is when the fall occurs over a projecting object or from a considerable height...."

The most common types of blunt force injuries are: Contusions, abrasions, lacerations, fractures, and hematomas.

— Contusions are traumatic tissue hemorrhages, with preservation of the outer layers of the organ. They are commonly known as bruises or black and blue marks on the skin. However, they are also fergently encountered within the internal organs, such as muscles, kidney, lungs, liver, brain, etc.

— Abrasions are a type of blunt force damage Referring to skin injuries in which the outer layer of the skin (epidermis) is "shaved" off by a tangential, frictional force. Such injuries are commonly known as scrapings, superficial grazing injuries or "brush-burn" injuries.

Lie #7  Trial Transcript 9/21/2017 pg 35. Line 19 - pg 36 Line #8

Q: "I think eventually you settled on I guess it's technically possible that each of these blunt force injuries could be from a fall, correct?"

A: "Yes."

Q: "But each of those would have to be from a seperate fall?"

A: "Yes. I describe in my report clusters of abrasions and contusions."

Q: "So this would have to be from somebody falling and hitting something and getting up and falling and hitting something and getting up over and over and over, correct?"

A: "Or a combination of being struck by something plus falling."

Q: "As Mr. Lesica put it, consistent with somebody fighting for their life?"

A: "Yes."

2 Forensic Sciences 25 J. 07 Mechanism of Death - Blunt Force Trauma

[B] Investigation

The type and level of forensic death investigation conducted is heavily dictated by the cause of death. In addition, the type of forensic evidence collected is also dictated by the type of case. Critical information that needs to be collected is the objects or surfaces that caused the B.F.T. .... If the B.F.T is caused by a fall, the height, type of surface and cause of the fall should be ascertained."

In this case, defendant, Joshua Salyers, had stated from the beginning that he had shoved Barbara Ann Dailey to force her to drop the knife to catch her fall. That she had hit her head and left hand on the bannister falling onto the right side of her body on the stairs. And then, again, shoving her over his left leg and her landing face first and when her body landed her head bounced once to face the front door.

No investigation had been conducted regard Blunt Force Trauma because the cause of death has been from the start said, and wanted to be by all involved, to be from homicidal incisions. Also, it was not investigated because a .5cm x .5cm x .3cm contusion of the inferior left temporal lobe would not be sufficient to cause death.

Further, Dep. Med. Examiner, Amanda D. Fisher-Hubbard, gives the false testimony that the blunt force injuries must have all been from seperate individual falls. So explain, then, why Barbara Ann Dailey being shoved the one time caused the State I.D. in her bikini top to cause an abrasion to the left breast and the bruise to the back of her left hand hitting the bannister, slinging the Alcatel cellphone about 6 inches from the south wall; further, Barbara's left side of her head also hitting the bannister; her body turning to fall onto her right side. This all from being shoved once and falling once and we're still not finished. When she landed onto the right side of her body there are bruises and abrasions that had an investigation been conducted would prove came from falling on the stairs; landing on the 3 to 4 stair edges causing the bruises on the upper right arm,

causing the bruise on the right neck as well as the fracture of the right hyoid bone, the bruising on the right face and the small abrasions of the right scalp. That's possibly 8 or more bruises and the fracture of the right hyoid and maybe the supposed right mandible that, again, was not examined.

The jurors asked if the bruises came from falls or more from being hit by someone? (TT 9/21/2017 pg 34 Line # 13-16.

A: "I can't differentiate between the two."

Because there was <u>NO</u> investigation of the B.F.T because police had already determined this was a Homicide and, therefore, it was treated as such even though police were told after the promise was made that Barbara tried committing suicide. Even Det. Kory Luker advised Sahpers that this looked to have been an <u>attempt</u> to commit suicide which ~~lead~~ led to the promise offered and made.

Lie # 8   Trial Transcript 9/21/2017 pg. 36 Line # 9-16.

Q: "I believe that you testified that one of the cuts, at least, was shallow and then got deeper. What does that tell you?"

A: "I don't think there's any particular conclusion that I can draw from that."

Q: "Would that be consistent with a less amount of pressure and then as the cut is happening a greater amount of pressure?"

A: "Yes, yes."

<u>Look</u> at the Autopsy Report Page 6 Bulletin 3 (12cm) That wound did not begin shallow and as the cut was happening became deeper. 12cm (4.72 inches) irregular, horizontal incised wound. The right aspect shows a <u>superficial</u> 5cm (1.96 inches) linear continuation on the lateral right neck. The left aspect shows a <u>superficial</u> 0.6cm (.24 inches) on the lateral left neck.

This proves the cut that caused death ~~had~~, in fact, began "deep" and ended <u>superficially</u>, or very shallow.

A little more to add about the <u>Contusion</u> the Deputy Medical Examiner claims to be a factor in the cause of death.

[1] <u>Temporal Lobe Contusion</u>

1- 251-37 Courtroom Medicine Series: Head and Brain §37.02

"The anterior and inferior portions of the temporal lobe are common sites of cerebral contusions. As is generally the case with lesions involving the cerebral cortex, the clinical manifestations depend on the extent of the injury, the type of injury and the exact site. The temporal lobe is regarded as playing an important role in such functions as visual recognition, perception of sounds, memory formation and emotion."

"The left cerebral hemisphere, often referred to as the dominant hemisphere, usually plays the major role in language function, and the left temporal lobe lesions have a detrimental impact on various functions involving language... Some functions are affected regardless of which temporal lobe is damaged. The effects include emotional and behavioral changes."

"One study of patients with brain contusions found that in comparison with patients who had concussions,... a contusion of the left temporal lobe was associated with speech problems (Eide and Tysnes, 1992)."


Trial Transcript 9/21/2017  pg 20 line# 3 -#23

Q: "Do you examine the eyes?"

A: "Yes."

Q: "And did you do that in this case?"

A: "Yes I did."

Q: "And what, if anything, was significant about that examination?"

A: "She had large amounts of confluent hemorrhage, or a large amount of hemorrhage within the white part of her eye as well as small hemorrhages that are called petechial hemorrhages in her eye."

Q: "And what do petechial hemorrhages tell you about what happened?"

A: "Petechial ~~hemorrhaging~~ can be seen when there is stoppage of the blood draining from the head. We will occasionally see them in hangings or when there is pressure that is placed around

Federal Habeas                    9 (KKK)

the neck."

Q: "Would you see those in a case where somebody was, say, couldn't breathe because their airway had been cut or the blood was draining, restricting that airway, or would it take pressure?"

A: "It's generally there's pressure applied to the neck, yes."

On pg. 35 line # 5 - #18

Q: "Maybe I missed it. Let me see the question again. So it says "the fracture to her neck, how do you think it was sustained?"

A: "Pressure on the side of ~~the~~ neck."

Q: Would that pressure be consistent with someone having their hands around that victim's neck?"   (A bit speculation much?)

A: "That's one of the ways that we could see a fracture to the end of the hyoid bone, yes."

Q: "Affixation?"   (it's actually called "Asphyxiation").

A: "Yes."


See 3B-236-32 Courtroom Medicine Series: Death § 32.04

Pathophysiology

"Asphyxiation may occur when there is simply not enough oxygen in the inspired air to maintain life. Hypoxemia is the term used to describe inadequate oxygen in the blood; hypoxia is a term often used interchangeably. Normally about 21 percent of inspired ambient air is oxygen. The percentage of inspired air that is oxygen is called the Fraction of Inspired Oxygen, or $FIO_2$. Bodily function may be affected by even minimal reduction in this figure. When $FIO_2$ drops into the range of 12 to 16 percent, symptoms of hypoxemia develop, including tachycardia (rapid heart rate), tachypnea (rapid breathing) and central nervous system dysfunction, including confusion and lack of concentration. At an $FIO_2$ of 10 to 14 percent, exhaustion is common. Nausea, vomiting, and lethargy are common at 6 to 10 percent, with death occurring in otherwise healthy individuals when the $FIO_2$ drops to about 6 percent (Rosen, 1992)."

— This is important because during closing arguments, prosecution says

Federal Habeas                    9 (LLL)

on **Trial** Transcript 9/22/2017 pg 49 line #11 - #16

"And I'll submit to you what he did in order to make sure that he knew she could not tell the truth, the thing that put that blood on his hands was that he put his hands on her throat and applied pressure so that she would never be able to tell us the truth. That's what the evidence shows."

3B-236-32 Courtroom Medicine Series: Death $32.04

[2] External Factors Leading to Asphyxiation

"Acute external factors that can interrupt the normal physiology of breathing are discussed in the following sections. These generally fall into one of the following categories:

(3) Airway Obstruction – inability to move air through the air passages due to blockage, I.E. smothering in a pillow or plastic bag, choking because of a foreign substance/object in airway."

[6] Airway Obstruction

"The airway is considered to be the large tubes or hollow cavities permitting the passage of air between the lungs and the environment outside of the body. This includes the mouth, nose, pharynx, larynx, trachea and the left and right mainstem bronchi."

"Asphyxiation by airway obstruction involves at least partial blockage of one or more of the hollow structures. It is usually abrupt and with a very fatal outcome. Unless it is immediately corrected, complete airway obstruction results in loss of consciousness, usually within about 15 seconds, followed by diminished brain stem activity within about a minute. Cessation of heartbeat and respiratory effort, i.e., physiologic death, follow shortly thereafter. Irreversible brain damage is likely ~~after~~ within 4 to 6 minutes. For these reasons, in essentially any emergency, the highest priority is to verify or establish an open airway (Emergency Cardiac Care Committee, 1992)."

3A-236-23 Courtroom Medicine Series: Death 23.55

Asphyxia is interference with the oxygenation of the Red blood cells

Federal Habeas                    9 (mmm)

and tissues of the body. It can be caused in any of five ways:
- Mechanical Blockage: Blockage of the airways prevents breathing.
- Iatrogen Asphyxia: Caused by the acts of medical professionals. One of the above 4 mechanisms is also involved in Iatrogenic asphyxia.

[1] Mechanical ~~Blockage~~ Asphyxia

Mechanical Asphyxia results when a physical blockage prevents breathing. Suffocation, forceful restriction of chest movement, strangulation or obstruction of the airways by internal blockage can all cause asphyxia. The event causing mechanical asphyxia may be accidental, homicidal, or suicidal.

[5] Iatrogenic Asphyxia

Iatrogenic (caused by treatment) Asphyxia can occur under a variety of circumstances and is most commonly associated with anesthesia. Most iatrogenic asphyxia events are related to medication reactions that interfere with breathing or to mechanical obstruction of the airway. The latter, most frequently, occurs when an endotracheal (breathing) tube is, incorrectly, inserted into the esophagus (opening of the gastrointestinal tract) rather than the trachea (windpipe).

Iatrogenic Asphyxia is rarely a factor in suicide or parasuicide attempts, but may become an issue if a suicide victim's death occurs after the onset of medical care. On rare occasions, a patient who has inadequate respirations will become apneic (stop breathing entirely) during attempts to intubate the trachea.

✳    This is important because the prosecution speculated openly during closing argument telling the jury the fracture was due to choking Barbara to death and that the blood is on my hands due to choking her to death so she could never tell the "truth." Why couldn't the fracture have occurred when she landed on the stairs and the asphyxia from medical

placing the endotracheal tube in the wrong way? That is what the evidence shows. How? Look at the distances from the abrasion to the top right side of the scalp to the bruise of the neck & fracture to the bruise on her right arm. Then, compare that to the distance from one stair edge to the next and the next. They'll match. And as for the "Asphyxiation" that caused the petechial (pin-point Hemorrhaging) to the eyes...

Clearly occurred AFTER Medical care attended Barbara because 1) per report and testimony she was breathing 2) Salyers (Mr.) had already established and verified an open airway by turning her head to face the kitchen and covering the incision of the front part of her trachea so that she didn't aspirate blood and drown. Autopsy doesn't report finding blood in the lungs which is what would have happened had Salyers, instead of Rendering aid, choked her.

"When the windpipe is cut you'll begin to aspirate blood, which would cause more pain as the lungs would no longer be a place for aeration or oxygenation; this is called dyspnea, painful breathing. ~~There~~ There'd be significant amount of blood in the lungs."

see, Jones v State, 212 So. 3d 321

Per Bringedahl's testimony, he did NOTHING to render aid because he saw that the wound had sort of sealed itself and he didn't want to reopen the wound. So, if Salyers hadn't rendered aid, then how'd she survive long enough for Medical to attend her? Why all of a sudden she dies 46 minutes later and Asphyxiation was included to the cause of death or "couldn't be ruled out." Obviously, it'd be caused by whatever Medical did to try to help her, as Salyers was in police custody against his will.

"Iatrogenic Asphyxia is rarely a factor in suicides or parasuicides attempt but may become an issuer if a suicide victim's death occurs AFTER the onset of medical care."

Prosecution objects to the relevancy of Toxicologic findings.

pg 30 - 31 Trial Transcript 9/21/2017

Q: "Are you familiar with a finding that she had a certain level of cannab — THC marijuana in her blood level?"

A: "Yes"

Q: "Ok."

Mr. Medema: "At this point your honor I'm going to object to Relevance."

Court: "Relevance?

Mr. Lesics: We're talking of a possible fight here over a knife and if she was energized by this marijuana or some way affected by it." . . . .

pg. 33 line # 3-5

Court: "Ok. Let's bring them in (Jury). I guess rather than me telling them to ignore it, you want to just take her answer, she says it has no effect on anything?"

Mr. Medema: That's fine.

This was an obvious ERROR because the Court misstated what she, Dep. M.E., said:

pg 32 "I cannot say anything about the concentration of THC in her blood."

This is still ERROR because the Dep. Medical Examiner had a duty to investigate just as the prosecution had.

2 Forensic Sciences 25.11 <u>Toxicology</u>

"From the stand-point of intensive, complete surveys being conducted in all cases of sudden, unexpected, violent, unexplained and suspicious deaths in Medico-legal investigative offices in the United States, toxicologic principles have not been invoked for too long a time. Unfortunately, many law enforcement officers, coroner, and even certifying physicians still make determinations regarding the cause and manner of death in many cases without the benefit of toxicologic studies. <u>This is a great tragedy and undoubtedly results in serious injustice in many civil and criminal matters.</u>"

Federal Habeas                    9(PPP)

3A-23b-23B Courtroom Medicine Series: Death § 23B.54

[I] Medical Uses of Marijuana

During the 1800's, it was used medicinally in the Orient and Middle East as an analgesic, anti-convulsant and sedative..."

"There are also claims that it is effective as an analgesic." (Pain Reliever).

[3] Effects of Cannabis

"THC, the principle psychoactive substance in cannabis, acts on a receptor located on the surface of brain cells and other tissues that is referred to as the anandamide receptor. This receptor is of the "G-protein-linked" family of receptors. When they are stimulated, these receptors change the affinity of another receptor for its neurotransmitter, usually causing inhibitory effect. Though the specific functions of the anandamine receptor are not completely understood, it apparently opposes or reduces the effects of the neurotransmitter dopamine at some locations within the brain (National Institute of Drug Abuse, 1999a).

"The principle psychological affects of cannabis include a sense of euphoria, followed by a feeling of relaxation and loss of inhibition." It causes the effects of "distorted body image, alterations of sense of time and space, synesthesia (hearing sounds or seeing colors), depersonalization and sense of deeper awareness." "Subjective effects begin within 2 or 3 minutes after smoking, peak in about 30 minutes and last 2 to 4 hours. The ability to think and concentrate is impaired following use, and reaction time slows noticeably. Balance, coordination and equilibrium are all effected to some degree, and individuals will often sway slightly when standing after smoking cannabis (Liguori, et al., 1998)."

"Cannabis usually causes tachycardia, sometimes doubling the heartbeat, and may increase blood pressure slightly. The blood vessels of the conjunctiva (white of the eye) become dilated, resulting in red, bloodshot eyes..."

See also, 17 Geo. J.L & Pub. Pol'y 555  (Blocks Pain Signals)

Per Toxicology Expert, Dr. Marilyn A. Huestis. "Non frequent users can be very intoxicated at 1ng/mL heart blood." (Mhuestis@intra.nida.nih.gov).

✱ Barbara Ann Dailey had 1.9ng/mL heartblood, nearly double as a non frequent user.

Federal Habeas                    9(QQQ)

Trial Transcript 9/20/2017 Deputy Marcie Jo Neel  pg. 101

Prosecution Knowingly Elicited false testimony from Deputy Marcie Jo Neel.

She testifies the conversation between Eric Emery and Salyers was as follows:

On 9/5/2016 Salyers "said something to the effect of I'm here for murder, I'll slit your ~~teoot~~ throat and watch you lay there." He also said, "I killed her and now I have to live with it and it's tearing me up inside."

Prosecution had a duty to investigate this himself or a duty to learn of the truth of this via the investigators. Two investigators come to the jail and spoke to Eric Emery in regards to this incident. Eric Emery told the investigators the truth of what was actually said. Investigators continued to try getting Eric Emery to corroborate the Report written falsely by the Deputy, Marci Jo Neel.

Eric Emery had written a letter to Salyers Defense Counsel regarding this, asking to come to court to set the record straight. Prosecution knew or, at least, had a duty to learn the truth of this and failed to do so, rather, instead he used knowingly false information/testimony because it is exactly what he needed.

Deputy Neel claims what was said was to the effect of this and couldn't recall what the argument was about or if anyone else was talking during this time but on cross exam pg 116'

Q: "Deputy is it possible that despite your testimony where he said 'I'll do this and I'm here for this', is it possible the defendant used 'they said I did something" rather than I did something? Is there any possibility of that?"

A: "NO".

This is an issue because the prosecution/investigators

knew that it was exactly as counsel (defense) ask the deputy.

"They said I'm here for murder. They said I slit her throat and watched her lay there. They said I killed her and now I have to live with that and it's tearing me up inside. All I tried doing was prevent her from committing suicide."

This argument between him and I was because he was being loud and obnoxious calling himself Jesus and yelling stranger danger everytime someone new came to jail. He kept claiming he's innocent for why he's in jail. Salyers told him to shut the Fxxk up or he'd beat his ass when they got to G.P. Salyers told Emery that he's innocent but you don't hear him yelling and being stupid. Emery asked what did they accuse him of. Salyers told him  They Said ..."

Why else would prosecution fail to put Mr. Eric Emery on the stand if Salyers actually confessed to him and threatened to kill him? Instead, prosecution elicited, knowingly, false testimony to help obtain this wrongful conviction.

\*  Trial Transcript 9/20/2017  Joshua Guerin   pg.117

Prosecution coerced Joshua Guerin's testimony. 1) despite what the "jail log" claims, Salyers was moved June 28, 2017 from A pod and place in a suicide gown in M-Pod. Ms. Jennifer Swanger the mental health liaison/social worker can verify this. However, 2) Everything Joshua Guerin testified that Salyers said to him was in the letter to Gov. Rick Snyder in one form or another. See included letter. This letter was a trap to prove that the prosecution/investigative team were coercing witnesses and violating attorney/client privilege materials by illegal search & seizure.

Federal Habeas               9 (SSS)

On 9/23/2016 detectives had removed a poem written, in regards to the suicide that occurred on 9/4/2016, from Salyers attorney/client folder that was given to him by Adam Masserang. They document it as being a multi-page letter regarding the Homicide in question.

Plain and simple it was search; Seizure violation because it was in the Attorney/Client privilege folder clearly label as such.

So with the incident of 9/5/2016 with the false Report by Deputy Marci Jo Neal, then, later detectives trying to get Eric Emery to go along and corroborate the false report, and then stealing the poem written about the suicide that took place and claiming it to be a multi page letter about "Homicide", Salyers decided to set a trap to prove the prosecution/investigators were committing misconducts and trying to build a case to convict rather than to seek the truth.

Salyers wrote a letter to MLive, who, in turn, wrote an article regarding that letter on June 25, 2017 (Sunday) "Alleged Throat-Slasher writes Officials." Because Salyers knew he'd be removed from his cell to undergo a "security shakedown" so the prosecution/investigative team can see what has been written to the many officials Salyers had written. That night and into the morning of 6/25/2017 - 6/26/2017 Salyers wrote the letter to Gov. Rich Snyder and rewrote another copy to send to his family, sealing and partially addressing the one to the Governor, placing it in his Attorney Client privilege information folder. When Salyers was "cleared" to be taken off "observation" 7/21/2017 this letter and book manuscript was missing out of the Attorney/client folder.

On Sept. 20, 2017 all of a sudden this jailhouse liar/informant claims I confessed to him. What he claims I confessed is nearly identical as what is said in this letter. NO WHERE ELSE is there any mention of the living Room or that this occurred in the living Room, except in this letter. Yet, Guerin AND Ofc. Smith make claims of the living Room. Prosecution coerced their testimony during preparation. How else could BOTH Guerin and Smith have that information about the living Room when the said officer had no further connection to the case after 9/4/2016?

Trial Transcript 9/21/2017   <u>Motion in Limine</u>

Prosecution moved to exclude evidence that in all fairness should have been allowed as evidence. Both facebook and phone log, text log, facebook messenger log.

This evidence would show that the "One cut...two cuts... Three Cuts...four... what I have in my mind will ease this pain for real" post was, in fact, in regards to Salyers thinking of cutting his own wrists, properly, which is four cuts. Prosecution garbled what it wanted to knowingly mislead the court and jury that it was instead in regards to murdering Barbara Ann Dailey. You will see from the post screenshot that there was a prolonged conversation between Stephanie Ann and Salyers in the comments of the said post that prosecution failed to provide to the defense to begin with. Then after defense counsel informed prosecution at trial that it's getting submitted into evidence to prove that the post wasn't in regards of murder, prosecution then moves to further hide it. You'll notice on the next screenshot that all comments of Salyers and Stephanie Ann were removed from the posts' subcomments.

Also, the contents of Salyers phone, messenger & text log would further show that them posts were about thoughts of self-inflicting/suicide; Not murder. However, prosecution moved to have these suppressed because again, it'd prove that Salyers was talking about committing suicide and it, when compared with the comments of Salyers and Stephanie, would prove again the posts were about Salyers thinking of committing suicide. Also, upon reviewing the phone log you will see that the phone log/messenger/texts →

\* The Motion was in Violation because it wasn't conducted 7 days before trial \*

Federal Habeas          9(444)

had been altered, manipulated, deleted by the investigative/ prosecution team.

They first deleted and altered messages of the text log and facebook messenger log and a phone call from Barbara (my wife) to Salyers (405) 747-0680. Then, because Salyers sent screenshots of the entire conversation between Barbara Dailey and himself to Stephanie Ann, the prosecution/ investigative team deleted all of the screenshots to keep the truth of what was altered, deleted, manipulated from being seen.

Also, it would prove that prosecutor Benjiman Lee Medema had deliberately misled the jury regarding a "argument" Salyers and Dailey supposedly had while sitting behind Hackley Hospital.

The Court said nothing not in evidence could be spoken about before the jury in trial; however, Medema tells the jury Salyers was told by Dailey in the course of an argument that she wanted to end the relationship and told him to, "burn in hell." (TT 9-19-17 pg 124 line 15-19) and (Plaintiff's brief in Opposition 8/30/17 pg 2 line "6) and (TT 9/21/17 pg 113 line 11 - pg 114 line 3). Both of which is proven to be either false (As I left her, not her leaving me) and that the time she told Salyers to "burn in hell" was due to Salyers 1) leaving her and 2) Blocking Her on facebook.

Salyers further believes prosecution suppressed these pieces of evidence to hide the misconducts of either prosecution or investigative team deleting, altering, manipulating the facebook, phone calls, text and messenger logs. Or perhaps both prosecution and Investigative team are involved.

Such suppression violates due process (Brady v Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

Federal Habeas                    9 (VVV)

Trial Transcript 9/21/2017  Joshua Salyers      Pg.66

Prosecution continously "put words in defendants mouth", which even after being corrected, he then still used during closing arguments to call defendant the liar.

Pg. 81 during direct examination line 20 - pg 82 line 7

"When they had asked me to place something soft to her neck I had seen, observed that she was trying to breathe and she was breathing blood like frothing, bubbling so like they told me the trachea had been severed some way so I put my fingers in her neck and placed the shirt on top of the wound." (pg 81 line 20-25).

* This is both what I said and did NOT say. *
Here is what I said:
     "observed that she was trying to breath and WHEN she was breathing HER blood WAS like frothing, bubbling so like THAT told me the trachea had been severed IN some way... put my FINGER..."

     * Defense counsel told me after my testimony that he heard what I said, clearly, that the prosecutor was only trying to "mix you up", and he'll make sure the Record is set straight. * It was clearly NOT set straight.

     Prosecution used this anyways during closing arguments to call defendant a liar though he was corrected.
     pg 85   line 13-20
     Q: "You didn't just say that?"
     A: "No."
     Q: "Go ahead and explain then what you said about the trachea."

Federal Habeas               9 (WWW)

A: "She — I explained about the trachea because I had seen blood coming out of her neck and it was foaming. THAT told me that her trachea was cut."

Q: "So you —

A: "I observed that myself."

Again, on pg 87 line 4 "Okay, So you can admit you never told the police that you stuck your HAND in her neck?"

A: Not my HAND, my fingers. (I said Finger).

On pg 87 line 13 - 17

Q: "So let's go back there. I think at one point you said that you saw her in the driveway, correct?"

A: "No."

Q: "That's not what you ~~said~~ just said?"

A: "That's not what I said."

See Trial Transcript 9/21/17 pg 75 line 5 - 7

"Anyways I told her you know it was probably the lady across the street you know 'cause I seen her when I looked down the driveway from the alley."

* In other words, I was on the phone with Barbara who told me nobody had come home because I had left Barbara's thinking the family came back from the BBQ. Over the phone I told Barb it was probably the lady across the street because I saw her (lady across the street) carrying stuff into her home from her vehicle when I looked down the driveway to see who came home. *

On pg 87 line 18 - 19

Q: "Let's talk about this phone call then. You got this phone call and you were where?"

A: "Somewhere on Leahy, not too far off Grand on Leahy."

Q: "And what was the nature of the phone call?"

A: "Pretty much telling me that nobody had come back to the house and I said, pretty much told her, I know, it was probably the lady across the street. And she told me to continue to go to her dad's and let him know that she's sorry for everything, she forgives him and she loves him, and I said okay. And I had asked her what's wrong and she had said 'I love you, I'm sorry' and she hung the phone up. So I run back."

pg 88

Q: "So she didn't actually say anything about suicide. She just said 'I love you, I'm sorry'."

A: "Yes."

On pg 89 Prosecution puts words in defendants mouth.

line 10  Q: "Why would you not go the shortest distance if the love of your life, as you claim, threatens suicide? You take the long way instead of going down the alley here, correct?"

A: "Who said anything about her stating anything about suicide attempt?"

Q: "You assumed — you just testified that you assumed that she was going to kill herself, right?"

A: "No."

- - - -

Q: "So now you ran back because she was crying, not because she was going to commit suicide?"

A: "Why would I have any thought that she was going to commit suicide at the time?"

pg 90

Q: "You were here 10 seconds ago for this conversation with you and I, Right? When I asked you what she said and you said, "I'm sorry for everything, I love you" and you said that concerned you about her committing suicide so you ran back."

Not only does the prosecutor put words in defendants
mouth, he insinuates, implies, infers to defendant as lying
Pg 90 line 16
Q: "I'd like you to tell us the truth about what happened."

This above is an issue because prosecution 1) knows
what defendant had said, 2) Prosecution tries to tell defendant
and the jury, who is listening, what assumptions defendant had
made as if he could read defendant's thoughts, 3) Insinuates that
defendant took the long way back when either route to the
front door is equal in distance, 4) Prosecution puts words in
defendant's mouth, and 5) practically calls defendant the
liar because defendant's truth doesn't fit with prosecution's,
knowingly, false theory/speculations, and 6) Most importantly,
during closing argument prosecution uses it all to again call
defendant the liar, knowing he's the one who claimed these things.
   See Commonwealth v Potter, 445 Pa. 284, 285 A. 2d 492 (1971).
[new trial awarded where prosecutor suggested on cross-examination that
the defendant's testimony was a malicious lie.]
   See Wend v People, 235 P.3d 1089 (2010) [New Trial awarded for use
of the words lie, lied, and liar or any form or implication of such
words in reference to a witnesses or defendant's veracity.]
   See Dyson v United States, 450 A. 2d 432 [New Trial awarded]

On pg 94 line 10-14
   Q: "And then you shoved her with your leg, correct?"
   A: "Nope. I had jerked her arm away from her and
      shoved her over my leg."
   Q: "Excuse me, shoved her over your leg..."

   You see here that defendant corrected prosecutors
deliberate attempt to mislead the jury, again. However,
on pg 105 line 8 - pg 106 line 7

Federal Habeas                   9 (ZZZ)

Q: "But you just witnessed according to this most recent story that nobody's heard until today that she hit her head on the bannister, that she fell on the stairs, that you pushed her one time with your leg, the other time over your leg...."

A: "Let's back up just a moment please. When did I ever say anything about her over with my leg? I lunged forward and shoved her. I didn't specify anything. Shoved her means what? With your hands. I would appreciate it if you would stop putting words in my mouth."

Q: "So two minutes ago we didn't have a discussion where you made sure to correct me when I asked if you pushed her with your leg? You said, no, no, no that's not what I said; pushed her over my leg' We didn't have that conversation two minutes ago?"

A: "That was the second one. You had said, first, you shoved her with your leg and then you shoved her over your leg. The correction is I shoved her, not with my leg."

Q: "And not over your leg?"

A: "The second one is over my leg. When I sidestepped to her side and shoved her over my leg is when she hit face first."

Q: "We'll get back to the point here...."

This is prosecutorial misconduct because 1) Defendant never claimed to shove Barbara WITH his leg. That would suggest he kicked her. 2) Prosecution had already been corrected on this issue but he, again, misstates what was said. 3) He knows he was corrected but still suggests that defendant was the one lying. 4) It's NOT the first time he has heard what was said as defendant had written the prosecutor with all that happened.

Federal Habeas                    9(AAAA)

5) The point of trial is to ascertain the truth, not put words in the accused's mouth and, then, even after being corrected, imply and call the accused/defendant the liar during closing arguments. 6) Prosecution added more times that Barbara fell and, at closing, claims defendant added the additional fells to try explaining the injuries. See pg 105 line 9-13

"She hit her head on the bannister... She fell on the staires... You pushed her ~~with~~ one time with your leg, the other time over your leg..."

This suggests that Barbara fell 4 times. However, defendant said she made a cut at which he lunged toward her and shoved her which caused her to hit her head on the bannister and fell onto the right side of her body on the staires. Then, shoved her a second time ~~over~~, this time over his left leg where she fell face first to the floor.

Then, it goes to show that the prosecutor doesn't care about establishing the truth because on pg 106 line 7 "We'll get back to the point here."

Back on pg 94 line 21-25
Q: "So you've accounted for three. When did the fourth cut happen?"
A: "Want my assumption; 'cause that's all I can give you?"
Q: "I want the truth about when that ~~forth~~ fourth cut happened."
A: "Then I couldn't tell you."

Again, this is prosecutorial misconduct because 1) prosecution knows that Barbara had SIX; not four incisions. 2) The judge had already told defendant that he couldn't testify about anything

Federal Habeas                    9 (BBBB)

that hasn't been admitted into Evidence. So for the prosecution to ask that defendant tell the TRUTH about the 4th cut was ERROR because nothing was in evidence to speak on, Such as the Autopsy Report. 3) Prosecution continues to stress 4 cuts to mislead the jury that the post was in Regards of premeditated murder Rather than what it, in fact, was truely; defendant's thought of cutting himself. Again, it's why the entire post & comments were suppressed by prosecution to keep the jury from the truth. It's why the Autopsy Report wasn't admitted into evidence; it's proof there were SIX wounds that varied from Shallow to very Shallow (superficial).

On pg 95 line 16 - 23

Q: " So if she's not struggling and she's not moving and she has the ~~handle~~ knife in her Right hand by the handle and you pull it out, how does she cut her hand?"

A: "How does she not? It's a sharp object Running through your fingers."

Q: "She had the handle.

A: "She had the handle and I pulled the knife out by the handle."

<u>During Closing Argument:</u>

Even after this was explained Regarding the minor 1.5 cm long (9/16") incision on the medial distal portion of Barbara's second finger of her Right hand, prosecution again during closing statements implies that defendant is lying. (The words themselves may not mean much but the way he said it and the look he gave spoke volumes).

On pg 95 line 24 - Pg 97 line 25

Q: "Describe for us, again, exactly how this happened with you, Right at that point you then took the knife and wiped it down. Correct?"

A: "No."
Q: "When did you do that?"
A: "I didn't; I did not."

- - -

A: "I did not wipe it down."

- - -

A: "I did not. Before you say it, yes, I had heard it on the screen that I said I wiped it off."
Q: "I know you don't — I know you told us you don't Remember. But you told the officers that you wiped it down, correct?"
A: "That's what the interview said. I don't remember all what was said at the interview."
Q: "But you're not denying that you said it?"
A: "No, 'cause I heard it. I can't deny what I heard."

Again, Prosecution, during closing argument, tells the juny that ~~I~~ defendant had outright lied to them and went right on making claims that defendant NEVER said but still calls him the liar.

On pg 99 line 11 - pg 100 line 4  (Regarding 9-1-1 call)
Q: "Did you make the ~~cell~~ phone call while you were inside or outside?"
A: "I made the phone call, actually, when I was inside and I don't think it got answered 'til I was on the outside."
Q: "So you were walking outside at that point. And you did what while you were outside?"
A: "I had looked off to my left towards the hospital."
Q: "For what?
A: "Pro-Med"     (Pro-med is the ambulance service in Muskegon 2016)

- - - -

Q: "So you walked outside on the porch."

Federal Habeas                    9(DDDDD)

A: "Correct."

Q: "You're on the phone with 9-1-1.

A: "Yes, she mentioned----"

Q: "How long were you outside looking for Pro-Med?"

A: "I cannot honestly tell you. Seconds."

The point of the above is because even <u>AFTER</u> Sgt. Gust gave testimony that <u>PROVES</u> the call was made while defendant was inside the house, <u>AFTER</u> defendant testified he was inside when he called 9-1-1 and <u>after</u> seeing defendant on surveillance coming to the house without a cellphone in his hand and to his EAR, <u>prosecution still tells the jury defendant lied to them and that you see defendant call 9-1-1 based on what they saw on that video surveillance footage.</u>

Prosecution, Knowingly, misled the jury with his ~~inflammatory~~ ~~and~~ Remarks and false statements during his closing argument.

On page 101 Prosecutor, again, presumes to tell the jury his person thoughts of what the defendant is thinking and uses it to mislead the jury.

line 10-13  "So Right when it happened you had this instantaneous thought to go you know what I need to lie about this not for my own, you know, I just killed her, but I'm afraid for her losing her kids, correct?"

1) Barbara wasn't dead at the time the 9-1-1 call was going on. 2) She died 46 minutes AFTER the incident in the care of medical professionals who obviously did know what they were doing because a) They caused asphyxia, and b) if these wounds were as deep as the deputy M.E. testified to then why wasn't the jugular (internal) not stitched/repaired and why wasn't there any buried sutures? 3) The prosecutor cannot speculate his personal thoughts about what a defendant

may or may not be thinking.

On Trial Transcript 9/21/2017   pg 103

Q: "From that point on did you ever leave her side?"

A: "After that, No."

Q: "Remember asking Officer Anderson for your phone?"

A: "No."

Q: "You heard him testify to that, correct?"

A: "I heard it."

Q: "You heard him testify that somebody went inside and got it off the kitchen table, correct?"

A: "I heard him say it, yes."

Q: "So at what point while you're kneeling down beside the love of your life trying to save her life did you leave her side and go set your phone in another Room?"

A: "It wasn't another room. The table is right there..."

Prosecution had to know that the table was in the same Room and only half an arms Reach from where defendant was kneeling over Barbara Ann Dailey. State prosecutor also knew that both Ofc. Smith and the jailhouse liar, Joshua Guerin, had lied about where defendant was found and where the incident occurred. So for prosecution design a question calculated to cause further confusion and misleading of the jury & Court and further causing the jury to conclude negative thoughts about the defendant is clear misconduct. All throught opening statements, the trial, and closing arguments prosecution has stressed the defendant cannot be trusted or believed.

pg104    Because of defendant's lawyer not making objections that should have been made due to falsifying facts of the

Federal Habeas                    (FFFF)

interview, defendant goes along with the false information to prove that the prosecutor was knowingly eliciting and providing false testimony to capitalize on it.

Q:"And you watched that interview?"

A:" I did"

Q:"And you don't account for three cuts, much less four in that interview do you?"

A:" I honestly didn't pay a whole lot of attention to the watching that but I did hear —

Q:" You weren't paying attention to watching your interview?"

A:"Yeah. I heard myself say that there was two or there."


Prosecution knew this to be absolutely false. Never did defendant speak about how many cuts were made. He held up two fingers BECAUSE he couldn't speak due to the overwhelming grief he was feeling of 1) witnessing his girlfriend try killing herself and 2) trying to explain and make sense of it while telling detectives what SHE had done. Prosecution even confirms defendant said nothing after he held his two fingers up, and Det. Luker's report states that a promise was made and that defendant held up two fingers. So how could defendant have HEARD himself make claims that there were three cuts. See 6/25/2017 article MLive Muskegon Cronicle. "Alleged Throat-Slasher Writes Officials" Det. Luker gave that false statement publicly that defendant confessed to cutting Barbara THREE times. Again, how is holding up 2 fingers equal 3?

On pg.106 line 7-20

Q:" You not only observed or participated in some of those injuries and when the person who can get the

love of your life help says does she have any other injuries you respond "I don't know", correct?"

A: "Correct. You obviously haven't seen somebody with their neck cut, the amount of blood that comes out. It's kinda hard to tell about other injuries."

Q: "But you just testified you know that she was bleeding from the mouth, that you saw that before that, correct?"

A: "No."

Q: "When your defense attorney was asking you questions, when the police were talking to you, you didn't tell them that you saw her mouth and it was bloody?"

This is error because that isn't what was said and prosecution knows it. He, then, changes the "bleeding" to "bloody." Those are two different observations. Barbara was laying face down in blood around her head. How is defendant suppose to be able to observe any other wounds due to the blood being on her face area/mouth area? How can defendant observe a tiny fracture to the hyoid bone in the right neck and a contusion to the inferior temporal lobe of the brain or any other bruising that hadn't been apparent at the time? Or the mark from her I.D. in her bikini top? More importantly where during Trial was there a conversation where defendant told his attorney that she was bleeding from the mouth or defendant saw her mouth and it was bloody?"

Again, prosecution making suggestive speculation to try proving defendant had no regard for the welfare of his girlfriend. Also, prosecution continues to use 'love of your life' in these misstatements, misrepresentations, and suggestive speculations to further inflame the jurors passions/prejudice toward defendant.

Federal Habeas                    9(HHHH)

Prosecution also brings this up dueing closing arguments to further imply defendant was lying to 9-1-1 and to the juey about not knowing of any other injueirs.

On pg 109 (TT 9/21/17) line 25 - pg 110 line 8

Q:"Now at the end of this interview you held up two fingers, correct?"

A:" Yes"

Q:" And that was in response to Detective Luker explicitly saying to you 'and then you picked up the knife and cut her how many more times', correct?

A:" That's what it said on the video, yes.

Q:" And then, in response, you held up two fingers, correct?"

A:" According to what the video shows, yes."

This further shows prosecution knew defendant didn't claim there were "two or three" and that he elicited, and provided the juey with, knowing false information. See pg 9(FFFF) and 9(GGGG) of this Habeas

On pg 110 line 9-23

Q:"Do you remember an altercation when you first got booked into the jail?"

A:"Yeah."

Q:" You do."

A:" I do"

Q:"Didn't you just testify a few minutes ago that you don't remember any of that and you, in fact, had to ask them where you were?"

A:" Yeah, that was the next day."

Q:" So the next day you remember the altercation?"

A: "I do."

Q: "Who was that with?"

A: "(indistinguishable)"   I said Eric Emory.

Q: "And you guys were in seperate holding cells, correct?"

A: "Correct."

Defense Counsel objects to Relevance.

**Pg 111**

Prosecution: "We've already heard testimony, your honor, that the defendant admitted during this conversation to killing Barbara ~~Bat~~ Dailey. I don't know how more relevant it gets than that."

Court: "Overruled."

Salyers: "So, yes, I do remember the altercation."

Q: "And in that altercation you said, "I'll slit your throat and watch you by there", correct?"

A: "That is what ~~the~~ Deputy Neel thought she heard, yes."

Q: "Is that not what you said?"

A: "That is not what I said."


     This is prosecutorial misconduct because he knows this ~~is~~ not what was said because they came and spoke to Eric Emory and tried to get him to back-up Deputy Neel's false Report when he told them the Report was wrong. Eric Emory wrote to defense counsel about this as well and wanted to testify on behalf of the defense. Neither defense nor prosecution called Emory to the stand because it'd prove the lies and misconducts being committed by city, county, and state officals.


     On page 111 line 25 -

Q: "Do you Remember being housed with Mr. Guerin?"

A: "Absolutely Not."

Q: "Were you ever housed with Mr. Guerin?"


Federal Habeas              9 (JJJJ)

A:" As far as I know, no."

Q:" Were you ever in A pod?"

A:" I have been in A pod and according to him he's been here for 2½ months. I've been in M pod for 3 months."

Q:" When did you go to M pod?"

A: "Late June."

Q: "Late June of this year?"

A:" I had been placed in a suicidal gown for almost 3 weeks."

Q:" Are you sure?"

A:" Pretty sure."

- - - - ~

Q:" So essentially you admit everything up to the point of even knowing Mr. Gurein."

A:" I don't know him.

Q:" Because you were transferred out of A pod in late June of 2017?

 Prosecution knows defendant was not in A pod with Joshua Gurein. Health-West social worker Jennifer Swanger came back from her vacation and came to see how defendant was doing on July 21, 2017. The jail log claimed defendant was still in A pod and did not even notify Ms. Swanger that defendant was placed on suicide observation as per policy. When she finally got defendant's location figured out, she met with him in the hall of M Pods 3rd floor. She told defendant the jail's log says he is still in A pod. (This is on 7/21/17) And she tells defendant that she was never notified that he was on observation status.

 Now, at trial, it's just a coincidence that the log claims defendant was moved from A to M on 6/14/17 and then all of a sudden there's a jailhouse liar that

claims defendant confessed to him this happened because defendant couldn't handle the break up and that this happened in the <u>Living Room</u>. This jailhouse liar just happens to know "explicit details" that could only come from the defendant the prosecution claims.

1) Never was anything ever mentioned about the living Room in <u>ANY</u> aspect of the investigation from beginning to end.

2) Barbara didn't end the Relationship; defendant did. That's why Barbara got mad when defendant blocked her on facebook and told him to "Block me... okay then you can burn in hell..." through a TEXT (which Court Ruled to be suppressed at State's Request in the Motion in Limine).

3) Then, Ofc. Smith corroborates Gurrin's assertion that this happened in the <u>living Room</u> with his knowing false testimony. ~~9/4~~ 9/4/2016 was Smith's last day working for Muskegon police. Yet he says defendant was found in the living Room though, in his Report, defendant was found kneeling over Dailey who was face down in the dining Room.

4) Defendant writes the press. They in turn writes an article 8/25/17. Defendant sees it and writes 2 copies of the letter he wrote to Governor Rich Snyder, sending 1 to his family the other in the Attorney/client folder.

5) Defendant is placed on "observation", placed in M pod in a suicide gown on June 28, 2017 (wednesday) and all his property is taken and searched and when, on 7/21/2017, he get Released off observation the letter to Rich Snyder and the 13 chapters of the book defendant was writing was missing.

6) Now two people state defendant was in the living Room and makes claims based on the letter to Snyder and contents of defendants ~~book~~ chapters.

Federal Habeas        9 (LLLL)

7) When defense counsel brought a copy of a crappy motion to the jail on 7/14/17 he also was sitting on the 2nd floor because the log still said defendant was in A-pod. Eventually Lesica met with defendant on the 3rd floor where M-pod was is. Yet, Lesica wouldn't testify nor call Ms. Swanger as a witness.

In other words the state committed misconducts when they continued taking stuff out of defendant's privileged folder to use against him, coercing both Smith and Currein, and having the jail log altered to show defendant was somewhere he wasn't. Had the camera's of A-pod's individual cell been looked at it'd be seen defendant Sahyers was removed from A pod cell 4 and taken to M-pod (per M pods cameras).


On pg 113  line 18- pg 114 line 3
Q: "You admit you made this facebook post, correct?"
A: "I did."
Q: "That you posted one cut, two cuts, three cuts, four...
    what z have in mind will ease this pain for real?"
A: "Correct."
Q: "And you admit that Doug Carlson basically said
    knock it off, correct?"
A: "Not to be so self-loathing."
Q: "And in response you said, "Doug, you know how
    I feel about her." correct?"
A: "Yes. May z ask where the rest of those comments
    are?"


Federal Habeas          9 (mmmm)

Prosecution knows because of all the comments and the contents of defendant's phone's facebook and text log that the post was in regards of defendant THINKING about suicide. Prosecution, however, garbled what it wished to mislead the jury to believe the post was in regards of planning to commit murder and moved in a Motion in Limine to suppress evidence that proves the exact opposite of state's knowingly false claims, and to hide that state tried covering up their acts of altering/manipulating and deleting contents from defendant's phone/text/messenger logs and facebook comments that prove that defendant was talking about committing suicide; NOT Murder.

Trial Transcript 9/21/17 Deputy Kaleb Gilbert pg.119

Prosecution used a Court Officer to verify what the jail log claims. Deputy Gilbert would NOT know where defendant actually was unless, like Defense Counsel and Ms. Swanger, he was needing to speak with defendant or transport him to court.
Again, Lesica had a chance to prove that Inmates are Not always where the Inmate Log says they are but failed to even cross-examine the Deputy, knowing from firsthand experience defendant was in M-pod while the Inmate Log still claimed him to be in A-Pod.

Trial Transcript 9/21/17 Sgt. James Gust pg. N22
After prosecution used video surveillance that was significantly flawed, they call the detective who did the technology aspect of the case to the stand to provide the "correct" time; which only

Confused the situation further. Dispatch time isn't what is at the center of the issue. It is when the defendant called 1) Barbara Dailey ("My Wife") at **5:01:27** and 2) When the defendant called 9-1-1 at 7:15:51 the day of the incident on 9/4/2016.

"Per Gust's Report:

"Sgt. Straus obtained a DVR from Kevin Sanders for his surveillance system. I downloaded videos from the system onto a flash drive. There were 5 cameras: CH1, CH2, CH4, CH5, CH7. I downloaded them from 1400 (2pm) to 20:59 (**8**:59pm). Each camera has several files. I changed the file names to begin with the camera and the time period the file covers."

"I reviewed the videos for the ~~the~~ time period between 19:00 (7pm) ~~and 19~~ and 19:59 (7:59pm).

| | | |
|---|---|---|
| CH 7 | 7:06:14 | Both walking North in alley |
| CH 1 | 7:07:12 | Both walking along South side of 1432 to the front |
| CH 1 | 7:07:26 | Both go onto the porch and inside |
| CH 7 | 7:14:48 | Salyers walking South in alley |
| CH 4 | 7:12:22 | Salyers walking West on Grand, then turns North on Eastside Jiroch |
| CH 7 | 7:17:48 | Salyers walking on East side of Jiroch |
| CH 2 | 7:17:53 | Salyers walking North on Eastside of Jiroch |
| CH 1 | 7:17:58 | Salyers walking North on Eastside of Jiroch |
| CH 1 | 7:18:16 | Salyers goes onto porch and inside |
| CH 1 | 7:20:15 | Salyers comes out and stands near the stairs |
| CH 1 | 7:20:37 | Salyers goes inside |
| CH 1 | 7:20:49 | Salyers goes out into yard by sidewalk |
| CH 1 | 7:21:20 | Salyers goes to the steps and sits down |
| CH1 | 7:22:31 | Salyers goes inside |
| CH 1 | 7:25:29 | First officer heading West on Irwin, then South on Jiroch |
| CH 1 | 7:25:52 | First officer enters house |

Where is CH5? Why was that not provided to defense?

Federal Habeas                    9(0000)

Trial Transcripts 9/21/2017 pg 123 line 21 - pg 125 line 10

Q: "And as a result of that you have had an opportunity to listen to the 9-1-1 phone call, to review the cruiser videos from the cruisers that were involved in this case and this investigation as well as a surveillance video that's already been entered into evidence?"

A: "Yes I did."

Q: "And as a result of that have you been able to determine what time, according to 9-1-1 Central dispatch, the 9-1-1 phone call was made?"

A: "I'd have to look at my notes. * (which he did not do). What I did determine was that the time on the video from the residence was approximately 4 minutes 38 seconds ⊘ or between 4 minutes 40 seconds faster than the dispatch time.

Again, the issue isn't finding the dispatch time; It's finding the time defendant made the call at 7:15:51. Sgt. Gust did not do that but instead compared the surveillance time with two unreliable sources; the cruiser video and someone else's phone call to 9-1-1 when the call was actually answered. Neither of these were present at the time 9-1-1 was called at 7:15:51 or when defendant called "My Wife" in front of the cameras at 5:01:27. The exact time could have been established by comparing the 5:01:27 call with the time of the surveillance footage. Instead, Sgt. Gust determined a rough guesstimate of the dispatch time. So what is the difference of time between defendant's call to 9-1-1 and dispatch?

line 15  Pg 124 claims the dispatch time the call was received/answered was 7:16:05.

So 7:16:05 and 7:15:51; that's 14 seconds difference however it cannot be relied on because that time is based on variables that were NOT present.

On pg 125 line 8-10

Q: "So at 7:20:43 or 7:20:44 would be when that 9-1-1 phone call was made, correct?

Federal Habeas                    9 (PPPP)

A: " Yes ".

CH1  7:20:37  He goes inside

  ✱ 7:20:43 or 7:20:44   9-1-1 call is answered

CH1 7:20:49  He goes outside into the yard by sidewalk


Even if this new information is correct, which it isn't, it STILL contradicts state's closing argument when prosecution calls the defendant a liar.

TT 9/22/2017 pg 49 line 2-9

"Now the defendant testified that he called 9-1-1, stepped briefly out onto the porch.... But, again, we know he lied. We see him <u>a</u>call 9-1-1, go out on that porch, go out into that yard and actually go sit on the steps while Barbara Dailey laid inside bleeding out gasping for air."


Prosecution committed prosecutorial misconducts yet calls the defendant the liar when it <s>was</s> is the prosecution that was <u>lying</u> or as the legal system calls it when prosecution lies deliberately; misstates evidence, facts, etc.

As the footage was presented, it corroborates the, knowingly, false theory/speculation of the prosecution. This flawed footage had been presented to the jury, knowing it was incorrect, which misled the jury to believe the state's version of events, and the state's implications of events.

As you see above, even though it is still incorrect, you do <u>NOT</u> see defendant call 9-1-1 as the prosecutor tells the jury, calling defendant the liar.


To establish the true time regarding the issue of when and where defendant made the 9-1-1 call, the footage from 5pm to 7:06:14 needs to be reviewed. Also, where is CH5 footage? These are both <u>Brady Violations</u>.


Federal Habeas                    9 (QQQQ)

Trial Transcript 9/21/2017   Det. Luker    pg 130

Defense Counsel asked a question based on his Ridiculous theory that isn't the truth of what happened. ~~too~~ pg. 137 line 5-9

Q: "The other blood on him would be consistent with the falling up and down and the feacas that kind of happened there from what I could see, is that correct?"

A: "I don't believe so. I believe I know what happened, So that's where it came from."

Such statement made by a State's witness giving its personal opinion and factuality based on speculation is improper. The State, though elicited by defense counsel, had a duty to redirect and correct the statement or establish grounds for the statement of "so that's where it came from."

Instead, State capitalizes on this detectives testimony by vouching for him during his closing arguments.

On page 134, prosecution elicits false testimony. line 18  People's Exhibit 31.

Q: "What is that?"
A: "It's a picture of his leg."
Q: "Specifically what part of his leg?"
A: "His calf."
Q: "And is there blood?"
A: "There is. There's small blood drops on the back of his leg."

Indeed, there is blood on the back of Salyers calf. However, they are <u>NOT</u> blood drops. The photo shows a river-let or stream-let of blood that was slung upwards onto his calf. Not drops that

Federal Habeas                    9(RRRR)

fell or dripped down onto his leg.

During cross examination, defense counsel asked
pg 136 line 13 – pg 137 line 4

Q: "And the blood you saw on him, like say on the lower leg
where he (defendant) testified she grabbed him, is that kinda
possible that blood came from there?"

A: "It doesn't look like a handprint. It just looks like blood droplets."

Q: "But you never checked any handprints or checked to see if there's
any handprints on there did you?"

A: "I'm sorry."

Q: "You never tried to verify if there were any handprints on his
leg; all you saw was blood, right?"

A: "I took the pictures. I didn't see any handprints on his leg, of
bloody handprints. There was bloody droplets that looked like
they sprinkled onto his leg. They weren't smeared. They weren't
smudges."

Q: "And if she reached up and ~~grapp~~ grabbed his leg and there
was blood on her hand it would splash on his leg, right?"

A: "Well, it would probably yes, a smudge or a smear."

This ~~was~~ is all false testimony that was elicited by defense
counsel. Prosecution had a duty still to correct the false
testimony it knew or should have known to be incorrect.

Per Ofc. Logan Anderson's report: "I was also instructed to seize
the clothing he was wearing at the time..."
Clothing:
All the clothing Joshua had on his person was hung at MUPD "dry" room.
All of the clothing had blood on it.
- 1 pair socks (white)
- 1 pair men's underwear (blue)
- 1 pair men's "And One" basketball shorts (gray)
- 1 pair men's Nike shoes (black)

There are photos that show blood "smeared" on the back of the sock and the right boot/shoe. Detective Luker, indeed, took the photos and asked how the blood ended up on each place. Luker KNOWS the blood on the back of the sock and boot/shoe is very possibly from Barbara Dailey slinging blood up the back of Salyers calf and grabbing the sock/boot area when Salyers placed his finger over the incision of the trachea to allow Dailey to breathe without drowning on her blood when, as advised by 9-1-1 dispatch, using something soft, "a towel or shirt", and apply light pressure over the wound.

On page 137 line 4, Luker say yes it probably would splash blood ~~top~~ on his leg but it would be a smear or smudge. He knows that is false because slinging blood upwards will NOT cause a smudge or smear unless it was brush against. He also knows there were smudge/smear on the sock/boot.

Since Luker is aware of this, then, also, the prosecution knows or should have known this.

Trial Transcript 9/22/2017 Motion for Mistrial/Jury Instructions pg 2
Review pg 139-141 of Trial Transcript 9/21/2017.

The Court: "Gentlemen, this probably a good reminder for me to never take anything for granted... I've not worried too much about a joint departure. What happened this time is this. The audience headed for the door about 10 seconds or maybe less ahead of the jurors... The problem then is that I think all 12 jurors were standing to my right in the courtroom when the deputies chained up Mr. Salyers, put the cuffs on him and led him out the side door, which, of course, we try desperately never to have ~~that~~. So I think there are a couple of lessons we need to learn, and, beyond that, I'm not in my heart of hearts seeing a mistrial issue... Mr. Medema, anything else?

Mr. Medema: "No your honor, not at this time."

The Court: "Mr. Lesica?"

Mr. Lesica: "No your honor."

The Court: "Ok, did I get the history accurately recited?"

    Both: "Yes your honor."

The Court: "Ok, all right thanks... I will say this. I don't think Mr. Sawyers is wearing any chains around his legs is he?"

       Mr. Lesica: "No."


Both counsels and the Judge know that Mr. Sawyers had an ankle tazer fitted to his right ankle. All three failed to be sure to have that said on Record.


On page 3 of Trial Transcript 9/22/2017 line 21- pg 4 line 3, prosecution lays blame on defendant

"First, I would point out that it was really at the defendant's own urging. The defendant did, with the jury present, reach his hands out to the deputies and at that time, and that time only, did the deputies actually then take up their handcuffs and handcuff him.

So it was at the invitation and based on the actions of the defendant it warrants a mistrial in and of itself based on that argument."


On 9/19/2017 & 9/20/2017, not once was there such an issue because Sawyers was fitted with the ankle tazer and escorted to and from by Dep. Sheriff's that knows the rules from long time on the job. On 9/21/2017, Deputy Gilbert is relatively new in the position as a Court officer. You can view the cameras of the Court and see that Sawyers was talking to the deputy as he was reaching and grabbed his cuffs, telling him that he already has him fitted with the ankle tazer and that he cannot handcuff him in front of the jury. The deputy told

Salyers to give him his hands or he could activate the ankle tazer. Then, you'll see Salyers extend out his hands to the deputy and call over to his lawyer about the issue.

Prosecution knows what was done was ERROR yet he still argues that the blame is not on them.

✱ I know this is a federal habeas, but why does the prosecution fight to prosecute wrong doings that people in society commit but also fight to _excuse_ the ERRORS they knowingly make to obtain a conviction regardless of the way they get it? Where's the integrity? ✱

Anyways, defendant did _NOT_, _voluntarily_, allow the deputy to place him in handcuffs in front of the jury.

The Jury Instruction for Involuntary Manslaughter. pg 6-12 Prosecution asks the Court to rely on the brief filed in opposition. A brief that is factually incorrect.
1) Barbara Dailey was _NOT_ severely beaten
2) Defendant did _NOT_ come out of the home to meet officers Smith's report states Salyers was found in the home kneeling over Dailey weeping and crying.
3) There was _NOT_ an argument behind Hackley Hospital where Dailey told defendant to "burn in hell".
See the text log that was suppressed. Entry # 255 at 4:19:37
4) Defendant did _NOT_ apply pressure to Dailey's hand or the knife that caused her neck to be cut open.
5) Defendant did _NOT_ _tell_ detectives he cut her neck two more times.
6) She (Dailey) did _not_ just say "Josh, please don't." She said "Josh, please don't, just let me do this" when defendant told her he can't because of her girls, then she asks to make sure her girls are taken care of and this is why she let Chris have his daughters.
7) Prosecution says "other evidence presented indicates

that ~~the~~ Defendant's story of what occurred was a prevarication. He never went for a walk with the victim."

If state didn't commit <u>Brady Violations</u> it would have been seen at Court that at 5:01:27 Defendant called Dailey while standing at Kevin Sandre's home (house with surveillance cameras) when Dailey told Defendant that nobody was there and to come over. Then, a minute or two later, both Dailey and Defendant leave together headed to Wood Street Market. After a period of time the footage would show the two Returning back to the house and go inside. After another minute or so they both leave together with drinks to go to her Dads. However, they sat under a shade tree behind Hackley Hospital because she got light headed and dizzy. Then, after about 15 minutes or so, the footage shows the both of them walking through the back alley to the house at "7:06:14".

Regardless of the Brady Violation of the footage from 5pm up to 7:06:14, there is still sufficient that they both had left and walked together. So state STILL lied in the brief of opposition and called defendant the liar.

8) Though defendant's facebook post indicates in a post a "PRIOR plan to administer four cuts", the State KNOWS from all the comments/subcomments/ facebook messenger and text log the post was, in fact, in Regards to defendant's <u>thoughts</u> of cutting his own WRISTS properly.

9) State claims in the brief that forensic evidence states "the victim suffered multiple (<u>four</u>) slicing/cut wounds to the neck" and was a victim "of a choke hold."
   A) The Autopsy Report, as prosecution KNOWS, only bulletins 4 but actually documents <u>6</u> wounds

and that they are ALL shallow and/or superficial
each and of themselves.

B) There is <u>NOT</u> any mention that Dailey was a victim
of a choke hold except by prosecution's speculation
during closing argument.    TT 9/22/2017 pg 49
"And I'll submit to you what he did in order to
make sure she could not tell the truth, the
thing that put that blood on his hands was that
he put his hand on her throat and applied
pressure so that she would never be able to tell
us the truth. That's what the evidence shows."

10) Defendant did <u>NOT</u> tell detectives that "after she
was dying told him she want him to take her
children and then slit her throat two more times."

11) Though it was filed on 9/21/2017, it was written
August 30, 2017. Three weeks before any testimony
at trial, where testimony is evidence.

On  pg 7 line 24 - pg 8 line 6
    Prosecution argues a point that is ERR.
 "Defendant himself has not even said that he was careless or
Reckless in what he did. His version that he eventually settled on
hear today, or yesterday, who was that all I was doing was trying
to stop somebody from killing themself. That in and of itself is not
a careless or reckless act and it does not warrant the involuntary
manslaughter jury instruction."

* First and foremost, the prosecution had received a letter
dated December 18, 2016  so he knew before trial that defendant's
position had been to prevent a suicide among other things.
    And, secondly, defendant's actions to preventing a suicide is, in fact,

a Reckless and careless act as well as SELFLESS. This is because defendant is not trained to try preventing suicides, it was already a dangerous situation since she had a knife to her neck which if she felt threatened by defendant, could have just as easily turned the butcher knife onto defendant causing harm. The entire situation was and could be presumed as careless and Reckless.

On pg 11 line 9  The judge misstated, what eventually, the Deputy Medical Examiner stated at the end of defense counsel's cross examination.
"Dr. Fisher-Hubbard said that Ms. Dailey died as the result of multiple injuries including blunt and sharp force... Later on in cross examination she said the death was caused by cutting and/or blunt trauma. And the word "OR" I think is important..."

State and defense counsel had a duty to correct the judge. Especially, the state since its duty is to ascertain the truth. During cross-examination deputy Medical Examiner said that the cause of death was due to the cutting and or blunt trauma. Not and/or.
Prosecution failed to correct the false statements on pg 11 line 24 - 25:
"These were Not shallow; they were very deep. There were four of them."

The Autopsy Report only bulletins 4 but clearly details 6. And the Autopsy Report is proof that all the incisions each and of themselves are either shallow or very shallow. Prosecution knew this or should have known since it's his duty to know and it's in the actual Report, yet he failed to correct false information.

Also, on pg 12 line 9 - 14  "Mr. Salyers' testimony essentially is that Ms. Dailey ... fell twice, maybe three times..."

Again, prosecution failed to correct this misstatement but instead allowed it to go uncorrected and used it to capitalize on his closing argument. see TT 9/22/17 pg 26 line 1-5

"Now I'll admit he added some more times where she fell because he heard her testify about how all these being different injuries from different events. So then he added, well she fell a second time, I pushed her. Then he added, well I pushed her over my leg...."

Defendant never added any extra times that Barbara had fell, the judge did, the prosecution did and the ineffective appointed estate attorney did.

TT 9/22/2017   State's Closing Argument I : II pg 15-31 : pg 42-49

pg15 line 20-25 "When I prepared for my closing arguments to you I started out making lists of what the defendant has said, when, and how all those things contradict themselves."

Prosecution committed error here because he knowingly began by attacking defendants veracity and truthfulness on the stand while also knowing that defendant had NOT contradicted himself on these issues and knowing that defendant did NOT at trial provide 'a brand new story.'

Pg 16 line 12-21 "But he outright lied to you as well. And you saw it yesterday. 'Oh, I never said that.' And I asked him 'were you here literally 10 seconds ago when that's what you told me?' So I could go through them again, all those inconsistencies, but it's not necessary. I know that using your reason and common sense you don't believe him. During our initial conversation when you guys were chosen to be the jurors I asked you if somebody

lies first and then tells a different version and then tell a different version, is that something you can take into account when determining their credibility and everybody raised their hands. And that's exactly what happened."

Prosecution lied to the jury. That's **NOT** what happened. Review pg 9(YYY-ZZZ) of this Federal Habeas.

Not once did the Defendant say or claim that at the time he was speaking with Barbara Ann Dailey that he was concerned she was going to commit suicide. That was the prosecutions false claims and words he's told the jury were from the defendant. And yet the prosecutor tells the jury that defendant outright lied to them.

See Wend v. People, 235 P.3d 1089 (2010); Commonwealth v. Potter, 445 Pa. 284, 285 A.2d 492 (1971); Dyson v United States, 450 A.2d 432

On Trial Transcript 9/22/2017 pg 18 prosecution, again, lies to the jury.

"We then hear from Daniel DeYoung... but what did he see that day? He saw exactly what, fortunately, we have on that surveillance video. And what he testified to is corroborated by that surveillance video... Mr. DeYoung testified... no indication of her wanting to take her own life... And pay attention to what he said. The look in his eyes, like he was getting caught doing something..."

Review pg 9(U-X) of this Federal Habeas.

What Daniel DeYoung testified to is **NOT** corroborated by the surveillance footage.

Prosecution committed misconduct by misstating facts, ~~misp~~ misrepresenting evidence and vouching for the credibility of DeYoungs testimony based on the misconduct the prosecution is knowingly committing. Even the jurors asked DeYoung where and when defendant stopped and looked at him because it isn't

seen on the video surveillance footage, Among other claims he made.

On page 18 line 24 - pg 19 line 6  the prosecution is giving his personal opinion that the emotion of the defendant is fakrd and based on a lie.

"At first glance that sounds like absolute raw emotion, but don't be fooled by it. Keep in mind that at the time Mr. Salyers fakrd that emotion and outright lied to that 9-1-1 dispatch, he knew, in his head, that everything that he was saying was a lie. So if he seems upset at a person who ran from the scene, that is fakrd  emotion based on a lie."

* Per Officer Smith's report,  Salyers was found in the home weeping and crying over kneeling over Ms. Dailey. He was very emotional and could not follow his questioning well.

— The emotion isn't what is or was false. A loved one is down and bleeding due to trying to commit suicide. The emotion is, in fact, overwhelmingly real and had NOTHING to do with the lie Salyers gave, trying to protect her from losing her children.

* Per Officer Anderson's report, before leaving for the jail Salyers was notified that Dailey had passed away. He cried uncontrollably.

— It is error for the prosecution to claim to know what it thinks the defendant feels or is thinking. It's mere speculation at best and has no place in the courtroom. Such personal opinion leads to inflammation of passions  because it misleads jurors to think defendant cared not for the well-being of his loved one.

On page 18 line 8-12
"You hear that 9-1-1 dispatcher say 'does she have any other injuries'

and he says 'I don't know'. Again, a lie. No matter which version he tells, each and every single one puts him knowing about those injuries."

— Again, this is ERROR due to saying defendant lied. At the time of the incident, defendant could NOT have known that Dailey sustained a fracture of the hyoid bone, a tiny contusion of the inferior left temporal lobe, or the laceration on her left breast from the State I.D. first responders found there. Just because defendant shoved her backwards in which caused Dailey to hit the bannister and fall onto the stairs with the right side of her body or when shoved over defendant's left leg to the floor does NOT mean defendant knows of any additional injuries that occurred within her body or under her clothes or under the blood that covered her skin.

*  Per Ofc. Bringedahl's report, the only injury he observed was the wound to the neck.

*  Per Ofc. ~~Ellis~~ Luker's Report, after medical at the hospital began cleaning her up they were able to begin seeing bruising which he relayed to the detectives as they learned of them.

On page 19 line 13-19
"Under oath yesterday Mr. Sahyers sat on that stand and he said to me and he said to the judge and he said to you and he said to his ~~attorney~~ that she said it sounded like her trachea was injured. There was nothing in that 9-1-1 phone call about a trachea. And then we heard again, for the first time yesterday, "I stuck my fingers in her trachea."

Review pg 9 (WWW) of this Federal Habeas. Defendant explained to the jury what he observed during the 9-1-1 call, NOT what 9-1-1 supposedly had said about the trachea. SHE said nothing about it because it was Sahyers' observation on which he took the initiative

to place his finger over the small incision of the trachea in her neck and placed the shirt over the rest of the wound.

So it was ERROR for prosecution to retwist what had already been corrected and established when the miscommunication occurred as seen on 9(WWW-XXX) of this Federal Habeas.

Then, prosecution further misstates what was said multiple times, "'I stuck my fingers in her trachea'."

Review pg 9(XXX) of this Federal Habeas.

First, prosecution claims defendant sticks his HAND in her neck. Defendant corrects him, saying it was his finger in her neck. There is NOTHING about fingers in her TRACHEA.

To place your finger over the incision of the trachea so that Dailey doesn't inhale her blood.

See Jones v State, 212 So. 3d 321

"Once Perez's windpipe was cut, he began to aspirate blood, which would cause even more pain because his lungs were no longer a place for aeration or oxygenation; this is called "dyspnea, painful breathing." There was a significant amount of blood in both lungs."

In the present case, per Autopsy Report, there was no blood in Dailey's lungs. And there was no further damage to the trachea which, had defendant placed his fingers IN her trachea, it would have torn the trachea open further; which did NOT happen, so prosecution is in clear ERROR for such misstatements and implications that follow such misstatements.

On page 19, TT 9/22/2017 line 23-24

"What did he call Barbara Dailey yesterday? The Subject. Assessed the subject."

This is ERROR; defendant isn't the one that called Dailey the subject. Defendant only told the jury what Ofc. Bringedahl

said to him after the officers cleared the home.
Officer Bringedahl asked defendant to step outside
so that he could "assess the subject" and asked Ofc.
Smith to take a statement from defendant.
See pg 20 line 6-7 of TT 9/20/2017 and pg 9(GG) of this Federal Habeas.
See TT 9/20/2016 line 13

 Prosecution twisted what was said to inflame the
passion of the jury against the defendant. Prosecution
knows "assessing the subject" is police language. Prosecution
has continued throughout the entire trial pulling at the
strings of the jury by using defendant's words of "the
love of my life" in the many instances when he's attacking
defendant's "lack of concern" for Dailey's well-being.


 TT 9/22/2017 pg 19 line 25 - pg 20 line 2.
 "That 9-1-1 operator knows don't apply too much pressure
and she tells the defendant that."


 Defendant never got a transcription of the 9-1-1 call
or the interview. Defendant doesn't recall 9-1-1 telling him
"don't apply too much pressure", only that she wanted him to
"use something soft, a towel or shirt and apply light pressure
to the wound"
 However, it is _prosecutorial misconduct_ for him to <u>vouch</u>
for what that 9-1-1 dispatch operator <u>knows</u>, and doesn't know.


 On page 20 line 3-8
 "We then have Ofc. Dill who arrives on the scene... He runs
into the house and what does he see but... Mr. Salyers and Barbara
Dailey and Barbara is laying in a pool of blood and Mr. Salyers is
kneeling over top of her. Use your reason and your common sense."


 First, this is just the beginning of an accumulation of errors
of prosecution giving his personal opinions and personal implications.

Secondly, this also proves that prosecution <u>KNEW</u> state witnesses gave false testimony, and that he failed to correct it. Instead, prosecution capitalizes on the false testimony and even ~~mistakes~~ misstates even that false testimony.

See pg 20 TT 9/22/2017

"Ofc. Bringedahl testified that he was on scene shortly thereafter and he walked in and he saw... and Mr. Sahyers walking out in the hallway..."

See pg.6 TT 9/20/2017

Bringedahl claims that defendant had come walking out of the house practically the same time as he got onto the porch, and that defendant pointed and identified the victim who was laying down in a hallway.

See pg 9(BB) of this Federal Habeas

See pg 5 line 19-23 of TT 9/20/2016 (Perlim. Exam.)

See pg 6 line 11-17 of TT 9/20/2016

"I immediately observed the victim, <u>LATER identified</u> as Barbara Dailey, in the hallway between the dining room and the kitchen..." Contradicts his testimony that defendant met officers on the porch and "pointed and identified the victim..."

On pg 20 TT 9/20/2017 prosecution again vouches for Ofc. Bringedahl  line 19-22

"and he immediately, ~~knew~~ based on his training; based on his gut, said to his partner go talk to that man. Because at that instant <u>Ofc. Bringedahl Knew</u> that Mr. Sahyers had something to do with this." and

pg 21 line 1-2

"He said to Ofc. Edings (Edens) go talk to that guy right now. He knew."

— * Per Bringedahl's case supplemental report, "I began to assess Dailey and directed Ofc. Smith to retrieve a statement from Sahyers."

Prosecution misstating facts. Ofc Bringedahl's partner was Ofc. Edens who was under training by Field Training Officer Casey Bringedahl. Ofc. Eden took no statements from defendant.

On TT 9/22/2017 pg 21 line 2-5.
"He observed in Barbara's right hand her cellphone and it was lit up. And he observed that the last phone call was to somebody listed as "My Husband.""

First. Evidence proves the phone could NOT have been in Barbara's RIGHT hand. Remember the 1.5cm incision? She could not have gotten that incision with a phone in her hand. Prosecution knows the testimony of Bringedahl's was false and failed to correct it but instead capitalize on it by misleading the jury to believe defendant's testimony is false.

Secondly, it was improper for the prosecutor to say "Somebody listed as My Husband" when Bringedahl's report and Det. Luker's report all prove that the Somebody is, in fact, the defendant, Joshua Salyers. Prosecution withheld this fact to try giving the implication that Barbara called someone else rather than the defendant since this prosecution's knowingly false theory is that Barbara was wanting out of the relationship and that is why defendant, supposedly, committed murder.

On pg 21 TT 9/22/2017 line 20-25
"Mr. Lesica asked Ofc. Bringedahl why did you check for a pulse on her wrist. Ofc. Bringedahl had a little bit of shock actually at that question. You saw the pictures. There's no way you can get a pulse based on those injuries with all of that blood."

First, Bringedahl was not "a little bit shocked" as prosecution claims to the jury. Secondly, prosecution cannot provide a

statement Regarding the possibility, or lack of, finding a pulse due to "all of that blood."

A person covered in oil, thick oil, will still have a pulse that can be felt. Blood is a combination that is both oily and sticky and has NO bearing on whether someone can find a pulse beneath the skin covered in blood.

Finding a pulse has a LOT to do with a persons blood pressure. If the the blood pressure is low due to the loss of a lot of blood, the finding a pulse anywhere is going to be difficult.

On pg.23 TT 9/22/2017 line 4-12,
"Throughout the course of the interview Mr. Salyers is probing. He is asking what seems like maybe some inconsequential questions in addition to "is she still alive", not out of concern — He fakes that emotion of concern. — but out of wanting to know if she's going to be able to say what happened. He wants to know, before he talks to these detectives, is she going to be able to tell the truth."

Again, this is ERROR. Prosecution makes statements giving his personal opinion claimingly as fact. Prosecution presumes to KNOW what is going on in defendant's mind. Prosecution further implies that defendant has lied to the jury about what happened... "He wants to know..... is she going to be able to tell the TRUTH."

Who's truth? The one the prosecution concocted knowing, very well, it is false? What would they have done had she survived and told them that she made the cuts herself and the defendant was only trying to prevent it? Would they believe it? Probably not. But what could they do, legally, besides take her kids into State's custody. However, because she died, it's "Let's get a conviction at any cost Regardless of the truth."

Federal Habeas                    9 (HHHHH)

On pg 23  line 14-18
"He knows it is not prudent, and he testified it's not prudent to tell the suspect whether or not somebody is deceased, whether or not that person will be able to tell the truth about what happened. You heard Det. Luker's training and experience."

Prosecution <u>KNOWS</u> that the Detectives knew BEFORE the interrogation began that Barbara Dailey had passed away at 8:01pm. However, neither of the detectives obtained a knowing, intelligent, and voluntary waiver because they failed to notify the defendant what he's suspected of. Instead, after offering leniency and still getting what they WANTED, Det. Luker tells defendant that "this looks to have been an ATTEMPT to commit suicide and only then does defendant ask them to <u>promise</u> they would not take her children if he tells them what SHE did. They both agreed.
    Why else would the <u>state</u> fail to have a "Confession" interview transcribed? To cover up the several police misconducts and to keep the judge from granting the suppression.

    "In determining whether a confession is voluntary, the test is whether the confession was.... obtained by <u>any</u> direct or implied promises, however slight, or by the exertion of any improper influence...
    This test has been applied by several recent Federal and state courts, which have found that confessions induced by promises are inadmissible. 'A confession is no more reliable simply because the defendant begins the negotiating...'" People v Jones, 416 Mich 354

    In Colorado v Spring, 479 U.S. 564, "the failure to notify the accused of the accusations against him is a violation of the 6th Amendment guaranteed him through the Constitution of the United States; to be notified of the accusations so that the accused may give an effective waiver of Constitutional Rights"

In State v Vincenty, 202 A.3d 1273, The Court observed that the common law has granted individuals the "right against self-incrimination since colonial times" State v A.G.D., 835 A.2d 291 (2003). "It is one of the most important protections of the criminal law" State v Persha, 748 A.2d 1108 (2000). "However, law enforcement officers must inform suspects of the right before getting a waiver" Miranda v Arizona, 384 U.S. 436 (1966). "A waiver must be knowing, intelligent, and voluntary" State v Reed, 627 A.2d 630 (1993). "The State has the burden of proving beyond a reasonable doubt that the waiver was knowing, intelligent, and voluntary" Persha. "If suspects are not informed of the charges pending against them, they necessarily lack critically important information to enable them to knowingly, intelligently, and voluntarily waive the right against self-incrimination" A.G.D.,. In such circumstance, the state cannot meet its burden of proof" Id. "The police may inform the suspect of the charges before or after the Miranda warnings, but they must do so BEFORE obtaining any waiver" Id.

In Roger v Richmond, 365 US. 534, 540-541; 81 S. Ct. 735; 6 L. Ed 760 (1961) "Our decisions under [the 14th] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary CANNOT stand. This is so because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system —— a system in which the state must establish guilty by evidence independantly and fairly secured and may NOT, by coercion, prove its charge against an accused out of his own mouth."

Yet, in the instant case, the prosecutor vouches for Detective Lukens's misconducts and the "interview tactics" (pg 23 line 23).
"You heard Detective Lukens's training and experience. That's important because he also said some other things during that interview. Like, "I don't think you're malicious." Or some things about Ms. Bailey... Those are all interview tactics. Those are all things that Detective Lukens

Knows, as he testified, will get us closer to the truth. He admitted "not everything I said there about her bi-polar or him not being malicious is true." So don't take those statements as true.

This is ERROR. Not only does prosecution vouch for Detective Lukers veracity, he also verifies and vouches for the coercive/manipulative Reid Manual Techniques employed during the interrogation which prosecution KNOWS were in violation to begin with. Then, prosecution tells the jury to not take Luker's statements as true.

On pg 24 TT 9/22/2017 line 10-11 Prosecution purposely misstated, again, what was said and used his misconduct to imply that defendant was lying. "And then Mr. Satyers, under oath, said "I never said I wiped it down." Unexplainable."

Review pg 9 (CCCC - DDDD) of this federal habeas or TT 9/21/2017 pg 95 line 24 - pg 97 line 25
Q: "Describe for us, again, exactly how this happened with you, right at that point you then took the knife and wiped it down, correct?"
A: "No."
Q: "When did you do that?"
A: "I didn't; I did not." ...
A: "I did not wipe it down"...
A: "I did not. Before you say it, yes, I heard it on the screen that I said I wiped it off."
Q: "I know you don't — I know you told us you don't remember. But you told the officers that you wiped it down, correct?"
A: "That's what the interview said. I don't remember all what was said at the interview."

Q: "But you're not denying that you said it?"
A: "No, 'cause I heard it. I can't deny what I heard."

Clearly, ~~I~~ defendant did say that ~~I~~ he said it. So for the prosecutor to tell the jury otherwise and imply that defendant was lying is prosecutorial misconduct.

On pg 25 TT 9/22/2017 line 3-15. ⓟ
Prosecution vouches for Deputy Neel's testimony it knew to be false because they interviewed Eric Emory regarding the argument the defendant and Mr. Emory had. Emory told them what happened.
"There is no chance that Deputy Neel mistook what he said." This is ERROR.

Then, the prosecution ~~claim~~ implies that the defendant is a racist because there was a black juror sitting in the jury box.

"I believe Mr. Salyers testified it was something he said about being white to that other inmate. Not even close to ~~being~~ what Deputy Neel heard."

Review TT 9/21/2017 pg 110 line 9-24 or pg 9(IIII-JJJJ) of this Federal Habeas.

As Mr. Eric Emory told the detectives that interview him and where trying to get Mr. Emory to lie, what was said was that if Emory did not stop yelling "Stranger Danger" everytime someone walked into the jail's holding area and if he doesn't quit yelling that he is "Jesus", etc. That defendant would be his fucking ass when we got to G.P. (general population). Emory said he's in jail for something he didn't do. Defendant told him that he was in jail for something that never happened yet you don't hear defendant yelling and carrying on. Emory asked what defendant was accused of so defendant asked Emory "did you not hear what they said earlier?" Emory said "no, what'd they say?" Defendant told Emory "They said I slit my girls throat and just watched her lay there. They said I'm here for murder." Defendant

told Emory "Now I have to live with that and it's tearing me up inside. All I did was try to prevent a suicide." Emory apologized to defendant and stayed polite and quiet the rest of the time.

Emory sent a letter to Fred Lesica, appointed estate attorney, regarding what was said and what detectives tried doing and said he'd testify on defenses behalf. Prosecution knows Deputy Neel's report is false due to the interview detectives held with Emory.

Also, Nowhere did defendant ever testify that "it was something he said about being white."

This is prosecutorial misconduct and is a racism profiling error that was committed to inflame the single black juror on the trial's jury.


On TT 9/22/2017 pg 25 line 16 - pg 26 line 20,
Prosecution knows that an article was written June 25, 2017 about defendant. It was ordered that defendant's cell be "shaken down" to collect what defendant was writing to officials. Prosecution knows defendant was moved on June 28, 2017 into M-Pod and placed on "suicide observation" so they could take control of defendant's possessions which included a letter written to the, then, Governor, Rick Snyder, on June 26, 2017 and defendant's numerous chapters of his book he was writing. Prosecution KNOWS defendant has never encountered this "jailhouse rat", Joshua Gurrein, who says defendant confessed to him in A-Pod.

Prosecution verifies/vouches for Gurrein's false testimony by telling the jury "He talked about exactly what room. He talked about getting the knife. He talked about the first story. He talked about the second story that the defendant told. The only way he could have gotten that detail is from the defendant himself."

This is ERROR because prosecution knows neither has ever met

and that defendant has never talked to Mr. Guerin yet he still tells the jury such detail could come only from the defendant himself.

For this to be true why did Guerin claim the exact motive state knows to be false; claiming the "murder" happened because Dailey was ending the relationship? That this occurred in the Living Room? That there were 4 cuts? etc. This is ALL what the prosecution has concocted.

When prosecution "prepares" a witness to testify, they have the ability to "prep their witness" to say what they want them to say. The ONLY place that ever mentions ANYTHING about the living room is is that letter to Governor Rick Snyder. However, not only does Guerin now claim defendant claims this happened in the living room which prosecution "verifies" ("He talked about exactly what room) knowing it all occurred in the Dining Room, but we've also now have another "Prepped" witness, Ofc. Smith, who, in his Report, states defendant was found in the home weeping and crying, kneeling over Ms. Dailey who is reported to be in the Dining Room but at trial he testifies that defendant was found standing around in the living room.

So, then, how does Ofc. Smith get this same information when he already written his report and never had anything more to do with the case since the day of the suicide, or "murder", was his very last day as a Muskegon City Police Officer? THEY both, Smith and Guerin, were prepped by the prosecutor.

Guerin also let it slip at trial that defendant told him he was part of a group called the "Sacred Seven" and that it is a satanic cult. That Sacred Seven satanic cult is the antagonists of defendant's book which was taken, by those working the case, on June 28, 2017. Defendant has never shared anything regarding the contents of his book.

On TT 9/22/2017 pg 27  line 1-3,  prosecution vouches for the testimony of the state "medical expert."
   "I didn't bore you to death because it was so very, very clear that she knows what she's talking about"

And, again, on line 17-18
   "And she was very, very honest with you and with us."

   It's was NOT clear she (deputy M.E.) knows what she's talking about because she 1) Bullentins only 4 of the 6 incisions, 2) She marks on the death certificate that Dailey wasn't pregnant within a year before her death (Gemma was only 5 month-7 months old), 3) Included in the Autopsy Report is information pretaining to someone named Tania Lynn Sweets, 4) She testified that an incision began shallow and, as the cut went, it got deeper (exact opposite than what she wrote in her Report, 5) She claims there were no hesitation marks yet medical literature say superficial incisions could be indication of hesitation, 6) She testifies it would be likely that the 4 incision could have happened had Dailey fell four times, however, that's wrong because the floor would limit the range of motion dramatically, 7) She states the 1.9 ng/mL of THC in the heartblood had no effect on anything even though a 180lb man would be impaired with only 1ng/mL THC.

   Prosecution further uses exactly four cuts on pg 28 line 4 while knowing the Autopsy Report documents 6 incisions. He continues to hammer 4 incisions home in the jury's minds to mislead them to believe the post was about "murder" even though prosecution knows it was, factually, in regards of defendants' thoughts of self-inflicting.

   On pg. 29 line 1-3  prosecution knowingly misleads the jury making false claims.

Fedreal Habeas                    9(00000)

"Now I'll admit he added some more times she fell because he heard her testify about all these being different injuries from different events."

Prosecution KNOWS defendant did NOT add more times that Dailey fell. Prosecution was purposely infringing on defendant's right to be present by suggesting defendant add more times Dailey fell because he heard testimony from the expert. It was NOT defendant that added more times she fell it was first the worthless estate attorney appointed to defendant. and then at the hearing for lesser included offenses the Judge added the extra times she fell in his opinion. Defendant NEVER added more times she fell.

Furthermore on lines 3-10 prosecution implies defendant was lying again based on his (prosecutions) misconduct/lies.
"So then he added, well she fell a second time, I pushed her. Then he added, well I pushed her over my leg. And I said no, no, no, I said trauma. And then he even denied saying that 10 seconds later and said I never said anything about my leg. He was grasping at straws trying to come up with an even brand new story to explain the overwhelming evidence that he heard and it makes no sense."

Firstly, see pg 9 (YYY) of this federal habeas. The conversation the prosecution refers to about "10 seconds later" wasn't even regarding the conversation he's now talking about during closing arguments. Secondly, Review pg 9 (ZZZ-AAAA) Not once did defendant add more times Dailey fell nor did defendant ever claim that he never said anything about his leg. Prosecution just said what he did to try further impressing to the jury that defendant lied when it is, in fact, he (prosecutor) that was lying to the jury.

On TT 9/22/2017 pg 30  Prosecutor presumes to mistate what was written and then presumes to know what defendant is thinking. However, the prosecution knows for a fact that the post was in regards of defendant THINKING of harming himself from the evidence of defendants phone text and facebook messenger log and all the subcomments to that same post. It's why they tried destroying that evidence and requested to suppress all that exculpatory evidence in the Motion in Limine that was untimely filed. Motion in Limine were supposed to have been filed, 7 days before trial.

Line 2-5  During closing:  "One cut, two cuts, three cuts, four. What I have in mind will ease this pain for real." What I have in mind, what. I'm thinking about, hours before the victim is cut four times."

Further, prosecution knows he's lying to the jury by withholding the fact that though the Autopsy Report bulletins only 4 incisions, it clearly proves there were 6 cuts and all of them were shallow or very shallow each and of themselves. And what was said is:

"One cuts...two cuts... three cuts....four. What I have in MY mind will ease this pain for real."

If this post wasn't about defendant's thoughts of self-infliction, then why had all comments between Stephanie Ann and Josh Salyers and Connie get deleted by city, county, or state officials? Why did they try deleting, manipulating, the phone log, text log facebook messenger log? All of which shows proof that defendant was thinking of harming HIMSELF not murder.

On page 31 TT 9/22/2017  the prosecutor tells the jury:
Line 7-8 "And you all don't have to agree" regarding how they find those elements. That is

That is improper ~~mis~~ conduct.  Just as well as:
Line 17-18 "I told you when we started that you can't believe the defendant."

This is also misconduct. Especially when he has constantly and purposely misstated, twisted, and lied about what was said to then call

the defendant the liar.

On TT 9/22/2017  pg 42  line 22-25

"There's one thing that I do agree with Mr. Lesica on. He said to you, you don't kill yourself by cutting your throat. That's not possible. I agree. And Ms. Dailey wasn't ~~try to~~ trying to do that either."

Here are 12 of 895,740 cases

1) Reinking v Philadelphia Am. Life Ins. Co., 910 F.2d 1210

Reinking stabbed <u>herself</u> 11 times in the arm and wrist, <u>6 times in her neck</u>, 7 times in her chest (nicking her heart twice), 8 times in her abdomen, then thrusted the knife into her thigh. Virtually, severing a finger when the blade closed. She injured almost every vital organ in her body as well as numerous severings of arteries, tendons, and ligaments and nerves. She said despite the extreme brutality of her injuries, <u>she felt NO PAIN</u> as she inflicted them.

2) Fetter v Frederick County, 2015 U.S. Dist. Lexis 14302
3) Dodd v Workman, 2011 U.S. Dist. LEXIS 85604
4) Rosario v Brown, 2011 U.S. Dist. Lexis 531145
5) Acerbo v State of New York, 32 Misc. 3d 1230(A)
6) Shoemaker v Central Business Men's Ass'n, 218 Mo. App. 374
7) Jacoby v Baldwin County, 2013 U.S. Dist. LEXIS 72212
8) Mulbarky v Tice, 2017 U.S. Dist. LEXIS 142815
9) Wilson v Prince George's County, 2017 U.S. Dist. LEXIS 50155
10) Easley v Kiemser, 235 F. Supp. 2d 945
11) Wilson v Cosio, 2014 U.S. Dist. LEXIS 184637
12) People v Flores, 2012 Cal. App. Unpub. LEXIS 1602

So, clearly, both the prosecution and appointe estate attorney were in clear ERROR to tell the jury it is not possible to kill yourself by cutting your own neck or throat.

Federal Habeas            9 (RRRRR)

On TT 9/22/2017 the prosecutor vouches for the detectives on pg 43 line 11-14  "Detective Luken and Detective Stratton are two of the nicest people I know and they're in there saying listen, just tell us the truth.

On pg 44 line 14-17 the prosecutor misstates what is said. "You saw Mr. Salyers point out on that knife, no, no, no I didn't wipe it down. Right there on that knife that we used---

On pg45 the prosecutor calls defendant a liar and attacking defendant's veracity as a witness (testimony).
"Mr. Lesica says well yeah he made some statements in the jail but those are disputed. Disputed by whom? Mr. Salyers. Shocking. Disputed what? He said she must have mistaken what I said, but what he claims he said wasn't even close. So how are they disputed by a liar?"
    See Wend v People, 235 P.3d 1089

On pg 46 prosecutor tells the jury "We're not hiding anything." So then why was there no transcription of the interview so that it could be seen, read, the offer of leniency; the failure to notify; the deceit, trickery, lie; the promise made; the fact that the waiver is invalid?  If, "we're not hiding anything", where is the complete phone, text, facebook and facebook messenger log that proves the posts were about defendant thinking of self-inflicting? Why, if, "we're not hiding anything", wasn't the Autopsy Report put in evidence to show that there are not just 4 incision as bullshitted but 6 and that they all did NOT affect the neck muscles as the deputy M.E. testified to. Or to prove that the cut did NOT start shallow then got deeper as the cut went as, again, deputy M.E. testified to. Or to show that the deputy M.E. refused to document ALL scars that'd show Ms. Dailey was a cutter and was tortured by being burnt with a cigar on her chest? If, "we're not hiding anything", where are the videos from 5pm to 7pm

that prove Daniel DeYoung lied about defendant not being on the West side of Jiroch st? To also prove the exact time difference by comparing the call at 5:01:27 to the time on the surveillance. Or to prove prosecutors falsified their facts in their motions when they say defendant and Ms. Dailey never went for a walk?

Prosecution has done NOTHING ~~but~~ except hide everything that proves the defendant is innocent and that they are knowingly convicting an innocent man and condemning him to a LIFE sentence.

On pg 47 the prosecutor tells the jury "It's physically impossible to punch yourself this many times that would cause this significant of injuries. He did this over and over. Four incised wounds."

Firstly, it is NOT physically impossible to punch oneself any number of times. Secondly, nobody claimed Ms. Dailey punched herself more that she was even punched. Thirdly, had Ms. Dailey been punched however many times the prosecutor has implied, suggested, etc., then it would be inevitable to prevent some form of injury/bruising/swelling of defendants hand. However, on TT 9/22/2017 pg 45 the prosecutor had just told the jury "Detective Luther saw Mr. Sawyers with no injuries."

line 23- pg 48 lin 2

On pg 47 (TT 9/22/2017), the prosecutor says "Look at that surveillance video. We know he gets that phone call and know he runs back. And when he's running back, who sees him? Mr. DeYoung and he has a look in his eyes that he's getting caught doing something."

Nowhere in that video does it corroborate Mr. DeYoung's testimony that defendant stopped and looked Mr. DeYoung in his eyes and had a look "like a deer in headlights."

The prosecutor knows this yet he still uses it in his closing arguments.

On pg 48 (TT 9/22/2017) line 11-13 the prosecutor says "Even after seeing all the evidence he got on that stand and he lied to you and he still cannot account for four cuts."

Again, prosecution calls defendants testimony a lie. Defendant offered to provide an assumption as to the other incisions but the state didn't want to hear that because then the Autopsy Report would have to be admitted into evidence and the State would have to explain why it was manipulatively written bullet lining only 4 of the 6 shallow and/or Superficial incisions. Defendant was told he could not give testimony on anything that hadn't been admitted into evidence and here the prosecutor uses that to his benefit committing prosecutorial misconduct.

On pg 48 line 21-24, prosecutor says "As Mr. Lesica put it, is it possible that these injuries are consistent with someone fighting for her life? And that expert who knows what she's talking about said absolutely.

Prosecution yet again vouching for its medical expert.

line 24- pg 49 line 2 "And that expert also told you about a broken hyoid bone and when did she tell you when she sees that? From somebody having hands around and pressure on someone's neck."

First, it was a small fracture to the top of the Right hyoid bone. ②Secondly, the "expert" tells the jury in answer

Federal Habeas                9( UUUUU)

pg 34
TT 9/21/17
pg 35

to their jury Question: "The fracture to her neck, how do you think it was sustained?" She Responds, "You usually see injury to the hyoid bone when there's pressure that's placed on the sides of the neck."

pg 35

Then, the prosecution asks on Redirect, "Would that pressure be consistent with somebody having their hands around that victim's neck?" She Responds, "That's one of the ways that we could see a fracture to the ~~neck~~ end of the hyoid bone, yes."

So, No, the Dr. Medical examiner did NOT say "From somebody having hands around and pressure on someone's neck." She said "That ONE of the ways...."

Medical literature states that evidence of a fractured hyoid bone is had in about 1 of every 3 cases of strangulation. Also, that hyoid fractures are very common when impact is had in the neck area from falls, motor vehicle accidents, etc.

On page 49 (TT 9/22/2017) line 2-9 prosecution lies to the jury, deliberately, saying "Now the defendant testified that he called 9-1-1, stepped briefly out onto the porch and looked to see if pro-med was coming and immediately went back inside. But, again, we know he lied. We know from the surveillance video that's not what happened. We see him call 9-1-1, go out on that porch, go out into that yard and actually go sit on the steps while Barbara Dailey laid inside bleeding out gasping for air."

lne 5-9
lne 20-
pg 81 lne 6

First, TT 9/21/2017 pg 80-81 defendant testified, "I placed the knife in the sink... Reached in my pocket to grab the phone and called 9-1-1 going outside... I had stepped outside and looked out to my left to see if pro-med was coming back 'cause when I ran back to the house Pro-Med ~~passed passed~~ had

Federal Habeas                    9 (∨∨∨∨∨)

And they had said something about Responsiveness so I went back inside. And I guess whatever I had said to 911 people after that I went back outside... And I went out to the yard's sidewalk area and looked back to the left again back down to the hospital to see if they're coming back and she asked me if I'd be willing to kneel down and help her with something. So she said put something soft to her neck and apply light pressure on something."

(I did sit on the steps when 9-1-1 dispatch told me to calm down, that she can't understand me.) (I was on the steps when she asked me to go in and use something soft a towel or shirt and place it over the wound and apply light pressure).

So, the prosecutor omitted the portions he wanted to mislead the jury to believe defendant lied to them and he calls defendant the liar.

Secondly, Prosecutor says based on the surveillance video, "We see him call 9-1-1, go out on that porch..."

How can you see defendant call 9-1-1 if he was inside the home? Per testimony of Sgt. Guest the 9-1-1 call would have been made, according to the surveillance time, at 7:20:43 or 7:20:44. Now per surveillance video CH1 7:20:37 He goes inside and doesn't come out until 7:20:49.

Review Federal Habeas pgs. 9(NNNN – QQQQ)

Prosecutor committed prosecutorial misconduct. The video does Not corroborate his claims. However, Thirdly, prosecutor again calls the defendant the liar.

On TT 9/22/2017 pg 49 line 11-16 the prosecutor gives a knowingly inaccurate Personal opinion. "And I'll submit to you what he did in order to make sure that he

knew she could not tell the truth, the thing that put that blood on his hands was that he put his hand on her throat and applied pressure so that she would never be able to tell us the truth. That's what the evidence shows."

Again, prosecution implies that defendant's version is a lie. The prosecutor _KNOWS_ that Barbara did not die at defendant's hand; that she died 46 minutes later at the hospital. So to insinuate defendant killed her by choking her to keep "the truth" from being known from her is ERROR. The evidence does NOT support what he has just claimed to the jury in his _personal opinion._

l. no 22-25   On pg 49 TT 9/22/2017 prosecution again misleads the jury. "That he did exactly what he said he was going to do. One cut, two cuts, three cuts, four, hours earlier. And that's exactly what he did. I ask you to find him guilty of first degree premeditated murder."

First, prosecution knows from all conversations prior, during, and after that facebook post that it was a post regarding defendant's _thoughts_ of harming himself to ease his pain. And, Secondly, prosecution _KNOWS_ there are 6 shallow and/or superficial cuts Not _4_ like he insists to deliberately mislead the jury to believe.

Suicide is _NOT_ a crime in the State of Michigan. I ask THIS HONORABLE Court to grant me the appropriate relief so that I may be given my right to have a FAIR trial to prove my innocence.

Federal Habeas            9 (X X X X X)

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available) : _____

_____

Date of result: _____

(d) **Other Remedies**:  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

(e) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

**GROUND FOUR:** Police and other investigative official misconducts.
+ Ground FIVE

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim): _____

Destruction of Evidence, tampering/deleting evidence, fabricating evidence, writing false and/or manipulative reports, lying under oath/perjury, unlawful arrest, Constitutional violations during the interrogation, and search/seizure violations.

See 10(B) - 10(N)

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  Yes ☒ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: I did. ½ on 6.500 because direct appeal didn't rule on it.

- 10 -

Officer Logan Anderson, without first arresting and/or Mirandizing defendant, Joshua Salyers, made defendant go to the Muskegon City Police Department. Defendant asked to be allowed to go with or be taken to his girlfriend at the Hospital. Ofc. Anderson told defendant that could not happen since the hospital is currently on "lockdown" status. Anderson then suggested going to the police department to talk to detectives. Defendant told him he would not talk to detectives and asked to be taken home to Barbara's Dad's house so defendant could tell her (Barbara's) dad what she had told him to tell her dad and to tell him what really happened. Ofc Anderson agreed and asked for the address. Defendant gave him the address and got into the transport vehicle uncuffed to go the Kevin Dailey's (Barbara's Dad). Instead of taking defendant to Kevin Dailey's where defendant lived, the officer took him to the police department, where defendant did not want to go, against his wishes and without being arrested and/or read Miranda or otherwise informing him that he was a suspect.

Police and crime scene technicians claim to have "searched" the home of 1432 Jiroch St. and found "no weapon." They advised officer Smith that the defendant may have ditched the weapon in the alley when he left as no weapon was found inside. The Butcher Knife Dailey used was still bloody and had been put in the kitchen sink on top of a small steak knife and a long carving knife, its tip pointing toward the back door. Where is this Butcher Knife. During the interrogation, defendant described the knife as being shaped like a big steak knife and long like a bread knife because defendant couldn't think of what the knife was called at the time.

Criminal Law Deskbook P16.21 provides a correct logical and/or common sense (sensible) understanding that rules out the small steak knife that the investigative team knowingly

falsified as being the knife used just because it tested positive for human blood. It could have had blood on it either because 1) Someone who used it had cut themselves while using it or 2) if it was Barbara's blood on the knife it'd be from the blood transferring from the blood on the butcher knife.

Defendant and Barbara Ann Dailey first met up together at 5:01pm - 5:02pm on 9/4/2016. Defendant stood on the West side of Jiroch in front of Kevin Sanders' house, the house with the cameras on it. Defendant called Dailey at 5:01:27pm to let her know he was outside waiting for her. She tells him that nobody else was there, to just come over and inside because she was still getting ready. He goes over and they both leave a minute or two later walking North on Eastside of Jiroch st then turns East on Irwin to go to Wood Street Market.

Police collected the surveillance footage as evidence and downloaded the files from 2pm until 7:59. However, the report only documents the footage content from 7:06:14 until 7:25:52, and while knowing that the footage time was incorrect. This is a Brady violation.

Prosecution KNOWS that the video footage proves that Barbara and the defendant met up and left together to walk, yet in one of its motions/briefs of opposition they claim that Defendant lied about Dailey and defendant going for a walk. It also proves Daniel DeYoung lied on stand about defendant not being on the West side of Jiroch St. see Brady v Maryland, 373 U.S. 83. Also, 514 U.S. 419 (1995) The complete video footage was withheld so the defendant could not impeach state witnesses and to prevent defendant proving that states knowingly built its theory based on lies and incorrect evidence.

• After police detectives had gained access to defendants phone, and loaded it onto their computer program, they had begun deleting, manipulating, tampering with the call, text, facebook posts, and facebook messenger logs.

The full printout of the facebook post, comments, and sub-comments would have proven that the post was _NOT_ in regards of defendants thoughts/plan to commit murder but was rather about his thoughts of harming himself. It would also have shown proof that it was the defendant that was planning on leaving Barbara Dailey. Both being the exact opposite of the state's knowingly false claims.

You'll notice that at the time state printed out the facebook there were comments/subcomments from Stephanie Ann who ~~was~~ defendant was talking to about cutting himself to ease his pains but state fails to preserve all these comments because it'd prove state's theory wrong on both accounts: That the post was a premeditated plan to murder and that Barbara was leaving the defendant. The state garbled what it wanted and, as you can see on the other print-out, deleted all remaining comments on that same post to prevent the truth from being seen. This is, again, a Brady violation.

Further, by reviewing the phone/text/messenger log you will see that portions of the conversations ~~are~~ missing and that police deleted all the screenshots that would show what they deleted. See page 14 between #223 & #224, pgs. 18 - pgs. 20 all screenshots deleted. Pg 20 between 320 & 321 a call from Barbara is missing and a text.

You'll also see by reading the conversations that ~~I~~ defendant was NOT talking about committing murder but was instead talking about his thoughts of killing himself.

• At the police station, where defendant was forced to be, defendant was made to wait in the break/briefing room where detectives Lukra and Stratton spoken with him at about 8:40pm and then was taken to their "Office" to answer some questions at 8:45pm. Barbara had passed away at 8:01pm. Per transcript of the preliminary examination on 9/20/2016 pg 13, detective Lukra knew she had passed BEFORE the interrogation had begun. Detectives failed to obtain a valid waiver of rights because they did not inform defendant that he was a suspect for the death of Barbara Ann Dailey. Instead, they offered leniency; that they'd talk to whom ever is over the case about providing a lighter sentence and then even telling defendant that this looks to have been an attempt to commit suicide. Because they were already aware that Barbara had passed away at 8:01pm, nearly an hour Before the interrogation began, that would mean they used deceit and improper influence saying that it looks to be an ATTEMPT to commit suicide. And because of this, to keep Barbara from losing custody of her daughters for attempting to kill herself, the defendant ask the detectives to promise they wouldn't take her girls from her if he tells them what she had done. They agreed.

While defendant was explaining as best he could what was happening the detective, Lukra, asked "how many more cuts did she make after the initial cuts?". I held up two fingers because I couldn't speak. Supposedly, he asked me again and I didn't respond. I didn't hear him. However, all the way to the day of trial when it was played for the jury defendant believed what was asked was "how many more cuts did SHE make after the initial cuts" but what defendant learn at Trial, detective Lukra asked how many more cuts did You make after the initial cuts?"

Defendant didn't make any cuts to her neck she did

So it only made sense that Lukez was asking how many more cuts she made after her initial cuts. Also, they'd already said this looked to have been an <u>attempt</u> to commit suicide and <u>Promised</u> not to take her girls if defendant told them what she had tried doing. So, again, it only made sense he'd ask what defendant thought he asked "How many more cuts did <u>she</u> make after the initial cuts?"

She made the <u>first cut</u> and got shoved backwards to try getting her to catch her fall by dropping the knife. She hit the back of her hand and left side of her head on the bannister and fell onto her right side on the stairs. She got up putting the knife to her neck again and said please don't, just let me do this. She made the <u>Second cut</u>. I reached with my left hand for her right wrist but got her hand instead. I pulled her hand toward me to take the knife from her with my right hand. She jerked her hand free causing the <u>Third cut.</u> <u>She made 2 more cuts</u> when her hand twitched a couple of times while the knife was still in her neck.

See Michigan v. Harvey, 494 U.S. 344; People v Jones, 416 Mich 354; Roger v Richmond, 364 U.S. 534; Colorado v Spring 479 U.S.564; State v. Vincenty, 202 A.3d 1273

• Officer Casey Bringedahl states that he observed an alcatel cellphone in Daily's right hand, that it was lit up, and showing the last outgoing call to "My Husband" # 405-747-0680 (defendant's #) at 7:11 pm.  This is Search; Seizure violation, prejury, falsifying evidence location and improper Collection of evidence.

In order for the officer to view the exact details; name, number, time and date, and the length of the call, he'd have to manipulate the phone by 1) unlocking it by pressing two seperate buttons one after another and 2) go into the call history and opening the menu to further get the details of that specific call.

This specific model of phone has a two button lock, the back light only stays on for so long (so many seconds), and locks after 10 minutes of not being used. If the call was made at 7:11 (7:10:48 per my call/text log) and police don't arrive until nearly 7:22, there's eleven minutes. Then, the clearing the home of threats about another 2 minutes and then assessing her, there's about 15 minutes. That phone would <u>NOT</u> have been "lit up" nor would it have been still unlocked.

Bringedahl claims the phone was in Dailey's Right hand. That is false testimony and falsified Report. This is important because if the Alcatel cellphone was in her Right hand then how would she have had the Butcher knife in the same hand to make the cuts to herself. The evidence and his testimony contradicts what he claims.

1) He doesn't Remember if he was wearing gloves. Now can he not be aware of whether or not he has blood on his hands from handling a phone that is supposedly in her Right hand which has a 1.5 cm cut on the palm side of her second Right finger?

2) How, if she had this phone in her hand, would she have been able to sustain the 1.5cm cut in the first place?

3) If the phone was in her Right hand there'd be blood all over the phone and since it wasn't placed in an evidence bag there'd be blood on his cruiser's passenger seat.

The Alcatel cellphone was on the left side of her opposite from defendant when he was rendering aid as advised by dispatch. Bringedahl did <u>NOTHING</u> to render aid and could have <u>properly</u> collected evidence AFTER preserving it via a quick photo from his phone or evidence kit camera.

Federal Habeas                    10(G)

- The newly appointed deputy Medical Examiner, Amanda O. Fisher-Hubbard, detailed the wrong individual in her written Autopsy Report. Barbara Ann Dailey was NOT 5'6" (66"), She was NOT 134 lbs, and she was not a brunette.

She failed to document the scars on Barbara's upper inner thighs caused by her self inflicting in the past. She failed to document the 2 cigar burn scars from her grandpa burning her as a taste of what was to happen if she told on him for sexually assaulting her. These burn scars were on her chest and symmetrical from one another. She failed to document the scars on Barbara's armpits from previous self-inflictions. She failed to document the scar on Barbara's right neck from self inflicting in April of 2016. And she failed to document the poke scarring on the bottom of her right foot.

The deputy M.E. failed to bulletin all 6 incisions properly but instead bulletined only 4 of the 6 to help corroborate State's knowingly false theory that the facebook post was about murder. She failed to document the depths of the incisions. All the above falls under Brady violations and is Medical Malpractice.

At trial, she testifies that there were at least 4 incisions though she knows there were 6. She claims that they were all significantly deep and that they all affected the neck muscle muscles. However, the written report proves that all the incisions were shallow or both shallow and superficial each and of themselves and that only the 2 additional superficial incisions within the 12 cm incision caused damage to neck muscles, jugular vein (right) and the trachea.

She testified falsely saying that there was an incision that began shallow and as the cut was happening more pressure

was applied to cause it to become deeper.  A superficial continuation onto the right neck means it ended very shallow.

In both her Report, which was not admitted into evidence, and in her testimony she says the cause of death was both blunt force and sharp force. However, during cross exam, she admits it was either from cutting and OR blunt trauma.

The 0.5 x 0.5 x 0.3 cm contusion on the inferior left temporal lobe is not sufficient to cause death. Therefore, Blunt Force Trauma is NOT a factor of death in this case.

She acknowledges that she was aware of Barbara's toxicology Report showing she had 1.9 ng/mL of THC in her system. That being 1.9ng THC per millilitre of Heartblood; nearly double the amount of THC that'd impair a 180 lb male who uses often. However, dep. M.E. testifies it had no effect on anything.

Thus far, Review: Toxicology & Forensic Sciences 25.11; 3A-236-23B Courtroom Medicine Series: Death 23B.54 [I] Medical Uses of Marijuana and [3] Effects of Cannabis

Blunt Force Trauma 3A-236-23 Courtroom Medicine Series: Death 23.50

[23.51] Wounds    [I] Contusions

& Forensic Sciences 25.06

1-251-37 Courtroom Medicine Series: Head and Brain 37.02 [1] Temporal Lobe Contusion

~~& Forensic~~ & Forensic Sciences 25J.07 Mechanism of Death—BFT [A] definition [B] Investigation

Also, in the deputy M.E.'s Report and at trial she claims that asphyxiation could not be Ruled out. Prosecution later, during closing told the jury Barbara was choked to keep her from being able to tell the truth, suggesting she died there at the house

at my hands. And that that is what the evidence shows.
If there were any signs of asphyxia present at the time
of death 46 minutes later at the Hackley Hospital it wouldn't
be from defendant choking her as the prosecutor claimed.
    See  3A-236-32 Courtroom Medicine Series: Death 32.04
Pathophysiology of Asphyxiation
    [2] External Factors  (3) Airway obstruction
    [6] Airway Obstruction
  3A-236-23  Courtroom Medicine Series: Death 23.55
    - Mechanical Blockage
    - Iatrogenic Asphyxia
    [] Mechanical Asphyxia
    [5] Iatrogenic Asphyxia


  Dep. Med. Exam. Amanda Fisher-Hubbard holds off to write her
Report until 1 month AFTER the Autopsy was conducted and AFTER
they cremated Dailey's body so a second and independent exam
could be done by a defense expert. Dr. Badre Cassis and/or
Dr. Ljusiba Deegovic.
    The death certificate says Barbara wasn't pregnant within
a year of her death yet she just gave birth to Gemma Hughes
in february of 2016 only 6-7 months before she committed suicide.
Also included in the Autopsy Report is information regarding
someone named Tania Lynn Swarts.


    There was no investigation into whether the manner of
death was actually a suicide or not.
    See 3 Forensic Sciences 32F.02
        3A-236-23 Courtroom Medicine Series: Death 23.50
        [4] Incisions
        [6] Cause of death after wounding
    4A Lawyers' Medical Cyclopedia §31.16 [F] Repair
    1 Attorneys' Textbook of Medicine (3rd edition) § 3.04 (d)

\* Pseudocides will usually arrange to be found before death occurs. Substance abuse accompanies and complicates the majority of these cases. \*

\* Toxicology expert, Marilyn A. Huestis has stated:
"Non-frequent users of THC can be very intoxicated at 1ng/mL \*
~ Barbara had 1.9 ng/mL

\*       2 Forensic Sciences [1] Brief autopsy procedure guide for the forensic pathologist:  General Rule: "if is doubt about the manner of Death, treat as a Homicide."

\* Criminal Law Deskbook P16.21

\* One cut to the main artery of the neck would kill a person in a matter of 1 to 2 minutes \*   (Barbara lived 46 minutes).

"When the windpipe (trachea) is cut you'll begin to aspirate blood, which would cause more pain as the lungs would no longer be a place for aeration or oxygenation; this is called dyspnea, painful breathing. There'd be significant amount of blood in the lungs."
Jones v State, 212 So. 3d 321

"Fatal wound would render victim unconscious within 10-15 seconds, and victim would have bled to death a few minutes later."
Perez v State, 281 Ga. 175

— Both of which did not occur to Barbara Dailey —

\* There are 3 times more suicides than homicides in the United States of America — Caitlin Rother

\* Hyoid bone fractures are not rare, but occur in ⅓ of strangulation cases.

• Deputy Marci Jo Neel wrote a false report on 9/5/2016 claiming defendant confessed. Detectives came to the jail and had interviewed Eric Emory regarding the supposed confession and threat toward him. Emory told detectives what was really said and told them he would not lie for them like they were trying to get him to do. Prosecution failed to disclose the contents of that interview with Eric Emory. Brady violation.

• The investigative team and/or the prosecutors had, on 9/28/16 had defendant's cell "shookdown." While doing the shakedown, they took a multipage Poem regarding the suicide. They took it out of the Attorney/client folder and labelled it as a Multi page letter regarding the homicide in question. State failed to provide this in the discovery and did not Return it to defendant. This is Search & Seizure & Brady violation.

Again, on 6/28/2017, defendant was removed from his cell and placed on "observation" and put in M-Pod for the investigative team and/or Prosecutor to obtain any information the could gather about what defendant had written to state and Government officials and writing a book about. 6/25/17 MLive wrote an article "Alleged Threat-Slasher Writes Officials." That night defendant wrote a letter and a copy of it. He sent one home and left the other sealed and partially addressed to the Governor and left it in the Attorney/client folder. On 7/21/2017 Jennifer Swanger Released defendant from "observation" not even being aware defendant was on observation as is policy. Defendant's Book manuscript and the sealed letter to Governor Snyder was missing. At trial, Ofc. Smith and Joshua Guerin prove the prosecution used the book and contents of the letter to the Governor to coerce some of their testimony. Search & Seizure Violation and prosecutorial misconduct for coercing witnesses and committing other misconducts

⑫ Ground Five:  Ineffective Assistance of Appellate Counsel

Supporting facts:

Melissa Krauskopf was appointed to assist defendant with his direct appeals. She held only 1 (one) video visit. Defendant gave her a large number of issues to raise on direct appeal on top of the few she had raise. See Supplement 4 Brief. She refuse to raise any of them issues as defendant asked her leaving him to navigate the legal system not knowing what needs done or how to do it.

Many issues she did not bother even investigating into. One of the biggest errors was that trial counsel deprived defendant of an expert witness. Melissa was told to contact Dr. Dragovic regarding the medical aspect of the case. She failed to do so. Dr. Dragovic had even written back to defendant stating to get his help he needs to have a lawyer of ~~his choice~~ defendant's choice to contact him. See included letter from Dr. Dragovic.

Ineffective assistance of Counsel is the number One reason there was a conviction due to failing to get an independent examination of Barbara Dailey's body before State destroyed the evidence viz cremation, failing to obtain defense expert, failing to call Eric Emory and Stephanie Ann as witnesses, failing to present the video footage of the interrogation to show offers of leniency, deceit, and promises were made. Among many other errors including putting in a request to be removed and replaced as Counsel.

Ms Krauskopf failed to investigate into anything except the trial transcripts. She failed to obtain any and/or all of the discovery material from appointed trial

or even consult with appointed trial counsel before he passed away on 12/25/2018. Now that Ferd Lasire is deceased defendant cannot get his full discovery materials and since she failed to get them she was unable to fully investigate to be prepared and to fill an effective direct appeal.

It is ineffective assistance of appellate counsel to not obtain all relevant documents to properly investigate a client's case and issues. She had over a year to obtain these documents yet she failed even when defendant/appellant continued to tell her he needed his discovery materials.

Melissa Kraushopf filed her appeal without first reviewing it with her client and made her client wait 45 of the 90 days to get a copy of the trial transcripts to file a supplement-4 Brief. Even after the transcripts arrived around July 12, 2018, they were incomplete. She refused to provide them to her client. Until her client had written her a letter telling her people will come and not leave until she gave over these missing transcripts and all discovery he was without. The Court denied the first request but granted the second request for the rest of the transcripts which are still incomplete.

Many times appointed appellate counsel was asked and told and demanded to request a S.A.D.O Replacement and to remove herself off the case. See letters that are included.

She was asked to contact Dr. Desgoviz, Patty Barrett, Wesley Salyers, Stephania Ann, Dr. Bedra Cassin, Lara Nichols but she had failed to contact any of them. Therefore, she could not investigate into anything.

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules? Yes ☒ No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

    Date motion was filed: _2/19/21_

    Name and location of the court where the motion was filed: _Muskegon County   990 Terrace_
_St. Muskegon, MI 49442_

    Docket or case number: _16-4697-FC_

    Result (attach a copy of the court's opinion and order, if available): _Denied_

    Date of result: _3-24-2021_

    (3) Did you receive a hearing on your motion? Yes ☐ No ☒

    (4) Did you appeal from the denial of your motion? Yes ☐ No ☒

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes ☐ No ☐

    If yes, answer the following:

    Date you filed: _____

    Name and location of court: _____

    Docket or case number: _____

    Result (attach a copy of the court's opinion and order, if available) : _____

    Date of result: _____

(d) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

(e) If you did not exhaust your state remedies on Ground Four, explain why: _MDOC Legal Writer Program_ _denied me access to the Courts while I was in Administrative Segregation and after I was released back to General Population making up an excuse of asking them to be a typing service. I write out everything myself._

- 11 -

15. Have you previously filed any type of petition, application or motion in a federal court regarding the conviction that you challenge in this petition? Yes ☒ No ☐

If "Yes," state the date of filing, the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available:

12/13/2018 (date filed)

United States District Court Western District of Michigan Southern Division

399 Federal Building  110 Michigan St., N.W.  Grand Rapids, Mi  49503

Case# 1:18-CV-01371-PLM-RSK          Judge Paul L. Maloney

Court Decided 1/11/19

16. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, as to the judgment you are challenging? Yes ☐ No ☒

If "Yes," state the date of filing, the name and location of the court, the docket or case number, the type of proceeding, and the issues raised:

17. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Adam Masserang (Preliminary Exam)

Fred J. Lisica (Deceased) (Pre-trial hearings)

(b) At arraignment and plea: None

(c) At trial: Fred J. Lisica (deceased)

(d) At sentencing: Fred J. Lisica (deceased)

(e) On appeal: Melissa Sue Kraushkopf

(f)  In any post-conviction proceeding: _____ N/A _____

_____

(g)  On appeal from any adverse ruling in a post-conviction proceeding: _____ NA _____

_____

18. Do you have any future sentence to serve after you complete the sentence imposed by the judgment you are challenging? Yes ☒ No ☐

(a)  If so, give the name and location of court which imposed the sentence to be served in the future: _____

_____ Carter County Tennessee _____

(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the above sentence: ___ 3 years _____

(d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? Yes ☐ No ☒

19. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

_____ I believe I've got until 12/16/21 as I was told by the legal _____

_____ writer program of MDOC and due to the law library/LWP shut _____

_____ downs for COVID. _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

- 13 -

*The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of -
  (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
  (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
  (C) the date on which the constitutional right asserted was itially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
  (D) the date on which the factual predicate of the cla im or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.


Therefore, petitioner asks that the Court grant him or her the relief to which he may be entitled in this proceeding.


I declare under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on ___Drcumber 8, 2021_____ (month, date, year).

_____     ___12/8/21_____
Signature of Petitioner                 Date


_____
Signature of Attorney (if any)


If the person signing is not petitioner or an attorney, state relationship to petitioner and explain why petitioner is not signing this

petition. _____

_____

_____

_____

- 14 -

**UNITED STATES POSTAL SERVICE®**

**PRIORITY® MAIL**



US POSTAGE PAID PITNEY BOWES

ZIP 49660
02 4W
0000362149DEC 08 2021

$ 023.15⁰

FROM:



Joshua Salyers #422144
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, Mz 49662

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**TO:**

Clerk, U.S. District Court
399 Federal Bldg.
110 Michigan St., NW
Grand Rapids, Mz 49503



UNITED STATES
POSTAL SERVICE ®

**USPS TRACKING #**

9114 9022 0078 9762 3950 73

# LARGE
# MAILING BOX
## FOR DOMESTIC AND
## INTERNATIONAL USE

To schedule free Package Pickup,
scan the QR code.



**USPS.COM/PICKUP**



PS00010000018

O-BOX7 June 2020
ID: 12 x 12 x 8
OD: 12 1/4 x 12 1/4 x 8 1/2
ODCUFT: 0.738