STATE OF MICHIGAN

IN THE 14TH CIRCUIT COURT
FOR THE COUNTY OF MUSKEGON

\* \* \*

PEOPLE OF THE
STATE OF MICHIGAN,

        Plaintiff              File #16-4697-FC

     V

JOSHUA MICHAEL SALYERS,

        Defendant.

--------------------------------------------------\

JURY TRIAL - DAY 4 OF 4

BEFORE THE HONORABLE TIMOTHY G. HICKS

Muskegon, Michigan, September 22, 2017

APPEARANCES:

For the People:     Benjamin Medema
                     *Muskegon County Prosecutor*
                     990 Terrace Street
                     Muskegon, MI 49442
                     231-724-6435

For the Defendant:   Fred J. Lesica
                     Lesica & Associates
                     3224 Glade Street
                     Muskegon Hts., MI 49444
                     231-733-1001

Transcribed by:     MILLS COURT REPORTING (8387)
                     1615 Sunset
                     N Muskegon, MI 49445
                     231-744-6823
                     BOBBIE SPRINGER, CER-3408

# TABLE OF CONTENTS

WITNESSES:      PEOPLE                                    PAGE

      None.

WITNESSES:      DEFENDANT

      None.

EXHIBITS:                                   identified   received

      None.


    OTHER                                           PAGE

People's Closing Argument                        15
Defense Closing Argument                         32
People's Rebuttal Closing Argument               42
Jury Instructions                                50

(Videotape, 9-22-17, 9:14:06)

1      THE COURT: Good morning.  Welcome back for day
2  four people.  State of Michigan versus Joshua Michael
3  Salyers, file number 16-4697-FC.  We have everybody in
4  place.  The jurors are gathered.
5      First order of business.  Anything that
6  needs to be discussed about our handcuff hiccup at the end
7  of the day yesterday?  I want you to know I've spoken to
8  both deputies.  I think what happened was a combination of
9  several missteps including probably a couple of my own.
10 So I think we've made a record.  Is there anything else we
11 need to discuss about that?  Mr. Lesica?
12     MR. LESICA: Your honor, I think it's grounds for
13 a mistrial and I so move.  All the jurors were out
14 standing on the courtroom floor and this defendant was
15 handcuffed by the deputies in plain view of every one of
16 them.  This could inflame the jury or influence their
17 decision against my client and I think it was a
18 particularly unfortunate circumstance but that's my motion
19 on that.
20     THE COURT: All right, thanks.  Mr. Medema?
21     MR. MEDEMA: Thank you your honor. First I would
22 point out that it was really at the defendant's own
23 urging.  The defendant did, with the jury present, reach
24 his hands out to the deputies and at that time and that
25 time only did the deputies actually then take up their

*(Videotape, 9-22-17, 9:14:06)*

1   handcuffs and handcuff him.  So it was at the invitation

2   and based on the actions of the defendant it warrant a

3   mistrial in and of itself based on that argument.

4             In addition, we have the testimony from the

5   defendant himself that his residence is, and he kind of

6   laughed it off, at the jail and gave that residence as 25-

7             THE COURT: Well he didn't say at the jail.  He

8   said 25 West Walton.

9             MR. MEDEMA: Yes.  And we have extensive

10  testimony from not only another inmate but Mr. Salyers

11  himself as to him being in the jail for an extended. In

12  fact the exact locations in the jail.  We have the

13  testimony of Deputy Gilbert as to where he was in the jail

14  so the fact that the defendant himself reached out his own

15  hands on his own actions and was handcuffed really does

16  not inflame the jury any more than the evidence that we

17  already have in play here and therefore I ask to deny the

18  motion for mistrial.

19            THE COURT: All right, thanks.  The Court denies

20  the motion.  What happened yesterday was unfortunate.  I

21  think we stride mightily to avoid those kinds of scenes.

22  Occasionally they happen.  The defendant is entitled to a

23  fair trial.  It's not a perfect trial though we try our

24  best.  I think Mr. Medema has nicely articulated the other

25  things which suggest that that particular incident really

*(Videotape, 9-22-17, 9:14:06)*

1   is probably not that big a deal for the jurors.  The

2   deputies have been here transporting Mr. Salyers

3   throughout the trial; they're sitting here behind him the

4   whole time.  We have testimony that he lives in the jail,

5   that he's been in the jail, that he's had cellmates,

6   things like that.  So it's unfortunate but I don't think

7   that there's any grounds for a mistrial here as the Court

8   evaluates the severity of the circumstance.  In fact, I

9   think Mr. Salyers was quite cooperative and that's good,

10  inures to his benefit.

11          All right, next.  Jury instructions.

12  Gentlemen, you've had them.  I'll entertain your comments

13  now.  I think the number one thing we have to decide is

14  whether the Court should give the involuntary manslaughter

15  instruction requested by the defense.  Correct Mr. Lesica?

16          MR. LESICA: Correct your honor.

17          THE COURT: Mr. Lesica, before we do that I want

18  to just take care of two other things.  I don't see any

19  way that voluntary manslaughter comes into play here

20  because that essentially requires the killing under so-

21  called hot blood, right?

22          MR. LESICA: Yes.

23          THE COURT: OK, so you're not asking for that.

24          MR. LESICA: No.

25          THE COURT: There was some chat in chambers about

(Videotape, 9-22-17, 9:14:06)

1    negligent homicide and it looks to me like that particular

2    statute has been repealed.  If you look at the jury

3    instruction 1614 which is where the negligent homicide

4    instruction used to be it says that the instruction was

5    deleted due to a repeal of the negligent homicide statute.

6    And it's covered under MCL - I'm sorry, jury instruction

7    15.16 in the Vehicle Codes.  So unless there's some other

8    authority you want to point me to I'm not sure how that

9    comes in here.  Mr. Medema, do you see it a different way?

10         MR. MEDEMA: No your honor.

11         THE COURT: Mr. Lesica, anything else on that

12   point?

13         MR. LESICA: No.  My research is similar.

14         THE COURT: All right.  So involuntary

15   manslaughter then.  Mr. Lesica I'll entertain any other

16   comments you may have at this time.

17         MR. LESICA: Your honor I believe the statute

18   clearly states that involuntary manslaughter occurs when a

19   person is accidentally killed due to someone else's

20   criminal negligence, i.e., the defendant.

21         THE COURT: You're reading from the what?

22         MR. LESICA: The statute your honor. 750-

23         THE COURT: 750 point what?

24         MR. LESICA: I think it's 329(a).

25         THE COURT: OK.

K AND Q LAW, PC
39520 Woodward Avenue, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 377-1080

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

July 24, 2018

Joshua Salyers #422144
Oaks Correctional Facility

Dear Mr. Salyers,

The court has forwarded on to me your correspondence. I have also received numerous letters from you in which you indicate you want a new attorney. Please understand I am not "forcing" you to file a supplemental brief. It is my obligation to explain to you your right to do so, and I have explained that in a previous letter. I raised the issues that I believed were legally supported in your case. It is my opinion that you stand a strong chance of getting a new trial because of the deputies handcuffing you in front of the jury. I appreciate that there are other arguments you wanted to make. I told you from the beginning I would consider everything, and raise what I could.

You have continued to insist that I am not doing a good job representing you because I "work for the state." As I have explained to you numerous times, I do not work for the state. I do not work for Muskegon County. I have only a handful of cases in Muskegon

County every year. Furthermore, the majority of my work is appointed. I do not have clients paying me "6 figures." I have spent a lot of time and effort on your case.

I was able to locate your Facebook, and see the posts. If you'd like, I can send you copies of what I printed. In my opinion, there was nothing in there that was helpful to you at all. Furthermore, subsequent to your arrest, many of the people you referenced as potential witnesses to your suicidal tendencies posted some very negative and quite frankly violent statements regarding you. I do not believe any of them would have been helpful.

If you remain convinced that I am not working for you, please confirm for me that you would like me to formally withdraw from your case and ask the judge for a new attorney for you.

Sincerely,

Melissa Krauskopf



**WESTERN MICHIGAN UNIVERSITY**
Cooley Law School Innocence Project

Marla Mitchell-Cichon
Clinic Director

January 14, 2019

Joshua M. Salyers, #422144
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, MI 49660

Dear Mr. Salyers:

We received and carefully reviewed the information you provided in your letter dated December 2, 2018. The WMU-Cooley Innocence Project may help only those individuals whose case presents a strong claim of factual innocence and meets the criteria for post-conviction DNA testing under MCL 770.16.

We understand that your case is currently on appeal in the Michigan Court of Appeals. The Project is unable to offer you its services at this time, and your file will be closed.

If your appeal to the Michigan Court of Appeals is unsuccessful, please contact us at that time.

Sincerely,

Lori Montgomery
Staff Attorney

DW:lm:cmk
cc:      File # 18-81965

**WESTERN MICHIGAN UNIVERSITY COOLEY LAW SCHOOL**
LANSING CAMPUS
300 SOUTH CAPITOL AVE • LANSING, MICHIGAN 48933
(517) 334-5764  e-mail: innocence@cooley.edu

CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER
CYNTHIA DIANE STEPHENS

MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JAMES ROBERT REDFORD
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK



State of Michigan

# Court of Appeals
## Lansing Office

July 9, 2019

Joshua Michael Salyers, #422144
Oaks Correctional Facility
1500 Caberfac Hwy.
Manistee, MI 49660

    Re:  **People of MI v Joshua Michael Salyers**
    Court of Appeals No. **341162**
    Lower Court No. **16-004697-FC**

Dear Mr. Salyers:

    This Court has received your correspondence with regard to the status of the above matter on July 5, 2019.  Please find attached the July 9, 2019 Opinion which is the decision of this Court.  A copy was also sent to your attorney on the above date.

          Very truly yours,

          Jerome W. Zimmer Jr.
          Chief Clerk

JWZ/las
Encl.
cc:  Melissa Krauskopf
     Charles F. Justian

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN  48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN  48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN  49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN  48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/



**Michigan Supreme Court**
**Office of the Clerk**
Michigan Hall of Justice
P.O. Box 30052
Lansing, Michigan 48909
Phone (517) 373-0120

August 15, 2019

JOSHUA SALYERS, #422144
OAKS CORRECTIONAL FACILITY
1500 CABERFAE HWY.
MANISTEE, MI 49660

      Re: *People v JOSHUA SALYERS, #422144,  Supreme Court No.  160076*
      *Court of Appeals No.  341162*
      *Trial Court No.   Muskegon 16-004697-FC*

JOSHUA SALYERS, #422144,

Your application for leave to appeal from a decision of the Court of Appeals has been received by the
Supreme Court and accepted for filing. By copy of this letter, the prosecuting attorney is advised that
your filing is complete. If the prosecuting attorney chooses to file an answer to the application, it is due
on or before 09/10/2019. MCR 7.305(D). You have the right to file a reply to an answer within 21 days
after the date of service. MCR 7.305(E).

Once all pleadings have been filed in the case, or the time for doing so has passed, the case will be
submitted to the Court for a decision. Most cases are decided within seven to eight months of filing.
That time may be shorter or longer depending on the Court's workload and the complexity of the case.

When the Court issues a decision, this office will provide a copy to all parties of record.

                                     LARRY ROYSTER
                                       Supreme Court Clerk

cc:   CHARLES F JUSTIAN, ASST PROS, Muskegon

Court of Appeals Clerk,                                          10/17/18

My name is Joshua Salyers   case #341162   LC#16-004697-FC
I am writing in Regards for confirmation as to the status
of my appeals. On August 21, 2018 this Court entered an
order for me to file a Standard 4 Brief that is limited
to 50 pages. It was due by 9/18/2018. I had sent
it to Ms. Krauskopf to file it with the Court of Appeals
on 9/5/2018. I have not heard anything from my lawyer
about my Appeal being filed (Standard 4 Brief).

Ms. Krauskopf has not been effective for my case
as she has not gotten all Relevant documents so that
she can thoroughly investigate and perfect Appeal of my
case. I have written letters to the Judge, ~~court of~~ Clerk
of the Court as well as my lawyer so I may obtain
all Relevant documents in Regards to my case to no
avail. I have consistantly Requested new counsel and
for Ms. Krauskopf to withdraw and have me appointed
S.A.D.O counsel who will take my case seriously.

Enclosed is a motion for Leave and Requesting the
Court of Appeals to Remand back to the Lower Court
for S.A.D.O substitute counsel and GRANT a
Reinstatement of 'Right to Appeal' to it's original status
after Sentencing.                     17

Please let me know what is going on Regarding
my case, as my lawyer Refuses to communicate with
me as she is suppose to. Thank You!
                                         Yours Respectfully,

STATE OF MICHIGAN

IN THE COURT OF APPEALS

RETURNED

OCT 2 2 2018

COURT OF APPEALS
THIRD DISTRICT

People of the state of Michigan,

Plantiff-Appellee,

v

Joshua Salyers,

Defendant-Appellant.

Muskegon County Court
Case No. 16-004697-FC
Court of Appeals
Case No. 341162

Appellant's Motion For Leave

From Claim of Appeal/Requesting Oral Argument

Now Comes before the Court, the Appellant, Joshua Salyers in pro se being first duly sworn. Appellant is in pursuant to MCR 7.211 and 7.204

Appellant has appealed his conviction as of 'Right to Appeal'. He was appointed counsel by the trial courts that has been ineffective in representing his issues that are clearly established in his case. Appellant's counsel, Melissa Krauskopf, has failed to obtain all documents pertaining to the case # 16-004697-FC. so that she can, thoroughly, investigate all claims Appellant wishes to raise in the Court of Appeals. Ms. Krauskopf has failed to make her initial visit, in person, so attorney/client can successfully establish a meaningful understanding of the case at hand. On several occasions I've written Ms. Krauskopf in Regards to Removing herself from the case and getting me S.A.D.O substitute appellant counsel. I've even written to the trial judge over my case in Regards to being appointed S.A.D.O substitute and Removing Ms. Krauskopf. Ms. Krauskopf has filed on May 29, 2018 an appeal, motion, and brief before first allowing Appellant's review and consent

-1-

After filing the appeal it had taken Ms. Krauskopf nearly 44 days to supply Appellant with his Trial Transcripts, leaving Appellant only 40 days to write his Standard 4 Brief Raising issues I've, diligently, Requested for her to ~~Raise~~ investigate and Research and Raise. Appellant is not familiar with the law and does not possess the know how to be left without effective assistance of counsel. Ms. Krauskopf has acknowledge that I wish for her immediate withdrawal and the appointment of a S.A.D.O substitute so that I may effectively be assisted with filing my claims with this Honorable Court of Appeals as of Right.

Therefore at this moment Defendant-Appellant is, Respectfully, asking this Honorable Courts to Grant a Reinstatement of 'Right to Appeal' to its first original status after sentencing and Remand to the trial courts for a S.A.D.O substitute to effectively ~~represent~~ ~~and file~~ obtain all documents of Case # 16-004697-FC, investigate, Research, and Represent the Appellant-Defendant in his appeal as of Right.

By /s/ Joshua Salyers
                    Defendant-Appellant

Joshua Salyers # 422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, Mi 49660

RETURNED
OCT 2 2 2018
10/13/18
COURT OF APPEALS
THIRD DISTRICT

-2-

Joshua Michael Salyers #422144
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, Michigan 49660

To the Court of Appeals,

My C.O.A # is 341162 and my Lowe Court # is 16-004697-FC.
I am writing to request information regarding the status of my appeals
as my current appeal attorney has not been responding to any of my letters
and she refuses to withdraw from my case and get me substitute S.A.D.O
Representation. In my Standard 4 Brief I had requested oral argument
so I just wish to know when I will be allowed the opportunity to orally
present my case and whether or not I'm going to be given an evidentiary
hearing for ineffective assistance and all.

Melissa Krauskopf is the currently appeals attorney of my case.

Thank you for your time at the Court of Appeals.

Respectfully,

Joshua Michael Salyers
#422144

12/3/2018



CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
WILLIAM B. MURPHY
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PETER D. O'CONNELL
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER

CYNTHIA DIANE STEPHENS
MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK

**State of Michigan**
**Court of Appeals**
**Grand Rapids Office**

December 10, 2018

Joshua Michael Salyers #422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

Re: **People of MI v Joshua Michael Salyers**
Court of Appeals No. **341162**
Lower Court No. **16-004697-FC**

Dear Mr. Salyers:

This Court received your recent letter inquiring about the status of the above appeal.

After the briefs have been filed and the record obtained from the trial court, an appeal will generally be submitted to a panel of judges for decision in the sequence that it was filed. The progress of your appeal is being monitored, and it will be submitted as soon as possible. Your attorney will be notified of the time and date of case call at least three weeks in advance. Please note, however, that only your attorney will be allowed to present oral argument on your behalf.

I trust this provides you with the information you requested.

Sincerely,

Patricia A. Murray
District Clerk

By Brian Dietrich

PAM/bd

cc: Melissa Krauskopf
Charles F. Justian

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN 48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN 48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN 49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN 48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE – http://courts.mi.gov/courts/coa/

# Court of Appeals, State of Michigan

# ORDER

**People of MI v Joshua Michael Salyers**

Docket No.    **341162**

LC No.    **16-004697-FC**

Jane M. Beckering, Chief Judge Pro Tem, acting under MCR 7.211(E)(2), orders:

The motion to file a brief pursuant to Administrative Order 2004-6, Standard 4, in excess of the 50-page limitation is DENIED for failure to demonstrate extraordinary and compelling reasons requiring the excess length. The brief that was filed is returned with this order. A Standard 4 brief limited to 50 pages in length, MCR 7.212(B), and otherwise substantially conforming to MCR 7.212(C), may be filed within 28 days of the Clerk's certification of this order.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

AUG 2 1 2018
_____
Date

_____
Chief Clerk

Honorable Jane M. Beckering, Chief Judge,

Docket 341162
LC# 16-004697-FC

I have recently sent all I had researched to my lawyer, Melissa Krauskopf, with instructions for her to do what needed to be done to submit my Standard 4, properly, to the Court of Appeals. I do not know what I'm doing and only know how to look stuff up on the Electronic Law Library. Melissa Krauskopf was court appointed to me. Since she's had my case she has 1) Never made a physical visit, only a video visit and I was shackled, 2) She did not allow me to Review her brief (Appeal) before she filed it, 3) Did not, thoroughly, investigate my claims nor did she file anything I asked her to file, 4) She has not given me "All" my court documents. Many transcripts are missing and All evidence and Exhibits are missing.

I have written to the trial courts several times as well as to Krauskopf in regards to getting her off my case and a substitute S.A.D.O attorney, someone who will take their job seriously and will lookout for my best interest. I have written to Mr. Bradley Hall at M.A.A.C.S requesting a S.A.D.O substitute and to have my "Right to Appeal" re-instated back to its original status after sentencing so that my new attorney may acquire The Complete Court Documents so that my lawyer and I can, thoroughly, investigate and file in the Court of Appeals all claims that have merit.

Actions taken by Melissa Krauskopf is depriving me from my Right to defend myself. I am guaranteed by the Constitution of the United States counsel that is EFFECTIVE in defending the defendant/Appellant. Having Melissa as my counsel the justice system is leaving me at the mercy of counsel who is doing nothing asked or requested by me as well as not getting all of the Relevant documents. She filed Appeal without my Review or consent on May 29, 2018 and did not send me what transcripts she did send until a month and a half later and expects me to write a supplement brief, knowing, because I've told her countless times, that I don't know what I'm doing. She has told me to tell her to withdraw and she will but she has not after several letters telling her to get off my case. I have written one last letter to her as I'm sending you this letter telling her to get off my case and I'll admit that I'm not nice about it this time. This is <u>my life</u> she is playing with. I am innocent of murder. I can prove my innocence and Malicious Prosecution and Ineffectiveness of trial counsel as well as a Structural error for Removing initial trial counsel without my request, consent, or knowledge but Melissa is not doing anything to investigate into any of my claims.

I'm requesting substitute counsel from S.A.D.O and asking that my "Right to Appeal" be re-instated so I can put into the Court of Appeals a meaningful opportunity to defend myself and my Rights, Wrongfully and Maliciously, taken from me.

Yours Respectfully,

#422144



CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
WILLIAM B. MURPHY
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PETER D. O'CONNELL
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER

CYNTHIA DIANE STEPHENS
MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JUDGES

JEROME W. ZIMMER JR.
CHIEF CLERK

**State of Michigan**
**Court of Appeals**
**Grand Rapids Office**

September 7, 2018

Joshua Michael Salyers, MDOC #422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

Re: **People of MI v Joshua Michael Salyers**
Court of Appeals No. **341162**
Lower Court No. **16-004697-FC**

Dear Mr. Salyers:

Your letter addressed to Chief Judge Pro Tem Jane M. Beckering has been forwarded to the Clerk's Office for a response. Please be aware that the judges of this Court are precluded from corresponding with individuals whose cases they have heard or may be required to hear in the future.

Matters pertaining to the appointment of counsel remain within the jurisdiction of the trial court during the pendency of an appeal. See MCR 7.208(H). Therefore, you must file a motion to remove or appoint counsel in the Muskegon Circuit Court.

Also, please be aware that on August 21, 2018, this Court entered an order allowing you to file a Standard 4 brief that is limited to 50 pages. Pursuant to the order, such a brief is due on or before September 18, 2018. A copy of the order is enclosed with this letter.

If you have additional questions, you may contact the Grand Rapids Clerk's Office.

Very truly yours,

Patricia A. Murray
District Clerk

By: _____
Kate Budzynski

Enclosure

PAM/kb
cc: Charles F. Justian
Melissa Krauskopf

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN 48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN 48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN 49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN 48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

9/6/18

Melissa,

So I've repeatedly asked for my full complete set of Court Documents. Everything Pertaining To MY CASE. YOU HAVE NOT OBTAINED THEM and if you have I DONT HAVE THEM. That being said proves that you are NOT doing YOUR JOB. which means you are clearly unable to thoroughly investigate this case which therefore renders you INEFFECTIVE. How many more times do I need to tell you or that worthless Piece of shit trial Judge Timothy Hicks that I want S.A.D.O substitute. You still have not even called the people I've asked you to for witnesses. And don't try telling me that you have b/c you'd be a liar. You see one of those witnesses have a piece of mail that is Unopened that will prove that I was Maliciously Prosecuted by at least witness coercion and violation of Federal law and the 6th and 14th Amendments. The prosecutor is not going to be able to claim absolute immunity. But you see you are NOT DOING Your job. I've said it from the beginning and I'll say it again, "I AM INNOCENT and I CAN PROVE MALICIOUS PROSECUTION!! It'd be nice to have that Joshua Guerin, guy to Recant his lies but I don't need it and can still prove that he and officer Smith were Coerced. Your Practice is a damn joke, Melissa. I may not be court smart, know how to write briefs and motions and know how to be an Ass Kisser to be a successful lawyer but I am DAMN SURE smarter than you and knows how to prove someones goddamn innocence. You are doing

nothing to afford me that opportunity. If you were you'd have ALL MY CASE FILES, Exhibits, ROA Reports Discovery, ALL TRANSCRIPTS such as when Hicks removed my initial trial counsel and 2/15/17 when Hicks gave improper legal advice and, without giving me a hearing for ineffective assistance so I can have a lawyer that is going to work for ME, forces me to keep Fred J. Lesica. And NOW Took!!! He Appoints another pathetic lawyer to my case who can't even investigate into my claims, can't make a simple visit to personally discuss this case, can't even get all documents from the courts, can't even send me my trial transcripts until half of my "deadline" is up to file a Standard 4 Brief, can't even accept my calls or write to communicate about my case, can't even allow her client to review the appeal before submitting it, and even more pathetic DOESN'T KNOW WHAT "GET THE FUCK OFF MY CASE" and "GET ME S.A.D.O substitute counsel" means. Regardless of what your Beautiful self has to say, if I was paying you 5-6 figures you would be doing something with my case to succeed but you are worse than a prostitute. At least a prostitute stops fucking you when you pay her. Get off my goddamn case, Melissa, or you're going to have bigger problems than you want. I've been trying to get rid of you for months by letters to you, the judge (trial), Mr. Hall at M.A.A.C.S, to the chief judge Jane M. Beckering. GET ME S.A.DO COUNSEL and get off MY CASE. DO NOT FUCK UP MY APPEAL PROCESS I don't care if you have to ask for complete reinstatement for my "Right to Appeal"

so the S.A.DO counsel can start completely fresh with you. ALL BEAUTY no brains. ⟨signature⟩ - June Schaefer # 422144

so the sentencing after sentencing so the S.A.DO counsel can start completely fresh with you. I'm very disappointed with

its original status after sentencing so the back to its original status from your pathetic excuse of work.



### STATE OF MICHIGAN

MICHAEL E. KOBZA HALL OF JUSTICE
14TH JUDICIAL CIRCUIT COURT
990 TERRACE STREET
MUSKEGON, MICHIGAN 49442-3357

TELEPHONE (231) 724-6337
FAX (231) 724-4587

HON. TIMOTHY G. HICKS
CIRCUIT JUDGE

Joshua Salyers #422144
1500 Caberfae Hwy
Manistee, MI 49660

Re:  File No. 16-4697-FC

Dear Mr. Salyers:

I write in response to your latest letter, received herein September 10.

Generally speaking, the court cannot take any action in a case in response to a letter from one of the parties.   The court's obligations are invoked by a properly filed motion.

You have the services of the State Appellate Defender.   You cannot generally file your own **motions** and simultaneously have counsel. (You can sometimes submit your own briefs in conjunction with counsel) For this reason, we are again forwarding your letter to her and taking no action, as we specified in a prior order in your case.

If you file a motion to ask the court to remove the office of the State Appellate Defender from your case, we will consider it.   But we cannot manage the State Appellate Defender to the extent that we can tell it which attorneys to assign to your case.   You should carefully consider such a request, since both that office and your current counsel have excellent reputations.

From this point on, we will respond to any properly-filed motions. We will not respond to any other letters, nor will we respond to improper motions.

Sincerely,

HON. TIMOTHY G. HICKS
Circuit Judge

TGH:arw
c: Counsel

Joshua Michael Salyers
MDOC No. 422144
Oaks Correctional Facility
1500 Caberfae Hwy.
Manistee, M. 49660

D.C. Case No. 16-179863-FY
C.C. Case No. 16-4697-FC

Clerk of the Court
Hall of Justice, 6th floor
990 Terrace Street
Muskegon, M. 49442

Dear Court Clerk,

I am writing you this day, 8-15-2018, because I'm unable to perfect my appeals without "all" of the court records pertaining to the above captioned case that have been filed with this Honorable Court since date of complaint until sentence date to include: Preliminary, Trial transcripts, pre-trial hearing transcripts, The explanation of removal of initial trial counsel, Witness (es) Statements, Sentencing transcripts, Register of Action, "All" evidence, Medical Reports and Statements, and any and all other pertinent "documents" pertaining to the above captioned case that is relevant to me perfecting my appeals in the Higher Courts.

"A defendant has the burden to establish entitlement to relief."
Under M.C.R 6.508 (D)(3), Relief is not available if the defendant's motion:

Alleges ground for relief other than jurisdictional defects, which could have been raised on appeal from the Conviction and Sentence, or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in a prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief. As used in this subrule, "actual prejudice" means that,

(I) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;

— Page One —

(II) in a conviction entered on a plea of guilty, guilty but mentally ill, or nolo contendere, the defect in the proceeding was such that it rendered the plea an involuntary one to a degree that it would be manifestly unjust to allow the conviction to stand,

(III) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should NOT be allowed to stand regardless of its effects on the outcome of the case,

(IV) in the case of a challenge to the sentence, the sentence is invalid.

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

This defendant respectfully asks the clerk of this Honorable Court to forward All documents in the above captioned case so that this Defendant may perfect his appeals to the Higher Courts, as this is a "capital murder case" and is appealable. I am very grateful for all of your time in meeting my request herein and will be expecting a reply within a reasonable time as court rules dictate. Pursuant to M.C.R. 2.119(3)(C)(8), a fee cannot be charged as this is a criminal case.

Joshua Michael Salyers #422144                    Dated: 8/16/____, 2018

CC: Clerk                    - Page Two -



# COUNTY OF MUSKEGON
## NANCY A. WATERS, COUNTY CLERK

| VITAL RECORDS | ELECTION/CAMPAIGN FINANCE | CIRCUIT COURT RECORDS |
|---|---|---|
| 990 TERRACE ST., 1st FLOOR | 990 TERRACE ST., 1st FLOOR | 990 TERRACE ST., 6th FLOOR |
| MUSKEGON, MI 49442 | MUSKEGON, MI 49442 | MUSKEGON, MI 49442 |
| (231) 724-6221 | (231) 724-6425 | (231) 724-6251 |
| FAX (231) 724-6262 | FAX (231) 724-6262 | FAX (231) 724-6695 |

*16-004697-FC*

August 20, 2018

Joshua Michael Salyers
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, MI  49660

*?*

*8/16/18*

Subject:   Documents

Dear Mr. Salyers:

I am in receipt of a letter dated August 20, 2018, which you requesting me to mail you all of your documents.  Unfortunately, the cost is $1 per page. I see that you have transcripts as well. Transcripts are 30-cents per page.

When you are ready to pay for the documents, I would be happy to mail them out to you.

If you need anything further, please contact your attorney

Sincerely,

*Tracey J. Vold*

Tracey L Vold
Circuit Court Records Coordinator
(231)724-6453
voldtr@co.muskegon.mi.us

*I do not have 10/24/16, 11/29/16, 12/16/16, 2/15/17, 5/31/17, 8/3/17*

*I've also requested all other documents; Exhibits, all photos (scene + Autopsy), R.O.A, Medical Reports + Statements. Everything Pertaining to Case 16-004697-FC.*

*An EEO / AA Employer*
*recycled paper*

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

March 3, 2020

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

160076

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellee,

v

JOSHUA MICHAEL SALYERS,
Defendant-Appellant.

SC: 160076
COA: 341162
Muskegon CC: 16-004697-FC

_____/

On order of the Court, the application for leave to appeal the July 9, 2019 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.





I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 3, 2020

Clerk

s0224

**STATE OF MICHIGAN**

**IN THE COURT OF APPEALS**

PEOPLE OF THE STATE OF MICHIGAN,

              Plaintiff-Appellee,

v

JOSHUA SALYERS,

              Defendant-Appellant.

Muskegon County Circuit No.
2016-4697-FC
Court of Appeals No. 341162

_____/

## DEFENDANT'S MOTION TO REMAND TO LOWER COURT FOR MOTION FOR NEW TRIAL AND/OR EVIDENTIARY HEARING

Now comes Defendant-Appellant, Joshua Salyers, by and through his attorney, Melissa Krauskopf, and hereby moves this Honorable Court to remand pursuant to MCR 7.211(C)(1) for the purpose of an evidentiary hearing on his claim of ineffective assistance of counsel and suppression of his statements to the police for the following reasons:

1. Defendant-Appellant, Joshua Salyers, was convicted following a jury trial of one count of Homicide-1st Degree Premeditated Murder on September 22, 2017, in the Muskegon County Circuit Court. He was sentenced by the Hon. Timothy Hicks on November 1, 2017.

2. Prior to trial, Mr. Salyers's attorney moved to suppress incriminating statements Mr. Salyers made to the police, and an evidentiary hearing was held. The People called Detective Luker to testify at the evidentiary hearing. He testified that he was present during the interview with Mr. Salyers when another detective read Mr. Salyers his *Miranda* rights. (9/5/17 Tr, p. 30).

RECEIVED by MCOA 5/29/2018 9:53:12 PM

3.  The detective did not testify in detail at the hearing as to what Mr. Salyers was
    specifically told in regard to his *Miranda* rights.  Detective Luker testified that Mr.
    Salyers waived his rights and spoke with them.  (9/5/17 Tr, p. 33). Ultimately, Mr.
    Salyers made statements incriminating himself in the death of Barbara Daley.

4.  The interview was recorded, although it was not entered into evidence at the hearing
    and the record does not reflect that the court viewed it before rendering a decision.
    (9/5/17 Tr, p. 39).

5.  The court denied the motion to suppress, finding that Mr. Salyers was "lucid," there
    was no evidence of any physical or mental issues, and that there was no evidence of
    police misconduct.  (9/5/17 Tr, p. 47).

6.  Trial counsel did not make an argument in the trial court that the *Miranda* warnings
    given were inadequate, and the trial court did not consider or make a ruling on that
    issue.

Correct 7.  The Sixth Amendment to the U.S. Constitution guarantees criminal defendants the right
    to the assistance of counsel during their criminal proceedings. *Strickland v.
    Washington,* 466 U.S. 668, 684-85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

8.  In *People v Mathews,* COA No. 339079, (for publication, May 22, 2018), this Court
    recently held that "a general warning regarding 'a right to a lawyer' does not comply
    with the dictates of *Miranda*."  This Court concluded "that the essential information
    required by *Miranda* includes a temporally-related warning regarding the right to
    consult an attorney and to have an attorney present during the interrogation, not merely
    general information regarding the 'right to an attorney'." "It is the right to counsel in

RECEIVED by MCOA 5/29/2018 9:53:12 PM

connection with a custodial interrogation that must be overtly conveyed to a suspect under *Miranda*." See *Mathews*, slip op at 11.

9. Trial counsel did not ask any questions regarding the details of the warnings given to Mr. Salyers, and made no argument in regard to the adequacy of the warnings. The failure to do so cannot constitute reasonable trial strategy. The trial court made no findings on the adequacy of the warnings given.

10. A development of the factual record and a ruling from the trial court is required for appellate consideration of these claims.

For these reasons, Defendant-Appellant Joshua Salyers respectfully requests that this Honorable Court remand this matter to the trial court to allow him to file a motion for a new trial and conduct a hearing in the trial court on the issue of ineffective assistance of counsel and suppression of his statements to the police in regard to the adequacy of the *Miranda* warnings given to him.

Respectfully submitted,

K AND Q LAW, PC

By:      /s/ Melissa Krauskopf
         Melissa Krauskopf (P68278)
         Attorney for Defendant-Appellant
         39520 Woodward Suite 230
         Bloomfield Hills, MI 48304
         (248) 732-2850

Dated: May 29, 2018

RECEIVED by MCOA 5/29/2018 9:53:12 PM

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

               Plaintiff-Appellee,

v

                                                    Muskegon County Circuit No.
2016-4697-FC
Court of Appeals No. 341162

JOSHUA SALYERS,

               Defendant-Appellant.

_____/

**APPEAL BRIEF OF APPELLANT**

**ORAL ARGUMENT REQUESTED**

**E-CERTIFICATE OF SERVICE**

K and Q Law, PC,

By:    /s/Melissa Krauskopf
        Melissa Krauskopf (P68278)
        Attorney for Defendant-Appellant
        39520 Woodward Suite 230
        Bloomfield Hills, MI 48304
        (248) 732-2850

Dated: May 29, 2018

RECEIVED by MCOA 5/29/2018 9:53:12 PM

## TABLE OF CONTENTS

INDEX OF AUTHORITIES CITED................................................................3

STATEMENT OF JURISDICTION..........................................................4

STATEMENT OF QUESTIONS INVOLVED........................................5

STATEMENT OF FACTS..........................................................................6

ARGUMENT I: THE DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN HE WAS HANDCUFFED IN THE COURTROOM IN FULL VIEW OF THE ENTIRE JURY AND THE TRIAL COURT DENIED HIS MOTION FOR A MISTRIAL ........................................................................................................14

ARGUMENT II: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF A FACEBOOK POST PURPORTEDLY AUTHORED BY THE DEFENDANT-APPELLANT WHERE THE POST WAS NOT PROPERLY AUTHENTICATED.......................................................................................16

ARGUMENT III: THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT-APPELLANT'S REQUEST THAT THE JURY BE INSTRUCTED ON THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER................................18

RELIEF REQUESTED................................................................................19

RECEIVED by MCOA 5/29/2018 9:53:12 PM

## INDEX TO AUTHORITIES CITED

**Cases**                                                                    **Page**

*Miranda v Arizona*, 384 U.S. 436 (1966)........................................................6
*Strickland v Washington*, 466 US 668,; 104 S Ct 2052 (1984)...........................16
*People v Armstrong*, 490 Mich 281; 806 NW2d 676 (2011)..............................16
*People v Dunn*, 446 Mich 409; 521 NW2d 255 (1994)...................................14
*People v LeBlanc*, 465 Mich 575; 640 NW2d246(2002)..................................16
*People v Mendoza*, 468 Mich 527; 664 NW2d 685 (2003)...............................18
*People v Bauder*, 269 Mich App 174; 712 NW2d 506 (2005)...........................14
*People v Dixon*, 217 Mich App 400; 552 NW2d 663 (1996)............................14
*People v Horn*, 279 Mich App 31; 755 NW2d 212 (2008)...............................15
*People v Jambor*, 271 Mich App 1,; 717 NW2d 889 (2006)............................17
*People v Mitchell*, 301 Mich App 282; 835 NW2d 615 (2013).........................18
*People v Williams*, 173 Mich App 312; 433 NW2d 356 (1988).........................14

## Constitutions, Statutes, and Court Rules

MCR 2.613(C).................................................................................16
MCR 7.203(A)..................................................................................4
MRE 901(a)....................................................................................17

RECEIVED by MCOA 5/29/2018 9:53:12 PM

3

## STATEMENT OF JURISDICTION

Defendant-Appellant, Joshua Salyers, was convicted following a jury trial of one count of Homicide-1st Degree Premeditated Murder on September 22, 2017, in the Muskegon County Circuit Court. He was sentenced by the Hon. Timothy Hicks on November 1, 2017. He requested counsel be appointed for appeal on November 1, 2017. Melissa Krauskopf was appointed as counsel on November 17, 2017.

This Court has jurisdiction in this appeal as of right pursuant to MCR 7.203(A).

4

RECEIVED by MCOA 5/29/2018 9:53:12 PM

## STATEMENT OF QUESTIONS INVOLVED

I.   WAS THE DEFENDANT-APPELLANT DENIED HIS RIGHT TO A FAIR TRIAL WHEN HE WAS HANDCUFFED IN THE COURTROOM IN FULL VIEW OF THE ENTIRE JURY AND THE TRIAL COURT DENIED HIS MOTION FOR A MISTRIAL?

Defendant-Appellant answers "YES"
Appellee will answer "NO"
The Trial Court answered "NO"

II.  WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF A FACEBOOK POST PURPORTEDLY AUTHORED BY THE DEFENDANT-APPELLANT WHERE THE POST WAS NOT PROPERLY AUTHENTICATED?

Defendant-Appellant answers "YES"
Appellee will answer "NO"
The Trial Court did not answer

III. DID THE TRIAL COURT ERR WHEN IT DENIED THE DEFENDANT-APPELLANT'S REQUEST THAT THE JURY BE INSTRUCTED ON THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER?

Defendant-Appellant answers "YES"
Appellee will answer "NO"
The Trial Court answered "NO"

RECEIVED by MCOA 5/29/2018 9:53:12 PM

5

## STATEMENT OF FACTS

Defendant-Appellant Joshua Salyers was charged with Homicide in the death of his girlfriend, Barbara Daley.  Testimony at trial revealed that Ms. Daley suffered cuts to her throat that caused her death.  The People contended that Mr. Salyers murdered her; Mr. Salyers contended that Ms. Daley killed herself and he was simply trying to stop her.

Prior to trial, the trial court heard several motions from Mr. Salyers and conducted an evidentiary hearing on September 5, 2017, taking testimony on Mr. Salyers' motion to suppress statements he made to the police following Ms. Daley's injury and death.  Mr. Salyers testified at that hearing that he was "not understanding" and "distraught" when being interviewed by the police. (9/5/17 Tr, p. 8).  He could not understand anything, and could not think about anything. (9/5/17 Tr, p. 9).  He described himself as being "in a state of shock" and had no idea what he had said to the police. (9/5/17 Tr, p. 11).

The People called Detective Luker to testify at the evidentiary hearing.  He testified that he was present during the interview with Mr. Salyers when another detective read Mr. Salyers his *Miranda* rights. (9/5/17 Tr, p. 30).  The detective did not testify in detail at the hearing as to what Mr. Salyers was specifically told in regard to his *Miranda* rights.  Detective Luker testified that Mr. Salyers waived his rights, spoke with them, and that he was "fluctuating between being fairly calm and going into these situations where he would you know seem as if he were crying or trying to cry." (9/5/17 Tr, p. 33).  Mr. Salyers "gave a couple of different versions" of what happened. (9/5/17 Tr, p. 34).  The interview was recorded, although was not entered into evidence at the hearing and the record does not reflect that the court viewed it before rendering a decision. (9/5/17 Tr, p. 39).  The court denied the motion to suppress, finding that Mr. Salyers

RECEIVED by MCOA 5/29/2018 9:53:12 PM

6

was "lucid," there was no evidence of any physical or mental issues, and that there was no evidence of police misconduct. (9/5/17 Tr, p. 47).

Trial began on September 19, 2017. The People began their case with Sara Grandinette, who was Barbara Daley's friend and roommate. (Trial Tr. Vol. I, p. 141-142). On September 4, 2016, she and Ms. Daley had a conversation at their home, and then Ms. Grandinette left with some friends to go to a barbecue. (Trial Tr. Vol. I, p. 145). Ms. Grandinette returned home later that day after getting a phone call informing her that there were emergency vehicles at her house. (Trial Tr. Vol. I, p. 146). When she arrived, she saw Mr. Salyers sitting, shirtless, on the front porch. (Trial Tr. Vol. I, p. 147). Mr. Salyers told her that someone, a black male, had attacked Ms. Daley. (Trial Tr. Vol. I, p. 148). She testified that Mr. Salyers was "clearly upset" and was "crying and sobbing." (Trial Tr. Vol. I and II, p. 148, 154).

Ms. Grandinette testified that she had seen Mr. Salyers and Ms. Daley argue over things like what was appropriate for her to wear. (Trial Tr. Vol. II, p. 153). She testified that Ms. Daley's three children lived in the house, along with Mr. Salyers and a few other people. (Trial Tr. Vol. II, p. 158).

The People's next witness was Daniel DeYoung, who testified that on September 4, 2016, he lived down the road from Ms. Daley and Mr. Salyers, and next door to a man named Kevin Sanders. (Trial Tr. Vol. II, p. 162-163). That day, he saw Mr. Salyers and Ms. Daley walking together down the sidewalk across the street from him. (Trial Tr. Vol. II, p. 165). Nothing seemed out of the ordinary, they seemed to be fine, and he watched the two of them going up to the front porch of their house. (Trial Tr. Vol. II, p. 166, 172). He went inside his house to get a cup of coffee, and then came back out. (Trial Tr. Vol. II, p. 167). Shortly afterwards, he saw Mr. Salyers again, walking outside. (Trial Tr. Vol. II, p. 167). A few

RECEIVED by MCOA 5/29/2018 9:53:12 PM

7

minutes later, he saw Mr. Salyers again, "like on a jog." (Trial Tr. Vol. II, p. 168).  Mr. DeYoung testified that he went down his driveway and watched Mr. Salyers go in the front door of his own home. (Trial Tr. Vol. II, p. 169).  He did not see anybody else go inside the home, although he acknowledged that he had gone inside his own house to get coffee. (Trial Tr. Vol. II, p. 169).

Mr. DeYoung testified that he was aware that his next-door neighbor, Mr. Sanders, had surveillance cameras outside his home. (Trial Tr. Vol. II, p. 170).  The People then played a video apparently from Mr. Sanders's cameras, which Mr. DeYoung testified was a "fair and accurate representation" of what he saw that day. (Trial Tr. Vol. II, p. 177).  Mr. DeYoung, however, could not make any comment as to the accuracy of the date and times on the videos, as he did not create them and it was not his camera. (Trial Tr. Vol. II, p. 180).

The People's next witness was Officer Dill.  Officer Dill responded to a 911 call on September 4, 2016, from who turned out to be Mr. Salyers. (Trial Tr. Vol. II, p. 190).  When he arrived, the front door was open and he observed Mr. Salyers kneeling over Ms. Daley, who was in a pool of blood near the bottom of a staircase. (Trial Tr. Vol. II, p. 191-192, 195,211).  Officer Dill told Mr. Salyers, who was panicking, to step out of the house. (Trial Tr. Vol. II, p. 193-194).  Officer Dill also testified that he went in search of a suspect who had been described to him as a black male, but did not locate anybody. (Trial Tr. Vol. II, p. 196).  Officer Dill then went to the hospital where Ms. Daley had been taken. (Trial Tr. Vol. II, p. 197).  After she was pronounced deceased, he waited with her body until the medical examiner arrived. (Trial Tr. Vol. II, p. 197).  He observed that she had bruises on her face and neck, and a cut from one side of her neck to the other side, along with a cut on her right finger and redness on her knees. (Trial Tr. Vol. II, p. 197-199).

8

RECEIVED by MCOA 5/29/2018 9:53:12 PM

The People's next witness was Officer Bringedahl, who was also one of the responding officers at the scene. He observed Ms. Daley laying face down in blood and a cell phone in her hand. (Trial Tr. Vol. III, p. 8). The cell phone was "lit up" and the screen showed the last outgoing phone call to "my husband." (Trial Tr. Vol. III, p. 18). After medical help arrived, Officer Bringedahl went in the kitchen to look for any knives with blood on them. (Trial Tr. Vol. III, p. 10). He testified he was also approached by a man named Doug Carlson, who wanted to show the officer a Facebook post on his phone that he claimed had been made by Mr. Salyers, saying something about "one cut, two cuts, three cuts, four." (Trial Tr. Vol. III, p. 11). The officer took a picture of Mr. Carlson's phone. (Trial Tr. Vol. III, p. 11). The picture was admitted without objection from trial counsel, and the People asked the officer if there was "any other statements from Mr. Salyers on that Facebook page." (Trial Tr. Vol. III, p. 12). Officer Bringedahl testified that there was a "subpost also made from the account of Josh Salyers" that was "you know how I feel about her Doug Carlson." (Trial Tr. Vol. III, p. 12).

The People next called Officer Smith, who testified that he spoke to Mr. Salyers, and Mr. Salyers told him that Ms. Daley had called him and said she was being attacked by a black male. (Trial Tr. Vol. III, p. 41). Officer Smith did in fact make contact with a black male, but quickly determined he was not a part of the case. (Trial Tr. Vol. III, p. 43).

The People next called Officer Anderson, who also had contact with Mr. Salyers that day. Officer Anderson recalled that Mr. Salyers was "very shaken, distraught, on the verge of crying." (Trial Tr. Vol. III, p. 54). He requested that Officer Anderson bring him his cell phone. (Trial Tr. Vol. III, p. 55). Officer Anderson requested that Mr. Salyers come with them to the police department, and he agreed. (Trial Tr. Vol. III, p. 58). Mr. Salyers described Ms. Daley as "his life" and asked if she was still alive. (Trial Tr. Vol. III, p. 58-59).

RECEIVED by MCOA 5/29/2018 9:53:12 PM

9

Detective Luker then testified at the trial. He again testified that Mr. Salyers's version of events changed several times during his interview with the police, and that he was "up and down" through the whole interview. (Trial Tr. Vol. III, p. 68). Prior to ultimately taking responsibility for the cuts, Mr. Salyers did tell Detective Luker that Ms. Daley wanted to commit suicide and that he was trying to stop her. (Trial Tr. Vol. III, p. 71). He told the detective that he had wiped the knife that had been used so that Ms. Daley's prints would not be on it so that nobody would think she was the type of person that would take her own life. (Trial Tr. Vol. III, p. 73).

The People next called Deputy Marci Neel, who testified that she heard Mr. Salyers arguing with another inmate while she was on duty at the jail, and that she heard Mr. Salyers say to the other inmate that he was there for murder and he would slit his throat. (Trial Tr. Vol. III, p. 104). The deputy also testified that she heard Mr. Salyers say "I killed her and now I have to live with it and it's tearing me up inside." (Trial Tr. Vol. III, p. 104). She testified that Mr. Salyers was in a suicide gown, and asked several times to see a psychiatrist. (Trial Tr. Vol. III, p. 106, 109).

The People also called Joshua Guerin, who testified that he was lodged at the Muskegon county jail with Mr. Salyers and that Mr. Salyers had told him he had had a dispute with his girl and he couldn't handle her not wanting to be with him anymore, so he wound up cutting her throat four times. (Trial Tr. Vol. III, p. 126). Mr. Guerin contacted his attorney and was promised that the prosecutor would let his sentencing judge know of his cooperation in testifying against Mr. Salyers. (Trial Tr. Vol. III, p. 127).

The People next called the forensic pathologist, Dr. Amanda Fisher-Hubbard. She performed the autopsy on Ms. Daley. She testified that there were "at least" four incised wounds

RECEIVED by MCOA 5/29/2018 9:53:12 PM

to Ms. Daley's throat. (Trial Tr. Vol. IV, p. 12). Ms. Daley also had some blunt force injuries. (Trial Tr. Vol. IV, p. 13). Dr. Fisher-Hubbard testified that there was nothing in the cuts that she would consider as consistent with hesitation marks, and that the wounds were fairly deep. (Trial Tr. Vol. IV, p. 17). She concluded that it was unlikely that Ms. Daley inflicted the injuries upon herself. (Trial Tr. Vol. IV, p. 18). She did testify that it was possible, although she believed it unlikely, that the wounds could be caused by two people pulling and shoving with a knife at one's throat in a prolonged struggle. (Trial Tr. Vol. IV, p. 25, 28). The doctor testified that Ms. Daley had THC in her blood, but she could not testify as to what effect that may have had on her. (Trial Tr. Vol. IV, p. 33).

The People's final witness was Doug Carlson. He testified that he knew Mr. Salyers and that they would communicate via Facebook, and that he knew it was Mr. Salyers on Facebook because "he would be the only person on his facebook." (Trial Tr. Vol. IV, p. 42). He then identified the Facebook post previously entered through Officer Bringedahl. (Trial Tr. Vol. IV, p. 43). It had been Mr. Carlson's opinion that the Facebook post was regarding Mr. Salyers being suicidal. (Trial Tr. Vol. IV, p. 43).

The People rested following Mr. Carlson's testimony. Mr. Salyers then testified on his own behalf. He testified that he was in a relationship with Ms. Daley. (Trial Tr. Vol. IV, p. 68). He testified that Ms. Daley had had mental health issues and threatened to end her own life using a knife on previous occasions. (Trial Tr. Vol. IV, p. 69-70). On September 4, Mr. Salyers testified that he left the house while Ms. Daley was still there, and then received a phone call from her that worried him. (Trial Tr. IV, p. 75). When he got back to the house, Ms. Daley had a knife in her hand. (Trial Tr. Vol. IV, p. 76). She cut herself, and he shoved her to try and stop her. (Trial Tr. Vol. IV, p. 77). He testified that the other cuts were made during the course of her

RECEIVED by MCOA 5/29/2018 9:53:12 PM

11

struggling with him as he tried to pull the knife away from her. (Trial Tr. Vol. IV, p. 78). He called 911 to summon help, and testified that he was just trying to get the knife away from her and prevent her from harming herself. (Trial Tr. Vol. IV, p. 81). He testified that he did not remember going downtown with the police, and he was overwhelmed with grief. (Trial Tr. Vol. IV, p. 82). He wanted to protect her from losing her kids. (Trial Tr. Vol. IV, p. 101).

Following the close of testimony, and as court was winding down for the day, the court made a record that the jurors, essentially, had seen Mr. Salyers in restraints. The court stated: "What happened this time was this. The audience headed for the door about 10 seconds or maybe less ahead of the jurors. So I think (the prosecutor) suggested my Court Officer (court officer) ought to go out to the hallway to direct traffic, which wasn't a bad idea. The problem then is that I think all 12 jurors were standing to my right in the courtroom when the deputies chained up Mr. Salyers, put the handcuffs on him, and led him out the side door, which of course we try desperately never to have that. So I think there are a couple lessons we need to learn and beyond that I'm not sure what else we do except to memorialize this. I'm not in my heart of hearts seeing a mistrial issue. The deputies have been here throughout. But it's something that should not have happened." (Trial Tr. Vol. IV, p. 140).

The next morning, the court asked if there was anything about the "handcuff hiccup" at the end of the previous day that needed to be discussed, and trial counsel moved for a mistrial, stating "all the jurors were out standing on the courtroom floor and this defendant was handcuffed by the deputies in plain view of every one of them." (Trial Tr. Vol. V, p. 3). The court denied the motion, stating that the sight of Mr. Salyers in handcuffs was "probably not that big of a deal for the jurors" because the deputies had been in the courtroom the whole time and

RECEIVED by MCOA 5/29/2018 9:53:12 PM

there had been testimony that Mr. Salyers had been in jail and had cellmates.  (Trial Tr. Vol. V, p. 5).

The trial court also denied the defense's request for the jury to be instructed on the lesser offense of involuntary manslaughter, finding that there was not a rational view of the evidence that would support the giving of the instruction.  (Trial Tr. Vol. V, p. 11).  The trial court held that  Mr. Salyers's testimony was not consistent with the doctor's testimony and the evidence of blunt force trauma.  (Trial Tr. Vol. V, p. 12).  Ultimately, the jury convicted Mr. Salyers of first degree murder and he was sentenced to mandatory life in prison without parole on November 1, 2017.

The Defendant-Appellant bases his appeal on the foregoing facts.

RECEIVED by MCOA 5/29/2018 9:53:12 PM

## ARGUMENT I

**THE DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN HE WAS HANDCUFFED IN THE COURTROOM IN FULL VIEW OF THE ENTIRE JURY AND THE TRIAL COURT DENIED HIS MOTION FOR A MISTRIAL**

### STANDARD OF REVIEW

A trial court's decision on a motion for a mistrial is reviewed for an abuse of discretion. *People v Bauder*, 269 Mich App 174, 194; 712 NW2d 506 (2005).  Furthermore, a decision to restrain a defendant is also reviewed for an abuse of discretion.  *People v Dixon*, 217 Mich App 400, 405; 552 NW2d 663 (1996).

### PRESERVATION OF THE ISSUE

This issue was preserved by trial counsel's motion for a mistrial.

### ANALYSIS

Freedom from shackling is an important component of a fair trial.  *People v Williams*, 173 Mich App 312, 314; 433 NW2d 356 (1988).  Restraints should be permitted only to prevent the escape of the defendant, to prevent the defendant from injuring others in the courtroom, or to maintain an orderly trial.  *People v Dunn*, 446 Mich 409, 426; 521 NW2d 255 (1994).

Here, the record is clear that deputies handcuffed Mr. Salyers in the courtroom in full view of the entire jury.  The record is also clear that this was not done on the trial court's orders, but mistakenly.  The fact that it was not done purposefully does not render it harmless; if anything, it makes the error worse.  Normally, when restraints are permitted in the courtroom, a trial judge has undertaken a careful analysis that it is absolutely necessary to maintain safety and security in the courtroom.  No such analysis was done here.  The record is bereft of any evidence that Mr. Salyers was a flight risk or posed a danger; indeed, he had sat peacefully without

RECEIVED by MCOA 5/29/2018 9:53:12 PM

14

incident through three days of trial and had previously testified in the same courtroom in an evidentiary hearing with no issue.

Caselaw holds that a defendant is not prejudiced if a jury cannot see restraints on a defendant. See *People v Horn*, 279 Mich App 31, 37; 755 NW2d 212 (2008). Here, though, the restraints were visible. The handcuffing did not occur in the hallway or corridor; it occurred in the courtroom with the jury still present. The trial court judge and trial counsel made a full record that the jury saw Mr. Salyers being handcuffed by the deputies as everyone was present in the courtroom, unlike defendants in other cases whose restraints were placed on in hallways, or whose restraints were obscured from the jury's view by skirted tables or placement of desks.

In denying trial counsel's motion for a mistrial, the court found that there was no prejudice because there had been testimony about Mr. Salyers being in jail and having cellmates. This ruling fails to appreciate the nature of the prejudice that occurs when a jury sees a restrained defendant. It is not merely a danger of a jury concluding that a defendant is incarcerated; a number of other possible influences or conclusions can occur from seeing someone handcuffed. In this case, Mr. Salyers was accused of a violent and assaultive crime. His theory of the case rested in great deal on the jury's assessment of his credibility and belief in his testimony. The prejudice of the sight of handcuffs was not that the jury would conclude that Mr. Salyers was incarcerated; it was that the sight of the handcuffs would cause the jury to believe that Mr. Salyers was dangerous and violent, lending credence to the prosecutor's theory and making his testimony less credible. The trial court abused its discretion by failing to consider the nature of the prejudice and abused its discretion in denying trial counsel's motion for a mistrial.

RECEIVED by MCOA 5/29/2018 9:53:12 PM

## ARGUMENT II

**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF A FACEBOOK POST PURPORTEDLY AUTHORED BY THE DEFENDANT-APPELLANT WHERE THE POST WAS NOT PROPERLY AUTHENTICATED**

### STANDARD OF REVIEW

The determination of whether a person has been denied the effective assistance of counsel comprises a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Where the trial court finds certain facts in relation to a claim of ineffective assistance of counsel, those findings are reviewed for clear error. MCR 2.613(C); *LeBlanc* at 579. Also, whether the facts establish ineffective assistance of counsel involves a question of constitutional law, which is reviewed de novo. *Id.*

### PRESERVATION OF THE ISSUE

The error is apparent on the record.

### ANALYSIS

The Sixth Amendment to the United States Constitution guarantees to a criminal defendant the right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052 (1984). A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel. First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable. *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011).

16

RECEIVED by MCOA 5/29/2018 9:53:12 PM

Here, the People admitted into evidence, without objection, through Officer Bringedahl's testimony, a photograph of a Facebook post on Doug Carlson's phone. Officer Bringedahl testified that he was told by Mr. Carlson that the Facebook post was authored by Mr. Salyers, and it discussed "four cuts" and "ending the pain for real." (Trial Tr. Vol. III, p. 11).

"The burden rests with the party seeking to admit the evidence to show that the foundational prerequisites have been satisfied." *People v Jambor*, 271 Mich App 1, 5; 717 NW2d 889 (2006). MRE 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Officer Bringedahl could not have laid the proper foundation to admit the Facebook post. He did not know Mr. Salyers, or Mr. Carlson, and could have no way of knowing whether the post was what the People alleged it to be. Furthermore, Officer Bringedahl's entire conversation with Mr. Carlson was hearsay. Admitting the post through the officer was not permissible, and the erroneous admission was not harmless. It was not harmless because although Mr. Carlson testified later in the trial, the prosecutor was absolved of the burden of properly authenticating the post through him as it had already been erroneously admitted through the officer. Furthermore, again, this case rested very much on Mr. Salyers's credibility and believability with the jury. To have the post admitted through a police officer insinuated to the jury that this was evidence that had an air of credibility to it because the police investigated it and the officer testified that it was Mr. Salyers's words.

Because Officer Bringedahl could not have properly authenticated the post, trial counsel's performance fell below an objective standard of reasonableness when he failed to object to its admission through the officer. For the reasons outlined above, the error was not

17

RECEIVED by MCOA 5/29/2018 9:53:12 PM

harmless.  In addition to being a credibility issue, the People also used the post to argue that Mr. Salyers premeditated the incident..  The People spent a good deal of time in opening and closing discussing their view of Mr. Salyers's premeditation and the Facebook post was part of the People's argument.  It was therefore not harmless to fail to object to its improper admission.

### ARGUMENT III

**THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT-APPELLANT'S REQUEST THAT THE JURY BE INSTRUCTED ON THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER**

#### STANDARD OF REVIEW

A claim of instructional error involving a question of law is reviewed de novo.  The trial court's determination that a jury instruction applies to the facts of the case is reviewed for an abuse of discretion.  *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013).

#### PRESERVATION OF THE ISSUE

The issue was preserved by trial counsel's timely request for the instruction at trial.

#### ANALYSIS

When a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence.  See *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003).  Trial counsel requested that the jury be instructed on involuntary manslaughter.  The trial court denied that request, finding that a rational view of the evidence did not support Mr. Salyers's version of events.  The trial court acknowledged that the medical examiner admitted Mr. Salyers's version was possible and said "so there is some testimony but that's simply not a rational view of the evidence here." (Trial Tr. Vol. V, p. 11).  In so holding, the trial court conflated its opinion of the evidence with a rational view of the evidence.  Mr. Salyers testified as to what happened, and the medical examiner

RECEIVED by MCOA 5/29/2018 9:53:12 PM

18

acknowledged that it was possible. A rational view does not mean the only view, or a view

beyond a reasonable doubt, or a view that the trial court thinks makes the most sense. It simply

means there is rational evidence to support the request. The trial court, therefore, erred when it

denied the request to instruct the jury on involuntary manslaughter.

## RELIEF REQUESTED

Defendant-Appellant, therefore, respectfully requests that this Honorable Court vacate

his convictions and remand to the trial court for a new trial.

Respectfully submitted,


By:     /s/Melissa Krauskopf
        Melissa Krauskopf (P68278)
        Attorney for Defendant-Appellant
        39520 Woodward Suite 230
        Bloomfield Hills, MI 48304
        (248) 732-2850

Dated: May 29, 2018

RECEIVED by MCOA 5/29/2018 9:53:12 PM

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

JOSHUA MICHAEL SALYERS,

          Defendant-Appellant.

UNPUBLISHED
July 9, 2019

No.  341162
Muskegon Circuit Court
LC No.  16-004697-FC

Before: BECKERING, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction for first-degree premeditated murder, MCL 750.316. He was sentenced to life in prison. We affirm.

## I. BACKGROUND

Defendant's conviction arose from the death of his girlfriend Barbara Daley. On September 4, 2016, defendant made the 9-1-1 call reporting that his girlfriend was cut and bleeding. First responders arrived to find Barbara lying on the floor in a pool of her own blood, beaten, and with multiple cuts across her neck. Barbara was found alive and died some hours later at the hospital. Medical examiner Dr. Amanda Fisher-Hubbard concluded that the cause of Barbara's death was "cutting" and "[m]ultiple injuries including blunt and sharp force." She also opined that "[t]he lack of hesitation marks, the wound that she had on her finger as well as the additional blunt force injuries that she had" made it highly unlikely that Barbara caused her own death. Defendant initially claimed that he had seen an unknown black male run out the backdoor of the home and blamed him for Barbara's assault. He later abandoned that story. Defendant also gave multiple versions as to how the cuts on Barbara's neck occurred. He eventually settled on an account where Barbara had planned to take her own life and she and the defendant wrestled with a knife resulting in further cutting, injury, and death. At trial, the jury heard that Barbara had planned to leave the defendant and had not communicated suicidal ideations to anyone. Her neighbor, Doug Carlson, testified that he approached Officer Casey Bringedahl at the scene and showed him a Facebook post transmitted six hours prior to the officer's arrival from an account with the name "Josh Salyers" that read, "one cut, two cuts, three cuts, four. What I have in my mind will ease this pain for real," and with a sub post of "you know how I

feel about her Doug Carlson." Defendant requested that the jury be instructed on involuntary manslaughter based on his testimony that Barbara's neck was cut as they struggled for the knife. The court denied the instruction. The jury subsequently found defendant guilty of first-degree premeditated murder. He appealed the verdict and during the pendency of this appeal, he unsuccessfully motioned this Court to remand his case to the trial court for an evidentiary hearing on a claim of ineffective assistance of counsel.

## II. SHACKLING

Defendant first argues that he was denied a fair trial when he was handcuffed while the jury was still in the courtroom. He also contends that the trial court abused its discretion when it denied his motion for a mistrial on the same ground. We disagree with both contentions. We review for an abuse of discretion the trial court's decision to restrain a defendant and it decision on a motion for a mistrial. *People v Dixon*, 217 Mich App 400, 404-405; 552 NW2d 663 (1996); *People v Ortiz–Kehoe*, 237 Mich App 508, 513; 603 NW2d 802 (2000). An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Ortiz–Kehoe*, 237 Mich App at 513–514.

"Freedom from shackling is an important component of a fair trial." *Dixon*, 217 Mich App at 404. Handcuffing a defendant during trial should only be done in extraordinary circumstances. *People v Jankowski*, 130 Mich App 143, 146; 342 NW2d 911 (1983). A defendant "may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994). "[T]he prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom." *People v Horn*, 279 Mich App 31, 37; 755 NW2d 212 (2008).

It is undisputed that the court did not order that the defendant be shackled. Further, this defendant was not shackled in the courtroom except on this one occasion and at all other times was brought into the courtroom before the jury and exited after the jury. However, on the day in question, the defendant was shackled while the jury was still present. The court immediately made a record of the incident and the court's factual statements were undisputed by either counsel or the defendant. The court noted that on the day of the incident there was a large crowd present which began to leave the courtroom prior to the jury being excused. The court noted that the deputies were left to manage the jury, the crowd, and the defendant, and chose to control the crowd and remove the defendant in handcuffs prior to escorting the jury from the courtroom. The court found that the shackling was a mistake made by the deputies and was viewed by the jury. Defense counsel made an objection to the shackling the next day and requested a mistrial. The court found that the shackling was done to maintain order and for public safety, and that it did not prejudice the defendant. It was not an abuse of discretion, in light of the uncontroverted facts, for the court to determine that the shackling was for the purposes of public safety and for transporting the defendant out of the courtroom. Thus, this shackling was not prohibited under these circumstances. *Horn*, 279 Mich App at 37. We then turn to the issue of prejudice to the defendant. *Id*. The burden is on the defendant to establish prejudice, *Id.*, however, "[i]f it is determined that the jury saw the defendant's shackles" the prosecution must "demonstrate

beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant," *People v Davenport*, 488 Mich 1054; 794 NW2d 616 (2011). The court made a finding that the defendant was shackled while the jury was still in the courtroom and inferred that this was seen by the jurors. That finding was not contested. Therefore, the prosecution bears the burden of proving beyond a reasonable doubt that the incident did not contribute to the verdict. Defense counsel argues that the court failed to appreciate the effect of a defendant who was accused of a violent crime being handcuffed. However, as the court noted, again without objection, the defendant had almost flippantly testified that he resided in the jail at the time of trial and other witnesses also noted other jailhouse interactions. Thus, defendant's in-custody status was already known by the jury. The actual shackling of the defendant whose custodial status was known was done with the defendant's physical cooperation and without rancor. The court's finding of an absence of prejudice from the shackling was supported by the record and not the product of court error.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues by way of his attorney's brief and a Standard 4 Brief, that he received ineffective assistance of trial counsel. We disagree.

"To establish ineffective assistance of counsel, the defendant must first show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v Toma*, 462 Mich 281, 302–303; 613 NW2d 694 (2000).

In his attorney's brief, defendant argues that trial counsel was ineffective for failing to object to Officer Bringedahl's testimony concerning the Facebook post he saw on Carlson's phone. He argues that only Carlson would have been able to authenticate the post and that Officer Bringedahl's entire conversation with Carlson was inadmissible hearsay. Both arguments are meritless.

We agree that evidence must be authenticated. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). An example of "authentication or identification conforming with the requirements of" MRE 901 is "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1). We also agree that the admissibility of hearsay is constrained. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay evidence is not admissible at trial unless within an established exception." *People v Meeboer*, 439 Mich 310, 322; 484 NW2d 621 (1992); MRE 802. "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... offered against a party and is ... the party's own statement. . . .". MRE 801(d)(1), (2)(a). However, since the defendant himself admitted making the Facebook post and receiving the subsequent response from Carlson, it is of no consequence whether Carlson authenticated the post prior to Officer Bringedahl's testimony or not. Because both Carlson and the defendant later authenticated the post, there was no prejudice to the defendant. Additionally, had an objection been made on hearsay grounds, the

prosecutor could have argued that the officer's testimony went not to the truth or meaning of the post but to providing a context for his later investigations and interrogations in this case. The statement's impact was not as the Standard 4 Brief argues, amplified because it was first heard from the mouth of an officer. The jury was instructed that it was to examine a police officer's testimony just as it would any other witness's, and "[i]t is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant also argues that trial counsel should have objected to Officer Bringedahl's testimony on grounds that the officer's conversation with Carlson was inadmissible hearsay. Defendant cannot demonstrate ineffective assistance of counsel on these grounds or that but for counsel's failure to object, the outcome of his trial would have been different, because substantially the same information was testified to later at trial by Carlson and the defendant.

Defendant raises additional claims of ineffective assistance of counsel in his Standard 4 Brief that are unpreserved for failure to raise them in a motion for a new trial or a motion for a *Ginther*[1] hearing. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Unpreserved claims of ineffective assistance of counsel are reviewed for mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). "If the record does not contain sufficient detail to support defendant's ineffective assistance claim, then he has effectively waived the issue." *Id.*

*[handwritten margin note: I ask in the letter that my Appellate Counsel — she didn't!]*

Defendant first argues that trial counsel was ineffective for failing to call 14 witnesses in his defense. "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A defense is substantial if it might have made a difference in the outcome of the trial." *People v Hyland*, 212 Mich App 701, 710; 538 NW2d 465 (1995), vacated in part on other grds 453 Mich 902; 554 NW2d 899 (1996). Defendant presents a synopsis, or offer of proof as to what he believes each person would testify to, however without an affidavit from each of these individuals, defendant's assertion that their testimony would have been favorable is speculative.

Defendant next argues that trial counsel was ineffective for not suppressing statements defendant made to Officers Smith and Anderson, and for not moving to have the police cruiser video admitted into evidence. "Whether a statement was voluntary is determined by examining police conduct, but the determination whether it was made knowingly and intelligently depends, in part, on the defendant's capacity." *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). At the hearing, defendant testified that he did not feel like the officers put a lot of pressure on him to provide a statement. Defendant's claim was rather one of not being able to remember. Absent any evidence of police misconduct in obtaining defendant's statement or that defendant was impaired, admission of the video would not have changed the outcome of the motion.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

*[handwritten margin note: This Court cannot read! This is NOT the claim in my brief.]*

-4-

Defendant also argues that trial counsel was ineffective for failing to investigate forensic evidence such as pubic hair, materials removed from the crime scene, and the fingerprints lifted from crime scene surfaces and materials. "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (quotation marks, brackets, and citation omitted). Because defendant does not dispute that only he and Barbara were present at the Jiroch address during the cutting incidents, the failure to test certain pieces of forensic evidence did not undermine confidence in the trial's outcome. Defendant also argues that there were errors in the medical examiner's report that trial counsel failed to investigate. However, he neither appended the report nor provided any explanations of the errors therein. This argument is, therefore abandoned. MCR 7.212(C)(7); *People v Kelly*, 231 Mich App 627, 640–41; 588 NW2d 480 (1998).

Defendant last argues that trial counsel was ineffective in his closing statement to the jury. Trial counsel clearly argued defendant's theory of the case, which was consistently that Barbara sustained the last cuts on her neck by wrestling with the defendant. The fact that this strategy was not successful did not render counsel ineffective. See *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001) ("That the strategy Gorosh chose ultimately failed does not constitute ineffective assistance of counsel."). Summarily, there are no apparent mistakes on the record to support defendant's ineffective assistance of counsel claims.

## IV. EVIDENTIARY ERROR

Defendant argues by way of his Standard 4 Brief, that the trial court erred when it agreed with the prosecution that comments made by others in response to his "one cut, two cut, three cut, four" Facebook post were inadmissible hearsay for which there was no exception. We disagree.

To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal. MRE 103(a)(1)." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). This issue was not preserved for appeal because defendant's objection below is not the same on appeal. In the trial court, defendant argued that the comments should be admitted out of fairness to the defendant and for context to the conversation. On appeal, defendant argues that the trial court's decision to exclude the evidence violated his constitutional right to present a defense. We review unpreserved issues for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"Few rights are more fundamental than that of an accused to present evidence in his ... own defense." *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008). That right however, is not absolute. "The right to present a complete defense may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012) (quotation marks and citation omitted). For example, an "accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984) (quotation marks and citation omitted). "The Michigan Rules of Evidence do not infringe on a defendant's constitutional right

to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve." *King*, 297 Mich App at 474 (quotation marks and citation omitted).

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay evidence is not admissible at trial unless within an established exception." *Meeboer*, 439 Mich at 322; MRE 802.

Here, the prosecutor filed a motion in limine to exclude and defendant sought to introduce a chain of comments posted on Facebook that included his "one cut" post and the comments from others in response to that post. The argument offered by the defendant was that the comments of others provided "context" for the "one cut" post by the defendant to show that others believed the post was suicidal rather than homicidal. Those comments included one from Sheronda who wrote, "don't talk like that," and a responsive post by Carlson, "quite [sic] being so self-loathing, the world will move on." What defendant describes as context is actually the truth of the matter asserted by the commentators. Defendant does not offer, nor do we find, a hearsay rule under which those statements are admissible as substantive evidence. At best, those responses could have been used to impeach the commentators. He also offered his own post in that chain which read, "goodbye I'm sorry, Jamestown story with lyrics." The court reviewed the posts and found that comments from defendant where he talked about himself were inadmissible under MRE 801(d)(2). The court's decision did not deprive defendant of the right to present a defense. Under MRE 801(d)(2), a party's own statements are admissible as an exception to the hearsay rule when they are offered against the party by a party-opponent. Here the party sought to admit the statement in his own favor. Further, defendant's rebuttal to the prosecutor's assertion that the post was an expression of homicidal intent was placed before the jury when defendant testified that the "one cut" post expressed his suicidal, not homicidal ideation.

Defendant also argues that the trial court should have admitted the excluded posts and the contents of other social media sites. Defendant has not identified either the statements or the authors of those additional statements on appeal. We therefore find defendant's Standard 4 Brief arguments abandoned for defendant's failure to brief the merits of his allegation, *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004), or waived for failure to object, *People v Carter*, 462 Mich 206, 218; 612 NW2d 144 (2000).

## V. JURY INSTRUCTIONS

Defendant argues that the trial court abused its discretion when it denied him an instruction on the lesser included offense of involuntary manslaughter when the instruction was supported by a rational view of the evidence. We agree, but find that the error was harmless.

"This Court reviews de novo claims of instructional error." *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006), aff'd 482 Mich 851; 752 NW2d 457 (2008). "[A] trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Hawthorne*, 265 Mich App 47, 50; 692 NW2d 879 (2005). An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Babcock*, 469 Mich at 269. "Manslaughter is a

necessarily included lesser offense of murder." *People v Gillis*, 474 Mich 105, 137; 712 NW2d 419 (2006), citing *People v Mendoza*, 468 Mich 527, 544; 664 NW2d 685 (2003). "[W]hen a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Mendoza*, 468 Mich at 541.

Defendant proposed the jury be instructed on involuntary manslaughter under a theory of gross negligence under M Crim JI 16.10. The court denied the request holding that no rational view of the evidence would support instructing the jury on involuntary manslaughter. We hold that the court's decision was an abuse of discretion. The instruction was rationally supported by defendant's testimony that he had not intended to kill Barbara, but due to his careless and reckless actions, she died. Medical examiner Dr. Fisher-Hubbard testified that Barbara's cause of death was "cutting" and "[m]ultiple injuries including blunt and sharp force." Defendant testified that he and Barbara struggled over the knife and that his actions, while intended to interrupt and stop the suicide, actually caused further injury which led to her death. Medical examiner Dr. Fisher-Hubbard agreed with defense counsel that it was possible that the cuts across the trachea and the jugular vein could have been caused by two people pulling and shoving with a knife at the throat. Defendant further testified that during the struggle, Barbara fell multiple times on her face. Dr. Fisher-Hubbard agreed that Barbara's facial contusions, injuries to her teeth, and cut on her knee could have been the result of multiple falls or from a combination of being struck by something plus falling.

The trial court's failure to give the instruction however constituted harmless error in light of the evidence of defendant's overwhelming guilt. *Gillis*, 474 Mich at 140 n 18. Carlson testified that the night before her death, Barbara wanted to end her relationship with the defendant. Hours before her murder, defendant made a public post on social media that "one cut, two cuts, three cuts, four" would ease his pain. Defendant testified he waited until everyone left and Barbara was alone to go to the house. Sanders' security cameras and DeYoung's testimony placed defendant in the house around the time of the murder and leading up to the arrival of first responders. When officers arrived defendant had Barbara's blood all over him. Defendant initially blamed the murder on a "black male." After that identification failed, he changed his story to that of trying to prevent Barbara from committing suicide. The medical examiner testified that Barbara suffered four cuts to her throat, none of which was self-inflicted. She was also severely beaten. The jury heard defendant's version of events, and when given the choices on the jury form to find defendant guilty of first-degree or second-degree murder, it found defendant guilty of first-degree murder. Thus, even had the instruction been given, defendant's testimony would not have persuaded the jury to convict defendant of any charge lesser than first-degree murder.

## VI. REMAINING CLAIMS OF ERROR

Defendant's remaining Standard 4 Brief claims are without merit.

Defendant argues that he was denied his Sixth Amendment right to counsel when the trial court substituted his trial counsel without his approval or notice. The record contains evidence that defendant had multiple persons appear on his behalf from the Public Defender Office during these proceedings. There is no record of defendant objecting to substitution of his counsel until this appeal. We find such silence to waive any argument on appeal. *Carter*, 462 Mich 214-219.

Defendant also claims that multiple incidents of prosecutorial misconduct denied him a fair trial.  Defendant made no contemporaneous objections to the prosecutor's statements, thereby failing to preserve them for appeal.  *People v Thomas*, 260 Mich App 450, 453–454; 678 NW2d 631 (2004).  Having reviewed defendant's claims, defendant failed to show that he was prejudiced by plain error.  Therefore, reversal is not warranted on this basis.  *Unger*, 278 Mich App at 235.

Affirmed.

/s/ Jane M. Beckering
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

V

Muskegon County Circuit No.
2016-4697-FC
Court of Appeals No. 341162

JOSHUA SALYERS,

Defendant-Appellant,

STANDARD 4
APPEAL SUPPLEMENT BRIEF OF APPELLANT
ORAL ARGUMENT REQUESTED

By:   /s/ Joshua Salyers
      Joshua Salyers #422144
      Defendant-Appellant
      1500 Caberfae Highway
      Manistee, Mi 49660

-1-

<u>Statement of Jurisdiction</u>

Appellant was sentenced in Muskegon County Circuit Court on November 1, 2017. Appellant counsel has already filed a brief on this matter on May 29, 2018. In addition to the statement of jurisdiction noted in the original brief on appeal, defendant-Appellant refers this Court to administrative order 2004-6 minimum standards for indigent criminal appellate defense services standard 4, which allows a defendant-Appellant to file pro per brief raising issues that his/her counsel refused to raise.

## Statement of Facts

In addition to the statement of facts cited in the brief on appeal submitted by Appellant's attorney, Defendant-Appellant further states: I Defendant refers this Court to the Statement of Facts contained in defendant-Appellant's initial brief on appeal.

I.

Defendant - Appellant was denied Constitutional Rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four day trial.

## Standard of Review

Defendant may raise an ineffective assistance of counsel claim for the first time on appeal because it involves a constitutional error that likely affected the outcome of the trial. People v Henry, 239 Mich App 140, 146; 607 NW2d 767 (1999). The performance and prejudice prongs of an ineffective assistance of counsel claim are mixed questions of law and fact Reviewed de novo. Strickland v Washington, 466 US 668, 698; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

## Preservation of the Issue

Because this issue involves the ineffective assistance of counsel, no objection was necessary in order to preserve this issue for appeal. It would be unreasonable and illogical to require trial counsel to preserve the issue of his own ineffectiveness, and this Court's failure to consider this issue would be a miscarriage of justice. Ornelas v United States, 517 US 690; 116 S Ct 1657; 134 L Ed 2d 911 (1996)

## Analysis

The Constitution guarantees a Defendant's right to the effective assistance of counsel. US Const Am VI; Powell v Alabama, 287 US 45; 53 S Ct 55; 77 L Ed 158 (1932); Johnson v Zerbst, 304 US 458; 58 S Ct 1019; 82 L Ed 1461 (1938); Gideon v Wainright, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963). The purpose of ensuring a fair trial is the guiding principle behind the constitutional guarantee of effective assistance. Id. at 686; US Const VI, XIV; Const 1963, art 1, § 20.

Proving a claim of ineffective assistance of counsel requires that the defendant demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, supra, at 687; Pickens, supra, at 309. In challenging counsel's reasonableness, the defendant must overcome the presumption that the challenged action could have been sound trial strategy. Grant, at 485

Effective assistance requires that defense counsel make reasonable investigations into the prosecution's case and into various defense strategies. Kimmelman v Morrison, 477 US 365, 384; 106 S Ct 2574; 91 L Ed 2d 305 (1986). Ineffective assistance of counsel can be premised on a failure to call witnesses or present other evidence which would have supported a substantial defense that might have made a

-4-

difference in the outcome of the trial. People v Hoyt, 185 Mich App 531, 537-538 (1990). In order to overcome the presumption of sound trial strategy, the defendant must show that counsel's failure to prepare resulted in a failure to present valuable evidence that would have substantially benefited the accused. People v. Caballero, 184 Mich App 636, 640-642 (1990). It is counsel's duty to provide competent assistance and to avoid serious mistakes. People v Garcia, 398 Mich 250; 247 NW2d 547 (1976). Failing to file a motion, when the motion would have been granted, will establish a claim of ineffective assistance of counsel. People v Thomas, 184 Mich App 480; 459 NW2d 65 (1990).

The failure of the defense counsel to investigate and call exculpatory witnesses may amount to ineffective assistance of counsel, where the missing testimony affected the outcome of the trial.  Compare People v Johnson, 451 Mich 115; 545 NW2d 637 (1996) (failure to call six witnesses in murder case....); People v Bass, 247 Mich App. 385; 636 NW2d 781 (2001) (unexplained failure to call two witnesses known before trial that defendant was not......); People v Grant, 470 Mich 477; 684 NW2d 686 (2004) (defense trial counsel was ineffective in failing to interview and call witnesses..).

In the instant case, had defense trial counsel investigated into the prosecution's case and into the Defendant-Appellant's defense, defense trial counsel would have had presented the evidence proving that (1) There was no life threat to Eric Emory nor a confession of committing murder, of the instant case, (2) Defendant-Appellant's facebook posts are about himself thinking of cutting himself, properly, being 4 cuts, (3) the alleged victim, Barbara Dailey, has self-inflicted scars and cigar burn scars due to her past of being sexually assaulted and being raised by a drug addict and cutter, Wendy Brown, Barb's Guardian, (4) Barbara did not sustain 4 cuts, the Autopsy report documents 6 cuts. (5) Photos prosecution suppressed may have revealed the past self-inflictions that was neither disclosed by the prosecution or the M.E.'s Autopsy report, (6) The Defendant-Appellant could not have confessed to Joshua Guerin as he was never around Mr. Guerin as he was moved 6/28/17 to M-Pod and placed in a suicide gown for 3 weeks until seeing Jennifer Swanger, the mental health liasian, (7) the knife that the prosecution claims to be the knife used is NOT a chef/butcher knife nor is it close to being "long like a bread knife and shaped as a big steak knife," (8) defense trial counsel would have not allowed incorrect surveillance footage to be used.

But for trial defense counsel's errors, and lack of due diligence and his deficient performance, the evidence against Defendant-Appellant was not sufficient to render a verdict of guilty.

Defendant-Appellant was denied his right to effective assistance of counsel where trial counsel failed to (1) affirmatively assist in the Defendant-Appellant's defense, (2) not conferring with his client, (3) taking vacations in Florida during the pretrial process, (4) complaining to the client about the pain he is in from surgery and is why he's been unable to work on the motions and to meet with client to work on the defense, to call and interview witnesses including an expert witness, (5) to subject the prosecution to meaningful adversarial testing in both the Suppression

hearing on 9/5/2017 and throughout the trial process as a whole, (6) build a substantial substantial defense to present, (7) to effectively cross-examine state's witnesses and impeach them, (8) to turn over all the discovery material requested by Defendant-Appellant, and during the closing argument (9) defense trial counsel tells the Jury, "How do you kill yourself? You kill yourself by cutting your wrists. One, two, three, four. Not, you know, kill yourself by cutting your throat four times. That's, you know that's not possible."

Counsel made no efforts to present witnesses whose testimony, even if not conclusive, would have been useful. Counsel had barred his client from introducing witnesses and present admissible evidence he had that would have emphasized all the flaws in the state's case regarding the incorrect video surveillance, the "confessions" to inmates, the number of cuts, the inconsistencies of the state's speculative theory. For counsel to do this cannot be considered trial strategy.

Witnesses: Eric Emory — would have testified that I did not threaten to "slit his throat and watch him lay there", or say, "I killed her and now I have to live with it." He would testify that detectives had come to speak with him regarding the argument and he's told them that I did not threaten his life nor did I "confess" but had actually told him I was only trying to prevent a suicide.

Kierelle Burns — would have testified that I was moved to M-Pod, 3 days after he read an article written about me on 6/25/17, on 6/28/17 and placed in a suicide gown, which is in violation of jail policy, for 3 weeks before seeing the Mental Health Liasion, Jennifer Swanger, on July 21, 2017. Therefore, I could not have been in A-pod with Joshua Guerin at anytime to have "confessed" to him.

Jennifer Swanger — Could have testified that she was unaware that I was placed on "suicide status" and in a suicide gown until she had asked to have me called out on July 21st 2017. She could tell you that it had to have been a while since I last was allowed to shower because I looked disgusting and smelled horrible, which she commented to me about. She can testify to all that I've told her about my case and that I've kept her up-to-date with all my issues with appointed counsel not working with me but against me. She could testify that I've been steadfast in my claim of innocence and that I'd only tried preventing a suicide. I've told her exactly what happened, even explaining why I at first lied, and she's even told me that she and people she's talked about my case believe me to be innocent.

Stephanie Ann — Could have testified to prove that the facebook posts were all about me thinking about cutting myself. She can also verify that the texts in my phone via facebook to her are the same ones that police deleted from my phone when they printed out my phone call/text/and message log. She can testify that her and her mom, Connie, calmed me of the

suicidal thoughts from talking on Snapchat and comment/replies on Facebook post "One Cut, Two Cuts, three cuts, four ... what I have in my mind will ease this pain for real."

Lara Nichole — Could have testified that I had spoken with her in regards of thinking about suicide.- Again, someone that knows that I was talking about myself.

Patricia Barnett (My Mom) — Could testify to being there when Barbara was talking about doing and selling pills and that I'm the reason she's been able to begin getting her life back together and that she is a cutter and that I've never been violent toward women.

Sandy Craft — Could testify that when Barbara and I came to her place on July 4th 2016 to hang out and smoke weed and just chill, Barbara was wearing a spaghetti strapped shirt and it revealed the 2 cigar burns on her chest and Barb went on showing the self inflicted cut scars she had done as well.

Sammy Craft — Could testify to the same thing as her mom Sandy as she was there as well.

Charles Dudley — Could testified that in the 4 years he's known me I've never been violent toward women and that I, in fact, come to their defense when they are being abused by their boyfriends. Charles "Chuck" Dudley is my bestfriend and can even testify that I'm not racist, as the prosecutor infers to me as being, as "Chuck" is Black and his daughters and son are "considered by my "nieces" by their own claim.

Bo Carter — Ex-Marine and founder of the Jackson Guardians, a non profit organization, that I was a volunteer member of to help put a stop to the abuse to the women and children, the bullying and drugs on the streets and in our schools, to work hand-in-hand with the local law and law enforcement agencies to help bring about a better Jackson without all the gangs and gang related crimes, the crimes on the streets in general, a Jackson where we give the youth more positive activities to keep them off the streets and less chance of them being caught up drugging it out and getting involved in gangs and crime.

Wesley Salyers (my Dad) — Could testify I've never been violent toward women and that I'm someone who would rather help another than myself. That I'm a caring and compassionate individual. That I volunteer to help others in a positive and constructive ways to bring others comfort and happiness. I'm a individual that puts others's well-being before my own, that I volunteer to help take care of the elderly and mentally ill disabled at the Nursing Academy he works at just as I've done here in Michigan where my Mom worked with the mentally and physically disabled. He can testify to the fact of Barbara being a person of unsureness and issues with relationships when she had

-7-

Left me in July then got right back with me. Left me in August, got right back with me. I've not once called Barbara out of her name or been violent toward her.

Sonny Buchler — Would have testified that he is very mad at me as he had to call the police to get me out of the house because he couldn't give me a 30 day notice before my departure. He's a disabled uncle I lived with to help take care of him and my Grandma. Him and I had words and threatened one another. A family dispute. He could still testify that I've never been violent toward women and that I'm, in fact, against violence toward women and children. He can testify that I'm a loving, caring, helpful, selfless, empathetic, sympathetic person. And, of course, I can be a pain in the butt, too.

Sherranda Gile — Daughter of the elderly couple I lived with in Oklahoma. She can testify that we've been friends since 2012 and never has she known me to be violent toward women, that I'm an emotional person who has in the past referred to suicide when I fell into a depression. She can testify that the posts on my facebook are about me thinking of ending my pains by cutting myself.

Cindy Burley — Retiree of the Pentagon and my Aunt or Cousin can testify that from what she knows of me I'm not violent toward women and I'm always one to be to help a woman in their time of need. She can testify that I'm a good man and that I'm caring of other before myself.

## Evidence

All throughout my proceedings trial counsel would not allow me access to any of my Discovery except police reports and autopsy report. When I would request for anything else he'd tell me there is nothing else to be had except for the interview video recording.

At the suppression hearing defendant-appellant requested that the interview recording to be played as evidence to show he was not notified of the accusation brought against him as is guaranteed under the 6th Amendment of the United States Constitution. Colorado v Spring, 479 U.S. 564. Also the interview evidence would have shown that coercion was used and that there was assurances of leniency and promises made to obtain a "Confession" that was from someone who was in a state of shock, "unable to follow questioning will and very emotional" as described by another officer in the police reports of Officer Smith. Police knew Barbara had died 46 minutes after she did this and defendant-appellant called the police yet they used deception to make defendant-appellant continue protecting her so she would not lose her girls.

Had defense trial counsel called Officers Smith and Anderson as witnesses and introduced

-8-

the video as evidence the motion to suppress would have been granted. People v. Jones, 416 Mich 354. Supreme Court ruling, "Conviction for .... first degree was based in part on the confessional statement admitted into evidence over his objection. Reversing the conviction and remanding the case, the Court held that defendant's statement was inadmissible per se. There was no reason to conclude that a confession was voluntary and more reliable merely because defendant initiated the bargaining. Defendant was still influenced by the state's promises of leniency."

A person innocent and knows that the alleged victim will clear it up is not going to need to invoke or waive rights. But when you've got a death that you're being accused of then you have the right to be notified so you can then choose to invoke or waive your rights. To the defendant-appellant, that is what the Colorado v Spring reads.


## Adversarial Testing

As in Elmore v Ozmint, 661 F. 3d 783. Elmore's trial counsel used blind acceptance of the state's forensic evidence. Trial Counsel failed to investigate the states forensic evidence such as pubic hair, materials removed, fingerprints lifted. That kind of failure had a palpably adverse effect upon the petitioner's defense. Counsel, despite a professional obligation to conduct an investigation failed to investigate at all. Because no strategic reason could support the total failure to investigate, no amount of deference could compel any fair conclusion other than that petitioner was denied effective assistance of counsel.

In the instant case, defense trial counsel took blind acceptance to all evidence regarding defendant-~~Appellant's~~ case as he did not introduce any evidence on behalf of the defendant-appellant. He did not investigate into defendant-appellants defense by calling and questioning the autopsy performed that clearly has errors that show both prejudice to defendant for lack of giving a complete and unmanipulative report and the addition of some other person's information by the name of Tania Lynn Swets. He failed to investigate into the pattern of the bruising and the fractured hyoid, and he failed to even question the impossibility of a small steak knife being the knife she used to cut a 12 centimeter cut compared to a chef butcher knife being used. He failed to investigate on getting fingerprints off the knife the state claims was used, as it would have someone's prints on it but not the defendant-appellants. You can't wipe a knife off and still save somebody's prints to exclude only yours or another persons specific fingerprints. He failed to investigate defendant-appellant's hands to determine if defendant-appellant could have beat Barbara compared to as her falling and hitting her right side face on the flat of the stairs and the front and left side of her face on the floor on the second fall. Failed to investigate as he told defendant-appellant because Judge Timothy G Hicks will not and has not granted a criminal defendant in a murder ~~conviction~~ case motions for Experts and private investigators as he feels its a waste of time and taxpayers money to afford a vicious murderer a ~~strong~~ chance to go free.

Trial defense counsel failed to present adversarial testing with prosecutions statis witnesses Deputy Neal and Joshua Guerin by calling witnesses to fully dispute state's witnesses' claims. Instead, defense counsel, prejudices defendant-appellant by telling the jury, "When you go to jail you want to establish that you're a tough guy 'cause you won't survive in the jail for one year, two years, three years unless you're at the top and people fear you. You can't be a wimp so you start out right away acting tough. And a statement my client made is disputed, but you hear that all the time. Jail confessions are reported by other inmates. Every trial there has to be one of these. What are they really worth?

<span style="font-size:smaller">Trial Tr. Vol 4 pg35-36</span>

Had defense trial counsel called Eric Emory, who even wrote Lesica a letter, defense would have been able to present proper adversarial testing as compared to prejudicing defendant-appellant by making him out to be a violent and frightful person to be around. Defendant-Appellant made no life threatening statements or confessed but counsel is trying to "excuse" the actions he's insinuating his client, the defendant-appellant, had done.

Defense Counsel did not investigate into the impossibility of the confession to Joshua Guerin for if he had he'd have been able to see for himself and presented to the court documentation and witnesses stating defendant-Appellant was NOT housed with Guerin in the same "pod."

Defense counsel further investigated into matters of a critical element of the case. (Trial Tr. Vol 4 pg 36) "And what's there basis for premeditation? One little part of a, I guess you call it a string of video statements? Did we see the whole string of video statements? No. We just saw a little part of it. Then the witness said, "well my impression was he was going to kill himself."

There's two issues with this. Trial counsel did not adhere to Trial Judge's orders to not comment on that evidence because it's "Hearsay" although he was breaking Judges law for defendant-Appellant but most of all Trial Counsel, as you can clearly see, did not even know what he was talking about. They are not video statements. Further shows that trial counsel was not prepared to defend this case. You cannot subject the prosecution's case to adversarial testing if you haven't a clue to what you are trying to present.

From (Trial Tr. Vol 3 pg 21-34) you will see again trial counsel is not prepared to subject state's witness, Amanda O. Fisher-Hubbard, the Medical Examiner to proper cross-examination and that he, clearly, was "freestyling" scenarios based off of the prosecutions claims not his Clients.

Trial Counsel tells defendant-Appellant at the beginning of trial that due to vacations and surgery recovery he was unable to investigate and build a case. Counsel asked defendant-Appellant if defendant-appellant would like him to present

the case that defendant-Appellant has built as it is very thorough and truly solid. Defendant-Appellant has been from day one trying to get this to happen but counsel would not confere with or even address the case with his client until the day of trial. You can review the trial court video and see the counsel came unprepared as he is using all the defendant-Appellant's notes and questions for state's witnesses but still ~~tries~~ "freestyles" a defense and then another instead of presenting the only defense defendant-Appellant demanded to be presented.

In Elmore, "there is a reasonable probability that, had the 1984 jury heard the evidence that Elmore's lawyers deficiently failed to uncover, the verdict would have been, "not Guilty."

The fact that defendant-Appellant made all those 4 posts on facebook in regards to self infliction thoughts, the fact that there were 6 cuts rather than 4 as state claims, the fact witnesses can dispute allegations of confessions and threats of killing another inmate, the fact of the steak knife not being the weapon she used, the fact no evidence was tested, the fact that the trial counsel did nothing to secure a fair trial goes to show clear proof of ineffective assistance of counsel then to top it all off, at closing arguments:

(Trial Tr.Vol 4 pg 37) "How do you kill yourself? You kill yourself by cutting your wrists. One, two, three, four. Not, you know, kill yourself by cutting your throat four times. That's, you know that's not possible."

Trial counsel just open and blantantly insinuated that his client murdered Ms. Dailey because, "Not, you know, kill yourself by cutting your throat four times. That's, you know that's not possible." So how else did she sustain 6 not 4 cuts to her throat if it's "not possible"? There are several cases of people slitting their own throat and stabbing themselves in the throat, yet it's "not possible." Again counsel failed to investigate and he prejudice the defendant-appellant beyond curative repair. He failed to object to the use of all falsified/incorrect evidence that the prosecution knowingly used to mislead the jury and Court.

Therefore Defendant-Appellant respectfully asks and prays this Honorable Court to reverse the convictions and remand for New Trial or hold an evidentiary Hearing as in People v Ginther to determine ineffectiveness if further needed. And ask this Honorable Court for a hearing to hear what my defense was that counsel deliberately destroyed to determine if ~~evidence~~ true evidence would invoke double jeopardy.

-61-

II. Defendant-Appellant was denied due process when trial court erred by allowing inculpatory hearsay evidence and the exclusion of exculpatory hearsay evidence by using an Uneven Application of the Hearsay Rule.

## Standard of Review

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. May v William Beaumont Hosp, 180 Mich App 728 (1989). The test of relevancy is whether evidence has any tendency to make the existence of a fact more probable or less probable than it would be without the evidence. People v Trevino, 155 Mich App 10 (1986)

## Preservation of the issue

The error is apparent on the record

## Analysis

Under the 6th and 14th Amendments to the United States Constitution a criminal defendant has a right to present a defense. U.S. Const. Amends. VI, XIV. Under the Michigan Constitution. Mich. Const. Art 1 §§ 13, 17, 20. The right to present a defense is a fundamental element of Due Process. The United States Supreme Court has held that its cases establish, at a minimum, that criminal defendants have the right to put before a jury evidence that might influence the determination of guilt. Under the Due Process Clause of the 14th Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. The Court has long interpreted this standard of fairness to require criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system. Brady v Maryland, 373 U.S. 83 (1963).

As stated in Grano, supra, at 1018, "The primary objective of criminal procedure is to facilitate the ascertainment of truth. To some extent, therefore, fairness must encompass this concern. Accordingly, rules are unfair when they do not provide either party an adequate opportunity to develop and present his case. The special concern with fairness for the defendant, however, stems from the special abhorrence of erroneous conviction. Thus, basic agreement exists that

a Rule is unfair if it denies the defendant an adequate opportunity to defend against the charges."

The finding of materiality of the evidence is required under Brady, supra, at 87.

Tr. Tran Vol 3
pg. 56

In the instant case, prosecution requested, "a motion in Limine to exclude potential evidence that he could see the defense trying to introduce in this case. And that would be the contents of the defendant's phone and conversations from that phone, any statements defendant made to somebody in that phone conversation, or any statements made to the defendant are a very classic example of hearsay that I know of no exception that would allow the introduction of that evidence."

As in May v William Beaumont Hosp, 180 Mich. App. 728 (1989) "When.... introduced by a party.... adverse party may require.... any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

Defendant-Appellant believes it is ~~the~~ the denial of the complete disclosure of all the writings of the four posts and all its subcomments as well as the evidence of all facebook and text conversations that he was unable to develop and present the truth of the post that the prosecution, knowingly and falsely, claims to be premeditation and deliberation to commit murder. That post is, CLEARLY and Factually, about ~~me~~ thinking about cutting his wrists, properly. So by being unable to defend against ~~the~~ the improper admission of the same evidence by providing something ~~that~~ that will show completeness and to show context for the erroneously admitted post, due process was violated and ~~the~~ the conviction should not stand.

"One Cut... Two Cut... Three Cut.... four... What I have in my mind will ease this pain for real." 1:40 pm

If this is admitted why is it not allowed to see the rest of the posts' contents? Why is it not allowed to admit the rest of the posts before that specific post?

~~Prosec~~ Prosecution used this post as means of showing premeditation and deliberation knowing that the posts are factually about me thinking about self inflicting. Barbara Dailey did not cut herself four times. She cut herself six times and the prosecutor knows it.

I ask this Honorable Court to reverse the conviction and remand to the lower court for a new trial or at the least to give ~~and~~ an evidentiary hearing in regards to sufficiency of evidence.

III.  Trial court erred when it removed initial trial counsel off Defendant-Appellant's case without his Request, consent or knowledge, violating the Constitutional Right to counsel of the 6th Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

### Standard of Review

It is well established that an important constitutional issue may be raised on appeal for the first time and addressed by the appellate court. People v Heim, 206 Mich. App. 439, 441; 522 NW 2d 675 (1994).

### Preservation of the issue

The Courts have failed to turn over the Documents for this issue as well as "ALL" transcripts and Documents regarding my case, including transcripts for 2/15/2017.

### Analysis

Our Supreme Court has noted that appellate courts will consider claims of Constitutional error for the first time on appeal where the alleged error could have been decisive of the outcome. This is a situation where the trial court acted without a request by the defendant to remove his counsel and without defendant's consent to do so. The trial court's action was an arbitrary infringement on the right to the assistance of counsel and an interference with the attorney-client relationship. The trial court improperly interfered by Removing counsel with no justification for doing so. Naeling, Supra, p 1106; In re the welfare of MRS, Supra, p 152. See also People v Johnson, 215 Mich. App. 658

In the instant case Defendant-Appellant did not have any knowledge that initial trial counsel had been removed and is still not aware as to why Chad Catalino was removed and, in his place, Defendant-appellant was given Fred J. Lesica as unwanted trial counsel. To defendant-appellant's knowledge there was no hearing held as he was not ever informed that Chad Catalino was being removed.

Trial Court had also erred when, on 2/15/2017, instead of holding a hearing to remove Fred J. Lesica as unwanted and ineffective counsel, trial court instead tells Defendant-Appellant to trust his lawyer because he knows what he's doing as he's been doing it for a long time, and trial court tells Defendant-Appellant that it wishes to no longer recieve letters from Defendant-Appellant, that 95% of cases such as Defendant-Appellant's are handled via plea bargains.

I ask this Honorable Court for a new trial before a different Judge

IV.    Defendant-Appellant was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony, evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in Cross-Exam and Closing arguments, and destroying evidence.

## Standard of Review

In order to establish prosecutorial misconduct in introducing false testimony, defendant must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. When such false testimony could in any reasonable likelihood have affected the judgement of the jury, the knowing use by the prosecutor of false testimony results in a denial of Due Process under the 14th Amendment and a new trial is required. United States v Lochmondy, 890 F. 2d 817, 822 (6th Cir. 1989).

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. May v William Beaumont Hosp, 180 Mich app 728 (1989).

## Analysis

Due Process is violated when the prosecutor, although not soliciting false evidence from witnesses, allows it to stand uncorrected when it appears. The duty to correct false testimony of witnesses for the Government is on the prosecutor.   A conviction obtained through the use of false evidence, known to be such by representatives of the state, must fall under the Due Process of the 14th Amendment; the same results obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears. It is immaterial that the silence of the state representatives was not the result of guile or a desire to prejudice. When a representative of the state in a criminal trial solicits false testimony or permit it to go uncorrected, the fact that the jury was apprised of other grounds for believing that the witnesses are being truthful while testifying against the defendant does not turn what is otherwise a tainted trial into a fair one.

1) Defendant-Appellant made several posts on facebook in regards to self-infliction. There is sufficient, factual or substantial, evidence to support that fact such as multiple conversations from about the time he woke up until the time he had quit talking to people via phone texts and facebook messenger and the replies to the posts he made on facebook in regards to self-infliction. Defendant-Appellant had conversations with Amanda Holland, Lara Nichole, Stephanie Ann, Sherranda Gile, Bria Fowler, and the alleged victim, Barbara Ann Dailey, herself.

## Facebook Issue

st #4 Josh Salyers

"One Cut... Two Cuts... Three Cuts.... Four... what I have in my mind will ease this pain for real." 1:40pm

Share 4

View 2 more Comments ^

~~Sherranda Gale: "Don't talk like that." September 4 at 3:16~~

Doug Carlson: "Quit being so self-loathing. The world will move on." September 4 at 3:21pm

Stephanie Ann replied – 5 Replies

Post #3 Josh Salyers

"I'm Sorry...."

Youtube song share

"Goodbye (I'm sorry)" by Jamestown Story. September 4 at 1:00pm

Post #2 Josh Salyers

"I've never felt this damn helpless. This low. I need my comfort... come talk to me a while."

Youtube song share

"Baby don't cut" by B-mike. September 4 at 12:47pm

Post #1 Josh Salyers

"Just move on she says.... if she only knows what that means now.... Angels Fall.... when that happens all hurts will be over" September 4 at 11:40 am

feeling depressed ☹

"Angels Fall" by Breaking Benjamin.

## Phone and Facebook Log

10:41am 9/4/2016 To Stephanie Ann, "Barb is literally killing me. Like I don't want to be alive right now." "Will you please talk to her?"

11:17am 9/4/2016 To Lara Nichole, "I wish she ~~knew~~ really knew how I feel." Lara says, "Tell her." 11:18am To Lara, "I've tried. She don't seem to understand but when I'm gone she will maybe realize it." Lara says, "if you honestly love her, you wouldn't put her through that kind of pain. I've been through that, and it sucks when someone you love, with everything you are, takes their life. You're not just ending your pain but creating more for others." To Lara, "She acts like I don't mean shit to her, Lara." 11:21am Lara says, "Then let her go, man. Don't end your life but end it. Then after she may realize what's what."

\* Post #1 was made on facebook at 11:40 Am

To Sherranda Gile : 9/4/16 at 12:04 pm, "My life is on the line with this one Sherranda, I can't do this pain anymore."

12:47 pm post #2 was made on facebook

Post #3 was made on facebook at 1:00 pm

9/4/16 at 1:36 pm to Barb (alleged victim), "Barb, I need you here to calm me.....please...."

\* Post #4 was made on facebook at 1:40 pm

1:45 pm 9/4/16 Amanda Holland says, "How are you?" I say, "I'm numb" Amanda says, "What?" I say, "I'm numb.... I'm dead inside and not sure how much more I'm gonna fight before I feel not a thing." Amanda says, "Life hands us all bullshit. Gotta keep living. It's all you can do." I say, "Gotta....lol." Amanda says, "Yup! Don't care, correct my fucking grammer. I don't claim to be perfect nor do I give a shit." I say, "Not what I meant. You said I gotta 'keep on living'. There are other options." Amanda says, "And now I'm done talking to you. Goodbye." I say, "Fine, Dueces." Amanda says, "Yup, dueces punk ass bitch who wants to give up because life got hard. Grow the fuck up, buck up and be a damn man with a respectable job instead of a failed-ass pornstar."

At 2:48 pm 9/4/16 Stephanie Ann finally responds, "I have family over so I can't call ☹" I say, "Okay, well after they leave then." Stephanie says, "We can still talk on here until then ☺ Do you have snapchat?" I say, "No on Snapchat but I can get it if you want me to. I had one but I hated it." Stephanie says, "Really? I love snapchat!" I say, "Okay. I'll get it." Stephanie says, "Okay!"   Our conversation moved to Snapchat for a bit.

9/4/16   3:48 pm to 4:36 pm Barbara Ann Dailey and I are facebooking and texting.

I say, "Barb, please." She says, "What? I just woke up not that long ago." I say, "Call me, please." She says, "Why?" I say, "Barb, Just call me." Barb says, "Tell me why." I say, "You'll know when you call. Just please call me." She called for a second then hung up. I say, "Really?" I called her back and talk a moment then she hangs up. She is still hurt from the night before 9/3/16. I say, "Why did you hang up? I wasn't fighting with you. You'll remember this Barb. Trust me. Just know that you had a very good man. I love you but, clearly, you want to prove EVERYONE right about your feelings for men and in life itself. I Love you." She says, "What the fuck ever. Just leave me the hell alone." I say, "Okay. Your Call. Just know, I love you." She says, "Bye. LEAVE ME THE HELL ALONE." So I did. I blocked her on facebook at 4:15 pm. 4 minutes later Barb texts my phone, "Block me.... okay then, you can just burn in hell.... you need to get out of MY DAD's. He is not your family."

-17-

I say, "You said leave you alone, Barb. You hung up on me and I'm TRYING to keep myself from the END AND YOU WON'T HELP ME."

From Stephanie Ann, "Where did you go?" at 4:24pm.

To Barb I say, "I'm asking you to leave this on a positive level and you won't even do that. Barb my head is running in the wrong direction and I need you to calm it." She says, "Well, you try to push me and you don't need to. I'm not with you and how it stands now we will never be together. Find a new place to live." I say, "Then COME MEET ME AND JUST TALK. No fights. Dad said I'm not going anywhere." She says, "Then I won't be there until you're gone. I say, "If you want me gone then come TALK to me. Get me through what I'm feeling." She says, "That's not my responsibility, my family is and now that you won't leave my Dad's, he won't be seeing me or MY GIRLS until you're gone." I say, "BARB, I WANT TO DIE RIGHT NOW. I'M TEMPTED TO RUN UP IN THE ~~HOOD~~ hood and get myself shot and it is Your responsibility." She says, "No the Fuck its not and neither are you." I say, "Yes it is because you made me fell in love with you, then you ripped it all apart with your games. Since you WANT me out of your life and I'm such a BAD PERSON, stay out of mine until you grow the fuck up. But if you need someone to talk to, you know I'm here."

From Stephanie Ann, "Josh?" at 4:33pm

From Barb, "If you want me to stay out of your life then you are not there for me to talk to. I didn't make you do shit. You fell in love with me way to fast. You moved the relationship we had too fast. So, no, it's not my fault and if you want to keep that shit up, then, jump off a cliff... I'm not dealing with this." I say, "OKAY. NOT A PROBLEM." She says, "Whatever. Bye." I say, "I LOVE YOU. ENJOY YOUR LIFE AND MY BLOOD IS ON YOUR HANDS." ends at 4:36pm

## Destruction of Evidence

4:38

From Stephanie Ann, "You're seeing my messages but not writing back.... that's cool."

I screenshot everything between Barb and I in 14 screenshots and sent them to Stephanie. I then told her, "That's where I was. Sorry....." She says, "Okay. Now block her and be done with it."

Police have deleted all the screenshots from the print out of my phone as well as text and a call from Barb at 4:50pm. She said, "I'm going for a walk. I'll see you if I see you. I Love you and I'm sorry." You will see that I call her 3 times before she answers at 4:54pm. At 5:01 ish (pm) you'll see me in front of the house with cameras when I call at tell her I'm there and she tells me to come over.

Police, obviously, destroyed the Butcher/chef knife that was on top of the other knives in the sink as well as it was not in the evidence at trial. Police destroying evidence of the screenshots isn't an issue as the proof is all there, however, it's a serious implication showing that this case is being built based

-18-

on lies, misrepresentation, misstating of facts, and tactics that are "artfully" created to mislead the courts and jury. The evidence speaks for itself that it's been destroyed or tampered with.

The prosecutors case evolves around the "one" post, that was improperly admitted into evidence, stressing to the Court and jury that the post is about committing murder, not about me thinking about cutting my wrists, as means of premeditation and deliberation. All the remaining posts, comments, replies and my texts and facebook messages with everyone including Barbara all goes to show that the prosecutor has falsified evidence and cannot at all, in good faith and honesty, say that the posts are not about me.

"Promoting the truth seeking process is one of the judiciary's primary goals in determining the appropriate action to take when one party prevents the other from obtaining evidence. The discovery of the truth is essential to the successful operation of the system's mechanisms for controlling crime and mitigating its consequences." — Preliminary Proceedings, Discovery & Inspection.

"Where evidence or a witness is unavailable or compromised because of the conduct of prosecutors and police officers, the court should not keep more evidence away from the juror, but should rather give the jurors all the pertinent information, including what has been denied to them, and allow them to access the consequences." — Trials, Jury Instructions.

This is important because the jury had actually inquired about texts that were made by me to Barbara.

Search & Seizure violation

Trial Transcript Day 2 pg 22 "Was the call incoming or outgoing call and how long was the call?" Officer Bringedahl says," I don't recall specifically. I just glanced at it for a second. Phones are kind of a touchy subject under search and seizure and I didn't want to go through the phone without a ~~warrant~~ search warrant. It was just something I saw for a quick second." "Were there any text messages from Joshua on Barbara's phone that would have been threatening?" Bringedahl says, "Once again, it's something that I — I can't search without permission from the victim or a search and, unfortunately, at that point I didn't have either so it was just — we can, if something is on the screen I can look at it but I'm not allowed to manipulate the phone in order to get that information."

I can prove that Search & Seizure has been violated.

~~&~~ Misstating factual evidence

The prosecutor's theory is this: Mr. Salyers could not take or handle Barbara ending the relationship so he posts onto facebook "One Cut... Two cuts... Three Cuts.... Four.... What I have in my mind will ease this pain for real," only

hours before Barbara was cut EXACTLY 4 times.

Based on the County Medical Examiner's Act, the Supreme Court of Michigan has concluded that, "a county medical examiner's duty is owed to the state. A medical examiner fulfills their statutory duty to investigate violent deaths by communicating their medical findings to the prosecution and testifying on behalf of the prosecution regarding the results of "their" investigation. A county medical examiner is expected to work closely with the prosecution in cases related to the investigation of violent or unexpected deaths and is expected to testify on the prosecution's behalf."

The United States Supreme Court does not limit the prosecution's duty to learn of favorable evidence to only the police or law enforcement agencies, but, instead, "extends this duty to any others acting on the Government's behalf. Given ~~the~~ a County Medical Examiner's duty to act on the Government's behalf in cases involving violent or unexpected deaths in Michigan, (1) the medical examiner may be understood as acting on the Government's behalf in a particular case; and (2) evidence within the Medical Examiner's control may be imputed to the Government, even if unknown to the prosecution."

Throughout the entire trial, the prosecutor states that Barbara was cut "four" time just as the defendant said he was going to do. When questioning the M.E. on direct exam. She (M.E.) would constantly say, "at least four", when describing the incised wounds. The medical examiner did not document the scars of ~~her~~ Barbara's self inflicted cuts from past self inflictions nor the 2 burn scars on her chest from cigars. M.E. also withholds the depths of these cuts and claims they are impossible to be self inflicted because of the depths and lack of hesitation marks. Then she later contradicts herself saying it could be possible. The M.E. excluded what would show that Barbara is a cutter and written her report as the prosecutor needed it to say, to show "four" cuts.

- Approximately 3 centimeter curvilinear, oblique incised wound on the anterior-lateral right neck. The left aspect show a superficial, horizontal approx. 2 centimeter linear continuation of this incised wound on the anterior neck. *Approximately a 2 inch cut altogether.*

- Approximately 8 centimeter irregular incised wound on the anterior-lateral left neck. * 3⅛ inch cut *

- Approximately 12 centimeter irregular, horizontal incised wound across the anterior neck. The right aspect shows a superficial 5 centimeter linear continuation of this incised wound on the lateral right neck and the left aspect shows a superficial 0.6 centimeter linear continuation of this incised wound on the lateral left neck. *6⅞" inch cut*
  There are two ADDITIONAL superficial, curvilinear incised wounds that extend from the superior mid aspect of this wound onto the right neck approx. 2-5 centimeters each.* That is two 1" inch cuts *

-20-

Associated with this wound are incised wounds of the neck muscles, right jugular vein, and the anterior trachea.

- Approximately 7 centimeter roughly linear, horizontal incised wound across the anterior midline and right neck. * 2¾" inch cut *

So, clearly, this report reads that there are 6 cuts, not 4, but is written to bulletin just as the prosecutor needs for his falsifying evidence to mislead the jury.

The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence. It is clearly improper for the prosecutor to state facts that are not in evidence. State v Ly, 277 Kan. 386, 393, 85 P. 3d 1200 (2004).

In the instant case the prosecutor should have known by reading the evidence that the posts are, factually, about me and that Barbara sustained 6 cuts not 4 when she was cutting on herself. By his actions of prosecutorial misconduct he had successfully misled the jury to believe Barbara sustained only and EXACTLY "four" cuts hours after I wrote a post about thinking of cutting my wrists properly, which is four cuts.

Appeals, prosecutorial misconduct — When prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or her knows, or ought to know, is improper.

Appeals, prosecutorial misconduct — The standards by which appeals courts evaluate claims of prosecutorial misconduct are shaped by the unique role prosecutors have in a state's judicial system. The prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. A prosecutor is not an ordinary advocate. His or her duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. By reason of his or her office, a prosecutor usually exercises great influence upon jurors. His or her conduct and language in the trial of cases in which human life or liberty is at stake should be forceful, but fair, because a prosecutor represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment.

The test in, United States v Carroll, 26 F. 3d 1300, 1385 (6ᵗʰ Cir. 1994), is whether the "impropriety was flagrant" and thus violated the defendant's due process rights. And if so, United States v Carter, 236 F. 3d 777, "(1) whether the conduct and remarks of the prosecution tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were

deliberately or accidentally made; and (v) whether the evidence against the defendant was strong.

In this case the evidence reviewed in light of prosecution's favor is indeed strong due to the prosecutorial misconduct and the ineffective assistance of counsel. The prosecutor knew of all the facebook posts, texts, comments, replies, messages. Prosecution knew of the medical examiner's results being that there are 6 cuts, not 4, and that Barbara was a self-inflicter, herself, and that she has scars from it. It's why many photos are suppressed and such finding, earlier stated, were not documented in the Autopsy Report. In the following is more improper conduct of putting words in defendant's mouth, misstating facts, falsifying evidence and making me out to be Racist.

First in Trial Tr. Vol 3 pg 81  I did not say, "they told me the trachea had been severed."... I said, " That told me the trachea had been severed....  Prosecution wanted to argue unneedlessly about that.

Trial Tr. Vol 3 pg 86 Prosecution: "This is the first time that you've told anybody that you put your fingers in her neck, correct?"

— That's a lie and knows it. Dr. Stephanie Howell forensic psych and Jennifer Swanger as well as my lawyer were all told.

pg 87   Okay Prosecutor: "So you can admit you never told the police that you stuck your hand in her neck?"

— Now he is changing the facts from fingers to hand. Seems harmless but it isn't because when you cover a small incised wound on the trachea you don't use your hand, you use your fingers otherwise you keep the cut open to allow blood to seep through the incision and fill her lungs and, causing her to drown on her blood and die. Clearly the report shows blood was not in her lungs so he is trying to create prejudice.

Here he gives personal expression and putting words in my mouth:

Prosecutor: "I think at one point you said that you saw her in the driveway, correct?

— I never said anything about her in the driveway

He is using his influence on the jurors to mislead and suggest things to put in their heads that he may have information that they don't.

Prosecutor: "And what was the nature of the phone call?"

pg 88

ME: "Pretty much telling me that ~~nobody~~ nobody had come back to the house and I said pretty much told her I know it was probably the lady across the street. And she told me continue to go to her dads and ~~tell~~ let him know that she's sorry for everything, she forgives ~~forms~~ him, and she loves him. And I said okay. And I asked her whats wrong and she said I love you, I'm sorry, and she hung up the phone. So I run back.

pg 89

Prosecutor: So she didn't ~~say~~ actually say anything about suicide, she just said I love you, I'm sorry?

ME: Yes

Prosecutor: Why would you ~~not~~ go the shortest distance if the 'love of your life' as you claim, threatens suicide? You take the long way instead of going down the alley here, correct?

                    * The ~~distant~~ distances are the same *

ME: Who said anything about her stating anything about suicide attempt?

Prosecutor: you assumed — you just testified that you assumed that she was going to kill herself, right?

me: NO.

prosecutor: Then why did you run back?

ME: Because she's in an emotional state; sounds like she was crying. We ~~were~~ just fine before I left.

prosecutor: So you ran back because she was crying, not because you thought she was going to commit suicide?

ME: Why would I have any thought that she was going to commit suicide at the time?

pg 90

Prosecutor: You were here 10 seconds ago for this conversation with you and I, right? ...... and you said that concerned you about her committing suicide so you ran back.

    — When did I say she was going to commit suicide or I thought or assumed she was going to commit suicide? He is deliberately trying to prejudice me and mislead the jury.

Here again:

Pg 94

Prosecutor: And then you shoved her with your leg, correct?

ME: Nope ........ and shoved her over my leg.

Prosecutor: Excuse me, shoved her over your leg....

    * He's acknowledged this now *

Prosecutor: Q So you've accounted for three. When did the fourth cut happen?
   * He fails still to disclose that there are 6 cuts, not 4, knowing I can't
   speak on the evidence not admitted. *

pg 97    prosecutor: And are one of those knives the ~~one you~~ one that you used?
   me: I didn't use a knife   — not the —
   prosecutor: I'll rephrase. Are one of those ~~knif~~ knives the one that you
      claim Barbara used?

me: It is   — I said "isn't", not is. * Refer back to Trial Tran Vol 3 pg 23
   Jessica says can you make a blunt wound with a butcher knife? *
   — Barbara didn't ~~use~~ a steak knife she used a chef/butcher knife. —
   * In the interview I even describe it as long as a bread knife and shaped
      like a steak knife *

pg 98    Prosecutor: And you never wiped it down. If somebody cut their throat
   four times with this knife and you think you can see a
   speck of blood on it, does that make ~~since~~ sense to you?

me: Makes perfect sense to me.
   — "This" knife has speck of blood on it b/c the missing butcher/chef
      knife was on top of these other ~~knif~~ knives and had much blood on it
      that transfered to that smaller knife. —
   * He doesn't press the issue b/c he knows my lawyer told me
      what happened to the butcher knife but knows I can't introduce
      anything not spoken and admitted into evidence as the judge told me
      and my lawyer told me *

pg. 105    Prosecutor: But you just witnessed according to this most recent story
   that nobody's heard until today, that she hit her head on
   the bannister, that she fell on the stairs, that you pushed her one
   time with your leg and you demonstrated for us very, very specifically
   how you pushed her face down and that's when she smashed her
   face on the floor, right?
   — He, again, after acknowledging "OVER my leg" he still misstates "with your leg".
      He knows I've told other people as in Jennifer Swager and Dr. Howell
      and its in the police interview —

pg. 106    Prosecutor: But you just testified you know she was bleeding from the mouth,
   that you saw that before, correct?
   me: NO
   Prosecutor: When your defense attorney....... you didn't tell them that you saw
      her mouth and it was Bloody
   * Bleeding and Bloody mean two different things *

pg. 110   Prosecutor : Do you remember an altercation when you first got booked into the jail ?

me : yeah

Prosecutor : you do ?

me : I do

Prosecutor : Didn't you just testify a few minutes ago that you don't remember any of that and you ~~had to ask~~ in fact had to ask them where you were ?

— Prosecutor <u>Knows</u> the altercation was in the evening of the next day. If I threatened this mans life and confessed to murder why isn't he there to testify? B/c state <u>knows</u> I didn't threaten to slit his throat or confess to murder and Eric Emory was asked to lie for the state for a deal. Eric Emory was wanting to testify for defense but Jessica would not obtain or even investigate him even after Eric wrote him a letter asking to testify on my behalf. —

## <u>Prosecutions Closing Argument</u>

Trial Tr. Vol 4 pg 16   "But he outright lied to you as well, and you guys saw it yesterday, "Oh, I never said that" and I asked him "were you ~~literally~~ here literally 10 seconds ago when that is what you told me?"

— He is using his misconduct to capitalize on his further misconduct to mislead the jury —

pg 17   — Vouching for Sarah Grandinette when knowing that she is lying about being close and talking about everything in life. — He has seen the texts showing sarah's hatred toward Barbara.

pg 18   we then hear from David DeYoung. He saw exactly what, fortunately, we have on that surveillence video. Mr DeYoung testified that nothing seemed wrong. She didn't seem distressed. No indication of her wanting to take her own life. After a period of time he saw Mr Solyses come around this corner running down Jiroch. And pay attention to what he ~~said~~ said, "The look in his eyes, like he was getting caught doing something." — DeYoung did not speak half that and how can DeYoung see my facial expression if 1) I didn't even look at him and 2) He couldn't even see a large T.V. screen in Court without having to get up and closer? — Medema (Prosecutor) did not correct the elicited false testimony and later capitalized on it. His insinuation here, "the look in his eyes, like he was ~~getting~~ getting caught doing something" suggests that I must have already committed the crime and was just returning to stage the scene.

pg 19   "I stuck my fingers in her trachea". and  what did he call Barbara

yesterday? "The Subject."   — I did not say I put my fingers in her trachea. to do so would be to keep her from breathing. She would have not lived 46 minutes if I were to have restricted her air way. I did not call her the "subject" the officer asked me to step away so HE could assess the "SUBJECT." The prosecutor is playing on the feelings of the jurors to inflame them to my supposed indifference and disrespect for Barbara—

pg 22    Officer Smith came in and testified again that he saw the victim face down — Not any mention that he deliberately lied on stand to give credibility to Graveline's story corrected by the Prosecutor — He saw Smith says I was found in the living room when questioned by the state. Without having to have his memory "Refreshed" he tells that I was found kneeling crying and weeping over Barbara. — State elicited false testimony and did not correct it but instead capitalized on it.

pg 22    ... Anderson observed blood on Mr Salyers hands .... consistent ... rendering aid..... yes.... could it be something more menacing ..... Yes ...
He is asking what seems to be inconsequential questions ... "is she still alive"... not out of concern — He fakes that emotion of concern — but out of wanting to know if she's going to be able to say what happened.
        * His insinuation is that I'm trying to keep her from talking, not rendering aid, which if you look at the facts *She was alive for 46 minutes after, she did this, with a severed jugular vein and a small cut of her trachea (windpipe). So Stokes "Inferences" are based on mere speculation with absolutely no substantial, circumstantial. facts to support his claims. The facts support I was keeping her alive.

pg 23    State is vouching for the investigator who violated constitutional rights and used assurances of leniency and promises, deception and coercion to get a statement that he wanted and I, unknowingly, gave.

         "You heard det. Lukas training and experience. That's important......
         .. Those are all things .... Lukas knows, as he testified, will get US closer to the Truth...... So don't take those statements as true."

pg 24    Speaking about the what was said in the interview I, obviously, said I wiped it down... But then state says, "And then, Mr. Salyers, under oath, said, "I never said I wiped it down." Unexplainable. — Refer back to Trial Tr. Vol 3 pg 95-96 —

         "...... and wiped it down, correct? No. "when did you do that?"
         I didn't. I did not. .... "And you never wiped the knife down, correct" correct. "Never put it in the sink?" I did put it in the sink.

\* So where do I say, "I never said I wiped it down?" I admitted I said it at the interview but again I was not in a stable condition to be interrogated. But that's not what he's getting at. He says I told lied on stand under oath saying, "I never said I wiped it down" in order to again mislead and confuse the jury. \*

Testimony which gives a false impression is false testimony. People v Atkins, 397 Mich 163, 173 (1976), "A lie is a lie, no matter of its subject.... Responsibility and duty.... elicit the truth." Napue, supra, at 269-270 quoting People v Servides, 1 NY2d 555, 557; 154 NYS2d 885, 887; 136 N.E.2d 853, 854-855.

pg 25   "I believe MR. Salyers testified it was something he said about, "Being White" to that other inmate."

    \* Empanelled on the jury is at least one maybe two jurors that are not White. \* Why does the state deliberately lie and put personal expression, "I believe", on something NEVER mentioned, thought of, or said, period? He has now possibly prejudiced defendant appellant and inflamed the jurors to resent defendant-appellant for being "Racist" when, clearly, he isn't.

" We cannot speculate in light of this substantial ERROR whether or not the jury gave consideration to the erroneous testimony in reaching its verdict. A new trial is required." See People v Andersen, supra, at 44 Mich App pp 228-229; 205 NW 2d pp 84-85; People v Cassell, 63 Mich App 226 (1975) (supra, at 228).

As the 5th Circuit has explained the "Reasonable Likelihood" standard is a low one: "There is no doubt .... support a verdict of guilty. But the fact we would sustain a conviction untainted by the false evidence is not the question. After all ..... deciding guilt or innocence. The Jury is that body.... defendant is entitled to a jury ... not laboring under .... false impression.... when it decides ... ... guilt or innocence with all its ramifications." United States v Barham, 595 F.2d 231, 242 (CA 5, 1979)

"The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence. It is clearly improper for the prosecution to state facts that are not in evidence." State v Ly, 277 Kan. 386, 393, 85 P.3d 1200 (2004)

"It is misconduct for a prosecutor to express personal opinion of a defendant's guilt or credibility." Commonwealth v Cherry, 474 Pa. 295, 378 A.2d 800 (1977)

"The prosecutor should not use arguments that are calculated to inflame the passions or prejudices of the jury." Standard 5.8(c), ABA Standards for the Prosecution Function and the Defense Function (approved draft 1971), cited in Commonwealth v Toney, 474 Pa. 243 A.2d 310 (1977)

pg. 26.    "The only way he could have gotten that detail is from the defendant himself. . . .
that's the closest story that WE have to the truth."
        * The evidence supports coercion, lies, exactly what the state needs since it wants
to convict an innocent man. Why use Guerin and not Eric Emory? B/c Eric wasn't
going to lie for the state. I can prove Guerin was coerced and got that info
from the state. *

pg. 27.    You heard that Dr. Amanda O. Fisher - Hubbard has extensive training and experience. . . .
. . At least four incised wounds. . . . at least four. . . . . actual physical observation . . . .
and how deep they were. . . . . . no hesitation marks. . . . . pain that somebody feels.

pg. 28    Imagine how prevalent they would be on your throat FOUR times. . . .
highly unlikely . . . . had to happen FOUR times. . . . . . . A FOURTH time.
        * ~~Consist~~ Consistantly and extensively ~~most~~ misstating facts. At least
4 is NOT 4, its more than 4. Autopsy proves this but state failed
to disclose the truth in order to capitalize on false evidence, my
post being Premeditation. "one cut. . . Two cuts. . . three cuts. . . four. . . . " *

pg. 29    I'll admit he added some more times where she fell because he
heard her (M.E) testify about all these being different injuries
from different events.
        * Again he expresses with personal inferences regarding credibility
        and violates my right to be present for and through my trial.
        I don't add more times that she falls, my ineffective lawyer did,
        as I've always said she fell only twice . * — Constitutional violations * —

"So then he add . . . . "I pushed her . . . . well I pushed her over my leg . . . . "
"And I said, no, no, no I said trauma" And then he even denied
saying that 10 seconds ~~later~~ later and said, "I never said anything about my leg."
He was grasping at steams trying to come up with ~~a new~~ an even newer story
to explain the overwhelming evidence that he heard and it makes no sense."
        * Nobody says anything about, "No No No I said trauma" and the
        argument about 10 second later wasn't even about the "leg" ordeal, it was
        in regards to why I Ran Back to the house due to her crying when
        Prosecution says its because I testified it was because I thought
        she was going to commit suicide. The evidence when viewed when
        you look at the TRUTH, not ~~false~~ false evidence, you'll see all the facts
        proving this case is clearly setup to get a conviction and the Prosecutor
        knows it therefore Maliciously Prosecuting the innocent. *

"Lastly, Doug Carlson came and testified. . . . . Yeah, originally when I saw it

I thought he was talking about him and so I responded, "Stop being so self-loathing"
> * What made Doug think it was no longer about me? ☜He doesn't know the truth about the # of cuts and everyone is all going off the prosecutor's lies.*

pg. 30  — you see, again, here:
"one cut... two cuts... three cuts... four ... what I have in mind, pro."
what I have in mind, what I'm thinking about, hours before the victim is cut 4 times
> * Still, prosecutor is not disclosing 6 cuts only 4 to link, what is factually about me, my posts as a means of premeditation.

pg. 31  There's NO DOUBT that Mr Szlyzra murdered Ms. Dailey. The only thing WE have to consider then is whether its first degree or second degree. And you all don't have to AGREE.
> * SEVERE CASE of PROSECUTOR Misconduct *

pg. 42  I'll never mislead you.
> — He vouched for himself to gain further influence from the jury. And ALL HIS MATERIAL, CIRCUMSTANTIAL, SUBSTANTIAL facts and/or EVIDENCE IS ALL MISLED!! I can PROVE it —

There's one thing that I do agree with Mr. Lesica on. He said to you, "you don't kill yourself by cutting your throat. Thats not possible!" I agree. And Ms. Dailey wasn't trying to do that either.
> * Was he there when it happened? So if you cut your throat you still live? How's it not possible? ... It's happening all around us. John Irwin (Shiawassee County) Kayla Worley (in Indiana) People in MDOC.

pg. 44  you saw Mr. Szlyzra point out on that knife, "no, no, no, I didn't wipe it down. Right there on that knife we used," he identified it for you, "Right there is that speck of blood that I didn't wipe down."
> * completely lied and misled the jury *

pg. 46  "We're not hiding anything." * only 2-3 dozen photos, the truth of my

—29—

facebook post, the correct # of cuts, the Butcher/chef knife they destroyed, the evidence on my phone police deleted (I can show you) the truth of why Gausain knows NOTHING about me but EVERYTHING the state needs him to say, that they tried getting Eric Emory to lie for them. * Yeah, I'd say they are not hiding anything. How about Jessica telling me at the end of trial, "sorry but I owed the prosecution's office a favor?"

"If he was so distraught about losing her as he claims then why after he sees her dying does he not have a single injury? "I'm so afraid of losing her, I'm so afraid of her committing suicide that I said I was going to do it too." . . . . . . . . Use your Reason and common sense."
    * When did all this get said again? Hmmm... and I'm gasping for straws? When he said all that if I'd have had a knife in court I'd have began cutting myself up just to show him how hurtful it is to know what he is doing and I can do nothing to stop him. My case was <u>not</u> presented b/c my lawyer was helping the prosecutor. *

pg. 47      "Why would he . . . . . knock her around . . . . . "She was fighting for her life." ~~B~~ . . . . He had every opportunity to stop. . . . . again, again, again. Talk about your deliberation. ~~Look at the physical evidence.~~ And then he used the knife FOUR times. <u>Talk about your deliberation</u>"
    * He's misled the jury completely. They've no idea of the 6 cuts. They hear his FOUR and see a post that says Four cuts. Lies, deceit, misstating, false evidence, hiding the truth, suppressing potential exculpatory photos, excluding Autopsy report from evidence. etc.*
    It Boils down to Malicious Prosecution in the most severe degree and because he is the law it ~~it~~ is okay for him to break it and claim immunity.

"Look at the evidence. It's physically impossible to punch yourself this many times that would cause this Significant of injuries. He did this over and over. <u>FOUR</u> incised ~~ta~~ wounds. Look at the other evidence."
    * This remark, comment, statement of fact hold NO significance whatsoever. Autopsy say 6 cuts. My hands are <u>not</u> swelled, bruised, scraped, cut, scratched, abraded. All signs of beating on someone.

"Look at that surveillance video. . . . . . . . who sees him? Mr DeYoung and "he has a look in his eyes that he's getting caught doing something". . . . . . when

he claims he's trying to prevent a suicide? . . . . . . because he knows exactly what he is about to do."

Brainstem

Hear is the surveillance with the time used at trial on the and the correct time after misleading the jury through the ~~whole~~ trial. ~~Pretrial~~ Including calls made by Barbara and myself.

Incorrect

* You decide where I called 911 at on the camera at 7:15:51 *

| | | |
|---|---|---|
| 7:06:14 | CH7 | Both walking North in the Alley |
| 7:07:12 | CH1 | Both walking along southside of 1432 Jireah to the front of the house |
| 7:07:26 | CH1 | Both of them walk onto the porch and go inside |
| all  7:11 | | Barb's Outgoing call to "My Husband" (ME) (Clearly establishes i'm inside the house with her.) |
| 7:14:48 | CH7 | He is walking South in the Alley |
| 7:12:22 | CH4 | Walking West on Northside of Girard, then turns North on Eastside of Jireah |
| 7:17:48 | CH7 | He is walking on eastside of Jireah. |
| 7:17:53 | CH2 | "                                           " |
| 7:17:58 | CH1 | "                                           " |
| 7:18:16 | CH1 | He goes onto the porch and inside |
| 7:20:15 | CH1 | He goes outside and stands at edge of stairs |
| 7:20:37 | CH1 | He goes inside |
| 7:20:49 | CH1 | He goes outside into the yard and by the sidewalk |
| 7:21:20 | CH1 | He goes to the steps and sits down on them |
| 7:22:31 | CH1 | He goes inside |
| 7:25:29 | CH1 | First officer is heading west on Irwin and then south on Jireah |
| 7:25:52 | CH1 | First officer enters the house. |

This clearly establishes guilt beyond a reasonable doubt because it shows i'm with Barbara when she calls me at 7:11 while we are together in the house. Why call me unless I called myself, Right? Then after I had all the time to beat her, Choke her, knock her around, and cut her "4" times I have time to stage the scene and discard the weapon, Right? Then leave and "Panic" and on my way back but BEFORE I get back to the house I call 911 at 7:15:51. So that would prove that I must have assaulted her before I left to know that she is in need of emergency medical attention. 911 call is about 3 to 4 minutes long if im correct * I Don't have nothing other than trial transcripts sent to me * So I'd just be getting back to the house when my phone dies. BEYOND REASONABLE DOUBT GUILTY!!

Now lets see this with the correct time or that very close to the correct time! * Nearly corrected on Rebuttal after Jurors are misled *

CH7 7:02:14   Both of them walking North in the Alley

5 Message  7:03:04   Good? Not Good? I was behind 1432 Jireah petting the pitbull (sadie)

CH1 7:03:12   Both of them walking along Southside of 1432 Jirach to the front of the house
CH1 7:03:26   Both of them walk onto the porch and go inside
CH7 7:10:48   He is walking South in the Alley   (lady across the street is carrying stuff in from the car)
Barbara calls me at 7:11   (Clearly I'm not there at the house with her)
CH4 7:12:22   He is running west on Northside of Gerard, then turns North on Eastside of Jirach
CH7 7:13:48   He is running North on Eastside of Jirach
CH2 7:13:53   He is running North on Eastside of Jirach   (Pro-Med Ambulance passes me)
CH1 7:13:58   He is Running North on Eastside of Jirach   (lady across the street gets in her car, on the phone)
CH1 7:14:16   He goes inside   (1432 Jirach) (Leaving the door OPEN)
I call 911 at 7:15:51   (1 minute 35 seconds after I go in) (trying to prevent a suicide)
CH1 7:16:15   He goes outside and stands at edge of stairs (looking left for Pro-Med's Return up the street)
911 dispatch answers the call at 7:16:21 (According to their time) (lady across the street leaves)
CH1 7:16:37   He goes inside
CH1 7:16:49   He goes outside into the yard and by the sidewalk (looking left for Pro-Med's Return)
CH1 7:17:20   He goes to the steps and sits down on them
CH1 7:18:31   He goes inside (to render aid as advised by 911 dispatch)
CH1 7:21:29   First officer is heading West on Irwin and then South on Jirach
CH1 7:21:52   First officer enters the home

You can see, clearly, how much of a difference it makes with the closer to correct time as compared to the incorrect time. I could not, physically, have had time to do as the prosecutor speculates to. You preview the camera you will not see me on no phone "making a call" as ~~they~~ stated by the prosecutor. This, clearly, establishes "Bad Faith" on part of the state as it is Plainly Obvious the time is incorrect and the state knew of the ERROR.

Napue v Illinois, 360 U.S. 264, 269, 272 (1959) "Due Process is violated when prosecutors knowingly or Recklessly use false testimony; " ..... false impression is false evidence." People v Atkins, 397 Mich 163, 173 (1976). The United States Supreme Court has clearly established that the Fourteenth Amendment Due Process Clause requires that a criminal defendant receive a New Trial when his convictions are obtained through the use of Material false and perjured testimony, which the prosecutor knew or should have known was perjured. See Mooney v Holohan, 294 US 103 (1935); Berger v United States, 295 US at 85-86; Pyle v Kansas, 317 US 213 (1942); Napue v Illinois, Supra; Brady v Maryland, 373 US at 86-88; Giglio v United States, 405 US 150, 153-154 (1972); United States v Agurs, 427 US 97, 103-105 (1976); United States v Bagley, 473 US 667, 679 & n 8 (1985)
   The "Same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears". Napue v Illinois, Supra, at 269; Giglio v United States, Supra at 153.

The prosecutor has a duty to correct false testimony not only going to the elements of the charged offense, but anything that affects the credibility of a witness.

*Napue v Illinois*, supra, at 269; *Giglio v United States*, supra, at 153-155.
"The prosecution's duty to prevent false evidence from entering the evidence in the guise of truth is derived from the prosecutor's duty to represent the public interest, and to place the pursuit of truth and justice above the pursuit of conviction."

"We cannot speculate in light of this substantial error .... jury gave consideration .... erroneous testimony..... verdict. A new trial is required." *People v Anderson*, supra, at 44 *Mich App* pp 228-229; 205 *NW2d* pp 84-85. *People v Cassell*, 63 *Mich App* 226 (1975)(supra, at 229).

There is no doubt, in the instant case, that the False Evidence of facebook post, number of cuts, manipulated autopsy report, suppression of all photos, the surveillance footage, several witness and the improper racial comment and mere speculation is sufficient to support a verdict of guilty. However, the United States Supreme Court has clearly established that convictions obtained by the use of false evidence cannot stand. And as earlier cited by the 5th Circuit on "Reasonable Likelihood" in *United States v Barham*, 595 F2d 231, 242 (CA5, 1979), "........ the defendant is entitled to a jury that is not laboring under Government - sanctioned "false impression", which is as stated in *People v Atkins*, 397 Mich 163, 173 (1976) ".... false impression is false evidence.", of material evidence when it decides the question of guilt or innocence with all of it ramifications"

Trial Tr. Vol 4
Pg. 49

"And that expert also told you about a broken hyoid bone and when did she tell you when she sees that? From somebody having hands around and pressure on someones neck."

* It was a fractured hyoid bone and she (M.E.) didn't say or tell it is from one "having hands around and pressure on someone's neck." * refer to Trial Tr. Vol 3 pg-35; .... "when there's pressure that's placed on the sides of the neck." "Pressure on the side of her neck."

Prosecutor: "Would that pressure be consistent with somebody having their hands around that victim's neck?"

M.E.: "That's one of the ways that we could see a fracture to the end of the hyoid bone, yes."

* Again, misstating facts and putting words in witnesses mouths *

"We ~~see~~ him know from the surveillance video that's not what happened. We see him call 911 ------- That dispatcher told him don't apply to much pressure. And

-33-

I'LL SUBMIT to you what he did in order to make sure that he knows she could not tell the truth, the thing that put that blood on his hands was that he put his hand on her throat and applied pressure so that she would never be able to tell us the truth. That's what the evidence shows.

* Appeals, Prosecutorial Misconduct — The prosecutor may not express his own opinion, either directly or indirectly..... Such expressions of personal opinions are a form of unsworn and unchecked testimony. These expressions of opinions are particularly difficult for the jury to ignore because of the special position held by the prosecutor. The jury is aware that he or she has prepared and presented the case and, consequently, may have access to matters not in evidence which the jury may infer to have precipitated the personal opinions. *

During Jury Selection

The Prosecutor had shown a photo of Barbara's bruised face and cut neck. The potential jurors had not yet be sworn in to be the fact-finders, violating the right to a fair and impartial jury trial under the 6th Amendment.

It had resulted in one of the jurors coming forward in honesty and fairness. Refer to the Trial Tr. Vol 1 2of 2 pg 221 for context of the consequences of the prosecutor's actions of influencing the jury against the defendant.

For the reasons stated above and for the Due Process requirements enunciated in several of Case Laws, Defendant-Appellant asks this Honorable Court to Reverse the conviction and Remand for a new trial if a new trial doesn't violate Double Jeopardy after review of the true evidence.

<u>Relief Requested</u>

Defendant - Appellant, Therefore, Respectfully Requests that this Honorable Court Vacate his conviction and Remand for a New trial or demand his immediate release from imprisonment and ~~dismissed~~ dismissal of his case.

Respectfully Submitted,

By /s/ ~~Joshua Salyers~~

Joshua Salyers #422144
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, MI 49660

-35-

(Videotape, 9-22-17, 9:14:06)

1    THE COURT: Good morning.  Welcome back for day

2 four people.  State of Michigan versus Joshua Michael

3 Salyers, file number 16-4697-FC.  We have everybody in

4 place.  The jurors are gathered.

5    First order of business.  Anything that

6 needs to be discussed about our handcuff hiccup at the end

7 of the day yesterday?  I want you to know I've spoken to

8 both deputies.  I think what happened was a combination of

9 several missteps including probably a couple of my own.

10 So I think we've made a record.  Is there anything else we

11 need to discuss about that?  Mr. Lesica?

12    MR. LESICA: Your honor, I think it's grounds for

13 a mistrial and I so move.  All the jurors were out

14 standing on the courtroom floor and this defendant was

15 handcuffed by the deputies in plain view of every one of

16 them.  This could inflame the jury or influence their

17 decision against my client and I think it was a

18 particularly unfortunate circumstance but that's my motion

19 on that.

20    THE COURT: All right, thanks.  Mr. Medema?

21    MR. MEDEMA: Thank you your honor. First I would

22 point out that it was really at the defendant's own

23 urging.  The defendant did, with the jury present, reach

24 his hands out to the deputies and at that time and that

25 time only did the deputies actually then take up their

(*Videotape, 9-22-17, 9:14:06*)

1   handcuffs and handcuff him.  So it was at the invitation
2   and based on the actions of the defendant it warrant a
3   mistrial in and of itself based on that argument.
4             In addition, we have the testimony from the
5   defendant himself that his residence is, and he kind of
6   laughed it off, at the jail and gave that residence as 25-
7             THE COURT: Well he didn't say at the jail.  He
8   said 25 West Walton.
9             MR. MEDEMA: Yes.  And we have extensive
10  testimony from not only another inmate but Mr. Salyers
11  himself as to him being in the jail for an extended. In
12  fact the exact locations in the jail.  We have the
13  testimony of Deputy Gilbert as to where he was in the jail
14  so the fact that the defendant himself reached out his own
15  hands on his own actions and was handcuffed really does
16  not inflame the jury any more than the evidence that we
17  already have in play here and therefore I ask to deny the
18  motion for mistrial.
19            THE COURT: All right, thanks.  The Court denies
20  the motion.  What happened yesterday was unfortunate. I
21  think we stride mightily to avoid those kinds of scenes.
22  Occasionally they happen.  The defendant is entitled to a
23  fair trial.  It's not a perfect trial though we try our
24  best.  I think Mr. Medema has nicely articulated the other
25  things which suggest that that particular incident really

(Videotape, 9-22-17, 9:14:06)

1    is probably not that big a deal for the jurors.   The

2    deputies have been here transporting Mr. Salyers

3    throughout the trial; they're sitting here behind him the

4    whole time.   We have testimony that he lives in the jail,

5    that he's been in the jail, that he's had cellmates,

6    things like that.   So it's unfortunate but I don't think

7    that there's any grounds for a mistrial here as the Court

8    evaluates the severity of the circumstance.   In fact, I

9    think Mr. Salyers was quite cooperative and that's good,

10   inures to his benefit.

11             All right, next.   Jury instructions.

12   Gentlemen, you've had them.   I'll entertain your comments

13   now.   I think the number one thing we have to decide is

14   whether the Court should give the involuntary manslaughter

15   instruction requested by the defense.   Correct Mr. Lesica?

16             MR. LESICA: Correct your honor.

17             THE COURT: Mr. Lesica, before we do that I want

18   to just take care of two other things.   I don't see any

19   way that voluntary manslaughter comes into play here

20   because that essentially requires the killing under so-

21   called hot blood, right?

22             MR. LESICA: Yes.

23             THE COURT: OK, so you're not asking for that.

24             MR. LESICA: No.

25             THE COURT: There was some chat in chambers about

(Videotape, 9-22-17, 9:14:06)

1  negligent homicide and it looks to me like that particular

2  statute has been repealed.  If you look at the jury

3  instruction 1614 which is where the negligent homicide

4  instruction used to be it says that the instruction was

5  deleted due to a repeal of the negligent homicide statute.

6  And it's covered under MCL - I'm sorry, jury instruction

7  15.16 in the Vehicle Codes.  So unless there's some other

8  authority you want to point me to I'm not sure how that

9  comes in here.  Mr. Medema, do you see it a different way?

10           MR. MEDEMA: No your honor.

11           THE COURT: Mr. Lesica, anything else on that

12  point?

13           MR. LESICA: No.  My research is similar.

14           THE COURT: All right.  So involuntary

15  manslaughter then.  Mr. Lesica I'll entertain any other

16  comments you may have at this time.

17           MR. LESICA: Your honor I believe the statute

18  clearly states that involuntary manslaughter occurs when a

19  person is accidentally killed due to someone else's

20  criminal negligence, i.e., the defendant.

21           THE COURT: You're reading from the what?

22           MR. LESICA: The statute your honor. 750-

23           THE COURT: 750 point what?

24           MR. LESICA: I think it's 329(a).

25           THE COURT: OK.

(Videotape, 9-22-17, 9:14:06)

1        MR. LESICA: "Involuntary manslaughter occurs

2    when a person is accidentally killed due to someone else's

3    criminal negligence where the intent was not to cause

4    death.  The person has no intention of killing another but

5    due to their careless or reckless action causes the death

6    of another."   I believe the testimony of my client

7    clearly established those facts when he described that

8    from the witness stand.  Evidence comes from the witness

9    stand and I believe that as an included offense is

10   appropriate in this particular case.

11       THE COURT: Thank you.  Mr. Medema?

12       MR. MEDEMA: First your honor I would obviously -

13   I would rely on the brief that was filed yesterday for

14   one.  Secondly, simply (indistinguishable) just because

15   the defendant mentions something does not mean that

16   automatically warrants a jury instruction.  In order to

17   get the jury instruction it needs to be based on a

18   rational view of the evidence and I would submit to the

19   Court that just because the defendant may have said he did

20   these things all of the other evidence in this case is

21   overwhelmingly disproving anything that he said so that

22   any rational view of it would not allow for the jury

23   instruction.

24       Thirdly your honor I would submit that

25   defendant himself has not even said that he was careless

(Videotape, 9-22-17, 9:14:06)

1    or reckless in what he did.  His version that he

2    eventually settled on here today, or yesterday, was that

3    all I was doing was trying to stop somebody from killing

4    themself.  That in and of itself is not a careless or

5    reckless act and it does not warrant the involuntary

6    manslaughter jury instruction.

7         THE COURT: Thank you.  Well gentlemen I made a

8    point of outlining the applicable jury instruction on the

9    board here and I made a point of being sure you both had

10    that you both had that instruction before you as I spoke.

11    Mr. Gereaux you can maybe move that up a little bit for

12    me.

13         (Off record at 9:21:52)

14         (Court resumes at 9:25:35)

15         THE COURT: OK, back on the record.  Mr. Lesica,

16    you're reading from MCL 750.329(a)?

17         MR. LESICA: Yes.

18         THE COURT: OK.  I think the more applicable

19    statute might be MCL 750.321 but for the attorneys and for

20    the folks in the audience, let me say this.  The

21    legislature enacts the laws.  It put them in the books and

22    they say here's what the crime is, and beyond that

23    attorneys and judges have to do additional work.  We have

24    to take those statutes, as you've seen throughout the

25    trial, and make it presentable so that lay people who

(Videotape, 9-22-17, 9:14:06)

1    aren't attorneys, perfectly smart but aren't attorneys can
2    understand them.   So it's probably in the good old days,
3    50 years ago, 100 years ago we would just give the jurors
4    the statute and say "here, figure it out".   Well we don't
5    do that now.   We give them jury instructions that are
6    based upon the statutes and based upon court cases that
7    have come along that have helped to explain things.
8         And so what I've done for you here is from
9    this book the involuntary manslaughter jury instruction is
10   1610 and it has three elements really.   Number one, a
11   defendant caused the death of Ms. Daley.   Number two,
12   there are two versions.   One is that he did so by gross
13   negligence.   Now gross negligence is defined in the jury
14   instructions as well.   It says, "In doing the act that
15   caused Ms. Daley's death the defendant intended to injure-
16   "   No, I'm sorry, that's the second version.   Gross
17   negligence says that "the defendant knew of the danger to
18   another.   That is he knew there was a situation that
19   required him to take ordinary care to avoid injuring
20   another.   Second, that the defendant could have avoided
21   injuring another by ordinary care.   Third, that he failed
22   to use ordinary care to prevent injuring another when to a
23   reasonable person it must have been apparent that the
24   result was likely to be serious injury".
25        So it seems like of the two alternatives in

1    element number two Mr. Lesica you're focusing on that

2    first one, gross negligence.

3            MR. LESICA: Yes.

4            THE COURT: OK.  The second part of that,

5    alternative (b) under 2 I don't think applies here anyway

6    even if Mr. Lesica asked for it because that second

7    version assumes that there was an intent by the defendant

8    to injure Ms. Daley.  And the form jury instruction says

9    "the act charged in this case is assault and battery.  The

10   prosecutor must prove the following beyond a reasonable

11   doubt-" and even by Mr. Salyers' own testimony when he was

12   doing this he didn't intend injury to Ms. Daley, he was

13   trying to help her.  So that's why I put that big red X on

14   2(b).  I don't think that applies.  So we have to evaluate

15   the gross negligence part.

16           And the third element here is there's no

17   legal excuse for what he did and I really don't that

18   applies here.

19           So really the Court's analysis is focused

20   right there.  The Court is obligated to allow the jurors

21   the possibility of making that decision only when a

22   rational view of the evidence supports it.  And that's

23   important.  The Court is not obligated to give that

24   instruction in response to any testimony offered by

25   anybody.  Now the Court has to be careful here because

*(Videotape, 9-22-17, 9:14:06)*

1    it's very important that I don't invade the decisions that

2    the jurors have to make.  I shouldn't be and I can't weigh

3    the evidence now and think that there's a plausible or not

4    plausible or would the jurors believe it or not believe

5    it.  I have to determine whether there is a rational view

6    of the evidence would support the giving of that

7    instruction of the gross negligence standard and in my

8    view it does not.  So the Court will not be doing that.

9           Dr. Fisher-Hubbard said that Ms. Daley died

10    as the result of multiple injuries including blunt and

11    sharp force.  She said that in response to Mr. Medema's

12    questions.  Later on in cross-examination she said the

13    death was caused by cutting and/or blunt force trauma.

14    And the word "or" I think is important.  Cutting and/or

15    blunt force trauma.  Now I have to say this, she did admit

16    to Mr. Lesica that it's possible that a wound was

17    inflicted with two folks pushing and shoving.  He asked

18    her could this happen during a prolonged fight for life

19    with more than one fall.  "Yes", she said, "multiple

20    falls".  So there is some testimony but that's simply not

21    a rational view of the evidence here.  Dr. Fisher-Hubbard

22    said that the self-inflicted knife wound like this usually

23    has hesitation marks.  There were none of those here.

24    Hesitation marks are sometimes shallow.  These were not

25    shallow; they were very deep.  There were four of them.

(Videotape, 9-22-17, 9:14:06)

1  She said it was highly unlikely she did it to herself.

2  Even under the defendant's version, the cutting had

3  started or seemed to start, he said there was one cut     *Incorre*

4  incurred by Ms. Daley when he was pulling, her jerking

5  away.  That does not seem like the type of incisive cut

6  we're talking about here.

7         I've also examined the pictures again and

8  there's extensive blunt force trauma that is not

9  consistent with a rational view of the evidence.  Mr.

10  Salyers' testimony essentially is that Ms. Daley in the

11  course of this struggle, in the course of his attempts to

12  save her, fell twice, maybe three times and the amount of

13  blunt force trauma here is not consistent with that    *I did not say maybe 3*

14  testimony as well.                                     *times.*

15         So overall as the Court evaluates the

16  evidence there's really no rational view of the evidence

17  that would support the giving of this instruction and so

18  the Court declines to do that.

19         So beyond that, any other jury instruction

20  issues?  Mr. Lesica, Mr. Medema I think contacted our

21  office today.  He said he was going to ask for the giving

22  of 1615 involving state of mind.  What's your position

23  about that?

24         MR. MEDEMA: Your honor, it's 1621.

25         THE COURT: I'm sorry.  Thank you Mr. Medema.

(Videotape, 9-22-17, 9:14:06)

1    I've got too many instructions here on the bench.   1621,

2    Mr. Lesica your position?

3         MR. LESICA: Your honor, it's a Standard Jury

4    Instruction that would seem to fit the circumstances.

5         THE COURT: I think it fits these facts.  We need

6    to clean up the pronouns and things like that but we'll

7    give it; I'll integrate it into the body of the other

8    instructions.  Any other jury instruction issues?  Mr.

9    Medema?

10        MR. MEDEMA: Yes your honor.  I think that 3.3 in

11   the last copy that we were given should be deleted.  It's

12   about the defendant not testifying.

13        THE COURT: Sure, yeah we cleaned those things up

14   already, thank you.   Any other substantive issues Mr.

15   Medema?

16        MR. MEDEMA: No your honor, thank you.

17        THE COURT: Mr. Lesica, any substantive issues?

18        MR. LESICA: No your honor.  We made our — we

19   made our point.

20        THE COURT: All right.  You did and that

21   objection is noted and it is preserved for the record.

22        All right gentlemen, I need to digress for

23   a minute and take a case on my civil docket.  What I'd

24   like you guys to do is go out and talk to Ms. Severi who

25   is filling in for Ms. Orrison and between the three of you

(Videotape, 9-22-17, 9:14:06)

1    you can clean up any other technical issues.  Thank you

2    very much.

3              (Off record at 9:34:17)

4              (Court resumes at 9:57:34)

5              THE COURT: Gentlemen, let me burnish my ruling

6    with just one more thing.  If you look at 1610, the

7    instruction, it became clear to me last night when I was

8    working at home that these facts just don't fit because

9    the first paragraph, the paragraph that starts with the

10   word "first" says "that the defendant caused the death of

11   Barbara Daley, that is that Barbara Daley died as the

12   result of" and then we would say multiple injuries

13   including blunt and sharp force.  And then the second

14   element said that "in doing the act that caused Ms.

15   Daley's death".  So the phrase "the act" is singular.  I

16   think it sort of reflects a situation of where maybe

17   somebody is driving the wrong way on the freeway or

18   something like that.  And that just doesn't fit here.

19             Also, a determination of gross negligence

20   would be very problematic in this very unusual situation.

21   So I thought I should add that as well.

22             So that concludes my work on that.  We've

23   had a good discussion in chambers.  You guys have a newly

24   minted copy of these instructions in blue.  Are we all set

25   for closing arguments Mr. Medema?

*Marissa: 313 8675309*

*People v Goulett*
*D# 44701*
*Rickery v Mitchell*
*395*
*F.3d 660*
*Reversed/Remanded*

STATE OF MICHIGAN
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
CENTER FOR FORENSIC PSYCHIATRY

**RICK SNYDER**
GOVERNOR

**NICK LYON**
DIRECTOR

May 18, 2017

Benjamin L. Medema
Muskegon County Prosecutor
990 Terrace Street
Muskegon, MI 49442

and

Fred J. Lesica
Defense Attorney
3224 Glade Street
Muskegon Heights, MI 49444

RE:  SALYERS, Joshua Michael
CFP #:  1004376
Docket #:  16-4697-FC
Subject:  Criminal Responsibility

Dear Attorneys:

The defendant, Mr. Joshua Michael Salyers, is a 29-year-old man who was born on August 26, 1987. He was evaluated at the Center for Forensic Psychiatry (CFP) satellite location at the Kent County Correctional Facility on April 11, 2017 pursuant to a court order for evaluation relative to criminal responsibility dated February 15, 2017 and signed by the Honorable Timothy G. Hicks in the 14th Circuit Court, Muskegon County, Michigan. Mr. Salyers is charged with one count of Homicide – Open Murder – Statutory Short Form under Docket Number 16-4697-FC. This is his first time being evaluated at the CFP. This report summarizes findings from Mr. Salyers' evaluation and my reasoning with respect to my opinion regarding his criminal responsibility.

**Sources of Information**
- Order for Evaluation Relative to Criminal Responsibility, dated February 15, 2017
- Documents that accompanied the court order, including:
  - Information sheet
  - Muskegon Police Department Incident/Investigation Report
  - Postmortem Examination Report

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 2

- o State of Michigan Department of State Police Forensic Science Division Laboratory Report
- o Muskegon County Sheriff jail incident report
- o Records from Mercy Health Muskegon
- o Certificate of Death
- o Muskegon County Medical Examiner's Office Case Report
- o Handwritten letter signed by "Josh" and addressed to "Barbara"
- o AIT Laboratory Report
- Attempted telephone contact with Mr. Salyers' attorney, Mr. Fred Lesica
- Personal contact with Mr. Salyers on April 11, 2017 totaling approximately one hour and 20 minutes
- Telephone contact with Mr. Salyers' mother, Patricia Barnett, on April 12, 2017
- Records from HealthWest
- Records from the Muskegon County Jail
- Records from Allegiance Health
- Mr. Salyers signed a release for records from Rivendell Hospital. These records were requested, but had not been received, at the time of writing this report.

**Advisement/Notification**

Prior to this examination, Mr. Salyers was informed that the Court had ordered an evaluation of his criminal responsibility, involving what he was thinking and feeling when the alleged crime occurred. He was advised that the examination is not protected by the usual psychologist/patient confidentiality, in accordance with MCL 330.1750. He was also informed that a report would be submitted according to legal requirements, and that I could be subpoenaed to testify about the report or anything else related to the examination. Salient points regarding the advisement were explained and Mr. Salyers was provided with the advisement form to review, which he read without difficulty. He was given the opportunity to ask questions and agreed to participate in the evaluation.

**Current Mental Status**

Mr. Salyers was evaluated at the CFP satellite location at the Kent County Correctional Facility on April 11, 2017 for approximately one hour and 20 minutes. He was transported from the Muskegon County Jail where he was being detained. He was dressed in standard, jail-issued attire and his grooming/hygiene appeared adequate. No disturbance of fine or gross motor functioning was observed. The rate and volume of his speech were within normal limits and he maintained appropriate eye contact throughout the examination. Rapport, sufficient for the purposes of this evaluation, was established and maintained. Mr. Salyers displayed good behavioral control during the current evaluation. He was oriented to person, place, time, and situation. He

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 3

demonstrated an understanding of the nature and purpose of this evaluation after it was explained to him. Based on his vocabulary, grammar, sentence structure, fund of information, and reported educational history, he appeared to have normal cognitive/intellectual abilities (i.e., not significantly subaverage). His memory appeared grossly intact as he was able to recall recent and remote events, some of which was corroborated by collateral sources. His attention and concentration appeared intact as he was able to appropriately follow the flow of conversation and provide relevant responses.

Mr. Salyers' thought processes were coherent, logical, organized, goal-directed, and free of abnormalities of thought process indicative of a formal thought disorder. No excessively rapid or pressured thought processes were evident through his speech. He did not exhibit signs indicative of bizarre or perseverative thinking or disorganized speech or behavior during the current evaluation. He also did not exhibit unusual mannerisms or bizarre behavior. Mr. Salyers' observed expression of emotion was reasonably positive and generally appropriate to the topics of discussion. When asked to describe his mood, he replied, "Okay right now but I'm just there... not really happy." He denied current suicidal ideation including plan or intent. He denied a disturbance of appetite but indicated that he does not get a lot of food in jail. He stated that he sleeps "here and there" and wakes up early. He reported that he talks to Jennifer, the jail CMH liaison, to help cope. He said that in jail he was taking Celexa and Prozac at some point but he has not taken any medications since December 2016 or January 2017 because they did not really help and resulted in side effects (e.g., "affects my sight").

**Relevant Background Information**

Mr. Salyers reported that he quit school after the 11th grade and subsequently earned his GED and entered the Army. According to him, he was "almost through basic and [he] just stopped" because he "couldn't stand authority" so "they gave [him] failure to adapt." He endorsed a history of special education. He said he did not know why he was in special education and stated, "I was a complete asshole unless you were a woman." He denied being diagnosed with an intellectual disability/mental retardation, and he stated, "I was actually really smart." Mr. Salyers denied a history of seizures or brain injuries. In terms of mental health history, he reported that he received medications and counseling from his family doctor at Foote Hospital when he was a child. He stated that he went to Rivendell Psychiatric Hospital when he was seven or eight years old. According to Mr. Salyers, he last received mental health treatment when he was 12 or 13 years old. He denied a history of inpatient or outpatient substance abuse treatment. He endorsed a history of smoking marijuana but stated, "I'm not an addict – drugs are not a problem for me."

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 4

Available records from Allegiance Health indicate that Mr. Salyers was seen for physical health complaints (e.g., upper abdominal pain, leg numbness, sore throat) in November 2013, June 2014, and February 9, 2016. His mood, affect, and cognition were described as normal during these visits. As part of the current evaluation, I spoke via telephone with Mr. Salyers' mother, Patricia Barnett. She indicated that he was diagnosed with ADHD (attention-deficit/hyperactivity disorder), oppositional defiant disorder (ODD), and PTSD (posttraumatic stress disorder) when he was a young child. He reportedly took ADHD medication only for a short time. She reported that when he was about eight years old, Mr. Salyers went to Rivendell Hospital for a couple weeks. When asked what prompted this hospitalization, she described him sitting in the middle of the road "flipping cars off not letting them through." She stated that he was "always in trouble." For example, he reportedly "caught [her] house on fire" a few times. She added that Mr. Salyers couldn't stay in school/daycare because he would get "kicked out" due to his behaviors. She described him as being "very hyper" and "all over the place" (e.g., happy one minute, angry the next) when he was a child.

## Police Version of the Alleged Offense

In brief, Mr. Salyers is accused of murdering Barbara Ann Dailey on September 4, 2016. According to the police report, officers were dispatched to the scene of the alleged offense where they discovered the alleged victim "unconscious and not responsive... bleeding from the throat." Mr. Salyers was also at the scene where he was reportedly "crying and weeping over the victim." He initially told police that the alleged victim, who was his girlfriend, "called him yelling and stated that a black male was attacking her... he then ran" to her home. He said that, on the way to her home, he saw a "black male wearing a black shirt and red shorts running North... he then walked into the home and found Barbara covered in blood and he called 911." Officers eventually determined that Mr. Salyers "was likely the only person who entered or exited the home" and they found a knife in the sink that tested positive for human blood.

Mr. Salyers was subsequently transported to the police department where he was questioned. He reportedly "asked... several times if Barbara was alive" and "made several statements... about his relationship with Barbara." According to him, he had moved in with her at the residence in question "sometime in mid May" but "he moved out in mid August [and stayed with the alleged victim's father] because of the 'drama' in the home." For example, he "stated that roommates in the home and friends of Barbara's did not like him and were trying to break him up." Mr. Salyers reportedly "made several comments... that he believed it was the 'black guys' across the street that may have hurt Barbara." Detectives "confronted him with the idea that he had something to do with this incident. He would go from helpful to angry and sad." Eventually, Mr. Salyers indicated that the alleged victim "put the knife to her throat" and "he grabbed a hold of her arm and tried to pull it away" but "she jerked her arm... [and]

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 5

when she jerked her hand away the knife ran across her throat." According to the police report, "He said he took the knife and wiped her fingerprints off and put his own prints on the handle. He then placed the knife in the sink. He said he wiped the knife off with his shirt." Detectives then "received a message stating that the victim had blunt force trauma to her head as well as an injury to her shoulder and her mouth," which Mr. Salyers was confronted about. He was asked again to tell what happened with the alleged victim that day and he "said he shoved her and she probably hit her head on the banister. He shoved her because she said she was going to get a knife in the kitchen... he thinks she may have damaged her mouth and teeth when she hit the floor." Mr. Salyers was given the opportunity to write a letter to Barbara, which he did.

According to the alleged victim's father, Mr. Salyers had been staying with him for a few days leading up to the alleged offense. He said that Barbara broke up with Mr. Salyers "around midnight Saturday night going into today 09/04/2016" and Mr. Salyers was "blowing up Barbara's phone with text messages." Other witnesses described him as "a very jealous person" and "controlling." His brother also reportedly said that he has been "fucked up" in the head from a young age and that "if Joshua is not in control he becomes angry." According to the police report, while in jail Mr. Salyers threatened another inmate saying, "I'll slit your throat and watch you lay there. I'm here for murder" and he made "further statements of I killed her and now I have to live with it and it is tearing me up inside."

## Defendant's Account of the Alleged Offense

As part of the current evaluation, Mr. Salyers was asked to provide his account of the alleged offense. He indicated that it occurred on September 4, 2016. When asked to describe that day, he said that he was "talking to a girl named Stephanie for hours... about suicide." He said she tried to help him and told him to block the alleged victim so he took her advice and blocked the alleged victim on Facebook. According to Mr. Salyers, the alleged victim saw that he blocked her and she sent him a text message to the effect of, "Wow you blocked me burn in hell jump off [a] bridge -- something like that." Mr. Salyers described making dinner for the alleged victim's father and his girlfriend, who he was living with at the time, that day. He reported that he was helping them with cooking, cleaning, etc. because her father was on bed rest and her father's girlfriend was getting back surgery. Returning to the day of the alleged offense, Mr. Salyers said that the alleged victim sent him a message about going for a walk. She also reportedly said something like "I'll see you if I see you." He reportedly called her and asked what she meant. He said he walked over to where the alleged victim was living and he initially stayed across the street. He said she told him the door was open and she came downstairs. They then walked to the market and "talked about everything." She reportedly apologized that he had to leave the residence due to being kicked out. According to Mr. Salyers, they saw their friend David. The alleged victim

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 6

reportedly gave him a hug and a dollar; he got beer and left. David reportedly invited them to come over to smoke marijuana, drink, and hang out.

Mr. Salyers indicated that he and the alleged victim continued walking to her home. During this walk, the alleged victim reportedly sat down near a "broken-down-used-to-be business." He said they smoked cigarettes and "talked some more." According to Mr. Salyers, the alleged victim said she was thirsty so they went to her house and she grabbed a Mt. Dew. She reportedly told him that she had apple juice so he went in the house and grabbed it from the refrigerator. He said they then walked up the street to a tree in front of the hospital. He said she was allergic to the sun and was light-headed. They were reportedly "going through [their] phones" and she asked him to unblock her, which he agreed to do. She reportedly tried to unblock him but couldn't find him so she gave him her phone. He said he found himself but "it said something about... can't add this person" so he gave her phone back. He said he walked her back to her house and the back door was locked so they went in the front door. According to Mr. Salyers, he sat down on the chair and she straddled him, kissed him, and said that she missed him/was sorry. He reportedly said "it's okay" and they kissed again. They heard a noise and they thought the other residents were back so they "jumped up." He described running out the back door, over the dog, and over the fence then down the alley. The alleged victim reportedly called him and said that it wasn't them. She also "said I love you and I'm sorry." He noted that she was crying and then she hung the phone up.

Mr. Salyers said he "ran back up the street" and got to the house where she was "standing with [a] knife to her neck." He stated, "She's just I'm sorry, I love you, make sure my girls are taken care of." He reported that she then took the knife and "lightly ran it across [her] neck," which caused a "little trickle of blood." He said he "shoved her" and "she hit her head on [the] banister" but "she didn't drop [the] knife like [he] wanted her [to]." According to Mr. Salyers, "She said Josh please don't, I want to do this. I'm tired of the bullshit." He stated that "she did it again a little deeper" and blood splattered across his shirt/necklace. He said he lunged with his left hand to grab her wrist "but she was moving her hand and she jerked it and it just went in deeper." He said he then reached up with his right hand and "snapped her wrist back as fast as [he] could." He said he "shoved her to the floor to get [the] knife away" and "her head bounced off [the] floor." He said he grabbed the knife out of her hand and put it in the sink. He then called police and he described himself as hysterical/crying. He said he remembered "lying to them about what happened." According to him, at this point she was still breathing and he "hoped she'd live." He indicated that he told police she was attacked so her children would not be taken away from her. When asked to elaborate on this, he said that she would be "considered [an] unfit mom" if they knew she had tried to commit suicide. He explained that the alleged victim had attempted suicide twice in the past.

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 7

According to Mr. Salyers, he put his shirt on the alleged victim's neck because dispatch told him to. He did not remember hearing the police arrive but he recalled one of them putting their hand on his shoulder. He said the officers were trying to talk to him but he did not recall what they were saying. He reportedly agreed to go to the police department and they "kept asking [him] what happened." He said he kept giving them the same story about another guy attacking her and he told them that "they were stupid if [they] thought [he] did anything to her." The officers reportedly said that there was more to the story and Mr. Salyers told them that if he said what really happened not to take her children. He stated, "They asked how many cuts – I held up two fingers." He stated that he "just melted... crying" when police told him the alleged victim was deceased. He said he did not remember getting booked in to the jail but he remembered waking up the next morning in jail with a suicide gown on. According to him, he was in the "suicide tank" for two to three weeks. He said he saw "Jennifer" (the jail CMH liaison) four of five times during that time. Mr. Salyers asserted that the report from the jail was "a lie" because he "would never kill [a] girl or admit to it in front of [a] cop even if [he] did." Mr. Salyers stated that he would "plead to anything [he] did."

Mr. Salyers reported that he and the alleged victim met online on Facebook. He said "she has mental issues pretty bad" and he "kept her from killing herself two times." According to Mr. Salyers, he lived with the alleged victim and her "baby daddy" until they "kicked [him] out." He indicated that he moved in with her family friend David for three weeks and then the alleged victim told him to move in with her father until Labor Day when they were going to move to Jackson "to get away from drama." He stated that "Barb wanted [him] close so [they] could work on [their] relationship." He described working a number of jobs (e.g., Taco Bell, McDonald's) prior to the alleged offense, although he said he had difficulty getting transportation there. He said he "got into adult cam modeling thing" for some time. Mr. Salyers indicated that his mother told him he was diagnosed with ADHD, PTSD, and bipolar disorder during childhood. He indicated that he took medications for these but stopped when he was "young" and he denied taking any medications at the time of the alleged offense. Mr. Salyers described himself as "depressed" due to going through a divorce with his wife and finding out his father had cancer. When asked about consuming drugs or alcohol around the time of the alleged offense, Mr. Salyers reported that he and the alleged victim "smoked weed" the day before the alleged offense (i.e., September 3, 2016).

**Relevant Collateral Information**

According to available HealthWest records, Mr. Salyers had a screening on September 6, 2016 (i.e., two days after the alleged offense). The records note that he was seen in the jail "in response to suicide hold." He was described at that time as presented with depressed mood and congruent, dysthymic affect. He reportedly "explained that him and his girlfriend fight constantly and threaten suicide regularly," although he denied

*I did not deny previous attempts. I've tried several times*

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 8

previous suicide attempts. He reported that he was on medications as a child but did not remember the details. He indicated that he has "worked on and off in the past" and "admitted to marijuana use but nothing more." The records state that he was "vaguely interested in meds but does not want the money taken out of his account." Available Muskegon County Jail records indicate that he has been prescribed Prozac, Zyprexa, Celexa, and Paxil. A note dated October 25, 2016 indicates that he complained of vision changes since starting Paxil. According to an October 27, 2016 note, he stated that since stopping the Paxil his vision had improved.

The HealthWest records indicate that Mr. Salyers was not seen again until January 18, 2017. According to a Direct Individual Progress Note from that date, "He noted that he was doing a bit worse than before. He asked if he could go back into a room with a camera." He denied being suicidal at that time but he was worried that he might be soon ("I'm just trying to take precautionary steps"). He reportedly stated that he was taking the medications but he did not feel like they were working very well. According to the note, "He appeared more dysthymic than usual" so a consult with the doctor was to be requested "to determine a medication adjustment to assist with his symptoms." A Direct Individual Progress Note dated March 13, 2017 indicates that HealthWest staff met with Mr. Salyers on that date "in response to numerous KITE requests." The records state, "Overall, Josh reports he is doing okay with his mood" and "he is irritated by court stuff." The HealthWest records indicate that Mr. Salyers was seen again "in response to several KITE requests" on April 17, 2017. It was noted that there were "no psychotic symptoms present" and he presented with "moderate grooming." Mr. Salyers' diagnoses as listed in the HealthWest records included major depressive disorder and cannabis dependence.

## Michigan's Applicable Statute Regarding Determination of Criminal Responsibility

Concerning the matter of criminal responsibility, MCL 768.21a, as amended effective March 28, 2014, indicates that "An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity. " This section also indicates that "An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances."

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 9

The definition of mental illness so indicated is "a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." The definition of intellectual disability so indicated is "A condition manifesting before the age of 18 years that is characterized by significantly subaverage intellectual functioning and related limitations in 2 or more adaptive skills and that is diagnosed based on the following assumptions: (a) Valid assessment considers cultural and linguistic diversity, as well as differences in communication and behavioral factors; (b) The existence of limitation in adaptive skills occurs within the context of community environments typical of the individual's age peers and is indexed to the individual's particular needs for support; (c) Specific adaptive skill limitations often coexist with strengths in other adaptive skills or other personal capabilities; (d) With appropriate supports over a sustained period, the life functioning of the individual with an intellectual disability will generally improve."

**Conclusions and Opinion Relative to Criminal Responsibility**

Concerning the issue of intellectual disability, it is my opinion that Mr. Salyers does not have an intellectual disability as statutorily defined. A review of his history does not suggest that he has significantly subaverage cognitive/intellectual capacities that manifested before the age of 18 years. For example, although he endorsed a history of special education services, based on descriptions from him and his mother, it appears that this was related to behavioral issues as opposed to an intellectual impairment. Mr. Salyers' presentation during the current evaluation was similarly not indicative of significantly subaverage cognitive/intellectual capacities. Furthermore, his history is not indicative of impairment in adaptive functioning (e.g., socialization, daily living skills, communication, or motor skills) resulting from subaverage cognitive development. Therefore, it is my opinion that Mr. Salyers did not meet the statutory definition of intellectual disability at the time of the alleged offense.

Regarding the question of whether Mr. Salyers had a mental illness as defined by statute at the time of the alleged offense, available information suggests that he did not. Although he was reportedly psychiatrically hospitalized and received a number of diagnoses as a child, he did not receive any mental health treatment during adulthood until he was in jail following the alleged offense. Available information indicates that he has displayed depressive symptoms (e.g., dysphoric mood), likely in response to his current situation (e.g., the death of his girlfriend and being charged for it). Although Mr. Salyers described being "depressed" surrounding the time of the alleged offense, his description was consistent with a typical reaction to stressors (e.g., finding out his father had cancer) rather than a substantial disorder of thought or mood. Further, available information including Mr. Salyers' report and collateral information do not suggest that at the time of the alleged offense he was experiencing symptoms of a mood or thought disorder that significantly impaired his judgment, behavior, capacity

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 10

to recognize reality, or ability to cope with the ordinary demands of life. Consequently, based on the weight of available information, it is my opinion that Mr. Salyers did not have a mental illness as statutorily defined at the time of the alleged offense.

I considered whether Mr. Salyers was under the influence of drugs or alcohol at the time of the alleged offense. He reported that he "smoked weed" with the alleged victim the day before the alleged offense but he did not endorse any other drug or alcohol use around that time. Additionally, the police report does not suggest that he was observed to be intoxicated. Unfortunately, there does not appear to be dispositive data (PBT results, urine analysis or other drug screening) of him having used or not used drugs or alcohol surrounding the time of the alleged offense. Nevertheless, it is my understanding that whether or not Mr. Salyers was under the influence of alcohol or other substances may be a matter considered by the Trier of Fact. It is also my understanding that by statute (i.e., MCL 768.21a(2)), "An individual who is under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances."

Mental illness and intellectual disability aside, available information does not suggest that at the time of the alleged offense Mr. Salyers lacked substantial capacity to appreciate the nature and quality or the wrongfulness of his conduct, or lacked substantial capacity to conform his conduct to the requirements of the law. For example, he provided a logical and coherent account of his thoughts and actions that day, which did not indicate that he was out of touch with reality. He initially lied to police about what happened, denying involvement on his part, suggesting that he appreciated the wrongfulness of his behavior. Mr. Salyers did not suggest that he was out of behavioral control at the time of the alleged offense and available information does not suggest otherwise. It does not appear that he was driven or compelled by uncontrollable, psychological forces (e.g., he appeared to engage in purposeful, goal-directed behavior). Rather, in his statements to police as well as during the current evaluation, Mr. Salyers asserted that he did not purposely harm the alleged victim and was only trying to prevent her from harming herself further. Regardless, it is my understanding of statutory guidelines that legal insanity is a threshold issue. That is to say, if neither threshold condition (i.e., mental illness or intellectual disability) is met, a person does not qualify for a finding of legal insanity as limitations on capacities such as appreciation and conformity of conduct must be "as a result of" at least one of the qualifying threshold conditions. It follows then, as it is my opinion that Mr. Salyers was neither mentally ill nor had an intellectual disability at the time of the alleged illegal activity, that his relevant capacities were not compromised as a result of such conditions.

Benjamin L. Medema, Muskegon County Prosecutor
Fred J. Lesica, Defense Attorney
RE: SALYERS, Joshua Michael, CFP# 1004376
May 18, 2017
Page 11

To summarize the issue of criminal responsibility, it is this examiner's opinion that Mr. Salyers was neither mentally ill nor had an intellectual disability as defined by statute at the time of the alleged offense. Additionally, available information does not suggest that Mr. Salyers, as a result of mental illness or intellectual disability, lacked substantial capacity to appreciate the nature and quality or the wrongfulness of his conduct, or lacked substantial capacity to conform his conduct to the requirements of the law. Therefore, it is the opinion of this examiner that the weight of the available information does not support a defense of legal insanity.

Respectfully submitted,

Stephanie Howell, PsyD
Licensed Psychologist
Consulting Forensic Examiner

*Defendant's conviction of first degree premeditated murder was appropriate because the autopsy photographs were relevant to the criminal case and were not unduly prejudicial to defendant. People v. Unger, 278 Mich. App. 210, 749 N.W.2d 272, 2008 Mich. App. LEXIS 587 (Mich. Ct. App. 2008).*

## WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
## SCHOOL OF MEDICINE

*How about if photographs were Excluded Showing several self inflicted scars?*

*How about if the Autopsy Report is coerced to be just what the prosecutor needs it to say and not say?*

# Postmortem Examination Report

# BARBARA A. DAILEY

*MRE:*
*Rule 602: lack of personal Knowledge*
*A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal Knowledge ~~about~~ of the matter. Evidence to prove personal Knowledge may, but need not, consist of the witness'own*

| | | | |
|---|---|---|---|
| | WMed Number: | W16-668 | Procedure: **Full autopsy** *testimony. This Rule is subject to the provisions of Rule 703.* |
| Date of Birth: | 02/26/1994 | Identification: | **Transport pouch and body tags** *Relating to opinion testimony by expert witness* |
| Date Pronounced Dead: | 09/04/2016 | County: | **Muskegon** |
| Age: | 22 years | Deputy Medical Examiner: | **Amanda O. Fisher-Hubbard, M.D.** |
| Sex: | Female | Persons in Attendance: | **Megan Deats (assistant)** |
| Date of Examination: | 09/05/2016 | | **Sarah Prolo (assistant)** |
| Time of Examination: | 08:00 | | |

---

## Examination and Investigative Findings:

I. Found unresponsive at her home lying prone with blood pooled around her face
II. Multiple injuries, including blunt and sharp force
    A. Head and neck – multiple incised wounds to the neck including injury to the trachea and right jugular vein; multiple cutaneous contusions, lacerations, and abrasions; fractured mandible and hyoid bone; left temporal lobe contusion
    B. Torso and extremities – incised wound to the right second finger, multiple cutaneous contusions and abrasions

---

**Cause of Death:**
**Multiple injuries, including blunt and sharp force**

**Manner of Death:**
**Homicide**

Department of Pathology
1000 Oakland Drive • Kalamazoo, MI • 49008-8074
269.337.6173 • med.wmich.edu

State ID in her bRa

Could she sustained that fracture by hitting
Right side of neck on some edge

Are the cuts consistent with someone just
wanting to cut a persons neck

It is my opinion that BARBARA A. DAILEY, a 22-year-old woman who was found unresponsive at her home lying prone with blood pooled around her face, died as a result of multiple blunt and sharp force injuries.  There were blunt and sharp force injuries to the head and neck, including multiple incised wounds to the neck with injury to the trachea and right jugular vein; multiple facial/head and neck contusions, lacerations, and abrasions; a fractured mandible; a fractured hyoid bone; and a left temporal lobe contusion.  A component of asphyxia could not be excluded.  There were blunt and sharp force injuries to the torso and extremities, including an incised wound to the right second finger and multiple cutaneous contusions and abrasions.

*[handwritten note]* Is the M.E. office a part of Health and Human Services or Public Safety? If its under public safety the police have more control over the M.E., meaning no check and balance. The police department is covered, would it not also be easy to alter/change their cases.

*Amanda Fisher-Hubbard, MD*

Amanda O. Fisher-Hubbard, M.D.
Deputy Medical Examiner
Wednesday, November 02, 2016

*[handwritten note]* Why was the report done nearly two months after the autopsy? The prosecutor wanted me... said he wanted her to see her tox... together his opinion trying to get the info...

*[handwritten note]* exactly what are Blunt face injuries effective... She was obviously not functioning after hitting her head on the hard...

*[handwritten note]* ... trachea and aviation breaks appear consistent without damage or compromise... how can one support a component of asphyxia? Does not the injury to the trachea... some... freedom in the trachea and neck with a build up who they wanted... damaged?

Based on the county medical examiners act, MCL 52.201 et seq., the Michigan Supreme Court has concluded that a county Medical examiner's duty is owed to the state. A medical examiner fulfills his/her ~~duty~~ statutory duty to investigate violent deaths by ~~comment~~ communicating his or her medical findings to the prosecution and testifying on behalf of the prosecution regarding the results of his/her investiga

A county medical examiner is expected to work closely with the prosecution in cases related to the investigation of an unexpected death or violent death and is expected to testify on the prosecutions behalf. The United States Supreme Court does not limit the prosecution's duty to learn of favorable evidence to only the police or law enforcement agencies, but, instead extends this duty to any others acting on the government's behalf. Given a county's medical examiner's duty to act on the government's behalf in cases involving violent or unexpected deaths in Michigan, (1) the medical examiner may be understood as acting on the government's behalf in a particular case; and (2) evidence within the medical examiner's control may be imputed to the government, even if unknown to the prosecution.

## Investigative Summary

Per the investigative report, medical records, emergency medical services report, and Muskegon Police Department Incident/Investigation report, BARBARA A. DAILEY, an adult white female, reportedly was found unresponsive at her home lying prone with blood pooled around her face. Her boyfriend or ex-boyfriend reportedly called 911 and emergency medical services responded to the scene; she was noted to have wounds to her neck and contusions to her face. She was conveyed to the emergency department, where she was pronounced dead.

## Receipt of Remains

The remains were transported to the morgue by Eric Hathorn on 09/05/2016 at 00:17 hours and assisted into the facility by Sarah Prolo of the Pathology Department.

*Eric Hathorn? Barb's friend Eric was lives off location by the external car station*

## General External Examination

The remains are received in the supine position contained within a zippered transport pouch. A tag attached to the transport pouch bears the name "Daily Barbara." A seal securing the zippers on the transport pouch bears the number "0094868." A tag attached to the remains bears the name "Daily Barbara." It was clarified that the spelling of the decedent's last name is "Dailey."

The remains are received wearing and with:

- A pink tank top (previously cut)
- A pink bra (previously cut)
- Black/multicolored shorts
- Black bathing suit bottoms
- Pink briefs ?
- Two black/white shoes
- Two black socks
- A white towel ?
- A black hair elastic band
- A yellow metal necklace (broken) with yellow metal pendant
- A white metal curved navel barbell with blue stones
- A white metal tongue barbell
- Hospital identification band around the right wrist
- Right and left hand paper bags

---

W16-668
BARBARA A. DAILEY
02/26/1994
Page 3 of 12

The body is that of a well-developed, well-nourished white female appearing consistent with the reported age of 22 years. The remains are 66 inches long and weigh 134 pounds. The transport pouch and personal effects are included in the body weight.

*Barbara was 110-115 lbs. Not 134 lbs.*

***Postmortem changes:***
The unembalmed body is cool to the touch from refrigeration. Rigor mortis is fixed in the mandible, upper extremities, and lower extremities. There is blanching, red-purple lividity on the posterior surfaces of the body, except in areas of pressure.

*With the exception of the injuries described in the "Evidence of Injury" section, the external examination is as follows:*

**Skin:** The skin is within normal limits.

**Head:** The head is normocephalic. The hair has the normal female distribution, is brown in color, and is long.

*Barbara had Dishwater Blonde hair before she had me dye it violet (purple) on 9/2/2016. when Barbara was*

**Eyes:** The irides are hazel.
*Barbara has Blue eyes. Not hazel.*

**Ears:** The ears are normal except for perforations of the lobes. *Examined she had purple hair. Not Brown.*

**Nose:** The septum is midline. There are no perforations.

**Mouth:** The anterior teeth are natural and in a good state of repair. *Not consistent if assaulted with a fractured mandible if she had stood up*

**Face:** The face is normal.

**Neck:** The neck organs are in the normal midline position. The thyroid gland is not palpable.
*There is a multifocal hemorrhage of the Thyroid Gland.* *not Palpable? meaning*

**Chest:** The chest has a normal antero-posterior dimension. The nipples and breasts are symmetrical and are those of a normal female. There are no palpable masses.

**Abdomen:** The abdomen is flat.

---

W16-668
BARBARA A. DAILEY
02/26/1994
Page 4 of 12

**Genitalia:**  The external genitalia are those of a normal adult female.

**Anus:**  The anus is within normal limits.

**Upper extremities:**  The upper extremities are well-developed and symmetrical.  The nails are normal.

**Lower extremities:**  The lower extremities are well-developed and symmetrical.  The nails are normal.

**Back:**  The back and sacrum are within normal limits.

*Evidence of therapeutic intervention:*
There is an endotracheal tube within the trachea.  There are defibrillator pads and electrocardiogram lead stickers on the body.  There is an intravascular catheter in the left antecubital fossa.  There is also a puncture wound covered by a bandage in the left antecubital fossa.  There is an intravascular catheter in the dorsal left hand.  There is an intraosseous catheter in the proximal lower right leg.  The incised wounds of the neck had been sutured.

*Identifying marks, scars, and tattoos:*
There are tattoos as follows: black tattoo on the anterior right forearm, multicolored tattoos on the anterior bilateral forearms, green/black tattoos on the anterior bilateral pelvis, black tattoos on the midline upper back and mid back, black tattoo on the lateral right thigh, and black tattoo on the lateral lower left leg.  There are two 15 centimeter horizontal linear scars on the lower midline pelvis.

WHERE ARE the two burn scars from a cigar at

**Evidence of Injury (See Body Diagrams)** on her Chest ?

*Blunt and sharp force injuries to the head and neck:*   WHERE ARE the self-inflicted scars
There are at least four open incised wounds to the neck as follows:   on neck, underarms and inner top thigh

- An approximately 3 centimeter curvilinear, oblique incised wound on the anterior-lateral right neck, the right aspect of which is located 6 centimeters inferior to the right external auditory meatus, 1 centimeter anterior to the right external auditory meatus, and 4 centimeters right of the anterior midline; and the left aspect of which is located 8.5 centimeters inferior to the right external auditory meatus, 2.5 centimeters anterior



to the right external auditory meatus, and 2.5 centimeters right of the anterior midline. The left aspect shows a superficial, horizontal approximately 2 centimeter linear continuation of this incised wound on the anterior neck.

- An approximately 8 centimeter irregular incised wound on the anterior-lateral left neck, the right aspect of which is located 8.5 centimeters inferior to the right external auditory meatus, 4 centimeters anterior to the right external auditory meatus, and at the anterior midline; and the left aspect of which is located 7 centimeters inferior to the left external auditory meatus, 0.5 centimeters anterior to the left external auditory meatus, and 4.5 centimeters left of the anterior midline. There is a 1.5 superficial, linear, oblique incised wound that extends from the superior right-mid aspect of this wound onto the left neck.

- An approximately 12 centimeter irregular, horizontal incised wound across the anterior neck, the right aspect of which is located 8 centimeters inferior to the right external auditory meatus, on a vertical line with the right external auditory meatus, and 4.5 centimeters right of the anterior midline; and the left aspect of which is located 9.5 centimeters inferior to the left external auditory meatus, 4 centimeters anterior to the left external auditory meatus, and 3 centimeters left of the anterior midline. The right aspect shows a superficial 5 centimeter linear continuation of this incised wound on the lateral right neck and the left aspect shows a superficial 0.6 centimeter linear continuation of this incised wound on the lateral left neck. There are two additional superficial, curvilinear incised wounds that extend from the superior mid aspect of this wound onto the right neck, approximately 2.5 centimeters each. Associated with this wound are incised wounds of the neck muscles, including the right sternocleidomastoid muscle, bilateral omohyoid muscles, bilateral sternohyoid muscles, and bilateral sternothyroid muscles, right jugular vein, and anterior trachea.

- An approximately 7 centimeter roughly linear, horizontal incised wound across the anterior midline and right neck, the right aspect of which is located 9.5 centimeters inferior to the right external auditory meatus, 1 centimeter anterior to the right external auditory meatus, and 5 centimeters right of the anterior midline; and the left aspect of which is located 9.5 centimeters inferior to the right external auditory meatus, 4 centimeters anterior to the right external auditory meatus, and at the anterior midline.

Associated with these incised wounds are hemorrhage into the soft tissue of the neck and hemorrhage into the upper and lower airways.

There are blunt injuries to the head and neck as follows:

There are numerous coalescent purple-red contusions on the face, head, and neck, including the following: a 15 x 11 centimeter cluster on the right face, a 19 x 16 centimeter cluster on the nose and left face, an 11 x 7 centimeter cluster on the chin, a 3 x 3 centimeter cluster on the anterior-lateral right neck, a 10 x 5 centimeter irregular cluster on the anterior-lateral left neck extending to the level of the left clavicle, a 10 x 7 centimeter cluster on the lateral right head and neck, a 10 x 6 centimeter cluster on the lateral left head and neck, a 30 x 20 centimeter cluster on the posterior neck (left greater than right)/superior back/occipital scalp.  Abrasions are associated with these head and neck contusions as follows: a 2 x 1.5 centimeter cluster on the right frontal-parietal scalp, a 2 x 1.5 centimeter cluster on the right temporal scalp, a 5 x 2 centimeter cluster on the lateral left frontal scalp, a 3 x 2 centimeter cluster on the lateral right forehead, a 5 x 4 centimeter cluster on the lateral right face, a 2 x 1.5 centimeter cluster on the lateral right nose, a 4 x 3 centimeter cluster on the anterior left face, a 5 x 4 centimeter cluster on the scalp posterior to the left ear, two 2.5 x up to 0.2 centimeter roughly linear oblique on the anterior chin, and a 4 x 3 centimeter cluster over the lateral right mandible.

There are confluent hemorrhages of the bulbar conjunctiva, left greater than right, and bilateral petechial hemorrhages of the palpebral conjunctiva.

There are 6.5 x 3.5 centimeter clusters of abraded contusions of the bilateral ears.  There is a 1 centimeter laceration of the superior portion of the right earlobe.  There are 1 and 2 centimeter lacerations on the posterior portion of the right ear.

There is a fracture of the anterior-lateral left aspect of the mandible.  There is a 3 x 2 centimeter cluster of contusions of the superior inner lip and a 2 x 2 centimeter contusion of the inferior inner lip.  There is a 2.5 x 2.5 x 1.5 centimeter hemorrhage of the lateral right tongue.

There are subgaleal hemorrhages as follows: A 20 x 8 centimeter cluster of the right frontal-temporal-parietal region, a 25 x 14 centimeter cluster of the left frontal-temporal-parietal region, and a 6 x 6 centimeter cluster of the right occipital region.  There are hemorrhages of the bilateral temporalis muscles, right greater than left.

There is a 0.5 x 0.5 x 0.3 centimeter contusion of the inferior left temporal lobe of the brain.

There are multifocal hemorrhages of the neck musculature, including the bilateral sternocleidomastoid (left greater than right), omohyoid, sternohyoid, and sternothyroid muscles.  There is fracture of the right aspect of the hyoid bone with associated hemorrhage. There is multifocal hemorrhage of the thyroid gland, laryngeal mucosa, and proximal anterior esophageal mucosa.  There is hemorrhage of the right apical parietal pleural and hemorrhage of the anterior right pulmonary perihilar/mediastinal region.

Dissection of the posterior neck reveals hemorrhage into the musculature, left greater than right.

*Additional injuries:*

There is a 1.5 centimeter irregular incised wound on the anterior-medial distal right second finger.  There is a 1 centimeter linear abrasion on the superior-lateral aspect of the left areola. There is a 2 x 0.5 centimeter contused yellow abrasion on the right lower abdominal quadrant/pelvis.  There is a 2 x 2 centimeter red contused abrasion on the superior right back. There is a 5 x 4 centimeter cluster of purple contusions on the superior lateral left back.  There is a 1 x 1 centimeter purple-blue contusion on the lateral right back.  There are 3 x 0.5 and 1.5 x 1.5 centimeter purple contusions on the posterior upper right arm.  There is a 7 x 1 centimeter purple-blue contusion on the posterior upper left arm.  There is a 5 x 2.5 centimeter cluster of purple-red contusions on the distal posterior medial left forearm and a 5 x 4 centimeter cluster of purple-red contusions on the dorsal medial left hand.  There is a 1 x 1 centimeter brown contusion on the lateral right thigh.  There is a 4 x 2 centimeter faint purple-blue contusion on the anterior right thigh.  There are 1 x 0.5 and 1.5 x 1 centimeter abrasions of the right knee. There is a 3 x 1.5 centimeter brown-green contusion of the anterior lower right leg.  There is a 2.5 x 2 centimeter brown contusion on the distal anterior-lateral left thigh.  There is a 3.5 x 2 centimeter curvilinear contused abrasion on the left knee.

## Postmortem Radiographs

None.

## General Internal Examination

Organ weights:

| | | | |
|---|---|---|---|
| Heart | 250 grams | Spleen | 170 grams |
| Right Lung | 240 grams | Right Kidney | 110 grams |

| | | | |
|---|---|---|---|
| Left Lung | 210 grams | Left Kidney | 110 grams |
| Liver | 1300 grams | Brain | 1090 grams |
| Thymus | 30 grams | | |

The body is opened with a routine thoracoabdominal incision. The skeletal muscle has a normal dark brown color and normal smooth texture.

*With the exception of the abovementioned injuries, the internal examination is as follows:*

**Body cavities:**  The peritoneal surfaces are smooth and glistening.  There are no adhesions, effusions, or hemorrhages.  The pleural cavities are smooth and glistening.  There are no adhesions or effusions.  The diaphragms are intact.  The ribs are intact and without fracture. The pericardium is smooth and glistening and contains minimal serous fluid.

**Thymus:**  The thymus is 30 grams and has normal pink-tan lobulated parenchyma.

**Heart:**  The heart is 250 grams.  The heart has the normal configuration.  The epicardial surfaces are within normal limits.  The coronary ostia have a normal configuration and are widely patent.  The coronary arteries have a normal distribution.  On serial coronal sectioning, there are no significant areas of atherosclerosis, calcification, or thrombosis.  The valve leaflets are thin, pliable and competent, and free of vegetations.  The left ventricle is 1.4 centimeters, the interventricular septum is 1.3 centimeters, and the right ventricle is 0.3 centimeters in thickness measured 1.0 centimeter below the respective atrioventricular valve annulus.  The endocardial surface is free of fibrosis.  The trabeculae carne and papillary muscles are within normal limits. The myocardium has the normal red-brown color and consistency.  There are no areas of fibrosis or scarring.

**Aorta:** The aorta has a normal configuration without aneurysmal dilatation.  The intimal surface has the normal yellow color with minimal atherosclerosis.  The ostia of the major branches including the celiac, renal, and superior and inferior mesenteric arteries are widely patent.

**Lungs:**  The right and left lungs are 240 and 210 grams, respectively.  There is normal septation. The lungs are inflated.  There is mild anthracosis.  On cut surface, the parenchyma is mildly congested.  There are no areas of consolidation, masses, or abscesses.  The trachea and

*mild edematous? cut surface parenchyma mildly congested?*

---

mainstem bronchi appear normal without foreign bodies, masses, or mucus. Hilar lymph nodes are not enlarged. The pulmonary arteries are free of thrombi.

**Liver and biliary tract:**   The liver is 1300 grams. The capsule is intact, smooth, and glistening. The parenchyma has the normal red-brown color and soft texture. There are no nodules, masses, or hemorrhages. A thin-walled gallbladder is present and contains thick, viscous bile. No calculi are present.

*is this good or not?*

**Pancreas:**  The pancreas has a normal size, shape, and tan lobular appearance.

**Adrenal glands:**  The adrenal glands have normal cut surfaces with yellow cortices and gray medullae. There are no nodules. *what are nodules?*

**Spleen:**  The spleen is 170 grams and has a smooth intact capsule with normal, firm, red-brown parenchyma. There are no infarcts, nodules, scars, or cysts.

**Gastrointestinal tract:**
**Esophagus:**  The esophagus has the normal gray-white smooth mucosal surface. The gastroesophageal junction is within normal limits.
**Stomach:**  The gastric mucosa has the normal rugal folds and the lumen contains approximately 10 milliliters of partially-digested food material. There are no pill fragments noted.
**Small bowel and large intestines:**  The small bowel has the normal configuration. A vermiform appendix is present. The colon has the normal uniform dimension.

**Genitourinary tract:**
**Kidneys:**  The right and left kidneys are 110 grams each. The renal capsules strip with ease. The cortical surfaces have the normal red-brown color and smooth texture. There are no infarcts, nodules, scars, or cysts. The renal pelvis is free of stones.
**Bladder:**  The bladder contains minimal urine. The bladder mucosa is gray-tan and smooth.
**Uterus, salpinges, and ovaries:** The uterus has the normal configuration. The ovaries are white and cystic bilaterally. The right salpinx is interrupted; a portion of the left salpinx is present. *is this why she was undergoing so much pains in her abdominals?*
**Musculoskeletal:** The thoracolumbar spine has the normal configuration. The vertebral bodies are normal and are without degenerative spurring or lipping. The cervical spine is stable. The bone marrow has a normal dark red coloration.

**Neck:**  The neck musculature is dissected in a layered fashion.  The thyroid cartilage is intact.  The vocal cords are symmetrical.  The thyroid gland has a normal position and texture.  There are no cysts or nodules.

**Central nervous system:**
The skull is intact with a normal thickness; there are no fractures.  The dura is intact.  There are no epidural, subdural, or subarachnoid hemorrhages.  The meninges are thin, translucent, and without exudates.

**Brain:**  The brain is 1090 grams and the hemispheres are symmetrical with a normal gyral pattern.  The cranial nerves are intact and symmetrical.  The vessels at the base of the brain have a normal configuration and are free of atherosclerosis.  The cerebellar tonsils and uncal gyri appear normal and without herniation or grooving.  The pituitary gland is normal.  Serial coronal sections through the brain reveal no masses within the cortex, white matter, midbrain, pons, or cerebellum.

**Spinal cord:** The spinal cord is not examined.  *Then it is not a full Autopsy!*

## Additional Dissection

Posterior neck dissection: see Evidence of Injury section.

## Toxicology

Drugs of Abuse panel:  See toxicology report for further details.  *Another*
   Heart blood POSITIVE for THC.  *½ of her depression of all she went through and*
   *will give her a going through is why the end of and feelings and*

## Other Laboratory Tests  *calming of her waves.*

None.

## Evidence Recovered

The following items were released to David Ocharzak (Law Enforcement):

- Oral, vaginal, and anal slides and swabs
- Pulled head hair
- Right and left hand paper bags
- Bilateral fingernail clippings and clippers
- Fingerprints and palm prints

---

- Clothing and personal effects
- DNA card
- Photo CD

## Additional Procedures

Photographs for identification and documentation purposes are obtained.

Tissue samples are retained in formalin.

Tissue samples are placed in a cassette for processing to slides for microscopic examination.

Blood is submitted for a postmortem drug screen.

Liver and additional blood are obtained for analysis, if indicated.

Blood is placed on a DNA card and is retained for analysis, if indicated.

## Microscopic Examination

*Microscopic slide index:*

A.  Inferior left temporal lobe

*Microscopic description:*

INFERIOR LEFT TEMPORAL LOBE: The left inferior temporal lobe shows a cortical contusion.

*where is the inferior left temporal lobe?*
*what is a cortical contusion?*

---

**W16-668**
BARBARA A. DAILEY
02/26/1994
Page **12** of **12**



AIT Laboratories
A HIGHER STANDARD OF SERVICE

2265 Executive Drive, Indianapolis, IN 46241
Telephone: (800)875-3894 / Fax: (317)243-2789

| Laboratory Case Number: | 3101638 |
| --- | --- |

| Subject's Name: | DAILEY, BARBARA A |
| --- | --- |

| Client Account: | 19846 / wste01 |
| --- | --- |
| Physician: | |
| Report To: | Western Michigan University, S |
| | ATTN: EMR |
| | 1000 Oakland Dr |
| | Kalamazoo, MI  49008-8070 |
| | FX: 844-337-6001 |

| Agency Case #: | 160905-9 |
| --- | --- |
| Date of Death: | 09/04/2016 |
| Test Reason: | Not given |
| Investigator: | MOLLY ESSEBAGGERS |
| Date Received: | 09/09/2016 |
| Date Reported: | 09/19/2016 |

| Laboratory Specimen No: | 40599708 |
| --- | --- |
| Container(s):  01:RTB | Blood,HEART |

| Date Collected: | 09/05/2016  10:30 |
| --- | --- |
| Test(s):  70530 | Drugs of Abuse Panel |

| Analyte Name | Result | Concentration | Units | Therapeutic Range | Loc |
| --- | --- | --- | --- | --- | --- |
| AMPHETAMINES | Negative | | | | |
| BARBITURATES | Negative | | | | |
| BENZODIAZEPINES | Negative | | | | |
| CANNABINOIDS | POSITIVE | | | | |
| THC | POSITIVE | | | | |
| THC, Quant | | 1.9 | ng/mL | | |
| COCAINE/METABOLITES | Negative | | | | |
| FENTANYL | Negative | | | | |
| METHADONE/METABOLITE | Negative | | | | |
| OPIATES | Negative | | | | |
| OXYCODONE/METABOLITE | Negative | | | | |
| PHENCYCLIDINE | Negative | | | | |
| PROPOXYPHENE/METABOLITE | Negative | | | | |
| ALCOHOL | Negative | | | | |
| Methanol | Negative | | | | |
| Ethanol | Negative | | | | |
| Acetone | Negative | | | | |
| Isopropanol | Negative | | | | |
| ANALGESICS | Negative | | | | |
| BUPRENORPHINE | Negative | | | | |
| STIMULANTS | Negative | | | | |
| TRAMADOL/METABOLITE | Negative | | | | |

withholds the fact that Barbara is a Cutter by not stating so or including the information under the identifying marks with the rest of the scars or tattoos.

There are actually SIX (6) cuts but she only Bulletins four (4) and hides the 2 others in the 3rd bulletin. My guess is to make the prosecutors theory believable.

She does not mention anything about the lack of Hesitation Marks in her report or the depths of the cuts.

Examination Date is 9/5/2016 @ 0800 hrs
Death Certificate signed 9/6/2016
Date filed 9/23/2016
She states Manner of Death is Homicide (that Autopsy was performed and there were Autopsy findings available prior to completion of the cause of death. She states decedent was assaulted by another.
She also states that Barb was not pregnant within Past year but Gemma was born Feb. 2016.
Date of Injury 9/4/2016   Time of injury 19:15 (7:15pm) on or About   Time of Death (8:01pm) 2001 hrs at the Hospital Emergency Room

Her Report was not written until November 2nd, 2016   nearly 2 months after Examination.

Death happened within Minutes of the "Multiple injuries" including blunt and sharp force

Her Report was not written until Nov. 2, 2016 b/c she needed to see what the Prosecutor needed the report to say and not say.

✱ who is Tania Lynn Swartz? Why is her info involved in this case? Examined 9/5/2016 at 10:08pm but the form is printed out 6/29/2011? How is that possible.

Body tag # 0092599

Case # 16-18549

GOVERNMENT FILE USE ONLY

This Certified Copy VALID Only When SEAL and RED SIGNATURE Are Affixed.

STATE/FILE NUMBER
MUSKEGON COUNTY CLERK
249548

LF
CF D2016-01295

**STATE OF MICHIGAN**
**DEPARTMENT OF COMMUNITY HEALTH**
**CERTIFICATE OF DEATH**

| 1. DECEDENT'S NAME (First, Middle, Last) Barbara Ann Dailey | 2. DATE OF BIRTH February 26, 1994 | 3. SEX Female | 4. DATE OF DEATH September 04, 2016 | |
|---|---|---|---|---|

| 5. NAME AT BIRTH OR OTHER NAME USED FOR PERSONAL BUSINESS | 6a. AGE- Last Birthday (Years) 22 | 6b. UNDER 1 YEAR | | 6c. UNDER 1 DAY | |
|---|---|---|---|---|---|
| | | MONTHS | DAYS | HOURS | MINUTES |

| 7a. LOCATION OF DEATH Mercy Health - Hackley | 7b. CITY, VILLAGE OR TOWNSHIP OF DEATH Muskegon | 7c. COUNTY OF DEATH Muskegon |
|---|---|---|

| 8a. CURRENT RESIDENCE - STATE Michigan | 8b. COUNTY Muskegon | 8c. LOCALITY Muskegon | 8d. STREET AND NUMBER 1432 Jiroch |
|---|---|---|---|

| 8e. ZIP CODE 49442 | 9. BIRTH PLACE Muskegon, Michigan | 10. SOCIAL SECURITY NUMBER XXX-XX-XXXX | 11. DECEDENT'S EDUCATION 11th Grade |
|---|---|---|---|

| 12. RACE White | 13a. ANCESTRY Irish, French | | 13b. HISPANIC ORIGIN No | 14. EVER IN THE U.S. ARMED FORCES? No |
|---|---|---|---|---|

| 15. USUAL OCCUPATION Laborer | 16. KIND OF BUSINESS OR INDUSTRY Retail | 17. MARITAL STATUS Never married | 18. NAME OF SURVIVING SPOUSE |
|---|---|---|---|

| 19. FATHER'S NAME (First, Middle, Last) Kevin Dailey | 20. MOTHER'S NAME BEFORE FIRST MARRIED (First, Middle, Last) Shawn Johnson |
|---|---|

| 21a. INFORMANT'S NAME Brenda Cook | 21b. RELATIONSHIP TO DECEDENT Aunt | 21c. MAILING ADDRESS 5686 Jefferson Avenue, Muskegon Michigan 49442 |
|---|---|---|

| 22. METHOD OF DISPOSITION Cremation | 23a. PLACE OF DISPOSITION Phoenix Crematory Services | 23b. LOCATION - City or Village, State Muskegon Heights, Michigan |
|---|---|---|

| 24. SIGNATURE OF MORTUARY SCIENCE LICENSEE Dale R Clock | 25. LICENSE NUMBER 4501006296 | 26. NAME AND ADDRESS OF FUNERAL FACILITY Clock Funeral Home Inc. Muskegon Chapel, 1469 Peck Street, Muskegon, Michigan 49441 |
|---|---|---|

| 27a. CERTIFIER ☐ Certifying Physician - To the best of my knowledge, death occurred due to the cause(s) and manner stated. ☒ Medical Examiner - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner shown. Signature and Title Amanda Fisher-Hubbard, MD | 28a. ACTUAL OR PRESUMED TIME OF DEATH 2001 Military Time | 28b. PRONOUNCED DEAD ON September 04, 2016 | 28c. TIME PRONOUNCED DEAD 2001 Military Time |
|---|---|---|---|
| | 29. MEDICAL EXAMINER CONTACTED Yes | 30. PLACE OF DEATH Hospital | 31. IF HOSPITAL Emergency room |

| 27b. DATE SIGNED September 06, 2016 | 27c. LICENSE NUMBER 4301094351 | 32. MEDICAL EXAMINER'S CASE NUMBER W16-668 | 33. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER |
|---|---|---|---|

| 34. NAME AND ADDRESS OF CERTIFYING PHYSICIAN Amanda Fisher-Hubbard, MD, Muskegon County ME, Mailing Address 1000 Oakland Drive Kalamazoo, MI 49008, Muskegon, Michigan |
|---|

| 35a. REGISTRAR'S SIGNATURE | 35b. DATE FILED September 23, 2016 |
|---|---|

| 36. PART I. ENTER the chain of events– diseases, injuries or complications – that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest or ventricular fibrillation without showing the etiology. Enter only one cause on a line. | Approximate Interval Between Onset and Death |
|---|---|
| If disfavor was an immediate, underlying or contributing cause of death be sure to record diabetes to lead to Part I or Part II of the cause of death section, as appropriate. a. Multiple injuries including blunt and sharp force | Minutes |
| DUE TO (OR AS A CONSEQUENCE OF) | |
| IMMEDIATE CAUSE (Final disease or condition resulting in death) b. | |
| DUE TO (OR AS A CONSEQUENCE OF) | |
| Sequentially list conditions, IF ANY, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST c. | |
| DUE TO (OR AS A CONSEQUENCE OF) | |
| d. | |

| PART II. OTHER SIGNIFICANT CONDITIONS contributing to death but not resulting in the underlying cause given in Part I | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ Probably ☒ No ☐ Unknown | 38. IF FEMALE ☒ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Unknown if pregnant within the past year ☐ Not pregnant, but pregnant 43 days to 1 year before death |
|---|---|---|

| 39. MANNER OF DEATH Homicide | 40a. WAS AN AUTOPSY PERFORMED? Yes | 40b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? Yes |
|---|---|---|

| 41a. DATE OF INJURY 09/04/2016 | 41b. TIME OF INJURY 19:15 On or About | 41c. DESCRIBE HOW INJURY OCCURRED Decedent was assaulted by another |
|---|---|---|

| 41d. INJURY AT WORK No | 41e. PLACE OF INJURY Decedent Residence | 41f. IF TRANSPORTATION INJURY | 41g. LOCATION 1432 Jiroch St, Muskegon, Michigan 49442 |
|---|---|---|---|

SP02OO921S

VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED

VRHDSS11 (12/12) Authority: MCL 333.2882

V9/23/2016 01:57:05 PM Nancy A. Waters, County Clerk Muskegon County MI Page: 1 of 1



MUSKEGON POLICE DEPARTMENT

*Who is This & why is this person involved in my case?*

## PERSONAL EFFECTS

| Name: (Victim) | *TANIA LYNN SWARTS* | | Date of Examination: | *9/5/16* ← *2* |
|---|---|---|---|---|
| Case Number: | *16-18549* | Lead Detective: | Body Tag Number: | *0092599* |

| CLOTHING AND OTHER PROPERTY: | | Discard | Went with body | Held or Released as Evidence/Item: |
|---|---|---|---|---|
| ☐ Hat | | | | |
| ☐ Eye Glasses | | | | |
| ☐ Dentures | | | | |
| ☐ Coat | | | | |
| ☐ Pajamas | | | | |
| ☐ Long-Sleeve Shirt | | | X | |
| ☒ Short-Sleeve Shirt | *(purple)* | | | |
| ☐ T-Shirt | | | X | |
| ☒ Pants | *(grey/white/pink)* | | | |
| ☐ Shorts | | | | |
| ☐ Belt | | | X | |
| ☒ Bra | *(white)* | | X | |
| ☒ Underwear | *(blue)* | | X | |
| ☒ Shoes | *(black sandel on R foot)* | | | |
| ☐ Socks | | | | |
| ☐ Slippers | | | | |
| ☐ Purse | | | | |
| ☐ Wallet | | | | |
| ☐ Money Clip | | | | |
| ☐ Other/Additional | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| JEWLERY: | | | | |
| ☒ Rings | *(left middle finger)* | | X | |
| ☒ Rings | *(left rng finger)* | | X | |
| ☒ Rings | *(right middle finger)* | | X | |
| ☐ Earrings | | | | |
| ☐ Earings | | | | |
| ☐ Necklace | | | | |
| ☐ Other/Additional | | | | |
| MONEY: (counted by) | | | | |
| ☐ Bills: | $100   $50   $20   $10   '$5   $1 | | | |
| ☐ Coins: | $1   $.50   $.25   $.10   $.05   $.01 | | | |
| ☐ Total: | (Other Officer Initial if over $20.00) | | | |

| Officer (Printed) | *Kyle Fay* | Officer (Signature) | *[signature]* | Date: | *9/5/16* |
|---|---|---|---|---|---|
| Witness (Printed) | *[signature]* (Can be ME or Family) | Witness (Signature) | *J. Portell* | Time | *02:08* |

6/29/2011

*2*

_Attachment_ [handwritten]

## CASE SUPPLEMENTAL REPORT

Printed: 10/17/2016  13:11

OCA: **201618477**

_Muskegon Police Department_

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ARREST*        Case Mng Status: *ACTIVE*        Occurred: *09/04/2016*

Offense: *MURDER / NON-NEGLIGENT*

| | | |
|---|---|---|
| | Date / Time: | *09/07/2016 14:58:52, Wednesday* |
| Investigator: GUST, JAMES P  (MUPDJPG1) | Supervisor Review Date / Time: | *09/08/2016 14:55:53, Thursday* |
| Supervisor: GUST, JAMES P  (MUPDJPG1) | Reference: | *Supplement* |

Contact:

---

Information:
   On 9-4-16, I received a call from Sgt Haug about the complaint. I responded into assist with the investigation.

Actions on 9-4-16:
   Det Stratton and Det Luker interviewed Joshua Sayler. He signed a consent form for swabbing of his skin and a buccal swab. I saw that there were several places on his body that had blood on them. Det Luker took pictures of Sayler. After Det Luker took pictures of Sayler, I obtained the swabs and buccal swab. For the buccal swab, I used a Whatman OmniSwab rubbing the inside of his right and left cheek. For the left hand and right calf, I used swabs and sterile water provided by MSP lab personnel. For the left hand swab, I swabbed the back and palm of his hand by his index finger. For the right calf swab, I swabbed the back of his right calf. _how blood the [illegible]_ [handwritten]

Actions on 9-6-16:— _[handwritten illegible]_
   Sgt Straus obtained a DVR from Kevin Sander for his surveillance system. I down loaded videos from the system on to a flash drive. There were 5 cameras: CH1, CH2, CH4, CH5, CH7. I down loaded them from 14:00 to _2 pm_ [handwritten] 20:59. Each camera has several files. I changed the file names to begin with the camera and the time period the file covers. I also placed the videos into the photo folder for this complaint.

Actions on 9-7-16:
   I returned the DVR to Kevin Sander. While I was returning it, I was informed that Becky Arends want to speak with me. I went to 1432 Jiroch and spoke with her. She had a Samsung Galaxy S4 Active cell phone which she said was Barbara Dailey's. She turned it over to me and told me that the pin is 0801. I placed the cell phone into airplane mode. I gave it to Det Luker. _My AT&T spare phone was Not active and [illegible] was no pin on_ [handwritten]
   I reviewed the videos for the time period between 19:00 and 19:59. CH1 is on the front of the house near the southeast corner and it points to the northeast. This camera has 1432 Jiroch in the frame. CH2 is on the north side of the house and it points to the east down the driveway. CH4 is on the front of the house near the northeast corner and it points to the southeast. CH7 is on the front of the house near the steps and it points to the east. On the south edge of the viewing area there is an open which allows viewing of the alley on the east side of Jiroch. Below are the points that I found. _CH 4 is ONLY correct time all others is 4 minutes off_ [handwritten]

| | | |
|---|---|---|
| CH7 | 7:06:14 | Both of them are walking north in the alley. |
| CH1 | 7:07:12 | Both of them are walking along south side 1432 Jiroch to the front of the house. |
| CH1 | 7:07:26 | Both of them walk onto the porch and go inside. _[handwritten illegible]_ |
| CH7 | 7:14:48 | He is walking south in the alley. _2 not possible_ [handwritten] |
| CH4 | 7:12:22 | He is walking west on north side of Grand, then turns north on Jiroch on the east side of Jiroch. _— Running_ [handwritten] |
| CH7 | 7:17:48 | He is walking north on Jiroch on the east side. _— Running_ [handwritten] |
| CH2 | 7:17:53 | He is walking north on Jiroch on the east side. _— Running_ [handwritten] |
| CH1 | 7:17:58 | He is walking north on Jiroch on the east side. _— fast walk — left door open_ [handwritten] |
| CH1 | 7:18:16 | He goes onto the porch and inside. _[handwritten illegible] — on phone with 9-1-1_ [handwritten] |
| CH1 | 7:20:15 | He goes outside and stands at edge of stairs. |

---

Investigator Signature                    Supervisor Signature

Attachment EH 4 (Continued)

## CASE SUPPLEMENTAL REPORT

Printed: 10/17/2016 13:11

_Muskegon Police Department_                                        OCA: **201618477**

THE INFORMATION BELOW IS CONFIDENTIAL – FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: _ARREST_          Case Mng Status: _ACTIVE_          Occurred: _09/04/2016_

   Offense: _MURDER / NON-NEGLIGENT_

Investigator: _GUST, JAMES P_   _(MUPDJPG1)_        Date / Time: _09/07/2016 14:58:52, Wednesday_

Supervisor: _GUST, JAMES P_   _(MUPDJPG1)_      Supervisor Review Date / Time: _09/08/2016 14:55:53, Thursday_

   Contact:                                    Reference: _Supplement_

| | | |
|---|---|---|
| CH1 | 7:20:37 | He goes inside. |
| CH1 | 7:20:49 | He goes outside into the yard and by sidewalk. |
| CH1 | 7:21:20 | He goes to the steps and sits down on them. |
| CH1 | 7:22:31 | He goes inside. |
| CH1 | 7:25:29 | First officer is heading west on Irwin and then south on Jiroch. |
| CH1 | 7:25:52 | First officer enters house. |

Sgt J Gust

_[handwritten notes]_

Sep 4, 2016   7:16rd  call for help

8:04 Shes pronounced deceased

Time and Channels make no sense. I want the actual footage. The time and channels should not have been changed nor should the file name.

Ch 7, Ch 1 etc don't add up or make sense ... on the floor with [?] ... [?] in the report ... Shes I haven't even went into the house yet and the first officer reports he [responded] if [?] will

716

_[handwritten numbers/signature marks]_
911
22
88
00

7:10:08
2:20:08

Investigator Signature                    Supervisor Signature

Attachment # 2

| User: MCSDKSJ2. | MUSKEGON COUNTY SHERIFF | 09/08/2016  09:11 |
|---|---|---|

| Incident #: 2016-354067 | Shift: All |
|---|---|
| Reporting Officer: Neel, Marci J | Report Date/Time:  09/06/2016 02:49:49 |
| DOW: Monday          Post: | Facility: MUSKEGON COUNTY JAIL |
| Location Code: JAIL INCIDENT | Location Desc: GENERAL INFO - SALYERS, JOSHUA |
| Reviewed By: | |
| Incident Description:  General Information | |
| Additional Action: | |

**Inmates Involved**

| Name Code | Booking # | Name | Location | No. Viol |
|---|---|---|---|---|
| | 77320 | Joshua Michael Salyers | MCJ, FLOOR 1, HD12, 12-04 | 0 |

**Incident Description:**

DATE:             September 05, 2016
TIME:             20:00Hours
LOCATION:      Booking
INCIDENT TYPE:   General Information


INMATE(S) INVOLVED:

Salyer, Joshua  w/m  dob: 08-26-1987

INFORMATION:

Salyers is here on a charge of murder.  While I was working in booking tonight Salyers and another inmate, Eric Emory, got into an argument while in their individual cell.  During the course of the argument Salyers yelled to Emory "I'll slit your throat and watch you lay there. I'm here for murder." As the argument continued Salyers told Emory something to the effect of: I killed her and now I have to live with it and it tearing me up inside.  Salyers asked me several times this evening to speak to a "jail house psychiatrist" to talk out some things.

ACTIONS TAKEN:

I notified Command.

| Disposition: Pending Further | Disposition Date: 09/08/2016 |
|---|---|

Attachment # 8

## CASE SUPPLEMENTAL REPORT

Printed: 10/17/2016 13:11

*Muskegon Police Department*

OCA: **201618477**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *ARREST*          Case Mng Status: *ACTIVE*          Occurred: *09/04/2016*

Offense: *MURDER / NON-NEGLIGENT*

Investigator: *LISKEY, SCOTT G    (MUPDSGL1)*          Date / Time: *09/23/2016 05:38:45, Friday*

Supervisor: *FINE, THOMAS W    (MUPDTWF1)*          Supervisor Review Date / Time: *09/23/2016 06:33:18, Friday*

Contact:          Reference: *Supplement*

9-23-16

INFORMATION:

    I responded to the jail to retrieve a copy of a letter written by Josh Salyers. In the letter he talks about the homicide in question. I placed the multi page letter into property.

CLOSED LISKEY

Investigator Signature                Supervisor Signature

hot as fuck out. Time to start getting high. Josh is on his way OVER. It's 4:53 pm and I've got to get dressed. I'll make sure Josh or Sarah finds me so Angel doesn't when she gets home. I love you girls. I love you Josh. I'm sorry.

15g

A8 SUNDAY, JUNE 25, 2017 MUSKEGON CHRONICLE

## MUSKEGON

# Alleged throat-slasher writes officials from jail

**Stephen Kloosterman**
*skloost@mlive.com*

Joshua Michael Salyers is accused of slashing his fiancee's throat three times last fall, but now he's taking extreme measures to spread his own story about her death.

Salyers sent an eight-page, handwritten letter to MLive, explaining detailed stories of at his criminal cases in Muskegon County courts.

In addition to murder, Salyers is charged with two counts of malicious destruction of police property, from separate events on April 29 and again May 15. In both cases, Salyers is accused of tearing jail surveillance cameras off the wall, said Matt Roberts, chief trial attorney for the Muskegon County Prosecutor's office.

"Please forward copies of this letter to anyone that can be of help," Salyers wrote in his letter to MLive. "I have written thus far to the judge, the U.S. Attorney, the Michigan's attorney general, Governor Rick Snyder, Representative Bill Huizenga, Senator Debbie Stabenow, Senator Gary Peters, and I've got two more to write."

At a postscript under the



Above, Joshua Salyers appears for video arraignment in Muskegon County Courthouse on Sept. 6 on a charge of open murder in the Sept. 4 homicide of Barbie Dailey at a residence in the 1400 block of Jiroch Street. *MLive.com files*

At right, Salyers wrote an eight-page letter addressed to MLive Media Group discussing his criminal cases. He also has written to numerous politicians, the governor and the judge, and said he is writing a book. *Stephen Kloosterman, MLive.com*



letter, he added: "I've begun writing a new book called the Fallen Five."

Defense attorney Fred Lesica said he wouldn't allow any media interviews with Salyers. He confirmed his client has been writing to public officials while working on a book.

Earlier in the year, Lesica requested a psychiatric exam to determine if Salyers

is criminally responsible for his actions. The results of the exam are not public information, court staff said.

Salyers' letter repeated the defense theory earlier given at his Sept. 20 preliminary exam for the murder charge: That his fiancee,

Barbara Ann Dailey, was attempting suicide, and he was actually trying to save her.

He admitted that's not the first story he told.

"I had lied and said that she was attacked and called me for help to cover up her attempt at suicide to protect her from losing custody of her three children," he wrote.

Police say they have a confession.

Muskegon Police Detective Korey Luker testified at Salyer's preliminary exam that shortly after her Sept. 4 death, Salyers had confessed to cutting Dailey's throat.

Luker testified Salyers admitted to slicing his girlfriend's throat three times, and that the two had argued

earlier in the day, with Dailey telling Salyers to "burn in hell."

In his written letter to MLive, Salyers said he was in "shock" from a "traumatic incident" at the time of the police interview and argued police shouldn't have interviewed him in such a state.

Salyers' trial for the murder charge is set for Sept. 19.



Family members of victim Barbie Dailey comfort each other at the courthouse after Salyers appeared for video arraignment on the murder charge on Sept. 6. *MLive.com files*

**HOME DECOR 50% OFF**
*Categories Listed*

Candle Holders
Wood Decor
Decorative Lanterns, Birdcages & Terrariums

Knobs, Pulls, Handles, Hooks & Decorative Hardware
Decorative Bottles
Collage Frames
Trays, Coasters & Place Mats
Framed & Canvas Art

Glass Decor
Metal Decor
Wicker, Decorative Boxes & Storage

Decorative Memo Boards, Chalkboards & Corkboards
Men's Metal & Wood Decor



July 4th items are not included in Home Decor sale.

**THE SPRING SHOP™ 66%**
**Select Group of FURNITURE**
**JULY 4TH Seasonal Items 20%**
**SUMMER TOYS**

June 6, 2016                         copied original
                                    "that it can't be opened by anyone copy it with my
                                    family while the other side sealed addressed to
                                    the Governor "but not sent out"

Governor Snyder        "This is my confession"        6/26/17

        I seen in the paper by Mlive news group that they wrote an

article yesterday 6/25/17 "alleged throat slasher writes government officials."

I'm not fully understanding where it is coming from that I "confessed"

to making three cuts as Detective Luckie commented. That would mean that

there is four cuts if I confessed to making 3. I didn't even confess.

They asked me "how many cuts did she make after the initial cut" and I

held two fingers up. How is that "confession"? So since the article was

written and I'm sure that is going to cause a little problem for the

prosecutor and make him curious. I feel it best that I come in on your

and give you my confession. Illegally voting in an own saying the

suicide isn't gonna be enough for Mr. Medema. You will understand the

reason for this letter and confession when the time is right.

        I did not kill Barbara Ann Dailey. She killed herself by cutting

her throat several times. I only tried preventing it. That is the truth

and I can prove it. Yes I lied in the beginning to protect her from losing

her daughters for being an unfit mom. Here is where it matters. In the

living room she cut herself and when I finally got the knife away from

her I put it in the sink. We struggled with one another a bit but I

did not cut her. I never had the knife until putting it in the sink. Here's

before all this happened very well she wanted it again like always. She

was hurt from the night before of me telling her I may try becoming a

liver donor for a family friend. She told me I should move on if I

chose to donate my liver but if I chose to not we will stay together.

I chose the relationship but later in the day of the 4th I told her

I'm ending our relationship because I can't keep doing the back and forth

thing with her or deal with her not helping me take care of her and

the girls so I can still move forward with my betterment in life.

That along with my posts of thinking about cutting myself four times

                    Attachment #5                    2b

really bothered her and made her hurt and angry. My texts/fb messages will verify this if my lawyer gets them as I asked. He's told me that there is no log of my phone. Anyways I told her that I want to leave this on a positive level and that I still love her and all. She just wanted to fight and blame me that I wrecked the relationship first and that I push her to do better with her life when I don't need to. She told me leave her alone so when I do and block her she got more mad and tells me to burn in hell. I got to telling her I want to die and stuff and finally thought [illegible] and told her I'm out by saying something like since I'm such a bad person and she wants me out of her life then she needs to just stay out of mine until she grows the fuck up and if she needs someone to talk to she knows I'm there for her. Still she just wants to argue. I left the Governor and I felt bad for the emotional hurt I caused her. I would never kill a woman EVER.

The book I'm writing that the media talks about is for the girls to have money for college and all. I know Barbara would want that for them. She told me to make sure they are taken care of and that the reason Chris has the girls is because of what she planned to do. The book is about a group of female assassins protecting the country from bad people. They are witches against a satanic cult called Sacred Seven. If you like cars, beauties, guns, and military suspense and suspense mystery crime then I'll be glad to give you a copy when I finish it.

I got a letter back from Cheri Atwood your Executive Administrator on 2/15/17. I pray this letter gets to you instead of her this time. As I said you'll understand the reason for this letter in due time. It's written to prove something if it is to actually happen. I look forward to seeing you and helping make Michigan a better place when I'm through proving my innocence at trial.

Sincerely, Joshua Salyers

25 W. Walton Ave
Muskegon Michigan 49440

Attachment #5 (continued)

9/6/2016

Attachment #9



(5) Josh Salyers

**Josh Salyers**
September 4 at 1:40pm

One cut.... Two cuts.... Three cuts.... Four.... What I have in my mind will ease this pain for real

Share

4 Shares

View 2 more comments


Sherranda Gile Don't talk like that
September 4 at 8:16pm

Doug Carlson Quite being so self loathing. The world will move on.
- September 4 at 2:21pm
Stephanie Ann replied · 5 Replies

Brenda Dailey Braga-Cook The son of a bitch murdered my niece last yesterday
23 hrs

Jennifer Green replied · 7 Replies · 4 hrs

Jennifer Green Why Joshua Salyers why did you take Barbie Dailey from her beautiful girls. Now gemma gonna grow up not knowing how much her momma loves her n her sisters. Why did u take such a beautiful woman from us??? As if she didnt already live a hard enough life....who cares if u have her....her girls needed her more then u ever would think of needing her
1 · 4 hrs

**Josh Salyers**
September 4 at 1:00pm · YouTube

I'm sorry :.....



Goodbye (I'm Sorry) - Jamestown Story [with lyrics]
Slideshow with lyrics of the song 'Goodbye (I'm Sorry)' by Jamestown Story....and a few pictures. I luff this song :( Yeah') made a mistake in the video :(
YOUTUBE.COM

Share

**Josh Salyers**
September 4 at 12:47pm · YouTube

I've never felt this damn helpless. This low. I need my comfort..... come talk to me a while



Baby don't cut - B-mike
iTunes: http://itunes.apple.com/album/id923418539
Facebook - http://www.facebook.com/bmikemusic
Instagram: http://www.instagram.com/okayumm Twitter http://ww...
YOUTUBE.COM

Share


**Josh Salyers** — feeling depressed.
September 4 at 11:40am · Muskegon, MI

Just move on she says....... if she only knew what that means now....... Angels Fall.....when that happens all hurts will be over

Share

---

*Handwritten annotations:*

The trial court abused its discretion by failing to admit into evidence the exculpatory evidence. In excluding the evidence, the court deprived the jury of its ability to consider important, relevant factors in determining this so called Premeditation and deliberation

Kinda in reference:
People V. Feezel, 486 Mich. 184, 783 N.W.2d 67, 2010 Mich. LEXIS 1096 (Mich. 2010)

(July) Song Barb introduced to me when she held a knife to her neck before (1 of the 2 other times) Besides this time

(Aug) Suicidal Song Barb introduced to me before (1 of 2 other times.)

35 WEST HURON STREET, SUITE 401
PONTIAC, MI 48342
(248) 732-2850
FAX (248) 377-1080

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

November 20, 2017

Joshua Salyers
MDOC#422144
Charles Egeler Reception and Guidance Center
3855 Cooper Street
Jackson, MI 49201

Re:     Appeal

Mr. Salyers,

        By the present, I wish to inform you that I have been appointed as your appellate attorney. I do not have much information about your case but transcripts have been ordered. I will review the transcripts upon receipt and then come see you. Please write me with any issues you may have in regards to your case.

        I look forward to hearing from you.

Sincerely Yours,

Melissa Krauskopf
Attorney at Law

*Fackbook*

*Beto Martinez*
*Rob Gough*

*Better bay Appliance*
*-Icorp productions*

*Beto*

*Midge Gough*
*17462 Indian*
*Redford, Mi*
*48240*

*313 387 3038*
*313 957 9108 midge*
*Her Son Beto*

Melissa,                                                    12/11/17

    Hey. So I've been doing research on my case and I ran across the information about having to file a motion for a new trial within 6 months on claims of ineffective assistance of trial counsel and a Motion requesting a Ginther Hearing to establish a factual record of such claims of ineffectiveness. Will you please be sure to file that with the trial court as soon as you can. Thank you.

    I'm sending this with the included letter. Sorry about the writing. I just woke up and in a hurry to put these letters in the mail.

    Thanks Melissa.

               Sincerely
               Josh Selyres #422144

K AND Q LAW, PC
35 WEST HURON STREET, SUITE 401
PONTIAC, MI 48342
(248) 732-2850
FAX (248) 377-1080

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

February 14, 2018

Joshua Salyers #42214
Macomb Correctional Facility

Dear Mr. Salyers,

I am writing to let you know that I have received the complete transcripts in your case. I will need some time to review them properly. I prefer to do this before meeting with you because if I do not, I am unable to intelligently answer questions or give opinions. I do not like to guess, as that does not do you any good. I have received your letters and made notes of your potential arguments. I am not often in the office during the day, as I am in court and so am difficult to catch in the office during business hours. I also frequently work from home.

As for your questions regarding me working for the state, I do not work for the state. I run my own practice with my office partner. Appointed work is part of my business and I take it very seriously. I have no connection to anyone in Muskegon county. I do not know the trial attorneys involved with your case. I have appeared in Muskegon on appellate matters, but I do not have a trial practice there and have no personal connection with anyone there. I take appeals from the majority of the counties in the

state. Where my fee is being paid from makes no difference in how I handle anyone's case.

I schedule video visits because that is how we do the majority of our visits in every county these days, and it saves everyone precious time. Therefore, our initial visit will be done over video. If it is necessary to do an in person visit at Macomb after, I will do that. That is how we used to do it in the days before the video equipment existed.  I will tell you that I have conducted countless visits over video at the State Appellate Defender Office and have never once had an issue with confidentiality, recording, etc. As far as your transcripts, I have only one copy of them and I need them in order to be able to do my job. I do my best to provide copies when requested, but yours are lengthy. Our former boss used to charge people for copies; my office partner and I do not do that, but in return I ask for your patience in receiving them.

I will be in touch shortly. Please continue to write me if you wish.

Sincerely,

Melissa Krauskopf

K AND Q LAW, PC
35 WEST HURON STREET, SUITE 401
PONTIAC, MI 48342
(248) 732-2850
FAX (248) 377-1080

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

April 5, 2018

Joshua Salyers
c/o Oaks Correctional Facility

Dear Mr. Salyers,

I have scheduled a video visit with you for 4/18 from 3:30-4:30 pm. As I have

previously indicated, it is extremely important that I do have the opportunity to read

your transcripts before our visit, as I cannot provide intelligent opinions and answers to

your questions without first reading the materials. I am reading all of the transcripts,

and our meeting is scheduled and confirmed for 4/18. I have not filed any pleadings,

and will not do so until I consult with you. The due date for any pleadings on appeal to

be filed is May 29, 2018, so we are well within the appropriate timeframe. I understand

you are very eager to plead your case on appeal, but you must also understand that I

have to review all relevant material. Please also understand that you will have the

opportunity to file your own brief on appeal as a supplement to what I write if you so

wish, upon reading my final brief on appeal for you. I will talk to you on 4/18.

Sincerely,

Melissa Krauskopf

K AND Q LAW, PC
39520 Woodward Ave, suite 230
Bloomfield Hills, MI 48304
(248) 732-2850

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

May 22, 2018

Joshua Salyers #422144

Dear Mr. Salyers,

I am continuing to work on your appeal. I was able to locate the Facebook posts you told me about; not just the post introduced into evidence at your trial, but all of your posts from that day. In addition, upon complete review of your transcripts, it appears that the jury observed you being handcuffed by the deputies. This is a huge problem and is another issue I am raising in your brief. I am researching the other issues we discussed.

You will get a copy of the brief when it is filed. If you wish to file your own supplemental brief, you may simply follow the format of mine. If you do wish to file your own brief after reading mine, you have 84 days from the date mine is filed to submit yours to the Court of Appeals.

Sincerely,

Melissa Krauskopf

K AND Q LAW, PC
39520 Woodward, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 645-8262

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

June 11, 2018

Joshua Salyers #422144

Dear Mr. Salyers,

As you have noted, I have recently moved office locations and the current address is at the top of this letterhead. I have received all of your letters, as the mail is being forwarded here from our old address.

In regards to your complaints and issues with the brief I filed, I raised all the issues I felt I could raise on your behalf that were legally supported. Quite frankly, the rest of the Facebook posts were not helpful to you, and at any rate if, as I believe, the error is in admitting it in the first place, then the contents do not matter. I do have copies of the posts, as I was able to locate them on Facebook.

You are, as I have already told you, free to file your own supplemental brief along with mine. You may simply follow the format of the brief I wrote, and send it to me. I will make sure it is filed. This brief is due within 84 days of the date of my brief. I will have my secretary make copies of the transcripts for you. As I have repeatedly told you, I am provided with only one copy and it is extremely burdensome to provide copies to you, but since you have expressed an interest in filing your own brief I will have my assistant make copies of everything for you and I will put them in the mail. I

K AND Q LAW, PC
39520 Woodward, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 645-8262

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

am sorry that you are displeased with the brief. As I told you at the beginning, I raise all

issues I feel I can legally raise. If I do not raise an issue, it is because after researching it I

do not feel I can do so.

Sincerely Yours,

Melissa Krauskopf
Attorney at Law

Melissa [ ... & Love, P.C. ]                                   6/30/18

39520 Woodward [struck] Suite 230
Bloomfield Hills, MI 48304

Look here, I've been patient with you long enough. Here it is going on July in two days and I have still not recieved my transcripts and everything pertaining to my case. You constantly tell me be patient. Well guess what, I'm done waiting on you. You are doing the bare minimum and forcing me to file a supplement brief when it is your goddamn job to file what I tell you to file. You don't communicate with me and I have no idea how to file a supplement brief. You work for me, not the fucking State. I have sent a request to Judge Hicks asking him to make you turn over my transcripts and all other documents pertaining to my case. I want you off my case and someone that ~~will~~ is going to fight for me since you aren't doing that. There are many other grounds in which I've asked you to file in the appeal but you have not done it. Prosecutorial Misconduct, insufficient evidence, failing to notify me of the accusations against me prior to interviewing me, Arresting me without a warrant, forcing me to go to the police station against my wishes, falsifying evidence, failing to preserve and disclosing exculpatory evidence, compromised the jury during selection; seating a biased jury, using incorrect evidence to argue his mere speculative case to the jury, lying and misstating facts, putting words in my mouth and the Medical examiner's, failing to obtain my witnesses, shaking my cell down to illegally retrieve my case notes and poem, using a jailhouse liar I have never even met let alone talked to, Removing initial trial counsel from my case without my request, consent or knowledge, Coercing witnesses, Ruling evidence offered by defense, Mechanistically, as "hearsay" to defeat the ends of justice and not providing me with the full discovery so I'd know what is going on as I've been in the dark about my case all the way until trial. I never even knew I gave a "Confission" until trial when they first played the tape.

It's quite fucking amazing the shit I read from the Law Library that you want to tell me that there is little chance these grounds will be legit. If only I knew how to file all this appeal shit, myself, I'd be rid of all you State-paid-ass-kissing-Lawyers that don't do your best to your abilities. Not all of state appointed's are like that but ~~doesn't to be a~~ for some reason I seem to be a magnet for them. I know you are not going to appreciate this letter just as I am not liking writing it but this is my life you are playing with. I am innocent, Melissa, and can prove it but you don't seem to grasp that. If you wish to remain on my case, drive your ass here and lets work on my case. And bring me all that is ~~relevant~~ Related to my case, otherwise, get off my case and get me assigned to someone who takes their job seriously and works for me!!

Sincerely,
[signature]
Joshua M. Selyers                        6/30/18

#422144
1500 Caberfae Hwy
Manistee, MI 49660

K AND Q LAW, PC
39520 Woodward Avenue, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 377-1080

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

July 24, 2018

Joshua Salyers #422144
Oaks Correctional Facility

Dear Mr. Salyers,

The court has forwarded on to me your correspondence. I have also received numerous

letters from you in which you indicate you want a new attorney. Please understand I

am not "forcing" you to file a supplemental brief. It is my obligation to explain to you

your right to do so, and I have explained that in a previous letter. I raised the issues that

I believed were legally supported in your case. It is my opinion that you stand a strong

chance of getting a new trial because of the deputies handcuffing you in front of the

jury. I appreciate that there are other arguments you wanted to make. I told you from

the beginning I would consider everything, and raise what I could.


You have continued to insist that I am not doing a good job representing you because I

"work for the state." As I have explained to you numerous times, I do not work for the

state. I do not work for Muskegon County. I have only a handful of cases in Muskegon

County every year. Furthermore, the majority of my work is appointed. I do not have clients paying me "6 figures." I have spent a lot of time and effort on your case.

I was able to locate your Facebook, and see the posts. If you'd like, I can send you copies of what I printed. In my opinion, there was nothing in there that was helpful to you at all. Furthermore, subsequent to your arrest, many of the people you referenced as potential witnesses to your suicidal tendencies posted some very negative and quite frankly violent statements regarding you. I do not believe any of them would have been helpful.

If you remain convinced that I am not working for you, please confirm for me that you would like me to formally withdraw from your case and ask the judge for a new attorney for you.

Sincerely,

Melissa Krauskopf

K AND Q LAW, PC
39520 Woodward Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
kandqlaw@gmail.com

MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE

August 20, 2018

Joshua Salyers #422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

Dear Mr. Salyers

Enclosed please find your original copy of your Standard 4 brief. I apologize that it is

out of order, I had to scan it in a couple pieces in order to e-file it. I e-filed it with the

Court of Appeals and e-served it on the prosecutor on August 9, 2018. I will let you

know when I receive the prosecutor's reply brief, and I will set up a visit with you when

it is time to prepare for oral argument. I will let you know when I am notified of the

oral argument date.

Sincerely,

Melissa Krauskopf

*I still have not gotten a copy of the prosecutor's Reply breif*

*Visit was never made like she said she'd do!*

*K AND Q LAW, PC*
*39520 Woodward Suite 230*
*Bloomfield Hills, MI 48304*
*(248) 732-2850*
*kandqlaw@gmail.com*

*MELISSA KRAUSKOPF*
*CECILIA QUIRINDONGO BAUNSOE*

August 22, 2018

Joshua Salyers

Dear Mr. Salyers,

The Court of Appeals has returned your Standard 4 brief to me, as it exceeds 50 pages and they declined my motion to accept a brief in excess of 50 pages. I have retained a copy of your brief both electronically and in hard copy, and have already sent your hard copy back to you. Please let me know which 50 pages of the brief you wish me to resubmit, or if you wish to create a new 50 pages from what you have done. You have 28 days from August 21st to re-file your brief. This means that the filing deadline is September 18. I will be happy to efile a 50 page brief for you as soon as you let me know which pages you want filed. Please be aware that I will be leaving the office for two weeks on September 11, and will be unavailable during that time.

Sincerely,

Melissa Krauskopf



| | Jonathan Sacks<br>Director | Bradley R. Hall<br>MAACS Administrator |
|---|---|---|
| | Michael L. Mittlestat<br>Deputy Director | Kathryn R. Swedlow<br>MAACS Deputy Administrator |
| | Marilena David-Martin<br>Training Director | |

**State Appellate Defender Office**
645 Griswold, Ste. 3300, Detroit, MI 48226
(Phone) 313.256.9833 (Fax) 313.965.0372
(Client calls) 313.256.9822   www.sado.org

Michigan Appellate Assigned
**Counsel System (MAACS)**
200 N. Washington Sq., Ste. 250, Lansing, MI 48913
(Phone) 517.334.1200 (Fax) 517.334.1228

September 5, 2018

Mr. Joshua Salyers
#422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

RE:  *People v Joshua Salyers*
     Muskegon County File No. 16-4697

Dear Mr. Salyers:

I am writing in response to your letter of August 16, 2018, which was received on August 23, 2018. In your letter, you present various complaints about your assigned appellate attorney, Melissa Krauskopf. You also include several enclosures with your letter, including correspondence with Ms. Krauskopf and the Motion to Remand and the Brief on Appeal Ms. Krauskopf filed on your behalf.

From my review of your letter and enclosures, I find no violations of the Minimum Standards for Indigent Criminal Appellate Defense Services. Instead, it appears that Ms. Krauskopf properly consulted with you before filing; filed a timely Brief on Appeal, which preserved the right to oral argument in your case; filed a Motion to Remand; and has informed you about your right to file a *pro per* Standard 4 Brief. Indeed, my review of the appellate docket sheet in your case indicates that she filed your Standard Brief on August 9, 2018, together with a motion to exceed the 50-page page limit.

You also state in your letter that Ms. Krauskopf has refused your request to withdraw. However, in Ms. Krauskopf's July 24, 2018 letter to you, she asked you to confirm whether you wanted her to withdraw. If you still feel that you want Ms. Krauskopf to withdraw and for a different attorney to be appointed to your case, you should respond to Ms. Krauskopf directly.

Mr. Joshua Salyers
September 5, 2018                                                                          Page 2

I am returning the various enclosures you included with your letter, as I have
retained copies for my files. This letter closes my inquiry into this matter.


                                              Sincerely,


                                              Kathy Swedlow
                                              Deputy Administrator


KS/sns
Enclosures
Cc: Melissa Krauskopf (w/o enclosures)

F:\14th Circuit - Muskegon\16-4697\MAACS_Salyers_9-5-18.docx

Melissa,                                                    9/6/18

So I've repeatedly asked for my full complete set of Court Documents. Everything Pertaining To MY CASE. YOU HAVE NOT OBTAINED THEM and if you have I DON'T HAVE THEM. That being said proves that you are NOT doing YOUR JOB. which means you are clearly unable to thoroughly investigate this case which therefore renders you INEFFECTIVE. How many more times do I need to tell you or that worthless Piece of shit trial Judge Timothy Hicks that I want S.A.D.O substitute. You still have not even called the people I've asked you to for witnesses. And don't try telling me that you have b/c you'd be a liar. You see one of those witnesses have a piece of mail that is Unopened that will prove that I was Maliciously Prosecuted by at least witness coercion and violation of Federal law and the 6th and 14th Amendments. The prosecutor is not going to be able to claim absolute immunity. But you see you are NOT DOING Your job. I've said it from the beginning and I'll say it again, "I AM INNOCENT and I CAN PROVE MALICIOUS PROSECUTION!! It'd be nice to have that Joshua Guerin guy to Recant his lies but I don't need it and can still prove that he and officer Smith were Coerced. Your Practice is a damn joke, Melissa. I may not be court smart, know how to write briefs and motions and know how to be an Ass Kisser to be a successful lawyer but I am DAMN SURE smarter than you and know how to prove someones goddamn innocence. You are doing

nothing to afford me that opportunity. If you were you'd have ALL MY CASE FILES, Exhibits, ROA, Reports, Discovery, ALL TRANSCRIPTS such as when Hicks Removed my initial trial counsel and 2/15/17 when Hicks gave improper legal advice and, without giving me a hearing for ineffective assistance so I can have a lawyer that is going to work for ME, forces me to keep Fred J. Lesica. And NOW look!!! He Appoints another pathetic lawyer to my case who can't even investigate into my claims, can't make a simple visit to personally discuss this case, can't even get all documents from the courts, can't even send me my trial transcripts until half of my deadline" is up to file a Standard 4 Brief, can't even accept my calls or write to communicate about my case, can't even allow her client to Review the appeal before submitting it, and even more pathetic DOESN'T KNOW WHAT "GET THE FUCK OFF MY CASE" and "GET ME S.A.D.O substitute counsel" means. Regardless of what your Beautiful self has to say, if I was paying you 5-6 figures you would be doing something with my case to succeed but you are worse than a prostitute. At least a prostitute stops fucking you when you pay her. Get off my goddamn case, Melissa, or you're going to have bigger problems than you want. I've been trying to get rid of you for months by letters to you, the judge (trial), Mr. Hall at M.A.A.C.S, to the chief judge Jane M. Beckering. GET ME S.A.DO COUNSEL and get off MY CASE. DO NOT FUCK UP MY APPEAL PROCESS I don't care if you have to ask for complete reinstatement for my "Right to Appeal"

*(right margin, rotated text)* back to its original state after sentencing so the S.A.D.O counsel can start completely fresh BEAUTY with you. ALL yours [signature] Tolunn Bickford #422144 I'm very Disappointed with you, no brains. from your pathetic excuse of work.

Court of Appeals Clerk,                                    10/17/18

My name is Joshua Salyers  case # 341162  LC# 16-004697-FC
I am writing in Regards for confirmation as to the status
of my appeals. On August 21, 2018 this Court entered an
order for me to file a Standard 4 Brief that is limited
to 50 pages. It was due by 9/18/2018. I had sent
it to Ms. Krauskopf to file it with the Court of Appeals
on 9/5/2018. I have not heard anything from my lawyer
about my Appeal being filed (Standard 4 Brief).

Ms. Krauskopf has not been effective for my case
as she has not gotten all Relevant documents so that
she can thoroughly investigate and perfect Appeal of my
case. I have written letters to the Judge, ~~Court of~~ Clerk
of the Court as well as my lawyer so I may obtain
all Relevant documents in regards to my case to no
avail. I have consistantly Requested new counsel and
for Ms. Krauskopf to withdraw and have me appointed
S.A.D.O counsel who will take my case seriously.

Enclosed is a motion for Leave and requesting the
Court of Appeals to Remand back to the Lower Court
for S.A.D.O substitute counsel and GRANT a
Reinstatement of 'Right to Appeal' to its original status
after Sentencing.

Please let me know what is going on Regarding
my case, as my lawyer Refuses to communicate with
me as she is suppose to. Thank You!   Yours Respectfully,

STATE OF MICHIGAN

IN THE COURT OF APPEALS

People of the state of Michigan,

      Plantiff - Appellee,      Muskegon County Court
                                  Case No. 16-004697-FC

V                                  Court of Appeals
Joshua Salyers,                       Case No. 341162

          Defendant - Appellant. /

         Appellant's Motion For Leave
    From Claim of Appeal / Requesting Oral Argument

    Now Comes before the Court, the Appellant, Joshua Salyers in pro se being first duly sworn. Appellant is in pursuant to MCR 7.211 and 7.204

    Appellant has appealed his conviction as of 'Right to Appeal'. He was appointed counsel by the trial courts that has been ineffective in representing his issues that are clearly established in his case. Appellant's counsel, Melissa Krauskopf, has failed to obtain all documents pertaining to the case # 16-004697-FC. so that she can, thoroughly, investigate all claims Appellant wishes to raise in the Court of Appeals. Ms. Krauskopf has failed to make her initial visit, in person, so attorney/client can successfully establish a meaningful understanding of the case at hand. On several occasions I've written Ms. Krauskopf in regards to removing herself from the case and getting me S.A.D.O substitute appellant counsel. I've even written to the trial judge over my case in regards to being appointed S.A.D.O substitute and removing Ms. Krauskopf. Ms. Krauskopf has filed on May 29, 2018 an appeal, motion, and brief before first allowing Appellant's review and consent

-1-

After filing the appeal it had taken Ms. Krauskopf nearly 44 days to supply Appellant with his Trial Transcripts, leaving Appellant only 40 days to write his Standard 4 Brief Raising issues I've, diligently, Requested for her to ~~raise~~ investigate and Research and Raise.

Appellant is not familiar with the law and does not possess the know how to be left without effective assistance of counsel. Ms. Krauskopf has acknowledge that I wish for her immediate withdrawl and the appointment of a S.A.D.O substitute so that I may effectively be assisted with filing my claims with this Honorable Court of Appeals as of Right.

Therefore at this moment Defendant-Appellant is, Respectfully, asking this Honorable Courts to Grant a Reinstatement of 'Right to Appeal' to its first original status after sentencing and Remand to the trial courts for a S.A.D.O substitute to effectively ~~represent and file~~ obtain all documents of Case # 16-004697-FC, investigate, research, and represent the Appellant-Defendant in his appeal as of Right.

By /s/ Joshua Salyers
Defendant-Appellant

Joshua Salyers # 422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, Mi
          49660

10/13/18



CHRISTOPHER M. MURRAY
CHIEF JUDGE
JANE M. BECKERING
CHIEF JUDGE PRO TEM
DAVID H. SAWYER
WILLIAM B. MURPHY
MARK J. CAVANAGH
KATHLEEN JANSEN
JANE E. MARKEY
PETER D. O'CONNELL
PATRICK M. METER
KIRSTEN FRANK KELLY
KAREN FORT HOOD
STEPHEN L. BORRELLO
DEBORAH A. SERVITTO
ELIZABETH L. GLEICHER

CYNTHIA DIANE STEPHENS
MICHAEL J. KELLY
DOUGLAS B. SHAPIRO
AMY RONAYNE KRAUSE
MARK T. BOONSTRA
MICHAEL J. RIORDAN
MICHAEL F. GADOLA
COLLEEN A. O'BRIEN
BROCK A. SWARTZLE
THOMAS C. CAMERON
JONATHAN TUKEL
ANICA LETICA
JUDGES

*State of Michigan*

# Court of Appeals
## Grand Rapids Office

JEROME W. ZIMMER JR.
CHIEF CLERK

October 22, 2018

Mr. Joshua Michael Salyers #422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

Re: **People of MI v Joshua Michael Salyers**
Court of Appeals No. **341162**
Lower Court No. **16-004697-FC**

Dear Mr. Salyers:

This office has received you recent letter in the above matter. Your appointed attorney filed your Standard 4 brief on September 11, 2018. The brief has been accepted for filing.

Enclosed for return is the "motion for leave from claim of appeal/requesting oral argument" that you submitted with your letter. Matters pertaining to the appointment of counsel remain within the jurisdiction of the trial court during the pendency of an appeal. MCR 7.208(H). Therefore, your motion is being returned. You should file an appropriate motion to remove counsel in the trial court.

Very truly yours,

Patricia A. Murray
District Clerk

By:

Brian Dietrich

PAM/bd
cc:  Charles F. Justian
     Melissa Krauskopf

DETROIT OFFICE
CADILLAC PLACE
3020 W. GRAND BLVD. SUITE 14-300
DETROIT, MICHIGAN 48202-6020
(313) 972-5678

TROY OFFICE
COLUMBIA CENTER
201 W. BIG BEAVER RD. SUITE 800
TROY, MICHIGAN 48084-4127
(248) 524-8700

GRAND RAPIDS OFFICE
STATE OF MICHIGAN OFFICE BUILDING
350 OTTAWA, N.W.
GRAND RAPIDS, MICHIGAN 49503-2349
(616) 456-1167

LANSING OFFICE
925 W. OTTAWA ST.
P.O. BOX 30022
LANSING, MICHIGAN 48909-7522
(517) 373-0786

COURT OF APPEALS WEB SITE ~ http://courts.mi.gov/courts/coa/

**K AND Q LAW, PC**
39520 Woodward, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 645-8262

**MELISSA KRAUSKOPF**
**CECILIA QUIRINDONGO BAUNSOE**

January 8, 2019

Joshua Salyers
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, MI 49660

Dear Mr. Salyers,

I have received your latest letter to me. I have filed both my brief on appeal and your supplemental brief. Therefore, the issues you wanted raised in your own brief are before the Court of Appeals. The prosecutor has not yet filed any reply. I told you at the beginning that you may disagree with my brief, and that is why you have the option of including your own brief, which you have done and I have timely filed for you. I have done nothing wrong on your case, and feel that I raised strong issues on your behalf. We are now awaiting oral argument. I understand you are frustrated. However, I do not deserve some of the language you have used with me. I have never been disrespectful to you and expect the same courtesy in return. I maintain my position that the issue of you being handcuffed in full view of the jury is one that stands a good chance of getting you a new trial. If you have further questions, please write me. Otherwise, I will let you know when I receive notice of oral argument.

Sincerely Yours,

Melissa Krauskopf



ALAN M. GERSHEL
*GRIEVANCE ADMINISTRATOR*

ROBERT E. EDICK
*DEPUTY ADMINISTRATOR*

CYNTHIA C. BULLINGTON
*ASSISTANT DEPUTY ADMINISTRATOR*

*ASSOCIATE COUNSEL*

STEPHEN P. VELLA
RHONDA SPENCER POZEHL
EMILY A. DOWNEY
KIMBERLY L. UHURU
DINA P. DAJANI
JOHN K. BURGESS
CHARISE L. ANDERSON
SARAH C. LINDSEY
JORDAN D. PATERRA
NATHAN C. PITLUK
MICHAEL K. MAZUR

STATE OF MICHIGAN

# ATTORNEY GRIEVANCE COMMISSION

BUHL BUILDING
535 GRISWOLD, SUITE 1700
DETROIT, MICHIGAN 48226
TELEPHONE (313) 961-6585
WWW.AGCMI.ORG

January 4, 2019

**PERSONAL AND CONFIDENTIAL**

Joshua Salyers #422144
Oaks Correctional Facility
1500 Caberfae Hwy.
Manistee, MI 49660

RE:   **Joshua Salyers as to Fred J. Lesica**
      **AGC File No. 18-1553**

Dear Mr. Salyers:

The Commission is authorized to investigate and when necessary prosecute charges of attorney misconduct. After preliminary investigation and careful review of the materials in this file by the Commission's staff, it has been determined that the matters raised in your Request for Investigation will not be pursued further.

The Attorney Grievance Commission has no authority to function as an appellate court. The appellate system is designed to address your concerns regarding what you perceive as your trial attorney's ineffective representation. We recommend that you speak with a qualified attorney who can advise you of your rights.

Our office feels Fred J. Lesica has answered your allegations adequately. I am enclosing a copy of the answer for your review. We will take no further action.

Please be advised that this matter is being closed under the authority granted to the Grievance Administrator pursuant to Michigan Court Rule 9.112(C)(1)(a).

I hope that this letter adequately explains my office's position in this matter.

Very truly yours,

Cynthia C. Bullington
Assistant Deputy Administrator

CCB/jmb
Enclosure
cc: Fred J. Lesica

**FRED J. LESICA & Associates**
ATTORNEYS AT LAW
3224 Glade Street
Muskegon Heights, Michigan   49444
(231) 733-1001 / (231) 733-1988 (FAX)


December 19, 2018

Cynthia C. Bullington
Assistant Deputy Administrator
Attorney Grievance Commission
Buhl Building
535 Griswold, Suite 1700
Detroit, MI 48226


RE:  Joshua Salyers as to Fred J. Lesica
     AGC File # 18-1553

Dear Ms. Bullington:

Thank you for taking the time to speak with me regarding Mr. Lesica.  I have enclosed a typed copy of his hand written response along with his hand written response that you requested.

Currently Mr. Lesica is in Poppin House in Muskegon and is under hospice care and being keeped comfortable until passes into the hands of his lord.

Yours very truly,

Beverly Parkison
Legal Assistant of

Fred J. Lesica

AGC 2018/12/27 11:15

# K AND Q LAW, PC

39520 Woodward, suite 230. Bloomfield Hills, MI, 48304

248.732.2850   kandqlaw@gmail.com

February 21, 2019

Joshua Salyers

Dear Mr. Salyers,

I have received your letter to me in which you complain about your trial attorney and enclosed the grievance you filed regarding him. Please understand that the grievance process regarding your trial attorney is not something the Attorney Grievance Commission keeps me informed of or contacted me about. I have no knowledge of your trial attorney's health circumstances, either.

In regard to your questions about when a hearing will be held, as I already explained to you, I have filed both my brief on appeal and your supplemental brief. All of the issues in both briefs are now before the Court of Appeals. We must await direction from the Court, which as I have previously told you, can take a while. It is not uncommon to wait a year to 18 months for oral argument to be scheduled. As soon as I receive any updates from the Court, I will let you know.

Sincerely,

Melissa Krauskopf

# K AND Q LAW, PC

## 39520 Woodward, Suite 230 Bloomfield Hills, MI 48304

### 248.732.2850   kandqlaw@gmail.com

March 20, 2019

Joshua Salyers #422144

Oaks Correctional Facility

Dear Mr. Salyers:

Oral argument in your case has been scheduled for Tuesday, April 9, 2019, in the Court of Appeals in Grand Rapids. Your panel is judges Beckering, Servitto, and Stephens. As we discussed, you will not be brought for oral argument and the court will not make a decision at the oral argument; a written opinion will be issued afterwards, typically within 2-4 weeks. The prosecutor is not entitled to oral argument on your case, so I will be the only one appearing.

Sincerely,

Melissa Krauskopf

*We never discussed shit bitch! You never made the goddamn visit. Grrrr!!!*

5/24/2019

Melissa Krauskopf,

It's Joshua Salyers. I am writing you, again, Requesting that you send to me everything that you have pertaining to my case #16-4697-FC. I have copies of previous letters requesting everything and asking you to get the transcripts for 2/15/17 and the reason as to why Chad Catalino had been removed from my case without my request and/or consent and my knowledge. You have not provided to me any of this information. Let me, again, spell out for you what I want.

- I want all transcripts: 2/15/17, 9/14/16, 10/14/16, 11/29/2016, 12/16/2016, 5/31/17, 8/3/2017
- I want a transcript of the 9-1-1 call played at trial since I can't have the audio file.
- I want a full review (written) of the surveillance footage from 4:45pm to the time Barbara was taken to the hospital and I transported to the police station.
- I want all Discovery material from both the Prosecutor's files and the Defense attorney's files, including all actions taken by both parties in regards of investigating, research, inquiries and testing of evidence, witnesses seeked out, etc. In Strickler v Greene, 527 US. 263, 278. District Court grants discovery "of "all of the police and prosecution's files in the case."
- I want all photos taken of the house, scene, injuries, evidence, autopsy examination (All photos including those suppressed and full body examination) All photos of me taken by Detectives and the list of all my property that I come to jail with.

- I want all reports of the medical team that rendered aid to Barbara at the house and at the hospital.
- I want the length of that steak knife state claims to have been used. Both the length of the blade and the handle.
- I want a transcript of the interrogation done at the police station
- I want the report of the investigators that interview Eric Emory at the jail.
- I want the report regarding the illegal seizure of that "Multi page letter" regarding the homicide in question" and I want a copy of that "letter." (It was a poem, not a letter).

You have been asked several times for everything, Melissa, and as "my" attorney you are withholding me from everything that I need to prove, not only my innocence, but all other major issues of police + prosecutor's misconducts, medical malpractice, Malicious Prosecution, Judicial Misconduct, coerced witnesses, falsified evidence, evidence destruction and tampering, Malicious Prosecutions. You are not helping me. You are just playing with my life, my freedom, doing as little as you need to to try claiming that you properly represented me. People like you and Fred Lesica are the reason innocent people get convicted and has to fight to be heard to prove their innocence. Get me what I'm asking for, Melissa.

P.S. How did oral argument go?

Respectfully,
Joshua Salyers

# K AND Q LAW, PC

39520 Woodward, Suite 230 Bloomfield Hills, MI 48304

248.732.2850   kandqlaw@gmail.com

July 9th, 2019

JOSHUA MICHAEL SALYERS #422144
Oaks Correctional Facility
1500 Caberfae Highway
Manistee, MI 49660

Dear Mr. Salyers

Enclosed please find the Order of the Court of Appeals denying your Application for Leave to Appeal.  At this time, you may consider filing an Application for Leave to Appeal in the Michigan Supreme Court.

I have enclosed an instruction packet and form for you to fill out if you desire to file with the Supreme Court.  Please pay careful attention to Michigan Court Rule (MCR) 7.203 in filling out the form.  The Supreme Court must receive your Application within 56 days from the date of the Order denying leave.

This ends my representation of you. I wish you the best of luck.

Sincerely,

*Melissa Krauskopf*

Sincerely Yours,

Melissa Krauskopf

39520 Woodward, Suite 230
Bloomfield Hills, MI 48304
(248) 732-2850
FAX (248) 645-8262

<div align="right">
MELISSA KRAUSKOPF
CECILIA QUIRINDONGO BAUNSOE
</div>

July 1, 2020

Joshua Salyers #422144
Alger Correctional Facility
N 16141 Industrial Park Drive
Munising, MI  49862

Dear Mr. Salyers,

Enclosed please find the Facebook posts you requested and the remaining documents I have related to your case. It appears you already have some of these documents but I am sending them anyway. My records reflect that I mailed you a complete set of transcripts. I have no other documents related to your case. If there is something else specific you are looking for, I suggest you contact your trial attorney. If you need another copy of my brief or the prosecutor's brief, please let me know. I am assuming you have a copy of your own brief, but am happy to get you a copy of that as well, if need be.

Sincerely,

Melissa Krauskopf
Attorney at Law

Melissa,

7/6/20

First off, Fred J. Lesica is dead. I don't have any way to get anything from him.

Secondly, you are suppose to have everything that my trial lawyer had on my case. Thirdly, you have NEVER sent me all my transcripts. I am missing Nov. 29, 2016, Oct. 14, 2016, Dec. 16, 2016, Feb. 15, 2017 May 31, 2016, August Walker Hearing request. I have NONE of the crime scene photos, Autopsy photos, Medical Reports except the Autopsy. I have none of the evidence photos, nothing. This is all stuff you are suppose to have gotten but have not OR if you had, you had not sent them to me. Can you explain then why Chad Catalino was Removed from my case and I was appointed a piece of shit Estate Attorney who was dying of cancer and always high on pain meds and drinking?

I don't understand why getting me my full complete Record of everything pertaining to my case is so hard, difficult, and beyond your capabilities when Reviewing all documents, evidence, etc. is your job so that you can do my appeals. The fact that you have none of what I've asked you for is proof you Rendered ineffective assistance of counsel.

So what do we do from here because I need everything?

Josh Salyers #462144



Josh Salyers

| Add Friend | | Message |

Timeline     About     Friends     Photos     More

**DO YOU KNOW JOSH?**

To see what he shares with friends, send him a friend request.

| Add Friend |

 **Doug Carlson    Josh Salyers**
12 hrs · Muskegon, MI

Hey Josh. Your going to rot in prison the rest of your life. I got lots of friends
in there, and I'm gonna make sure you get fucked in the ass daily. Enjoy the
life of ass fucked hell you piece of shit.

1

 Lynette Tiggelman Im with you on that one. Doug it makes me sick my
girlfriends and I and how many people he friend requested and them messages
that all went out to the public and how sick and twisted his live feeds were.

1 · 11 hrs

 Doug Carlson I can't wait to stare him in the face as he gets life
11 hrs

Lynette Tiggelman Amen to that.
11 hrs

 Sherranda Gile Did he really kill the girl he was crying over in all his live feeds?
45 mins

Sherranda Gile replied · 2 Replies · 36 mins

 **Josh Salyers**
September 4 at 3:30pm ·

Stephanie Ann



**Chosen4U87**
scan to add

**Add me on Snapchat! Username: Chosen4U87**
Snapchat lets you easily talk with friends, view Live Stories from around the world,
and explore news in Discover. Life's more fun when you live in the moment!
SNAPCHAT.COM

Share



9/6/2016   Attachment # 9 

(5) Josh Salyers

**Josh Salyers**
September 4 at 1:40pm ·

One cut.... Two cuts.... Three cuts.... Four.... What I have in my mind will ease this pain for real

Share

2

4 shares

 View 2 more comments

Sherranda Gilm Don't talk like that
September 4 at 5:16pm

Doug Carlson Quit being so self loathing. The world will move on.
· September 4 at 5:21pm

 Stephanie Ann replied · 5 Replies

Brenda Dailey Brega Cook The son of a bitch murdered my niece last yesterday
23 hrs

 Jennifer Green replied · 7 Replies · 4 hrs

Jennifer Green Why Joshua Salyers why did you take Barbie Dailey from her beautiful girls. Now gonna grow up not knowing how much her momma loves her n her sisters. Why did u take such a beautiful women from us??? As if she didnt already live a hard enough life.....who cares if u have her....her girls needed her more then u ever would think of needing her
1 · 4 hrs

**Josh Salyers**
September 4 at 1:00pm · YouTube ·

I'm sorry.......

*(July)*
Song Barb introduced to me when she held a knife to her neck before (1 of the 2 other times besides this time)



 **Goodbye (I'm Sorry) - Jamestown Story [with lyrics]**
Slideshow with lyrics of the song 'Goodbye (I'm Sorry)' by Jamestown Story... and a few pictures. I luff this song :[ Yeah I made a mistake in the video...:(
YOUTUBE.COM

Share

1

**Josh Salyers**
September 4 at 12:47pm · YouTube ·

*(Aug)*
Suicidal Song Barb introduced to me before (1 of 2 other times.)

I've never felt this damn helpless. This low. I need my comfort...... come talk to me a while

 **Baby don't cut - B-mike**
iTunes: http://itunes.apple.com/album/id523418519
Facebook - http://www.facebook.com/bmikemusic
Instagram: http://www.instagram.com/okayunam Twitter http://ww...
YOUTUBE.COM

Share

1

**Josh Salyers** is feeling depressed.
September 4 at 12:40am · Muskegon, MI ·

Just move on she says....... If she only knows what that means now......
Angels Fall.......when that happens all hurts will be over

Share

*(Handwritten annotations in left margin:)*

The trial court abused its discretion by failing to admit into evidence the exculpatory evidence. In excluding the evidence, the court deprived the jury of its ability to consider important, relevant factors in determining this so called "premeditation and deliberation"

Cinda in Reference:
People V. Feezel, 486 Mich. 84, 783 N.W.2d 67, 2010
Mich. LEXIS 1096 (Mich. 2010)

*(Handwritten at bottom:)*
Angels Fall ... ... ... ...
... by an emo band.





Add Friend

CONTACT PAGES          SEE ALL

  

CONTACTS

 Erica Wiegmann          1s

Aimee Landstrom          1h

Jillian Elizabeth

Rob Wiegmann          4h

Kyleigh Landstrom          15m

Stephanie Wright          10m

Edith Landstrom          16m

Dennis Moshane

Debbie Allen          1h

GROUP CONVERSATIONS

Josh, Cecilia, Jamie, 9 oth...



### Goodbye (I'm Sorry) - Jamestown Story [with lyrics]
Slideshow with lyrics of the song 'Goodbye (I'm Sorry)' by Jamestown Story.. and a few pictures. I luff this song :) Yeah I made a mistake in the video.. :(
YOUTUBE.COM

Share

1

 **Josh Salyers**
September 4, 2016 · YouTube ·

I've never felt this damn helpless. This low. I need my comfort..... come talk to me a while

 **Baby don't cut - B-mike**
iTunes: http://itunes.apple.com/album/id923419519 Facebook - http://www.facebook.com/bmikemusic Instagram: http://www.insta...
YOUTUBE.COM

Share

 **Josh Salyers** is     feeling depressed.
September 4, 2016 · Muskegon ·

Just move on she says....... if she only knows what that means now....... Angels Fall.... when that happens all hurts will be over

Share

1

2 Shares

 **Lynette Tiggelman** Hun keep posting memories of her. Its killing people seeing all these all over again. I cant take no more hun. These are what he sent all the woman to make people think it was suicide. Please stop with these negative videoes or anything to do with him.... See More

1y

 **Doug Carlson** I didnt think i was sharing it. Just comenting . his Facebook has been deleted

1y

 **Sarah Shank** I don't know how this bastard is now on my friends list cause I sure didn't accept it

1y

 Doug Carlson replied · 7 Replies

 **Josh Salyers** shared Ride or Die's photo.
September 4, 2016 ·

Turn on chat to see who's available.

Search

Original - Court
1st copy - Defendant
2nd copy - Appointed attorney

Approved, SCAO

| STATE OF MICHIGAN 14th JUDICIAL DISTRICT JUDICIAL CIRCUIT Muskegon | REQUEST FOR COURT-APPOINTED ATTORNEY AND ORDER | CASE NO. 16-4697-FC |
|---|---|---|

| ORI MI-610015J | Court address 990 Terrace St, Muskegon, MI 49442 | Court telephone no. 231-724-6251 |
|---|---|---|

| THE PEOPLE OF | [X] The State of Michigan [ ] _____ | v | Defendant name, address, and telephone no. Joshua Michael Salyers 422144 Alger Correctional Facility N6141 Industrial Park Dr., Munising, MI 49862 |
|---|---|---|---|

| CTN 611600379201 | SID 2407623L | DOB 08/26/1987 |
|---|---|---|

## REQUEST

The defendant requests a court-appointed attorney and submits the following information.

**1. CHARGE**
[ ] Misdemeanor
[X] Felony
[ ] Paternity
Next hearing: _____ Date
Bail amount: $ _____
[ ] Bond posted

**2. RESIDENCE**
[ ] Rent  [ ] Own
[ ] Live with parents
[ ] Room/Board

**3. MARITAL STATUS**
[ ] Single  [ ] Divorced  [ ] Dependents: ____ Number
[ ] Married  [X] Separated

**4. INCOME**  Employer name and address
⊘

Length of employment
Average take-home pay  $ _____
[ ] weekly  [ ] monthly  [ ] every two weeks

Other Income  State monthly amount and source (DSS, VA, rent, pensions, spouse, unemployment, etc.).
⊘

**5. ASSETS***  State value of car, home, bank deposits, inmate accounts, bonds, stocks, etc.
N/A

**6. OBLIGATIONS***  Itemize monthly rent, installment payments, mortgage payments, child support, etc.
Inmate Account/Court fines/Court fees/Institutional debt
$1,251 plus copies & legal shipping

**7. CONTRIBUTION TOWARD ATTORNEY COSTS**

I understand that I may be required to contribute to the cost of an attorney.

Date: 2/18/21                 Signature: _____

*Use reverse side for additional information/comments.

## ORDER

[ ] 8. _____ is appointed to represent the defendant.
Name                                    Bar no.

[ ] 9. The petition is denied because: _____

| District Court Endorsement  (felony cases only) | |
|---|---|
| Date | Date |
| Judge                        Bar no. | Judge                        Bar no. |

MC 222 (3/09)  **REQUEST FOR COURT-APPOINTED ATTORNEY AND ORDER**          MCR 6.005(B), MCR 6.610(D),(G)

Approved, SCAO

| Original - Court | 2nd copy - Defendant |
|---|---|
| 1st copy - Prosecutor | 3rd copy - Defendant attorney |

| STATE OF MICHIGAN<br>14th JUDICIAL CIRCUIT<br>Muskegon COUNTY | MOTION FOR RELIEF FROM JUDGMENT | CASE NO.<br>16-4697-FC |
|---|---|---|

| ORI<br>MI-610015J | Court address<br>990 Terrace St., Muskegon, MI 49442 | Court telephone no.<br>231-724-6251 |
|---|---|---|

| THE PEOPLE OF THE STATE OF MICHIGAN | v | Defendant name, address, and inmate no.<br>Joshua Michael Salyers 422144<br>Alger Correctional Facility<br>N6141 Industrial Park DR., Munising, MI 49862 |
|---|---|---|

**To be completed by the court.**

| CTN/TCN<br>611600379201 | SID<br>240762 3L | DOB<br>08/26/1987 |
|---|---|---|

**INSTRUCTIONS:** Answer each question as completely as you can. If you need more space to answer any question, you may attach extra pages. You may also attach documents, affidavits, or a brief, if you wish. Only one motion for relief may be filed, except as indicated in MCR 6.502(G)(2). Information for items 1 and 2 is on both your judgment of sentence and basic information sheet, which are available at the prison record office.

1. I was found guilty on **September 22, 2017** of the crime(s) stated below.

| Count | CONVICTED BY | | | DISMISSED BY* | CRIME | CHARGE CODE(S)<br>MCL citation/PACC Code |
|---|---|---|---|---|---|---|
| | Plea* | Court | Jury | | | |
| 1 | | | X | | First Degree Premeditated Murder | 750.316-A |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill. For dismissal: insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

2. I was sentenced as stated below by Hon. **Timothy G. Hicks**

| Count | SENTENCE DATE | MINIMUM | | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Years | Mos. | Days | Years | Mos. | | Mos. | Days | |
| 1 | 11-1-2017 | | | | LIFE | | 11-1-2017 | | 420 | |

3. Fill in the charts below with the information requested about the court proceedings in your case and the names of the attorneys who represented you.

a. **Trial Level - All Proceedings.** From arrest to sentencing, including lineups and other proceedings.

| NAME OF PROCEEDING | NAME OF ATTORNEY |
|---|---|
| Arraignment | |
| Preliminary Examination | Adam Masserang |
| Pretrial hearing | Chad Catalino Frederick Johnson |
| Discovery Motion | Chad Catalino |

| NAME OF PROCEEDING | NAME OF ATTORNEY |
|---|---|
| Request of Substitute Counsel by | Frederick Johnson |
| Adjourned from 11/29/16 Discovery | Ford Lesica |
| Motion Forensic examination | Ford Lesica |
| Post-trial Hearing | Ford Lesica |

b. **Postconviction - All Proceedings.** State and federal, including appeals, posttrial motions, and habeas petitions.

| COURT | DOCKET NO. | NAME OF PROCEEDING | NAME OF ATTORNEY | RESULT | DATE OF RESULT |
|---|---|---|---|---|---|
| Court of Appeals | 341162 | Motion/Appeals | Melissa Krauskopf | Affirmed | July 9, 2019 |
| Mich. Supreme Court | 160076 | Appeal | | Denied | March 3, 2020 |
| U.S. District | 1:18-cv-1371 | § 1983 | | Denied | January 11, 2019 |

**(Continued on the other side.)**

CC 257 (3/10) **MOTION FOR RELIEF FROM JUDGMENT**                    MCR 6.502, MCR 6.503

4. **Appointment of Counsel.** Do you want an attorney appointed? ☒ Yes ☐ No  If yes, complete and attach a financial schedule.

5. **Grounds and Relief.**

a. What action do you want the court to take? Hold a Ginther Hearing (IAC). Hold Hearing to argue the true facts of the case & motions.  Grant New Trial

b. What are the legal grounds for the relief you want? **You must raise all the issues you know about.** You may not be allowed to raise additional issues in the future. Use extra sheets of paper, if necessary.

ISSUE ONE: Ineffective Assistance of Counsel.

Continued supporting facts on 5(b)(1)

Supporting facts: Failure to investigate into facts of the case, police reports & medical reports. Failure to work with me regarding motions, my defense, and opposition briefs. Failure to provide me with Discovery. Failure to call witnesses.

ISSUE TWO: Trial Court failed to provide Requested hearings to Remove Fred Lesica and replace him with effective Trial Counsel  and instead gave legal advice. Also failed to hold hearing to replace appellate counsel.

Supporting facts: Numerous written letters Requesting New Counsel to Trial Court and both Attorneys, Trial Judge was not impartial, Denied Suppression hearing without reviewing the video/audio interrogation recording.

ISSUE THREE: Prosecutorial Misconducts

Continued supporting facts on 5(b)(3)

Supporting facts: Brady Violations, threatening exculpatory witnesses, suppressing exculpatory evidence, coercing witnesses, knowingly eliciting false testimony, Misstating Relevant facts/testimony, Mischaracterizing evidence.

ISSUE FOUR: Police and other Investigative official Misconducts

Supporting facts: Destruction of evidence, tampering/deleting evidence, fabricating evidence, writing false and/or manipulated reports, lying under oath/perjury, Unlawful arrest, Constitutional violations during interrogation and violating search & seizures.

I declare that the statements above are true to the best of my information, knowledge, and belief.

2/18/21
Date

Signature

**PROOF OF SERVICE**

I certify that on this date I served a copy of this motion upon the prosecutor by ☐ personal service, ☒ first-class mail.

2/19/21
Date

Signature

Continued for 3(a)

Walker Hearing                    Fred Lesica

Suppression Hearing               Fred Lesica

Trial (4 days)                    Fred Lesica

Sentencing                        Fred Lesica


Continued for 5 (b)(1)

both expret and others, to Refute false claims by State & State witnesses.
Failure to object to several prosecutorial Misconducts. Providing unsupported
Scenerios instead of presenting MY defense. Providing prejudicial closing statements
that implicated his client to being 1)A violent individual and 2) as to being
the person that made the many cuts to Barbara Ann Dailey.


Continued for 5 (b) (3)

Fabricating material evidence, Using knowingly false/flawed evidence to
support states theory, failing to correct false/flawed testimony/evidence, using
inflammatory Remarks and prejudicial/Racist Remarks appealing to the jurys
passions to evoke strong and negative emotional Reactions against the defendant,
Making false statements of fact in Opposition Briefs, destruction of evidence.
Violating Search & Seizure/ 6th Amendment's right to privileged documents.


Issue Five: Ineffective Assistance of Appellate Counsel

    Supporting Facts: Failure to investigate aside than just lower
court transcripts, Failure to Raise and investigate clearly meritorious
issues, failure to interview witnesses, Failure to file timely motions
for New Trial/Ginther hearing for I.A.C in trial Court, failure to
provide appellant with all transcripts and failure to provide any
transcripts until half of Supplement 4 Brief deadline had elapsed, failure

to Request a substitute S.A.D.O Replacement, filed direct appeals before Reviewing anything with appellant, failure to work closely with appellant Regarding any aspect of the appeals, failure to obtain Relevant documents, ie., Discovery Material from Trial Counsel, Prosecution, or make the Request for them with Trial Court.

On the night of September 3rd, 2016, Barbara Ann Dailey and I WERE spending time together in her Dad's backyard, playing with the dog and laying under the stars together. We got to talking and I went ahead and told her that I planned on getting tested to determine whether or not I could be the donor for a family friend. She got upset because she did not want me to try donating a piece of my liver to grow for Kara. As I was walking her home, she told me that if I choose to donate. I should consider moving on, that she loves me but she will not stay around and watch me suffer from giving away my liver. We hugged, kissed and parted ways for the night. She went home and I walked back to her Dad's. When I got home I was asked what was wrong by Christine. Barbara's Dad replied, "She is probably just being a bitch as always." I said nothing and just went to my room. Laying in bed, I began thinking about everything because, although I love Barbara and did not want her upset and hurting, I also did not want to see my friend Kara die due to not finding the organ she needed.

You will see on my facebook that I had chosen to be with Barbara from my posts all night, as well as our facebook messages. I was apparently making posts and sharing things about meaningful relationships one after another without realizing it.

1

Eventually at about 5:30am of 9/4/2016 I fell asleep, and woke up about 5 hours later talking to people about how I was feeling on September 4th, 2016.

Via my phone log (Attachment #1) and page 2/23 of my posts I wrote out the conversations and posts in chronological order so that the meaning of it all can be properly understood and not mischaracterized or misunderstood out of context. I've also pointed out where police had deleted and tried deleting stuff out of my phone to better their case. Page 2 of 23 is labeled Attachment #9 and the chronological conversations of the two, together, is labeled Attachment #10. You'll see that conversations between Lara, Stephanie, Connie, Amanda, Sherranda, and Barbara all show that I was talking about harming myself; Not murder. All these conversations align with my facebook posts and comments.

As I was finishing making her Dad and his girlfriend tuna noodle casserole for dinner, I missed a text and call from Barbara. Her text said, "I'm going for a walk. I'll see you if I see you. I love you and I'm sorry." I had called her back 3 times before she answered at 4:54pm. She said that she was getting ready when I was calling and was still getting ready. I told her that I was going to Wood Street Market to get a couple single cigarettes and asked if she wanted to go with me, and I told her that I love her, too. She told me to meet

2

at the house, where she was.  At 5:01 pm I call her to tell her that I was, there, across the street in front of Kevin's.  She told me that nobody was home because they went to the B.B.Q and to just come over. We left together a minute or so later heading to Wood Street Market.  As we were walking she showed me the message she tried sending me when facebook told her that I had blocked her.  To sum up the letter, she said that she was sorry for how she acted the night before, that she loves me. She stated that I have helped her so much since we've been together and that she really doesn't want for me to end our relationship though I tend to push her to be better, and to do better, a bit much. She apologized for fighting with me earlier but it pissed her off and hurt her to wake up and see the posts and comments regarding me thinking about cutting my wrists and harming myself. She told me she knows what it's like to cut yourself and that it becomes addictive, and to never talk like that again, especially over her. She asked that I give us another chance and that she promises that she won't let anyone or anything come between us and that after Angel starts school we can just move to Jackson, Michigan together if I would have her back. She thanked me for dying her hair and told me I should consider growing my hair out really long. It took nearly the entire walk there to Wood Street Market to read the whole letter. It was a good heartfelt letter.

3

When we got to Wood Street Market, we ran into a good friend of hers, David Cobb. I'm friends with David's wife. They hugged, we shook hands, then we went in to get our cigarettes and he bought beer. We went out of the store and David came out and asked if he could borrow a dollar. I gave him my last 30¢ and Barbara gave him her last dollar so he could buy another beer. After he went back in, we left to head back to where she was staying on Jiroch. to get her Mt. Dew she put on the porch rail as we left the house. David caught up to us on his bike and asked if we wanted want to come over to their new house on Pine St to hangout, smoke weed, drink and play video games. Barbara told him maybe and I offered to help him finish "Kicking" carpet into place. He said he was nearly done but gave us the address incase we decided to come. Barbara said we might come but we had to go get the rest of her weed from Dad's.

David headed home and Barbara and I started back to her place. As we were walking, she began getting dizzy and light-headed so we sat down in the shade of an abandoned building. We smoked a cigarette, talked, and watched a group of kids riding bikes doing stunts in the street and playing bike tag. Barbara gets dizzy and light-headed if she's out in the sun too long or gets too hot. After a bit, we got to the house and got her Mt. Dew. We went inside to get the half-gallon of apple juice for me to drink, what was left of it.

4

While inside, she showed me that ever since the home-owner, "Becky," "kicked" me out, everybody began eating all the food that is meant for her and her 3 daughters. There was nearly <u>Nothing</u> left of the $700.00 plus in food from E.B.T and W.I.C. and she just bought it barely 2 weeks ago on the 15th - 17th of August. As we were heading out, she was getting upset because she couldn't believe that her Dad told her that I could move in but her and her youngest two couldn't. That's part of the reason she asked him to move in ~~was~~ because of what everyone was doing and because of how she was being treated. I told her to chill, everything will be fine, and we'll be in Jackson together soon. As we were heading to her Dad's to get her weed, she began getting dizzy and light-headed again so at the end of Jiroch, and on Southern, we sat down beneath the shade trees behind Hackley Hospital.

She picked up a wifi signal and connected to it from the Hospital's public Wifi on the Samsung Galaxy S4 I let her borrow. She asked me if I would unblock her so she could put us back on facebook as being engaged. I was trying to be funny and said, "Whoa, didn't you tell me earlier that I fell in love with you and was moving our relationship too fast?" She told me, "not funny" and that she was still hurt and pissed over the night before and from seeing my posts about thinking of cutting myself. She then suggested that after we get to Jackson and get our first checks from work, we should get my divorce finalized and get married.

5

She couldn't find me on facebook, so I searched for myself using my email and gave her the phone back because I couldn't even find myself. Using my phone, I looked her up and tried adding her. It said because I blocked her I had to wait 48 more hours. I got up and crossed the street to throw away the apple juice container. As I was walking back toward her, she was getting up so we could continue on to her Dads to get her weed. She, again, became dizzy and light-headed and said she needed to get out of the heat for a bit. So I walked her home and was telling her I'd go get the weed and come back after I eat and asked her if she was hungry. She said she wasn't hungry and asked me if I'd just stay with her for a bit. She decided after a minute to take the back alley to get out of the sunlight.

When we got to the back of the house she went to the back door while was petting Sadie, the family pitbull. At that time, Stephanie Ann facebook messaged me at 7:03pm saying "Good? Not Good?" because I missed that I had a message from her at 6:16pm asking "How are you doing?" Barbara came out the back porch saying that the back door was locked so we walked to the front. She asked me again to stay with her for a little bit when we got onto the porch. She told me if anyone was to come home to go out the back door. We went inside together and I sat down near the window so we'd hear if someone came home. Facing me, she straddled me and was kissing me, telling me

6

She really misses me and that she loves me, and to always remember that no matter what. She told me that she is sorry for not believing in us the way that she should have. I told her it's fine, that I love and miss her, too. Things were about to get more intimate but we heard a car door nearby slam closed so I got up, with her still in my arms, turned and sat her down in the chair. I went out the back door, nearly tripping over Sadie, and to the back left corner of the yard to climb that rickety tree and leaped over the unsupported chain-link fence. While in the alley, walking South, I looked down ~~through~~ the drive-way and saw the lady that lives across the street who was carrying stuff into her house from her vehicle. I had also seen "Pretty Girl", as Barbara and I call her because we can never remember her name, as she was going into her house next door to Barbara's.

As I had gotten to the end of alley and near the corner of Grand Ave and Leahy St., Barbara calls me. Her phone, according to police report, says she called me at 7:11pm. She tells me that nobody came home. I told her that it was either "Pretty Girl" or the lady across the street because I'd seen her when I looked down the drive-way. I told her that I'm going to go get the weed and then I'll be back. She told me to tell Dad that, ~~she~~ "I'm sorry for everything, I forgive him, and that I Love him". I tell her "Okay. What's wrong?" because she sounded upset; like crying. She tells me, "I Love you and I'm sorry." I

7

tell her, "I love you, too. What's wrong?" Instead of
answering me she hung up. According to police the call
lasted 25-30 seconds. By this call ended I was near
Forest St. I put my phone in my right pocket and started
running back to the house to see what was wrong because
everything seemed fine when I left.

When I had come around the corner of Grand Ave onto
Jiroch St., Pro-Med ambulance service drove pass me heading
to Hackley Hospital. As I got closer to the house, I could
see the lady across the street on her phone and getting into
her vehicle to leave. I go up onto the porch and inside
of 1432 Jiroch St, leaving the front door open.

Barbara Ann Dailey was standing near the stairs that
leds to the upper level of the house. She was holding a
big chef/butcher knife in her right hand, at her neck, and
holding the Alcatel cellphone she called me from in her left
hand down by her side. As I was getting closer to her
I told her to put the knife down, that everything will be
fine. She said "I love you. I'm tired of all the bullshit."
She made a cut and I shoved her backwards hoping she'd
drop the knife to catch her fall. She hit the left side of
her head and the back of her left hand on the bannister.
Her body turned as she fell, landing onto the stairs with
the right side of her body. The phone landed behind me and
to my right near the south wall of the dining room. As she
got up I seen that she still held the knife in her hand. Her
neck was bleeding and the side of her face was red (right side).

8

She said, "Josh, please don't, just let me do this." I told her that I couldn't because of her girls and that if she died I would join her. She told me, "I'm sorry. Just make sure the girls are taken care of. This is why I let Chris have the girls this weekend." She made another cut. I grabbed for her wrist with my left hand so I could take the knife with my right but I got her hand instead. As I was pulling her right hand toward me, to take the knife from her, she jerked her hand away causing the knife to run across her neck with some force or pressure. Blood was sent across my shirt and necklace. Her hand twitched while the knife was still in her neck, and she began falling forward. I side-stepped to her right side grabbing her wrist with my right hand, placing my left hand on her right shoulder and my left leg in front of her. Shoving the knife hand forward and away from her, I shoved her over my left leg. She landed face first and when her body landed her head came up and rested on the left side of her face. She was facing me and the front door. Switching hands on her wrist, I used my thumb and forefinger of my right hand to slide the knife out of her hand by the tip of the handle.

I placed the knife in the sink, on top of two other knives, and immediately called 9-1-1. It was 7:15:51 on my phone. I stepped out onto the porch and looked down toward Hackley Hospital to see if Pro-Med was on their way back up Jiroch St. when 9-1-1 answered. I went back inside to check on her then back out and into the yard again looking for Pro-Med as I was

9

on the phone with 9-1-1. As dispatch was trying to calm me down I took a seat on the stairs outside. Dispatch asked me to go in and tell her everytime Barbara took a breath and told me to use something soft, a towel or shirt to slow the bleeding. I put my phone on speaker, and on the table, then took off my shirt and turned her head so I could better render aid. I then saw that everytime she took a breath the blood would froth and bubble, which told me that she'd cut her windpipe (trachea). I placed a finger into her neck to cover the incision on her trachea so she would not aspirate her blood into her lungs, and used my shirt to cover the remaining right side of her neck, that was bleeding most, with my left hand and with light pressure. When her hand came up, she slung blood up my right leg and grabbed my right sock and boot area on the back of my right leg. There, I emotionally and mentally broke.

Minutes later police arrive. They came into the house, guns drawn, cleared the house and gathered near Barbara and I. One of them placed a hand on my shoulder asking me to step aside so that he could "assess the subject" and asked another person to take something from me. A statement, I guess. Later, another officer asked if I'd come with him downtown to speak with detectives. I told him I wanted to go with Barbara to be with her at the hospital. He told me that I could not go to the hospital so I told him to take me to where I was staying on Smith St. so I can tell her Dad what she told me to tell him and what really happened. He said "okay

what's the address?" I told him. I got into the police cruiser and Becky came over. I was never taken to Dad's on Smith st., nor was I read my rights or arrested at that time. Only thing else I remember while on scene was Sarah Grandinette taking me in her arms, me ending up with a lit cigarette and seeing Barbara carried out with a plastic thing over her face wrapped in a white sheet.

At the police station, where I said I didn't want to be, I had to wait in the break room for a while before Det. Luker asked if I would come talk with him in his office. I had no idea I was taken into the interrogation room. Detectives offered me leniency by telling me that if I tell them what happened they'd talk to whoever would be over my case, on my behalf. When that didn't get them anything they wanted, they told me that this looks to have been an attempt to commit suicide. So I asked them to promise me that if I tell them what she had done they wouldn't take her girls away from her. They agreed. I began trying to tell them while I was still trying to process it myself when out of nowhere Det. Luker asks "How many cuts did you make after the initial cuts?" I held up two fingers thinking they had asked me how many cuts did SHE make after the initial cuts. Even the "apology letter" shows I didn't confess to making any cuts. On top of all this, I never was told that I was accused of murder until I woke up the next morning on 9/5/2016.

The police report states that:

Officer Smith: "I arrived back on the scene and was advised that Joshua was likely the only person who entered or exited the home. I was advised that Joshua may have ditched a weapon in the alley as no weapon was found in the home."

Officer Dill: "After the scene was processed MSP turned over the knife that they found in the ~~kitchen~~ sink that tested positive for human blood as well as three shirts they had collected that were covered in blood that were found by where the victim was laying upon arrival. I was advised that the lab would not be collecting the items or testing them as the suspect had confessed...."

Officer Anderson: "Det Luker and Det Stratton interviewed Joshua about the incident while being recorded. At the end of the interview, I was instructed to transport and lodge Joshua at MCJ on the charge of Open Murder. I was also instructed to seize the clothing he was wearing at the time. Before leaving for the jail, Joshua was notified that Barbara had passed. Joshua cried uncontrollably for a few minutes."

Det. Luker: "He told us where the knife was. He said it was in the sink pointing toward the back door. He described

it as having a blade like a bread knife but shaped like a steak knife."

"I told him I did not know what happened exactly and wanted him to fill me in on how and why this happened. He said again that he did not know what happened in there. At one point he sighed and said that if he tells us what he is about to say, then he wanted us to promise him we would not take her children. I informed him that I had no intention of that."

Officer Smith: "Joshua was in the home crying and weeping over the victim later identified as Barbara Dailey. Joshua was very emotional and could not follow my questioning well."

Officer Dill: "As I approached I observed Joshua Salyers through the doorway kneeling on the ground over Barbara Dailey."

Suicide is not a crime in the State of Michigan. From the very beginning police began formulating and treating this incident as a murder investigation. In the condition I was in I should not have been interrogated for at least 24 hours or not until I was psychologically evaluated by a professional psychologist of the police department or outside professional to

13

determine if I was fit or not able to give a waiver of my rights and understand the situation. I should never had been forced to go to the police station to begin with. I was not read my rights or placed under arrest when I was still made to go to the police station.

When finally I spoke with the detectives, I was supposedly read my rights and I supposedly fully understood them and waived my rights. I was not, however, notified of the accusation against me, otherwise I'd not be able to speak to them and when I could I'd have requested a lawyer. Both, Det. Luker and Officer Anderson are proof I was not notified of the charge or accusation against me until after the interrogation. (Read page 12 Officer Anderson's statement.)

In the transcripts of preliminary examination, page 13, Det. Luker is questioned.

Q: Detective, did this interview take place before or after Ms. Dailey was deceased?

A: I believe it was right after.

Q: Did it take place before or after you learned that?

A: It was after.

Q: So at the time you were conducting this interview you were aware that this was a homicide investigation?

A: Yes, sir.

According to the Michigan Supreme Court, People v Jones, 416 Mich. 354 "In determining whether a confession is voluntary, the test is whether the confession was extracted by any sort of..... or by

14

obtained by any direct or implied promises, however slight, or by exertion of any improper influences." Further it states, "A confession is no more reliable simply because the defendant begins the negotiating...." "A confession which is extracted by any sort of threats or violence or which is obtained by a direct or implied promise, however slight, or by the exertion of any improper influences, is involuntary and may not be admitted in a prosecution of the crime for which the confession was made."

In Rogers v Richmond, 365 U.S. 534 the United States Supreme Court held, "Our decisions under [the 14th] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary cannot stand. This is so because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system -- a system in which the state must establish guilt by evidence independently and freely secured and may not, by coercion, prove its charge against an accused out of his own mouth."

Det. Luker and Det. Stratton offered to speak on my behalf to whoever was over my case if I tell them my story. Det. Luker informed me that this looks to have been an attempt to commit suicide. Detectives Luker and Stratton agreed to the promise that they won't take Barbara's girls from her if I tell them what she had done.

The interrogation tactics utilized in my case clearly demonstrate the relevance and reasons why this supposed confession ~~should~~ must

have been suppressed. In the Gentle Art of Interviewing and Interrogation: A professional manual and guide 143 that Interrogators describe the point of the first admission as the 'breakthrough' and the 'beachhead', which once obtained will give them enormous 'tactical advantages.' See Criminal Interrogations and Confessions 82 (2d ed. 1967).

Now, As with a confession, an effective waiver of one's Constitutional Rights must be voluntary, knowing and intelligent. The burden of proof is on the prosecution by a preponderance of the evidence to prove that my waiver is valid. Not only is the suspect's awareness of the suspected criminal conduct relevant, its absence may be determinative in a given case. "The State's burden of proving that a suspect's waiver was voluntary, knowing, and intelligent is a 'heavy' one. Miranda, 384 U.S., at 475." We are to "indulge every Reasonable presumption against waiver of fundamental Constitutional Rights" and we shall "not presume acquiescence in the loss of fundamental Rights." Johnson, 304 U.S., at 464.

If I believed that it is reasonable to conclude that the detectives intent were to ask questions Regarding Murder, I would not have consented to interrogation without first consulting with an attorney.

In State v Vincenty, 202 A.3d 1273 (N.J. 2019), the Court observed that the common law has granted individuals the "right against self-incrimination since colonial times." State v A.G.D., 835 A.2d 291 (N.J. 2003). "It is one of the most

16

important protections of the criminal law". State v Presha, 748 A.2d 1108 (N.J. 2000). "But individuals may waive the right." Presha. "However, law enforcement officers must inform suspects of the right before getting a waiver." Miranda v Arizona, 384 U.S. 436 (1966). "A waiver must be knowing, intelligent, and voluntary." State v Reid 627 A.2d 630 (N.J. 1993). "The State has the burden of proving beyond a reasonable doubt that the waiver was knowing, intelligent, and voluntary." Presha. "If suspects are not informed of the charges pending against them, they necessarily lack critically important information to enable them to knowingly, intelligently, and voluntarily waive the right against self incrimination." A.G.D. "In such circumstance, the State cannot meet its burden of proof." Id. "The police may inform the suspect of the charges before or after the Miranda warnings, but they must do so before obtaining any waiver." Id.

Det. Luker testified at preliminary examination, the suppression hearing, and at trial that he knew before the interrogation took place that he was investigating a "murder." During the suppression hearing Luker admitted that he would not have informed me that I was being charged with murder until towards the end of the interview or afterwards. Luker was asked:

Q: So you misled him for a while there. You knew she was dead and you continued the interview, is that correct?

A: Sure, yes, sir.

Q: So your testimony is that you told him at the end

17

of the interview that he was going to be charged with murder?

A: It was either near the end or after.

Without this interview, or interrogation, there would have been no case of "Murder". No evidence had been tested. Following many lines of questions from 1 Criminal Law Deskbook P8.08: Tactics and Strategy at suppression hearing, would have proven that the only basis for an arrest was the supposed confession. From there, it was just a tactical game and a matter of forming a case based on lies, falsified evidence, manipulated reports, withholding exculpatory evidence, destroying evidence and coercing witnesses, mischaracterizing evidence, intimidating witnesses, etc.

I have made mention of manipulated reports and withholding of exculpatory evidence. Let me begin with the Autopsy Report and the Death Certificate of Barbara Ann Dailey.

On September 5, 2016, 8am, Barbara had undergone examination by Dr. Amanda O. Fisher-Hubbard. A Deputy Medical Examiner newly appointed only a month before taking this case. She claims that the cause of death is due to both sharp and blunt force injuries. However, at trial she testified cause of death was due to sharp force and/or blunt force.

During direct exam by the state, she was asked:

Q: "Obviously throughout your training and your experience you've had the opportunity to examine individuals who have inflicted wounds on themselves, correct?"

18

A: "Yes"

Q: "And that sometimes those things you confirm, correct? In other words you know sometimes when you examine a body you know for sure that's what happened or that's alleged what happened even before you examine the body, correct?"

A: "I'm not sure I understand."

Q: "Sure. When you — are you given information before you examine a body?"

A: "I'm given usually scene photos and an investigative report."

Q: "OK. And in those investigative reports a lot of times there's claims about what happened, correct?"

A: "Yes."

Q: "And in those investigative reports sometimes those claims would be that somebody inflicted wounds upon themselves."

A: "Yes."


Based on the County Medical Examiner's Act, the Supreme Court of Michigan has concluded that, "a county medical examiner's duty is owed to the state. A medical examiner fulfills their statutory duty to investigate violent deaths by communicating their medical findings to the prosecution and testifying on behalf of the prosecution regarding the results of their investigation. A county medical examiner is expected to work closely with the prosecution in cases related to the investigation of violent or unexpected deaths and is expected to testify on the prosecutions behalf."

"The United States Supreme Court does not limit the

prosecution's duty to learn of favorable evidence to only the police or law enforcement agencies, but, instead, 'extends this duty to any others acting on the Governments' behalf. Given a County Medical Examiner's duty to act on the Government's behalf in cases involving violent or unexpected deaths in Michigan, 1) the medical examiner may be understood as acting on the Government's behalf in a particular case; and 2) evidence within the Medical Examiner's control may be imputed to the Government, even if unknown to the prosecution."

From the beginning of this case against me, when police gleaned 1 of 4 facebook posts regarding thoughts of self-inflicting, the prosecution team began working the case to use that single post, "One cut... two cuts... three cuts... four.... What I have in my mind will ease this pain for real.", to charge and convict me of a crime that never happened. The Deputy Medical Examiner, Amanda O. Fisher-Hubbard recieved this very information to help her with her "examination" and ~~cause~~ "manner of death." Why else would she wait until Barbara Ann Dailey had been cremated and 2 months after her examination, on 9/5/2016, to finally write her report on November 2, 2016? Why else, under "Identifying marks, scars, and tattoos," would the Dep. Medical Examiner fail to document the 2 cigar burn scars on Barbara's chest that are symmetrical from one another? The self-inflicted cut scars on her upper inner thighs? The cut scar that was on her right neck, or the dozens of poking scars on the bottom of her right foot and

20

the scars on the underarms?

Why would the Dep. Medical Examiner write this Report bulletining only four of Six incised wounds and failing to document the depths of each incision?

On June 25, 2017 there was an article written by MLive in the Muskegon Chronicle. Det. Luker tells the media that, "Salyers admitted to slicing his girlfriend's throat three times..." So, now with this "confession" of 3 cuts plus the initial cut, that makes 4 cuts. Remember, the "Confession" they claim to have proves that I held only 2 fingers up, not 3. So where are they all coming up with 4 cuts? The only place that states anything Regarding only 4 cuts is my facebook post at 1:40pm Sept. 4, 2016. Nearly 5 and a half hours before the incident occurred and 3 hours and 20 minutes before her and I met up together.

All throughout the entire trial, the prosecutor states in his opening, examination of witnesses, and his closings that Barbara was cut "exactly four times just as the defendant said he'd do" or "she was cut four times", etc.

When the Dep. Medical Examiner was questioned, she'd constantly claim that there were "at least four" when describing the incised wounds. She wrote the Report and Knows that there were 6 incisions, just as the prosecutor knew, yet the two of them together misled the jury to believe that my facebook was about murder because the Dep. Medical Examiner gave false testimony and the prosecutor, knowingly, elicited false testimony and failed to correct it. Have a look.

Bulletin One — Approximately 3 cm curvilinear, oblique incised wound on the anterior-lateral Right neck. The left aspect shows a superficial, horizontal approximately 2 cm linear continuation of this incised wound on the anterior neck.

note: 3cm = about 1¼" (inches)

Bulletin two — Approximately 8 cm irregular incised wound on the anterior-lateral left neck.

note: 8cm = 3³/₁₆" (about) (inches)

Bulletin three — Approximately 12 cm irregular, horizontal incised wound across the anterior neck. The Right aspect shows a superficial 5cm linear continuation of this incised wound on the lateral Right neck and the left aspect shows a superficial 0.6 cm linear continuation of this incised wound on the lateral left neck. note: 12cm = about ~~1 cm = about~~ 4¾" (inches)

hidden incisions ————→ * There are two additional superficial, curvilinear incised wounds that extend from the superior mid aspect of this incised wound onto the Right neck approximately 2.5 cm each.

note: 2.5cm = almost 1" (inch)

Associated with this wound are incised wounds of the neck muscles, Right jugular vein, and the anterior trachea.

Bulletin four — Approximately 7cm roughly linear, horizontal incised

22

wound across the anterior mid line and right neck.
note: 7cm = about 2¾" (inches)

Clearly, this report reads that there is 6 cuts, not 4. It shows that this report bulletins only 4 and leaves out the depths and the previous self-inflicted scars in order to coincide with that which the prosecutor needs to obtain a conviction.

However, her report also contradicts some things she falsely testified to, and again the prosecutor knows this.

Q: "I believe that you testified that one of the cuts at least was shallow and then got deeper. What does that tell you?"

A: "I don't think there's any particular conclusion that I can draw from that."

Q: "Would that be consistent with less amount of pressure and then as the cut is happening a greater amount of pressure?"

A: "Yes, yes."

A superficial continuation is a wound that starts deeper than it ends, not shallow (superficial) to deep. A superficial incised wound is a wound that is "limited to the upper layers of the skin and mostly cause bleeding. They are open but do not penetrate the deeper layers of skin or fascia.—/ Attorneys textbook of Medicine (3rd edition) § 3.04 (d). "Superficial wounds require only a single layer closure of the skin. Deep lacerations

23

Require buried sutures." - 4A Lawyers' Medical Cyclopedia § 31.16 [F].

Trial Transcripts 9/21/17 pg 16

Q: "Is there anything significant about somebody's injuries when you can confirm that they've inflicted those injuries upon themselves?"

A: "Self-inflicted incised wounds, one of the characteristics of them is hesitation marks. It's very painful to cut yourself. and often times you do it multiple times because of the pain that it causes...."

(pg 17) Q: "For instance, what types of incisions would those be, locations? On a wrist or where do you normally see those types of—"

A: "Typically seen on a wrist or an extremity."

Q: "So there are hesitation marks and based on your training and experience exactly are those from?"

A: "As I said they're characteristics of self-inflicted wounds."

Q: "Did you, in any of these numerous incised wounds to her throat did you notice any hesitation marks?"

A: "Nothing I would consider consistent with hesitation marks."

Q: "You also described when somebody inflicts these injuries on themselves that they're often shallow, correct?"

A: "Yes"

Q: "Is that what you observed with Ms. Dailey?"

A: "No."

Q: "In fact these were pretty significantly deep, correct?"

A: "Yes."

Q: "What parts of the body did these incised wounds affect?"

(pg 18) A: These affected the neck muscles. And then one of the incised

24

wounds also included an incision of the trachea, or windpipe, as well as the right jugular vein which is the main vein that drains the blood from the head."

Q: "Based on all your observations and your training and experience, is it likely that Ms. Dailey inflicted these wounds upon herself?"

A: "No."

Q: "What leads you to that conclusion?"

A: "The lack of hesitation marks, the wound on her finger and the additional blunt force injuries."

3A-236-23 Courtroom Medicine Series: Death § 23.50 [4] Incisions

Major distinguishing factors between self-inflicted and not self-inflicted wounds are:

1) The positions of the incisions. Incisions at the wrists almost always suggests suicide, while those at the neck may suggest either homicide or Suicide. Examination of the wound may prove it was, anatomically, impossible to be self-inflicted.

(Note: The Deputy M.E. testified that the number of incised wounds, the depths of the incisions, and the lack of hesitation marks is how she concludes these are not self-inflicted.) Not that they are anatomically impossible.)

2) The number of wounds has little bearing, since suicides caused by incisions are frequently multiple. Suicidal incisions SOMETIMES show evidence of faltering determinations ("hesitation marks).

3) In Suicides, incisions generally involves incisions over the arteries of the wrists or of the major blood vessels in the neck.

25

The Deputy M.E. testified falsely saying that all the incised wounds were significantly deep and that they all affected the neck muscles. Every incision was actually superficial per incised wound but due to the 2 additional incised wounds (superficial) within the 12 cm incised wound, caused the 3 wounds, together, be "significantly deep." Based on the evidence, it is the external right jugular vein that was severed, not the internal. Also, the 3 incised wounds noted in bulletin 3 ~~also~~ caused a <u>small</u> incision to the trachea.

Here are 12 of several hundred thousand cases I've found regarding suicides and attempt to commit suicide by incisions to the neck:

✱✱ 1) Reinking v Philadelphia Am. Life Ins. Co., 910 F.2d 1210
   "Despite the extreme brutality of her injuries, <u>she testified that she felt no pain as she inflicted them.</u>"

2) Fether v Frederick County, 2015 U.S. Dist. Lexis 14302
   "The incision was 4 to 5 inches long."

3) Dodd v Workman, 2011 U.S. Dist. Lexis 85604
   "... attempted suicide by cutting his throat with a razor blade."

4) Rosario v Brown, 2011 U.S. Dist. Lexis 53145
   Died   "Made cuts to both, his neck and wrists. Large cut to neck."

5) Acerbo v State of New York, 32 Misc 3d 1230(A)
   "... cut his throat requiring 42 sutures."

6) Shoemaker v Central Business Men's Ass'n, 218 Mo. App. 374
   "... wounded himself three times in the neck ..."

7) Jacoby v Baldwin County, 2013 U.S. Dist. Lexis 72212
   "Cut his throat and swallowed broken razor blades."

26

8) Mullaeky v Tice, 2017 U.S. Dist. LEXIS 142815

"Severely cut his own throat causing a gaping wound from ear to ear."

9) Wilson v Prince George's County, 2017 U.S. Dist. LEXIS 50155

"... stabbing himself, & cutting his throat, stabbed himself in the chest."

✳ 10) Easley v Kirmsee, 235 F. Supp. 2d 945

"acting under the influence, cut himself several times on the wrists and throat."

✳ 11) Wilson v Casio, 2014 U.S. Dist. LEXIS 184637

"with two large butcher knives, he cut his own arms and neck."

✳ 12) People v Flores, 2012 Cal. App Unpub. LEXIS 1602

"inflicted a single slice, of a knife, onto his throat 6 inches in length from Right to left side of the throat... One cut to the main artery would kill a person in a matter of 1 to 2 minutes."


Based on the Deputy Medical Examiner's conclusions that Barbara Ann Dailey's wounds cannot be self-inflicted, that would mean that none of the 12 cases above are possible to be self-inflicted either.

<u>Investigation of Suicide</u>

3 Forensic Sciences 32F. 01

A clinician who makes decisions involving a suicidal patient based upon sociological data alone and without considering the individual is committing malpractice.

3 Forensic Sciences 32F. 02

Scientific Knowledge of suicide is well established, inasmuch as suicide is a major public health problem. Suicide ranks as the eighth leading cause of death in the United States, where there are more than 30,000 suicides each year. The accuracy of suicide statistics,

especially the accurate determination of suicide versus other modes of death, has significant public health implications and is of great emotional concern and significance to the deceased's family and the community.

Psychiatric disorders are the most significant factor leading to suicide. More than 90% of people who commit suicide have a recognizable psychiatric illness. Medical illness and substance abuse are also sometimes a factor, with substance abuse being more prevalent among the young suicide victims. Some of the common precipitating causes for suicide are <u>seperation</u>, <u>unemployment</u>, <u>legal trouble</u>, and <u>other major stresses</u>. The most important risk factor for suicide is <u>depressive illness.</u>

Depressive illness is characterized by <u>depressive mood</u>, <u>irritability</u>, weight loss, <u>insomia</u>, <u>agitation</u>, <u>feelings of worthlessness</u>, and <u>diminished ability to concentrate</u>. Pathological family interactions are a significant factor in adolescent suicides, and <u>family conflicts</u> are often the precipitating event.

Attempted suicide is often part of the history of someone who successfully completed suicide because suicide results from an attempt to get relief from severe mental suffering.

## Toxicology  (1.9 nanograms THC per milliliter of heart blood)
2 Forensic Sciences 25.11

From the stand-point of intensive, complete surveys being conducted in all cases of sudden, unexpected, violent, unexplained, and suspicious deaths in medico-legal investigative offices in the United States, toxicologic principles have not been invoked for too long a time.

Unfortunately, many law enforcement officers, coroners, and even certifying physicians still make determinations regarding the cause and manner of death in many cases without the benefit of toxicologic studies. This is a great tragedy and undoubtedly results in serious injustice in many civil and criminal matters.

<u>General Rule for the forensic pathologist</u>

2 Forensic Sciences [1]

"If in doubt about the manner of death, treat as a homicide."

Based on the injuries on Barbara's neck, it is clear that these wounds were most likely self-inflicted. But because the state wanted this to be considered a homicide that is how it had been treated. No evidence was tested. Had it been, it'd show that Barbara committed suicide and that the prosecution team has done nothing to seek the truth but instead did what they needed to do to maliciously prosecute this case and wrongfully convicted an innocent man.

To further show that my role was simply to prevent a suicide, look at the rest of the evidence and the lack of injuries on my body. Reading what happened in the beginning of this and comparing them with impacting the bannister, the stairs, and the floor would have shown the truth of what caused the bruising of the back of Barbara's left hand, the left temporal lobe contusion, the bruising of the right arm, the bruising of her right neck and the fracture of the right hyoid bone, the right face and the right abrasion on the top of her head, and the bruising of the front and left face.

The investigative team failed to obtain any of the evidence of

what caused the bruisings

2 Forensic Sciences 25.06

Contusion,

the second degree of injury, is caused by a structural alteration of the brain. This usually occurs on the crests of the brain convolutions, and is characterized by small punctate or streak-like hemorrhages and associated focal destruction of tissue, with or without edema (swelling).

Determination of Falls vs Blows in head injuries

In many instances, it is possible to conclude, on the basis of the pattern, type and localization of cranio-cerebral injuries, if they resulted from a fall or from blows. Usually, in blows, the scalp shows hemorrhages in various areas with possible underlying skull fractures. In some cases, the imprint of the assaulting weapon may be "branded" on the skin by the force of the impact and can be easily recognized. Linear or comminuted skull fractures may underly such injuries. Such fractures, if located on the top of the head or both sides of the head, are most often produced by a blows. Examination of the brain, most often, will highly enhance the accuracy of such determination.

In trauma to the brain, contusions may be produced both at the site of impact (coup lesions) and at the site opposite the area of impact (contrecoup injuries).

In blows, the brain may show much larger contusions underlying the area of impact (coup) than at the site opposite the impact (contrecoup).

The opposite is true in cases of head injuries caused by falls in which the contrecoup injuries, usually located in relatively inaccessible

30

positions, are larger than the coup contusions. The only instances where the distribution of coup and contercoup injuries caused by a fall resembles that of a blow is when the fall occurs over a projecting object or from a considerable height. (Bannister, stairs, etc. are projecting objects).   The explanation of the difference in the pattern of brain contusions in falls and blows is not entirely understood. It, apparently, relies on various gradients of accelerations of skull and brain at the time and site of impact.

   — Contusions are traumatic tissue hemorrhages, with preservation of the outer layers of the organ. They are commonly known as bruises or "black and blue marks" on the skin. However, they are frequently encountered within the internal organs such as muscles, kidneys, lungs, liver, brain, etc.

   — Abrasions are a type of blunt force damage referring to skin injuries in which the outer layer of the skin (epidermis) is "shaved" off by a tangential, friction force. Such injuries are commonly known as scrapings, superficial grazing injuries or "brush burn" injuries.

A) Blunt Force Trauma injuries are inflicted by a force sufficient to cause bruises, contusions, or fractures. Such injuries are seen in Motor vehicle accidents, falls, and suicides involving falls, and homicides involving fights.

B) The type and level of forensic death investigation conducted is heavily dictated by the cause of death. In addition, the type of forensic evidence collected is also dictated by the type of case. Critical information that needs to be collected is the object or surfaces that caused the blunt force trauma. The

forensic investigator should attempt to recover objects such as bats, pipes, and other objects used to inflict the injuries. If the Blunt Force Trauma is caused by a fall, the height, type of surface and cause of the fall should be ascertained.

See the specific manner of death for more detailed on the type of investigation to be conducted.

The Deputy Medical Examiner said at trial that the cause of death is due to sharp and/or blunt force trauma; however, ~~there was no~~ there was no investigation into the blunt force injuries. The most severe blunt injury on Barbara was a inferior left temporal ~~contusion~~ lobe contusion that measures 0.5 x 0.5 x 0.3 cm on the brain. Even this wound is not sufficient enough to cause death. So for the Deputy Medical Examiner to testify that blunt force trauma can be a possible cause of death in Barbara's case is false.

The lack of scratches, cuts, scraps, nails digging, bruises, swelling, and redness on My body show that there was obviously no "fight for life" as the prosecution and defense attorney claimed there to be. Also, you'll see blood spatter on the back of my right calf, and on the back of my sock and boot you'll find where Barbara grabbed the back of the sock area and slid her hand down my boot. This is proof that Barbara could not have had her alcatel cellphone in her right hand, that was bleeding, as ~~the~~ Ofc. Bringedahl falsely written in his report and testified at trial about. Just as he lied about not manipulating the phone. In order to see what time the call she made to "MyHusband" (me) he'd have to "view details" by selecting it from the call log options.

32

The call she made was at "7:11 pm"; however, police don't get there until 10 minutes after that call is made. That "government" phone automatically locks a few minutes after the seconds it takes for the back-light to go out. This is further proof that the officer lied and manipulated the phone violating search & seizure. This doesn't, in itself, seem to matter much but I'll explain why this is indeed important in a few minutes.

## Surveillance footage   (Per Report Sgt. Caust)

1) Surveillance system was downloaded from 2pm - 8:59pm.

2) File names were changed to begin with the camera and time period the files cover.

3) Prosecution only discloses and presents the videos for the time of 7pm to 7:59pm, omitting the portion when Barbara Ann Dailey and I first meet up 2 hours prior. (5pm)

4) The prosecution prejudices me by such omission because it would prove something extremely critical and relevant in the minds of the jury and it deprived me from proving the CORRECT establishment of the erroneous time even after the false rebutted testimony of the "correct" time was presented.


Here is what was presented to the jury before "rebuttal" along with Barbara's and my cellphone log:

Ch. 7 (7:06:14) Both walking North in the alley.

Ch. 1 (7:07:12) Both walking along Southside of the house to the front.

Ch. 1 (7:07:26) Both go onto porch and go inside.

7:11 outgoing call from Barbara to "My Husband" (me) 405-747-0680

Ch. 7 (7:14:48) I am walking South in the alley.

Ch. 4 (7:12:22) I am "walking on Grand Ave, then turns North on Jireach St.

7:15:51 outgoing call from Me to 9-1-1

Ch. 7 (7:17:48) I am "walking" North on Eastside of Jireach

Ch. 2 (7:17:53) I am "walking" North on Eastside of Jireach (Pro-Med passes)

Ch. 1 (7:17:58) I am "walking" North on Eastside of Jireach (I see lady across the street getting in her vehicle to leave and on her phone). *

Ch. 1 (7:18:16) I go onto the porch and go inside (leaving door open). *

Ch. 1 (7:20:15) I go outside to edge of stairs (looks down to the left to see if pro-med is coming back yet).

Ch. 1 (7:20:37) I go back inside

Ch. 1 (7:20:49) I go outside into the yard and by sidewalk (again looking toward Hickley for pro-Med).

Ch. 1 (7:21:20) I go to the steps and sit down on them (9-1-1 asked me to calt down).

Ch. 1 (7:22:31) I go inside (9-1-1 asked me to help Barbara).

Ch. 1 (7:25:52) First officer enters the house.


This footage, as presented, supports the prosecutions, maliciously intended, incorrect theory. It misleads the jury to believe that I had went into the house with the intent to commit murder by knocking her around, beat her, cut her "exactly four" times, and choke her. It's supported because it shows that I was in the house with Barbara Ann Dailey for 7 minutes. It shows that while inside the home with her, she calls me, or that a call was made from her phone to my phone at 7:11 (4 minutes after we go in together. Then it shows that I leave, alone, 3 minutes after the call to my phone was made, walking South in the back alley. Then

34

it shows that I make a call to 9-1-1 claiming she was attacked and bleeding badly ~~before~~, at 7:15:51, before I even got back to the house at 7:18:16. Case closed because, as presented, it tells the jury that I had the time to do this, "wipe the knife down," plant the phone in her Right hand, leave, then, because I knew she needed Medical attention, called 9-1-1 before I should have known she needed Medical attention.

Now if you view the footage with the more precise time established by rebuttal testimony (after the jury's been misled), or by the ~~it~~ time I feel is closest to correct, there is no way that the prosecutor's, maliciously intended, false theory will prove truthful or even possible.

~~Chart~~ Rebuttal time / My time        Rebuttal minus 4:30        My time minus 4:00
                                              m   s                      m   s

Ch. 7 ( 7:01:37 / 7:02:14) Both are walking North in the alley
Ch. 1 ( 7:02:35 / 7:03:12) Both walk to the front of the house
Ch. 1 ( 7:02:47 / 7:03:26) Both go onto porch and inside
Ch. 1 ( 7:10:10 / 7:10:48) I am walking South in the alley
7:11 outgoing call from Barbara to "My Husband" (Me) (25-30 seconds)
Ch. 4 ( 7:12:22 / 7:13:22) I am "on like a jog on Grand Ave, then turns
                North onto eastside of Jiroch St.
Ch. 7 ( 7:13:18 / 7:13:48) I am "on like a jog" on Jiroch St.
Ch. 2 ( 7:13:23 / 7:13:53) I am "on like a jog" on Jiroch St. (Pro-med
                ambulance service passes me heading to Hackley Hospital).
Ch. 1 ( 7:13:28 / 7:13:58) I am "on like a jog" on Jiroch St. (I see
                the neighbor across the street, on her phone, getting in her vehicle
                to leave).
Ch. 1 ( 7:13:37 / 7:14:16) I go onto porch and inside (leaving door open).

7:15:51  I call 9-1-1
Ch.1 (7:15:37/7:16:15) I go onto porch and stand near edge of
          stairs (looking toward Hospital for Pro-Med).
Ch.1 (7:15:59/7:16:37) I go inside
Ch.1 (7:16:11/7:16:49) I go outside into yard and by sidewalk
          (again looking for Pro-Med down the street).
Ch.1 (7:16:41/7:17:20) I go to steps and sit down on them
Ch.1 (7:17:53/7:18:31) I go inside (At request of dispatch to render
          aid).
Ch.1 (7:21:14/7:21:52) First officer enters the house.

        During Rebuttal, Sgt. Guist testifies that the 9-1-1 call
would have been made at 7:20:43 or 7:20:44 based on the
time initially presented, which would be 7:14:01/7:16:05
according to the more precise time. However, Regardless of the
time you use it shows that I could not be seen calling
9-1-1 as the prosecutor erroneously stated during his closing
argument as he was inflaming the jury:
        "Now the defendant testified that he called 9-1-1, stepped briefly
out onto the porch and looked to see if pro-Med was coming and
immediately went back inside. But, again, we know he lied. We
know from the surveillance video that's not what happened. We see
him call 9-1-1, go out on that porch, go out into that yard, and actually
go sit on the steps while Barbara laid inside bleeding out, gasping for
air."
        It is well settled that remarks calculated to arouse passion or
prejudice constitute prosecutorial misconduct. See Viereck v. United States,

318 U.S. 236, 237-43; 87 L. Ed. 734, 63 S. Ct. 561 (1948); Wead v. People, 235 P. 3d 1089.

Clearly, it is now seen that the prosecution's false evidence and maliciously intended false speculation misled the jury. I could not have time to "knock her around", "beat her", "cut her", "choke her", get rid of the butcher knife, stage the scene and call 9-1-1 in the allotted amount of time. Prosecution used this knowing incorrect timeline to base its maliciously misleading theory and speculation on this footage.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury." United States v Agurs, supra, 427 U.S. at p. 103 [96 S. Ct. at p. 2397]; Giglio v United States, supra, 405 U.S. 150; Napue v Illinois, 360 U.S. 264 [79 S. Ct. 1173, 3 L. Ed. 2d 1217]; Mooney v Holohan, 294 U.S. 103 [55 S. Ct. 340, 79 L. Ed. 791; 98 A. L. R 406]

In Mooney v Holohan, [Due Process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the prosecution of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation" (Id, p. 112 [55 S. Ct. at p. 342]. Mooney also made clear that deliberate

deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." In *Napue v Illinois*, "the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears."

In *Brady v Maryland*, 373 U.S. 83, 87[83 S.Ct. 1194, 1196-1197, 10 L. Ed. 2d 215] (1963), the United States Supreme Court held "... the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." United States Supreme Court cases expanded the duty to disclose favorable material evidence even if the defense failed to request it. (See *United States v Agurs, supra*, 427 U.S. at pp. 110-111 [96 S.Ct. at p. 2401]; *United States v Bagley*, 473 U.S. at p. 682[105 S. Ct. at p. 3383]. Favorable evidence in this context is evidence that "either helps the defendant or hurts the prosecution..."

Prosecution failed to disclose the complete record of the facebook post and its following comments and subcomments that proves the post was factually about suicidal thoughts, not murder. It failed to disclose the video portions for around 5pm and a little before 7pm which would establish that Barbara and I were not having issues/arguments and it'd fully establish the <u>correct</u> time of the surveillance footage. I was standing in front of Kevin Sanders house when I called Barbara at 5:01 pm according to the time of my phone which is automatically synced with the world clock. It also failed to disclose the butcher

Knife that was in the kitchen sink on top of the two other knives that were photographed. This knife would have proven to have been the knife she used as it would have had her fingerprints/DNA on it had it been tested. Had the other knifes been tested as ~~it~~ should have, ~~it'd have~~ proven that 1) it could not have physically caused the wounds 2) Fingerprints and/or DNA would have been on it, ~~being~~ neither Barbara's or mine, proving it was not the knife she used, thereby proving more false/fabricated evidence. Prosecution also suppressed many photographs that, though they may be explicit and such, prove that Barbara was a cutter and that the Medical ~~Aut~~ Autopsy Report fails to disclose these specific scars and others. It had also suppressed, with the help of court-appointed counsel, my phone log that could have been used to prove the prosecution's motive that Barbara was murdered because she was ending our relationship is <u>False</u> as well as prove that the investigation team was deleting/tampering/destroying evidence. It was I who was ending the relationship after talking to Stephanie Ann and Lara Nichols. Prosecution failed to disclose Barbara's diary/journal proving her plan of suicide.

The above mentioned in all these pages is just the tip of the iceberg of things that occurred in my case to Maliciously Prosecute and Wrongfully Convict me. Suicide is not a crime. It is a ever growing health problem that will not be cured by charging people of murder who try to prevent a suicide from happening.

I am <u>Not</u> a woman killer. I've never killed a person. My religion does not believe in harming others, especially killing them.

39

Does not your soul insist that humans should conduct themselves humanly? I cannot do this alone. I need your help to, rightfully, get my life back.

My name is Joshua Michael Salyers. I was born on August 26th of 1987. My MDOC# is 422144. The case is out of Muskegon County Michigan, Case# 16-4697-FC. I had been arrested and wrongfully charged with "Open Murder" on 9/4/2016 for the death of Barbara Ann Dailey who committed suicide. On 9/22/2017 I was maliciously prosecuted and wrongfully convicted of 1st degree premeditated Murder. Then, on 11/1/2017, I was sentenced to Life without parole. I had only tried to prevent the suicide, keep her alive, and protect her from losing her children.

If you need anything more to help you decide on taking the time and effort to help litigate my case please feel free to write me requesting what you need via jpay.com or through the U.S. postal Service. Please include your name, contact number, and address in the jpay.com email or the mailed letter.

p.s. My claims of innocence is not
   without merit. Salyers v. Medema
   1/11/2019
   Case# 1:18-CV-1371

Sincerely Yours,

Joshua Michael Salyers

Joshua M. Salyers #422144

"Plaintiff's allegations clearly call into question the validity of his conviction. ..."

Issue One: Ineffective Assistance of Counsel

Both the Michigan and United States Constitutions require that a criminal defendant be afforded the assistance of counsel in his or her defense. U.S. Const. Amend. VI ; Const. 1963, Art. 1, § 20. To be Constitutionally effective, counsel's performance must meet an "objective standard of reasonableness." To show that this standard is not met, a defendant must overcome a strong persumption that counsel's performance is born from a sound trial strategy. But a court cannot insulate a review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions to it objectively reasonable.

Courts must determine whether the strategic choices are made after less than complete investigation, or if a reasonable decision makes particular investigations unnecessary. To obtain relief for a denial of the effective assistance of counsel, the defendant must show that counsel's performance falls short of this "objective standard of reasonableness" and that, but for counsel's deficient performance, there is a reasonable probability that an outcome of the defendant's trial would have been different.

The Michigan substantive standard of review for I.A.C is the same as the Federal standard articulated in Strickland v Washington, 466 U.S. 668 (1984); People v Harris, 201 Mich. App. 147, 154 (1993); People v Pickens, 446 Mich. 298 (1994). I.A.C should be litigated in the trial court in post-conviction proceedings (6.500) so that a record can be developed on this issue.

During the investigation and prepearation of the defendant's case, it cannot be sound trial strategy for appointed estate attorney, Fred J. Lesica, to not obtain an independent review of the deceased, Barbara Ann Dailey, through a defense expert in forensic pathology specializing in incised and blunt force injuries as well as toxicology and Suicides, and to have said defense expert to testify at the

1

trial.

The prosecution of this case claims that the defendant intentionally and premeditatedly murdered Barbara Ann Dailey by cutting her neck exactly four times, beat her, knocked her around, and choked her. The State's only medical expert testified that this was "Homicide." Her opinion arises due to the lack of hesitation marks, the cut to the second right finger, the blunt force trauma, because there were at least four incised wounds, and because all of these wounds were significantly deep and effected the muscles of the neck.

However, according to the Autopsy Report, none of the incised wounds each and of themselves are "significantly deep" nor did any of the four bulletined incised wounds cause damage to the neck muscles. The "additional two" superficial incised wounds approximately 2.5 cm (.98") caused the incisions to the muscles that "severed the Right jugular vein" and caused a "small incision to the anterior portion (front portion) of the trachea." Not the "internal jugular" was severed, but the EXTERNAL jugular vein.

Had Fred Lesica done his duty to investigate, Research, and/or engage even a single expert witness to Rebut the prosecution's only medical expert, there'd have been a reasonable probability that the outcome of the defendant's trial would have been different.

Review the attached Research Information pg 1-6. Also Review the Autopsy Report to see that none of the incisions are "significantly deep" and that none but the two 2.5cm incisions caused muscular damage.

Also, had Fred Lesica Read the autopsy Report and Reviewed all the photos, he'd have seen that Dr. Amanda O. Fisher-Hubbard had 1) withheld the previous self-inflicted cut scars on Barbara's

2

armpits and inner upper thighs as well as the single scar on her neck (right-side) from razor blades/butcher knife. Also 2) She withheld the stab wounds of the bottom right foot and the cigar burn scars on Barbara's chest. 3) Lesica's failure to review the Autopsy Report had also allowed him to miss that the Report identifies someone other than Barbara Ann Dailey. Barbara did NOT weigh 134 pounds. She was NOT 66" (5'6"). She did NOT have Brown hair.

Lesica did not bother using the Autopsy Report to impeach the Dr's false testimony. The Dr. also testified that the toxicologic Result showing Barbara's THC level of 1.9 ng/mL of heart blood "had no effect on anything" was ERROR. (Research Information pg 3, last lines). (Inconsistency of Testimony/Report on pg 6 of Research Information). See People v Gracie-Mandujano, 909 NW2d 252, 2018 Mich Lexis 651 (Mich 2018)

The Dr. stated through improper questioning on Trial Transcript 9/21/2017, pg 36, line 9-16, "I believe you testified that one of the cuts at least was shallow and then got deeper.... would that be consistent with less amount of pressure and then as the cut continued is happening a greater amount of pressure?" "Yes, Yes."

and on pg. 33, line 23 - pg 34, line 1, her testimony to "So the summary of your opinion is that death was caused by i.e. just to simplify it, cutting and or blunt trauma I guess. Would that be accurate?" "Yes." Lesica failed to use the Dr's prior testimony on pg. 18 to impeach her when she falsely stated that cause of death was due to "Multiple injuries including blunt and sharp force," on line 12. Her statement above on pg 36 is contradicted by her Report and, again, Lesica didn't impeach her.

3

It is not hard to see that Dr. Amanda O. Fisher-Hubbard had written the Autopsy Report to match what the State needed it to say as 1) She left out scars that'd show Barbara was a cutter. 2) Left out the cigar burn scars to hide the physical/torturous abuse. 3) Only bulletined 4 of the 6 incisions to coincide with the State's knowingly false theory regarding defendant's facebook posts. 4) Failed to document the depths of these incisions, but instead lying on stand about the depths and the damage they caused to, again, coincide with the state's needs even though the testimony contradicts her Report findings.

Clearly, Lesica provided Ineffective Assistance of Counsel because all of this I had pointed out to him on 12/16/16 and the errors in her testimony as she was lying at trial, yet he did NOTHING to show her several contradictions and lack of proper investigation. (See Research Information pg 6-9  2 Forensic Sciences 25.06 : 25J.07)

It is obvious that there was NO investigation because 1) No evidence was collected or tested 2) Her testimony is "I don't know" regarding the type of knife used, what caused the fractures, and the blunt force injuries, and 3) "why bother, the guy "confessed" and his post talks of 4 cuts, that's premeditation, let's build a false theory."

Lesica's failure to investigate into the post is ineffective because had he called the witnesses Stephanie Ann, Sherranda Giltz, Connie Shoot, Laer Nichole, Amanda Holland, and Bria Fowler they could have all set the fact straight that the Post "one cut...two cuts...Three cuts....four...what I have in my mind

4

will ease this pain for real," was <u>factually</u> about defendant <u>thinking</u> of cutting his wrists properly.

Again, failure to call witnesses that could have made a difference in the trial outcome.

During the period of pre-trial sometime, Barbaer's friend Raven had contacted him with video recording and Barbaer's journal both being evidence that she planned to take her life on Sunday after spending time with defendant. Lesica told her he didn't care because "there is nothing he can do for you because the detectives and prosecutor are calling all the shots and are out to get a conviction at all costs." (Raven's Letter 12/22/19)

During the suppression hearing, Lesica filed nothing to be submitted as evidence, i.e., interrogation video or Ofc. Anderson & Ofc. Smith as witnesses. But most importantly, Lesica failed to file the motion as defendant told him; laying out the police misconducts violating constitutional rights by offering leniency for defendant's story; knowing Barbaer had passed <u>BEFORE</u> the interrogation began but tells Defendant this looks to have been an <u>ATTEMPT</u> to commit suicide; Promise made and agreed to; and not informing of the charge/complaint/accusation <u>before</u> obtaining any waiver. Lesica never even asked the detective the extent of defendant's awareness regarding his right to an attorney during the interrogation. He also failed to challenge post-miranda rights; See ~~People v Anderson, 398~~ People v Mathews, 324 Mich App 416 (2018)

At a bare minimum, a lawyer must "interview potential

5

witnesses and... make an independent investigation of the facts and circumstances in the case." Bryant v Scott, 28 F.3d 1411, 1415 (5th Cir. 1994)

"Failure to call a witness only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense" People v Dixon, 263 Mich. App. 393, 398; NW2d 308 (2004). Eldridge, 665 F. 2d at 237

"Counsel's failure to reasonably investigate a case can constitute ineffective assistance of counsel" People v McGhee, 268 Mich. App. 600, 626; 709 NW2d 595 (2005)

Had Fred J. Lesica reasonably investigated the facts and circumstances of this case Lesica would have known a defense expert on tox was required to present the best possible defense. Further, by calling Emory as a witness he'd have been able to dispute the issue of "confessing and threatening to slit his throat." Instead troop Lesica painted a violent picture of defendant being a "tough guy" at closing. By calling Stephanie, Lara, Shravonda, Amanda, Connie, and Briz the post would have been shown in its proper factual context; that it is a suicidal post, not about murder. Had Lesica drafted the motion to suppress statements properly the trial court would have been in a better position to grant the suppression due to police misconduct. Instead it was Lesica's advice for defendant to claim, "I don't Remember". Even after defendant written him laying out the issues 3 days after Lesica met with his client. (MRPC R 8.4 (a), (b), & (c))(MRPC Ri.1 & 1.3) "In the absence of any valid state justification, the exclusion of competent, Reliable evidence bearing on the credibility of a confession, when such evidence is central to a criminal defendant's claim of innocence, deprives the defendant of the basic Right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing. (§15 Trial) ( Jackson v Dennis, 378 U.S. 368)

6

During trial, Lesica concocted an irrational defense, failed to interview and call probably important witnesses just as in Stoddre, 394 Mich 193. And as in Giovglio, 292 Mich. App. 173, Lesica did not present any witnesses or evidence. His extent of adversarial testing was limited to Reacting to the prosecutions examination of the state's witnesses, to the cross-examination of State's witnesses, and his closing argument. Lesica did not properly cross-examine state's witnesses because he failed to use evidence that he could have obtained to impeach several witnesses and to impeach the sole expert with her own written Report.

Under Both, Cronic and Strickland tests, Lesica provided ineffective assistance of trial counsel.

The United States and Michigan's Constitution protects the Right of an accused to have the assistance of counsel. The Right to have the assistance of a lawyer is a fundamental component of the criminal justice system. Their presence is essential because they are the means through which the other Rights of the person on trial are secured. That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to guarantee the Right; this is because the Right envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just Results. For that Reason, the Right to counsel includes the Right to effective assistance of counsel. That is, an accused is entitled to be assisted by an attorney, whether Retained or appointed, who plays the role necessary to ensure that the trial is fair. Where the accused's counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just Result, the accused

7

has not Received the effective assistance of counsel.

In Cronic, it is Recognized that a defendant Receives the kind of support envisioned by the 6th Amendment; U.S. Const. Amend. VI, where the defendant's trial counsel subjects the prosecution's case to meaningful adversarial testing even though he or she made demonstratable ERRORS. However, if the process losses its character as a confrontation between adversaries, the constitutional guarantee is violated. There are circumstances involving trial counsel's performance that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. In such cases, prejudice is presumed. There are three situations warranting a presumption of prejudice: Where the defendant was completely denied the assistance of counsel at a critical stage" (getting an independent Autopsy performed and obtaining examiner for defense expert), " where defendant's trial counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" (Suppression Motion, cross-examination of state expert, failure to present evidence and witnesses), "and where the circumstances under which the defendant's trial counsel functions are such that the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial" (Closing argument the largest issue)

"How do you kill yourself? You kill yourself by cutting your wrists. One, two, three, four. Not, you know, cut your throat four times. That's, you know that's not possible..." (See pages 4:5 of Research Information Suicides: Attempted Suicides).

MRPC 1.1 states that a lawyer shall provide competent representation to a client. MRPC 1.3 provides that a lawyer shall act with reasonable diligence and promptness in representing a client.

Fred Lesica during trial provided no defense experts or witnesses,

no evidence, did not use Reports to impeach witnesses false testimony, concocted Ridiculous scenarios and then at Closing Argument painted the picture that his client is a violent person who wishes to be freed and then states to the jury that is is NOT possible for someone to cut their own throat four times, thereby suggesting that his client had to have been the one to do it since there were only Barbara and the defendant in the home.

That above are all grounds of Ineffective Assistance of Counsel requiring a New Trial.

Further, Lesica fails to object to Repeated prosecutorial misconducts. During jury selection, Medema showed a photo of Barbara's cut neck and bruised face. Instead of objecting, Lesica tells his client to, "use it on your appeal". (Can't if he doesn't object). This conduct was highly prejudicial, as it did nothing more than to portray the defendant as a violent and bad man, leading the jury to lower the burden of proof based on their desire to punish him regardless of the substantive evidence. Allen, supra, at 569; People v Ullah, 216 Mich. App. 669, 684-686 (1996).

Lesica fails to object to the state knowingly eliciting false testimony from its witnesses, Saresh, Coalson, Neel, Gurain, Bringedahl, Smith, Luker, DeYoung, and Dr. Amanda O. Fisher-Hubbard. Also he fails to object to the use of knowingly flawed video surveillance footage and the still false testimony of Sgt. Gust on Rebuttal.

Lesica further fails to object to the prosecutor changing things I said to make me out to being a liar. 1st I never said dispatch said it sounds like the trachea was cut, 2nd I never claimed Barbara said she told me that she was going to commit suicide, 3rd I never said I shoved her WITH my leg, 4th I never said that I didn't say I wiped the knife, 5th I did NOT point out the knife and say it was the knife we used. The knife SHE used was NOT in the photo and I said "It isn't", not "it is". 6th I never said anything about it being "white"

9

Eric Emsay or anyone. 7th I did Not call Beehees "the subject," Bringedahl did. 8th We did NOT have any argument at the tree when she told me to "burn in hell." All of this was used by the prossecutor, capitalizing on his lies, during closing arguments when he'd say that I was lying, a "liar," "Lied" about all those same things that HE was lying about what was said.

Lesics failed to object to this. That is ineffective assistance of counsel that was highly prejudicial considering this case was based on who's credibility was best believed by the Jury.

Defendant submits that he has demonstrated "actual prejudice" in that but for the alleged errors, he would have had a Reasonably likely chance of acquittal. Mich. Ct. R. 6508(D)(b)(i).

The factual and legal basis needed for these claims may need put on Record for appellate Review. Therefore, Defendant, Joshua Michael Salyers, asks this Honorable Court to provide him with the Required Ginther/evidentiary hearing to make such record and/or grant him a New Trial base on Ineffective Assistence of Counsel.

Trial Counsel did NOT provide defendant with nor did Counsel review any Relevant Discovery material with his client. And Counsel did NOT work closely with his client Regarding State's Brief in Opposition to Defense Motions or the Defense Motions themselves. Nor did counsel relieve himself from this case and ask for Replacement counsel as was asked of him by the defendant. Counsel left expert testimony to stand unchecked and later highlighted the testimony with his closing, prejudicing his client.

10

Mr. Fred J. Lesica                                    12-19-2016

I greatly appreciate that you had informed me
that the state and police had destroyed the only pieces
of evidence that would have proven my innocence.
However, Sir, I am not happy that the Judge
had removed Chad Catalino without my consent, Request
or knowledge and appointed you to my case. I am
sorry that you are having your medical issues and
I am very sorry that you think you may have
cancer. Really, I am.

You told me yourself that you don't want
my case and it clearly shows when the first thing
you ask me is, "What in god's name possessed you
to nearly cut off your girlfriend's head?"

As I've told you 3 days ago, I didn't cut
her. I have point out several things that you need
to have corrected on record. I asked you already but
you said the trial court won't approve you getting an
independent Autopsy performed nor to place a court
order obtaining all of my facebook contents that the
state and/or police tampered with. I also know that
you are lying to me about there not being a phone
log because in the police report it says something
that was only said via text message when I blocked
Barbara on facebook. I've showed you the inconsistence's
inconsistency of the video surveillance footage and
I've told you that all of the footage is missing from
the report from the time Barbara and I had met
up around 5pm. Watch the footage and see what time

I am standing in front of the camera when I call her to tell her I was there. Then, look at my phone log and see what time it was that I called her. That'll tell you the exact time difference. You then take that time and subtract it from the Ch.1 time of 7:18:16. After you get that look at my log again of when I called 9-1-1. That'll tell you how long I was in the house with her trying to prevent her from cutting herself before I called 9-1-1.

I don't understand the court system. Why am I not allowed to review my own discovery? Are they really that afraid I'll see what they are doing? I already know. Doctor Hubbard had left out a lot of scars on Barbara's body, she left out the depths, bulletined only 4 of the 6 cuts, and she described some other woman. Barbara does Not have Brown hair. She isn't 5'6". And she is not 134 lbs. She might have hazel eyes but I think they were more blue than hazel. Who the fuck is this Tania Lynn Swarts? And I don't care about Emory being in jail. Put him on as a witness because that shit the deputy wrote is not what I said. He wrote you and told you what was said and how they offered him a get-out-of-jail-free card if he'd back her story. But anyways she bulletined only 4 incisions to match the number of cuts on

that post.

I want for you to call Stephanie Ann, Lara Nichol, Connie, Amanda and Bria Fowler as witnesses. With them there the state isn't going to be able to make those false claims and it will have to show the rest of what is said not just what it wanted.

I also want and need a defense expert or two. One that is great with incisive wound examinations and blunt force injuries and the other neuropathology and toxicology. Get Dr. Bader Cassin & Dr. Ljubisa Dragovic.

Look at the incisions, man. Someone as trained as I am with knives, butchering animals for my family and being trained with the Tennessee Army National Guard, are you going to tell me that I'm that stupid to make 6 small and shallow incised wounds? If I did have done this, 6 cuts would have taken her head off, especially using a butcher knife.

I didn't kill her, she killed herself. I had stopped her 2 times before by waking up her girls. She didn't have them there this time.

As I told you, all I did was shove her to force her to drop the knife, she hit her hand and head on the bannister, the phone landed behind me from her left hand. She fell onto her right side on the stairs. When she got up she said, "Josh, please don't. Just let me do this." Blah Blah Blah ... I had seen she hadn't dropped the knife as it was back at her neck and her

Right side face and neck was red from hitting the stairs, I guess. Nothing serious. My concern was getting the Butcher knife out of her hand without her making anymore cuts off or cutting me. The cut was not that big but it did bleed a lot. When she made the 2nd cut I had grabbed for her right wrist but grabbed her hand instead. When I was pulling her hand toward me and just about grabbed the knife with my right hand, she jerked her hand free from mine and the force from her pulling her hand from mine like she did caused her to make a bigger cut. Blood splashed onto my shirt, necklace, and wrist. Her hand twitched 2 times while still holding the knife which is the reason I held up 2 fingers when Luker asked me, "how many more cuts did she make after the initial cuts?"   As I reached up and grabbed her wrist with my right hand and side stepped to her side, she was rocking back and forth, which is probably where that 7 cm (2.7 inch) cut came from. I had pushed her hand away from her neck and out to the side shoving her, with my left hand on her right shoulder, over my left leg. She landed face first then when her body landed her head came up and fell onto the left side face. She was facing the front door. I set her arm down and switched hands grabbing the tip of the handle with my thumb & fore-finger and slide the knife out of her hand. I believe that is where the 9/16" cut (1.5 cm) on her finger came from. I place the bloody knife in the sink on top of two other knives facing the same direction. I reached into my right pocket

for my phone and called 9-1-1. As it rang I stepped outside to see if pro-med was coming back up the street yet, so I could get them to stop. The 9-1-1 answered. I only lied about seeing someone that was running from the area and her calling saying she's been attacked to prevent her from losing her daughters. That's the only reason. Trust me, I know what it's like not having my mom in my life. I could NOT let the State take her girls for trying to kill herself. It is why I did not tell Det. Lukera & Stratton do anything they wanted until they promised me they wouldn't take her girls. Lukera told me this looked to have been an attempt to commit suicide so I thought she was telling them what she did so I asked them to promise me they wouldn't take the girls if I tell them what she did. They agreed.

After preliminary exam I realized they were lying to me all along. Had I been told that she died and I was a suspect of murder or whatever I'd never had said anything at all. I still don't see how I can be in jail when I didn't confess. I did NOT cut her I just tried to prevent a suicide and thought I did until they told me she passed and that they are sorry for my loss.

9-1-1 asked me to tell her everytime Barbara took a breath so I went back in to do that. She said to use something soft a towel or shirt. I put my phone on speaker & on the table, took off my shirt to use to place on the wound and apply light pressure. When I turned her head to face the kitchen, so I could get to the wound better I had seen her blood frothing & bubbling so that told me she cut her windpipe. I used my finger (middle) and placed it over that incision so she doesn't drown on her blood,

and placed this shirt over the rest and, as 9-1-1 said, applied light pressure. Breanne scared the hell out of me when she grabbed my sick area and squeezing. I mentally broke then. I was already emotionally devastated but was holding on trying to be strong for her because she needed help. When they told me she died so did a big piece of me.

I swear to you I didn't kill her. However, since I know you don't want my case and that you believe I am guilty from what you said the other day as well as you saying you are not gonna be able to get me a independent review of the report, since they cremated her, nor get me any defense experts and you say you won't be putting anyone on stand from the jail, I want you to put in a motion to withdraw and get me new counsel. I had wrote the Judge & prosecutor asking for a hearing to replace you. It's nothing personal it's just this is MY life ya'll are playing CHESS with. This shit is NOT a game and I refuse to be a pawn for the Judge's, prosecutor's and detective's political agendas.

I wish you the very best with your upcoming surgery and I pray to the Goddess you don't have Cancer. Good luck doing your Estate cases. Perhaps when I prove I'm innocent I can become a paralegal and come help you so you don't have so much to burden ya, Old timer.

Blessed Be!

25 W. Walton

Muskegon, MI 49442

Josh Salyers

16-4697-FC    8/26/87

3 Forensic Sciences 32 F. 01

"A clinician who makes decisions involving a suicidal patient based upon sociological data alone and without considering the individual is committing malpractice."

3 Forensic Sciences 32 F. 02

"Scientific knowledge of suicide is well established, inasmuch as suicide is a major public health problem. Suicide ranks as the 8th leading cause of death in the United States, where there are more than 30,000 suicides per year. The accuracy of suicide statistics, especially the accurate determination of suicide versus other modes of death, has significant public health implications and is of great emotional concern and significance to the deceased's family and the community.

Psychiatric disorders are the most significant factor leading to suicide. Medical illness and/or substance abuse are also factors, with substance abuse being more prevalent among young suicide victims. Some of the common precipitating causes for suicide are Separation, Unemployment, legal trouble, and other major stresses. The most important risk factor for suicide is depressive illness. Depressive illness is characterized by depressive mood, irritability, weight loss, insomnia, agitation, feelings of worthlessness, and diminished ability to concentrate. Pathological family interactions are a significant factor in adolescent suicides, and family conflicts are often the precipitating event."

Suicides result from an attempt to get relief from mental sufferings. It is the 2nd leading cause of death for people between the ages 10 and 34.

* Note that i've underlined the several factors that apply to Barbara Ann Dailey. Had Counsel investigated into such it'd have been known that those who testified at trial for the state had been lying. *


3A-236-23 Courtroom Medicine Series: Death §23.50

[1] "Contusions,

are NOT often the cause of death, although if major internal blood vessels or the brain are involved, it can have lethal consequences."


[4] "Incisions,

Result from the use of a sharp edge, such as a knife blade or glass shard. The depth of the wound depends upon the amount of force applied and the sharpness of the edge. The lethality of the wound depends upon what underlying structures are involved in the incision.  Incisions may be accidental; in such cases, they are seldom serious. More often, the examiner must differentiate between incised wounds that are self-inflicted with suicidal intent and similar injuries resulting from an aggravated assault.

Major distinguishing factors includes:

• The position of the incisions. Incisions at the wrist almost always suggests suicide, while those at the neck may suggest either homicide or suicide. Examination of the wound may prove that it was anatomically impossible to self-inflict.

• The number of the wounds has little bearing, since suicidal incisions are frequently multiple. Suicidal incisions Sometimes show evidence of faltering determination. ("Hesitation Marks").

3A-236-23 Courtroom Medicine Series: Death §23.50 (continued)

Forensic evaluation can usually determine the direction of the incision, especially if the wound is deep. Such determinations may be invaluable in deciding if a wound was self-inflicted."

[6] "Cause of death after wounding.

Contusions and lacerations rarely cause death, unless an underlying vital organ is ruptured by the blow. Hemorrhage from incisions is usually not severe, but if an underlying blood vessel is involved in the incision, hemorrhage sufficient to cause death can occur. In suicides, this generally involves incisions over the arteries of the wrist or of the major blood vessels in the neck."

4A Lawyers' Medical Cyclopedia §31.16 [F] Repair

"Superficial wounds require only a single layer closure of the skin. Deeper lacerations require buried sutures."

1 Attorneys' Textbook of Medicine (3rd Edition) §3.04 (d)

"Superficial wounds are limited to the upper layers of the skin and mostly cause bleeding. They are open but do not penetrate the deeper layers of skin or fascia."

* Pseudocides will usually arrange to be found before death occurs. Substance abuse accompanies and complicates the majority of these cases. *

Toxicology Expert, Dr. Marilyn A. Huestis has stated:
"Non-frequent users of THC can be very intoxicated at 1ng of THC per mL of heart blood."   * Barbara Ann Dailey had 1.9ng/mL. *

2 Forensic Sciences 25.11 Toxicology

"From the stand-point of intensive, complete surveys being conducted in all cases of sudden, unexpected, violent, unexplained, and suspicious deaths in Medico-legal investigative offices in the United States, toxicologic principles have not been invoked for too long a time. <u>Unfortunately, many law enforcement officers, coroner, and even certifying physicians still make determinations regarding the cause and manner of death in many cases without the benefit of toxicologic studies. This is a great tragedy and undoubtedly results in serious injustice in many civil and criminal matters.</u>"

Here are only 26 of 895,982 cases of suicides and attempts to commit suicide via self-inflicted wounds to their necks:

**** 1) Reinking v Philadelphia Am. Life Ins. Co., 910 F. 2d 1210

2) Crowder v City of Manila, 2019 U.S. Dist. Lexis 5442

3) Glenn v Washington County, 673 F.3d 864

4) Father v Frederick County, 2015 U.S. Dist. Lexis 14302

5) Dodd v Workman, 2011 U.S. Dist. Lexis 85604

6) A.C. v City of Santa Clara, 2015 U.S. Dist. Lexis 123114

7) Cunningham v Vigness, 2013 U.S. Dist. Lexis 62202

8) Rosario v Brown, 2011 U.S. Dist. Lexis 53145

9) Acerbo v State of New York, 32 Misc 3d 1230(A) #113869

10) Shoemaker v Central Business Men's Assn, 218 Mo. App 374

11) Breedlove v Kennedy, 2018 U.S. Dist. Lexis 99736    Dr. Travis Hindman

12) Jacoby v Baldwin County, 2013 U.S. Dist. Lexis 72212

13) Stephens v Herrington, 2011 U.S. Dist. Lexis 104812

*** 14) Mallacky v Tice, 2017 U.S. Dist. Lexis 142815

15) Watkins v Comm'r of Soc. Sec., 2018 U.S. Dist Lexis 131630

Research Information pg 3

<u>Suicides and attempted Suicides  (continued)</u>

16) Wood v City of Lakeland, 203 F.3d 1288.

17) Norton v City of S. Portland, 831 F. Supp. 2d 340

18) Wilson v Prince George's Cnty, 2017 U.S. Dist. LEXIS 50155

19) Anderson v City of Hopkins, 805 F. Supp. 2d 712

20) Ramirez v Ferguson, 2011 U.S. Dist. LEXIS 34625

21) Easley v Kramser, 235 F. Supp 2d 945

22) Glenn v Wash. County, 2010 U.S. Dist. Lexis 61858

23) Tenorio v Pitzer, 802 F.3d 1160

24) Wilson v Cosro, 2014 U.S. Dist. Lexis 184637

25) Gonzales v McDonald, 2016 U.S. App. Vet. Claims Lexis 1635  #15-2766   10/27/2016

26) People v Flores, 2012 Cal. App. Unpub. LEXIS 1602

<u>2 Forensic Sciences</u>

[1] Brief autopsy procedure guide for the forensic pathologist:

General Rule: <u>"if in doubt about the manner of Death,</u>

<u>treat as a Homicide."</u>


<u>Criminal Law Deskbook P 16.21</u>

"Certain presumptions must be made; that to rapidly make a wound that is an inch deep, you need a fairly sizeable instrument. It has to have, the cutting edge has to be a certain size. If it isn't, you'll see stops and starts when you look at the wound. A large sharp object could make one clean cut four inches long and an inch deep, and you could as a layperson, at least, make that observation."


One cut to the main artery of the neck would kill a person in a matter of 1 or 2 minutes. *(Barbara lived 46 minutes)*

Research Information Pg 6

"When the windpipe (trachea) is cut you'll begin to aspirate blood, which would cause more pain as the lungs would no longer be a place for aeration or oxygenation; this is called 'dyspnea', painful breathing. There'd be significant amount of blood in the lungs."

— Jones v State, 212 So. 3d 321 —

"Fatal wound would render victim unconscious within 10-15 seconds, and victim would have bled to death a few minutes later."

— Perez v State, 281 Ga. 175

1 Forensic Sciences 10.05
Inconsistency of Testimony/Report

1 Forensic Sciences 18.07
Constitutional Right to appointment of Expert

"There are 3 times more suicides than homicides in the United States of America." - Caitlin Rother-

"Hyoid bone fractures are not rare, but occur in 1/3 of strangulation cases." Medical Literature

2 Forensic Sciences 25.06
The determination of Falls v. Blows in Head injuries:
"In many instances, it is possible to conclude, on the basis of the pattern, type and localization of cranio-cerebral injuries, if they resulted from a fall or from blows. Usually, in blows,

## 2 Forensic Sciences 25.06 (continued)

the scalp shows hemorrhages in various areas with possible underlying skull fractures. In some cases, the imprint of the assaulting weapon may be "branded" on the skin by the force of the impact and can be easily recognized. Linear or comminuted skull fractures may underly such injuries. Such fractures, if located on the top of the head or both sides of the head, are most often produced by a blow. Examination of the brain, most often, will highly enhance the accuracy of such determination.

In trauma to the Brain, contusions may be produced both at the site of impact ("coup" lesions) and at the site opposite the area of impact, ("Contercoup" injuries). In blows, the brain may show much larger contusions underlying the area of impact ("coup") than at the site opposite the impact (contercoup").


The opposite is true in cases of head injuries caused by falls in which the contercoup injuries, usually located in Relatively inaccessible positions (i.e., Inferior left temporal lobe), are larger than the coup contusions. The only instances where the distribution of coup and contercoup injuries caused by a fall Resemble that of a blow is when the fall occurs over a projecting object or from a considerable height.

The explanation of the difference in the pattern of brain contusions in falls and blows is not entirely understood. It Relies apparently on various gradients of acceleration of skull and brain at the time and site of impact.


The most common types of blunt force injuries are Contusions,

abrasions, lacerations, fractures, and hematomas.

• Contusions, the second degree of injuries, are caused by a structural alteration of the brain. This usually occurs on the crests of the brain convolutions, and is characterized by small punctate or streak-like hemorrhages and associated focal destruction of tissue, with or without edema (swelling). They are traumatic tissue-hemorrhages, with preservation of the outer layers of the organ. They are commonly known as bruises or "black and blue" marks on the skin. However, they are also frequently encountered within the internal organs, such as muscles, kidneys, lungs, liver, brain, etc.

• Abrasions are a type of blunt force damage referring to skin injuries in which the outer layer of the skin (epidermis) is "shaved off" by a tangential, friction force. Such injuries are commonly known as scrapings, superficial grazing injuries or "brush-burn" injuries."

## 2 Forensic Sciences 25J.07 Mechanism of Death : Blunt Force Trauma

"[a] Blood Definition

Blunt Force Trauma (BFT) injuries to the body are inflicted by a force sufficient to cause bruises, contusions, or fractures. BFT injuries are seen in accidents such as MVA and Falls, suicides involving falls from heights, and homicide involving fights.

[b] Investigation

The type and level of forensic death investigation conducted is heavily dictated by the cause of death. In addition, the type

## 2 Forensic Sciences 25J.07 (continued)

of forensic evidence collected is also dictated by the type of case. Critical information that needs to be collected is the object or surfaces that caused the BFT. The forensic investigator should attempt to recover objects such as bats, pipes, and other objects used to inflict the injuries. If the BFT is caused by a fall, the height, type of surface, and cause of the fall should be ascertained. See specific manner of death for more details on the type of investigation to be conducted."

1. <u>Fether v Frederick County, 2015 U.S. Dist. LEXIS 14302</u>
   Lihvarchik had grabbed a steak knife from a drawer
and, without saying a word, held it against his throat. He
put the knife down after he was told to but almost
immediately picked up a pizza cutter that was on the
kitchen counter. He touched it to his neck and "drew
it across his throat" with enough force that blood was
"dripping out" of his neck. The incision was 4 to 5
inches long.

2. <u>Dodd v Workman, 2011 U.S. Dist LEXIS 85604</u>
   While in jail, awaiting trial, Dodd attempted suicide
by cutting his throat with a razor blade.

3. * <u>Reinking v Philadelphia Am. Life Ins. Co., 910 F.2d 1210</u>
   While her husband was upstairs, she went into their
bedroom, took his pocketknife, and stabbed herself 11
times in the arm and wrist, 6 times in her neck,
7 times in her chest (nicking her heart twice), and 8 times
in her abdomen. She, then, thrust the knife into her thigh,
virtually severing a finger when the knife closed. Mrs.
Reinking injured almost every vital organ in her body
as well as severing numerous arteries, tendons, ligaments,
and nerves. Despite the extreme brutality of her injuries,
she testified that she felt no pain as she inflicted them.
Still conscious after stabbing herself 32 times, Mrs.
Reinking attempted to leave the house to lie down under a
bridge and bleed to death. She passed out before getting

1

out the door. She miraculously survived.

4.  Rosario v Brown, 2011 US Dist LEXIS 53145

Rosario made a large cut to his neck using a surgical blade that was later found after he died. Rosario was able to inflict wounds to his neck and wrists.

5.  Acerbo v State of New York, 32 Misc 3d 1230(A)

After hearing voices and thinking he would go to hell, claimant cut his throat with a knife and required 42 sutures.

6.  Shoemaker v Central Business Men's Assin, 218 Mo. App. 374

Samuel E. Shoemaker wounded himself three times in the ~~neck~~ throat with a pocket knife, and threw himself from the upper floor window, in Room #110, of St. John's Hospital in Springfield, Illinois, striking, with violence, on the granitoid pavement.

7.  Jacoby v Baldwin County, 2013 U.S. Dist. LEXIS 72212

On 12/22/2011, Plaintiff cut his throat with a razor, then broke the blade in half, wrapped the razor pieces in a paper towel, and swallowed the blades.

8.  Mullarky v Tice, 2017 U.S. Dist LEXIS 142815

In an attempt to commit suicide, Appellant had severely cut his own throat, causing a gaping wound from ear to ear.

A laceration in which he nearly died from by exsanguination.

9. <u>Wilson v Prince George's County, 2017 U.S. Dist. LEXIS 50155</u>
    Wilson, standing 20 feet from Officer PFC. Gill, began cursing, stabbing himself with the knife, yelling, and crying. Wilson did not threaten the officer, either verbally or physically. The police officer told Wilson to put the knife down. Wilson continued poking himself with the knife. The officer tried to reason with Wilson, who did not comply. Instead, Wilson cut his throat, and continued walking. Then he stabbed himself in the chest.

10. ✱ <u>Easley v Kirmsee, 235 F. Supp. 2d 945</u>
    Easley was <u>acting under the influence</u> and had cut himself several times with a knife, resulting in loss of blood. Christopher Easley cut, both, his wrists and his throat.

11. <u>Wilson v Cosio, 2014 U.S. Dist. LEXIS 184637</u>
    Plaintiff pulled out two large butcher knives. Plaintiff, then, cut his own arms and neck.

12. <u>People v Flores, 2012 Cal. App. Unpub. LEXIS 1602</u>
    Luis Alejandro Flores inflicted a single slice, of a knife, onto his throat. It was 6 inches in length from the right to the left side of the throat. With a smaller knife, cut his wrists.

3

One cut to the main artery would kill a person in a matter of 1 to 2 minutes.

Issue Two: Trial Court failed to provide Requested hearings to Remove Fred Lesica and Replace him with effective Trial Counsel, Instead gave legal advice. Trial Court failed to hold a hearing to Replace Appellate Counsel. Trial Court denied Suppression hearing without Reviewing the video audio Recorded interrogation. Trial Court was not impartial.

Removal of Chad Catalino:

In People v Anderson, 446 Mich 392, 405; 521 NW2d 538, "Our Supreme Court explained that... a court must determine if the error is a structural defect in the constitution of the trial mechanism that defies analysis by a harmless error standard. In other words, some errors Require automatic Reversal, such as deprivation of counsel."

The Leading case is Smith v Superior Court of Los Angeles Co., 68 Cal. 2d 547; 68 Cal. Rptr. 1; 440 P.2d 65 (1968).

"It follows that once counsel is appointed to Represent an indigent defendant... the parties enter into an attorney-client Relationship which is no less inviolable than if counsel had been Retained..."

Other Courts have also held that a trial court's arbitrary Removal of a defendant's appointed trial counsel, over the objection of the defendant, violated the defendant's 6th Amendment Right to Counsel. Nbeling v United States, 387 A.2d 1101 (1993). Thus, once an attorney is serving under a valid appointment by the court and an attorney-client Relationship has been established, the trial court may not arbitrarily Remove the attorney over the objection of both the defendant and counsel. Nbeling, Supra, pp 1105-1106.

In this case, Defendant, Joshua Michael Salyers, on 9/20/2016, was bound over to the Circuit Court of Timothy G. Hicks for trial. On 10/14/2016, defendant was appointed Chad Catalino. An attorney-

1

client relationship had been established. Catalino began sending an intern, named Josh, to see me every other week. On 11/29/2016, defendant had a pretrial hearing for prosecution to provide defense with discovery. Defendant was not taken to this hearing. On 12/16/2016, defendant, once again, had a pretrial hearing and, again, was denied to be present. However, defendant later that day met new counsel, estate attorney, Fred J. Lesica. When defendant asked Lesica where Catalino was, he was told that Catalino was Removed by trial court and Lesica was forced to take this case.

Had defendant been informed or consulted with a request or demand of Chad Catalino's Removal as his counsel, he would not have consented. However, defendant was not present nor had any knowledge of this removal of Catalino until met with Fred Lesica.

"The fact that defendant did not specifically object to the trial court's Removal of his court-appointed counsel is also of no consequence..." People v Heim, 206 Mich. App. 439, 441; 522 NW2d 675 (1994).

In people v Grant, 445 Mich. 535, 547; 520 NW2d 123 (1994), "Our Supreme Court also noted that appellate courts will consider claims of Constitutional error for the first time on appeal where the alleged error could have been decisive of the outcome."

This is a situation where the trial court acted without a Request or consent by the defendant to Remove his counsel.

"The trial court's action was an arbitrary infringement on the Right to assistance of counsel and an interference with the attorney-client relationship. The trial court improperly interfered by removing counsel with no justification for doing so." Hooling, Supra, p 1106; In re the Welfare of MRS.

2

In *People v Johnson*, 215 Mich. App. 658, "Defendant's convictions are Reversed and the case is Remanded for a new trial before a different judge in accordance with this opinion." Kathleen Jansen, J.

Defendant, Joshua Michael Salyeas, Requests this honorable Court to so move to ~~Remand~~ Reverse his conviction and Remand back to trial court before a new judge for a New Trial.

---

On 2/15/2017, Judge Timothy G. Hicks, tells defendant, upon his entering the Courtroom from chambers, that he's Received defendant's secured letters Regarding his attorney. Hicks further tells defendant that he's to trust his attorney as he has been doing this 20 plus years and that he's a good lawyer and knows what he is doing. Hicks tells defendant that he no longer wishes to Receive any further letters from him, and that 95% of cases are handled via plea bargaining.
(Review letters 12/18/16, 1/2/2017, 1/29/2017, 2/17/2017)

Defendants letters to Hicks Regarding counsel issues also make claims of corruption of all individual thus so far working and is over his case, including Judge Timothy G. Hicks.

## 230 P.3d 726

"The judge plays an essential Role to ensure the impartial and objective administration of criminal justice. When a judge becomes involved in becoming defendant's legal advisor, the judge is no longer a judicial officer or a neutral arbiter. Judicial participation transforms the judge from a neutral arbiter to an advocate for the advisement the judge has suggested to the defendant. When the judge does participate, he/she brings to bear full force of the judicial office. Because of the disparity in power

3

between the defendant and the judge, judicial participation in legal advice undermines the fundamental fairness of the proceedings."

## 1 Criminal Law Deskbook P1.05

"Just as prosecutors and defense counsel cannot proceed in a criminal case where there is a conflict of interest, so, too, must judges guard against these types of claims. In fact, where judges are involved, the concern is not only with situations where the conflict is established, but even where there is the possibility or the appearance of a conflict of interest."

Trial Court had a duty to hold a hearing to remove and replace Fred J. Lesica with effective Criminal Defense Trial Counsel. Defendant's duty was fulfilled when he sent the letters to the judge requesting the hearings. However, trial court refused the multiple requests of these hearings. The following cases are NOT binding for the State of Michigan but should be considered as it does effect substantial U.S. Constitutional Right to Counsel;

In State v Weddington, 179 A.3d 1038, trial court was held and Weddington was convicted. He filed a motion for a New Trial based, in part, on the fact that his requests for a different defense attorney were never heard. The trial court held a post-trial hearing on this motion and denied relief. Weddington filed an appeal on that matter and trial court's ruling was reversed.

There were two questions before the Court: (i) Did Weddington's letters trigger the requirements of Rule 4-215(e) when the clerk's office received them even though the trial judge did not have actual

4

notice of them, and (2) did Weddington waive his ~~Right~~ Request to Replace his defense ~~counsel~~ attorney by failing to repeat his Request to the judge prior to or during trial.

The Court ruled that actual notice by the trial judge is not Required to trigger the requirements of Rule 4-215(e). Because the Rule protects a fundamental right, i.e., the right to effective assistance of counsel, the Court reasoned that strict compliance with the statute is necessary and declined to introduce a requirement for actual notice by the trial judge in order to trigger the requirements of the Rule.

The Court said that whether the trial judge had actual notice of the letters is immaterial. According to the Court, what mattered was that the letters were clear, and the clerk's office had received them. Upon Receipt of Weddington's letters, a pretrial hearing should have been held Regardless of whether the trial judge had actual notice of his Requests.

The Court further determined that Weddington did not waive his right to the hearing for failing to mention the letters or otherwise Request his counsel to be Replaced during trial. The letters spoke for themselves and had been received by the clerk's office, and nothing in Rule 4-215(e) Requires a defendant to bring the request to a court's attention once duly filed in writing.

Lopez v State, 420 Md. 18 (2011)

"Provisions of Rule 4-215," are mandatory, must be strictly complied with, and are not subject to harmless error analysis."

The Reason for this is obvious: By the time trial is over, the ship has already sailed.

In sum, the error required Reversal of Weddington's conviction.

In the instant case, Hicks had informed Salyers that he has received his several letters regarding counsel issues, but failed to provide the requested hearing to remove and replace Fred J. Lesica. Instead, Hicks gave defendant legal advice and, as a result, was later convicted of 1st degree premeditated murder.
(Review People v Anderson 398 Mich 361 (1976)).

Also, defendant had sent the trial court multiple letters and motion to replace court-appointed appellate counsel, Melissa Sue Kreushopf, with substitute State Appellate Defense Office attorney. Request was denied by trial judge because a defendant cannot file motions when represented by counsel. (Read letters 6/11/2018, motion 6/13/18, court response 7/10/18, letter 7/10/18, request for documents 8/16/2018, records response 8/20/2018, letter 9/10/18, court response to letter of 9/10/18).

Trial Court refused to provide a hearing to replace Melissa Kreushopf with a S.A.D.O substitute.

For these reasons of providing legal advice instead of holding a hearing to replace Fred Lesica as Trial Counsel and providing more legal advice in the letter responding to 9/10/18 requesting S.A.D.O substitute to replace Melissa Kreushopf I ask this honorable court to provide the relief of a New Trial for failing to hold the requested hearings to remove and replace attorneys.

On 9/5/2017, trial court denied the Motion to Suppress statements made in the recorded interrogation on 9/4/2016 without first reviewing the recording to see

6

the multiple police misconducts that are in violation of the United States Constitutional Rights of the 5th, 6th, and 14th Amendments.

There is no record showing that Trial Court had reviewed the substantially relevant recording of the interrogation before it had ruled Denying the suppression that of statements made to detectives. Said statements was the only reason there is a case brought against defendant as NO evidence had been collected or tested, since "the suspect confessed", and the body of Barbara Ann Dailey had been cremated, thereby preventing the defense from getting an independent review to prove this was, in fact, a suicide.

At the police station, where I did not want to be as I asked the transporting officer, Anderson, to take me to be with Barbara. I was told I couldn't be there Right now so I asked to be taken home so I could tell Barbara's dad what she had told me to tell him and what really happened. Anderson agreed and asked me for the address. Instead, he still took me to the police station.

I sat in a break room for nearly an hour before Det. Luhra and Det. Stratton first spoke with me in the break room for about 5 minutes when they asked if I would come to their office to further speak with them. I asked to be there with Barbara and they said after we talk, not to worry, that she's in good hands. The time on the break room clock was 8:45 when I was taken to the break interview room from the break room. I was not read my rights up until the detectives weren't getting what they wanted.

They had asked me to tell them my story and if they feel I'm not gonna be a re-offender, they'll talk to whomever was over my

7

case about providing a lighter sentence. It may have been after reading me my rights. Either way, Detectives did NOT inform me that I was a suspect of Murder or, at least, the death of Barbara Ann Dailey, and they've offered leniency. When they still wasn't getting what they wanted, Lukis tells me this looks to have been an "attempt to commit Suicide." This was deceit and improper influence as they knew BEFORE the interrogation began that Barbara had passed. (See Preliminary Examination 9/20/16 pg.13).

Because I figured Barbara was telling them what she had done, Knowing now that her attempt to kill herself failed, I had asked the Detectives to promise me they wouldn't take Barbara's girls from her if I tell them what she had done. They agreed. I began trying to explain while trying to make sense of everything that happened my ownself, what she did what I was doing to stop it, and how I was thinking of covering it up for her. Then, out of nowhere Lukis asks me, what I thought he asked. "How many more cuts did SHE make after the initial cuts?" I couldn't form the words so I raised 2 fingers. I did not hear him ask me a second time. I also did not know he asked me "how many more cuts did You make after the initial cuts" until the day of trial when it was played.

Police misconducts were failure to notify before obtaining any waiver of rights, offers of leniency, Deceit/improper influence, and promise made.

According to the Michigan Supreme Court, People v Jones, 416 Mich 354, "In determining whether a confession is voluntary, the test is whether the confession was extracted by any sort of ... or obtained by any direct or

implied promises, however slight, or by exertion of any improper influence." Further it states, "A confession is no more reliable simply because the defendant begins the negotiating." "A confession which is extracted by any sort of threat or violence or which is obtained by a direct or implied promise, however slight, or by the exertion of any improper influence, is involuntary and may not be admitted in a prosecution of the crime for which the confession was made."

In Roger v Richmond, 365 U.S. 534, the United States Supreme Court held, "Our decisions under [the 14th] Amendment have made clear that convictions following the admission into evidence of confessions which are ~~invalid~~ involuntary cannot stand. This is so because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system -- a system in which the state must establish guilt by evidence independently and freely secured and may not, by coercion, prove its charge against an accused out of his own mouth."


Detectives failed to notify me of the accusation against me before obtaining any waiver. "Due to the nature of the incident" is not proper. "Tell us your story", "Let us help you", "we'll talk to whomever is over your case about giving you a lighter sentence", that is leniency. After knowing that Barbara Ann Dailey passed away at 8:01 pm, 44 minutes before I'd went into "their office", they tell me, this looks to be an _ATTEMPT_ to commit Suicide. That is deceit and improper influence. And because of this deceit and improper influence, I asked them to promise not to take her girls from her if I tell them what She had done. They

9

agreed. Promise made. Only through this statement did they find "the Knife," in the sink. "He told us where the knife was. He said it was in the sink pointing toward the back door. He described it as having a blade like a bread knife but shaped like a steak knife."

The knife I described is a Butcher/chef knife, not the steak knife they used in place of the Butcher/chef knife.

"The State's burden of proving that a suspect's waiver was voluntary, knowing, and intelligent is a heavy one". Miranda, 384 U.S. at 475. We are to "indulge every reasonable presumption against waiver of fundamental Constitutional Rights" and we shall "not presume acquiescence in the loss of fundamental Rights". Johnson, 304 U.S. at 464.

Had I known I was a suspect to murder, I would NOT have consented to waive my Rights without an attorney present.

In State v Vincenty, 202 A. 3d 1273, the Court observed that the common law has granted individuals the "Right against self-incrimination since colonial times." State v A.G.D, 835 A.2d 291 (2003). "It is one of the most important protections of the criminal law." State v Presha, 748 A.2d 1108 (2000). "However, law enforcement officers must inform suspects of the Right before getting a waiver." Miranda v Arizona, 384 U.S. 436 (1966). "A waiver must be knowing, intelligent, and voluntary." State v Reed, 627 A.2d 630 (1993). "The State has the burden of proving beyond a Reasonable doubt that the waiver was knowing, intelligent and voluntary." Presha. "If suspects are not informed of the charges pending against them, they necessarily lack critically important information to enable them to knowingly, intelligently, and voluntarily waive the Rights against self-incrimination." A.G.D. "In such circumstances, the State cannot meet its burden of proof." Id. "The police may inform the suspect of the charges before or after the <u>Miranda</u> warnings, but they must do

10

so before obtaining any waiver." Id.

Without this interview, or interrogation, there would not have been a case of "Murder." The ONLY basis for an arrest was the supposed confession. From there, it was just a tactical game and a matter of forming a case based on lies, knowingly false theories, flawed and falsified evidence, manipulated Reports, withholding exculpatory evidence, destroying evidence, coercing witnesses, mischaracterizing evidence, and intimidating witnesses.

In Sum, the Suppression should have been Granted. Defendant asks this Honorable Court to order a New Trial suppressing the interrogation and any/all evidence obtained through these statements in the interrogation.

During a untimely motion in limine, as they are suppose to be done 7 day BEFORE trial. Trial Court denied evidence that proves the evidence submitted by the prosecution for its theory of premeditation of Murder is false. This is abuse of discretion as it ruled the exculpatory evidence out as "Hearsay" though the evidence state submitted had come from the same source, the cell phone of Defendant and its contents.

"Exclusion of hearsay evidence relevant to the issue of punishment, held violation of due process clause of the 14th Amendment"... "The United States Supreme Court will vacate a Capital Sentence imposed upon a state criminal defendant convicted of Murder -- which sentence was imposed following a sentencing proceeding during which certain testimony

11

highly Relevent to a critical issue had been excluded as hearsay under state evidentiary Rules -- where exclusion of the hearsay testimony, Regardless of the propriety of its admission under state evidentiary Rules, denied the defendant a fair trial on the issue of punishment in violation of the due process clause of the 14th Amendment." Green v Georgia  442 U.S. 95

   Where Constitutional Rights directly affecting the ascertainment of guilt are implicated, the hearsay Rule may not be applied mechanistically to defeat the ends of justice." Chambers asserted that the trial court's application of state evidentiary Rules rendered his trial fundamentally unfair and deprived him of Due process under the 14th Amendment.

                              -- Chambers v Mississippi, 410 US 284

                              Reversed / New Trial.


   Trial Court has Refused defendant entitled documents until defendant wrote a letter to ineffective appellate counsel to give him all documents or people would come and get them and not leave until otherwise. Trial Court has still not provided defendant with all documents in their entirety nor the "bench" transcripts. Trial Court has still Refused to order the prosecution to turn over full discovery since appellate counsel nor defendant has received it before Trial Counsel passed away. These documents and discovery are very critical in perfecting defendant's direct appeals, 86.500 motion and Federal Habeas Corpus. (See letters / Motion

   Defendant Requests this Court to grant a New Trial or at the very least order prosecution to turn over Complete Discovery materials and Return defendant's "Right to appeal" to its beginning status with New State Appellate Defender appointed to do direct appeals, again!

                              12

Judge Timothy G. Hicks,                                    12/18/16
   Case: 8/26/87 Joshua Michael Salyers  16-004697-FC
       I am writing you to Request a hearing for
TWO things: 1) To document why you Removed Chad Catalino
from my case without my Request, Consent, or knowledge, and
2) I would like to Replace the "defense counsel" you have
appointed me. Please Schedule a Hearing for these reasons.


       Fred J. Lesica surprised me 2 days ago with a
visit. I was expecting Chad Catalino or that intern he
keeps sending, Josh.  The first thing he tells me is
"I'm generally an Estate Attorney, but I'm being forced to
take this case."  He tells me he doesn't want my case
and tells me he is about to be undergoing Hernia mesh
Surgery or something and that he is most likely about to
find out that he's got cancer. He told me that the State
and the Rest of the team are destroying evidence and violating
my attorney/client parti privilege rights when they stole my poem
Regarding the Suicide.  They labeled it as a "multipage letter regarding
the homicide in question.


       Why would you appoint this guy to me? He even had
the nerve to ask me "What in God's name would possess you
to decapitate your girlfriend's head off?"  This guy is high
on pills when he came seen me on 12/16/16. W.T.F!?!?
     You had no Right to Remove Chad Catalino. See the case
People v. Johnson, 215 Mich App 658.  So please provide me
with the Record as to why you Removed him or provide me

1

with a hearing to make such Record as I did not Request or consent to his Removal and I wasn't even brought to court for the date of Nov. 29, 2016.

Please provide me with a Hearing to Replace this new counsel you've appointed to me. He, clearly, does not want my case and is not fit to Represent me in a adequate defense as he believes that I am guilty and has openly expressed to me that he DOES NOT WANT TO REPRESENT ME! There is a case that mandates a hearing in a different state so, because it affects substantial Constitutional Rights, there must be some rule that mandates the same thing in Michigan. Why can't I have use of the jail's law library system? I hope this case isn't some bullshit as it came from another prisoner, Jeffrey Willis. Lopez v State, 420 Md. 18 (2011).

I had asked Lessica to hire a defense expert (forensic Pathologist) to Re-examine Barbara. I have a constitutional Right to the appointment of a expert. However, he told me, "No, because while the judge was Removing your counsel the State convinced Barbara's family to have her CREMATED."

I've also asked that he file a motion to suppress the interrogation due to 1) failure to advise me of the pending charges before obtaining any waiver, 2) offers of leniency, 3) the use of deceit and improper influence and 4) They promised not to take her girls from her if I told them what she had done. For issue (1) common law has granted suspects the "Right against

2

self-incrimination since colonial times." State v A.G.D., 835 A.2d 291 (2003). "It's one of the most important protections of the criminal law." State v Presha, 748 A.2d 1108 (2000). Individuals may waive the Right. Id. Law enforcement officers must inform them of the Right before getting any waiver. Miranda v Arizona, 384 U.S. 436 (1966). "A waiver must be knowing, intelligent, and voluntary and the burden of proof is on the prosecution by preponderance of the evidence." People v Daoud, 462 Mich 621, 634 (2000); People v Cheatham, 453 Mich 1, 27 (1996). "The state has the burden of proving beyond a reasonable doubt that the waiver was knowing, intelligent, and voluntary." State v Presha, 748 A.2d 1108 (2000). "If suspects are not informed of the charges pending against them, they necessarily lack critically important information to enable them to knowingly, intelligently, and voluntarily waive the Right against self-incrimination." State v A.G.D., 835 A.2d 291 (2003). In such circumstances, the State cannot meet its burden of proof. Id. The police may inform the suspects of the charges before or after the Miranda warnings, but they must do so before obtaining any waiver. Id. See also, Colorado v Spring, 479 U.S. 564.

For issue 2) 3) and 4) People v Jones, 416 Mich 354. Reversed/Remanded. Michigan Supreme Court Ruled, "Conviction for premeditated first degree murder was based in part on the confessional statement admitted into evidence over his objection." Reversing the conviction and remanding the case the Court held, "that the defendant's statement was inadmissible per se. There was no reason to conclude that a confession was voluntary and more reliable merely because the defendant initiated the bargaining. Defendant was still influenced by the state's promises of leniency."

"In determining whether a confession is voluntary, the test is

3

whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the ~~extraction~~ exertion of any improper influence." .... "A confession is no more reliable simple because the defendant begins the negotiating...."

The United States Supreme Court's decisions under the 14th Amendment have made clear that, "convictions following the admissions into evidence of confessions which are involuntary, that is, the product of coercion, either physical or psychological, cannot stand."

The reason that involuntary confessions are not admissible was set forth by the Court in Rogers v. Richmond, 365 U.S. 534, 540-541; 81 S.Ct. 735; 5 L Ed 2d 760 (1961),

"Our decisions under [the 14th] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary cannot stand. This is so because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system -- a system in which the state must establish guilt by evidence independently and freely secured and may not, by coercion, prove its charge against an accused out of his own mouth."

Judge, if you read the preliminary exam, Detective Luhee admits that he knew BEFORE the interrogation began that Barbara had died and he was investigating a "Homicide". However, he fails to advise me that I'm a suspect for her death. (Failure to advise before waiver obtained). Then after offering leniency that, if I tell them my story, they'll speak to whoever is over my case about being light on

4

sentencing, and still not get what they want me to say, they then tell me that this looks to have been an <u>Attempt to commit Suicide.</u> (Deceit & improper influence). This led to me trying to further protect her from losing her children by asking them to <u>promise</u> me that they wouldn't take her girls if I tell them what <u>she</u> had done. They agreed. (Promises made).

I've pointed all this out because when I asked Lesica to file the motion to suppress and showed him these cases, he told me it is pointless to file it because you will not grant these type of motions and will leave it for the appeal process to correct. This motion is important because 1) it's clear violation of my Constitutional Rights and 2) There was absolutely no collecting or testing of any evidence (per report) as "suspect confessed"... That also means that there was not even any investigation into anything regarding if this was a Suicide.

Judge, Timothy G. Hicks, I'm asking you to <u>provide me with that Hearing to replace defense counsel,</u> immediately, before any further evidence "vanishes", is "destroyed", "lost", etc. so that effective counsel will have a chance to present the <u>Truth</u> at trial. Why, if the state believes I'm guilty, would they ask Lesica to try to get me to plea to negligent homicide? One) it's not even applicable anymore for this kind of case. It'd fall under "Involuntary manslaughter" or "Assisting Suicide," and two) I'm <u>NOT</u> going to plea to a crime that <u>never</u> happened!

5

I appreciate your time in reading this. I've had copies made for my own record of these letters to you and Medema that way if Fred Lesica is right about you not doing your job as is required by law to do, then I'll be back in court before a different and, hopefully, a non corrupt Judge. Getting back, if convicted, will only end with me being either exonerated, acquitted, or dismissed of charges with prejudice as evidence was never collected, tested, preserved, ~~destroy~~ because its been fabricated as Lesica is telling me, destroyed, etc.

Give me Replacement of Counsel hearing. See you in Court.

Respectfully,

*[signature]*

Joshua Selyers
25 W. Walton Ave
Muskegon, MI 49442

Medema is going to fry himself the next time he tries to coerce a witness or steals anything out of my cell and/or Attorney client privilege folder.

6

Attachment B

Judge Hicks        <u>1</u>        Mon 1/2/2017

Hi. It's Joshua Salyers case #16-4697-FC. I am writing you because, without my consent, Request, and Knowledge, you Removed Chad Catalino from my case. On 12/16/16 you had appointed Fred Lesica, an estate lawyer, to my case. He told me that he does not want to work my case because of him being under a lot of pain in his stomach area and will be undergoing surgery soon. He says that he also wants nothing to do with my case because there is talk that police have destroyed evidence and the state are going to do their best to get a conviction no matter what.

I asked Lesica to have the evidence tested and it will prove my innocence. He told me that the court will not give him the money to do that. As I asked prior counsel to do, I asked him to get a second examination of the wounds that the State's M.E. claim to have caused the death but, again, he told me that the State's Medical Examiner is all the proof he needs. I had asked him to call upon several people to come to court on my behalf. He told me he will call them and have them testify on my behalf, however, I've called them same people and the one inmate here in jail and no lawyer has talked to them. Lesica is a joke of an attorney. I do not trust him and I'm asking you to hold a hearing to make a record of the reasons that you removed my initial trial counsel and why you appointed me new counsel without my request, consent or knowledge.

Just so you are made aware, I know that the state's officials and Muskegon County Officials working my case are

2

doing some shady and corrupt shit on my case and I
will expose them when this is over. Make sure you let
Medema know the next time he violates the 6th Amendment
Right and the 4th Amendment Right by illegally searching and
seizing anymore attorney/client information or anything I have
in that attorney/client folder it'll be his ass. I see the
game ya'll are playing, don't start something ya'll can't finish.
    Your actions are beginning to make me wonder if you
are a part of this bullshit. I am innocent and I
can prove it. However, this piece of shit lawyer you
appointed me says he will not have time or the money to
be of any use to me. That's your plan though, isn't it?
Stack the deck against me to prevent me from proving
my innocence? Why? Let me guess, b/c it's your friend
Benjamin Medema's first "murder" trial? I know already
that the M.E. was coerced on how to write her
report b/c it's missing the self-inflicted cut scars and
the cigar burn scars. It's missing the depths and it
details in 4 bulletins, only 4 of the 6 cuts. Ya'll are
not all that smart trying to cover the tracks. Suicide
is not a crime in Michigan. The Police investigators, Medema,
and now you, so it seems, are trying to turn what really
happened into Murder. Give me counsel that will test the
evidence, that will get a second exam of Barbara's wounds,
that will have a expert to testify on my behalf, if not I
will know you don't care about finding the truth and that
you really are corrupt and do, knowingly, send innocent people
to prison for crimes that never even happened.   I've

<u>3</u>                                    Mon 1/2/2017

been writing to many state and Government officials to
keep their eyes on the proceedings of this case.

Nobody is more sorry that Barbara is gone than I am.
I have to forever live with my failure to prevent her from
cutting herself. That by itself is a life sentence. I did <u>NOT</u>
murder her. A little something more you should know, Barbara
could not have died from both sharp and blunt force trauma
as the M.E. said in her report. The contusion on the
left temporal lobe is a very minor bruise, too small to
be considered a factor as there was no swelling of the
brain or any clotting of blood or hemorrhaging of the
brain. The left temporal lobe area controls the hearing, talking,
and such.

Judge Hicks, do the right thing and give me a
hearing to establish for record of removal of my initial
counsel and hearing for me to be appointed new counsel
other than this idiot you appointed me on 12/16/16

                         Sincerely,
                         Joshua Salyers
p.s.
Tell Medema not to set off the snare
unless he wants it to bite him in the ass.

Judge Timothy G. Hicks                                                    1/29/#17

So, I've written you several letters in regards of providing me a hearing to replace Fred J. Lesica. I do NOT want him as my appointed Defense Counsel. I do NOT and CANNOT Trust this guy to Represent me. He would not even let me see all my discovery. I've only got police Report and a manipulated autopsy Report. The video transcript of the surveillance footage is missing the time I called Barbara from across the street, at 5pm or So, in front of the house with the cameras. This portion is Important to establish the Correct time so that yo'll can see I could not have had time to commit a murder.

This attorney you appointed me after you, deliberately, improperly, and arbitrarily Removed good/effective counsel (INITIAL TRIAL Counsel) is a Joke.

Please give me a hearing to Replace this newly appointed ESTATE attorney youve put on a "Murder Case." He cannot be trusted and he is not fit to Represent my Case. He doesn't even want to be on my case! He says he cannot afford a defense expert to help and that you wont appoint one. I have a CONSTITUTIONAL RIGHT to a defense expert. I'm asking yo'll to STOP PLAYING WITH MY LIFE & FREEDOM for Yours and Medema's Political ambitions. I know you are both up for being promoted in yo'lls positions and I am betting that is why this shit is happening to me. It's sad that this is how ya'll operate. Condemn an INNOCENT man to face a trial

with absolutely no way of defending myself and present the goddamn TRUTH!

You are obviously a corrupt Judge and a absolute DISGRACE to the Judicial Office and the Integrity of the Criminal Justice System. Please excuse yourself from this case and have me put before a Judge that is going to be Honest, Fair, Impartial and Neutral because, CLEARLY, you are NOT!!!

Joshua Michael Salyers

Joshua M Salyers

25 W. Walton Ave
Muskegon, Mi 49442

GIVE ME A HEARING TO REPLACE DEFENSE COUNSEL, FRED J. LESICA.

2/14/17

Dear Mr. Timothy G. Hicks, the Corrupt Judge of Muskegon County,

Wow, I cannot BELIEVE you have the audacity to come into the courtroom, sit your pathetic ass down in your "judicial throne" and tell me that you've received my several letters, that I need to TRUST my lawyer, that he knows what he's doing as he's been doing this 20 plus years and is a good attorney. Oh, and that 95% of cases such as mine are handled via plea bargaining. How can you become my LEGAL ADVISOR instead of giving me a hearing to Replace this worthless piece of shit Defense Counsel. He's a walking death! Ask him yourself. He's told me that he may die sometime before this case gets to trial due to his medical situations. At this point I'm better if I just Represent my damn self. And for you to tell me to no longer to write you any further letters... Fuck You... I'll keep writing to make Record.

It's okay, though! Thank you for your participation in becoming my legal advisor.

## 230 P.3d 726

"The judge plays an essential role to ensure the impartial and objective administration of criminal Justice. When a judge becomes involved in becoming defendant's legal advisor, the judge is no longer a judicial officer or a neutral arbiter. Judicial participation transforms the judge from a neutral arbiter to an advocate for the advisement the judge has suggested to the defendant. When the judge does participate, he/she brings to bear full force of this judicial office. Because of the disparity in power between the defendant and the judge, judicial participation in legal advice undermines the fundamental fairness of

the proceedings."

Would you know it, dummy, that your participation in giving me legal advice, Removing initial trial counsel without my consent, knowledge, and Request, and failing to provide me with the Replacement of defense counsel hearing, you have literally Rendered ANY conviction. I may get after trial, if there is even a Conviction, Reversed and Remanded for a New Trial.

Because NO evidence has been collected or tested and because the autopsy has been manipulated/erroneously written and the fact that Barbara had been Cremated before I could get an Independent Medical Examination through PineRest or some other credible forensic Pathologist defense expert such as Dr. Badar Cassin, there is NO WAY a new trial could provide me a fair trial and ensure that Justice is served properly.

I did not murder my fiancé Barbara Ann Dailey. I am NOT a Murderous person and could NEVER be violent toward a woman or child.

So, I guess we'll see how it goes with the suppression hearing where I'm sure you will screw me, again, just as this pathetic attorney said you will.

People v Joshua Michael Salyers

Joshua M. Salyers                    8/26/87
Joshua M. Salyers                    16-004697-FC
25 W. Walton Ave
Muskegon, Mi 49442

Judge Hicks,

RECEIVED

JUN 15 2018

THREE RIVER

6/11/2018

This is Salyers case# 16-4697-FC. You have appointed me Melissa Krauskopf #68278. I have been locked away in prison since 11/3/2017 after being wrongfully convicted. I CAN prove my innocence and Malicious Prosecution. I don't know what it is that my appellate lawyer is doing but she has not file a damn thing I've asked her to file except ineffective Assistance of Counsel. She has already filed with Court of Appeals and my deadline for my supplement brief is 84 days starting May 29th 2018. Melissa Krauskopf still has not send me my transcripts. I am requesting that you Remove Melissa from my case and provide to me someone who will Come See me and work for me. If you insist on continuing to ignore my letters then so be it but what you allowed to happen in YOUR courtroom has seriously affected the fairness, integrity or public reputation of judicial proceedings. You have allowed an innocent man be convicted wrongfully and Maliciously. As I have said already, I CAN PROVE IT !!!

Under United States v Olano, Supreme Court explain plain error. Reversal is warranted when plain error resulted in the conviction of an actually innocent defendant.

By allowing the prosecutor to falsify the knife Barbara used, by allowing the prosecutor to show a photo of Barbara's cut neck and bruised face to the jury DURING jury selection, by allowing the prosecutor to use only two parts of my facebook post to wrongfully show there is premeditation when, in fact, he would know for certain that the post was about ME thinking about committing an act of self-infliction, by allowing the prosecutor to use surveillance footage that is incorrect to prove his bullshit theory, to allow the prosecutor to lie about the number of cuts by saying there were exactly 4 when the autopsy proves otherwise, by allowing the prosecutor to COERCE his witnesses, by you denying my motion to suppress when based on People v Jones, 416 Mich 354 Docket #66011 and Colorado v Spring (failure to notify of accusation) and Roger v Richmond, 365 U.S. 534, 540-541 the suppression must be granted. Michigan Supreme Court Justice Kavanagh, J opins, "A confession which is extracted by any sort of threat or violence or which is obtained by a direct or implied promise, however slight, or by exertion of any improper influence, is involuntary and may not be admitted in a prosecution of the crime for which the confession was made," by mechanistically applying the "hearsay" rule on evidence which would have proven the prosecutor is lying in regards to the posts premeditation theory you have allowed me to be Maliciously prosecuted and wrongfully convicted. Not to mention you Removed my initial counsel without my knowledge, request or consent (People v Johnson 215 Mish App 658 Docket #163267) and on Feb. 15 2017 you overstepped your position by giving me legal advice dooming me to keep counsel that was not doing anything for my case.

③

I can't a appeals Lawyer that is going to work for me, Judge. You have Sentenced an innocent man to Prison for the Remainder of his life for only trying to prevent someone he loves from committing suicide. For what purpose can you find to excuse yourself for that? The only one you may use is your ignorance of what was Really going on. I can prove what I've claimed. You say you are an honest judge and that you have intregity. Prove it. Re-open this case and allow me to _show_ you what the truth is. For starts, go back through the prosecutor's theory and try to make sense of it watching the surveillance footage the way he presented it. Then watch it when you subtract 21 minutes from all the Channels 1, 2. + 7. CH 4 is the only camera that's time is correct. Keep in mind that she calls me at 7:11 and I call her at 7:15:51. That is only the beginning of my case. I know it is hard for you to do to trust a "Criminal" but Judge I swear on all my family dead and alive that I did _not_ kill my girlfriend/fiance Barbara Ann Losey. I CAN PROVE IT. Fred J. Lesica is _Slime_ and did _Nothing_ to investigate my claims or case. He used _MY_ case because he didn't have case built and he NEVER gave me anything except supplement Reports and autopsy Report.

an honest and Fair Judge and allow me to prove all that I claim. Luckily for the prosecutor I don't give a damn about seeing him prosecuted for his criminal actions at this point but I have to continue fighting for my Rightful freedom and prove my innocence after sitting in Prison even longer I will be marrie

(A)

Malicious prosecution, which I can prove, and then I'll be filing civil suit in the millions. I only wish at this time for true justice to be done. You have that power to make that happen, Judge Hicks.

The prosecutor in St. Clair County, Illinois has taken a unique approach to promoting fairness. County State's Attorney Brendan Kelly calls the program the Actual Innocence Claim Policy and Protocol, and it's triggered when if a defendant, his/her counsel, or anyone else associated with the case brings forward compelling reasons to believe that the defendant is innocent. The defendant is then given the opportunity to take a polygraph and/or voice-stress test. The test inadmissible in court, but can filter out disingenuous defendants. Regardless of the test results the assistant state attorney(s) in charge of the case performs a review of all evidence from the beginning. "The ASA shall confirm that no other pre forensic testing can be conducted and that no other witnesses can be identified and interviewed. At the end of this review, if both the ASA and supervising ASA(s) either no longer believe there exists a moral certainty of the defendants guilt or believe no longer exists a reasonable likelihood of conviction, then the case shall dismissed without prejudice." Defendants lives are still disrupted during the investigation, some being held in jail and some on electronic monitoring.

I am asking you to acknowledge, now, that I'm requesting to be forward very compelling reasons to believe that I'm innocent. Allow t for me judge and I will not disappoint you nor will I file for civil su for Malicious prosecution. I'll simply accept that "mistakes" happen and acc the wrongful conviction compensation of $50,000 a year since I've been inca

I will also request that everything I lost due to this wron

and County of Muskegon has done to me. I am __not__ a killer and I have never taken a persons life.

Here is this as well... talk to our mutual friend, Jennifer Swanger. Ask her of her opinion as I've told her everything that had happened. Even she does not believe I'm guilty. There is much that was not Revealed at trial because Fred J. Lesica is a joke of a lawyer and Benjamin Lee Medema made your courtroom a stage for acting. Police Knew so it goes to say that Medema knew this was only an attempt to Prevent a suicide. Read the "Criminal Responsibility" Evaluation. Page 10, lines 28-30. "In his statements to police as well as during the current evaluation, MR. Salyers asserted that he did not purposely harm the alleged victim and was only trying to prevent her from harming herself further."

There is so much more I can provide you to see compelling Reason of my innocence as well as Malicious prosecution. I just need to know that you actually care about the truth and about true justice. I know why I was convicted and I promise you I will have no problems with exposing everyone involved with my conviction and injustice done to me if this does not get Fixed. I do __not__ belong here and I will __NOT__ be used for political gain.

So, Judge, let us understand one another. You claim to be a honest and moral and fair Judge. I am claiming my

innocence. You have the power and ability to give me a new trial. I have all I need to prove my innocence and Malicious Prosecution except the funds to pay for my expert witnesses. You don't want to be the Judge known for costing Muskegon County Millions of dollars since you like your seat as Judge and I know Medema doesn't want to also be the Reason of costing the County Millions for by the time I'm through destroying him in court he will not have a job as a criminal Prosecutor again. I don't want Millions, I just want my rightful freedom, enough money to start my life over and if it pleases the court I'd very much like to Reenlist in the Military to serve my country before it is too late. I'm 31 this year in August on the 26th. I can not Reenlist after I'm 34 or 35, I think.

I am not a murderer or a woman killer. As I said I've never taken a persons life. And Judge, our mutual friend can also tell you that I was physically incapable of being in A-Pod with Joshua Guerin in July. A-Pod is on the 2nd floor while M-Pod is on the 3rd floor. From June 28, 2017 until I left County to State facilities I was in M-Pod. I can prove that Regardless of what the jail system said. I have witnesses including jail staff (Deputies) Please let me know something about accepting my Actual innocence claim, if you accept than I will send to you all the compelling reasons, and please Relieve Melissa Krauskopf from my case and get me a lawyer that will file my appeals I've asked to be Raised.

Sincerely,          "Equal justice under law"

"Blödgarm"        Joshua Michael Salyers #422144     I NEED my Transcripts ASAP!!!

JOSHUA SALYERS
OAKS CORRECTIONAL FACILITY
1500 CABERFAE HWY
MANISTEE, MI 49660

RECEIVED

JUN 15 2018

JUDGE HICKS

JUNE 13, 2018

HONORABLE JUDGE Timothy G. Hicks      35198
990 TERRACE ST
MUSKEGON, MI 49442


RE: PEOPLE v JOSHUA SALYERS
    MUSKEGON COUNTY COURT CASE No. 16-4697.00-FC


   DEAR JUDGE Hicks      35198


   MY APPOINTED COURT ATTORNEY HAS NOT SEEM FIT TO
TIMELY PROVIDE ME WITH MY NUMEROUS REQUEST FOR MY
TRANSCRIPTS FOR THE FOLLOWING DATES:
9/6/16; 9/20/16; 11/29/16; 2/15/17; 5/31/17; 9/5/17; 9/19-22/17; AND
11/1/17. MY APPELLATE ATTORNEY REFUSED TO RAISE THE ISSUES
THAT I DESIRE TO RAISE, THEREFORE I WANT TO PREPARE
A STANDARD-4 BRIEF ON MY OWN BEHALF RAISING MY DESIRED
ADDICTIONAL ISSUES THAT I BELIEVE ARE DEAD BANG WINNERS.
HOWEVER AS STATED ABOVE, MY APPELLATE ATTORNEY HAS REFUSED
AND/OR IGNORED MY REQUEST FOR THE TRANSCRIPTS DATED ABOVE.


AS SUCH, THERE IS A LEGITAMATE DIFFERENCE OF OPINION THAT
HAS DEVELOPED BETWEEN ME AND MY APPOINTED APPELLATE ATTORNEY
THEREFORE, I RESPECTFULLY REQUEST A SADO SUBSTITUTE ATTORNEY
WHO WILL RESPECT MY WISHES, AND AN ORDER FROM THIS HONORABLE
COURT FORCING APPELLATE ATTORNEY Melissa Krauskopf      TO TURN

-1-

OVER MY TRANSCRIPTS AND MY COMPLETE FILE IN MRS. ~~Krauskopf~~ Krauskopf
POSSESSION THAT IS RELATE TO MY CRIMINAL CASE.
"I TRUST THAT YOU ARE AWARE THAT I AM PREVENTED FROM FILING
ANYTHING IN THE MICHIGAN COURT OF APPEALS OR THIS COURT WHILE
I HAVE COUNSEL APPOINTED IN THE ABOVE CAUSE OF ACTION.
THEREFORE, I PRAY THE COURT WILL GRANT MY REQUEST IN
A MANNER THAT GIVES ME A FAIR CHANCE TO PERFECT MY APPEAL
OF RIGHT.


DATED ON: JUNE 13, 2018                    VERY TRULY YOURS,
                                           X _____
                                           # 422144


                        DECLARATION


I, JOSHUA SALYERS, DECLARE UNDER PENALTY OF PERJURY THAT THE
FOREGOING IS TRUE AND CORRECT TO MY BEST KNOWLEDGE.

                                           X _____
                                           # 422144



        THANK YOU FOR YOUR ATTENTION TO THIS MAILING.


                                           SINCERELY
                                           X _____
                                           # 422144

# STATE OF MICHIGAN

## IN THE 14th CIRCUIT COURT

* * * * *

THE PEOPLE OF THE
STATE OF MICHIGAN,

                 Plaintiff,

v

JOSHUA SALYERS,

                 Defendant.

_____/

HON. TIMOTHY G. HICKS

File No. 16-004697-FC

Dale J. Hilson (P57726)
Muskegon County Prosecutor
990 Terrace Street, Fifth Floor
Muskegon, MI 49442
(231) 724-6435

Melissa Kraukopf (P68278)
Attorney for Defendant
State Appellate Defender Office
39520 Woodward Ave., Ste. 230
Bloomfield Hills, MI 48304
(248) 732-2850

_____/

## OPINION AND ORDER REGARDING DOCUMENTS RECEIVED FROM THE DEFENDANT

### INTRODUCTION

On September 22, 2017, Salyers was convicted by a jury of first degree premeditated murder, contrary to MCL 750.316(1)(a), for the killing of Barbara Dailey.

Salyers is currently appealing his conviction. State Appellate Defender Melissa Krauskopf has been appointed as Salyer's appellate counsel. The claim of appeal was entered on November 17, 2017. The transcript was filed with this court on February 6, 2018.

On June 15, the court received two hand-written but legible documents relating to Salyer's case. They appear to emanate from two different writers.  Neither was entered into the court record, and it appears neither was sent to his own counsel or the prosecutor's office.

The best thing this court can do right now is to memorialize this event and provide copies to both attorneys with this order.  The court will defer to appellate defense counsel about how to handle or manage these documents.

**IT IS SO ORDERED.**

Date: July _10_, 2018

Timothy G. Hicks, P35198
Circuit Judge

CERTIFICATE OF MAILING

I hereby certify that on the _12th_ day of July, 2018, I personally handed and/or mailed copies of this order to the parties above named at their respective addresses, by ordinary mail.

Autumn R. Ward, Circuit Court
Legal & Scheduling Secretary

2

July 10, 2018

I have written you 3 times now in regards to my court appointed Appellant Lawyer, Melissa Krauskopf. She filed appeals on May 29th, 2018 and has left it to me to file a supplement brief. I do not know what I am doing and I still have not recieved my copy of Transcripts or anything else regarding my case. I have asked for a New Trial motion to be filed by her before the 6 months was up and it was never filed.

Because I am without money, none of the lawyers You appoint me is working for me. The only lawyer that was doing anything for me was the one You Removed from my case without my knowledge, request or consent, violating my 6th Amendment. You and Your courtroom are a disgrace to the integrity of the justice system. I have seen all the cases brought against you. You constantly violate peoples rights Constitutional Rights and somehow get away with it. If not for you denying me a fair trial and if you had not removed my initial trial counsel, I'd have proven my innocence. You allowed everything for the goddamn prosecution and absolutely nothing for the truth.

Knowing what I know now, when I get a new trial, I do not need no damn lawyer because they don't work for the poor they work for political gain. None of my witnesses I asked to be called were even in contact with your choice of counsel for me. He didn't have a case ready for trial. He didn't investigate my case or claims, he instead took vacation and twiddled his thumbs complaining about the pain he's in from surgery. Then, at trial, does nothing to help me by objecting to NOTHING when the prosecutor, during jury selection, showed a photo of Barbara's cut neck and bruised face to the jury. When prosecutor lied constantly about the number of cuts. When the prosecutor improperly admitted a post that is, FACTUALLY, about me thinking about cutting my wrists 4 times, hell, you ruled the factual evidence to that post as "hearsay", Mechanistically, to defeat the ends of justice. My "Lawyer didn't object to the use of the incorrect footage until after the damage is done and failed to object when the prosecutor wanted to argue with me, putting words in my mouth. Then, at closing arguments, my lawyer tells the jury, "you don't kill yourself by cutting your neck, you kill yourself by slitting your wrists." That, by itself, is grounds to a new trial but you, being a clown and your courtroom a damn circus, don't give a fuck about justice, all you want is "successful" convictions.

A damn moron could tell you witnesses were coerced by Medema and that his theory is very speculative and physically impossible. Review the footage and his theory yourself WITH the correct CORRECT time.

Nothing was tested yet there's a knife he says tests positive for human blood? Where is the chef/Butcher knife she used that is covered in blood that was in the sink?

I'm tired of sitting here for a crime I did not commit. I only tried preventing a suicide. Even the coerced M.E. says it isn't possible to be self-inflicted but then changes her story. So even there it shows there is Reasonable Doubt.

I want a new appeals lawyer who will file what I've asked to be filed and I want my transcripts. It's been 2 months since my appeal (unfinished)

has been filed. I've a month left before I get shut down from raising all the claims. Still I am being denied fairness and still fundamental rights are being violated. I CAN PROVE Malicious Prosecution and my Innocence. You can order a New Trial but chose not to. You are a corrupt judge.

Respectfully

Joshua Salyers

#422144
1500 Cabozfac Hwy
Manistee, MI.
            49660

I've sent you a motion
for my new lawyer and
compell to get my transcripts

Joshua Michael Salyers
MDOC No. 422144
Oaks Correctional Facility
1500 Caberfae Hwy.
Manistee, M. 49660

D.C. Case No. 16-179863-FY
C.C. Case No. 16-4697-FC

Clerk of the Court
Hall of Justice, 6th floor
990 Terrace Street
Muskegon, Mi. 49442

RETURNED
OCT 2 2 2018
COURT OF APPEALS
THIRD DISTRICT

Dear Court Clerk,

I am writing you this day, 8-15-2018, because I'm unable to perfect my appeals without "all" of the court records pertaining to the above captioned case that have been filed with this Honorable Court since date of complaint until sentence date to include: Preliminary, Trial transcripts, pre-trial hearing transcripts, The explaination of removal of initial trial counsel, Witness (es) Statements, Sentencing transcripts, Register of Action, "All" evidence, Medical Reports and Statements, and any and all other pertinent "documents" pertaining to the above captioned case that is relevant to me perfecting my appeals in the Higher Courts.

"A defendant has the burden to establish entitlement to relief." Under M.C.R 6.508 (D)(3), Relief is not available if the defendant's motion:

Alleges ground for relief other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence, or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in a prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief. As used in this subrule, "actual prejudice" means that,

(I) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;

— Page One —

(II) in a conviction entered on a plea of guilty, guilty but mentally ill, or nolo contendre, the defect in the proceeding was such that it rendered the plea an involuntary one to a degree that it would be manifestly unjust to allow the conviction to stand,

(III) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should NOT be allowed to stand regardless of its effects on the outcome of the case,

(IV) in the case of a challenge to the sentence, the sentence is invalid.

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

This defendant respectfully asks the clerk of this Honorable Court to forward All documents in the above captioned case so that this Defendant may perfect his appeals to the Higher Courts, as this is a "capital murder case" and is appealible. I am very grateful for all of your time in meeting my Request herein and will be expecting a reply within a reasonable time as court Rules dictate. Pursuant to M.C.R. 2.119(3)(C)(B), a fee cannot be charged as this is a criminal case.

Joshua Michael Salyers #422144         Dated: 8/16/_____, 2018

CC: Clerk                              — Page Two —



# COUNTY OF MUSKEGON
## NANCY A. WATERS, COUNTY CLERK

| VITAL RECORDS | ELECTION/CAMPAIGN FINANCE | CIRCUIT COURT RECORDS |
|---|---|---|
| 990 TERRACE ST., 1st FLOOR | 990 TERRACE ST., 1st FLOOR | 990 TERRACE ST., 6th FLOOR |
| MUSKEGON, MI 49442 | MUSKEGON, MI 49442 | MUSKEGON, MI 49442 |
| (231) 724-6221 | (231) 724-6425 | (231) 724-6251 |
| FAX (231) 724-6262 | FAX (231) 724-6262 | FAX (231) 724-6695 |

*16-004697-FC*

August 20, 2018

Joshua Michael Salyers
Oaks Correctional Facility
1500 Caberfae Hwy
Manistee, MI  49660

*?*

Subject:  Documents

*8/16/18*

Dear Mr. Salyers:

I am in receipt of a letter dated August 20, 2018, which you requesting me to mail you all of your documents.  Unfortunately, the cost is $1 per page. I see that you have transcripts as well. Transcripts are 30-cents per page.

When you are ready to pay for the documents, I would be happy to mail them out to you.

If you need anything further, please contact your attorney

Sincerely,

*Tracey L. Vold*

Tracey L Vold
Circuit Court Records Coordinator
(231) 724-6453
voldtr@co.muskegon.mi.us

*I do not have 10/24/16, 11/29/16, 12/16/16, 2/15/17, 5/31/17, 8/3/17*

*I've also requested all other documents; Exhibits, all photos (scene + Autopsy), R.O.A., Medical Reports + Statements. Everything Pertaining to Case 16-004697-FC.*

An EEO / AA Employer
recycled paper

Judge Hicks,                                                                    7/15/18

I have written you in regards of giving me substitute counsel from the S.A.D.O. I have written Melissa Krauskopf countless times about withdrawing from my case. SHE IS NOT EFFECTIVE. I want her off my case. If we need a hearing about it then so be it but I want substitute counsel.

As of now I am going to start an "investigation letter campaign." I am tired of how Muskegon County is being corrupt and violating constitutional rights. I have a "Right to Appeal", I have a "Right to Effective Counsel." How can I have either if the system denies that? How can I do anything without ALL my Court Records? I wrote the County Clerk of the Court there and unless I pay for All Court Documents and All transcripts, ROA's, evidence, exhibits, etc I can't get them she says. Well that is incorrect. I have a Right to one copy of EVERYTHING pertaining to my case.

You have allowed an innocent man be convicted and now you and the County of Muskegon are trying to cover it up. You know you screwed up which is why you and the County has withheld the transcripts of when you Removed my initial trial counsel, when you overstepped your position on 2/15/2017 after I've written you several letters about Lesica and wanting counsel that is doing his job guaranteed by the U.S. Constitution, you tell me to "Trust your lawyer..... I wish to no longer recieve letters from you...... 95% of cases like yours are handled by Pleas...."

I've written the Medema guy as well and haven't heard nothing back from him either. So I'm now going to write to people that is going to look into Muskegon County with a microscope and fine tooth comb. I'm done playing these bullshit games with this broken system. You have convicted an innocent man and are now trying to waste time to Bar my Right to Appeal and cover up ya'lls mistakes.

# I WANT ALL MY PAPERWORK! EVERYTHING FILED AND NOT FILED REGARDING MY CASE.

Judge, just because I'm in prison, wrongfully, doesn't mean I can't get things done. I don't understand why Assholes like you and the prosecutors feel it is okay to abuse your powers. You have ruined my life and everyone involved is going to pay for your crimes by the time I done. You see, the Federal Government have the right to investigate and middle into the state courts affairs "1994 Federal Law prohibiting any "pattern or practice of conduct by law enforcement officers" that deprive a person of legal or constitutional rights. You, just like Medema, are a "law enforcement officer." So ya'll are not immune to federal oversight. I've been in touch with Prison Legal News and they have given me what I need to begin this that

I'm now being forced to do.

Get Melissa Krauskopf off my case, get me S.A.D.O substitute, and get my "Right to Appeal" re-instated. AND GET ME ALL OF THE COURT RECORDS FOR 16-4697-FC!!

People wonder why our system is Broken ... B/c all the state care about is convicting people regardless if they are innocent or not. Then they give you no chance of defending themselves in Appeals by giving them ineffective counsel while the system try to cover up their mistakes like you and that Medema asshole are doing.

B/c of your actions and Medema's, I will be leaving the prison and filing lawsuits and possibly criminal charges on everyone that I can for what has been done to me. I AM INNOCENT and whats more is I CAN PROVE IT.

Joshua Salyers #422144
1500 Caberfae Hwy
Manistee, Michigan 49660

14th CIRCUIT COURT
MUSKEGON COUNTY

RECEIVED

JUN. 2 4 2020

JUDGE HICKS

2016-004697-FC
CCR-COR
NOT PROPOSED

16-4697-FC

#1162

Judge Hicks,

It's Joshua Salyers, case #16-4697-FC. I had received the §6.500 Motion paperwork from you. I have finished it to the best of my knowledge and had requested to have the copies made so I can send it in to the Court, prosecutor, and have the copies for appointed counsel and myself, but ~~MDOC will not make copies for me.~~ Is it possible that you can appoint me counsel to this 6.500 issue so that I can send what I have to counsel and let counsel do what is needed to properly file the §6.500 motion with the Courts?

I am fighting against the Clock and there is literally nothing I can do now because I am Indigent and MDOC is refusing to make the copies I need. I cannot send the Court my only copy otherwise I have no evidence left of my innocence and proof of corruption by the investigative and prosecution team that worked my case.

Please let me know what can be done regarding this problem. Thank You.

Sincerely,

Josh Salyers

#422144
Alger Correctional Facility
N6141 Industrial Park Dr.
Munising, MI 49862



# STATE OF MICHIGAN

MICHAEL E. KOBZA HALL OF JUSTICE

14TH JUDICIAL CIRCUIT COURT

990 TERRACE STREET

MUSKEGON, MICHIGAN 49442-3357

HON. TIMOTHY G. HICKS
CHIEF JUDGE
CIRCUIT AND PROBATE COURTS

TELEPHONE (231) 724-6337
FAX (231) 724-4587

June 25, 2020

Joshua Salyers #422144
Alger Correctional Facility
N6141 Industrial Park Dr.
Munising, MI 49862

Re:  File No. 16-4697-FC

Dear Mr. Salyers:

I'm responding with a letter since you wrote a letter. We will have a better record if you file motions instead of letters.

This is the first time anyone has reported to me that the DOC is refusing to allow someone to copy items, and we receive a lot of documents from the DOC. It might be an administrative issue, and you'll note that I am sending a copy of this letter to the DOC.

I have reviewed the Court of Appeals opinion in this case, and decline your request for appointed counsel.

Sincerely,

HON. TIMOTHY G. HICKS

TGH:arw

cc: Alger Correctional Facility Administration

CCR-DTR
NOT PROPOSED

FILED 9/23/2020
14th CIRCUIT COURT
MUSKEGON COUNTY

RECEIVED

SEP 21 2020

JUDGE HICKS

9/14/2020

Judge Timothy G. Hicks

<u>Motion for Transcripts never Gotten</u>

People v. Joshua Michael Salyers    # 16-4697-FC    DOB 8/26/87

        Per Rule 6.433 Documents for Postconviction Proceedings; Indigent
Defendant.

        On Countless attempts to obtain all transcripts for my case to perfect
the appeals. Appellate Attorney, Melissa Kazushopf, and the Circuit Court
Records Coordinator, Tracey L. Vold, has refused to provide me with
the following transcripts: <u>10/14/16</u>, <u>11/29/16</u>, <u>12/16/16</u>, <u>2/15/17</u>, <u>5/31/17</u>,
and 8/3/17.   I've also asked for all other documentation documents:
Exhibits, all photos (scene and autopsy); Medical reports and statements/notes,
transcription of all the interrogation, 9-1-1 call as well as the full
disce transcription of the DVR surveillance footage from about 4:45 pm
until 7:59 pm, And the full contents of the facebook post used at trial.

        I am indigent and cannot be made to pay for what I have
<u>NoT</u>, yet, gotten in my original set.

        Refer to MCR 6.425 (G); <u>Burns v. Ohio</u>, 360 U.S. 252 (1959); <u>Griffin v.</u>
<u>Illinois</u>, 351 U.S. 12 (1956). <u>Strickler v. Greene</u>, 527 U.S. 263, 278 (1999)

                                        Joshua Salyers

        I swear the above said, under oath, is true!

        Please provide me with the Above mentioned documents to
                <Joshua Salyers #422144
                Alger Correctional Facility
                N6141 Industrial Park Dr
                Munising, Mi 49862