UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOSHUA SALYERS,

               Petitioner,                Case No. 1:21-cv-1047

v.                                    Honorable Paul L. Maloney

MICHAEL BURGESS,

               Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Joshua Salyers is incarcerated with the Michigan Department of Corrections at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. On September 22, 2017, following a four-day jury trial in the Muskegon County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316. On November 1, 2017, the trial court sentenced Petitioner to a statutory mandatory sentence of life imprisonment without parole.

On December 8, 2021, Petitioner filed his habeas corpus petition, raising five grounds for relief, as follows:

    I.      Trial court erred when it removed initial trial counsel off [Petitioner's] case without his request, consent, or knowledge, violating the constitutional right to counsel of the Sixth Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

    II.    [Petitioner] was denied constitutional rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four-day trial.

III.  [Petitioner] was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony/evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in cross-exam[ination] and closing arguments and destroying evidence.

IV.  Police and other investigative official misconducts.

V.  Ineffective assistance of appellate counsel.

(Pet., ECF No. 1, PageID.11, 25, 144, 270, 282.) Petitioner, however, raises numerous subclaims within each ground for relief. Respondent asserts that all of Petitioner's grounds for relief are meritless, and that many are procedurally defaulted and non-cognizable. (ECF No. 11.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## <u>Discussion</u>

### I.  **Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's conviction as follows:

> [Petitioner's] conviction arose from the death of his girlfriend Barbara Daley. On September 4, 2016, [Petitioner] made the 9-1-1 call reporting that his girlfriend was cut and bleeding. First responders arrived to find Barbara lying on the floor in a pool of her own blood, beaten, and with multiple cuts across her neck. Barbara was found alive and died some hours later at the hospital. Medical examiner Dr. Amanda Fisher-Hubbard concluded that the cause of Barbara's death was "cutting" and "[m]ultiple injuries including blunt and sharp force." She also opined that "[t]he lack of hesitation marks, the wound that she had on her finger as well as the additional blunt force injuries that she had" made it highly unlikely that Barbara caused her own death. [Petitioner] initially claimed that he had seen an unknown black male run out the backdoor of the home and blamed him for Barbara's assault. He later abandoned that story. [Petitioner] also gave multiple versions as to how the cuts on Barbara's neck occurred. He eventually settled on an account where Barbara had planned to take her own life and she and the [Petitioner] wrestled with a knife resulting in further cutting, injury, and death. At trial, the jury heard that Barbara had planned to leave the [Petitioner] and had not communicated suicidal ideations to anyone. Her neighbor, Doug Carlson, testified that he approached Officer Casey Bringedahl at the scene and showed him a Facebook post transmitted six hours prior to the officer's arrival from an account with the name "Josh Salyers"

> that read, "one cut, two cuts, three cuts, four. What I have in my mind will ease this pain for real," and with a sub post of "you know how I feel about her Doug Carlson." [Petitioner] requested that the jury be instructed on involuntary manslaughter based on his testimony that Barbara's neck was cut as they struggled for the knife. The court denied the instruction. The jury subsequently found [Petitioner] guilty of first-degree premeditated murder.

*People v. Salyers*, No. 341162, 2019 WL 3000916, at *1 (Mich. Ct. App. Jul. 9, 2019). "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

Jury selection began on September 19, 2017. (Trial Tr. I, ECF No. 12-6.) Over the course of four days, the jury heard testimony from numerous witnesses, including a friend of the victim, two neighbors (including Carlson), several law enforcement officers, an individual who was incarcerated at the Muskegon County Jail with Petitioner, a forensic pathologist, and Petitioner himself. (Trial Tr. I, II, III, and IV, ECF Nos. 12-6, 12-7, 12-8, and 12-9.) On September 22, 2017, after about two hours of deliberation, the jury reached a guilty verdict. (Trial Tr. V, ECF No. 12-10, PageID.2471–2472.) Petitioner appeared before the trial court for sentencing on November 1, 2017. (ECF No. 12-11.)

Petitioner, with the assistance of counsel, directly appealed his convictions and sentences to the Michigan Court of Appeals. In his counseled brief, Petitioner raised the following claims:

I.     The defendant-appellant was denied his right to a fair trial when he was handcuffed in the courtroom in full view of the entire jury and the trial court denied his motion for a mistrial.

II.    Trial counsel was ineffective for failing to object to the admission of a Facebook post purportedly authored by the defendant-appellant where the post was not properly authenticated.

III.   The trial court erred when it denied the defendant-appellant's request that the jury be instructed on the lesser included offense of involuntary manslaughter.

(ECF No. 12-15, PageID.2842.) Petitioner also filed a Standard 4 brief, raising the following claims:

I.     Defendant-Appellant was denied constitutional rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four day trial.

II.    Defendant-Appellant was denied due process when [the] trial court erred by allowing inculpatory hearsay evidence and the exclusion of exculpatory hearsay evidence by using an uneven application of the hearsay rule.

III.   [The] trial court erred when it removed initial trial counsel off Defendant-Appellant's case without his request, consent[,] or knowledge, violating the constitutional right to counsel of the 6th Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

IV.    Defendant-Appellant was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony, evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in cross-exam[ination] and closing arguments, and destroying evidence.

(*Id.*, PageID.2868–2898.) The court of appeals affirmed Petitioner's conviction and sentence on July 9, 2019. *Salyers*, 2019 WL 3000916, at *1. On March 3, 2020, the Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Salyers*, 939 N.W.2d 265 (Mich. 2020).

On February 19, 2021, Petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, raising the following five claims for relief: (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; (3) denial of his right to counsel because the trial court did not hold hearings to remove his trial and appellate attorneys; (4) investigatory misconduct; and (5) ineffective assistance of appellate counsel. (ECF Nos. 12-12 and 12-13.) Petitioner's claims included many subclaims. By order entered on March 24, 2021, the trial court denied Petitioner's motion. (ECF No. 12-14.) Petitioner did not seek leave to appeal the trial

4

court's decision to the Michigan Court of Appeals. (Pet., ECF No. 1, PageID.284.) This § 2254 petition followed.

## II.     Procedural Default

Petitioner's habeas petition spans almost 300 mostly handwritten pages, and Petitioner attached more than 500 pages of exhibits to his petition. Moreover, while Petitioner has set forth five main grounds for relief in his habeas petition, he raises numerous subclaims within those grounds for relief. Petitioner's subclaims include an almost moment-by-moment review of the trial transcript and the constitutional wrongs he suffered throughout the trial. Petitioner has not clearly presented his claims, instead opting to present them in a scattershot, stream-of-consciousness way. However, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Undoubtedly, many of Petitioner's subclaims were never raised in the state courts, either in Petitioner's direct appeal or in his Rule 6.500 motion. Rather than attempt to sift through the hundreds of handwritten pages Petitioner has submitted, the Court will consider Petitioner's direct appeal briefs and Rule 6.500 motion to provide the outer boundaries of his grounds for relief. As noted above, however, Respondent contends that many of these grounds for relief are procedurally defaulted. (ECF No. 11, PageID.1705–1707.) The Court, therefore, considers that argument below.

### A.      Overview of Procedural Default

There are two types of procedural default. First, procedural default can occur pursuant to state law. When a state law default prevents further consideration of a federal issue by the state, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court enforced the rule so as to bar

5

the claim, and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). To determine whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291–92 (6th Cir. 2010).

Second, procedural default may occur if Petitioner failed to raise a federal issue in the state courts. Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–78 (1971). Failure to fairly present an issue to the state courts is a problem only if a state court remedy remains available for the petitioner to pursue. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available, the petitioner's failure to exhaust does not bar relief, but the claim may be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

If a petitioner procedurally defaulted his federal claim, the petitioner must demonstrate either (1) cause and prejudice—cause for his failure to comply with the state procedural rule (or fairly present the issue in the state courts) and actual prejudice flowing from the violation of federal law alleged in his claim—or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Hicks*, 377 F.3d at 551–52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*,

547 U.S. at 536–37. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### B.     Rule 6.500 Proceedings

As noted above, Petitioner filed a Rule 6.500 motion raising the following five overarching claims for relief: (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; (3) denial of his right to counsel because the trial court did not hold hearings to remove his trial and appellate attorneys; (4) investigatory misconduct; and (5) ineffective assistance of appellate counsel. (ECF Nos. 12-12 and 12-13.) Petitioner's claims included many subclaims. By order entered on March 24, 2021, the trial court denied Petitioner's motion. (ECF No. 12-14.) Petitioner did not seek leave to appeal the trial court's decision to the Michigan Court of Appeals, and his time for seeking such leave has long since expired. Accordingly, any claims for relief raised by Petitioner in his Rule 6.500 motion that were not also raised on direct appeal are procedurally defaulted. *See Gray*, 518 U.S. at 161–62. Moreover, Petitioner demonstrates neither cause and prejudice nor a fundamental miscarriage of justice to excuse his procedural default of such claims. Thus, any grounds for relief raised by Petitioner in his Rule 6.500 motion that were not raised on direct appeal are subject to dismissal on this basis alone.

### C.     Direct Appeal Proceedings

To determine which grounds for relief have been exhausted and not procedurally defaulted and, therefore, can be considered on the merits, the Court must first ascertain what claims for relief Petitioner raised during his appellate proceedings in the state courts.

In his counseled brief, Petitioner raised the following claims:

I.      The defendant-appellant was denied his right to a fair trial when he was handcuffed in the courtroom in full view of the entire jury and the trial court denied his motion for a mistrial.

II.    Trial counsel was ineffective for failing to object to the admission of a Facebook post purportedly authored by the defendant-appellant where the post was not properly authenticated.

III.   The trial court erred when it denied the defendant-appellant's request that the jury be instructed on the lesser included offense of involuntary manslaughter.

(ECF No. 12-15, PageID.2842.) Petitioner appears to have raised these claims for relief in his *pro per* application for leave to appeal to the Michigan Supreme Court as well. (ECF No. 12-16, PageID.2957–3005.) These grounds for relief are, therefore, exhausted.

Petitioner also filed a Standard 4 brief in the court of appeals, in which he raised the following claims:

IV.    Defendant-Appellant was denied constitutional rights under the 5th, 6th, and 14th Amendments due to ineffective assistance of counsel throughout the pre-trial process and throughout the four day trial.

V.     Defendant-Appellant was denied due process when [the] trial court erred by allowing inculpatory hearsay evidence and the exclusion of exculpatory hearsay evidence by using an uneven application of the hearsay rule.

VI.    [The] trial court erred when it removed initial trial counsel off Defendant-Appellant's case without his request, consent[,] or knowledge, violating the constitutional right to counsel of the 6th Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

VII.   Defendant-Appellant was deprived of due process under the 14th Amendment due to prosecutorial misconduct and the use of false testimony, evidence, incorrect video footage, misinterpretation of facts, misstating facts, misrepresenting facts, and improper commenting in cross-exam[ination] and closing arguments, and destroying evidence.

(*Id.*, PageID.2868–2898.) Petitioner raised numerous subclaims for relief in his first and fourth grounds for relief presented in his Standard 4 brief. Upon review of that brief, the Court has discerned the following subclaims:

IV.    Trial counsel was ineffective by:

A.     Failing to call 14 witnesses in Petitioner's defense;

8

> B.    Failing to move for the suppression of statements Petitioner made to Officers Smith and Anderson, and failing to move to have the police cruiser video admitted into evidence;
>
> C.    Failing to investigate forensic evidence;
>
> D.    Failing to challenge and investigate errors in the medical examiner's report; and
>
> E.    Failing to present an effective closing argument.
>
> VIII.   Prosecutorial and police misconduct occurred when:
>
> A.    The police deleted several screenshots from a printout of text messages sent and received by Petitioner's phone;
>
> B.    The police destroyed the butcher/chef knife that was on top of other knives in the sink;
>
> C.    The prosecution falsified evidence to suggest that Petitioner's Facebook posts referenced him murdering the victim rather than his intent to harm himself;
>
> D.    Officer Bringdahl essentially testified that he violated the Fourth Amendment when he testified to observing texts from the victim on Petitioner's phone;
>
> E.    The prosecution continuously misstated and presented testimony suggesting that the victim was cut only 4 times;
>
> F.    The prosecutor vouched for several witnesses during closing arguments;
>
> G.    The prosecution presented false testimony; and
>
> H.    The prosecution showed a photograph of the victim's bruised face and cut neck during jury selection.

Again, it appears that Petitioner raised these claims for relief in his *pro per* application for leave to appeal to the Michigan Supreme Court as well. (ECF No. 12-16, PageID.2957–3005.)

Nevertheless, the fact that Petitioner exhausted the claims for relief set forth above by raising them before both the Michigan Court of Appeals and the Michigan Supreme Court does not automatically lead to a conclusion that all of his grounds for relief are not procedurally

9

defaulted. As noted *supra*, when a state law default prevents further consideration of a federal

issue by the state, the federal courts ordinarily are precluded from considering that issue on habeas

corpus review. *See Ylst*, 501 U.S. at 801. A review of the court of appeals' opinion reveals that

some of Petitioner's grounds for relief are procedurally defaulted, as discussed below.

The court of appeals summarily dismissed Petitioner's claim regarding substitution of

counsel, stating:

> [Petitioner] argues that he was denied his Sixth Amendment right to counsel when
> the trial court substituted his trial counsel without his approval or notice. The record
> contains evidence that [Petitioner] had multiple persons appear on his behalf from
> the Public Defender Office during these proceedings. There is no record of
> [Petitioner] objecting to substitution of his counsel until this appeal. We find such
> silence to waive any argument on appeal. *Carter*, 462 Mich. [at] 214–219.

*Salyers*, 2019 WL 3000916, at *7. Likewise, the court of appeals summarily dismissed Petitioner's

numerous claims of prosecutorial and police misconduct, stating:

> [Petitioner] also claims that multiple incidents of prosecutorial misconduct denied
> him a fair trial. [Petitioner] made no contemporaneous objections to the
> prosecutor's statements, thereby failing to preserve them for appeal. *People v.
> Thomas*, 260 Mich. App. 450, 453–454; 678 N.W.2d 631 (2004). Having reviewed
> [Petitioner's] claims, [Petitioner] failed to show that he was prejudiced by plain
> error. Therefore, reversal is not warranted on this basis. *Unger*, 278 Mich. App. at
> 235.

*Salyers*, 2019 WL 3000916, at *7.

The court of appeals, therefore, relied upon state procedural bars to deny Petitioner's claims

regarding the substitution of counsel and prosecutorial misconduct. Although the court of appeals

reviewed Petitioner's claims of prosecutorial misconduct for plain error, plain error review "does

not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557

(6th Cir. 2000). Moreover, these state procedural rules are adequate and independent because they

were "firmly established and regularly followed" at the time of the asserted procedural default. *See

Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423–

24 (1991)). In 2011, the Michigan Supreme Court reiterated its position that "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v. Kowalski*, 803 N.W.2d 200, 211 (Mich. 2011) (quoting *People v. Carter*, 612 N.W.2d 144, 149 (Mich. 2000)). Thus, this rule was well established at the time of Petitioner's trial.

As noted above, if a petitioner procedurally defaults a federal claim, he must demonstrate either (1) cause and prejudice or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536. Attorney error rising to the level of ineffective assistance of counsel may establish cause for purposes of cause and prejudice. *See Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004).

Here, Petitioner's habeas petition could be construed as offering as "cause" his second and fifth grounds for federal habeas relief—ineffective assistance of trial and appellate counsel. While Petitioner has exhausted his ineffective assistance of trial counsel claims, he raised his ineffective assistance of appellate counsel claim for the first time in his *pro per* application for leave to appeal to the Michigan Supreme Court. (ECF No. 12-16, PageID.3002.) Petitioner also raised this claim in his Rule 6.500 motion, which was rejected by the trial court. (ECF No. 12-14.) Petitioner, however, never sought leave to appeal the trial court's denial of his Rule 6.500 motion. Thus, Petitioner's ineffective assistance of appellate counsel claim was never exhausted in the state courts. Although ineffective assistance of appellate counsel may serve as cause to excuse a procedural default, such a claim itself must have been exhausted in the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Because of this, Petitioner's claim of ineffective assistance of appellate counsel cannot serve as cause to excuse his procedural default of his substitution of

11

counsel and prosecutorial and police misconduct claims. Petitioner also fails to demonstrate cause and prejudice or an actual miscarriage of justice to overcome the procedural default of his ineffective assistance of appellate counsel claim. The Court, therefore, will dismiss habeas ground V as procedurally defaulted.

Petitioner, however, also suggests that "cause" exists because of ineffective assistance of trial counsel. The showing necessary to establish ineffective assistance of counsel as "cause" is the same showing necessary to establish an independent claim of ineffective assistance of counsel: the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Thus, determining whether counsel rendered ineffective assistance because he or she failed to raise a claim necessarily involves some inquiry into the merits of the claim that counsel failed to raise.

The Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix* and *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997)). Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.

*See Hudson*, 351 F.3d at 215–16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) ("[T]he procedural default raises more questions than the case on the merits. We will therefore assume without deciding that there was no procedural default by petitioner and decide the merits of the case."); *Watkins v. Lafler*, 517 F. App'x 488, 498 (6th Cir. 2013) ("[T]he district court specifically noted that it chose not to address these [procedural default] arguments and rather assumed that no procedural default existed because "the procedural default issue raises more questions than the case on the merits.'. . . Given the variety and complexity of the defaults involved . . . we do likewise."). Here, it is simpler to resolve Petitioner's substitution of counsel and prosecutorial and police misconduct claims on the merits, especially in light of Petitioner's suggestions throughout his petition that trial counsel was ineffective for failing to raise these challenges. The Court, therefore, will forego the procedural default analysis with respect to these claims.

In light of the foregoing discussion, it is apparent that several of Petitioner's underlying federal habeas claims are not properly before the Court because they are either unexhausted or procedurally defaulted. The Court, therefore, deems the following grounds for relief, as raised in Petitioner's federal habeas petition, to be the grounds that are fully exhausted and not procedurally defaulted and, therefore, can be considered on the merits:

I.  Trial court erred when it removed initial trial counsel off [Petitioner's] case without his request, consent, or knowledge, violating the constitutional right to counsel of the Sixth Amendment and infecting the entire trial mechanism because the violation occurred before trial began.

II.  The trial court erred when it denied Petitioner's request that the jury be instructed on the lesser-included offense of involuntary manslaughter.

III.  Petitioner was denied his right to a fair trial when he was handcuffed in the courtroom in full view of the entire jury and the trial court denied his motion for a mistrial.

IV.  Prosecutorial and police misconduct occurred when:

A.   The police deleted several screenshots from a printout of text messages sent and received by Petitioner's phone;

B.   The police destroyed the butcher/chef knife that was on top of other knives in the sink;

C.   The prosecution falsified evidence to suggest that Petitioner's Facebook posts referenced him murdering the victim rather than his intent to harm himself;

D.   Officer Bringdahl essentially testified that he violated the Fourth Amendment when he testified to observing texts from the victim on Petitioner's phone;

E.   The prosecution continuously misstated testimony regarding the number of cuts the victim suffered during closing arguments;

F.   The prosecutor vouched for several witnesses during closing arguments;

G.   The prosecution presented false testimony; and

H.   The prosecution showed a photograph of the victim's bruised face and cut neck during jury selection.

V.   Ineffective assistance of counsel occurred when trial counsel:

A.   Failed to object to the admission of a Facebook post purportedly authored by Petitioner where the post was not properly authenticated;

B.   Failed to move for the suppression of statements Petitioner made to law enforcement, and failed to move to have the police cruiser video admitted into evidence;

C.   Failed to investigate forensic evidence;

D.   Failed to call numerous witnesses in support of Petitioner's defense;

E.   Failed to investigate and challenge errors in the medical examiner's report; and

F.   Failed to present an effective closing argument.

### III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.    Discussion

### A.    Substitution of Counsel

Petitioner first faults the trial court for violating his Sixth Amendment right to counsel and "infecting the entire trial mechanism" by removing initial trial counsel from Petitioner's case without Petitioner's request, consent, or knowledge. According to Petitioner, at a status hearing held on December 16, 2016, he was taken to a room to meet with attorney Fred Lesica before a hearing. (Pet., ECF No. 1, PageID.11.) Petitioner had been expecting to be meeting with attorney Chad Catalino. (*Id.*) Lesica told Petitioner that Catalino had been removed as counsel and that the trial court had "forced" Lesica to take Petitioner's case. (*Id.*)

Petitioner returned to court for a status hearing on February 15, 2017. (*Id.*, PageID.12.) He contends that at that time, the trial court should have held a hearing to remove Lesica, who

Petitioner refers to as "the unwanted and ineffective counsel." (Pet., ECF No. 1, PageID.12.) Petitioner contends that as the trial judge entered the courtroom, he told Petitioner that he "need[ed] to trust [his] lawyer." (*Id.*) Petitioner states that a hearing to replace counsel should have been held because of his many letters regarding Lesica. (*Id.*)

As noted above, Petitioner raised this claim in his Standard 4 brief on direct appeal, and the court of appeals summarily rejected it, stating:

> [Petitioner] argues that he was denied his Sixth Amendment right to counsel when the trial court substituted his trial counsel without his approval or action. The record contains evidence that [Petitioner] had multiple persons appear on his behalf from the Public Defender Office during these proceedings. There is no record of [Petitioner] objecting to substitution of his counsel until this appeal. We find such silence to waive any argument on appeal. *Carter*, 462 Mich. [at] 214–219.

*Salyers*, 2019 WL 3000916, at *7.

Although the court of appeals did not address the merits of Petitioner's claim, ultimately, on habeas review, whether or not there was a complete breakdown in the attorney-client relationship is immaterial because clearly established federal law does not tie substitution of counsel to such a breakdown. Indeed, many of the factors that courts look to when evaluating whether or not to substitute counsel are derived from the opinions of lower federal courts[1] or even the United States Supreme Court interpreting the Federal Rules of Criminal Procedure[2] or federal statutes.[3]

---

[1] For example, the Sixth Circuit holds an indigent defendant "must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution" of counsel. *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985); *accord Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011).

[2] For example, cases interpreting Federal Rule of Criminal Procedure 44 regarding the court's obligation to inquire into potential conflicts that might exist when there is joint representation. *See, e.g.*, *Wheat v. United States*, 486 U.S. 153, 161 (1988); *Mickens v. Taylor*, 535 U.S. 162 (2002).

[3] For example, in *Martel v. Clair*, 565 U.S. 648 (2012), the Supreme Court considered the appropriate standard for permitting the substitution of counsel appointed for capital defendants and habeas petitioners pursuant to 18 U.S.C. § 3599. The Court settled on the "interests of justice"

United States Supreme Court authority regarding the ***federal constitutional*** requirement to provide substitute appointed counsel is scant. The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. One element of that right is the right to have counsel of one's choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). However, the right to counsel of choice is not without limits. *Id.* "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). "[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale*, 491 U.S. at 624.

As the Sixth Circuit explained in *Peterson v. Smith*, 510 F. App'x 356 (6th Cir. 2013):

> The Sixth Amendment right to counsel does not guarantee "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Although Peterson relies on a Ninth Circuit decision finding that being forced to proceed with appointed counsel despite the complete breakdown of the attorney-client relationship violated the right to counsel, the en banc court vacated that decision precisely because the state court decision denying new counsel was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See Plumlee v. Masto*, 512 F.3d 1204 (9th Cir. 2008) (en banc), *rev'g Plumlee v. Sue del Papa*, 426 F.3d 1095 (9th Cir. 2005).

> Peterson further argues that the trial court failed to make the inquiry this court would require of a district court considering a defendant's request for substitute counsel. *See United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir.2007). Not only does it appear that the trial court made sufficient inquiry, the failure to do so

_____

standard employed for substitution requests in non-capital cases under 18 U.S.C. § 3006A. The Court described the context-specific inquiry attendant to that standard by reference to the factors that courts might consider: "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Martel*, 565 U.S. at 663. The Sixth Circuit Court of Appeals concluded that *Martel* "centered on the federal statutory standard for reviewing substitution motions, and not the Sixth Amendment." *Wallace v. Chapman*, No. 19-1374, 2019 WL 4943757, at *3 n.1 (6th Cir. Sept. 23, 2019).

could not be the basis for relief under AEDPA because such inquiry is not required by clearly established Supreme Court precedent. *See Brooks v. Lafler*, 454 F. App'x 449, 452 (6th Cir. 2012) (per curiam) (finding requirement that court inquire into good cause was not clearly established Federal law); *James v. Brigano*, 470 F.3d 636, 643 (6th Cir.2006) (reversing a grant of relief because the inquiry requirement was not clearly established Federal law). Of course, that would not preclude petitioner from seeking relief on the grounds that the refusal to appoint new counsel resulted in a denial of effective assistance of counsel at trial. *Brooks*, 454 F. App'x at 452 (relying on *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts")).

*Peterson*, 510 F. App'x at 366–67; *see also Wallace*, 2019 WL 4943757, at *3 n.1 (stating that the petitioner "could prevail on his substitution-of-counsel claim only by showing 'that the refusal to appoint new counsel resulted in a denial of effective assistance of counsel at trial'" (quoting *Peterson*, 510 F. App'x at 366–67)).

Here, Petitioner focuses his claim on the fact that Lesica was appointed to represent him without the trial court obtaining Petitioner's consent for Lesica's appointment. The record is silent as for the reasoning behind the trial court's removal of Catalino and appointment of Lesica. Nevertheless, because Petitioner was an indigent defendant, he simply had no right to his counsel of choice. *See Gonzalez-Lopez*, 548 U.S. at 148, 151. Accordingly, to the extent Petitioner seeks habeas relief on the basis that he did not consent to Lesica being appointed to represent him, such an argument simply lacks merit.

Petitioner also faults the court for not holding a hearing on February 15, 2017, to remove Lesica as counsel. Petitioner states:

> As Judge[] Timothy J. Hicks[] entered the courtroom and took a seat, he told me that he has received my several letters, that I need to trust my lawyer, as he's been doing this for 20 plus years and knows what he's doing. He further tells me that he no longer wishes to receive anymore letters from me and that 95% of cases such as mine are handled via plea bargaining. Then, court began regarding a motion I had no idea was filed for a forensic evaluation.

(Pet., ECF No. 1, PageID.12.)

A review of the transcript from the February 15, 2017, hearing, however, indicates that Petitioner has greatly misconstrued the record. During the hearing, Petitioner indicated that Lesica had discussed the motion for a forensic evaluation with him. (ECF No. 12-3, PageID.1834–1835.) Petitioner indicated that he understood that he would likely stay in jail and that the motion for an evaluation "pretty much put[] [his] case in park for a while" because the case could not proceed until the evaluation was completed. (*Id.*, PageID.1836.) After Petitioner indicated his understanding, the trial court stated:

> All right. It's important to me that you understand it. I don't want you to write me letters later saying what am I doing here; what happened, because I think this is— Mr. Lesica's got a lot of gray hair so he knows how to do this. And I think it's his best advice to you to do this, but it is going to slow your case down a bit. You understand that?

(*Id.*, PageID.1836.) The parties then indicated that there were no discussions about plea offers because Petitioner had not expressed interest in pleading guilty. (*Id.*, PageID.1836–1837.) The trial court then noted:

> Mr. Salyers we probably resolve 90 to 95 percent of our cases through some negotiated settlement at some point. For your case right now there is probably not much point talking about that because the prosecutor says they're pursuing the open—they're pursuing a first degree murder conviction of some sort and if that happens you'll be—I will be required to sentence you to prison for life without parole. You understand that?

(*Id.*, PageID.1837.) Petitioner indicated that he did. (*Id.*)

Nowhere does the transcript indicate that the trial court acknowledged receiving numerous letters from Petitioner and told Petitioner that he needed to trust Lesica. Also, the reference to not wanting to receive letters was referring to the trial court's notation that proceedings would be stalled while Petitioner's forensic evaluation was conducted. Notably, at no time during the hearing did Petitioner raise any concerns about Lesica's appointment and representation.

Although Petitioner does not focus on the adequacy of Lesica's representation in this habeas ground, he does assert that Lesica was ineffective in numerous ways. However, as thoroughly discussed *infra*, Petitioner has failed to demonstrate that Lesica rendered ineffective assistance in any way. Because of this, Petitioner fails to show that the rejection of his claim regarding the substitution of Lesica and the failure to hold a hearing to remove Lesica and appoint a new attorney was contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on this claim.

### B.    Jury Instruction

Petitioner contends that the trial court erred when it denied Petitioner's request that the jury be instructed on the lesser-included offense of involuntary manslaughter.

The Supreme Court repeatedly has rebuffed due process challenges to erroneous jury instructions. *Waddington v. Sarausad*, 555 U.S. 179, 192–94 (2009); *Henderson v. Kibbe*, 431 U.S. 145, 152 (1977); *Levingston v. Warden*, 891 F.3d 251, 255 (6th Cir. 2018). Typically, a claim that a trial court gave an improper jury instruction or failed to give a requested instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Henderson*, 431 U.S. at 155; *see also Estelle v. McGuire*, 502 U.S. at 62, 75 (1991) (concluding that erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Estelle*, 502 U.S. at 75.

22

Here, the Michigan Court of Appeals agreed with Petitioner that the involuntary manslaughter instruction should have been given, but that the trial court's failure to do so was harmless:

> [Petitioner] proposed the jury be instructed on involuntary manslaughter under a theory of gross negligence under M Crim JI 16.10. The court denied the request holding that no rational view of the evidence would support instructing the jury on involuntary manslaughter. We hold that the court's decision was an abuse of discretion. The instruction was rationally supported by [Petitioner's] testimony that he had not intended to kill Barbara, but due to his careless and reckless actions, she died. Medical examiner Dr. Fisher-Hubbard testified that Barbara's cause of death was "cutting" and "[m]ultiple injuries including blunt and sharp force." [Petitioner] testified that he and Barbara struggled over the knife and that his actions, while intended to interrupt and stop the suicide, actually caused further injury which led to her death. Medical examiner Dr. Fisher-Hubbard agreed with defense counsel that it was possible that the cuts across the trachea and the jugular vein could have been caused by two people pulling and shoving with a knife at the throat. [Petitioner] further testified that during the struggle, Barbara fell multiple times on her face. Dr. Fisher-Hubbard agreed that Barbara's facial contusions, injuries to her teeth, and cut on her knee could have been the result of multiple falls or from a combination of being struck by something plus falling.
>
> The trial court's failure to give the instruction[,] however[,] constituted harmless error in light of the evidence of [Petitioner's] overwhelming guilt. *Gillis*, 474 Mich. at 140 n. 18. Carlson testified that the night before her death, Barbara wanted to end her relationship with the defendant. Hours before her murder, [Petitioner] made a public post on social media that "one cut, two cuts, three cuts, four" would ease his pain. [Petitioner] testified he waited until everyone left and Barbara was alone to go to the house. Sanders' security cameras and DeYoung's testimony placed [Petitioner] in the house around the time of the murder and leading up to the arrival of first responders. When officers arrived [Petitioner] had Barbara's blood all over him. [Petitioner] initially blamed the murder on a "black male." After that identification failed, he changed his story to that of trying to prevent Barbara from committing suicide. The medical examiner testified that Barbara suffered four cuts to her throat, none of which was self-inflicted. She was also severely beaten. The jury heard [Petitioner's] version of events, and when given the choices on the jury form to find [Petitioner] guilty of first-degree or second-degree murder, it found [Petitioner] guilty of first-degree murder. Thus, even had the instruction been given, [Petitioner's] testimony would not have persuaded the jury to convict [Petitioner] of any charge lesser than first-degree murder.

*Salyers*, 2019 WL 3000916, at *6.

The Supreme Court has provided some guidance with regard to the constitutional implication of failing to give a "lesser included offense" instruction. In *Beck v. Alabama*, 447 U.S. 625 (1980), the Court explained

> While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake
>
> * * *
>
> In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason—that, whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.

*Id.* at 637, 642–43. The *Beck* Court expressly reserved the question of "whether the Due Process clause would require the giving of such instructions in a noncapital case." *Id.* at 638, n.14.[4]

Put differently, the Supreme Court has never held that failure to give a lesser included offense instruction in a noncapital case, such as Petitioner's, violates due process. For that reason,

---

[4] Although due process does not require giving a lesser-included offense instruction in noncapital cases, such instructions were required in noncapital cases under the English common law and they are still required under the common law or by statute in every state and in the federal courts, if and when the evidence supports it. *Beck*, 227 U.S. at 633–34, 636 nn.11,12.

the Sixth Circuit Court of Appeals consistently rejects the argument Petitioner raises. *See, e.g.,* *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014) (where the petitioner requested involuntary manslaughter instruction, the court held that "[b]ecause the Supreme Court has never held that due process requires lesser-included-offense instructions in a non-capital case, McMullan's claim rests on no such federal ground. Therefore, his claim fails."); *Dansby v. Trombley*, 369 F. App'x 657, 660 (6th Cir. 2010) (where the petitioner sought voluntary manslaughter and involuntary manslaughter instructions in addition to first-degree and second-degree murder instructions, the court determined that, in a noncapital case, the petitioner's challenge fell outside the purview of the AEDPA); *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc) ("[The failure to instruct on lesser included offenses in noncapital cases [is not] such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]"). And this Court must reject the argument as well. Because Petitioner has failed to identify clearly established federal law that requires lesser-included offense instructions in noncapital cases, he cannot show that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.

Moreover, even if a lesser-included offense was constitutionally required, the court of appeals concluded that failure to give the instruction in Petitioner's case was harmless. *See Salyers*, 2019 WL 3000916, at *6. Before Petitioner might obtain relief, he would have to show that the state court's determination of harmlessness satisfied the requirements for relief under the AEDPA—that "*every* fairminded jurist would agree that an error was prejudicial—and under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)—"whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown v. Davenport*, 596 U.S. 118, 135–136 (2022) (emphasis in original).

One of the state appellate court's reasons for the harmlessness conclusion was based on the instructions as given:

> The jury heard [Petitioner's] version of events, and when given the choices on the jury form to find [Petitioner] guilty of first-degree or second-degree murder, it found [Petitioner] guilty of first-degree murder. Thus, even had the instruction been given, [Petitioner's] testimony would not have persuaded the jury to convict [Petitioner] of any charge lesser than first-degree murder.

*Salyers*, 2019 WL 3000916, at *6. Thus, to prevail, Petitioner would have to show that every fairminded jurist would disagree with that reasoning. He cannot. The Sixth Circuit Court of Appeals has concluded that "jurists of reason could not debate" the Michigan Court of Appeals' reasoning. *Edwards v. MacLaren*, No. 17-2455, 2018 WL 6436389, at *2 (6th Cir. July 12, 2018); *see also Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005) (noting that "if the jury chose felony murder over second-degree murder, there is no basis to believe that it would have opted for the even lesser offense of voluntary manslaughter over felony murder"). Accordingly, Petitioner has also failed to demonstrate that the state court's determination of harmlessness is contrary to, or an unreasonable application of, clearly established federal law.

For all of these reasons, Petitioner is not entitled to habeas relief on his lesser-included offense jury instruction claim.

### C.    Shackling

Next, Petitioner contends that he was denied his right to a fair trial when he was handcuffed in the courtroom in full view of the entire jury and when the trial court denied his motion for a mistrial based upon that fact.

The shackling in question occurred when the trial court went into recess on the third day of Petitioner's trial. The record reflects that the court was in recess at 3:51 p.m., and that the jurors started leaving the courtroom at that time. (Trial Tr. IV, ECF No. 12-9, PageID.2405.) Two minutes later, the trial court stated the following on the record:

> THE COURT: Gentlemen, this is probably a good reminder for me to never take anything for granted. The audience attendance has been pretty good. I've not worried too much about a joint departure. What happened this time was this. The audience headed for the door about 10 seconds or maybe less ahead of the jurors. So I think Mr. Medina suggested my Court Officer Mr. Gereaux ought to go out to the hallway to direct traffic, which wasn't a bad idea. The problem then is that I think all 12 jurors were standing to my right in the courtroom when the deputies chained up Mr. Salyers, put the handcuffs on him and let him out the side door, which of course we try desperately never to have that. So I think there are a couple of lessons we need to learn and beyond that I'm not sure what else we do except to memorialize this. I'm not in my heart of hearts seeing a mistrial issue. The deputies have been here throughout. But it's something that should not have happened.

(*Id.*, PageID.2405–2406.) The parties agreed that the court had accurately set forth what happened. (*Id.*, PageID.2406.)

The following day, before the jury was brought in, the court asked the parties if anything "need[ed] to be discussed about our handcuff hiccup at the end of the day yesterday?" (Trial Tr. V, ECF No. 12-10, PageID.2410.) Petitioner's attorney moved for a mistrial, arguing that Petitioner's handcuffing in "plain view" of the jury "could inflame the jury or influence their decision against my client." (*Id.*) In response, the prosecutor stated that Petitioner "did, with the jury present, reach his hands out to the deputies and at that time and that time only did the deputies actually then take up their handcuffs and handcuff him." (*Id.*, PageID.2410–2411.) The prosecutor also noted Petitioner's testimony that he resided at the jail and testimony from other witnesses referencing jailhouse interactions with Petitioner. (*Id.*, PageID.2411.) The trial court denied the motion for a mistrial, noting that the incident was "unfortunate" but that there were no grounds for a mistrial after "evaluat[ing] the severity of the circumstance." (*Id.*, PageID.2411–2412.)

Petitioner raised his shackling claim on direct appeal, and the court of appeals rejected it, stating:

> "Freedom from shackling is an important component of a fair trial." *Dixon*, 217 Mich. App. at 404. Handcuffing a defendant during trial should only be done in extraordinary circumstances. *People v. Jankowski*, 130 Mich. App. 143, 146; 342 N.W.2d 911 (1983). A defendant "may be shackled only on a finding supported by

record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *People v. Dunn*, 446 Mich. 409, 425; 521 N.W.2d 255 (1994). "[T]he prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom." *People v. Horn*, 279 Mich. App. 31, 37; 755 N.W.2d 212 (2008).

It is undisputed that the court did not order that [Petitioner] be shackled. Further, [Petitioner] was not shackled in the courtroom except on this one occasion and at all other times was brought into the courtroom before the jury and exited after the jury. However, on the day in question, [Petitioner] was shackled while the jury was still present. The court immediately made a record of the incident and the court's factual statements were undisputed by either counsel or [Petitioner]. The court noted that on the day of the incident there was a large crowd present which began to leave the courtroom prior to the jury being excused. The court noted that the deputies were left to manage the jury, the crowd, and [Petitioner], and chose to control the crowd and remove [Petitioner] in handcuffs prior to escorting the jury from the courtroom. The court found that the shackling was a mistake made by the deputies and was viewed by the jury. Defense counsel made an objection to the shackling the next day and requested a mistrial. The court found that the shackling was done to maintain order and for public safety, and that it did not prejudice the defendant. It was not an abuse of discretion, in light of the uncontroverted facts, for the court to determine that the shackling was for the purposes of public safety and for transporting [Petitioner] out of the courtroom. Thus, this shackling was not prohibited under these circumstances. *Horn*, 279 Mich. App. at 37. We then turn to the issue of prejudice to [Petitioner]. *Id.* The burden is on the defendant to establish prejudice, *id.*, however, "[i]f it is determined that the jury saw the defendant's shackles" the prosecution must "demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant," *People v. Davenport*, 488 Mich. 1054; 794 N.W.2d 616 (2011). The court made a finding that [Petitioner] was shackled while the jury was still in the courtroom and inferred that this was seen by the jurors. That finding was not contested. Therefore, the prosecution bears the burden of proving beyond a reasonable doubt that the incident did not contribute to the verdict. Defense counsel argues that the court failed to appreciate the effect of a defendant who was accused of a violent crime being handcuffed. However, as the court noted, again without objection, [Petitioner] had almost flippantly testified that he resided in the jail at the time of trial and other witnesses also noted other jailhouse interactions. Thus, [Petitioner's] in-custody status was already known by the jury. The actual shackling of [Petitioner] whose custodial status was known was done with [Petitioner's] physical cooperation and without rancor. The court's finding of an absence of prejudice from the shackling was supported by the record and not the product of court error.

*Salyers*, 2019 WL 3000916, at *2.

It is well settled that placing a criminal defendant in physical restraints that are visible to

the jury during trial is forbidden unless doing so is "justified by an essential state interest—such

as the interest in courtroom security—specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005). As the Court noted, allowing the jury to see a defendant in restraints "undermines the presumption of innocence and the related fairness of the factfinding process. It suggests to the jury that the justice system itself sees a need to separate a defendant from the community at large." *Id.* at 630 (citations omitted).

The petitioner in *Deck* had been convicted of capital murder, and during the sentencing phase, he was shackled with leg irons, handcuffs, and a belly chain in plain view of the jury. *See id.* at 624–25. The *Deck* Court, however, was careful to repeat throughout the opinion the fact that its holding was limited to visible restraints. *See id.* at 630 (noting that "*[v]isible* shackling undermines the presumption of innocence") (emphasis added); *id.* at 632 (stating that "[d]ue process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case") (emphasis added); *id.* at 633 (indicating that "courts cannot routinely place defendants in shackles or other physical restraints *visible to the jury* during the penalty phase of a capital proceeding"); *id.* at 635 (noting that "[w]here a court, without adequate justification, orders the defendant to wear shackles *that will be seen by the jury,* the defendant need not demonstrate actual prejudice to make out a due process violation") (emphasis added).

The Sixth Circuit has noted that "[r]estraining a defendant in the courtroom, and restraining him during transport there, are two very different things." *Mendoza v. Berghuis*, 544 F.3d 650, 655 (6th Cir. 2008) (citing *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991). "[I]t is reasonable for law enforcement officers to transport custodial criminal defendants to and from courthouses across the country with restraints." *Id.* (emphasis in original omitted). Moreover, "jurors may well *expect* criminal defendants—at least ones charged with the kind of conduct at issue here [murder]—to be restrained during transport to the courtroom." *Id.* (emphasis in

29

original). "[F]ar less danger of prejudice arises in a situation where a juror's viewing of a defendant in custody 'is fleeting and outside the courtroom.'" *United States v. Robinson*, 645 F.2d 616, 618 (8th Cir. 1981) (quoting *United States v. Jackson*, 549 F.2d 517, 527 n.9 (8th Cir. 1977)).

In his § 2254 petition, Petitioner suggests that the court of appeals' "provided its opinion based on its own unevidenced facts." (Pet., ECF No. 1, PageID.15.) According to Petitioner, the shackling was not warranted because he "was already strapped to a device that would 'ruin [his] manhood' from '150,000 volts of electricity' if [he] did anything to cause a problem." (*Id.*) Petitioner also contends that the deputy insisted on cuffing him even after Petitioner "told him no that he can't cuff me in front of the jury." (*Id.*) Petitioner, however, fails to provide any evidence, much less clear and convincing evidence, to support these assertions and overcome the court of appeals' factual determinations.

This is not a case like *Deck* where Petitioner was shackled in full view of the jury while he testified or while he was sitting at defense counsel's table during trial proceedings. Instead, the trial court had gone into recess, and Petitioner was handcuffed to be transported out of the courtroom. Unfortunately, the handcuffing did occur in view of the jury, which the judge had just excused after the deputies managed the observers departing from the courtroom. Thus, Petitioner's shackling is more akin to situations where defendants have been shackled for "routine security measures rather than situations of unusual restraint such as shackling of defendants during trial." *Payne v. Smith*, 667 F.2d 541, 544–45 (6th Cir. 1981) (quoting *United States v. Diecidue*, 603 F.2d 535, 549 (5th Cir. 1979)). And, as the Sixth Circuit has noted, the Supreme Court has never clearly held that "a defendant's constitutional rights are violated when jurors see him shackled during transport to or from the courtroom." *Mendoza*, 544 F.3d at 655; *see also Vera v. Ryan*, 508 F. App'x 603, 604 (9th Cir. 2013) (rejecting habeas petitioner's claim that his due process rights were

violated "by a few jurors catching a fleeting view of him in handcuffs while he was being transported").

Petitioner also has not provided any argument to overcome the court of appeals' determination that Petitioner was not actually prejudiced by the incident. The court of appeals correctly noted that Petitioner himself referenced the jail as his current address. (Trial Tr. IV, ECF No. 12-9, PageID.2332–2333.) Likewise, other witnesses testified as to jailhouse interactions with Petitioner. Notably, Deputy Marci Neel testified that on September 5, 2016, she was working in the booking room at the Muskegon County Jail when she overheard an argument between Petitioner and another inmate, Eric Emery. (Trial Tr. III, ECF No. 12-8, PageID.2232–2234.) During the argument, Petitioner "said something to the effect of I'm here for murder, I'll slit your throat and watch you lay there." (*Id.*, PageID.2234.) Petitioner also said, "I killed her and now I have to live with it and it's tearing me up inside." (*Id.*) Joshua Guerin testified that during his time in the Muskegon County Jail, he had a conversation with Petitioner during which Petitioner admitted to killing Barbara. (*Id.*, PageID.2249–2256.) In light of that testimony, as well as the overwhelming evidence of Petitioner's guilt, Petitioner fails to demonstrate any actual prejudice from the jury's fleeting view of Petitioner being handcuffed for transport from the courtroom following the third day of trial. *See Moreno*, 933 F.2d at 368 (rejecting defendants' due process claim for failing to show actual prejudice because they were "inadvertently observed in shackles while being transported by the marshals and the jury learned of defendants' custodial status through trial testimony").

Because the Supreme Court has never held that a defendant's due process rights are violated when a court is in recess and the jury fleetingly glimpses the defendant being placed in restraints for transport from the courtroom, Petitioner cannot show that the court of appeals'

rejection of his shackling claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, for the reasons set forth above, Petitioner is not entitled to habeas relief with respect to this ground.

### D.     Prosecutorial and Police Misconduct

As noted above, Petitioner alleges that several instances of prosecutorial and police misconduct occurred during pretrial and trial proceedings. Specifically, he asserts: (1) the police deleted screenshots from a printout of text messages from Petitioner's phone; (2) the police destroyed a butcher/chef knife that was found on top of other knives in the sink; (3) the prosecution falsified evidence to suggest that Petitioner's Facebook posts referenced him murdering the victim rather than his intent to harm himself; (4) Officer Bringedahl testified to violating the Fourth Amendment when he testified to observing texts from the victim on Petitioner's phone; (5) the prosecution continuously misstated and presented testimony suggesting that the victim was cut only 4 times; (6) the prosecution vouched for several witnesses during closing arguments; (7) the prosecution presented false testimony; and (8) the prosecution showed a photograph of the victim's bruised face and cut neck during jury selection.

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11– 12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving

courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. 637, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    Deletion of Text Message Screenshots

Petitioner first contends that after law enforcement officers gained access to his phone, they began "deleting, manipulating, [and] tampering with the call, text, Facebook posts, and Facebook messenger logs." (Pet., ECF No. 1, PageID.273.) According to Petitioner, screenshots of these posts would have shown that Petitioner's Facebook post about cutting was not regarding a plan to commit murder, but "was rather about his thoughts of harming himself." (*Id.*) He claims further that these posts would have shown that he was planning on breaking up with the victim, not the other way around. (*Id.*) Petitioner has attached a printout of various texts and messages to his petition. (ECF No. 1-1, PageID.375–395.) He has annotated that printout to point out where he believes the police tampered with call and text logs to delete certain information.

Petitioner contends that by tampering with the call and text logs, the prosecution and police essentially destroyed exculpatory evidence, violating Petitioner's due process rights. The Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Prejudice and materiality are established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682.

The Supreme Court later clarified that due process requires that police and prosecutors preserve clearly exculpatory evidence in their possession that might not be available to a defendant through other means. *California v. Trombetta*, 467 U.S. 479, 489 (1984). If such evidence is destroyed, a due process violation occurs irrespective of the good or bad faith of the police. To prevail on such a claim, a defendant must show that the police destroyed evidence with "an exculpatory value that was apparent before it was destroyed." *Id.*

Conversely, when police fail to preserve "potentially useful" evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith to establish a due process

violation. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In such a scenario, a defendant must show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

"A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence." *Malcum v. Burt*, 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003). Bad faith cannot be established solely by the mere fact that police had control over the evidence and failed to preserve it, nor will bad faith be established in a situation involving a negligence, or even grossly negligent, failure to preserve such evidence. *Id.*; *see also United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56.

Petitioner's claim, however, is purely speculative. He gives no information about what the allegedly deleted messages and texts said, thereby failing to demonstrate that the information in question was definitively exculpatory. Accordingly, the most that can be said is that these messages were "potentially exculpatory"; consequently, *Youngblood* governs Petitioner's claim. Petitioner, however, fails to present any evidence to suggest that the prosecution and law enforcement officers acted in bad faith. Moreover, Petitioner fails to show that the messages in question were material, as Petitioner himself testified regarding the nature of his relationship with the victim and regarding what he was conveying when he made the Facebook post about cutting. Moreover, Petitioner has not shown that he would have been unable to obtain the missing messages

by other reasonably available means, as presumably the defense would have been able to obtain such information from Petitioner's cell phone provider.

Petitioner's conclusory allegations that the police and prosecution acted in bad faith are insufficient to justify federal habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (noting that conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335–36 (6th Cir. 2012) (citing *Workman* and affirming the denial of habeas relief for conclusory claims). Petitioner, therefore, is not entitled to relief with respect to this assertion of prosecutorial and police misconduct.

### 2.     Destruction of Knife

Next, Petitioner suggests that the prosecution and investigating officers committed misconduct by destroying a knife that had been in the sink at the time of the incident. According to Petitioner, there had been a "bloody butcher knife" on top of the knife that was collected by officers at the scene of the crime. (Pet., ECF No. 1, PageID.168, 271–72.) Petitioner appears to suggest that the prosecution and investigating officials destroyed the knife that was used and then testified regarding another knife that, according to Petitioner, could not have made the cuts at issue. (*Id.*, PageID.172.) Petitioner states that he had placed a bloody butcher knife on top of other knives, which is why the other ones tested positive for human blood. (*Id.*) Petitioner claims that the State "fabricated or manufactured this knife as evidence and presented [it] only in photographic form." (*Id.*)

Petitioner's claim is that the prosecution essentially destroyed exculpatory evidence, violating Petitioner's due process rights. However, like Petitioner's claim regarding the Facebook and text messages, Petitioner's allegations regarding the knife are purely speculative. As an initial matter, he fails to present any evidence to even suggest that the police collected the knife in question that he believes was destroyed. The most that can be said is that the knife was "potentially

exculpatory." Consequently, *Youngblood* governs Petitioner's claim. Petitioner, however, fails to present any evidence from which the Court could conclude that the prosecution and investigating officers acted in bad faith. Moreover, Petitioner fails to demonstrate that the alleged destruction of the knife was materially prejudicial to his defense, as both parties essentially agreed that the victim suffered cuts to her neck from a knife. Petitioner's theory of defense, however, was that the victim suffered the cuts when he was trying to wrestle the knife away from her to prevent her from committing suicide.

Simply put, Petitioner's conclusory allegations that the prosecution and officers acted in bad faith regarding the knife are also insufficient to justify federal habeas relief. *See Workman*, 178 F.3d at 771; *see also Wogenstahl*, 668 F.3d at 335–36. Petitioner, therefore, is not entitled to habeas relief with respect to this assertion of prosecutorial and police misconduct.

### 3.    Officer Bringedahl and Alleged Fourth Amendment Violation

Third, Petitioner faults the prosecutor for allowing Officer Bringedahl to testify regarding an alleged Fourth Amendment violation he committed. (Pet., ECF No. 1, PageID.174, 275–76.) According to Petitioner, Officer Bringedahl testified that the victim had a phone that was in her right hand when he arrived on scene. (*Id.*) The phone "was lit up and so he looked at the screen." (*Id.* at 174.) Officer Bringedahl testified that the screen showed "an outgoing call to 'my husband' at 7:11 p.m." (*Id.*) Petitioner argues that this is a "search [and] seizure violation and the prosecutor was made aware of this and still allowed it into evidence." (*Id.*)

Petitioner contends that Officer Bringedahl committed a search and seizure violation because he would have had to "first press 2 separate buttons on the phone to unlock it." (*Id.*) He then would have to "go to the call log and view details." (*Id.*) Petitioner avers that the victim's phone was "one of those old, cheap, 'government' phones given to state assisted people" and that the "light does NOT stay on and automatically locks within 5 minutes." (*Id.*)

Petitioner cannot demonstrate that the prosecutor's presentation of this testimony from Officer Bringedahl "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The phone in question was the victim's, not Petitioner's, and Petitioner simply does not have standing to assert any Fourth Amendment violation with respect to the phone. Standing is recognized as the "substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of the *third person's* premises or property has not had any of his Fourth Amendment rights infringed." *Id.* (emphasis added).

Here, Petitioner has not demonstrated that he himself had any legitimate expectation of privacy in the victim's phone. Likewise, given that the phone was found in the deceased victim's hand, Petitioner simply cannot claim that the phone "would remain free from governmental intrusion" and would not be collected as evidence. *See United States v. Ocampo*, 402 F. App'x 90, 95–96 (6th Cir. 2010) (quoting *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). In any event, Petitioner's claim that Officer Bringedahl violated the Fourth Amendment by searching the phone is simply speculative, and in light of the overwhelming circumstantial evidence of Petitioner's guilt, testimony regarding what Officer Bringedahl observed on the phone screen was not prejudicial to Petitioner's defense. Petitioner, therefore, is not entitled to relief with respect to this claim of prosecutorial and police misconduct.

### 4.    False Testimony

Throughout his § 2254 petition, Petitioner faults the prosecutor for presenting false testimony. Petitioner has made a point of going line by line and page by page through the

preliminary examination and trial transcripts and detailing every little bit of testimony that he believes is false. For example, Petitioner contends that Sarah Grandinette gave false testimony regarding the nature of his relationship with the victim. (Pet., ECF No. 1, PageID.162–163.) He avers that DeYoung's testimony is belied by video evidence. (*Id.*, PageID.163–166.) Petitioner suggests that Officer Dill lied when he testified that Petitioner stepped outside with another officer before the house was cleared. (*Id.*, PageID.167.) Petitioner argues that much of Officer Bringedahl's testimony was false, including testimony regarding Petitioner's Facebook posts and how they appeared to be referencing an intent to commit murder instead of suicide. (*Id.*, PageID.170–177.) Petitioner continues in this manner, poring over each line and page of prosecution testimony and asserting that much of it is false. (*Id.*, PageID.177–215, 233–245.) Essentially, Petitioner takes issue with almost all the testimony given by the prosecution's witnesses.

The Fourteenth Amendment's right to due process prohibits a state from knowingly and deliberately using perjured evidence to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 260 (1959). The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Presentation of perjured testimony, without more, however, does not rise to the level of a constitutional violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983). Rather,

> [t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).

Despite all of Petitioner's assertions that the prosecutor presented false testimony, Petitioner has failed to provide any support for his claim that such testimony was false, and that the prosecution knew it was false. Petitioner points out inconsistencies in the testimony, but such inconsistencies do not establish that the prosecution knowingly used false testimony. *Id.* At best, Petitioner's assertions that the prosecution witnesses presented false testimony is supported only by the testimony that Petitioner gave. However, by finding Petitioner guilty of first-degree murder, the jury presumably concluded that Petitioner's testimony was much less credible than the testimony and other evidence presented by the prosecution. Such a credibility determination is a factual determination that this Court must presume to be correct. *See Wesson v. Shoop*, 17 F.4th 700, 705 (6th Cir. 2021) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 339–40 (2003); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Petitioner can overcome that presumption with clear and convincing evidence. He offers nothing.

In sum, Petitioner has failed to demonstrate that the court of appeals' rejection of this assertion of prosecutorial misconduct is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to habeas relief with respect to this claim.

### 5.    Misstatement of Evidence During Closing Arguments

Petitioner also faults the prosecutor for misstating the evidence during closing arguments. For example, Petitioner references the prosecutor's statement that Petitioner stuck his hand in the victim's trachea, when Petitioner testified that he stuck his finger over the incision. (Pet., ECF No. 1, PageID.249.) Petitioner also contends that the prosecution referenced the victim having four cuts to her neck when the autopsy report documented six cuts. (*Id.*, PageID.260.)

Petitioner, however, has not demonstrated that any misstatements by the prosecutor induced the jury "to trust the Government's judgment rather than its own view of the evidence." *See Young*, 470 U.S. at 18–19. It does not appear that the prosecutor deliberately mischaracterized the evidence. Furthermore, the trial court instructed the jury to consider only the evidence admitted during trial, and that counsel's closing arguments did not constitute evidence. (Trial Tr. IV, ECF No. 12-10, PageID.2459.) A jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has not demonstrated that any misstatements by the prosecutor during closing arguments "so infected the trial with unfairness" that Petitioner was denied due process. Accordingly, he is not entitled to relief with respect to this assertion of prosecutorial misconduct.

### 6.    Vouching

Next, Petitioner contends that the prosecution improperly vouched for the credibility of several witnesses during closing arguments. Specifically, Petitioner avers that the prosecutor vouched for the credibility of DeYoung's testimony. (Pet., ECF No. 1, PageID.246.) Petitioner also faults the prosecutor for "giving his personal opinion that [Petitioner's] emotion . . . [was] faked and based on a lie." (*Id.*, PageID.247.) Petitioner further claims that the prosecutor vouched for the credibility of other witnesses, including Officer Bringedahl, the 911 operator, and Detective Luker. (*Id.*, PageID.250–269.)

The Sixth Circuit has identified two types of objectionable vouching. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). *But see Wogenstahl*, 668 F.3d at 328–29 (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster his or her credibility. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994). The second type, also known as

bolstering, occurs when the prosecutor invites the jury to believe there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

Moreover, a prosecutor may not "offer [his or her] opinions as to credibility of a witness or the guilt of a defendant." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). As the Supreme Court has noted:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18–19 (1985). However, not every reference to the credibility of a witness is objectionable vouching. "[A] prosecutor may ask the jury to draw reasonable inferences of credibility from the evidence presented." *Willoughby v. White*, 786 F. App'x 506, 513 (6th Cir. 2019). Furthermore, where the prosecutor's attack on a defendant's credibility is based on the evidence presented in court, the attack is not improper. A prosecutor may assert that a defendant is lying during closing argument when emphasizing discrepancies between the evidence and a defendant's testimony. *See United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994). Such comments, however, must "reflect reasonable inferences from the evidence adduced at trial." *See id.* (quoting *United States v. Goodapple*, 958 F.2d 1402, 1409–10 (7th Cir. 1992)).

Upon review of the record, the Court concludes that where the prosecutor referred to Petitioner as a liar during closing arguments, the prosecutor tied his arguments to the evidence offered at trial or reasonable inferences from that evidence. Petitioner does not point to any part of

the prosecutor's argument that suggests that the prosecutor invited the jurors to accept the characterization of Petitioner as a liar simply because the prosecutor believed that to be the case. Moreover, the prosecutor did not invite the jury to believe there was other evidence justifying the prosecutor's belief in Petitioner's guilt. Furthermore, at no time did the prosecutor place the prestige of the government behind the other witnesses to bolster their credibility. The Court also notes that the trial court instructed the jury to consider only the evidence admitted during trial, and that counsel's closing arguments did not constitute evidence (Trial Tr. IV, ECF No. 12-10, PageID.2459), and the jury presumably followed that instruction. *See Weeks*, 528 U.S. at 234. Petitioner has not demonstrated that the remarks made by the prosecutor during closing arguments "so infected the trial with unfairness" that Petitioner was denied due process. Petitioner, therefore, is not entitled to relief with respect to this assertion of prosecutorial misconduct.

### 7.    Showing Photograph During Jury Selection

Finally, Petitioner faults the prosecutor for showing a photograph of the victim's bruised face and cut neck during jury selection. However, the Court's review of the transcript from *voir dire* indicates that at no time did the prosecutor show any photographs to the potential jurors. The court and counsel referenced the fact that the jury may view gruesome photographs if they were entered into evidence, but the record simply does not support Petitioner's claim that such photographs were displayed during *voir dire*. Accordingly, Petitioner is not entitled to relief with respect to this prosecutorial misconduct claim.

### E.    Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel rendered ineffective assistance in numerous ways. As noted above, Petitioner faults counsel for: (1) failing to object to the admission of a Facebook post purportedly authored by Petitioner where the post was not properly authenticated; (2) failing to move for the suppression of statements Petitioner made to law enforcement and to have the police

43

cruiser video admitted into evidence; (3) failing to investigate forensic evidence; (4) failing to call numerous witnesses in support of Petitioner's defense; (5) failing to investigate and challenge errors in the medical examiner's report; and (6) failing to present an effective closing argument.

### 8.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per

44

*Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised the ineffective assistance of counsel claims noted above on direct appeal, and the court of appeals addressed them under the following standard:

> "To establish ineffective assistance of counsel, the defendant must first show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Toma*, 462 Mich. 281, 302–303; 613 N.W.2d 694 (2000).

*Salyers*, 2019 WL 3000916, at *3. Although the court of appeals cited state court authority for the standard, the standard applied is identical to *Strickland*. Moreover, in *Toma*, the supreme court identified *Strickland* as the source of the standard. *Toma*, 613 N.W.2d at 703. Thus, there is no question that the court of appeals applied the correct standard.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly

be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard Petitioner can only overcome the deference afforded state court decisions if the determinations regarding Petitioner's ineffective assistance claims are unreasonable applications of *Strickland* or if the state court's resolutions were based on unreasonable determinations of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider whether the court of appeals reasonably applied the standard for each of Petitioner's claims of ineffective assistance of counsel.

### 1.    Failing to Object to Admission of Facebook Post

First, Petitioner faults counsel for not objecting to Officer Bringedahl's testimony regarding the Facebook post he observed on Doug Carlson's phone. According to Petitioner, counsel should have objected on the basis that Officer Bringedahl's testimony regarding the post was inadmissible hearsay and that only Carlson would have been able to authenticate the post. (ECF No. 1, PageID.45.)

During trial, Officer Bringedahl testified that while he was securing the perimeter of the crime scene, he was approached by Doug Carlson. (Trial Tr. III, ECF No. 12-8, PageID.2141.) Carlson provided his cell phone and "specifically pointed out a [F]acebook post with the name Josh Salyers approximately six hours earlier." (*Id.*) The post said "one cut, two cut, three cut, four. What I have in my mind will ease this pain for real." (*Id.*, PageID.2142.) A "sub post" from Petitioner's account stated, "you know how I feel about her Doug Carlson." (*Id.*, PageID.2142–2143.) Officer Bringedahl testified that he took a picture of the post, and the photograph that he took was admitted into evidence. (*Id.*, PageID.2142.)

Doug Carlson, the victim's neighbor and "good friend," also testified at trial. (Trial Tr. IV, ECF No. 12-9, PageID.2306.) Carlson testified that he and Petitioner regularly conversed on Facebook. (*Id.*, PageID.2308.) Carlson testified that on September 4, 2017, he saw a Facebook post on Petitioner's account. (*Id.*, PageID.2308–2309.) Carlson stated:

> It was about 2:00 in the afternoon and I [saw] a post that he made that I thought it was more of a suicidal type of thing. So I commented back. I was like stop being so self-loathing. The world's going to move on. And then he commented back Doug you know how I feel about her; I'm in love. And I was like, you know, be a man, stand tall and have some pride and move on from it.

(*Id.*, PageID.2309.) Carlson testified that the post in question read: "One cut, two cut, three cut, four. This is how I gotta end my day." (*Id.*) When shown the photograph that had been admitted during Officer Bringedahl's testimony, Carlson noted that the photograph showed the post that had been on his phone and that he was showing the post to Officer Bringedahl. (*Id.*) He read the post for the jury, confirming that it stated "One cut, two cuts, three cuts, four. What I have in my mind will ease this pain for real." (*Id.*, PageID.2310.) Carlson noted that nowhere in the post did Petitioner reference himself. (*Id.*) Petitioner himself testified and admitted to making the Facebook post. (*Id.*, PageID.2379–2380.) He stated that he was referring to himself and not the victim. (*Id.*, PageID.2381–2382.)

The court of appeals rejected Petitioner's ineffective assistance claim on direct appeal, stating:

> We agree that evidence must be authenticated. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). An example of "authentication or identification conforming with the requirements of" MRE 901 is "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1). We also agree that the admissibility of hearsay is constrained. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay evidence is not admissible at trial unless within an established exception." *People v. Meeboer*, 439 Mich. 310, 322; 484 N.W.2d 621 (1992); MRE 802. "A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . offered against a party and is . . . the party's own statement . . . ." MRE 801(d)(1), (2)(a). However, since [Petitioner] himself admitted making the Facebook post and receiving the subsequent response from Carlson, it is of no consequence whether Carlson authenticated the post prior to Officer Bringedahl's testimony or not. Because both Carlson and [Petitioner] later authenticated the post, there was no prejudice to [Petitioner]. Additionally, had an objection been made on hearsay grounds, the prosecutor could have argued that the officer's testimony went not to the truth or meaning of the post but to providing a context for his later investigations and interrogations in this case. The statement's impact was not[,] as the Standard 4 Brief argues, amplified because it was first heard from the mouth of an officer. The jury was instructed that it was to examine a police officer's testimony just as it would any other witness's, and "[i]t is well established that jurors are presumed to follow their instructions." *People v. Graves*, 458 Mich. 476, 486; 581 N.W.2d 229 (1998).
>
> [Petitioner] also argues that trial counsel should have objected to Officer Bringedahl's testimony on grounds that the officer's conversation with Carlson was inadmissible hearsay. [Petitioner] cannot demonstrate ineffective assistance of counsel on these grounds or that but for counsel's failure to object, the outcome of his trial would have been different, because substantially the same information was testified to later at trial by Carlson and [Petitioner].

*Salyers*, 2019 WL 3000916, at *3.

Here, Petitioner merely relies upon the arguments he raised before the court of appeals—arguments that have already been rejected—to support his ineffective assistance claim. Even if counsel had successfully objected to Officer Bringedahl's testimony about the Facebook post and his authentication of the photograph, the fact remains that both Carlson and Petitioner testified

about the Facebook post and provided similar information as that testified to by Officer Bringedahl. Petitioner, therefore, has not demonstrated any prejudice from counsel's failure to object. Because Petitioner fails to show that the court of appeals' rejection of his claim is contrary to, or an unreasonable application of, *Strickland*, Petitioner is not entitled to relief with respect to this claim of ineffective assistance of counsel.

### 2.   Failing to Move for Suppression of Statements

Petitioner next faults counsel for not "subject[ing] the State's case to deny suppression to meaningful adversarial testing." (Pet., ECF No. 1, PageID.25.) According to Petitioner, the statements he made to law enforcement should have been suppressed because he was "very emotional and unable to follow questioning well." (*Id.*) Petitioner argues that "[i]nstead of doing his job properly, [trial counsel] told [Petitioner] to just tell the court that [he did] not remember." (*Id.*, PageID.27.)

The record reflects that Petitioner's counsel filed a motion to suppress Petitioner's statements to law enforcement based upon the argument that "there was police misconduct in the sense that they took advantage of the emotional distraughtness [sic] of [Petitioner] and he didn't really recognize a lot of what the police were saying and did a lot of things where he was just overwhelmed." (ECF No. 12-4, PageID.1842.) The trial court held an evidentiary hearing on September 5, 2017, at which Petitioner and Detective Luker testified. (ECF No. 12-5.) Petitioner testified that he "vaguely" recalled talking to police at the station and that he did not recall being read his rights. (*Id.*, PageID.1852–1853.) Petitioner indicated that during the interview, he "was not understanding and [he] was distraught" for "[his] girl." (*Id.*, PageID.1854.) Petitioner did not recall writing a statement or letter but realized that he wrote it after seeing it included in his discovery packet. (*Id.*, PageID.1854–1855.) When asked if "anybody put any pressure" on him during the interview, Petitioner responded:

I'm not gonna say they put a lot of pressure towards me but like they came at me and said well this is what it looks like, this is what it looks like and I kept telling them you know they would get it but they would figure it out. And they mentioned something about it could have been a suicide, they don't know, that's why they're talking to me.

(*Id.*, PageID.1855.) Petitioner did "not really" follow any of the questions he was asked, and he cried during the interview. (*Id.*) Throughout his testimony, Petitioner repeatedly responded that he did not recall or did not remember talking to the detectives about what had happened.

Detective Luker testified that he observed Detective Stratton read Petitioner his *Miranda* rights, and that Petitioner did not invoke those rights at any point. (*Id.*, PageID.1876–1877.) Detective Luker observed that during the interview, Petitioner was "fairly normal" and "fairly calm at most points." (*Id.*, PageID.1878.) He noted that there were times that Petitioner "acted as if he were crying." (*Id.*) Detective Luker did not recall seeing tears. (*Id.*) During the interview, Petitioner "gave [officers] a version of events that he said happened at first and then later changed that to something else." (*Id.*, PageID.1879.) Detective Luker testified that Petitioner "fluctuat[ed] between being fairly calm and going into these situations where he would . . . seem as if he were crying or trying to cry." (*Id.*) He denied that Petitioner seemed "emotionally distraught" during the interview. (*Id.*, PageID.1883.)

At the conclusion of the hearing, the trial court orally denied the motion to suppress. (*Id.*, PageID.1892.) The trial court believed Detective Luker's testimony over Petitioner's regarding the administration of *Miranda*[5] rights. (*Id.*) The court found "no evidence that the police did anything wrong here." (*Id.*, PageID.1893.) Instead, the court noted, Petitioner himself admitted that he did not remember a lot from the incident date, and that "lack of memory doesn't necessarily portend legal merit in the claims that he's asserting." (*Id.*, PageID.1892.)

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Petitioner raised his ineffective assistance claim on direct appeal, and the court of appeals

rejected it, stating:

> [Petitioner] next argues that trial counsel was ineffective for not suppressing statements [Petitioner] made to Officers Smith and Anderson, and for not moving to have the police cruiser video admitted into evidence. "Whether a statement was voluntary is determined by examining police conduct, but the determination whether it was made knowingly and intelligently depends, in part, on the defendant's capacity." *People v. Tierney*, 266 Mich. App. 687, 707; 703 N.W.2d 204 (2005). At the hearing, [Petitioner] testified that he did not feel like the officers put a lot of pressure on him to provide a statement. [Petitioner's] claim was rather one of not being able to remember. Absent any evidence of police misconduct in obtaining [Petitioner's] statement or that [Petitioner] was impaired, admission of the video would not have changed the outcome of the motion.

*Salyers*, 2019 WL 3000916, at *4.

In his § 2254 petition, Petitioner avers that the court of appeals misread his claim. He states

that he was not seeking suppression of statements made to Officers Anderson and Smith; instead,

he wanted counsel to call them as witnesses at the suppression hearing. (Pet., ECF No 1,

PageID.26.) According to Petitioner, these officers could have testified as to Petitioner's state of

mind. (*Id.*) He also argues that video from the police cruiser he was transported to the station in

could have supported argument that he was emotionally distraught. (*Id.*)

Petitioner, however, fails to provide any evidence to support his self-serving statement that

Officers Anderson and Smith would have testified in his favor. He provides no factual support

regarding the testimony he believes they would have provided regarding his state of mind.

Likewise, Petitioner fails to detail what the video would have shown. "A defendant cannot simply

state that the testimony would have been favorable; self-serving speculation will not sustain an

ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote

omitted); *see also Clark v. Waller*, 490 F.3d 551, 558 (6th Cir. 2007) (rejecting an ineffective

assistance claim for the petitioner's failure to provide a "basis on which to conclude that failure to

call a possibly favorable witness amounts to constitutionally deficient performance").

Even if Officers Anderson and Smith had testified that Petitioner was emotional during the transport to the police station, and even if the video had shown such emotion from Petitioner, that would not have automatically led to a conclusion that Petitioner's statements were the result of police misconduct, especially given Detective Luker's testimony that Petitioner's behavior fluctuated throughout the interview. Quite simply, Petitioner offers no evidence, much less clear and convincing evidence, to overcome the presumption of correctness afforded to the state courts' conclusions that there was no evidence that Petitioner was impaired or that the police committed misconduct to obtain his statement. Because Petitioner fails to show that the court of appeals' factual determinations were unreasonable or that the court of appeals' rejection of his claim is an unreasonable application of *Strickland,* he is not entitled to relief with respect to this claim of ineffective assistance.

### 3.    Failing to Investigate Forensic Evidence

Next, Petitioner faults trial counsel for not investigating the forensic evidence collected by law enforcement. In his petition, Petitioner states that trial counsel told him that the butcher knife that had been found in the sink had been destroyed and "in its place a small steak knife that tested positive for human blood was preserved as evidence." (Pet., ECF No. 1, PageID.32.) Petitioner asserts that he asked counsel to have forensic evidence tested for blood spatter and fingerprints, arguing that neither his nor the victim's prints were on the knife. (*Id.*, PageID.33.) According to Petitioner, trial counsel told him that "the court would not provide the funds to do that and he couldn't afford it either." (*Id.*)

In his Standard 4 brief, Petitioner faulted counsel for "us[ing] blind acceptance of the State's forensic evidence" and failing to investigate it. (ECF No. 12-15, PageID.2873.) Petitioner suggested that counsel should have investigated the fingerprints, pubic hair, and other items

removed from the scene. (*Id.*) According to Petitioner, his fingerprints would not have been on the knife the State claimed was used. (*Id.*) The court of appeals rejected Petitioner's claim, stating:

> [Petitioner] also argues that trial counsel was ineffective for failing to investigate forensic evidence such as pubic hair, materials removed from the crime scene, and the fingerprints lifted from crime scene surfaces and materials. "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v. Russell*, 297 Mich. App. 707, 716; 825 N.W.2d 623 (2012) (quotation marks, brackets, and citation omitted). Because [Petitioner] does not dispute that only he and Barbara were present at the Jiroch address during the cutting incidents, the failure to test certain pieces of forensic evidence did not undermine confidence in the trial's outcome.

*Salyers*, 2019 WL 3000916, at \*4.

The Court recognizes that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Certainly, "attorneys can always do more in preparation for a trial." *Mason v. Mitchell*, 320 F.3d 604, 618 (6th Cir. 2003). However, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). In short, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

At trial, Officer Dill testified that he took custody of a "[b]lack handled kitchen knife, like a steak knife," from the state police crime lab personnel. (Trial Tr. II, ECF No. 12-7, PageID.2102–2103.) He had been told that the knife was found in the sink but did not see any blood on the knife. (*Id.*, PageID.2103.) Officer Dill also collected "three bloody shirts." (*Id.*, PageID.2104.) Officer Bringedahl testified that he went into the kitchen to look for knives with blood on them. (Trial Tr. III, ECF No. 12-8, PageID.2140.) He saw the black knife in the sink but did not seize it at that point because there was no blood on the knife. (*Id.*) Officer Bringedahl did testify, however, that

Petitioner "was the only person that was on scene. There was nobody else in the house." (*Id.*, PageID.2154.) Furthermore, Detective Luker testified that during the interview with Petitioner, Petitioner stated that he had wiped off the knife and put it in the sink. (*Id.* PageID.2203.) Petitioner said that "he wanted to wipe [the victim's] fingerprints off of the knife because he didn't want anyone to think that she was the type of person that would take her own life." (*Id.*) Detective Luker did testify that fingerprints are not aways ascertainable, and that it is "less often" than not that fingerprints can be obtained. (*Id.*, PageID.2215.) He stated that in a case where a suspect avers that he wiped the knife off, it would be a "[w]aste of time and taxpayer dollars" to even send the knife to a lab for fingerprint analysis. (*Id.*, PageID.2229.) Although Petitioner testified that he did not wipe the knife off, he also did not deny stating that he had done so during his interview with law enforcement. (Trial Tr. IV, ECF No. 12-9, PageID.2362.)

Petitioner fails to provide any explanation as to why counsel should have investigated forensic evidence such as pubic hair and blood splatter and how an investigation into such would have been beneficial to his defense. Moreover, Petitioner fails to suggest how any investigation by counsel into fingerprint evidence would have changed the trial's outcome. Given the testimony that suggested Petitioner had wiped off the knife, it is more likely than not that any fingerprint testing would have been inconclusive. A lack of Petitioner's fingerprints on the knife seized would not have led to an automatic conclusion that Petitioner did not murder the victim. Where "one is left with pure speculation on whether the outcome of the trial . . . could have been any different," prejudice has not been established. *See Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).

In sum, Petitioner fails to present any evidence to overcome the presumption that the court of appeals' factual conclusions are correct. Accordingly, because he fails to demonstrate that the

court of appeals' rejection of his claim is contrary to, or an unreasonable application of, *Strickland*, he is not entitled to relief with respect to this claim of ineffective assistance.

### 4.        Failing to Call Witnesses

Next, Petitioner faults trial counsel for failing to call numerous witnesses in his defense. Petitioner mentions that counsel should have called two individuals—Stephanie Ann and her mother, Connie—to testify that the Facebook post discussed *supra* "was NOT about murder, it was about [Petitioner] thinking about cutting [his] wrists." (Pet., ECF No. 1, PageID.86.) Petitioner also asserts that counsel should have called numerous witnesses who could have testified that Petitioner "was, in fact, in M-pod from 6-28-17 to trial and that the inmate log does not always show accurately where a person is moved to until it later gets realized." (*Id.*, PageID.134.) According to Petitioner, such testimony would have refuted Deputy Neel's testimony that Petitioner "threatened and 'confessed' to" inmate Eric Emory. (*Id.*)

In his Standard 4 brief, Petitioner presented a list of 14 individuals who he believes counsel should have called as witnesses. (ECF No. 12-15, PageID.2870–2872.) For example, Petitioner suggested that Emory could have testified that Petitioner never confessed to killing the victim and instead told Emory that he "was only trying to prevent a suicide." (*Id.*, PageID.2870.) Petitioner also asserted that his parents and others could have served as character witnesses, testifying that Petitioner has never been violent towards women. (*Id.*, PageID.2871–2872.)

The court of appeals summarily rejected Petitioner's claim, stating:

[Petitioner] first argues that trial counsel was ineffective for failing to call 14 witnesses in his defense. "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v. Dixon*, 263 Mich. App. 393, 398; 688 N.W.2d 308 (2004). "A defense is substantial if it might have made a difference in the outcome of the trial." *People v. Hyland*, 212 Mich. App. 701, 710; 538 N.W.2d 465 (1995), *vacated in part on other grounds by* 453 Mich. 902; 554 N.W.2d 899 (1996). [Petitioner] presents a synopsis[] or offer of proof as to what he believes each person would testify to,

however without an affidavit from each of these individuals, [Petitioner's] assertion that their testimony would have been favorable is speculative.

*Salyers*, 2019 WL 3000916, at *4.

Petitioner fails to offer any evidence, much less clear and convincing evidence, to overcome the presumption that the court of appeals' factual determinations are correct. Petitioner's speculative claim does not entitle him to habeas relief because, notably, he fails to indicate that any of these suggested witnesses would have been available to testify at trial and that they would have testified in the myriad ways suggested by Petitioner. Again, as noted above, Petitioner "cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Ashimi*, 932 F.2d at 650 (footnote omitted); *see also Clark*, 490 F.3d at 558.

Furthermore, although Petitioner suggests that certain individuals could have testified that Petitioner's Facebook post was referring to suicide, such testimony would have been cumulative of Petitioner's own testimony. The Supreme Court has held that counsel cannot be ineffective if the evidence that counsel failed to offer "can reasonably be expected to be only cumulative." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). Moreover, with respect to the use of character evidence, the Sixth Circuit has noted that "something . . . is not always better than nothing given the risk that every positive argument by a defendant potentially opens the door to a more-harmful response." *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005). Had Petitioner presented character witnesses to support his assertion that he was not violent towards women, the prosecution could have explored instances of Petitioner's prior conduct pursuant to Michigan Rule of Evidence 405. *See* Mich. R. Evid. 405 (setting forth methods of proving character). Furthermore, testimony by individuals that Petitioner did not engage in violence prior to the incident at issue does not equate to definitive proof that Petitioner did not murder the victim in this case.

For the reasons stated above, Petitioner has failed to demonstrate that the court of appeals' rejection of this ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to habeas relief with respect to this claim.

### 5.    Failing to Investigate and Challenge Medical Examiner's Report

Petitioner next faults trial counsel for failing to investigate and challenge alleged errors in the medical examiner's report prepared after the victim's autopsy. The court of appeals summarily rejected Petitioner's argument, stating: "[Petitioner] also argues that there were errors in the medical examiner's report that trial counsel failed to investigate. However, he neither appended the report nor provided any explanation of the errors therein. This argument is, therefore[,] abandoned." *Salyers*, 2019 WL 3000916, at *4.

Petitioner rectified this omission by including a copy of the report with his motion for relief from judgment. Petitioner has annotated the report with handwritten notes pointing out what he believes are errors in the medical examiner's investigation. For example, Petitioner notes that the medical examiner erroneously stated that the victim had brown hair and weighed 134 pounds. (ECF No. 12-13, PageID.2676.) Petitioner wrote that the victim was a blonde with dyed purple hair, and that she weighed 110.79 pounds. (*Id.*) Petitioner also noted that the medical examiner omitted the fact that the victim had two burn scars from a cigar on her chest, and that she had self-inflicted scars on her neck, underarms, and inner thighs. (*Id.*, PageID.2677.) Petitioner added other notes, many of which are not legible. He also faults the medical examiner for not performing a full autopsy because the spinal cord was not examined. (*Id.*, PageID.2683.)

In his habeas petition, Petitioner faults trial counsel for not investigating and challenging the alleged errors and omissions. (Pet., ECF No. 1, PageID.28.) According to Petitioner, counsel should have challenged the fact that the report omitted information concerning the victim's self-inflicted scars, the fact that there were six incisions and not just four, and that "the contusion/blunt

force trauma she had was not due to being beat and was not a factor that caused death." (*Id.*) Petitioner suggests that counsel should have called an expert for the defense to rebut the medical examiner's testimony but instead "allowed [the victim] to be cremated before a[n] independent expert could be had." (*Id.*, PageID.61.) Petitioner avers that counsel should have used the report to impeach the medical examiner's testimony as well. (*Id.*, PageID.64.)

Petitioner, however, has not demonstrated that trial counsel was ineffective with respect to the handling of the autopsy report and the medical examiner's testimony. As an initial matter, Petitioner's own exhibits indicate that Petitioner and counsel "went over in detail the postmortem examination report for the victim . . . . There was little in there that [they] could find as helpful." (ECF No. 1-1, PageID.399.) Furthermore, contrary to Petitioner's assertion, the report detailed "at least four open incised wounds to the neck." (ECF No. 12-13, PageID.2677–2678.) In any event, the alleged errors that Petitioner points out are red herrings—they have no bearing on the ultimate conclusion that the victim died "as a result of multiple blunt and sharp force injuries." (*Id.*, PageID.2674.) Petitioner, therefore, cannot establish prejudice from counsel's failure to explore these alleged discrepancies during his cross-examination of the medical examiner.

With respect to Petitioner's assertion that counsel should have hired a defense expert, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert for the defense." *Harrington*, 562 U.S. at 111. As noted by the Sixth Circuit, "the Supreme Court has held that '[i]n many instances *cross-examination will be sufficient* to expose defects in an expert's presentation.'" *Jackson v. McQuiggin*, 553 F. App'x 575, 582 (6th Cir. 2014) (quoting *Harrington*, 562 U.S. at 111). The record reflects that trial counsel cross-examined the medical examiner regarding "[s]uicide and/or somebody wrestling with the deceased over a knife." (Trial Tr. III, ECF No. 12-9, PageID.2287.)

During cross-examination, the medical examiner admitted that she did not know "the implement that was used" to make the cuts. (*Id.*, PageID.2288-2289.) She also noted that a butcher knife could make an incised wound, but that a cut across the neck would not usually be a blunt wound. (*Id.*, PageID.2289.) Counsel also asked the medical examiner if it would be possible for the wounds to be caused by Petitioner and the victim wrestling with the knife. (*Id.*, PageID.2292.) The medical examiner responded that she "ha[d] a hard time seeing how that would happen," and that it was "unlikely given that there were at least four wounds." (*Id.*) She emphasized that it could be possible if there was a single wound, but not with at least four wounds. (*Id.*, PageID.2293.) Although this response was not helpful to Petitioner's defense, the record reflects that counsel thoroughly cross-examined the medical examiner in line with Petitioner's defense, which is that he wrestled with the victim to try to get the knife away from her before she could commit suicide. Given this focus, counsel's decision to not present a counter-expert was a reasonable trial strategy. *See Tinsley*, 399 F.3d at 806.

In sum, Petitioner fails to demonstrate that counsel was ineffective with respect to his handling of the medical report and the medical examiner's testimony. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel's pursuit of it was professionally unreasonable. Petitioner, therefore, is not entitled to habeas relief with respect to this assertion of ineffective assistance.

### 6.    Failing to Present Effective Closing Argument

Finally, Petitioner faults counsel for not presenting an effective closing argument. Petitioner suggests that counsel improperly "[gave] expert testimony about how one kills themselves." (Pet., ECF No. 1, PageID.136.) He asserts that counsel's closing argument "was absolutely unhelpful, unreliable, and was extremely prejudicial." (*Id.*, PageID.137.)

On direct appeal, Petitioner took issue with the following statements made by counsel during closing arguments:

> How do you kill yourself? You kill yourself by cutting your wrists. One, two, three, four. Not you know, kill yourself by cutting your throat four times. That's, you know that's not possible. The only way your throat gets cut is if you're fighting somebody and you're going up and down. He's trying to grab it. He made some mistakes when he grabbed the knife, the way he fought her.

(Trial Tr. V, ECF No. 12-10, PageID.2444.) According to Petitioner, counsel "just open[ly] and blatantly insinuated that [Petitioner] murdered [the victim] by making that statement. (ECF No. 12-15, PageID.2875.) The court of appeals rejected this claim of ineffective assistance, stating:

> [Petitioner] last argues that trial counsel was ineffective in his closing statement to the jury. Trial counsel clearly argued [Petitioner's] theory of the case, which was consistently that Barbara sustained the last cuts on her neck by wrestling with [Petitioner]. The fact that this strategy was not successful did not render counsel ineffective. See *People v. Kevorkian*, 248 Mich. App. 373, 414–415; 639 N.W.2d 291 (2001) ("That the strategy Gorosh chose ultimately failed does not constitute ineffective assistance of counsel.").

*Salyers*, 2019 WL 3000916, at *4.

In his § 2254 petition, Petitioner merely reiterates the arguments that he raised on direct appeal and that have already been rejected by the court of appeals. A review of the trial transcript indicates that during closing arguments, counsel made the statements set forth above when arguing that Petitioner had no reason to commit the murder and that there was no evidence of premeditation. Throughout his proceedings, Petitioner consistently maintained that the victim held the knife to her throat and threatened to kill herself, and that the knife slit her throat when he wrestled with her to get the knife away from her. Counsel's statements reiterated that theory and did not insinuate that Petitioner committed the murder. Moreover, the trial court instructed the jury that arguments presented by counsel are not evidence (Trial Tr. V, ECF No. 12-10, PageID.2459), and "[a] jury is presumed to follow its instructions." *Weeks*, 528 U.S. at 234. Petitioner has not demonstrated that the court of appeals' rejection of this claim of ineffective assistance is contrary

to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to this claim.

In sum, Petitioner has not demonstrated that trial counsel was ineffective in any of the ways discussed above, and therefore has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claims is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to this habeas ground.

### F. All Other Claims

At certain points throughout his petition, Petitioner appears to suggest that this Court has already suggested that he is innocent and entitled to release because of a civil rights action Petitioner previously filed. In 2018, Petitioner filed a civil rights suit pursuant to 42 U.S.C. § 1983 against the prosecutor, his trial attorney, the trial judge, the deputy medical examiner, the law enforcement officers, and other trial witnesses involved in his criminal proceedings. *See Salyers v. Medena*, No. 1:18-cv-1371, 2019 WL 168475, at *1 (W.D. Mich. Jan. 11, 2019). Petitioner's complaint "detail[ed] the many errors he claim[ed] were made during the investigation and prosecution of the offense on which he was convicted and remains incarcerated." *Id.* The Court dismissed Petitioner's complaint for failure to state a claim, noting: (1) Petitioner's challenges to the fact or duration of his incarceration were not cognizable under § 1983 and instead needed to be brought as a petition for habeas corpus; and (2) Petitioner's claims for injunctive, declaratory, and monetary relief were barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Salyers*, 2019 WL 168475, at *2–3. At no point did the Court suggest that Petitioner was innocent and entitled to release. Instead, the Court advised Petitioner that he could not seek injunctive, declaratory, and monetary relief until his criminal conviction has been invalidated. *Id.* at *2. Thus, Petitioner's reliance on the outcome of his prior civil rights suit to support his claims for habeas relief is clearly misplaced.

61

As noted above, although the claims discussed *supra* are the claims that Petitioner exhausted before the state courts, Petitioner raises numerous subclaims, including an almost moment-by-moment review of the trial transcripts and the constitutional wrongs he believes he suffered throughout the trial. The Court has spent a great deal of time examining the record and Petitioner's grounds for relief and is satisfied that no errors rising to the level of constitutional violations occurred during Petitioner's criminal proceedings. Accordingly, Petitioner is not entitled to habeas relief on any of the numerous claims he asserts.

## V.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 327. In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:  ____March 12, 2024____                    __/s/ Paul L. Maloney_____
                                                                  Paul L. Maloney
                                                                  United States District Judge